Ibq6tay1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                              17 Cr. 390 (ALC)

5   DAVID TAYLOR,
                    Defendant.              Trial
6
    ------------------------------x
7
                                           New York, N.Y.
8                                          November 26  , 2018
                                           9:30 a.m.
9

10  Before:

11
                    HON. ANDREW L. CARTER, JR.,
12
                                           District Judge
13
                            APPEARANCES
14
    GEOFFREY S. BERMAN
15      United States Attorney for the
        Southern District of New York
16  BY:  KIERSTEN A. FLETCHER
         JUSTIN V. RODRIGUEZ
17       NICOLAS T. ROOS
         Assistant United States Attorneys
18
    CHARLES F. CARNESI
19      Attorney for Defendant

20  Also Present:

21  Matthew Del Rosario, Special Agent DEA
    Rosanna Corrado, Paralegal Specialist
22

23

24

25

Ibq6tay1

1          (In open court)

2          THE COURT:  Please be seated 10:10 a.m.

3          THE DEPUTY CLERK:  Counsel, please state your

4   appearance for the record.

5          MS. FLETCHER:  Kiersten Fletcher, Justin Rodriguez and

6   Nicolas Roos for the government.

7          THE DEPUTY CLERK:  For defendant.

8          MR. CARNESI:  Good morning, your Honor.  Charles

9   Carnesi for David Taylor.  Judge, my apologies for the delay

10  this morning.

11         THE COURT:  Good morning.

12         Let's do a couple housekeeping matters and then we'll

13  get on it with jury selection.  First, let me make sure there

14  is no update from the last time we were here regarding any plea

15  offer.

16         Has any plea offer been extended by the government

17         MS. FLETCHER:  No, your Honor.

18         THE COURT:  Has any plea offer been requested by the

19  defense?

20         MR. CARNESI:  No, your Honor.

21         THE COURT:  Has there been any Pimentel letter or

22  request for Pimentel letter in this case?

23         MS. FLETCHER:  No, your Honor.

24         MR. CARNESI:  No, your Honor.

25         THE COURT:  Mr. Taylor, have you discussed your

Ibq6tay1

1    options in terms of pleading guilty with your attorney?  Have

2    you discussed that?  I don't want to get into the details of

3    that, but have you discussed that with your attorney?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Are you satisfied with your legal

6    representation up to this point?

7              THE DEFENDANT:  Yes, I am, your Honor.

8              THE COURT:  Has your attorney in fact informed you

9    that the sentencing guidelines are advisory?  What that means

10   is although I am required to determine the guideline range that

11   applies to your case, once I make such determination I am not

12   required to sentence you within a particular guidelines range.

13             Do you understand?

14             THE DEFENDANT:  Not quite.

15             THE COURT:  Okay.  Let me just check in with the

16   government.

17             Is there a statutory minimum in this case?

18             MS. FLETCHER:  There is not, your Honor.

19             THE COURT:  Let me advise you again, Mr. Taylor or Dr.

20   Taylor, the sentencing guidelines, have you and your attorney

21   discussed the sentencing guidelines and how they might operate

22   in your case?

23             THE DEFENDANT:  No.

24             THE COURT:  Counsel, would you like an opportunity to

25   discuss the sentencing guidelines with your client?

Ibq6tay1

1    MR. CARNESI:  Yes, Judge.  I want a minute to refresh

2    the doctor's recollection.

3    THE COURT:  You may borrow my copy of the guidelines,

4    counsel, if you want for the time being.

5    MR. CARNESI:  Thank you.

6    THE COURT:  I will be back.

7    (Pause)

8    THE COURT:  So, defense counsel, did you speak to your

9    client some more about the sentencing guidelines?

10    MR. CARNESI:  Yes, I did, Judge.  So the record is

11    clear, we did not request a Pimentel letter because our

12    Pimentel letter would have mirrored the letter that we did see

13    for Vito Gallicchio.  We knew what the government's position

14    was regarding the amount of bills.  But for a few minor

15    changes, there was an enhancement in Mr. Gallicchio's Pimentel

16    because of obstruction of justice, which would not have applied

17    to the doctor; but conversely, it would be an enhancement for a

18    special skills which would have applied to the doctor.  That

19    being said the Pimentel letter was beyond the statutory maximum

20    for the crime.

21    THE COURT:  Okay.  These conversations that you had

22    with Mr. Taylor, you had these conversations before today?

23    MR. CARNESI:  Yes, Judge.  We had them quite a while.

24    THE COURT:  I what I want to make sure what Dr. Taylor

25    understands, regardless of what you may have seen in a Pimentel

Ibq6tay1

1    letter that was intended for someone else, you and your

2    attorney, have you discussed the sentencing guidelines and how

3    they might apply in your case?

4            THE DEFENDANT:  Yes.

5            THE COURT:  I want to make sure that you understand

6    that the sentencing guidelines are advisory, which means

7    although I am required to determine the guidelines range --

8    let's back up.

9            Whatever guidelines range you saw listed in a Pimentel

10   letter or that your lawyer discussed with you is simply an

11   estimate as to what the government thought or what your lawyer

12   thought the guideline range would be.

13           Do you understand?

14           THE DEFENDANT:  Yes.

15           THE COURT:  I would make the ultimate determination as

16   to what your guidelines range would be.

17           Do you understand?

18           THE DEFENDANT:  Yes, your Honor.

19           THE COURT:  Once I made that determination, I would

20   not be required to sentence you within that guidelines range.

21           Do you understand?

22           THE DEFENDANT:  Yes, your Honor.

23           THE COURT:  Meaning that I could sentence you above or

24   below the guidelines range that I determined.

25           Do you understand?

1            THE DEFENDANT:  Yes, your Honor.

2            THE COURT:  Now, I would not have the authority to

3   sentence you above or below any statutory minimum or maximum

4   term, but I would have the discretion within the statutory

5   minimum and maximum in terms of the sentence that I impose if

6   you were to plead guilty.

7            Do you understand?

8            THE DEFENDANT:  Yes.

9            THE COURT:  Have you in fact discussed that with your

10  lawyer?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Mr. Carnesi, you discussed that with your

13  client?

14           MR. CARNESI:  Yes.

15           THE COURT:  Dr. Taylor, I want to make sure that you

16  understand all of your rights before we continue with this

17  trial.  You have an absolute right to go to trial and we're

18  about to proceed to trial.

19           Let me just ask you again, Dr. Taylor, is it your

20  intention to go to trial?

21           THE DEFENDANT:  Yes, your Honor.

22           (Continued on next page)

23

24

25

Ibqntay2

1          THE COURT:  Any further questions from the government
2     on this topic?
3          MS. FLETCHER:  No, your Honor.
4          THE COURT:  OK.  Anything else from the defense on
5     this?
6          MR. CARNESI:  No, your Honor.
7          THE COURT:  OK.
8          There are a couple of outstanding motions I need to
9     give you a ruling on regarding Witness 1 and Witness 2.  You
10    probably got a sense of where I was leaning on this, but I will
11    give you my ruling on that.
12         I will not allow the government to introduce this
13    evidence regarding Witness 1 or Witness 2 on their direct case.
14    If the door gets opened, then we'll see what happens with that.
15    But I will not allow the government to introduce that evidence
16    on their direct -- well, on their case in chief.
17         If the door gets opened during the government's direct
18    case, we will obviously deal with that, and that can come in
19    during the timing of their direct case, but I am not going to
20    let the government put that on in their case in chief.
21         Let's move on to one other thing.  I have an updated
22    list from the government regarding 66 names and places that may
23    come up during the course of the trial.  I want to make sure
24    defense counsel has seen that and make sure there are no
25    additional names or places I need to tell the jury about.

Ibqntay2

1          MR. CARNESI:  Not that I am aware of, Judge.

2          THE COURT:  Counsel for the government, are there any

3   other names on that?

4          MS. FLETCHER:  No additions, your Honor.  The

5   government does have a couple of questions on the ruling your

6   Honor just announced, whenever it is convenient.

7          THE COURT:  OK.  Sure.  Let's go ahead and deal with

8   that.

9          MS. FLETCHER:  What in the Court's view would open the

10  door?  I understand your Honor to be ruling that Witness 1 and

11  Witness 2 can't testify in our case in chief, meaning if the

12  door were opened in our case in chief, we could call those

13  witness as rebuttal witnesses.

14         THE COURT:  Whatever label you want to put on them, if

15  the door gets opened, that testimony may come in perhaps,

16  depending on how the door is opened.

17         MS. FLETCHER:  OK.

18         THE COURT:  If it's opened in any way and at any time

19  from defense counsel, if the door is opened based on defense

20  counsel's opening statements, if it's opened based on defense

21  counsel's questioning of witnesses, if it's opened on any

22  testimony offered by the defense in their case in chief if they

23  were to put forward a case, we would have to wait and see.

24         MS. FLETCHER:  Understood.  Sounds like we'll be

25  discussing this at a later point.

Ibqntay2

1          THE COURT:  We may.

2          All right.  Regarding those 66 names, there are a

3     couple of pharmacies on that list.  I just want to find out

4     from the parties.  There are a couple of CVS's, a Walgreen, and

5     a Pathmark.

6          Just so I don't get a lot of hands because they

7     recognize sort of the chain, it seems to me that it may be

8     appropriate for me to say to the potential jurors, I am not

9     asking if you're familiar with Walgreens in general, but I want

10    to know if you're familiar with this particular Walgreens at

11    this particular location.

12         Let me find out what counsels' view is on that.

13         MR. RODRIGUEZ:  I think that's correct, your Honor.

14    The reason they are on the list is we anticipate there will be

15    some government exhibits which show a map with some of these

16    specific pharmacies, and they will be pharmacies where members

17    of the conspiracy had their prescriptions filled, but I think

18    your Honor's inclination is entirely correct.

19         THE COURT:  Defense counsel?

20         MR. CARNESI:  That would be our position as well,

21    Judge.

22         THE COURT:  OK.

23         In terms of scheduling, I plan to tell the jury that

24    this will take two and a half weeks.  I think that may be a

25    little longer than we may need.

Ibqntay2

1          I am not going to be available on Monday, December 3

2    so we will be off that day.  So I want to make sure counsel

3    know that so they can plan accordingly and plan the witnesses.

4    I won't be here on that day.  I will be here on all the other

5    days.

6          Regarding the number of alternate jurors, I don't

7    think we discussed this before.  Let me get a sense from

8    counsel as to what they think an appropriate number of

9    alternates would be.  It seems to me that, even though this

10   isn't anticipated to be a particularly lengthy trial, based on

11   the time of year that we're in, we are sort of in the middle of

12   cold and flu season, it may make sense to have four alternates.

13   I think we definitely need at least two.  Let me hear what

14   counsel's view is on that?

15          MS. FLETCHER:  Our inclination was two to three.  If

16   your Honor wants to have four, we would be fine with that.

17          THE COURT:  Defense counsel?

18          MR. CARNESI:  Judge, leaning on the side of caution, I

19   would request four.

20          THE COURT:  All right.  Let's try to have four

21   alternates.  Depending on how things go in jury selection, if

22   we are stuck with just three, that is fine.  I prefer four.

23   The way jury selection will work is we'll need to qualify 36

24   jurors.  That means I will ask the jurors about their

25   familiarity with these names and places.  I will ask them

Ibqntay2

1    questions that are intended to get to any challenges for cause.

2    After we've done that, I will have counsel come in the back and

3    we can discuss any challenges for cause.

4         Once that has all been resolved with those 36, for the

5    regular jurors, the government has six peremptory challenges,

6    the defense has ten.  Those 16 challenges, assuming everyone

7    uses their challenges, will take care of the first 28 jurors.

8    Then the remaining eight jurors, there will be a total of four

9    peremptory challenges.  The government has two peremptory

10   challenges, the defense has two peremptory challenges for those

11   four, so that four plus four gives us the 36.  You can go in

12   any order, but we will go with the first 12 jurors who are not

13   struck will be our jury, and then the next four will be the

14   alternates.

15        Everyone clear on where we are with that?

16        MR. CARNESI:  Yes.

17        THE COURT:  OK.  While we are talking about jury

18   selection, what I plan to do is have the majority of the jury

19   selection conducted in the courtroom.  If a juror has something

20   they want to discuss in private, then we will take the juror

21   into the robing room, and counsel may come into the robing

22   room, and we will have that discussion.

23        I guess, let me ask Defendant Taylor, give him a

24   chance to discuss this with his lawyer, how you want to proceed

25   about this.

1          No federal court to my knowledge has ruled that it's

2     structural error for a defendant to be precluded from being

3     present when the jurors are discussing private matters in the

4     robing room.

5          Let me break this down and speak in English here.

6     What happens is, Mr. Taylor, there may be jurors, especially in

7     a case like this, who want to discuss sensitive topics that

8     they don't want to discuss publicly, perhaps their own

9     struggles with drug addiction or family member struggles with

10    drug addiction, things like that, that they will not want to

11    discuss in public.  So I would bring them into the robing room

12    and the lawyers would be back there, your lawyer would be back

13    there, and we would listen to this person discuss that or any

14    other personal matter that might bear on their ability to be a

15    fair juror in this case.

16         I would give you, if you wish, even though I don't

17    believe I'm required to, I would give you the opportunity if

18    you wanted to be present when those conversations are had.

19    Again, you will be present for all the other, for 98 percent of

20    the jury selection that's going to happen here.

21         If you want to come in the robing room in the back

22    when these jurors are discussing these private matters that

23    they don't want to discuss publicly, I will give you that

24    option.  But you should discuss that with your lawyer, because

25    many jurors will feel uncomfortable being as forthright about

Ibqntay2

1    these matters if the person on trial is there with them.

2                 So you may want to talk to your lawyer about that and

3    see if that's something you want to do.  Again, your lawyer

4    will be there.  If at any point your lawyer wants to discuss

5    any matter that's taken place in that robing room with you

6    before we go on, I will certainly give him and you that

7    opportunity.

8                 All right.  Is that clear?

9                 THE DEFENDANT:  Yes, it's clear, your Honor.  As long

10   as my lawyer is present, I'm comfortable with that.

11                THE COURT:  OK.

12                So, to the extent that there is any right, you waive

13   any right to be present when we are having these discussions in

14   the sidebar about jurors and their private concerns in terms of

15   jury selection, is that correct?

16                THE DEFENDANT:  Yes, your Honor.

17                THE COURT:  OK.

18                Is there anything else we need to discuss before we

19   get to jury selection from the government?

20                MS. FLETCHER:  Your Honor, the only open issue is an

21   issue that was the subject of some correspondence with the

22   Court last week, the proposed statement of the case.

23                THE COURT:  Yes.  OK.

24                I have reviewed the parties' proposed statement of the

25   case, and I sort of adapted something from both parties'

1    submissions.

2              Let me just read to you what I have and see what

3    counsels' view is on this.  What I plan to say is:  This is a

4    criminal case alleging a conspiracy to distribute narcotics

5    illegally.  The government alleges that the defendant, David

6    Taylor, who is a licensed physician, entered into an agreement

7    with others to issue medically unnecessary prescriptions for

8    oxycodone to patients for the purpose of obtaining oxycodone to

9    sell to third parties who were not his patients.  The defendant

10   denies those allegations.

11             That sort of incorporates the concerns of both

12   parties, I believe.  I will read it again slowly.

13             This is a criminal case alleging a conspiracy to

14   distribute narcotics illegally.  The government alleges that

15   the defendant, David Taylor, who is a licensed physician

16   entered into an agreement with others to issue medically

17   unnecessary prescriptions for oxycodone to patients for the

18   purpose of obtaining oxycodone to sell to third parties who

19   were not his patients.  The defendant denies those allegations.

20             How does that sound to the government?

21             MS. FLETCHER:  Your Honor, that proposal has the same

22   clause that was in the defense proposal that the government

23   took issue with.  The clause that creates the issue is the

24   clause that states that the patients were obtaining the

25   oxycodone for the purpose of obtaining it to sell it to third

Ibqntay2

1    parties or something to that effect.

2           The government's position and the law frankly is that

3    the defendant need not know or suspect that that's the purpose

4    for which the patient is obtaining the oxycodone.  It is

5    sufficient, if, for example, the patient is just obtaining the

6    oxycodone because they had an addiction to oxycodone, so long

7    as the government meets its burden of showing that the

8    oxycodone was medically unnecessary as to that patient.

9           So, by including this language, the language about the

10   purpose for which certain of these patients are obtaining the

11   oxycodone from Dr. Taylor, it puts before the jury a burden

12   that the government does not actually have to meet.  The

13   government need not prove, for example, that the object of the

14   conspiracy with respect to Dr. Taylor was to get these patients

15   oxy to sell to third parties.

16           THE COURT:  OK.  I think I understand your point.

17   Your point is that for oxycodone to patients that there needs

18   to be a greater clause between for the purpose of obtaining

19   oxycodone, because I had meant that to say that the agreement

20   with others to issue medically unnecessary prescriptions for

21   the purpose of obtaining oxycodone to sell to third parties.

22           MS. FLETCHER:  It's the "sell to third parties" part

23   that is the issue.  The patient need not sell the pills to a

24   third party for that patient to receive medically unnecessary

25   oxycodone.  In fact, I expect at least one government witness

Ibqntay2

1    will say that they took the majority of their pills, but that

2    they did not have a medical need for the pills.  They were

3    instead addicted to oxycodone.

4            THE COURT:  OK.  Let me hear from the defense.

5            MR. CARNESI:  Judge, I'm going to request that you

6    read the statement as you did earlier.  It is my belief in

7    dealing with this case for over a year that that's always been

8    the government's position regarding the idea that people were

9    going to Dr. Taylor, getting prescriptions, and then diverting

10   them to other individuals who were not patients.  That's what

11   this case was all about.

12           I know I have said this before, Judge.  I have been

13   very concerned about this from the beginning.  I don't think

14   it's a case that turns specifically and only on whether or not

15   somebody is making a subjective opinion that the medication was

16   not medically necessary.  He was a licensed physician.  He was

17   the individual who was meeting with the patients.  He was the

18   person who these patients said whatever they said to him in

19   order to get him to write the prescriptions.

20           To now turn that around and have some, as we've talked

21   about before, if they want to have some medical expert come in

22   and say, well, in my opinion that really wasn't the proper way

23   to do this, that's not what this case is about.  This case is a

24   criminal case with very serious ramifications on his future.

25           I think that we should hold the government to the

Ibqntay2

1    indictment that they originally returned, which clearly was

2    about these individuals, Gallicchio, the pharmacist, other

3    people in there who were selling their oxycodone prescriptions

4    so that they could be redistributed on the street.

5           We can defend that case.  That is a very defensible

6    case.  The idea that this case is somehow going to devolve

7    into --

8           THE COURT:  I understand.  That is not really the

9    standard, whether it's an easily defensible case.  Let me just

10   hear a little bit more from the government, making sure I fully

11   understand what your concern is, because, yes, my reading of

12   the indictment was that your theory is that Dr. Taylor entered

13   into an agreement with others, in particular, Vito Gallicchio,

14   and others that he was going to issue medically unnecessary

15   oxycodone with the understanding that this would be distributed

16   to others.

17          Is that not a fair reading of the indictment?

18          MS. FLETCHER:  Yes and no, your Honor.  I mean, the

19   issue here I think is that Mr. Carnesi wants to be able to

20   stand up before the jury and argue that his client should be

21   acquitted because the government has failed to meet its burden

22   that Dr. Taylor knew that these patients were selling their

23   oxycodone to third parties.

24          I think that's why he's saying that is a defensible

25   case.  That's the argument that he would like to make.  If the

Ibqntay2

    instruction that your Honor gives at the very beginning of this

    case is essentially that the purpose of the conspiracy is to

    allow these patients to sell oxycodone to third parties, what

    that will do is have the effect of heightening the government's

    burden beyond what the law actually states the burden to be.

        I mean, as the government has put forth in its letter

    dated November 19 and in its request to charge, for a doctor to

    be found guilty of conspiring to distribute narcotics as

    charged in the indictment, it is sufficient if the government

    introduces evidence that that defendant agreed to distribute

    medically unnecessary oxycodone, period.  He need not have any

    information about what the purpose of that medically

    unnecessary oxycodone was vis-a-vis his patient.

        Now the government will introduce evidence at this

    trial that certain of the patients did divert their prescribed

    oxycodone to Vito Gallicchio and to others, but the point the

    government is making here is it is not required that we prove

    that.  It's evidence that the oxycodone is medically

    unnecessary, that some of these patients were diverting it, and

    that the doctor knew it.  But if the government fails to prove

    that the doctor knew that patients were selling oxycodone, but

    succeeds in proving that the oxycodone prescriptions were

    medically unnecessary, we will have satisfied our burden, and

    the jury should understand that that is all they need to know

    to convict.

Ibqntay2

| | |
|---|---|
| 1 | THE COURT:  What's the government's position on Vito |

Gallicchio in this conspiracy?  What is your position on

Gallicchio and what his role is here.

MS. FLETCHER:  He is essentially the recruiter.  He

recruits patients to go and see the doctor so that they can

obtain oxycodone from the doctor with the understanding that --

the arrangement differs depending on who the patient is, but

with the understanding either that the patient is getting

oxycodone to sell to Vito --

THE COURT:  I'm sorry.  There was a cough in the

middle.  The patient is?

MS. FLETCHER:  The patient is getting oxycodone to

sell to Vito or that the patient is getting oxycodone to take

to feed their own addiction, and they are compensating Vito for

referring them to the doctor.  In some instances they're

compensating Vito by diverting some of their oxycodone.

But at least one patient -- for example, your Honor,

Michael Farley is one of the individuals who Mr. Gallicchio

recruits to see the doctor.  Michael Farley in the beginning is

recruited by his friend Vito Gallicchio to go and see the

doctor, but does not, at least initially, kick back any of the

oxycodone that he obtains from his prescriptions to Vito

Gallicchio.  The prescriptions to Mr. Farley are medically

unnecessary prescriptions from day one, even though he is not

subsequently diverting them.

Ibqntay2

1          THE COURT:  OK.  But it seems that the government's

2     theory in all of these cases is that, in terms of Gallicchio

3     and his role in this conspiracy vis-a-vis Taylor, is that

4     Gallicchio is the recruiter and Gallicchio is being compensated

5     and that Taylor is being compensated, correct?

6          MS. FLETCHER:  Yes.  So Taylor is being compensated in

7     two ways:  First, by receiving cash and gifts from Vito

8     Gallicchio around others; and, second, through his receipt of

9     cash payments for office visits by the various patients that

10    Mr. Gallicchio sent to see him.

11         THE COURT:  OK.  Hold on a second.

12         Does it answer the government's concern and the

13    defense's concern if, instead of "an agreement with others to

14    issue medically unnecessary prescriptions," that it's "entered

15    into an agreement with others to sell medically unnecessary

16    prescriptions for oxycodone," period?

17         MS. FLETCHER:  I'm sorry.  Because I am not looking at

18    the language, it's hard for me follow.

19         THE COURT:  Yes.  If I were to say instead, the

20    government alleges that the defendant, David Taylor, who is a

21    licensed physician, entered into an agreement with others to

22    sell medically unnecessary prescriptions for oxycodone.

23    Instead of simply issuing them, that he's getting a profit for

24    this in a different way than perhaps a regular profit from

25    issuing medically unnecessary oxycodone?

Ibqntay2

1          MS. FLETCHER:  I think the use of the word "sell"

2     implies that he has to be paid.  In fact, he doesn't.  I mean,

3     if he's issuing medically unnecessary oxycodone to patients

4     referred to him by Vito because Vito is his friend, that's

5     sufficient.  And we do expect there will be significant

6     evidence of the friendship between the two.

7          I realize we're arguing, your Honor, about a couple of

8     lines here, but this really is what in the government's view is

9     the central issue in this case.  Mr. Carnesi, to his credit I

10    think, has identified a way to make this case appear to the

11    jury to be something other than it is in an effort to move away

12    from the standard that applies to doctors in these cases, and

13    it's important that the first sentence that the jury hears

14    about this case is one that accurately reflects the law.

15         THE COURT:  OK.  Let me hear from Mr. Carnesi a little

16    bit more.

17         Let me just ask you, Mr. Carnesi, because again I took

18    very seriously your concerns about not turning this trial into

19    a trial simply about whether or not this is good medical

20    practice.  The more I'm --

21         MR. CARNESI:  Thank you, Judge.  I appreciate that.

22         THE COURT:  -- looking at this and chewing on this, it

23    does seem to me, especially since this is a conspiracy charge,

24    perhaps the fact that there's the statement indicating that

25    Dr. Taylor entered into an agreement with others to issue

Ibqntay2

1   medically unnecessary prescriptions for oxycodone sort of

2   alleviates or mitigates the concern that this case is simply

3   about a doctor doing things that other doctors wouldn't do.  If

4   he's entering into an agreement with someone else to prescribe

5   medicine, it does seem that this takes this now out of the

6   realm of just a doctor performing his job in a slightly

7   different way than another doctor might.

8          MR. CARNESI:  Right.

9          THE COURT:  What is your counter to that?

10         MR. CARNESI:  I think that that goes to some measure

11  to alleviate the concern, Judge.  I also think if you are going

12  to use the term medically unnecessary, I think it's incumbent

13  to say to issue prescriptions he knew to be medically

14  unnecessary.  The difference I have is one person coming in --

15  then we're getting back into the battle of the doctors.  One

16  person coming in and saying, no, it really wasn't necessary,

17  and the doctor, who is equally qualified with the same medical

18  schools, is licensed by the same licensing authorities, is of

19  the opinion that it was.  In this situation, Judge, the

20  testimony is going to be that patients intentionally lied to

21  the doctor.

22         THE COURT:  I understand.

23         It seems to me that those concerns will be dealt with

24  during the final charge to the jury when the jury gets the

25  instructions on the necessary knowledge for a conspiracy.  They

Ibqntay2

1    will get that information.  All we're trying to do right now is

2    give the jurors a brief synopsis of this case so that they will

3    have an idea of what this case is about so that they can figure

4    out whether or not they have a problem sitting on this case.

5        MR. CARNESI:  I think that it is a good idea.  I think

6    having a statement like that is a good idea.  But I think it

7    should be as accurate as possible, and it does require the

8    element of knowledge on his part.  The fact that it is going to

9    be an instruction that's going to be given to them after they

10   have heard all of the evidence I don't think really addresses

11   the idea and the very purpose of the statement so they have a

12   clue as to what it is that they are looking for.

13       THE COURT:  I understand that.  But I don't think that

14   the jury is going to be -- again, this is just to give them a

15   synopsis of the case so they can figure out whether or not they

16   can be fair and impartial.  I don't think they are going to be

17   misled during the course of the testimony here, because it is

18   my sense that the government's theory -- not even just my

19   sense -- the government's theory is not that Dr. Taylor was

20   simply a little bit off, was not quite as careful and

21   deliberate as he should have been.  Their theory is that he's

22   doing this intentionally.

23       So I understand that, but I will give them -- anything

24   else?  My intention is just to tell them, again, this is a

25   criminal case alleging a conspiracy to distribute narcotics

Ibqntay2

1    illegally.  The government alleges that the defendant, David

2    Taylor, who is a licensed physician, entered into an agreement

3    with others to issue medically unnecessary prescriptions for

4    oxycodone.  The defendant denies those allegations.

5              MS. FLETCHER:  Fine.

6              THE COURT:  Anything else from defense counsel on

7    that?

8              MR. CARNESI:  Nothing beyond what I have said, Judge.

9              THE COURT:  OK.  So I will give the jury that

10   description of the case.

11             Anything else before we start jury selection?

12             MR. CARNESI:  Judge, I have one scheduling matter that

13   I would like to discuss.

14             THE COURT:  Yes.  What is that.

15             MR. CARNESI:  I have a personal issue that I would

16   like to be able to take care of on December 5.

17             THE COURT:  OK.

18             MR. CARNESI:  It is not something I would prefer to

19   discuss in open court.

20             THE COURT:  That is fine.  What time is that?  Is it

21   something that would require the entire day?  What are we

22   talking about.

23             MR. CARNESI:  I think it probably will.  It would

24   probably start around 10:30 and at least go until 1 o'clock.

25             THE COURT:  Without getting into the details, is this

Ibqntay2

1    something, now that you know that we will not be sitting

2    December 3, that can be scheduled for December 3 instead of

3    December 5?

4              MR. CARNESI:  It is not something that is in my

5    control.

6              THE COURT:  OK.

7              You are saying it would start at 10:30?

8              MR. CARNESI:  I think, yes.

9              THE COURT:  And go until 1 o'clock?

10             MR. CARNESI:  Yes.

11             THE COURT:  Like how soon could you get back?

12             MR. CARNESI:  Just on the other side of the bridge,

13   Judge.

14             THE COURT:  That seems fine with me.  We are giving a

15   little bit of leeway in this two-and-a-half-week schedule

16   anyway.  We'll let the jurors know that.  Perhaps that will

17   maybe help the jurors out, that they know that there are two

18   days in case and if there are matters that they need to handle,

19   on the 3rd and the 5th they can do that.

20             Let me hear from the government.

21             What is your view on that?

22             MS. FLETCHER:  That is fine with the government.

23             THE COURT:  That is fine.  We will take off the 3rd

24   and the 5th we'll let the jurors know that today so we can give

25   them a sense of the schedule.

Ibqntay2

1          Anything else?

2          MS. FLETCHER:  On the 5th we could also sit in the

3     afternoon if that's convenient for the Court, if the Court

4     doesn't want to give them the entire day off.  We could just

5     start later.

6          THE COURT:  We could.  We could do I guess like 2 to

7     5.

8          MR. CARNESI:  Judge, again --

9          THE COURT:  I am not sure how.

10         MR. CARNESI:  -- I don't have control over it.  I

11    estimate that it will be done by 1 o'clock.

12         THE COURT:  Yes.  That's fine.  I understand.  I think

13    we can miss that day and hopefully --

14         MR. CARNESI:  Thank you.

15         THE COURT:  -- we can just keep things moving.

16         Again the jurors, especially the ones who are coming

17    from Westchester County and the other northern counties, will

18    appreciate getting out of here relatively early, especially at

19    this time of year, when we have increased snow, cold weather,

20    all sorts of issues with Metro-North, MTA and everything else.

21         Anything else before we start jury selection?

22         MS. FLETCHER:  Can we have one moment, your Honor.

23         THE COURT:  Sure.

24         MS. FLETCHER:  Your Honor, the government has one

25    scheduling issue.

Ibqntay2

1        THE COURT:  OK.

2        MS. FLETCHER:  But we think it probably makes sense to

3   raise it with your Honor at the end of the day today once we

4   see where we are.

5        THE COURT:  OK.

6        MS. FLETCHER:  It may solve itself depending on how

7   jury selection goes.

8        THE COURT:  OK.  Is this with the expert or somebody

9   else?

10        MS. FLETCHER:  It is with the expert.

11        THE COURT:  OK.

12        Another thing:  My law clerk just reminded me, there's

13   this issue about *Brady* and a witness and immunity that was

14   mentioned before.

15        Where are we with that?  Is there any update regarding

16   that?

17        MR. CARNESI:  Judge, I have since had the opportunity

18   to review all the 3500 material.  I think I can resolve the

19   issue.

20        THE COURT:  OK.  Meaning what?

21        MR. CARNESI:  Meaning I believe the information that I

22   deem to be necessary will be able to be brought out through

23   other witnesses.

24        THE COURT:  OK.

25        MS. FLETCHER:  Your Honor?

Ibqntay2

1          THE COURT:  Yes.

2          MS. FLETCHER:  Just so long as it's clear that if what

3     Mr. Carnesi is going to seek to do is to elicit from witnesses

4     what this woman, Denise Suarez, told those witnesses, the

5     government will object on hearsay grounds.

6          THE COURT:  Maybe, just to deal with this quickly now,

7     it seems to me, my recollection of what defense counsel wanted

8     to elicit from this witness was something to the effect that

9     this witness received some bribes in order to not send people

10    in order to not collect urine samples or to send things for

11    urinalysis, something to that effect.  Is that right?

12         MR. CARNESI:  That's right.

13         MS. FLETCHER:  That's correct.

14         MR. CARNESI:  That's it, as well as certain other

15    acts.

16         THE COURT:  OK.  So I guess just preemptively, so we

17    can maybe move this along and not have a prolonged argument

18    about it later, why wouldn't that be a statement against

19    interest?

20         MS. FLETCHER:  I'm sorry, your Honor.

21         THE COURT:  In terms of a hearsay exception, a

22    statement against that witness's interest.  It's against that

23    witness's pecuniary interest to make a statement confessing to

24    a crime.  That is an exception to the hearsay rule if the

25    witness is unavailable.

Ibqntay2

        MS. FLETCHER:  Your Honor, as the government

understands the facts --

        THE COURT:  Yes.

        MS. FLETCHER:  -- it is not clear that it is a

statement against her interest.  What she said was that she

accepted payments from patients in exchange for her agreement

not to submit their urinalysis nor testing, but that she did

not in fact divert any of the urinalysis samples for any of the

patients recruited by Gallicchio because those urinalysis

samples did not need to be diverted.

        So, it is not clear to me that her statement is in

fact against her interest as relevant here.  She may have

accepted bribes from patients separate and apart from this

particular scheme.

        THE COURT:  But that's still against her penal

interest.  It's against her interest.  Whether or not it's part

of this alleged conspiracy, it seems to me to be a statement

against her interest at the time that it's made.  To admit to

engaging in such behavior is a statement against interest.  You

can look at this and think about it.  We can get into later

whether or not there are other statements that would need to

come out with that.  I don't know.  But, just as I thought

about that, that's just what my initial thinking was about

that.

        MS. FLETCHER:  OK.

Ibqntay2

1          THE COURT:  We can deal with that.  At least maybe

2     that gives counsel some starting place.

3          MS. FLETCHER:  It does.  Thank you.

4          THE COURT:  Unless counsel, maybe defense counsel had

5     some other --

6          MR. CARNESI:  No, Judge.  I believe it fits squarely

7     within the 807 residual exception.  Clearly it is a statement

8     against interest.  It's made in the context of a proffer where

9     lying to the FBI would have been an additional crime.  It is in

10    a position where the issue, the problem of hearsay may

11    generally be the inability to cross-examine the witness.  Well,

12    here the government had full exposure to this witness.

13         THE COURT:  OK.  We can table this.  Let's go ahead

14    and start getting these jurors in here so we can start with

15    jury selection.

16         Let me get a sense of how short counsel's anticipated

17    opening statements would be?

18         MS. FLETCHER:  Mine should be about ten minutes, your

19    Honor.

20         THE COURT:  Defense counsel?

21         MR. CARNESI:  I think that's about right, Judge.  10,

22    15 minutes.

23         THE COURT:  OK.  Let's bring the jury in.  It will

24    take a while for them to come over.  Let's bring all the jurors

25    over.

ibqntay2                    Opening – Ms. Fletcher

1          MR. CARNESI:  Judge, I am just going to step out and

2     use the restroom.

3          THE COURT:  OK.

4          (Recess)

5          (A jury of twelve and four alternates was duly

6     selected and sworn)

7          THE COURT:  Thank you for your patience.

8          Congratulations.  You have been chosen as jurors on

9     this case.  We are going to now proceed with opening statements

10    by counsel.  What counsel say in the opening statements, that

11    does not constitute evidence, but you should still pay

12    attention to what counsel say in the opening statements.  They

13    are going to attempt to give you an overview of what they

14    believe the evidence in this case will show.

15         We will start off with opening statement by the

16    government.

17         MS. FLETCHER:  Your Honor, may I move that small

18    podium?

19         THE COURT:  Yes.

20         MS. FLETCHER:  This is a case about a drug dealer, not

21    a drug dealer who stands on the street corner or meets

22    customers in an alleyway, a drug dealer disguised in a white

23    coat, a drug dealer with a prescription pad, a doctor.

24         For years this man, the defendant, David Taylor,

25    prescribed a powerful and highly addictive painkiller to

1  patients he knew did not need it.  He did it for cash, and he

2  did it for the gifts that his drug dealer patients showered him

3  with.

4          The painkiller the defendant illegally prescribed is

5  called oxycodone.  It is an opioid drug similar in makeup to

6  heroin.

7          Now, this drug is highly addictive.  Addicts on the

8  street are willing to pay as much as $20 per pill.  It's this

9  addictive power that the defendant counted on and he exploited.

10         Here's how the defendant's crime worked:  The

11 defendant had an arrangement with a shameless drug trafficker

12 named Vito Gallicchio.  Vito supplied the defendant with a

13 steady stream of phony patients who were willing to pay cash

14 for oxy prescriptions.  The defendant knew these patients had

15 no medical need for oxy, but he didn't care.  He cared about

16 what was in it for him.  He cared about the cash payments and

17 the gifts that Vito and his crew gave him, gifts like expensive

18 single-malt Scotch, cigars, a television, and a refrigerator.

19         That's why we're here today, because it is a federal

20 crime for a doctor to prescribe oxycodone, an addictive

21 narcotic, to people that he knows do not need it.  That's

22 exactly what the defendant did for years.  He turned his

23 doctor's office into a drug den.

24         Over the next few minutes I will talk about what the

25 evidence will show in this case.  Then I will walk you through

some of the different types of evidence the government will

introduce to prove its case.

     I expect you will learn that the defendant was a

licensed medical doctor who operated out of several offices in

Staten Island, New York.  He was an internist who sometimes

claimed to be practicing in the area of medicine known as pain

management.  As you will learn during this trial, legitimate

pain management medicine is devoted to the treatment of

patients suffering from severe and sometimes chronic pain

patients, like cancer patients or people recovering from a

serious debilitating injury.

     You will learn that legitimate pain management

involves a wide range of treatments, like physical therapy and

in some cases pain medication.  That is legitimate pain

management, but that is not the way the defendant ran his

medical practice.

     The defendant's operation focused on one medication,

oxycodone, a medication that should be used to treat only the

most serious types of pain.  You will learn that because

oxycodone is such a powerful drug that people become addicted

to it.  They abuse it.  They buy it and sell it on the street

just like heroin or cocaine or other drugs.  Because of that,

oxycodone is also highly regulated.  You can only get it

legally from a pharmacy if you have a prescription for it from

a doctor for a legitimate medical condition.

1      During this trial, you will hear about how the

2  defendant's medical practice is anything but legitimate.  The

3  defendant violated the law and joined forces with a drug dealer

4  named Vito Gallicchio.  Vito recruited a crew of people, family

5  and friends who would pose as patients, go and see the

6  defendant, and collect oxycodone prescriptions that Vito would

7  then fill and sell on the street.

8      If any of Vito's recruits had trouble getting into the

9  door, they would just drop Vito's name or Vito would call the

10  doctor and the person would be seen, no questions asked.

11      You will learn what happened inside the defendant's

12  examination room.  Each visit lasted only a few minutes.  The

13  defendant didn't conduct any physical examinations.  He barely

14  spoke to the patients about their health.  He barely asked them

15  anything about their pain.  He didn't require the patients to

16  provide updated tests like MRIs to prove that they actually

17  needed the drug that he was prescribing them, and he never

18  explored alternative pain management methods, like physical

19  therapy or like less serious drugs.

20      Instead, during these visits, the defendant just put

21  his head down, kept writing and writing prescription after

22  prescription month after month year after year for people he

23  knew didn't need it.

24      The defendant is not on trial here because he was a

25  bad doctor or because he was careless.  He's on trial because

1    his medical practice was a pill mill, for anyone connected to

2    Vito or who gave the doctor gifts would get an oxy

3    prescription.

4         You will learn during this trial that the defendant

5    was careful.  He was worried about getting caught, so he took

6    steps to cover his tracks.

7         He wrote bogus notes in his patient charts.  He wrote

8    down fake results of examinations that never happened, of

9    things that patients never said to him.  He prescribed patients

10   additional medications along with the oxycodone to try and mask

11   his crimes.

12        He buried drug tests that revealed his patients had

13   not taken the oxycodone he prescribed, a clear sign that these

14   patients didn't need the pills.  You will see that the patients

15   that Vito sent to the defendant's medical office weren't

16   patients at all.  They were drug dealers, and the defendant was

17   the supplier.

18        The defendant gave the patients, the so-called

19   patients their oxycodone, oxycodone that the patients took back

20   to Vito for Vito to sell on the street or that the patients

21   took themselves to feed their own oxycodone addictions.  These

22   so-called patients paid the defendant cash every month,

23   sometimes several times a month for years, and Vito made side

24   payments to the defendant, his partner, to keep the operation

25   going.

1    You will hear how Vito bragged to members of his crew

2    that he paid the defendant $5,000 in cash and paid the rent on

3    the defendant's medical office.  You will hear how the

4    defendant accepted gifts, gifts like the single-malt Scotch,

5    the cigars, and the appliances I mentioned before.  You will

6    see that Vito and the defendant were partners in crime for

7    years and that from January of 2012 and June of 2017 they

8    flooded the streets of New York and New Jersey with hundreds of

9    thousands of oxycodone pills.

10   Cash and gifts for oxy; that was the deal.  And that's

11   what this case is about.

12   So how will the government prove its case?

13   You will see and hear many different types of evidence

14   in this case.

15   First, you will hear from witnesses.  You will hear

16   from an expert, a doctor who helped design the pain management

17   practice at NYU Medical Center here in Manhattan.  He will tell

18   you how legitimate pain management medicine works, and he will

19   tell you flat out that there was nothing legitimate about what

20   the defendant prescribed for Gallicchio and the members of his

21   crew.

22   You will also hear from a pharmacist who was in on the

23   scheme, who agreed to serve as a clearing house for the illegal

24   prescriptions that the defendant wrote and to fill the

25   defendant's prescriptions no questions asked.

1     He will tell you that even he knew that these

2  prescriptions were not medically necessary.  You will also hear

3  from some of the defendant's phony patients, including some

4  members of Vito's crew.  They will tell you how the scheme

5  worked, about the bogus, nonexistent exams the defendant

6  performed before he prescribed huge amounts of oxycodone for

7  months, even years, that they did not need.

8     They will lay out for you how they obtained their

9  pills and what they did with them.  They will discuss the money

10  and the gifts that the defendant demanded to keep the operation

11  running.

12     One witness will tell you about a time he was sitting

13  in the waiting room in the defendant's office, the crowded

14  waiting room waiting with other would-be patients and some of

15  the patients started arguing.  He will tell you about how the

16  defendant came out of the exam room and yelled at his patients:

17  "Every one better shut up or no one gets anything."

18     When you hear this, you will know that the defendant

19  knew exactly why these patients were there -- to get oxycodone

20  and nothing else.

21     Now, let me be clear.  The pharmacist and these

22  patients, they have committed crimes.  Some of these witnesses

23  are oxycodone addicts.  Others are people who broke the law to

24  make money.  They committed crimes right alongside the

25  defendant.

1          They will be testifying before you because they have

2    agreed to cooperate with the government, so you should keep

3    that in mind when you evaluate their testimony.  Ask yourself

4    whether their testimony is consistent with and supported by all

5    of the other evidence in this case.  When you do that, you will

6    see that what these witnesses tell you is corroborated by all

7    of the other evidence, evidence like recordings taken from

8    inside the defendant's examination room, recordings that will

9    allow you to see inside the defendant's corrupt practice of

10   medicine.

11         These recordings, which were made at the direction of

12   law enforcement, will tell you everything that you need to know

13   about how the defendant operated when he saw patients.  In

14   these recordings you will see the patients hand over cash or

15   gifts like Scotch to the defendant.  You will see the defendant

16   with your own eyes perform almost no examination.  In one

17   recording you will see the defendant do nothing but talk about

18   the Scotch that the patient had just brought him.

19         You will see the defendant deal drugs with his

20   prescription pad.  You will also see the defendant's

21   prescription data.  We will show you the data that pharmacies

22   collected and reported regarding the staggering amount of

23   oxycodone that the defendant prescribed over the course of

24   several years, including to Vito and his crew.

25         It will show you the defendant prescribed hundreds of

1    thousands of oxycodone pills and that oxycodone was the single

2    most commonly prescribed drug by the defendant by a long shot.

3         You will see the medical records of the so-called

4    patients.  You will see patient files and prescriptions

5    recovered from the defendant's office.  These records will show

6    you how the defendant prescribed oxycodone for patient after

7    patient and how the defendant wrote down lies in his patient

8    charts to conceal his crimes.

9         Finally, you will see pictures and video that law

10   enforcement took in the defendant's home of the stockpile of

11   gifts he accepted from patients in exchange for the oxycodone

12   that they did not need.  You will see the bottles and bottles

13   of Scotch, the boxes of cigars, and the electronic equipment --

14   the defendant's bounty for prescribing oxycodone to Vito and

15   the crew.

16        After you have seen and heard the evidence in this

17   case, you will know exactly what happened here.  The defendant

18   David Taylor was a drug dealer.  He doled out thousands of

19   oxycodone pills to people he knew didn't need them.

20        We will have a chance to speak with you again at the

21   end of this trial, but between now and then I ask you to do

22   three things:

23        First, pay close attention to the evidence as it comes

24   in, the testimony, the recordings, the medical records, the

25   prescription data;

1      Second, follow Judge Carter's instructions on the law;

2   And,

3      Third, use your common sense, the same common sense

4   that you use every day in making important decisions in your

5   own lives.

6      If you do those three things, listen to the evidence,

7   follow Judge Carter's instructions on the law, and use your

8   common sense, the defendant will get a fair trial, and you will

9   return the only verdict supported by the facts and the evidence

10   in this case, that the defendant is guilty.

11      THE COURT:  Does defense counsel have an opening

12   statement?

13      MR. CARNESI:  Yes, Judge.

14      THE COURT:  OK.

15      MR. CARNESI:  Good afternoon, ladies and gentlemen.

16      I represent Dr. David Taylor.  He is a doctor.  He's

17   been a doctor for a very, very long time.  All the finger

18   pointing and all the names that anybody wants to call him,

19   we're beyond that now.  They made their allegation.

20      If you remember anything in this case, remember just

21   what the prosecutor said to you, she's going to prove that he

22   was a drug dealer, that he knew what was happening with those

23   drugs.

24      Hold her to it, because if you do, you will see what a

25   sham this case actually is.  She talked to you a moment ago

1    about a pharmacist who they made a deal with.  He's going to

2    come in and he's going to testify.  The allegation is that my

3    client, a doctor for over 25 years, sold out his profession,

4    put himself in this position to go on trial here for cigars and

5    steaks.  Are we serious?

6           What she didn't tell you is the pharmacist who was

7    part of this, with this character Vito, he made over a million

8    dollars.  Not on things he did with the doctor, but he was

9    selling bottles of pills to this Vito as soon as they were

10   being unloaded off the truck.

11          As soon as he could order them, have them delivered,

12   Vito was there, prescriptions or no prescriptions, and the

13   pharmacist would just hand him out bottles, $10 a pill, $10 a

14   pill.  The prosecutor just told you that the street value,

15   according to the prosecution, for those pills was about $20.

16          OK.  Let's do the math.

17          If you bought them for 10 and sold them for 20, then

18   Vito's profit was over a million dollars.

19          But you want to point a finger at my client for steaks

20   and cigars?  Are you serious?

21          What this case is about is very simple, and the

22   evidence is going to show it, the evidence is going to show

23   that there were people who took advantage of my client, people

24   who he thought were doing things for him out of the goodness of

25   their heart because he might see them on short notice, because

1    in certain instances a woman brought him a bottle of Scotch and

2    he took off $20 from the visit charge.

3            You are going to find out not only was he betrayed

4    this Vito character, he was betrayed my staff in his own

5    office.  He had a receptionist in his office who he put in a

6    protocol, not required by law, but he put in a protocol to have

7    his patients tested, to have their urine tested because they

8    wanted to see, one, that the medication would show up in the

9    urine, and, two, that they weren't taking any chances.  It

10   sounds pretty reasonable, except the same people came in and

11   they would bribe the receptionist:  Don't test this guy,

12   fabricate my test.  They frustrated every attempt he made to

13   keep track.

14           Keep an open mind.  Listen, we waited a long time to

15   get to this point.  Now it's time to put up and prove it.

16   Prove it.  Put those people on the stand.  You listen to them,

17   and then you decide whether they did what they did for their

18   own motives, whether patients intentionally went in there and

19   lied to the doctor, whether patients understood that if they

20   failed this urinalysis test he was going to throw them out.  So

21   they decided to pay, pay the receptionist to defraud him, to

22   fake the test.

23           If they believed that he knew what was going on, it

24   wasn't necessary.  If they believed that if they were friends

25   with Vito they could do anything they wanted, they are not

1    worried about a urine test.

2           Keep an open mind, listen to all the evidence, and

3    then decide yourselves, because here, here in this courtroom

4    the only people who can decide what the facts are, what was

5    right or wrong, is you, the jury, not someone who was paid to

6    come and give their opinion about whether they are a better

7    doctor or a different type of doctor than Dr. Taylor.  You have

8    to decide not that question.  You have to decide if what she

9    just said to you, she's proved it, that he's a drug dealer.

10   And the answer to that is going to be a very loud and

11   resounding no.

12          Thank you.

13          THE COURT:  OK.

14          Government, you may call your first witness.

15          MR. ROOS:  Thank you, your Honor.  The government

16   calls Lawrence Montalbano.

17          MR. ROOS:  Your Honor, my apologies.  Apparently he's

18   in the security area.

19          THE COURT:  While we are waiting, let me just see

20   counsel at sidebar.

21          (In the robing room)

22          THE COURT:  While we are waiting, we might as well

23   talk about any closing instructions you want to give me at the

24   end of the day today.  I plan on reminding them not to do any

25   independent research regarding the issues, the parties, or the

1    locations and not to discuss this with anyone.

2            Is there anything else anyone wants me to say to the

3    jurors today?

4            MR. RODRIGUEZ:  No other instructions.

5            MR. CARNESI:  No, your Honor.

6            THE COURT:  I will ask the jury to get here bright and

7    early at 9:30 tomorrow.  I will have counsel get here at like

8    9:20 just to sort of avoid any unnecessary bumps into jurors.

9            MR. CARNESI:  Sure.

10           THE COURT:  All right.

11           Anything else while we are back here?

12           MS. FLETCHER:  I expect we may have a couple of issues

13   to raise with your Honor at the end of the day.

14           THE COURT:  OK.

15           MS. FLETCHER:  In part relating to doors being opened

16   in our view.  We can raise that after the end of the court day.

17           THE COURT:  Does any of that involve this witness,

18   though?

19           MS. FLETCHER:  No.

20           THE COURT:  All right.  We can deal with it today or

21   we can deal with it early tomorrow if you want.

22           (In open court)

23           THE COURT:  While we are waiting, members of the jury,

24   my deputy is going to provide you with notepads that you can

25   use to take notes.  These notepads will be collected from you

1   at the end of the day each day.  No one is going to read them

2   through, but we are going to collect them at the end of the day

3   so that we just keep track of them.

4           Don't let your note-taking become a distraction to

5   you.  I will give you further instructions about note-taking at

6   the end of the case.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ibq6tay3

1          THE COURT:  Let's take a six and a half minute break.

2     My deputy needs to get some information and get the contact

3     information from you.  We might as well do that now and do that

4     in the robing room -- the jury room.  Follow her lead.  In the

5     interim, do not discuss this case with anyone else.  See you in

6     six and a half minutes.

7          (Jury excused)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ibq6tay3

1            MR. ROOS:  My apologies, your Honor.  He was over at

2     U.S. Attorney's Office.  The marshals wouldn't let him go

3     through the bridge.  So they are bringing him through security.

4     When we last heard a few minutes, they were in the security

5     line downstairs.  One agent is with him.

6            THE COURT:  Is this someone who is in custody?

7            MR. ROOS:  No.

8            THE COURT:  All right.

9            MR. ROOS:  He is here now, your Honor.  Go figure.

10            THE COURT:  All right.

11            (In open court; jury present)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Please be seated.

2          MR. ROOS:  Thank you for your patience.  We'll try

3     this again.  The government called Lawrence Montabano.

4          THE DEPUTY CLERK:  Please remain standing and raise

5     your right hand.

6      LAWRENCE MONTABANO,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MR. ROOS:

11    Q.  Good afternoon, Mr. Montabano.

12          Can you hear me?

13    A.  Yes.

14    Q.  Are you employed?

15    A.  Yes.

16    Q.  What type of work do you do?

17    A.  I drive a -- delivery driver.

18    Q.  Where are you a delivery driver?

19    A.  Jay's on the Bay and Napolie's Pizzeria.

20    Q.  Where are those?

21    A.  Staten Island, New York.

22    Q.  Directing your attention to February 2018, were you

23    arrested at that time?

24    A.  Yes.

25    Q.  What were you arrested for?

1   A.  Conspiracy to distribute Oxycodone.

2   Q.  Can you tell us very briefly what made you guilty of that

3   crime?

4   A.  I conspired with another person to illegally get a

5   prescription and sell the pills.

6   Q.  Who did you conspire with?

7   A.  Vito Gallicchio.

8   Q.  What types of pills?

9   A.  Oxycodone, 30 milligrams.

10  Q.  Where did you get the pills, the prescription?

11  A.  From Dr. Taylor.

12  Q.  Do you recognize Dr. Taylor in the courtroom today?

13  A.  Yes.

14  Q.  Can you point him out for the jury and identify him with an

15  article of clothing?

16  A.  The gentleman with the gray tie and blue shirt.

17          MR. ROOS:  Let the record reflect that the witness is

18  referring to the defendant, Dr. Taylor.

19          THE COURT:  Okay.

20  Q.  For how long did you get Oxycodone prescriptions from Mr.

21  Taylor?

22  A.  Over three years.

23  Q.  Did you have any sort of medical need for the

24  prescriptions?

25  A.  No.

Ibq6tay3                          Montabano - direct

1   Q.  Did you have any injury at the time?

2   A.  No.

3   Q.  Were you in pain at that point when you were receiving the

4   prescriptions?

5   A.  No.

6   Q.  How many Oxycodone pills did Dr. Taylor prescribe you per

7   month when you saw him?

8   A.  On average, 150.

9   Q.  How many did you take?

10  A.  None.

11  Q.  So why did you get the Oxycodone prescriptions from Dr.

12  Taylor?

13  A.  To make money.

14  Q.  We'll come back to that in a bit.  First I want to ask you

15  some more questions about your background.

16          Mr. Montabano, how old are you?

17  A.  52.

18  Q.  Where were you born?

19  A.  Brooklyn, New York.

20  Q.  Where do you live right now?

21  A.  Bayonne, New Jersey.

22  Q.  Are you married?

23  A.  Yes.

24  Q.  Do you have any kids?

25  A.  Four children.

1      MR. RODRIGUEZ:  I am showing just the witness what has

2  been marked for identification as Government Exhibit 105 A.

3  Q.  Mr. Montabano, there should be a picture on the screen.

4          Do you see that there?

5  A.  Yes.

6      MR. RODRIGUEZ:  The jury should not see the picture.

7  Q.  Mr. Montabano, what is this that I am showing you?

8  A.  Me.

9      MR. RODRIGUEZ:  The government offers, your Honor,

10  Government Exhibit 105 A and B, which is the corresponding

11  name.

12      THE COURT:  Any objection?

13      MR. CARNESI:  No, your Honor.

14      THE COURT:  It's in.

15      (Government's Exhibits 105 A and 105 B received in

16  evidence)

17      MR. ROOS:  Can we publish Government Exhibit 105 A for

18  the jury.

19          This is a test run, folks.  Let us know if your

20  computers are working.

21      MR. ROOS:  Ms. Corrado, we can take that down.

22  BY MR. RODRIGUEZ:

23  Q.  So, Mr. Montabano, how far did you go in school?

24  A.  Eleventh grade.

25  Q.  Can you describe generally what you did after school?

1   A.  I worked on Wall Street.

2   Q.  Do you still work on Wall Street?

3   A.  No.

4   Q.  Why not?

5   A.  I was laid off in 2005.

6   Q.  What sort of work have you been doing since you left

7   finance?

8   A.  Delivering pizza, etc.

9   Q.  I think you told the jury, but where do you work now?

10  A.  Jay's on the Bay and Napolie's Pizzeria.

11  Q.  Where are those located?

12  A.  Staten Island, New York.

13  Q.  You testified that you were arrested for your involvement

14  in a conspiracy to distribute Oxycodone.

15          How did you first get involved in that?

16  A.  Through a mutual friend.

17  Q.  Who is that mutual friend?

18  A.  Vito Gallicchio.

19  Q.  Can you describe the events that resulted in your initial

20  involvement?

21  A.  He approached me and offered me to go to a doctor and

22  obtain a prescription and I agreed.

23  Q.  So Vito Gallicchio, do you know him by Mr. Gallicchio or

24  Vito?

25  A.  Vito.

1    Q.  I am going to use Vito from now on.

2    A.  Okay.

3    Q.  How did you know Vito?

4    A.  I met him at the pizzeria where I worked.

5    Q.  Where was that?

6    A.  Dileo's Pizzeria.

7    Q.  At Dileo's what did he say to you in this initial

8    conversation?

9    A.  I just -- he approached me and told me if I wanted to make

10   extra money, he could set me up with a doctor.

11             MR. ROOS:  Ms. Corrado, can we please show the witness

12   102 A.

13   Q.  Mr. Montabano, the picture in front of you, what is that?

14   A.  Vito Gallicchio.

15             MR. RODRIGUEZ:  The government offers Government 102 A

16   and B.

17             THE COURT:  Any objection?

18             MR. CARNESI:  No.

19             THE COURT:  It's in.

20             (Government's Exhibit 102 A and 102 B received in

21   evidence)

22             MR. ROOS:  Can we publish this to the jury.

23   BY MR. ROOS:

24   Q.  Now, a moment ago before this exhibit --

25             THE COURT:  Do the jurors have it yet?

1        You will see a glow.

2  Q.  You mentioned a moment ago that Vito asked if you wanted to

3  make some money.

4        What did you say in response?

5  A.  Yes.

6  Q.  Why did you say that?

7  A.  Because I needed the money.

8  Q.  When roughly was this?

9  A.  Around June of '14.

10 Q.  Did Vito give you any more specifics about what you needed

11 to do to make money?

12 A.  No.  He just told me he would set up an appointment at the

13 doctor and I would have to get into the old office and get a

14 prescription, bring it to the pharmacy.

15 Q.  When he said "the doctor," was he referring to anyone in

16 particular?

17 A.  Yes.

18 Q.  Who?

19 A.  Dr. Taylor.

20 Q.  Did you say Dr. Taylor's name?

21 A.  He called him Dr. T.

22 Q.  Now, at this point did you have any type of medical injury

23 or issue that required a prescription?

24 A.  No.

25 Q.  What, if anything, did Vito tell you about what you needed

1   to do then to get a prescription?

2   A.   To go to the doctor and tell them that the only thing that

3   would help me would be Oxycodone, 30 milligrams.

4   Q.   And what did Vito say would happen after that?

5   A.   He would probably send me for an x-ray and I would have to

6   go back and obtain the prescription.

7   Q.   As far as you are aware is Vito a doctor?

8   A.   No.

9   Q.   What does he do for a living?

10   A.   Nothing.

11   Q.   Well, what type of lifestyle does Vito live?

12   A.   Pretty good.

13   Q.   Why do you say good?

14   A.   Cars.  He had a nice Corvette.  He has a nice house.

15   Watches, etc.

16   Q.   Now, I am going to show you for identification what have

17   been marked as Government Exhibits 124 A and 124 B.

18          What are we looking at here in 124 A and B?

19   A.   Vito's Corvette.

20   Q.   How do you recognize them?

21   A.   How I do recognize the Corvette?

22   Q.   Yes.

23   A.   Because I have seen it in his driveway.

24          MR. ROOS:  The government offers 124 A and B.

25          MR. CARNESI:  No objection.

Ibq6tay3                    Montabano - direct

1              THE COURT:  That's in.

2              (Government's Exhibits 124 A and 124 B received in

3      evidence)

4              THE COURT:  Let's have a very quick side bar.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  We've got all this wonderful technology.

3    The way that the government's screen is angled, though, some of

4    the jurors can see.

5              MR. ROOS:  Mine or the ones on the table.

6              THE COURT:  The ones on the table.  They can see the

7    screens before the stuff is admitted into evidence.  It's not a

8    big deal with this, but that will be a problem later on.  So

9    let's try to angle those screens.

10             MR. ROOS:  We will.

11             MR. CARNESI:  Good.  Thank you.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury present)

2           THE COURT:  Go ahead.

3           MR. ROOS:  If we may publish 124 A for the jury.

4           THE COURT:  Okay.

5   BY MR. ROOS:

6   Q.  Mr. Montabano, what are we seeing?

7           THE COURT:  Hold on a second.  There is a delay.  You

8   have to way for the glow from their screens.

9           Go ahead.

10  Q.  What are we seeing in this picture, Mr. Montabano?

11  A.  Vito and his Corvette in front of his house.

12  Q.  In front of whose house?

13  A.  In his driveway.  Vito's driveway.

14          MR. ROOS:  Can we please see Government Exhibit 124 B.

15  Q.  What is this, Mr. Montabano?

16  A.  The back of Vito's Corvette.

17  Q.  Now, you testified that you don't have an injury; right?

18  A.  Correct.

19  Q.  What, if anything, did Vito say about what would happen if

20  Dr. Taylor did not prescribe the Oxycodone?

21  A.  He would make a phone call.

22  Q.  How do you know that Vito would make a phone call?

23  A.  That's what he said.

24  Q.  What, if anything, did Vito say you should do if Dr. Taylor

25  gave you a prescription?

1    A.  To get -- take it to the pharmacy, fill it, and give him

2    the pills.

3    Q.  Would Vito give you anything in return?

4    A.  Yes.

5    Q.  What?

6    A.  Money.

7    Q.  How much money?

8    A.  $1,125.

9    Q.  Was he paying you by pill?

10   A.  Yes.

11   Q.  How much was he paying per pill?

12   A.  750.

13   Q.  After Vito told you all this, about the doctor's office,

14   what did you do next?

15   A.  I went -- I made an appointment for the doctor and I went

16   there.

17   Q.  How long after your initial conversation with Vito did you

18   make an appointment?

19   A.  Right away.

20   Q.  Did you learn anything from Vito about what he would do

21   before you went to Dr. Taylor's office?

22   A.  Yes.

23   Q.  What did you learn?

24   A.  He would give them a heads up that I was going.

25   Q.  What do you mean by heads up?

1   A.  I call them and tell them that I am coming in.

2   Q.  Who would he call?

3   A.  The secretary or assistant.

4   Q.  Did there come a time that you went to see Dr. Taylor?

5          MR. CARNESI:  Judge, can we have the individual

6   identified if he knows the name?

7          THE COURT:  Hold on.  If counsel wishes to ask that

8   question.  If not, you can inquire on that on cross.

9          MR. ROOS:  I am happy to ask it.

10  Q.  Do you know the name of the person he spoke to.

11  A.  I think it was a colored girl that works in the office.

12  Q.  Now, did there come a time when you went to see Dr. Taylor?

13  A.  Yes.

14  Q.  And I am going to show you Government Exhibit 101 A for

15  identification.

16          What is this?

17  A.  That's Dr. Taylor.

18          MR. ROOS:  Government offers Government Exhibit 101 A

19  and B.

20          MR. CARNESI:  No objection.

21          THE COURT:  That's in.

22          (Government's Exhibits 101 A and 101 B received in

23  evidence)

24          MR. ROOS:  May we publish this to the jury?

25          THE COURT:  Yes.

1   BY MR. ROOS:

2   Q.  Now, when did you first see Dr. Taylor?

3   A.  In June of 2014.

4   Q.  Do you remember the specific date?

5   A.  June 30th.

6   Q.  Did you go alone or with someone else?

7   A.  I went with Vito.

8   Q.  Why did you go with Vito?

9   A.  To make me feel comfortable, he came.

10  Q.  Where did you see Dr. Taylor for your first visit?

11  A.  Victory Boulevard in Staten Island.

12  Q.  I am going to show you now what is marked for

13  identification as Government Exhibit 129.

14          What is this, Mr. Montabano?

15  A.  The doctor's office.

16  Q.  Does it fairly and accurately portray the doctor's office

17  as of when you went there in 2014?

18  A.  Yes.

19          MR. ROOS:  The government offers Government

20  Exhibit 129.

21          THE COURT:  Any objection.

22          MR. CARNESI:  No, your Honor.

23          THE COURT:  That's in.

24          (Government's Exhibit 129 received in evidence)

25          MR. ROOS:  May we publish this to the jury?

1              THE COURT:  Yes.

2    BY MR. ROOS:

3    Q.  Now, can you please describe for the jury your first visit

4    at Dr. Taylor's office?

5    A.  Yes.  I went in with Vito.  I said to their girl at the

6    front, I am here.  I have an appointment.  She said, Have a

7    seat.  Me and Vito sat down.  A few minutes after the doctor

8    came out and called me in.

9              THE COURT:  Let's go ahead and take our break for the

10   day.

11             Members of the jury, I am going to let you go for the

12   day.  Tomorrow you should get here bright and early at 9:30 so

13   that we can start immediately.  We'll go from 9:30 to 12:00.

14   Bring a snack if you would like.  We'll go from 12:30 to 3:00.

15             In the interim do not discuss this case with anyone

16   else.  Do not allow anyone to discuss this case with you.

17   Don't post anything about this case on any social media.  Don't

18   read anything about this case.  Don't do any independent

19   research about any of the issues, parties or locations in this

20   case.

21             We'll see you tomorrow morning.  Have a pleasant

22   evening.

23             (Jury excused)

24

25

1          (In open court; jury not present)

2          THE COURT:  Please be seated.

3          Should the witness be excused now?

4          MR. ROOS:  Yes, your Honor.

5          THE COURT:  Defense counsel, any objection to excusing

6     the witness?

7          MR. CARNESI:  No, your Honor.

8          THE COURT:  Is there anything that counsel want to

9     discuss now?

10         MS. FLETCHER:  Your Honor, the government's view as we

11    previewed during our side bar is that Mr. Carnesi's opening has

12    in the government's view triggered the door that once opened

13    should in our view permit the testimony of Witness 1 and

14    Witness 2.

15         There were a couple of things that Mr. Carnesi argued

16    in his opening.  In particular, he now put before the jury the

17    notion that his client was taken advantage of by patients, that

18    patients lied to him about their conditions.  He has also put

19    before the jury the notion that the defendant was not aware of

20    the urinalysis records related to his patients because his

21    secretary hid or diverted those records from being reviewed by

22    him.

23         So Witness 1.  The government proposes to call Witness

24    1 whose name is Michael Montanino, who would as the Court is

25    aware describe an interaction in which his brother -- both him

1  and his brother tested positive for drugs and he discussed with

2  the doctor the need for both of them to return to the practice

3  and provide the doctor with gifts in order to make that happen.

4  That directly rebuts the notion that Mr. Carnesi introduced

5  that the doctor was not aware that the urinalysis records of

6  his patients being problematic.

7          The proposed testimony from Witness 2 is similar.

8  Although, may I have one moment on Witness 2, your Honor?

9          THE COURT:  Yes.

10         MS. FLETCHER:  Your Honor, Witness 2 you will recall

11 is the mother of one of Dr. Taylor's patients who had an

12 addiction problem with Oxycodone and has since died of an

13 overdose.  In light of your Honor's concerns related to her

14 testimony, the parties have actually entered into a testimonial

15 stipulation as to what her testimony would be, which we think

16 addresses any 403 concern or any risk that she is emotional or

17 cries.  Her issues with her son, and in particular

18 documentation that she recovered from her son's room, would

19 again rebut the notion that the doctor was being taken

20 advantage of or being lied to by his patients.

21         THE COURT:  Okay.  Defense counsel.

22         MR. CARNESI:  Judge, I don't think there is any door

23 opened at all.  I mean I think they would like to see a door.

24 The fact of the matter is the testimony would be pursuant to

25 this witness's proffer and other witnesses who paid that

1    particular witness to either not test or to tamper with the

2    tests.  There were over 50 by her estimate tests involved.

3            THE COURT:  Get back to the door.  The issue with the

4    door and the issue of your opening statement talking about him

5    being betrayed by people and his lack of knowledge of certain

6    things.  Before we deal with Witness 2, let's deal with Witness

7    1 and what is your position on Witness 1 and why that door

8    hasn't been opened regarding Witness 1?

9            MR. CARNESI:  Because I don't believe I talked about

10   Witness 1 and I don't believe I said in my opening that he was

11   defrauded as to all the tests.  What I said was he put in

12   protocols to try and establish whether or not these people were

13   taking these medications or the time using other things and

14   that those protocols were frustrated by a person working in his

15   office.  The two things are not mutually exclusive.  What they

16   are talking about is there was a fellow who was tested.  I

17   think he tested positively for another substance.  And then the

18   issue becomes did the doctor decide, okay, I will give him

19   another chance.  That is not what we were talking about.  We

20   were talking about a course of business being conducted by an

21   employee in his office to cut side deals with patients that

22   clearly he wasn't aware of.

23           THE COURT:  How many more witnesses does the

24   government have?  My sense is that it may make sense for me to

25   rule on this with a slightly more full record?  My sense is

 1   that to the extent a door has been opened that the door may get

 2   bigger, at least the hole might get bigger and it might make

 3   sense to have a clearer sense of what is going to happen here.

 4           Here are my concerns:  I have several concerns about

 5   Witness 2, which we discussed before.  My concern with Witness

 6   1 is Witness 1 testifying about his brother.  I am not sure why

 7   that isn't a little bit cumulative to have Witness 1 testifying

 8   about his brother also being let back into the practice.  If

 9   Witness 1 wants to provide testimony about what happened with

10   him and him being kicked out of the practice and then him

11   providing this bribe to get back into the practice, then that's

12   a different thing.

13           Can you tell me what is the bribe that Witness 1 gave

14   to Dr. Taylor?

15           MS. FLETCHER:  It is a boiler.

16           Can I have a moment because I want to make sure I am

17   correctly delineating.

18           THE COURT:  Okay.

19           MS. FLETCHER:  Your Honor, at first glance I think

20   there is no issue with his testimony focusing solely on his own

21   interactions with the doctor and the fact that he was kicked

22   out.  I have understood there to be some overlap between his

23   bribe and his brother's bribe that AUSA Rodriguez clarified

24   that the two of them get kicked out at the same time and they

25   split the cost of the boiler in an effort to get them both back

 1    in and they both do get back in.

 2            THE COURT:  That makes a little more sense.  That is a

 3    little more clearer.

 4            Let me hear defense counsel's view on this, why the

 5    door to that testimony hasn't been opened by your opening

 6    statement talking about how he was betrayed by his patients and

 7    betrayed by his staff and this is not about a doctor who may

 8    have a different standard of practice than some other doctor

 9    and why that doesn't open the door to that sort of testimony.

10            MR. CARNESI:  Judge, I don't believe it does.  As I

11    said I don't think the two things are mutually exclusive.  It

12    almost proves the first point.  Because when the test came

13    back, he did take the step to kick him out.  That he decided to

14    give him another chance and let him back in, that's a whole

15    other issue.  It doesn't say that he was ignoring the test.  It

16    just says, okay, he partied and he did something that he should

17    not have done and we decided to give him another chance.  It

18    doesn't vitiate the fact that we did put in this protocol.

19            THE COURT:  That is an argument you can make.  The

20    government's theory that he gave him the other chance because

21    he got a bribe.  Maybe he was also being benevolent as well but

22    also because he got a bribe, which seems to contradict the

23    position that you took in your opening statement about his

24    being betrayed by his clients.  I think you said something

25    about patients giving gifts to their doctor or something.  I

 1   believe, but maybe I am conflating.

 2            MR. CARNESI:  I am sorry.

 3            THE COURT:  I think you might have said something

 4   today about there is something wrong with patients giving gifts

 5   to their doctor.

 6            MR. CARNESI:  I did speak to the idea that he received

 7   gifts and in return he moved up an appointment.  He charged

 8   less for a particular visit.

 9            THE COURT:  Right.  That seems a little bit different

10   than getting a boiler to let someone who has got allegedly a

11   drug addiction get back into the practice to get the same drug

12   that they are addicted to.  That does seem that that is

13   different and that that door has been opened.  I will think

14   about this some more.  My sense is that there may be more of

15   this coming as the trial goes.  If this portal might be bigger

16   than we currently anticipate and it seems that it may make

17   sense because I think the government has a lot of other

18   witnesses to call before we get to this for me to fully

19   understand all of the parameters of the upside down before

20   making a ruling on this.

21            MS. FLETCHER:  On that point, your Honor, we would

22   anticipate calling Mr. Montanino the day after tomorrow.

23            To address your Honor's point about the number of

24   other witnesses, there is a key difference between Mr.

25   Montanino and some of the other witnesses who will testify

1   here.  Much of the communications between many of our other

2   witnesses regarding Dr. Taylor relate -- are communications

3   that those witnesses had with Vito in which Vito is telling

4   those witnesses, I am doing this for the doctor.  If you do

5   this for the doctor, he will bring you up in the line or he

6   won't ask questions.  For Mr. Montanino this is a conversation

7   that is directly with the doctor.  There is no ability to argue

8   that there was an intermediary who was misleading Dr. Taylor.

9           THE COURT:  I will think about it.  I am leaning

10  toward at this point to allowing this testimony.  Certainly I

11  am leaning towards allowing this testimony for Mr. Montanino

12  regarding this boiler payment.  If we can parse out something

13  regarding the brother, that is one thing.  If it cannot be

14  parsed out fairly, I suppose we'll deal with that later.

15          In terms of Witness 2, I still have some grave

16  concerns about that.  can I guess a sense of what this

17  stipulation is that was reached between the parties if this

18  information comes in?

19          MS. FLETCHER:  If your Honor would like, I can hand up

20  the stipulation.  It is not long.

21          THE COURT:  That's great.

22          MS. FLETCHER:  The only thing that will not be clear

23  from the face of that is the contents of the exhibits that are

24  referenced, but I am happy to speak to those when your Honor is

25  finished reading it.

1          (Pause)

2          THE COURT:  Let me hear more from the government

3   regarding 302, this prescription for Oxycodone issue

4   April 21st.  You don't have to be that specific.  Let me get

5   from you again what it is that you are trying to get out here.

6          MS. FLETCHER:  What is the point of all this, your

7   Honor?

8          THE COURT:  Yes.

9          MS. FLETCHER:  So the point is this:  James

10  Impellizine was a patient of Dr. Taylor.  His chart had an

11  indication that he had some injury.  He was prescribed very

12  large amounts of Oxycodone over a lengthy period of time.

13  There was a point in time when he was a patient of Dr. Taylor

14  that he -- that he went into a rehab facility.  In connection

15  with going into that rehab facility, Dr. Taylor sent a letter

16  to Mr. Impellizine's job explaining that he wasn't treating him

17  for some injury, he was treating him for opioid addiction.  So

18  Impellizine goes.

19          Into this rehab facility and some time later he exits

20  the rehab facility and he resumes seeing Dr. Taylor and Dr.

21  Taylor prescribes him I believe it is even larger amounts of

22  Oxycodone over a sustained period of time.  So again what this

23  evidence does is shows that the doctor knows that he is

24  prescribing Oxycodone to patients who don't have a medical need

25  for the Oxycodone and it is the -- the letter itself is clear

 1    evidence of his knowledge that this person doesn't have an

 2    injury.  He has an opioid problem.

 3         THE COURT:  What I need a little bit of clarification

 4    on is this letter that you have been referring to that I see in

 5    front of me indicates is a letter from Dr. Taylor that

 6    Mr. Impellizine was treated from Dr. Taylor from June 13th,

 7    2012, to August 14th, 2012, for opioid dependency and

 8    self-reported abuse prescription of opioids.  He was not

 9    treated for cervical disk disease.  It was not related to an

10    accident or injury due to employment.  This is not a Workman's

11    Comp case.  If you have any questions, please notify our

12    office.

13         And then as you indicate in the stipulation that after

14    that on or around September 14th, 2012, Mr. Impellizine was

15    referred for an MRI for his cervical spine, which showed that

16    he had myo bilateral narrowing of a disk, which according to

17    this I don't know if this is true or not, but this seems that

18    now there is an issue with the cervical spine which is

19    different than the context that this letter was talking about

20    some two years earlier.  Now there is an issue with the

21    cervical spine and now Dr. Taylor is prescribing Oxycodone.

22    Maybe that is not a good idea to prescribe that for someone who

23    has this sort of substance abuse pendency.

24         It seems as if in the way that this is labeled that

25    this is related to cervical spine injury, which is different

 1   than that letter.  So at least in terms of the point that you

 2   are trying to make seems to me that there is something -- that

 3   there is a gap there that is significant.

 4           MS. FLETCHER:  We expect that the expert will fill

 5   that gap, Judge.  So we anticipate that Dr. Gharibo will

 6   explain what the condition is that is referenced in the

 7   referral for the MRI or the results for MRI and will say that

 8   is not a condition that will justify the prescription of

 9   Oxycodone that was provided to this particular patient.

10           He will also opine on risks associated with

11   prescribing not just the Oxycodone to this particular patient

12   but the other drugs that Dr. Taylor was also prescribing to the

13   same patient at the same time.  So in a nutshell and Dr.

14   Gharibo was not my witness but AUSA Roos will correct me if I

15   am wrong will say that he didn't have an injury.  The letter

16   demonstrates that he did not have an injury.

17           THE COURT:  In 2010?

18           MS. FLETCHER:  Correct, in 2012.

19           The later MRI does not show an injury that would

20   justify this amount of Oxycodone.  The government would argue

21   taking those two things into account and taking into account

22   the doctor's knowledge that this person has an opioid

23   dependency issue, that he is departing from the course of

24   professional medical conduct when he after this person exits

25   rehab prescribes him large amounts of Oxycodone and large

1   amounts of Xanax, which we will not put before the jury but in

2   the government's view will lead to this person's overdose

3   death.

4           THE COURT:  Is there evidence that the decedent gave

5   Dr. Taylor a bribe as well or no?

6           MS. FLETCHER:  No.  Not aware of one, no.  Apart from

7   cash payments for office visits, which I think were common to

8   all the patients.

9           I misspoke.  Some of his office visits were paid for

10  by insurance.

11          THE COURT:  Okay.  I will think about this.  It does

12  seem that Witness 2 in terms of the doors that perhaps were

13  opened, I don't think this door was opened in terms of what you

14  were trying to get out of this stipulation testimony.  This

15  does seem to be that now we're starting to get into whether or

16  not it was a good idea to give someone Oxycodone for this

17  particular cervical spine injury.  Obviously there is the issue

18  of this person having a prior opioid addiction, but this seems

19  very different than what we're talking about with Witness 1 in

20  terms of being consistent with your theory that he is getting

21  bribes for giving medically totally medically unnecessary

22  prescriptions.  This seems as if perhaps there is a judgment

23  call that could be made as to whether or not this was

24  appropriate.

25          Certainly that link of any kind of bribe here is

 1   missing.  This does seem as if this is extremely prejudicial.

 2   Again, while the stipulation does take some of this out of

 3   here, I am not even sure why we need to have any proffered

 4   testimony from this mother at all.  To the extent that your

 5   point would be that this person that Dr. Taylor wrote a letter

 6   to a rehab facility indicating that he believed that this

 7   person suffered from opioid addiction, and did you have a

 8   prescription later on two years later or four years later,

 9   indicating that he is prescribing Oxycodone to that person, I

10   am not sure why you need this mother's testimony to make that

11   point.

12          Again, my other concern is that point I think doesn't

13   really correspond to this issue of a door being opened.  I am

14   not sure this point is a 404(b).  This is something that is

15   prejudicial but not particularly probative of anything in this

16   case.

17          MS. FLETCHER:  Your Honor, I think we're happy to take

18   this up as more evidence comes in.  The government's view is

19   that this evidence is relevant to the defendant's knowledge and

20   that he is not being duped by his patients into prescribing the

21   medically unnecessary Oxycodone.  He believes it is necessary.

22   This is proof or at least -- and the Court can question the

23   probative value of the proof, but it is at least proof there

24   are instances where is he prescribing Oxycodone not because of

25   a medical condition but because the person has a Oxycodone

1   addiction.

2           THE COURT:  That does seem like a different issue and

3   different potential crime than what we're talking about here in

4   terms of this door being opened.

5           Does defendants counsel want to be heard on that?

6           MR. CARNESI:  No, your Honor.

7           THE COURT:  Anything else we need to discuss today?

8           MS. FLETCHER:  So as we previewed earlier today, your

9   Honor, there is some scheduling issue with Dr. Gharibo.

10  Actually, I think this makes more sense for AUSA Roos to talk

11  about it.  He raised a point now that the fact that Dr. Gharibo

12  will also testify about Michael Montanino, Witness 1.  So even

13  though Montanio is not going to be a witness soon, this issue

14  with respect to Witness 1 may present itself earlier than

15  indicated.

16          MR. ROOS:  Your Honor, Dr. Gharibo sees patients and

17  he is fully scheduled on Wednesday and early Thursday morning,

18  which is a conflict he raised with us when we required about

19  the move.  He can testify tomorrow.  He also has Thursday

20  afternoon and Friday available.  We were looking at ways to

21  move it around.  The concern we want to cut off is I think his

22  direct is lengthy.  It may be three hours.  Say we start it

23  tomorrow, there are two potential issues.  One is we hit 3:00

24  and defense counsel is in the middle of crossing Dr. Gharibo

25  and he cannot come back on Wednesday.  Another is one that AUSA

1   Fletcher just raised and that is Dr. Gharibo is going to opine

2   on the various patients that were seen.  So to the extent Mr.

3   Montabano is allowed to testify, Dr. Gharibo would do a

4   corresponding review of his medical chart.  So in terms of

5   sequencing, it is important to have a decision at least on

6   whether or not that person will testify at all so that Dr.

7   Gharibo's testimony can be adjusted accordingly.

8           The other option is of course we put him Thursday

9   afternoon and we'll have to move some people around and so it

10  is possible there could be a -- I don't know if the Court will

11  entertain a late start one day or early ending.  End with the

12  witness and Dr. Gharibo would be next on Thursday afternoon.

13  It is not a clear request, but I wanted to raise those

14  complications around the scheduling issue.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Ibqntay4

1          THE COURT:  OK.  It seems to me that we could

2     certainly juggle some things around if we need to.  It seems

3     that, based on what you have said, it may make sense for the

4     government's expert, he can start certainly Thursday afternoon

5     and finish up Friday.  It seems that that would work.  I am not

6     sure that -- your concern with Montanino's testimony as it

7     relates to the expert is what exactly?

8          MR. ROOS:  Your Honor, for instance, like I said

9     tomorrow would be the other possibility for the expert.  The

10    expert is testifying about his review of Montanino's records,

11    and Montanino is ultimately not a part of the case.  There will

12    be a disconnect there.

13          I mean, for instance, the letters that AUSA Fletcher

14    was referencing are in Michael Montanino's medical file that

15    was seized that the expert is going to review.  So, you know,

16    having clarity on at least whether there will be any testimony

17    from Michael Montanino is sort of relevant before Dr. Gharibo

18    testifies.  The same seem would go for James Impellizine -- my

19    apologies, your Honor.

20          THE COURT:  It seems to me, again, that the issue with

21    Michael Montanino, as I ruled before, was perhaps this coming

22    in as 404 evidence if a door gets opened.  If that door gets

23    opened, then certain evidence is admissible to sort of correct

24    any sort of misimpressions that may have been made by in this

25    case defense counsel.  That doesn't necessarily mean it opens

Ibqntay4

1      up everything that possibly concerns this witness.

2             I am not sure why this expert -- I understand why you

3      would like it, but I am not sure why this expert's testimony

4      regarding Montanino is all that probative when this expert is

5      going to be talking about other purported patients who are part

6      of the actual conspiracy.

7             The information about Montanino that may be coming in

8      would be the information to rebut defense counsel's claim about

9      his client being duped and being betrayed and this sort of

10     thing.  I don't think that the door has been opened to all of

11     that, to now allowing this expert to go and talk about whether

12     or not this was medically necessary.

13            I think that with Montanino, if this evidence comes in

14     that he was kicked out of the practice along with his brother

15     and they bought Dr. Taylor a boiler to get back into the

16     practice, that creates or that cures the harm that was done to

17     the government by me not allowing them to put some of that

18     evidence in and by defense counsel making some statements that

19     may be misleading to the jury if that isn't cured in some way.

20            I think that my inclination is that, no, I don't think

21     that the door gets opened to now having this expert talk about

22     Montanino, because it does also seem very cumulative.  This

23     expert is going to be talking about these other potential

24     patients.  Again, the issue is, it's curing the harm that may

25     have been done based on defense counsel's opening.

Ibqntay4

1          MR. ROOS:  Yes, your Honor.  As I mentioned, just in

2     terms of the pure scheduling question, I think our two options

3     are the expert tomorrow, although then he might run later, or

4     else Thursday to Friday.  Would your Honor entertain keeping

5     the jury a little late tomorrow to allow them to finish?  I

6     know now we are raising this after they've left for the day,

7     but I am thinking about, if he were to be testifying tomorrow,

8     a way to sort of get him off the witness stand.

9          THE COURT:  What do you mean if he testifies tomorrow

10     get him off the witness stand?

11          MR. ROOS:  Because we end at 3, and he can't appear on

12     Wednesday, there would be sort of this issue of what -- does he

13     come back Thursday afternoon?

14          THE COURT:  He could.  That's why tomorrow doesn't

15     seem like a great idea anyway.  Also, I am not sure why he

16     needs a three-hour direct.  That seems a little long, and it

17     may not be particularly riveting for a jury to listen to this

18     expert go through charts for three hours.

19          MR. ROOS:  Certainly.  If we are taking out Michael

20     Montanino, we will at least shrink it a little bit.

21          Thank you, your Honor.  We will look at the schedule

22     and figure out what is appropriate.

23          THE COURT:  Anything else from defense counsel on

24     this?

25          MR. CARNESI:  No, your Honor.

Ibqntay4

1          THE COURT:  Anything else?

2          MS. FLETCHER:  Your Honor, just, if we don't call

3     Dr. Gharibo tomorrow, I expect that we will call Detective Del

4     Rosario, who is sitting here.

5          THE COURT:  OK.

6          MS. FLETCHER:  Based on my earlier conversations with

7     Mr. Carnesi, it appears that Mr. Carnesi is going to try to

8     elicit the statements made by Denise Suarez through Detective

9     Del Rosario.  Those statements in the government's view will be

10    far beyond the scope of Detective Del Rosario's direct

11    examination.  We are really only calling him for the purpose of

12    introducing several recordings that were prepared by

13    confidential sources.

14         So I think in order to avoid having issues tomorrow

15    where we're arguing on the fly about what exactly is within the

16    scope of his testimony, the government would benefit from a

17    proffer from Mr. Carnesi as to what specific statements made by

18    Ms. Suarez to the government that he intends to elicit through

19    Detective Del Rosario.

20         We will also inform your Honor, to the extent that

21    he's eliciting only statements, it will inform what we will

22    seek to elicit and perhaps need to raise with your Honor in the

23    morning.

24         THE COURT:  All right.  Let's do this.  Why don't we

25    get counsel here at 9 o'clock tomorrow, and we can hash some of

Ibqntay4

| | |
|---|---|
| 1 | them out.  To the extent that the government is now making a |
| 2 | motion to preclude certain cross-examination, counsel for the |
| 3 | government, get me a letter brief by 7:30 this evening. |
| 4 | And, defense counsel, if you have any response, can |
| 5 | you get that to me by 9:30 this evening? |
| 6 | MR. CARNESI:  I will take a look at it, Judge. |
| 7 | THE COURT:  All right. |
| 8 | MS. FLETCHER:  Your Honor, to be clear, I am not sure |
| 9 | we are actually going to be moving to preclude, but we won't |
| 10 | know. |
| 11 | THE COURT:  What you are asking now -- this is what I |
| 12 | get concerned about, especially at the end of the day -- you |
| 13 | are asking Mr. Carnesi to give you a proffer which he hasn't |
| 14 | given you before.  Then you are going to respond, he's going |
| 15 | respond, and we're all kind of free styling here at the end of |
| 16 | the day.  I don't think that it is going to get me much clarity |
| 17 | without actually looking at the proffer statement and looking |
| 18 | at these documents. |
| 19 | So, if nothing else, I understand you may not want to |
| 20 | write some letter briefs this evening, but perhaps if the |
| 21 | parties just give me a joint status report.  How about that? |
| 22 | MS. FLETCHER:  Sure. |
| 23 | THE COURT:  At 8 o'clock p.m.  So the parties can |
| 24 | discuss this amongst themselves.  If there is agreement, fine; |
| 25 | if not, that's fine, too.  But also just draw my attention to |

Ibqntay4

1     the proffer notes so that we can deal with it.

2              MS. FLETCHER:  We are hopeful that we can work it out.

3              THE COURT:  All right.

4              But let's get counsel here at 9 o'clock a.m. in any

5     event just to make sure we can deal with any issues that have

6     come up.

7              MS. FLETCHER:  OK.

8              THE COURT:  All right.  Have a good evening.

9              (Adjourned to November 27, 2018, at 9:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        INDEX OF EXAMINATION

2  Examination of:                        Page

3   LAWRENCE MONTABANO

4  Direct By Mr. Roos . . . . . . . . . . . . . . .48

5            GOVERNMENT EXHIBITS

6  Exhibit No.                        Received

7   105 A and 105 B   . . . . . . . . . . . . . .51

8   102 A and 102 B   . . . . . . . . . . . . . .53

9   124 A and 124 B   . . . . . . . . . . . . . .56

10  101 A and 101 B   . . . . . . . . . . . . . .60

11  129   . . . . . . . . . . . . . . . . . . . .61

12

13

14

15

16

17

18

19

20

21

22

23

24

25