Ibrntay1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                        17 Cr. 390 (ALC)

DAVID TAYLOR,
              Defendant.       Trial

------------------------------x

                               New York, N.Y.
                               November 27, 2018
                               9:00 a.m.

Before:

                  HON. ANDREW L. CARTER, JR.,

                               District Judge
                               -and a Jury-

                       APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  KIERSTEN A. FLETCHER
     JUSTIN V. RODRIGUEZ
     NICOLAS T. ROOS
     Assistant United States Attorneys

CHARLES F. CARNESI
     Attorney for Defendant

Also Present:

Matthew Del Rosario, Special Agent DEA
Rosanna Corrado, Paralegal Specialist

Ibrntay1

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  Please be seated.

4          I received the government's letter.  I didn't get

5     anything from defense counsel that I saw on ECF or e-mail.

6          Was there anything submitted from defense counsel?

7          MR. CARNESI:  No, your Honor.

8          THE COURT:  OK.

9          Let me get clarification from the government as to

10    exactly what it is -- let me let you know what my concerns are.

11    In your letter, you talk about the need to submit the gist of

12    the statement to the jury.  You indicate that, taken together,

13    Ms. Suarez' complete statement is that while some patients

14    asked her or paid her not to submit their urine samples for

15    urinalysis, none of those patients were from Gallicchio's crew,

16    and she nonetheless submitted some of the samples even when

17    other customers tried to convince her not to do so.

18          That second part, "none of those patients were from

19    Gallicchio's crew," it doesn't seem to me from looking at the

20    proffer notes that that is exactly what she said, that she was

21    that definitive in the proffer.  It seems that she said she

22    didn't think any of them were from Gallicchio's crew, which is

23    a little different.

24          MS. FLETCHER:  Yes, I would agree that that is what

25    she said, that she didn't think that any of the people who paid

Ibrntay1

1  her or asked her not to submit urinalysis were people from

2  Vito's crew.

3        THE COURT:  OK.  Again, that is different than they

4  definitely were.  The way you have this in this letter makes it

5  seem as if they were not.  I just have also some concerns

6  about -- let me find out from the government.  Do you plan on

7  trying to elicit her statement about her belief about

8  Dr. Taylor and the urinalysis?  You have this in the discussion

9  section.  I don't know if this is just simply background or you

10 wish to try to elicit from her that it didn't matter whether

11 she submitted the urinalysis because she knew or she believed

12 that Dr. Taylor wasn't going to discharge them from the

13 practice.

14        MS. FLETCHER:  Here's the point, your Honor.  As I

15 understand what Mr. Carnesi wants to introduce, he seeks to

16 introduce through Detective Del Rosario that Denise Suarez said

17 that she accepted bribes from 50 patients in exchange for her

18 agreement not to submit their urinalysis.

19        I think, based on his opening, what Mr. Carnesi

20 intends to argue from that testimony is that, to the extent

21 that the urinalysis records were incomplete or that the doctor

22 didn't urine test people in Vito's crew, it was because Denise

23 effectively was thwarting his protocols and preventing members

24 of Vito's crew from getting their urine tested.  If you take

25 her entire statement, her statement makes clear that that is

1   not what was happening both because, even though she agreed,

2   she accepted payment for her agreement to not submit the

3   urinalysis, in fact, she submitted much of the urinalysis

4   anyway, and her statement is that, based on her recollection in

5   the proffer, the people who offered to pay her were members of

6   actually a different crew, Robert Bloome's crew, not Vito

7   Gallicchio's crew.

8          So the government wouldn't seek to elicit any of this,

9   but our position is that if some of it is coming in, the

10  defendant should be required to elicit the other information

11  that makes the portion he's seeking to elicit not completely

12  misleading and distorting of what she said.

13         THE COURT:  OK.  Defense counsel, what is it that you

14  plan to elicit?

15         MR. CARNESI:  Judge, I plan to elicit, as was laid out

16  in the proffer, that she said that she took payments from I

17  believe at least 50 people is the way she referred to it, 50 or

18  more patients in order to in one way or another either not

19  submit the urinalysis or to somehow tamper with the urinalysis,

20  and she did that as a result of receiving these bribes.

21         I am having a little bit of difficulty, Judge, in

22  understanding the government's argument, because although it

23  was my belief walking into this courtroom, having reviewed the

24  indictment and everything leading up to it that this was a case

25  about Dr. Taylor being alleged to have given Vito Gallicchio

Ibrntay1

1 prescriptions through third parties so that they could be sold

2 on the street, now the government, they moved away from that.

3 What they said is, well, just anybody where it was medically

4 unnecessary.

5 THE COURT: Again, because we have a jury coming soon,

6 let's try to cabin the comments to this issue. You wish to

7 elicit from this witness the portion of the proffer statement

8 in which Ms. Suarez indicates that she took payments. Exactly

9 what is it that you wish to --

10 MR. CARNESI: That she took payments in order not --

11 THE COURT: You are talking about tampering with. I

12 don't know if that's in the proffer, about tampering with

13 samples. I don't know if that's there.

14 MS. FLETCHER: I think the tampering is that she

15 doesn't submit the sample that either they provide her with a

16 sample and say please don't send this in or they don't provide

17 a sample at all. That is what I think the tampering was.

18 THE COURT: OK.

19 MR. CARNESI: The point that I was trying to get to,

20 Judge, is now under this, what I perceive as a new theory, any

21 patient whose urinalysis was not submitted because they

22 received the bribe, Ms. Suarez received a bribe, it is

23 relevant. It doesn't matter whether it had anything to do with

24 Mr. Gallicchio, whether they were his patients, whether she

25 remembered all of the patients. The evidence is going to be,

Ibrntay1

1   Judge, his patients were given urinalysis at least in certain

2   instances.

3           THE COURT:  Right.

4           What is the issue then with at least having brought

5   out or bringing out that, although she acknowledges receiving

6   payment for not submitting urinalysis on certain occasions, she

7   still did submit the urinalysis even in those situations,

8   correct?  Some of those situations, correct?

9           MR. CARNESI:  That is what the statement says.

10          THE COURT:  It seems to me that at a minimum that is

11  fair to bring that out, because it is a little misleading to

12  leave the jury thinking that she's receiving the payments and

13  because she received these payments she never submitted any of

14  these results, when according to her proffer and according to

15  what you say the evidence is going to show, and I assume

16  there's other evidence that is going to indicate that she did

17  in fact submit these.  So I am not sure why there's much

18  prejudice there to the defense or to the government in terms of

19  that.

20          MR. CARNESI:  Judge, my concern is that, as you

21  articulated when you started out, I don't believe that her

22  subjective opinion that the doctor would not have thrown out

23  Mr. Gallicchio's patients or patients referred by

24  Mr. Gallicchio should come in.

25          MS. FLETCHER:  That is not her opinion, your Honor.

Ibrntay1

| | |
|---|---|
| 1 | It's two separate things.  She says she accepted payments not |
| 2 | to submit urinalysis. |
| 3 | THE COURT:  OK. |
| 4 | MS. FLETCHER:  Those payments were made by people who |
| 5 | were not in Gallicchio's crew.  She identifies a list of them. |
| 6 | So that's who she is accepting the payments from.  She says |
| 7 | sometimes she accepted payments and she actually didn't submit |
| 8 | the urinalysis and other times she accepted the payment and she |
| 9 | submitted the urinalysis anyway. |
| 10 | THE COURT:  Right. |
| 11 | MS. FLETCHER:  Because she knew the doctor didn't |
| 12 | care.  Separately, she says that the people who paid her, the |
| 13 | people who asked her not to submit urinalysis were largely |
| 14 | members of Bloome's crew, and she says that she sometimes |
| 15 | didn't send the urine because Bloome was actually paying her. |
| 16 | Separate from that, she says that she didn't think any |
| 17 | of Vito's patients ever asked her not to submit their |
| 18 | urinalysis.  So we expect to present evidence that certain of |
| 19 | Vito's patients were urine tested, but not regularly, and to |
| 20 | make arguments about the lack of urinalysis testing related to |
| 21 | Vito's patients.  So it's two separate issues. |
| 22 | THE COURT:  Who is going to make the arguments about |
| 23 | the lack of urine testing?  You or the defense? |
| 24 | MS. FLETCHER:  The government. |
| 25 | THE COURT:  OK. |

Ibrntay1

1          MS. FLETCHER:  There's two issues with respect to

2     Vito's people that the doctor either didn't urine test or that

3     he did urine test them and didn't take steps to remove them

4     from the practice, notwithstanding a problematic urine test.

5          THE COURT:  OK.

6          OK.

7          Anything else from defense counsel on this?

8          MR. CARNESI:  No, your Honor.

9          THE COURT:  Again, I am troubled by this notion of

10    getting into statements from her saying that she didn't believe

11    that it would matter whether Vito's crew were tested.  That

12    does seem to me a bit far afield from what's been elicited or

13    what defense counsel wishes to elicit.

14         MS. FLETCHER:  Your Honor, again, I think your Honor

15    has combined the two statements.  There are two separate

16    statements.

17         THE COURT:  Right.

18         MS. FLETCHER:  So her statement that she didn't think

19    she actually needed to divert the urinalysis because the doctor

20    wouldn't kick patients out is unrelated to Vito's crew

21    entirely.

22         THE COURT:  I guess my question is do you wish to

23    elicit that?  That's the question.

24         MS. FLETCHER:  If Mr. Carnesi is going to elicit that

25    she accepted payments to divert urinalysis for particular

Ibrntay1

1    patients, that is going to create an impression that she in

2    fact diverted the urinalysis for those patients and that those

3    patients were members of Vito's crew.  Therefore, the evidence

4    that the government is presenting with respect to Dr. Taylor's

5    urinalysis testing of Vito's crew is misleading because Denise

6    was tampering with it all.

7         In fact, there's two separate reasons why that

8    particular statement is misleading.  One, those payments

9    weren't coming from Vito's crew at all.

10        THE COURT:  That's what I guess I am trying to see, if

11   we can cut to the chase.

12        MS. FLETCHER:  Yes.

13        THE COURT:  If we bring out her statement that she

14   accepted payments for not submitting urinalysis, and in those

15   situations she still did, when she received payments, submit

16   urine for urinalysis, and if the statement is introduced that

17   she doesn't believe that the people she received payments from

18   were from Vito's crew, doesn't that resolve all the rest of

19   this?

20        MS. FLETCHER:  Yes.

21        THE COURT:  OK.  Defense counsel?

22        MR. CARNESI:  I am fine with that, Judge.

23        THE COURT:  OK.  So let's try to keep it cabined to

24   that.

25        Back on the other issue of Mr. Montanino, I have

Ibrntay1

1    thought about that some more.  It does seem to me that the door

2    has been opened by defense counsel.  Again, some of his

3    statements in his opening statement about the doctor throwing

4    it all away for steaks, and there were some other things.

5              MS. FLETCHER:  Cigars.

6              THE COURT:  Cigars and some other things.  Obviously a

7    boiler is different from a steak and different from cigars.  It

8    seems to me that it is appropriate for Mr. Montanino to

9    testify, but in a very limited manner, regarding him being

10   kicked out of the practice, he and his brother getting kicked

11   out of the practice, and he speaking to his brother and them

12   chipping in to purchase a boiler, provide the boiler to

13   Dr. Taylor, and, as a result of that, being allowed back into

14   the practice.

15             That seems to me to be fine, but it should be limited

16   to that.  I don't believe that it is appropriate that the door

17   has been opened so much that the government's expert should be

18   offering testimony regarding Montanino and whether this was

19   medically necessary.  It does seem to me that it would be

20   appropriate, if Mr. Montanino can testify to this, that

21   Mr. Montanino could say that it wasn't necessary for him to

22   receive the oxycodone.  That seems to me to be fine as well.

23             MS. FLETCHER:  OK.  So, two points, your Honor.

24             First, one modification to what your Honor said.  In

25   fact, Mr. Montanino was kicked out of the practice three times.

Ibrntay1

1          THE COURT:  OK.

2          MS. FLETCHER:  So we would seek to elicit the full

3    extent of how often he was kicked out and got himself back into

4    the practice.

5          I think only the third instance involves the boiler.

6          The other two involve other gifts.

7          THE COURT:  What are the other gifts?

8          MS. FLETCHER:  The first one is lumber, your Honor.

9    And the second is -- I know, you can't make this up -- the

10   first one is lumber.  The second one I think the witness does

11   not remember exactly what the gift was.

12         THE COURT:  OK.  Defense counsel, anything on that?

13         MR. CARNESI:  He remembers a gift, but doesn't

14   remember what it was?  Is that the proposed testimony?

15         THE COURT:  On the second one, yes.

16         MR. CARNESI:  No, Judge.

17         THE COURT:  Anything else before we get ready to bring

18   the jury in?

19         MS. FLETCHER:  Your Honor, I think we are going to

20   asked to be heard further on the issue relating to

21   Dr. Gharibo's testimony, but that can be dealt with at the end

22   of the trial today.

23         THE COURT:  OK.  How much longer do you have with the

24   witness who is currently on the stand?

25         MR. ROOS:  Is probably over an hour, your Honor.

Ibrntay1

| | |
|---|---|
| 1 | THE COURT:  OK.  And then who's next? |
| 2 | MR. ROOS:  After the direct and cross of this witness, |
| 3 | Mr. Montalbano, it's the case agent, the detective sitting at |
| 4 | the table.  Then we have two other witnesses available for |
| 5 | today.  Depending on where we are in the day, we'll make a |
| 6 | decision on which one we will put on. |
| 7 | THE COURT:  All right.  As soon as the jury gets here, |
| 8 | we'll start. |
| 9 | (Recess) |
| 10 | THE COURT:  The jury is here. |
| 11 | So let's continue with the trial.  One thing we should |
| 12 | talk about, the government has indicated after this witness the |
| 13 | case agent is going to testify.  It seems to me that the |
| 14 | government could conduct their direct, Mr. Carnesi will |
| 15 | cross-examine this witness.  To the extent that Mr. Carnesi |
| 16 | doesn't bring out these other things the government can bring |
| 17 | that out on redirect.  But let's just make sure that the |
| 18 | government has spoken to the case agent about the limits on |
| 19 | this testimony regarding the proffer. |
| 20 | MS. FLETCHER:  We instructed the case agent actually |
| 21 | just a few minutes ago. |
| 22 | THE COURT:  OK.  Let's bring in the jury, and let's |
| 23 | bring the witness in. |
| 24 | MS. FLETCHER:  Your Honor, we also raised with |
| 25 | Mr. Carnesi the presence of case agent at counsel's table |

Ibrntay1

1    during other witness testimony.  He had no objection.

2            THE COURT:  OK.

3     LAWRENCE MONTALBANO, resumed.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ibrntay1                    Montalbano - Direct

1          (Jury present)

2          THE COURT:  OK.  Please be seated.

3          Welcome back.  I hope you had a pleasant evening.

4    Let's continue with the case on trial.

5          Go ahead, counsel.

6          MR. ROOS:  Thank you, your Honor.

7    DIRECT EXAMINATION (Continued)

8    BY MR. ROOS:

9    Q.  Mr. Montalbano, when we left off yesterday, I had asked you

10   about the doctor's office at Victory Boulevard.

11         Do you remember that?

12   A.  Yes.

13   Q.  Can you please describe for the jury your first visit at

14   Dr. Taylor's office.

15   A.  Sure.  I walked in.  I went to the secretary.  I said I had

16   an appointment.  She told me to have a seat, and then the

17   doctor called me in a few minutes later.

18   Q.  What happened in the exam room?

19   A.  I sat down, introduced myself.  The doctor asked me if I

20   was in any pain.  I said yes.

21         He said where was the pain.

22         I told him my lower back.

23         And at the time I think I had heel spurs.  I told him

24   my feet.  So he sent me on an x-ray, to get an x-ray of my

25   lower back and my feet.

1    Q.  You said you had you told him you had pain in your heels.

2    Do you tell him you had other types of pain?

3    A.  My back.

4    Q.  Did you say any type of back pain in particular?

5    A.  Excuse me.

6    Q.  Did you specify the type of back pain?

7    A.  Yes.

8    Q.  What?

9    A.  My lower back.  I couldn't bend too much.  I couldn't sit

10   too long or stand.

11   Q.  What type of x-ray did the doctor refer you for?

12   A.  My lower back and my heel -- my feet.

13   Q.  Were you actually in pain?

14   A.  No.

15   Q.  Did you tell him you were having any problems with your

16   feet besides the heel spurs?

17   A.  No.

18   Q.  Why did you say you were in pain if you weren't?

19   A.  So I could obtain a prescription.

20   Q.  How was it that you came to decide to tell him that you

21   were in pain?

22   A.  I was told by my friend Vito.

23   Q.  Now, in the examination room, did Dr. Taylor discuss any

24   alternative methods of treatment?

25   A.  No.

1   Q.  Did he discuss oxycodone addiction with you?

2   A.  No.

3   Q.  Did he conduct any type of physical examination?

4   A.  No.

5   Q.  Did he lay hands on you?

6   A.  For a couple of seconds.

7   Q.  How did he lay hands on you?

8   A.  He just touched my lower back.

9   Q.  Now, you said the doctor referred you for an x-ray.  Did

10  you get an x-ray?

11  A.  Yes.

12  Q.  When did you get the x-ray?

13  A.  Right after the visit.

14  Q.  What did you do with the x-ray report?

15  A.  I brought it back the next day to the doctor.

16  Q.  Did you hand it to him?

17  A.  I gave it to the girl at the front desk.

18  Q.  Do you know whether he saw it?

19  A.  Not -- I didn't see him look at it, but when I went into

20  the room, when he called me in, he read the report.

21  Q.  Could you describe his reading of the report.

22  A.  He just sat there and looked at it, and then he wrote the

23  prescription for oxycodone and Naprosyn.

24  Q.  Approximately how long did he look at the report?

25  A.  Minutes, a couple of minutes.

Ibrntay1                    Montalbano - Direct

1   Q.  Now, you said he wrote you a prescription.  What was the

2   prescription for?

3   A.  Oxycodone, 30 milligrams.

4   Q.  I'm showing you now for identification purposes what's been

5   marked as Government Exhibit 418A.

6           Is it up on your screen, Mr. Montalbano.

7   A.  Yes.

8   Q.  Do you recognize this document?

9   A.  Yes.

10  Q.  What is it?

11  A.  The two prescriptions he wrote on my first -- on my second

12  visit.

13  Q.  What is the date?

14  A.  July 1, 2014.

15          MR. ROOS:  The government offers Government Exhibit

16  418A.

17          THE COURT:  Any objection.

18          MR. CARNESI:  No, your Honor.

19          THE COURT:  OK.  It's in.

20          (Government Exhibit 418A received in evidence)

21          MR. ROOS:  May we publish this to the jury, your

22  Honor?

23          THE COURT:  Yes.

24  BY MR. ROOS:

25  Q.  Now, Mr. Montalbano, there are two prescriptions pictured

Ibrntay1                    Montalbano - Direct

1   on this document, is that correct?

2   A.  Yes.

3   Q.  What is the prescription on the right side?

4   A.  Roxicodone, 30 milligrams.

5   Q.  What is Roxicodone?

6   A.  That's the oxycodone.

7   Q.  Does the prescription say how many --

8   A.  Yes.

9   Q.  -- pills you got?

10  A.  Yes.

11  Q.  How many?

12  A.  150.

13  Q.  The other prescription on the document, what is that?

14  A.  Naprosyn.

15  Q.  Do you have an understanding of what Naprosyn is?

16  A.  Yes, an anti-inflammatory, like Aleve.

17  Q.  Do you know why you were prescribed that?

18  A.  For my heel spurs.

19  Q.  Did Dr. Taylor ever prescribe you Naprosyn again?

20  A.  No.

21  Q.  Now, did you pay for your office visit?

22  A.  I might have paid a copay through insurance.

23  Q.  What was your method of payment?

24  A.  Insurance.

25  Q.  What did you do with the two prescriptions after they were

1    written for you?

2    A.  I went to the pharmacy and had them filled.

3    Q.  Did you take the Roxicodone or oxycodone pills after the

4    prescription was filled?

5    A.  Take them, ingest them?

6    Q.  Correct.

7    A.  No.

8    Q.  What did you do with them?

9    A.  I gave them to Vito.

10   Q.  Do you know what he did with them?

11   A.  He sold them.

12   Q.  How do you know that?

13   A.  He gave me cash for them.

14   Q.  How much money did he give you for the pills?

15   A.  $1125.

16   Q.  And was your understanding that that was a lump sum or a

17   price per pill?

18   A.  Price per pill.

19   Q.  How much were you paid per pill?

20   A.  $7.50.

21   Q.  After the first visit to Dr. Taylor which you just

22   described, did you go back for any subsequent visits?

23   A.  Yes.

24   Q.  On approximately how many occasions?

25   A.  30, 30 plus.

Ibrntay1                    Montalbano - Direct

1   Q.  And how frequently did you go back for visits?

2   A.  Every month.

3   Q.  After the office visit when you got oxycodone for the first

4   time, when was your next visit?

5   A.  July 21.

6   Q.  Did you make an appointment for that visit?

7   A.  Yes.

8   Q.  When did you make the appointment?

9   A.  On July 1, the day I went to the doctor.

10  Q.  The day you went to the doctor for the first time?

11  A.  The first time, yes.

12  Q.  Which office did you go to for the second appointment?

13  A.  Castleton Avenue.

14  Q.  I'll show you now what's been marked for identification as

15  Government Exhibit 125.

16          THE COURT:  Counsel, do you plan to introduce this

17  into evidence?

18          MR. ROOS:  Yes, your Honor.

19          THE COURT:  Is there any objection to 125?

20          MR. CARNESI:  No, your Honor.

21          THE COURT:  OK.  It's in.

22          MR. ROOS:  Thank you, your Honor.

23          (Government Exhibit 125 received in evidence)

24          MR. ROOS:  May we publish it?

25          THE COURT:  Yes.

Ibrntay1                    Montalbano - Direct

1  BY MR. ROOS:

2  Q.  Mr. Montalbano, can you describe the Castleton office.

3  A.  Excuse me?

4  Q.  Can you describe the Castleton office.

5  A.  Yes, you walk in, there's chairs to the right and a desk to

6  the left, and then a door that goes into the doctor's area.

7  Q.  When you went to this office for the first time, was there

8  anyone else at the office?

9  A.  Yes.

10  Q.  Who else was in the office?

11  A.  Other patients.

12  Q.  What were some of the things you recall about the patients

13  that were there?

14  A.  Some of them were nodding off, some were standing in the

15  corner, some of them looked like they were on drugs, high.

16          MR. CARNESI:  Objection.

17          THE COURT:  Overruled.

18  Q.  Now, Mr. Montalbano, have you spent time around people who

19  have been using drugs?

20  A.  No.

21  Q.  Are you familiar in any way with what drug use looks like?

22  A.  Yes.

23  Q.  And how are you familiar with that?

24  A.  I know people that smoke pot, you know, they get the red

25  eyes.  I'm from Wall Street, so I seen people use cocaine

1   before.

2   Q.  Can you please describe for the jury your second visit.

3   A.  My second visit I went up to the desk.  I said, I'm here to

4   see Dr. Taylor.  I have an appointment.  I sat down.  A few

5   minutes later the doctor came out with my chart in his hand and

6   he called me into the office.

7   Q.  When you went into the office or the examination room with

8   Dr. Taylor, what happened?

9   A.  I sat down.  He said, Hi, Larry, how you doing?

10          I'm still in a lot of pain, Doc.

11          And he proceeded to look at my chart, flipping through

12  the pages.  Then he wrote whatever on top and then he gave me

13  another prescription.

14  Q.  Now, what, if anything, did you talk to the doctor about in

15  the examination room?

16  A.  Just about I'm still in pain and I still can't touch my

17  toes, you know, stretch or whatever, and that's basically it.

18  Q.  And did you elaborate on those topics further or was that

19  really all that you said?

20  A.  It was just condensed, like it was quick.

21  Q.  Did he do a physical examination of you?

22  A.  No.

23  Q.  Did he lay hands on you?

24  A.  No.

25  Q.  During the office examination, did anyone mention

Ibrntay1                    Montalbano – Direct

1    oxycodone?

2    A.  No.

3    Q.  Was there any discussion of the type of prescription that

4    the doctor would be writing for you?

5    A.  No.

6    Q.  You testified the doctor was writing this chart.  Could you

7    tell what he was writing.

8    A.  I'm sorry?

9    Q.  You testified that the doctor was writing in his chart,

10   right?

11   A.  Yes.

12   Q.  Could you tell what he was writing?

13   A.  No.

14   Q.  What did you observe about the way he was writing?

15   A.  It seemed like he was copying from the previous month.

16   Q.  Why do you say that?

17   A.  Because he would lift the page, put it down, write; lift

18   the page, put it down and write.

19   Q.  Did he ask you if you took the pills from the prior month?

20   A.  No.

21              (Continued on next page)

22

23

24

25

1    Q.  How many days was your first prescription for?

2    A.  30.

3    Q.  The second time you got a prescription, was it 30 days

4    later?

5    A.  No.

6    Q.  How many days later?

7    A.  20.

8    Q.  Why did you go back 20 days?

9    A.  I think he was going on vacation.

10   Q.  Mr. Montalbano, I will show you what's been marked as

11   Government Exhibit 418B.  Do you recognize this document?

12   A.  Yes.

13   Q.  What is it?

14   A.  My prescription on July 21 for --

15            MR. ROOS:  Government offers --

16   A.  -- Roxicodone.

17   Q.  I'm sorry?

18   A.  For oxycodone.

19            MR. ROOS:  Government offers Exhibit 418B.

20            THE COURT:  Any objection?

21            MR. CARNESI:  No objection.

22            THE COURT:  Okay.  It's in.

23            (Government's Exhibit 418B received in evidence)

24            MR. ROOS:  May we please publish it to the jury?

25   BY MR. ROOS:

1   Q.  Mr. Montalbano, what did you do with the prescription you

2   got the second time?

3   A.  I brought it to the pharmacy, got it filled, and gave the

4   pills to Vito.

5   Q.  Was there a time when you went for yet another appointment

6   with Dr. Taylor?

7   A.  Yes.

8   Q.  What happened at that appointment?

9   A.  Basically the same.  I went in, it was quick.

10  Q.  Did you do anything different when you went for the third

11  time?

12  A.  Yes, I brought some food.

13  Q.  What type of food?

14  A.  Italian food, chicken parm and spaghetti.

15  Q.  Why do you specifically recall chicken parm and spaghetti?

16  A.  Because I worked at a pizzeria, and that's what the doctor

17  liked.

18  Q.  Why did you bring the food?

19  A.  To cut the line.

20  Q.  What do you mean by "cut the line"?

21  A.  So I wouldn't have to wait a couple of hours in the waiting

22  room.

23  Q.  Why would you otherwise need to wait a couple of hours if

24  you had an appointment?

25  A.  Because there was a lot of people in the waiting room.

1   Q.  Do you recall approximately how many?

2   A.  On any given -- when I was there, ten to 15.

3   Q.  Besides the time that you brought -- besides the third time

4   when you brought food, did you ever bring food again?

5   A.  Yes, almost every visit.

6   Q.  From your third visit -- I'm sorry, at the third visit, did

7   the examination, or lack thereof, change in any way?

8   A.  No.

9   Q.  And when you saw the doctor approximately how long was the

10  visit?

11  A.  Less than five minutes.

12  Q.  When was the last time that you saw the doctor?

13  A.  I would have to say May of 2016.

14  Q.  2016?

15  A.  2017.

16  Q.  I'm going to ask you a series of questions about your

17  visits from the third visit until that last visit, okay?

18  A.  Sure.

19  Q.  For each of those visits, approximately how long was your

20  time in the examination room with the doctor?

21  A.  Less than five minutes.

22  Q.  During those visits, did he physically examine you in any

23  way?

24  A.  No.

25  Q.  Did he lay hands on you?

Ibr2tay2                    Montalbano - Direct

1    A.  No.

2    Q.  During those visits, did you have any discussions about

3    medical tests?

4    A.  No.

5    Q.  During any of the visits did Dr. Taylor discuss alternative

6    methods of treatment with you?

7    A.  No.

8    Q.  Did you ever discuss physical therapy?

9    A.  No.

10   Q.  Did Dr. Taylor have any discussions with you after the

11   first visit about whether you needed oxycodone?

12   A.  No.

13   Q.  And did you ever have a discussion about the amount of

14   oxycodone that was being prescribed?

15   A.  No.

16   Q.  Now, you testified previously that you didn't take your

17   oxycodone on your first visit.  Did you take it at any

18   subsequent point?

19   A.  No.

20   Q.  And why not?

21   A.  I didn't need them.

22   Q.  Did Dr. Taylor ask you if you were taking the oxycodone?

23   A.  No.

24   Q.  Did he conduct any urine tests to determine if you were

25   taking oxycodone?

1   A.  No.

2   Q.  What, if anything, did Dr. Taylor do with the subsequent

3   visits?

4   A.  Write a prescription.

5   Q.  Did you have any conversations during the office visits?

6   A.  We spoke about Trump.  That's basically about it.

7   Q.  Now, did he write anything in the charts that you could

8   observe during your office visits with him?

9   A.  Yeah, it looked like he was writing from the previous

10  month.

11  Q.  And what do you mean by that?

12  A.  The same thing.  He was looking at the previous month,

13  putting it down, writing, looking at the previous month, like

14  he was tracing.

15  Q.  How many pills did Dr. Taylor prescribe to you each month?

16  A.  On average 150.

17  Q.  Was there ever a time when he gave you something other than

18  150?

19  A.  Yes.

20  Q.  What happened?

21  A.  He lowered it to 120.

22  Q.  And what happened after he lowered it to 120?

23  A.  I think it was the next month I told him that I was running

24  out of pills and I needed to go back up to 150.

25  Q.  Now, did he tell you why he lowered you to 120?

1  A.  No.

2  Q.  Did he ever have a discussion with you about whether you

3  had taken oxycodone before you saw him?

4  A.  No.

5  Q.  Did you tell him that your pain had increased?

6  A.  To go up to 150, yeah.

7  Q.  Now, was there a time in your visits where you discussed

8  changing the number of pills per month to something other than

9  150?

10  A.  Yes.

11  Q.  What happened?

12  A.  I asked to go to 180.

13  BY THE COURT:

14  Q.  I'm sorry.  You asked to go to what?

15  A.  180.

16  Q.  Approximately how long after your first visit was that

17  conversation?

18  A.  I don't know if it was between six months and a year.

19  Q.  What did you talk about in those conversations?

20  A.  That I was in pain, I was running out by the end of the

21  month, I needed to go up a little more to 180, and that was the

22  discussion, and then the doctor said he wouldn't do it without

23  an MRI.

24  Q.  Were you actually in pain?

25  A.  No.

1  Q.  Why then did you ask to go to 180?

2  A.  To make more money.

3  Q.  Was this idea something that you came up with by yourself?

4  A.  No.

5  Q.  Did you have a conversation with another person about this?

6  A.  Yes.

7  Q.  Who did you have a conversation with?

8  A.  Vito.

9  Q.  And what was your conversation?

10  A.  He said, you know, you should get more pills.  Just ask the

11  doctor to get more, and he should prescribe them to you.

12  Q.  You just testified that Dr. Taylor said to have the

13  increase you would need an MRI, is that correct?

14  A.  Correct.

15  Q.  Did you get an MRI?

16  A.  No.

17  Q.  In all your visits with Dr. Taylor, did he ever send you

18  for any supplemental x-rays after the first one?

19  A.  No.

20  Q.  Did he ever refer you for an MRI?

21  A.  No.

22  Q.  What about a referral for physical therapy?

23  A.  No.

24  Q.  Did he require you to do a urine test to prove you were

25  taking the pills?

1    A.   No.

2    Q.   Did you ever discuss with Vito what Dr. Taylor did in the

3    exam rooms?

4    A.   Yes.

5    Q.   Did you raise any concerns with Vito?

6    A.   Not really.  I just told him what went on and that was it.

7    Q.   And what did you say to Vito about what happened in the

8    exam room?

9    A.   I said, you know, I just basically told him that we talked,

10   I give him food, and then I leave, I get the prescription.

11   Q.   Did you ever mention to Vito anything about the way the

12   doctor took notes?

13   A.   Yes.

14   Q.   What did you say to Vito?

15   A.   I said, it looks like he is copying from the month before,

16   and Vito laughed.

17   Q.   What, if anything, did Vito say in response?

18   A.   He said, don't worry about it.  His -- his files are

19   impeccable.

20   Q.   Did he say anything else about the doctor in that

21   conversation?

22   A.   Not that I recall.

23   Q.   Do you know how Vito knew that the doctor's files were

24   impeccable?

25             MR. CARNESI:  Objection.

1        THE COURT:  I will allow it.

2   A.  I guess he has been doing it so many years, and -- I don't

3   know.

4        MR. CARNESI:  Objection.

5        THE COURT:  Sustained.

6   BY MR. ROOS:

7   Q.  Did there come a time when the defendant's location

8   changed?

9   A.  Yes.

10  Q.  Do you know when?

11  A.  In 2016 sometime.

12  Q.  Where did Dr. Taylor's office move to?

13  A.  Hylan Boulevard.

14        MR. ROOS:  Can we please have for identification

15  Government Exhibits 126A and B.

16  Q.  Mr. Montalbano, do you recognize these?

17  A.  Yes.

18  Q.  What are they?

19  A.  That's the doctor's office on Hylan Boulevard.

20        MR. ROOS:  The government offers Government Exhibit

21  126A and B.

22        THE COURT:  Do you have any objection?

23        MR. CARNESI:  No, sir.

24        THE COURT:  Okay.  It's in.

25        (Government's Exhibits 126 A and B received in

Ibr2tay2                    Montalbano - Direct

1   evidence)

2         MR. ROOS:  Can we publish Government Exhibit 126A for

3   the jury.

4   Q.  Did you continue to see the defendant at this location?

5   A.  Yes.

6   Q.  What were the doctor's hours at this location?

7   A.  I'm not sure of the hours, but I know I went on Thursday.

8   Q.  What do you mean by you went on Thursday?

9   A.  That was my day to go, once a month on Thursdays.

10  Q.  Did you know other people who went on Thursdays?

11  A.  Yes.

12  Q.  Who were some of the other people you knew that went on

13  Thursdays?

14  A.  Mike Barberi, Ralph Debiase, Mike Farley, Don Carim, and

15  Lenny Danzi.

16  Q.  And how do you know those people?

17  A.  I saw them there.

18  Q.  Did you see other people in the office?

19  A.  Yes.

20  Q.  Can you describe the people that you saw in the office?

21  A.  Same as the other previous office, nodding off.  They

22  looked like they were on something.

23  Q.  Approximately how many patients were in the waiting room at

24  that office?

25  A.  Same ten to 20.

Ibr2tay2                     Montalbano - Direct

1    Q.  Do you recall any times where there were more patients than

2    that?

3    A.  Yes.

4    Q.  What, if anything, do you remember about those

5    circumstances?

6    A.  He was closed on Fourth of July, which was a Tuesday, so

7    they had the Tuesday patients come the same time as the

8    Thursday patients.

9    Q.  So to be clear, the doctor normally saw people on a

10   Tuesday, is that --

11   A.  Correct.

12   Q.  But he was closed for Fourth of July, is that right?

13   A.  Yes.

14   Q.  So instead all of the patients came on --

15   A.  -- Thursday.

16   Q.  And what happened that you recall?

17   A.  The lady at the front desk told me that he is going to

18   alternate patients, see a Tuesday, see a Thursday, see a

19   Tuesday.  And as far as I know when I went there they were on

20   the third Thursday in a row, and I saw some patients getting

21   agitated.  Then I was called in.  I was either the fourth or

22   fifth Thursday in a row.  And then the guy started yelling in

23   the waiting area and the doctor was sitting down with me, and I

24   kind of said, you are going to let them yell at your secretary

25   like that?  And he got up and yelled at them and said if

Ibr2tay2                    Montalbano - Direct

1   everybody doesn't shut up and sit down, they are not getting

2   anything.

3   Q.  And what did you understand Dr. Taylor to mean when he said

4   they are not getting anything?

5   A.  That they are not going to get their prescription.

6   Q.  Did you have an understanding of what type of prescription?

7           MR. CARNESI:  Objection.

8   A.  Yes.

9           THE COURT:  Overruled.

10  Q.  Do you have an understanding of what type of prescription?

11  A.  Yes.

12  Q.  What type of prescription?

13  A.  Oxycodone.

14  Q.  Did there come a time when you stopped seeing the doctor?

15  A.  Yes.

16  Q.  And you testified earlier that was in 2017?

17  A.  Yes.

18  Q.  Now, in the -- all of the visits at the Hylan office, did

19  the nature of the examinations change in any way?

20  A.  No.

21  Q.  Did the doctor ever touch you in any physical examinations?

22  A.  No.

23  Q.  Did the doctor change the number of pills that you were

24  prescribed?

25  A.  No.

1   Q.  From the second visit to the last visit, were you ever

2   urine tested?

3   A.  No.

4   Q.  Did Vito tell you what to do if you were urine tested?

5   A.  Yes.

6   Q.  What did he say?

7   A.  He told me to take a piece of the pill with me in case I

8   get urine tested and crush it and put it in the urine.

9   Q.  Was there ever a time that Dr. Taylor prescribed you

10  anything besides the oxycodone 30 milligrams and the Naprosyn?

11  A.  Yes.

12  Q.  What else did he prescribe to you?

13  A.  MS Contin.

14  Q.  Do you have an understanding of what type of pill that is?

15  A.  It's a 24-hour slow release opioid.

16  Q.  Showing you what's been marked for identification as

17  Government Exhibit 418C, Mr. Montalbano, do you recognize this

18  document?

19  A.  Yes.

20  Q.  What is it?

21  A.  The two prescriptions that I received.  I can't really see

22  a date.

23  Q.  I believe --

24  A.  March.

25          MR. ROOS:  I believe it is a multi-page document.

1    Ms. Corrado, can we go through each of the pages?

2    A.   What was that?

3    Q.   It's a multi-page document.  If you would look at your

4    screen, just to look at all four of the pages.

5    A.   So what do I do?  Okay.  I gotcha.

6    Q.   Mr. Montalbano, what are these?

7    A.   Those are my prescriptions from March to June of 2017.

8              MR. ROOS:  The government offers 418C.

9              THE COURT:  Any objection?

10             MR. CARNESI:  No, sir.

11             THE COURT:  Okay.

12             MR. ROOS:  Can we publish them?

13             THE COURT:  Yes.

14             (Government's Exhibit 418C received in evidence)

15   BY MR. ROOS:

16   Q.   Mr. Montalbano, are these the MS Contin prescriptions you

17   just mentioned?

18   A.   Yes.

19   Q.   What, if anything, did Dr. Taylor say when he prescribed

20   the MS Contin?

21   A.   He says he doesn't care if I don't take them, just make

22   sure I fill it.

23   Q.   You testified that your method of payment was insurance,

24   right?

25   A.   Correct.

Ibr2tay2                    Montalbano - Direct

1    Q.  Was there ever a time where you had to pay cash?

2    A.  Yes.

3    Q.  What year was that?

4    A.  2016.

5    Q.  Did you have insurance at the time?

6    A.  Yes.

7    Q.  Why did you pay cash?

8    A.  The office changed.  There was new women, and that's when I

9    think Denise was fired.

10   Q.  Were there any people who had to pay cash but had

11   insurance?

12   A.  Yes.

13   Q.  How do you know this?

14   A.  I was there when some young woman was complaining about

15   paying the 150 when she paid with her insurance the whole time.

16   Q.  Once you got prescriptions, what did you do with them?

17   A.  I went to the pharmacy, filled them, and gave it to Vito.

18   Q.  Was there ever a time you did not give your prescriptions

19   to Vito?

20   A.  Yes.

21   Q.  What did you do with them instead?

22   A.  I gave them to Mike Barberi.

23   Q.  So you sold them?

24   A.  Yes.

25   Q.  At all other times did you sell them to Vito or give them

Ibr2tay2                    Montalbano - Direct

1    to Vito?

2    A.  I'm sorry?

3    Q.  Besides the time with Mike Barberi, in all other instances

4    did you give your pills to Vito?

5    A.  Most of the time.

6    Q.  What else did you do with them?

7    A.  I sold them to Mike Barberi also.

8    Q.  Did the price that Vito paid for the pills change?

9    A.  No.

10   Q.  Do you know what Vito did with the pills?

11   A.  He sold them.

12   Q.  Do you know who he sold them to?

13   A.  Yes.

14   Q.  Who?

15   A.  Daniel Garcia.

16        MR. ROOS:  Okay.  Please show the witness Government

17   Exhibit 111A.

18   Q.  Who is this?

19   A.  Daniel Garcia.

20        MR. ROOS:  Permission -- I'm sorry.  The government

21   offers 111A.

22        MR. CARNESI:  No objection.

23        THE COURT:  Okay.  It's in.

24        MR. ROOS:  May we publish?

25        THE COURT:  Yes.

1          (Government's Exhibit 111A received in evidence)

2     BY MR. ROOS:

3     Q.   Mr. Montalbano, who is Daniel Garcia?

4     A.   An acquaintance, a friend of Vito's.

5     Q.   Do you know what he did with the pills?

6     A.   He sold them.

7     Q.   You mentioned earlier that you were arrested in February of

8     2018, is that right?

9     A.   Correct.

10    Q.   What you just described, is that what led to your arrest?

11    A.   Yes.

12    Q.   At the time of your arrest, did you make statements to law

13    enforcement?

14    A.   Yes.

15    Q.   Why?

16    A.   Because I wanted to cooperate.

17    Q.   Were you fully truthful and forthcoming at that time?

18    A.   No.

19    Q.   What did you do?

20    A.   I held back some information.

21    Q.   Did you make false statements to law enforcement?

22    A.   Yes.

23    Q.   Why did you do that?

24    A.   I was nervous.

25    Q.   Have you since corrected those statements?

1    A.   Yes.

2    Q.   Do you remember telling law enforcement agents at the time

3    of your arrest you don't know of any dealings that Vito had

4    with the doctor?

5    A.   Yes.

6    Q.   Were you being fully truthful when you said that?

7    A.   No.

8    Q.   What's the truth?

9    A.   They had an arrangement.

10   Q.   Do you know what type of arrangement?

11   A.   Informal.

12   Q.   I will come back to that.

13        Do you remember saying you don't know if Vito gave

14   Dr. Taylor money?

15   A.   Yes.

16   Q.   Were you being fully truthful when you said that?

17   A.   No.

18   Q.   What's the truthful answer?

19   A.   He gave him cash.

20   Q.   And do you remember saying that you didn't speak to Vito

21   about how things would go at the doctor?

22   A.   I'm sorry?

23   Q.   Do you remember telling the agents that you didn't talk to

24   Vito about the doctor?

25   A.   Yes.

1   Q.  And was that the truth?

2   A.  No.

3   Q.  What's the truth?

4   A.  I did.

5   Q.  Since the time -- since the time of your arrest, have you

6   cooperated with the government?

7   A.  Yes.

8   Q.  And when did you first start cooperating?

9   A.  In February of 2016.  No.  '18.  2018.

10  Q.  Why did you start -- why did you decide to cooperate?

11  A.  To do the right thing.

12  Q.  Were there any other reasons?

13  A.  And to get a 5K letter.

14  Q.  And what do you mean by a 5K letter?

15  A.  To help me, so I don't -- hopefully my end result would be

16  no jail time.

17  Q.  So you decided to cooperate, at least in part, to get

18  leniency.

19  A.  Yes.

20  Q.  Once you decided to cooperate, did you meet with law

21  enforcement agents and the government?

22  A.  Yes.

23  Q.  Did you tell them about your conduct in this case?

24  A.  Yes.

25  Q.  Since your arrest, how many times have you met with law

1  enforcement or government attorneys?

2  A.  More than ten.

3  Q.  Were some of those meetings spent preparing for your

4  testimony here today?

5  A.  Yes.

6  Q.  As part of those meetings, did you inform the government

7  about other issues with the law that you had?

8  A.  Yes.

9  Q.  What were those other issues?

10  A.  Shoplifting in 2014 and 2016.

11  Q.  What happened in the 2014 incident?

12  A.  In Stop & Shop I tried to walk out with groceries.

13  Q.  And what resulted from that?

14  A.  I got arrested and I had to pay a fine.

15  Q.  How about the 2016 incident?

16  A.  I used to take care of an elderly gentleman in a

17  wheelchair, and I used to take him shopping and he used to put

18  things underneath his -- underneath him in the chair and I got

19  caught for that, and he died, so I had no witness, so I

20  basically took that charge, too.

21  Q.  So you pled guilty to that as well?

22  A.  Yes.

23  Q.  Were you punished in any way?

24  A.  Fine.

25  Q.  Have you disclosed any other crimes you have committed to

Ibr2tay2                    Montalbano - Direct

1   law enforcement?

2   A.   Yes.

3   Q.   What are crimes?

4   A.   Giving the doctor counterfeit money to pay my office visit

5   one time.

6   Q.   Please describe what you did.

7   A.   I gave the woman $150, I think.  There was two 50s and a 10

8   were fake, to pay my office visit.

9   Q.   So you paid fake currency to the doctor's office?

10  A.   Yes.

11  Q.   Directing your attention to 2015, was there a time when you

12  were a witness to a robbery?

13  A.   Yes.

14  Q.   Can you describe what happened and your involvement?

15  A.   My car was involved.  I was with Vito at his house, and he

16  was waiting for somebody to come.  That person was Ralph

17  Debiase.  We got in the car, drove over to Willowbrook Deli.  I

18  sat in the car with Vito.  I had no idea what was going on at

19  the time.  Ralph ran out, threw something in the back seat, he

20  went back in the store, he came back out and he said to Vito,

21  go, go, go, and I said to Vito, are you going to let me out?

22  And he says he couldn't let me out because he was speeding, and

23  they went to Ralph's house.  I sat in the car while they, I

24  guess, did what they did inside, and then came out and drove me

25  back to his house.

Ibr2tay2                          Montalbano - Direct

1    Q.  That was sort of fast, so I'm going to break it down a

2    little bit.  So what, if anything, did you do during the

3    robbery of the deli?

4    A.  I sat in my car.

5    Q.  What, if anything, did you know about the robbery prior to

6    it happening?

7    A.  Nothing.

8    Q.  And how did you learn there was a robbery?

9    A.  After the fact.

10   Q.  From whom did you learn it?

11   A.  Vito.

12   Q.  What, if anything, did you get as a result of the robbery?

13   A.  Nothing.

14   Q.  Did you ever report the robbery?

15   A.  No.

16   Q.  So you didn't come forward with this information until you

17   were meeting with the government in 2018.

18   A.  Correct.

19   Q.  As a result of the meetings with the government, you became

20   a cooperating witness?

21   A.  Yes.

22   Q.  Are you being paid for your cooperation?

23   A.  No.

24   Q.  Since your arrest, have you pled guilty to any crimes?

25   A.  Yes.

Ibr2tay2                    Montalbano - Direct

1    Q.   What crimes?

2    A.   Conspiracy to distribute oxycodone.

3    Q.   At the time you pled guilty, did you have an agreement with

4    the government?

5    A.   Yes.

6    Q.   Was it a written agreement?

7    A.   Yes.

8    Q.   And what type of agreement was it?

9    A.   A cooperation agreement.

10   Q.   Are you testifying today pursuant to that cooperation

11   agreement?

12   A.   Yes.

13   Q.   And why are you testifying pursuant to the cooperation

14   agreement?

15   A.   For leniency and to do the right thing.

16   Q.   Your understanding of -- you mentioned a 5K letter earlier.

17   Do you have an understanding of what a 5K letter is?

18   A.   Yes.

19   Q.   And what is a 5K letter?

20   A.   It puts down all my good points and my bad points.

21   Q.   And who writes the 5K letter?

22   A.   Prosecution.

23   Q.   And when you say your bad points, what is included in

24   there?

25   A.   All my crimes.

1   Q.  Does the outcome of this trial have any impact on whether

2   the government writes you a 5K letter?

3   A.  No.

4   Q.  What would be the maximum possible sentence you face for

5   your guilty plea?

6   A.  20 years.

7   Q.  Do you have any understanding of whether the government

8   could prosecute you for the separate crime of perjury if you

9   lie during your testimony today?

10  A.  Yes.

11  Q.  Have you been sentenced for the crime you pled guilty to?

12  A.  No.

13  Q.  Has the government promised you any particular sentence --

14  A.  No.

15  Q.  -- for your cooperation?

16  A.  No.

17  Q.  Has anyone promised you a particular sentence?

18  A.  No.

19  Q.  Do you know whether the government is going to recommend a

20  particular sentence?

21  A.  No.

22  Q.  Who decides the sentence you get?

23  A.  The judge.

24  Q.  What sentence are you hoping to get?

25  A.  Nothing.

1  Q.  Does the outcome of this trial have any impact on the

2  sentence you get?

3  A.  No.

4  Q.  I want to change topics.

5      Earlier you mentioned you filled prescriptions at

6  pharmacies, is that right?

7  A.  Correct.

8  Q.  What pharmacies did you fill your prescriptions at?

9  A.  Bergen Point in Bayonne, New Jersey.

10 Q.  Any others?

11 A.  Safe Rx in Edison, New Jersey; Victory Boulevard -- Victory

12 Pharmacy, on Victory Boulevard, Staten Island; and Hudacko's in

13 Bayonne, New Jersey.

14 Q.  Why did you go to Bergen Point?

15 A.  That's where Vito sent me.

16 Q.  What did Vito say about Bergen Point?

17 A.  He said, give the pharmacist Joe $60, and he will give you

18 the script, he will give you the pills.

19 Q.  How did you get to -- and where is that pharmacy?

20 A.  Bayonne, New Jersey.

21 Q.  How did you get there?

22 A.  I drove my car over the bridge.

23 Q.  Which bridge?

24 A.  Bayonne Bridge.

25 Q.  What waterway does the Bayonne Bridge go over?

Ibr2tay2                    Montalbano - Direct

1    A.  Kill van Kull.

2    Q.  Were you able to fill at Bergen Point apothecary more than

3    once?

4    A.  Yes.

5    Q.  Did there come a time where you stopped filling there?

6    A.  Yes.

7    Q.  Why?

8    A.  I think him and Vito had a falling out.

9    Q.  You think who and Vito had a falling out?

10   A.  The pharmacist, Joe.

11   Q.  Where did you go next after that pharmacy?

12   A.  After that I went to Victory Pharmacy on Victory Boulevard

13   in Staten Island.

14   Q.  Why did you go there?

15   A.  That's where Vito sent me.

16   Q.  I'm showing you what's been marked for identification as

17   Government Exhibit 127.

18              Mr. Montalbano, what is this?

19   A.  That's Victory Pharmacy.

20   Q.  Do you recognize any of the individuals in the picture?

21   A.  Yes, Vito, with the white hat.

22              MR. ROOS:  Government offers Exhibit 127.

23              MR. CARNESI:  No objection.

24              THE COURT:  Okay.  It's in.

25              (Government's Exhibit 127 received in evidence)

1              MR. ROOS:  Can we publish it for the jury, please.

2    BY MR. ROOS:

3    Q.  Mr. Montalbano, can you describe for the jury which part of

4    the picture is the pharmacy?

5    A.  The one with the sign that says "Victory Pharmacy."

6    Q.  You mentioned a moment ago that you saw Vito in the

7    picture.  Which one is Vito?

8    A.  The one with the white hat.

9    Q.  Did Vito tell you why you should go to Victory Pharmacy?

10   A.  Yes, because he was close with the pharmacist there.

11   Q.  Who was the pharmacist there?

12   A.  Nick Avicolli.

13   Q.  Have you met nick Avicolli?

14   A.  Prior to filling my script, no.

15   Q.  What about after?

16   A.  Yes.

17   Q.  Showing you for identification what's been marked as

18   Government Exhibit 109A.

19              Do you recognize this picture?

20   A.  Yes.

21   Q.  What is it?

22   A.  That's the pharmacist, Nick Avicolli.

23              MR. ROOS:  Government offers 109A and B?

24              THE COURT:  Any objection?

25              MR. CARNESI:  No objection.

Ibr2tay2                    Montalbano - Direct

1          THE COURT:  Okay.  It's in.

2          (Government's Exhibits 109A and B received in

3    evidence)

4          THE COURT:  Do you want to publish it?

5          MR. ROOS:  Can we publish it?

6          THE COURT:  Okay.

7    BY MR. ROOS:

8    Q.  Mr. Montalbano, approximately how long did you fill your

9    prescription at Victory Pharmacy?

10   A.  Four times, roughly four times, maybe more.

11   Q.  Was there a time where you stopped filling your pharmacy

12   there?

13   A.  Yes.

14   Q.  Or stopped filling your prescription?

15   A.  Yes.

16   Q.  Why did you stop filling it?

17   A.  He was charging too much.

18   Q.  What did you do next?

19   A.  I drove around looking for a pharmacist that would accept

20   my prescription.

21   Q.  Did you go to another pharmacy?

22   A.  Yes.

23   Q.  What pharmacy?

24   A.  Safe Rx in Edison, New Jersey.

25   Q.  Why did you go all the way to Edison, New Jersey?

1    A.   'Cause nobody would take Dr. Taylor's script in Staten

2    Island.

3    Q.   What do you mean by that?

4    A.   I tried CVS on Victory Boulevard and they said that they

5    won't accept his prescription because he was red flagged.

6    Q.   Did you talk to anyone about that issue?

7    A.   Yes.

8    Q.   Who?

9    A.   Vito.

10   Q.   What was the substance of your conversation?

11   A.   I told him what happened, and he laughed about it.

12   Q.   You mentioned that you went to Safe Rx Pharmacy in Edison,

13   New Jersey.  How did you get there?

14   A.   I drove my car over the bridge.

15   Q.   Which bridge?

16   A.   Either the Goethals Bridge or the Bayonne Bridge.

17   Q.   Approximately how many times did you fill your prescription

18   there?

19   A.   Once.

20   Q.   Did there come a time where you filled at any other

21   pharmacies?

22   A.   Yes.

23   Q.   What other pharmacies?

24   A.   Hudacko's in Bayonne.

25   Q.   And how did you get there?

1  A.  I drove my car over the Bayonne Bridge.

2  Q.  Did you tell Dr. Taylor or his staff where you filled any

3  of your prescriptions?

4  A.  Yes.

5  Q.  Which, if any, of the pharmacies did you mention?

6  A.  Hudacko's.

7  Q.  Showing you what's been marked for identification as

8  Government Exhibit 418D, please.

9          What's this?

10  A.  That's my folder.

11  Q.  What do you mean your folder?

12  A.  My chart, where he puts all of my medical documents.

13  Q.  From Dr. Taylor's office?

14  A.  Yes.

15  Q.  Have you seen it before?

16  A.  Yes.

17          MR. ROOS:  Government offers 418D.

18          THE COURT:  Any objection?

19          MR. CARNESI:  No, sir.

20          THE COURT:  Okay.  It's in.

21          (Government's Exhibit 418D received in evidence)

22          MR. ROOS:  May we publish this to the jury?

23          THE COURT:  Yes.

24  BY MR. ROOS:

25  Q.  Mr. Montalbano, what is written on this chart, folder?

1   A.  Hudacko's Pharmacy, the telephone number, the address, and

2   the fact that I was self-pay for 150 --

3   Q.  Do you know why --

4   A.  -- my name.

5   Q.  -- those things are written on there?

6   A.  Yes, they were going electronic script, and they needed the

7   information for the pharmacy.

8   Q.  What's your understanding of what electronic script is?

9   A.  You don't get a paper script.  They send it directly to the

10  pharmacy through the Internet.

11  Q.  You mentioned it says "self-pay 150."  What does that mean?

12  A.  That means I had to pay 150 per visit.

13  Q.  What does "self-pay" mean?

14  A.  That I have no insurance.

15  Q.  You testified earlier that a number of other individuals

16  that you named also went to the doctor's office.  Did Vito

17  recruit anyone else besides you that you knew of to go to the

18  doctor's office?

19  A.  Yes.

20  Q.  Who else did Vito send to Dr. Taylor?

21  A.  Mike Barberi, Ralph Debiase, Don Carim, Lenny Danzi, Mike

22  Farley, Tara Farley, Lori Gallicchio.

23  Q.  What's your understanding of why these individuals went to

24  Dr. Taylor?

25  A.  To obtain a prescription for oxycodone to sell.

1    Q.  How, if at all, did Vito describe this group of people?

2    A.  How did he describe his people?

3    Q.  This group of people?

4    A.  That was his circle, his inner circle.

5    Q.  And what do you mean by his inner circle?

6    A.  His group that he has dealings with in . . .

7    Q.  Showing you now for identification what's been marked as

8    Government Exhibit 104A.

9           Who is this, Mr. Montalbano?

10   A.  Don Carim.

11   Q.  What's his connection to Vito?

12   A.  Vito called him his nephew.

13   Q.  Do you know if he saw Dr. Taylor?

14   A.  Yes.

15   Q.  How do you know that?

16   A.  He was in the office when I was there.

17          MR. ROOS:  Government offers 104A and B.

18          THE COURT:  Any objection?

19          MR. CARNESI:  No objection.

20          THE COURT:  Okay.  It's in.

21          (Government's Exhibits 104A and B received in

22   evidence)

23          MR. ROOS:  May we publish 104A?

24          THE COURT:  Yes.

25   BY MR. ROOS:

1   Q.  Mr. Montalbano, do you know roughly how old Don Carim is?

2   A.  I'm going to say late twenties.

3   Q.  I will show you now for identification -- can we take this

4   one down -- what's been marked as Government Exhibit 107A.

5           Who is this?

6   A.  Leonard Danzi.

7           MR. ROOS:  Government offers 107A and B.

8           THE COURT:  Any objection?

9           MR. CARNESI:  No.

10          THE COURT:  Okay.  It's in.

11          (Government's Exhibits 107A and B received in

12  evidence)

13          MR. ROOS:  May we publish it, your Honor?

14          THE COURT:  Yes.

15  BY MR. ROOS:

16  Q.  Mr. Montalbano, what was Mr. Danzi's connection to Vito?

17  A.  I was a friend of his.

18  Q.  Do you know if he saw Dr. Taylor?

19  A.  Yes.

20  Q.  How do you know that?

21  A.  'Cause he told me he went to the doctor.

22          MR. ROOS:  Can we please have 108A for identification.

23  Q.  Who is this?

24  A.  Mic Farley.

25          MR. ROOS:  Government offers 108A and B.

1        THE COURT:  Any objection?

2        MR. CARNESI:  No, sir.

3        THE COURT:  Okay.  It's in.

4        (Government's Exhibits 108A and B received in

5    evidence)

6        MR. ROOS:  May we publish it?

7        THE COURT:  Yes.

8    BY MR. ROOS:

9    Q.  Now, Mr. Montalbano, what is the -- do you have any

10   understanding what the connection or relationship is between

11   Vito and Mr. Farley?

12   A.  He was a friend of his and he also used to drive him

13   around.

14   Q.  What do you mean "drive him around"?

15   A.  He used to drive Vito around in the car at night.  We used

16   to call him Mikey Limo.

17   Q.  Do you know if he went to Dr. Taylor?

18   A.  Yes.

19   Q.  How do you know that?

20   A.  I seen him there.

21   Q.  Did you see these people there on Thursdays?

22   A.  It might have been the Thursday that everybody was grouped

23   together.

24   Q.  I show you now for identification 122A.  Who is this?

25   A.  Tara Farley.

Ibr2tay2                    Montalbano - Direct

1          MR. ROOS:  Government offers 122A.

2          THE COURT:  Any objection?

3          MR. CARNESI:  No, sir.

4          THE COURT:  Okay.  It's in.

5          (Government's Exhibit 122A received in evidence)

6          MR. ROOS:  May we publish 122A and B?  The government

7     offers 122B also, and may we publish 122A?

8          THE COURT:  Yes.  Is there any objection to 122B.

9          MR. CARNESI:  No, sir.

10         THE COURT:  Okay.  Yes, yes.

11         (Government's Exhibit 122B received in evidence)

12    BY MR. ROOS:

13    Q.  I'm sorry, Mr. Montalbano, who is this?

14    A.  Tara Farley, Mike Farley's wife.

15    Q.  Do you know her connection to Vito?

16    A.  Yes.

17    Q.  What's her connection?

18    A.  Friend, and she was also getting a prescription.

19    Q.  She was also getting a prescription from who?

20    A.  From Dr. Taylor for oxycodone.

21    Q.  How do you know that?

22    A.  'Cause Vito would tell me that he had to pick up her pills.

23    Q.  Showing you now what's been marked for identification as

24    120A.

25         Do you know who this is?

1   A.  Mike Barberi.

2           MR. ROOS:  Government offers 120A and B.

3           THE COURT:  Any objection?

4           MR. CARNESI:  No, your Honor.

5           THE COURT:  Okay.  It is in.

6           (Government's Exhibits 120A and B received in

7   evidence)

8           MR. ROOS:  May we publish Government Exhibit 120A for

9   the jury?

10          THE COURT:  Yes.

11  BY MR. ROOS:

12  Q.  Mr. Montalbano, how do you know Michael Barberi?

13  A.  Through Vito.

14  Q.  You testified earlier that you sold some of your pills to

15  someone beside Vito.  Is that Michael Barberi?

16  A.  Yes.

17  Q.  Do you know Michael Barberi's connection to Vito?

18  A.  Yes.

19  Q.  What is the connection?

20  A.  He was a friend and he also bought Vito's pills from him.

21  Q.  And how do you know that?

22  A.  'Cause I have seen the transaction.

23  Q.  Do you know if Michael Barberi was a patient of Dr. Taylor?

24  A.  Yes.

25  Q.  Showing you now what's been marked for identification as

1    Government Exhibit 121A.  What is this?

2    A.   Ralph Debiase.

3             MR. ROOS:  Government offers Exhibit 121A and B.

4             THE COURT:  Any objection?

5             MR. CARNESI:  No, your Honor.

6             THE COURT:  Okay.  It is in.

7             (Government's Exhibits 121A and B received in

8    evidence)

9             MR. ROOS:  May we publish 121A?

10            THE COURT:  Yes.

11   BY MR. ROOS:

12   Q.   Mr. Montalbano, what's Vito's connection to Ralph Debiase?

13   A.   Another friend.

14   Q.   Is this the individual that you testified earlier that was

15   involved in the robbery?

16   A.   Yes.

17   Q.   I just want to clarify -- actually let me ask, do you know

18   if this individual, Ralph Debiase, went to Dr. Taylor?

19   A.   Yes.

20   Q.   How do you know that?

21   A.   I seen him in the office.

22   Q.   Now, going back to Michael Barberi, let me ask you, do you

23   know if he saw the doctor or if he was in the doctor's office?

24   A.   Yes.

25   Q.   How do you know that?

1  A.  'Cause he would come to me prior to his visit and ask me

2  for my urine in case the doctor tested him.

3  Q.  And do you know what, if anything, the doctor was treating

4  him for?

5  A.  No.

6  Q.  Do you know if he was actually a patient?

7  A.  That he went to the doctor?

8  Q.  I mean if he was actually receiving treatment?  Do you know

9  if he was actually receiving treatment?

10  A.  No.

11  Q.  I'm showing you now for identification what's been marked

12  as Government Exhibit 115A.  Who is this?

13  A.  Lori Gallicchio, Vito's wife.

14         MR. ROOS:  Government offers 115A and B.

15         THE COURT:  Any objection?

16         MR. CARNESI:  No.

17         THE COURT:  Okay.  It is in.

18         (Government's Exhibits 115A and B received in

19  evidence)

20  BY MR. ROOS:

21  Q.  What's -- I think you said this, but what's the connection

22  between Vito and Lori Gallicchio.

23  A.  His wife.

24  Q.  And do you know if Lori saw Dr. Taylor?

25  A.  No.

1    Q.   You don't know or she did not see him?

2    A.   She didn't see him.

3    Q.   How do you know that?

4    A.   'Cause Vito would pick up the scripts from the doctor's

5    house for him and his wife.

6    Q.   How do you know that Vito picked up his prescriptions for

7    him and his wife at the doctor's house?

8    A.   'Cause he would tell me he's got to go to the doctor's to

9    get his script.

10   Q.   Did Vito tell you what type of prescription he was getting?

11   A.   Yes.

12   Q.   What type of prescription?

13   A.   Oxycodone.

14   Q.   Did he tell you how much he was getting from the doctor?

15   A.   Yes.

16   Q.   What?

17   A.   240.

18   Q.   What does 240 mean?

19   A.   Pills, 240 pills.

20   Q.   And do you know if he had a medical reason for receiving

21   the pills?

22   A.   No.

23   Q.   You don't know or he did not?

24   A.   He didn't.

25   Q.   How do you know that?

Ibr2tay2                    Montalbano - Direct

1   A.  'Cause he wasn't in pain.

2   Q.  Did Vito ever complain to you about any pain, illness, or

3   injury?

4   A.  No.

5   Q.  What about his wife?

6   A.  No.

7   Q.  Do you know whether she had any sort of medical reason for

8   the pills?

9   A.  No.

10  Q.  She did not or you don't know?

11  A.  She -- I don't know.  She didn't.  She didn't.  She wasn't

12  in pain either.

13  Q.  Let me ask you about a few other names.

14          Do you know Michael Montanino?

15  A.  No.

16  Q.  Do you know John Marino?

17  A.  No.

18  Q.  Do you know Brian Dolinko?

19  A.  No.

20  Q.  Besides paying for your office -- let me ask you, it said

21  "self-pay" earlier.  Was the cost of your visit $150?

22  A.  Yes.

23  Q.  Was that in cash?

24  A.  Yes.

25  Q.  Besides paying for your office visits, did you give

1   anything else to the doctor?

2   A.  Yes.

3   Q.  What else did you give him?

4   A.  The food and at Christmastime I bought him a bottle of

5   Macallan.

6   Q.  How often did you bring him food?

7   A.  Just about every visit.

8   Q.  Why?

9   A.  To jump the line.

10  Q.  Was there a time when you didn't bring him food?

11  A.  Yes.

12  Q.  What happened?

13  A.  I forgot to bring it.

14  Q.  Did you say anything about the food?

15  A.  Yes.  I apologized to the doctor, saying I forgot to bring

16  his food; if he wanted it, he can come by the pizzeria and pick

17  it up.

18  Q.  What happened after the visit?

19  A.  He came by the pizzeria to pick up the food.

20  Q.  Did he pay?

21  A.  No.

22  Q.  You mentioned you gave him, you said, a whisky?

23  A.  Yes.

24  Q.  What type of whisky?

25  A.  Macallan.

1    Q.  And why did you give him the Macallan?

2    A.  Because Vito told me he liked it.

3    Q.  Do you know how Vito knew that he liked to drink whisky?

4    A.  I guess he had a rapport with him.

5    Q.  Rapport with who?

6    A.  With the doctor.

7    Q.  How much did the bottle of Macallan cost?

8    A.  Around $50.

9    Q.  Do you know whether Vito gave the doctor anything?

10   A.  Yes.

11   Q.  What did Vito say about why or what he gave the doctor?

12   A.  He gave him Macallan, cigars, refrigerator, TV, and some

13   cash.

14   Q.  What about anything for Dr. Taylor's office?  Did Vito say

15   whether he did anything for the office?

16   A.  Yeah, he told me he helped set it up, paint and whatnot.

17   Q.  What about money?  Did Vito give Dr. Taylor any money?

18   A.  Yes.

19   Q.  What do you know about that?

20   A.  He gave him $5,000 cash one time.

21   Q.  And how do you know that?

22   A.  Vito told me.

23   Q.  What, if anything, did Vito say about giving $5,000?

24   A.  He said, I got to give the doctor $5,000 because he asked

25   for it.  If I don't give it to him, we are basically going to

1   be out of business.

2   Q.  What did you understand him to mean that he would be out of

3   business?

4   A.  Meaning the doctor would not write scripts for us and throw

5   us out of the office.

6          MR. ROOS:  One moment, your Honor.

7          (Counsel confer)

8          MR. ROOS:  Your Honor, I neglected to offer 111B,

9   which is the corresponding name for 111A, which is the picture

10  of Daniel Garcia.  The government would move to offer that

11  exhibit now.

12         THE COURT:  Any objection to that?

13         MR. CARNESI:  No, your Honor.

14         THE COURT:  Okay.  It is in.

15         (Government's Exhibit 111B received in evidence)

16  BY MR. ROOS:

17  Q.  What was your understanding of why Vito gave money and

18  these other items to the doctor?

19  A.  'Cause they had some kind of informal arrangement.

20  Q.  What do you mean by that?

21  A.  Meaning that one hand washes the other, both hands wash the

22  face.  You do for me, I do for you.

23  Q.  How do you know they had that arrangement?

24  A.  Because the people that were sent to Dr. Taylor, like me,

25  got a prescription, you know, with nothing wrong with them.

1   Q.  Did you have any type of arrangement with the doctor?

2   A.  I guess I did, because I gave him food and stuff like that.

3   Q.  And what was your understanding of your arrangement?

4   A.  That if I -- if he stays happy, I will be happy.

5   Q.  And did you ever have an explicit conversation with the

6   doctor?

7   A.  No.

8   Q.  Why, then, do you believe you had some sort of arrangement?

9   A.  'Cause he's the doctor, and he should know if I'm in pain

10  or not, and there was nothing wrong with me.

11  Q.  Based on your conversations with Vito, did you have any

12  understanding of what Vito's arrangement with the doctor was?

13  A.  Yes.

14  Q.  And what was your understanding?

15  A.  That they worked together, that the doctor knew who Vito

16  sent in was part of his inner circle.

17  Q.  And what's your understanding of what would have happened

18  if Vito stopped providing the money and the gifts?

19  A.  We would have been out of business basically.

20          MR. ROOS:  One moment, your Honor.

21          (Counsel confer)

22          MR. ROOS:  No further questions.

23          THE COURT:  Okay.  Any cross-examination?

24          MR. CARNESI:  Yes, Judge.

25          THE COURT:  Okay.

Ibr2tay2                    Montalbano - Cross

1    CROSS-EXAMINATION

2    BY MR. CARNESI:

3    Q.  Good morning, Mr. Montalbano.

4    A.  Good morning.

5    Q.  My name is Charles Carnesi.  I represent Dr. David Taylor.

6           You and I have never spoke before, have we?

7    A.  No.

8    Q.  Okay.

9           THE COURT:  Let me just remind the witness to speak

10   into the microphone.

11   A.  No.

12          THE COURT:  Okay.  Go ahead.

13   Q.  But you have spoken to the individuals seated at the table

14   in front of me.

15   A.  Correct.

16   Q.  To all of them?

17   A.  No.

18   Q.  Okay.  Have you spoken to them more than one time?

19   A.  Yes.

20   Q.  The first time that you spoke to them, do you remember

21   approximately when that was?

22   A.  It had to be in February of 2018.

23   Q.  And was that within a short period of time after you were

24   initially arrested?

25   A.  Yes.

Ibr2tay2                    Montalbano - Cross

1    Q.  How was that meeting set up?  Did you request the meeting?

2    A.  My lawyer.

3    Q.  At your request.

4    A.  Yes.

5    Q.  Okay.  And why did you request that meeting?

6    A.  So I can get leniency and to cooperate.

7    Q.  And you understood that in order to get leniency, you were

8    going to have to cooperate.

9    A.  Correct.

10   Q.  What did you understand cooperating to mean?

11   A.  To tell the truth.

12   Q.  Did you tell the truth at that first meeting?

13   A.  In the beginning?

14   Q.  Yes.

15   A.  No.

16   Q.  Now, what did you understand the purpose of this

17   cooperation to be?

18   A.  To help the government.

19   Q.  To help the government do what?

20   A.  To help the government prepare for this trial.

21   Q.  And you understood, did you not, that in order to have the

22   government enter into an agreement with you, that it was going

23   to be necessary on your part to convince the government that

24   you had something that they wanted, right?

25   A.  Correct.

1   Q.  And during that first meeting, I think you told us that you

2   never mentioned anything with regard to an understanding that

3   you say you had concerning the relationship between Vito and

4   the doctor, right?

5   A.  The meeting with the agents, yes, when I got arrested.

6   Q.  Your first cooperation --

7   A.  No, this was with the agents.

8   Q.  Okay.  So that's the first proffer.  You never mentioned

9   that.

10  A.  When I got arrested, no.

11  Q.  Now, what did you talk about in terms of --

12  A.  My --

13  Q.  Excuse me.  Just let me finish the question.  I'm sorry.  I

14  hesitated for a moment.

15          But what did you offer in terms of how you could

16  cooperate in the course of that first proffer meeting?

17  A.  My involvement in the whole thing.

18  Q.  And your involvement in the whole thing involved your

19  dealings with Vito, right?

20  A.  And the doctor.

21  Q.  Well, again, let's go step by step.

22  A.  Go ahead.

23  Q.  All right?

24          You told us that initially you were approached by

25  Vito?

1    A.  Correct.

2    Q.  You offered that to the government at the time, right?  You

3    told them that.

4    A.  Yes.

5    Q.  Did you tell the government at that time that Vito, when he

6    approached you, asked you whether or not you were having any

7    back pain or back problems?

8    A.  No.

9    Q.  Did you in fact have a conversation with Vito?

10   A.  About going to the doctor?  Yes.

11   Q.  About back pain or problems that you would have to present

12   in order to go to the doctor?

13   A.  Vito had mentioned to me that that's what I would do.

14   Q.  Well, he didn't just kind of mention it to you.  He told

15   you that in order to get a prescription from Dr. Taylor --

16   A.  Correct.

17   Q.  -- you would have to go there and say, I'm having back

18   problems?

19   A.  And ask for a specific medication, yes.

20   Q.  And ask for a specific medication.

21       And he told you that you would have to -- in order to

22   get that medication, you would have to lie to the doctor and

23   say you had these problems and that you were in pain and you

24   needed this medication, right?

25   A.  Yes.

1  Q.  And he also -- now, I think, and I may have misunderstood,

2  but I think you said on direct examination that you didn't

3  discuss a specific medication with Dr. Taylor on your first

4  visit.  Is that right?

5  A.  On my first visit?

6  Q.  Yeah.

7  A.  Sent me for an x-ray.

8  Q.  Okay.  On that first visit, when you told him about your

9  back pain, did you tell him that the only thing that worked for

10 you was oxycodone?

11 A.  Yes.

12 Q.  You said that, right?  You brought it up?

13 A.  Yes, I did.

14 Q.  Okay.  And you told that, of course, to the agent, right?

15 A.  Yes.

16 Q.  During the first proffer meeting.

17 A.  I don't recall if I did it on the first one.

18 Q.  Okay.

19        Now, going back to the first visit you had with the

20 doctor, the purpose of you going there was to get a

21 prescription, right?

22 A.  Correct.

23 Q.  Okay.  Did anybody meet you at the office?

24 A.  Vito came with me to the office.

25 Q.  And did Vito introduce you to anybody in the office?

1    A.  The girl at the front desk.

2    Q.  Do you remember her name?

3    A.  No, I don't know her name.

4    Q.  Did Vito subsequently tell you that it would be a good idea

5    to bring food to her?

6    A.  No, not at the Victory Boulevard office.

7    Q.  Now, you went in -- again, I'm talking about the first

8    visit with the doctor, right?  You go in, you lie to him, you

9    tell him these things about this pain that you are in, he

10   conducts some kind of examination and asks to you bend over and

11   stretch, things along those lines, right?

12   A.  If that's what you call an examination.

13   Q.  That's what I'm going to call an examination now because

14   that's what happened, right?

15   A.  That's what happened, but as far as I know, a doctor

16   examines a little better.

17   Q.  But that's what happened, right?

18   A.  That's what happened.

19   Q.  Did you get a prescription?

20   A.  For x-ray, yes.  First visit.

21   Q.  But you didn't go there for a prescription for an x-ray.

22   You went there for a prescription for oxycodone.

23   A.  That was my goal, yes.

24   Q.  That's what you had arranged with Vito, right?

25   A.  Correct.

1    Q.  Did you get a prescription for oxycodone?

2    A.  On the second visit, yes.

3    Q.  On the first visit.

4    A.  First visit I got a prescription for an x-ray.

5    Q.  Not for any kind of drugs.

6    A.  No.

7    Q.  Were you requested to take a urine analysis test?

8    A.  Yes.

9    Q.  Now, when was the next meeting you had with anybody at the

10   prosecution table?

11   A.  From --

12   Q.  The first --

13   A.  -- February?

14   Q.  The first meeting is with the agents.

15   A.  I don't recall.  It's been quite a few meetings.  I don't

16   recall the date.

17   Q.  How long after?

18   A.  After I was arrested?

19   Q.  Yes.

20   A.  It's hard to give you a date.  I'm going to say within a

21   month.

22   Q.  Okay.  And at that meeting, do you recall who was present?

23   A.  I what?

24   Q.  Who was present at the meeting?  Besides you and your

25   lawyer, who else?

Ibr2tay2                    Montalbano - Cross

1    A.  Three agents and the prosecutor.

2    Q.  And can you tell me whether or not you were completely

3    truthful and honest with them at that next meeting?

4    A.  Yes.

5    Q.  And it was at that meeting that you first raised the idea

6    that Vito had somehow paid the doctor cash, right?

7    A.  It wasn't an idea.  It was a fact.

8    Q.  Did you witness that?  Did you see Vito give him cash?

9    A.  I saw Vito had the cash to give him in an envelope.

10   Q.  Vito had cash to give him.  Did you see him, as you

11   testified --

12   A.  I didn't testify I saw it.

13              THE COURT:  Hold on.  Wait for the question.

14              Go ahead, counsel.

15   BY MR. CARNESI:

16   Q.  That's my question.  Did you see --

17   A.  No, I didn't see him physically hand him $5,000.

18   Q.  You know that and you have testified the only basis you

19   have to say that is because Vito told you that, right?

20   A.  Correct.

21   Q.  And you have known Vito for how long?

22   A.  A little over four years.

23   Q.  And you have interacted with Vito over that period of time,

24   you have observed other people interact with Vito over that

25   period of time?

Ibr2tay2                    Montalbano - Cross

1   A.  Correct.

2   Q.  Generally speaking, how would you describe Vito's

3   reputation for honesty and credibility amongst those people?

4   A.  Amongst the people that he knew?

5   Q.  Yes.

6   A.  Everybody generally liked him.

7   Q.  I'm sorry?

8   A.  Everybody generally liked him.

9   Q.  That wasn't my question.

10  A.  In his group.

11  Q.  Did they consider him to be an honest and truthful person?

12  A.  Yeah.  If they didn't, they didn't tell me.

13  Q.  Did you consider him to be an honest and truthful person?

14  A.  Yes.

15  Q.  Vito got you involved in a robbery, right?

16  A.  I wasn't involved.

17  Q.  Used your car?

18  A.  Used my car, yes.

19  Q.  You were there?

20  A.  I was there.

21  Q.  He had you in the car.

22  A.  Yes.

23  Q.  Did you know that he was about to commit a robbery using

24  your car as the getaway car?

25  A.  No.

Ibr2tay2                    Montalbano - Cross

Q.  He did that, had you at that location, used your car, put

you in that position, and you just didn't have any idea at all

as to what his plan was?

A.  No.

                    (Continued on next page)

Ibr2tay2                    Montalbano - Cross

1
1    Q.  Are you married?

2    A.  Yes, I am.

3    Q.  Did there come a time when you brought your wife as a

4    potential patient to Dr. Taylor?

5    A.  Yes.

6    Q.  Was that then with Vito's knowledge?

7    A.  Excuse me?

8    Q.  Did Vito know about that?

9    A.  No, he did not.

10   Q.  OK.  That was for you to get additional pills for you to

11   sell, is that correct?

12   A.  Correct.

13   Q.  What happened?

14   A.  My wife went with my son, went into the doctor, did the

15   same thing basically that I told her to do, say you are in pain

16   ask for a specific medication.  The doctor basically threw her

17   out of the office.

18   Q.  You told us about sometime during your one of your visits

19   with the doctor where you asked for an increase in your

20   medication, right?

21   A.  Correct.

22   Q.  Did you get it?

23   A.  No.

24   Q.  How much did Vito pay you, if you can estimate, in total

25   for the amount of bills that you sold to him?

1    A.   I have no idea.  I couldn't tell you off the top of my

2    head.

3    Q.   Well, the arrangement was for $7.50 a pill, is that right?

4    A.   Right.

5    Q.   That's what he was paying you?

6    A.   Correct.

7    Q.   Do you have any idea of how many pills you sold?

8    A.   I don't recall.  If you average out 150 times 30.

9    Q.   I'm sorry?

10   A.   150 times 30 I guess would be 5500 pills.  Is that about

11   right?  4500 pills?

12   Q.   4500 I would say.

13   A.   Times seven and a half, so 45,000 less -- maybe $35,000,

14   $32,000, something like that.

15   Q.   Separate and apart from that, you sold pills to other

16   individuals?

17   A.   Right.

18   Q.   Do you have an estimation of how many of those pills there

19   may have been?

20   A.   No.  But if I had to put a dollar value on the whole thing,

21   maybe 40 to 45,000 thousand dollars total.

22   Q.   You were asked about whether or not you knew if Vito was in

23   any kind of pain or had any kind of medical problem?

24   A.   Right.

25   Q.   Wasn't he on disability?

1    A.   Yes.

2    Q.   Do you know what the disability was for?

3    A.   My understanding of his disability was the fact that his

4    father-in-law was a big shot in the DEP, and he was able to

5    sign off on Vito's disability.

6    Q.   So your understanding is that --

7    A.   It was --

8    Q.   -- somehow that disability was a fraud as well?

9    A.   Yes.

10   Q.   Did you know Vito to be involved in any other types of

11   fraud?

12   A.   Besides the disability, no.

13   Q.   Any false insurance claims or anything like that that you

14   are aware of?

15   A.   No.

16   Q.   Now, you told us that Vito lived pretty well.

17   A.   Yes.

18   Q.   Can you describe his house.

19   A.   A modest house, but the backyard was probably worth more

20   than the house with the pavers.

21   Q.   How much would the backyard be worth?

22   A.   What's that?

23   Q.   How much do you think the backyard was worth?

24   A.   $150,000, $200,000.

25   Q.   You said something about cars, too, right?

1  A.  Yes, he had a few cars.

2  Q.  When you say a few?

3  A.  He had four cars.

4  Q.  OK.  What models do you remember?

5  A.  Corvette, I don't know Z12 -- I don't even know the name of

6  it, but the yellow Corvette.  He had a Lincoln Navigator.  He

7  had the Cadillac, a Jeep Cherokee.  Now, he has -- well, they

8  have a Honda.  He had another few cars before that, a Bentley,

9  a Lexus, a Jeep SRT.  All high-end cars.

10  Q.  Were they all relatively recent models?

11  A.  Yeah, I would say so.

12  Q.  Have you ever been to Dr. Taylor's house?

13  A.  No.

14  Q.  You never drove Vito there?

15  A.  No.

16          MR. CARNESI:  Thank you, Judge.

17          I have no further questions.

18          THE COURT:  Any redirect?

19          MR. ROOS:  Just briefly, your Honor.

20  REDIRECT EXAMINATION

21  BY MR. ROOS:

22  Q.  Mr. Montalbano, you were asked a few questions about your

23  initial interviews by law enforcement, is that right?

24  A.  Correct.

25  Q.  Was that first interview with just agents or did it include

1    prosecutors as well?

2    A.  Just the agents.

3    Q.  Is that the interview you're referring to when you said you

4    made some false statements?

5    A.  Yes.

6    Q.  Did you make any false statements after you started

7    cooperating with the government?

8    A.  I don't recall.

9    Q.  Mr. Carnesi asked you a few questions, and he put the word

10   "lie" or "lying" in the questions.

11           Did you think you were tricking the doctor?

12   A.  No.

13   Q.  Why not?

14   A.  Because he is a doctor.  He should know.

15   Q.  And what is your understanding of why you had to get the

16   x-ray?

17   A.  I guess for him to have something in my folder as proof.

18   Q.  What do you mean by that?

19   A.  That is to show that something is wrong with me.

20   Q.  Do you know if the x-ray actually even showed if anything

21   was wrong with you?

22   A.  I don't know how to read it, so I wouldn't be able to tell

23   you.

24   Q.  Was there anything that was wrong with you?

25   A.  No.

1  Q.  You mentioned an instance where Vito had cash in an

2  envelope.  Do you remember that?

3  A.  Yes.

4  Q.  Can you describe the circumstances of that.

5  A.  He was just complaining to me that he had to give the

6  doctor $5,000 because that's what he wanted at the time.

7  Q.  Did you see the cash in the envelope?

8  A.  Yes.

9  Q.  And do you know why he had to give the doctor $5,000?

10  A.  Because the doctor asked for it, and he had to give it.

11  Q.  You mentioned a time your wife went to the doctor, is that

12  right?

13  A.  Correct.

14  Q.  And she was kicked out without being given any

15  prescriptions?

16  A.  Yes.

17  Q.  Did you go along with her?

18  A.  No, my son went.

19  Q.  What is your understanding then -- you said that your wife

20  said very similar things to what you have said on your visits,

21  is that right?

22  A.  Correct.

23  Q.  What is your understanding of why your wife was kicked out,

24  but you were not?

25  A.  Because I went around Vito without Vito knowing.  If I had

1    told Vito, he would have gave the heads-up to the office, and

2    my wife probably would have obtained the prescription.

3              MR. CARNESI:  Objection, Judge.

4              MR. ROOS:  No further --

5              THE COURT:  Sustained.

6              Please rephrase the question.

7              MR. ROOS:  Certainly.

8    BY MR. ROOS:

9    Q.  You were not kicked out of the office, right?

10   A.  Correct.

11   Q.  Your wife was, is that right?

12   A.  Yes.

13   Q.  What is your understanding of why you were not kicked out

14   but your wife was?

15   A.  Because I went through Vito.

16             MR. ROOS:  No further questions.

17             THE COURT:  Anything else?

18             MR. CARNESI:  Just briefly, Judge.

19             THE COURT:  OK.

20   RECROSS-EXAMINATION

21   BY MR. CARNESI:

22   Q.  Mr. Montalbano, I just want to be clear on this.  The plan

23   you had with Vito before you ever met Dr. Taylor was to go in

24   and lie to Dr. Taylor, right?

25   A.  I --

1   Q.  He told you what you had to say?

2   A.  He told me what I had to say, correct.

3   Q.  In order to get this medication?

4   A.  Right.

5   Q.  You understood that it was going to be necessary for you to

6   do that, for you to lie, and that's why you did that in order

7   to get your prescription, right?

8   A.  As told to by Vito, yes.

9   Q.  Yes.  Vito not only told you how to go about lying to the

10  doctor, he also told you, again, in the event that you may get

11  urine tested, how to beat the test, right?

12  A.  Correct.

13          MR. CARNESI:  Thank you.

14          THE COURT:  OK.  The witness is excused.

15          (Witness excused)

16          THE COURT:  You may call your next witness.

17          MS. FLETCHER:  Thank you, your Honor.

18          The government calls Detective Matthew Del Rosario.

19          Your Honor, we anticipate introducing some recordings

20  during Detective Del Rosario's testimony.  Would this be an OK

21  time for us to hand out transcript binders.

22          THE COURT:  Does defense counsel have any position on

23  that?

24          MR. CARNESI:  I would like to wait until the recording

25  is going to be offered.

1          MS. FLETCHER:  That's fine.

2          THE COURT:  OK.

3   MATTHEW DEL ROSARIO,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6   DIRECT EXAMINATION

7   BY MS. FLETCHER:

8   Q.  Good morning, Detective Del Rosario.

9   A.  Good morning.

10  Q.  Where do you work, sir?

11  A.  I work in the Drug Enforcement Task Force.

12  Q.  What agency is the Drug Enforcement Task Force affiliated

13  with?

14  A.  The DEA, the Drug Enforcement Administration.

15  Q.  How long have you worked for the DEA?

16  A.  Since September of 2012.

17  Q.  What is your title?

18  A.  I am a detective in the NYPD, but I am also deputized

19  federally, and they call us task force officers.

20  Q.  You said you are a detective in the NYPD.  How long have

21  you been with the NYPD?

22  A.  27 years.

23  Q.  Are you assigned to a particular team within the DEA?

24  A.  Yes, ma'am.

25  Q.  What is the name of that team?

1    A.   The tactical diversion squad, we also call it TDS.

2    Q.   How long have you been with TDS?

3    A.   Since I got to DEA in 2012.

4    Q.   What does TDS do?

5    A.   We investigate the diversion of pharmaceutical controlled

6    substances, and we specifically investigate DEA registrants,

7    like pharmacists and doctors.

8    Q.   What do you mean when you say "diversion"?

9    A.   Diversion can be when a person obtains pharmaceutical

10   controlled substances and then, instead of taking the pills,

11   they sell the pills illegally on the street.  And it can also

12   mean when a person obtains prescriptions without medical

13   necessity.

14   Q.   Can a registrant commit diversion?

15   A.   Yes.

16   Q.   And how does that work?

17   A.   Registrants can commit diversion by giving out the

18   prescriptions without medical necessity and outside the scope

19   of professional medical practice.  Usually they accept cash for

20   scripts.  Some involve insurance.  Some are even more

21   egregious.

22   Q.   In your experience, what is the most commonly diverted

23   controlled substance?

24   A.   Oxycodone, 30 milligram.

25   Q.   What is that understanding based on?

1    A.  I've interviewed a lot of addicts and drug dealers, and

2    oxycodone 30 milligram is the desired pill on the street.

3    Q.  Why is it the desired pill on the street?

4    A.  Because it's the only one that can be crushed and therefore

5    snorted, break it down in water and shoot it.  You can smoke

6    it.

7    Q.  You used the word oxycodone.  Is there a brand name for

8    oxycodone?

9    A.  Roxicodone.

10   Q.  Did there come a time when you began investigating a

11   registrant named David Taylor?

12   A.  Yes.

13   Q.  Approximately when was that?

14   A.  Early 2015.

15   Q.  What led you to begin investigating Dr. Taylor?

16   A.  We had arrested a physician's assistant in Staten Island in

17   2014.  He had mentioned Dr. Taylor during a proffer.  So that

18   led us to look into Dr. Taylor's prescribing habits.

19        We then ordered up his prescribing data through the

20   bureau of narcotics enforcement, which is maintained by the

21   Department of Health in New York.  Furthermore, we ordered up

22   his prescribing data in New Jersey, which is controlled by the

23   Department of Consumer Affairs.

24   Q.  What generally were you looking for in that data?

25   A.  We were looking for what we referred to as red flags.  Red

1  flags in data can be multiple people from the same family with

2  the same last name going to the doctor, fathers and sons,

3  brothers and sisters; multiple people from the same address or

4  building; multiple people from the same block; multiple people

5  from the same areas or blocks or family members going to the

6  doctor on the same day, going to the same pharmacies month in

7  and month out.

8  Q.  What about volume?

9  A.  Volume is also another indicator, high volumes.  240 is one

10 of the highest I've seen.  I've seen more.  But 240 on a

11 regular basis is probably the highest I've seen.

12 Q.  When you say 240, what do you mean by that?

13 A.  240 oxycodone pills per month.

14 Q.  Did you investigate Dr. Taylor alone or did you have

15 partners?

16 A.  I had partners.

17 Q.  Who were your partners?

18 A.  Special Agent Kenneth McGrail and Special Agent Peter

19 Surette.

20 Q.  Detective Del Rosario, I want to talk you through some of

21 your investigative steps.

22            MS. FLETCHER:  Can we please pull up, Ms. Corrado,

23 what's been marked as Government Exhibit 103A.

24 Q.  Do you recognize Government Exhibit 103A, Detective?

25 A.  Yes, I do.

1   Q.  Who is depicted in 103A?

2   A.  Christine Oakes, also known as Christine Silvestri.

3   Q.  How does Ms. Oakes or Ms. Silvestri relate to your

4   investigation?

5   A.  She was a cooperator.

6           MS. FLETCHER:  The government offers Government

7   Exhibit 103A and 103B.

8           MR. CARNESI:  No objection.

9           THE COURT:  OK.  It's in.

10          (Government Exhibits 103A and 103B received in

11   evidence)

12          MS. FLETCHER:  Can we please publish 103A,

13   Ms. Corrado.

14   BY MS. FLETCHER:

15   Q.  Detective, how did you first become familiar with

16   Ms. Oakes?

17   A.  From looking at the data, I observed that there was two

18   Oakes on the data.  There was Christine and there was David.

19   She had also used the name Silvestri in the past.  The address

20   was the same as two additional patients which wound up being

21   her mother and father, Frank and Joyce Silvestri.

22          THE COURT:  Let me just check.  Can the jurors still

23   hear OK?

24          OK.  Great.  Go ahead.

25   Q.  You mentioned seeing those four patients in the

Ibsntay3                    Del Rosario - Direct

1   prescription data.  What information were you able to see in

2   the data about the prescriptions that those four individuals

3   were receiving?

4   A.  They were all getting 240 oxycodone 30-milligram pills, and

5   in addition they were getting 240, maybe a little less, in

6   Percocets, which is 10-milligram oxycodone mixed with 325

7   milligrams of acetaminophen, aspirin.

8   Q.  Did there come a time when you observed Ms. Oakes in

9   person?

10  A.  Yes.

11  Q.  When did you first observe her in person?

12  A.  During surveillance.

13  Q.  Describe what you observed during that surveillance.

14  A.  During that surveillance I observed Ms. Oakes go into the

15  doctor's office, come out shortly thereafter.  She was with

16  another male later known to me as William Bray, who was a

17  friend of hers.  They got into a car that was outside the

18  office.  I later learned the driver's name as John Hariel.

19          They all got into the car of Mr. Hariel.  We followed

20  them to a pharmacy in Staten Island, where Ms. Oakes appeared

21  to have filled her prescription.

22          She went in the pharmacy, paper in hand, came out with

23  a white bag.  They got into the car.  A short time after she

24  got into the car, the driver, Hariel, walked around to the

25  back, the trunk of the car, and we observed him in possession

1    off an amber prescription bottle; put it in the trunk, closed

2    the door, they drove off.  They dropped off Ms. Oakes and

3    Mr. Bray in the vicinity of Mr. Bray's residence.

4         We then stopped Mr. Hariel.  We went into the trunk.

5    We recovered a quantity of oxycodone, 150 pills.  We spoke to

6    Mr. Hariel.  He agreed to cooperate right away.  He was a very

7    large man, and he was afraid of being incarcerated even

8    overnight.  So he gave it up right away.

9         And he said that he had purchased Ms. Oakes' pills

10   that day, 150, and he also said that he's purchased her pills

11   in the past along with members of her family.

12   Q.  What, if anything, did you ask Mr. Hariel to do?

13   A.  We asked for his cooperation with the government and to go

14   back and complete the purchase of the pills from Ms. Oakes.

15   Ms. Oakes had given the pills to Mr. Hariel on consignment, up

16   front, without payment.  Mr. Hariel agreed to bring one of our

17   cooperating informants back with him to meet Ms. Oakes and make

18   payment for the pills.

19   Q.  Did that transaction happen?

20   A.  It did.

21   Q.  Did there come a time after that transaction that you spoke

22   with Ms. Oakes?

23   A.  Yes.

24   Q.  What, if anything, did you ask her to do?

25   A.  So, we approached Ms. Oakes on the street.  We informed her

1    that we had purchased pills from her.  We asked for her

2    cooperation against Dr. Taylor.  We asked her if she would be

3    willing to go into the office during a visit and make

4    recordings for us.

5    Q.  What did she say in response?

6    A.  She said she would.

7    Q.  Did Ms. Oakes come to make recordings of her visits with

8    Dr. Taylor?

9    A.  Yes, she did.

10   Q.  Approximately how many visits with Dr. Taylor did Ms. Oakes

11   record?

12   A.  It was nine or ten.

13   Q.  You've used the word "cooperating witnesses."  Are you

14   familiar with the term CS?

15   A.  Yes.

16   Q.  What does CS stand for?

17   A.  Confidential source.

18   Q.  Did there come a time when Ms. Oakes became a confidential

19   source?

20   A.  Yes.

21   Q.  What exactly does that mean?

22   A.  She's registered with the Drug Enforcement Administration.

23   She signs off on what they call a CS package.  It's basically

24   forms that we tell her what the rules are, she agrees and she

25   initials next to each line.  She then signs off on the

1    agreement.  Myself and one of the agents or both agents sign

2    off on the agreement as well.

3    Q.  What are some of the rules that a prospective CS is

4    required to sign off on?

5    A.  So we tell them that because they're working for us now

6    they're not allowed to be involved in any illegal activity.  We

7    tell them that they're not allowed to obtain a controlled

8    substance without our permission or without our direction.

9            They agree to make recordings.  They agree to tell us

10   any information they receive, and they also agree to be

11   available to us when we call them or request to meet with them.

12   Q.  Focusing on the recordings that Ms. Oakes made, prior to

13   sending her in to make the recordings, what, if any,

14   information did you seek to obtain from her about her

15   interaction?

16   A.  So, we spoke with Ms. Oakes about how her office visits

17   went to get a general idea of the doctor's practice.  We

18   debriefed her prior to going in.  And we told her to stay calm,

19   you know, don't be nervous because now she has a recorder on.

20   And, you know, we asked her to just do what she normally did at

21   these visits, you know, answer any questions the doctor has,

22   and that if he mentioned pain to just be vague in her answer

23   with the doctor.

24   Q.  Focusing on the first portion of that, Detective Del

25   Rosario, can you explain specifically what you asked her about

1   how the visits went?

2   A.  Yes.  So, in order to get an idea of what the doctor's

3   practice is, we asked if, does she get like a cursory exam when

4   she goes in.  Does a member of the staff take her blood

5   pressure and weight, check her vitals at all.  Then, when she

6   meets with the doctor, does he do a physical examination every

7   time.  Does he touch her.  Does he make her, you know, do

8   certain motions to judge, you know, her mobility.  Does he

9   speak about pain.  Does he ask about pain.  Does he follow up

10  on the pain.  Does he ask about the medication.  Is it working?

11  You know, Is it enough?  Things of this nature.

12  Q.  What was the purpose from your perspective of asking those

13  questions?

14  A.  To gauge whether the doctor is giving out the prescription

15  without medical necessity.

16  Q.  You mentioned that you told her to act natural.  What, if

17  anything else, did you tell her to do during the course of her

18  visits with Dr. Taylor?

19  A.  On a few occasions we told her on to give him a bottle of

20  whisky which we provided her with.

21  Q.  What, if any, instructions did you give her about how much

22  she should speak?

23  A.  We told her not to speak too much.  Based on our

24  debriefings, we knew the doctor got annoyed if you interrupted

25  him, so we told her to keep the speaking to a minimum so that,

1    you know, we could see what the doctor does.

2    Q.  You mentioned that you told her to be vague in her

3    discussions of pain.

4    A.  Yes.

5    Q.  Why did you instruct her to be vague?

6    A.  Because a vague answer -- well, we wanted to see if a vague

7    answer would lead the doctor to follow up and inquire a little

8    bit more about pain.  We wanted to see his reaction, what he

9    would say if a vague answer was given.

10   Q.  Now, let's talk about the recordings that Ms. Oakes made.

11           Were you present for each of the recordings that she

12   made?

13   A.  Yes.

14   Q.  What was your role?

15   A.  I was either in the car or outside of the car, but I was in

16   the area whenever we met with her.  Sometimes I would pick her

17   up with the agents.  Sometimes I would meet them at the office

18   already because I was doing surveillance ahead of time.  We

19   would meet with the agents, and we would prepare her to go into

20   the office.

21   Q.  Where did you typically meet?

22   A.  Predetermined location that we would pick.

23   Q.  And by "we," you mean the agents?

24   A.  Yes.

25   Q.  Did you meet outside on the street or did you stay in the

1   car?

2   A.  Most times we stayed in the car, unless we were in a very

3   secluded area.

4   Q.  What, if any, steps did you take with respect to Ms. Oakes

5   when you first met with her?

6   A.  So we ask her to empty out her pockets, we ask her to open

7   up her pocketbook so we can look in it, which is part of the

8   agreement also with DEA.

9   Q.  What is the purpose of searching her?

10  A.  To make sure that she has no contraband or extra money or

11  prescriptions or controlled substance on her.

12  Q.  What is the purpose of assuring yourself that she doesn't

13  already have a prescription on her?

14  A.  So that when she comes out of the office with a

15  prescription or whatever she receives that it actually came

16  from there.

17  Q.  What, if anything, did you give her before she went in to

18  her visit?

19  A.  So we set her up with audio and video recorders, sometimes

20  one, sometimes multiple.  We also gave her a sum of U.S.

21  currency to pay for the visit and any incidentals or tips that

22  she may have to give to the staff.  And, like we mentioned

23  earlier, sometimes we gave her bottles of whisky.

24  Q.  Why might she have to give for tore incidentals or tips?

25  A.  Because we sometimes would send her in without an

1    appointment, and on at least one occasion, we paid because she

2    got moved up.  We didn't have to wait that long.

3    Q.  To clarify, you paid so that she could jump the line?

4    A.  Yes.

5    Q.  You mentioned that you gave her one or more recording

6    devices.  Can you describe the different types of recording

7    devices that you used in your investigation?

8    A.  So, there are several types of recording devices that we

9    have.  We have a watch.  We also have what they call a key fob.

10   That's the key remote.  It looks like a Nissan key remote.  We

11   also have what we call a card recorder.  It looks like a credit

12   card or a hotel room key.  It's just plain white.

13   Q.  Starting with the watch, does the watch capture audio and

14   video or just one of the two?

15   A.  Both.

16   Q.  How about the key fob?

17   A.  Both.

18   Q.  How about the card?

19   A.  Just audio.

20   Q.  Sorry.  Just audio?

21   A.  Yes.

22   Q.  Are you familiar with how these three different types of

23   recording devices work?

24   A.  Yes, I am.

25   Q.  Did you affix them to sources in the context of your

1    investigation?

2    A.  Yes, I did.

3    Q.  Are you familiar with how these devices can be turned on

4    and off?

5    A.  Yes, I am.

6    Q.  In the course of your investigation, what, if any,

7    instructions did you give to the CS's like Ms. Oakes about how

8    to turn the recordings on and off?

9    A.  I didn't.

10   Q.  Why not?

11   A.  I turned them on myself, and we did not tell the informants

12   how to turn the recorders off so that they couldn't manually

13   turn them off on their own.

14   Q.  Why was it important for you to insure that they couldn't

15   manually turn them off?

16   A.  So that they couldn't break the video or audio.  By "break"

17   I mean stop.

18   Q.  Stop and start the audio?

19   A.  Correct.  Sorry.

20   Q.  Based on your familiarity with these devices, can the

21   recordings on the devices be manipulated in the field?

22   A.  No.

23   Q.  If someone wanted to edit a recording on the device, how

24   would they do so?

25   A.  It would have to be downloaded first, and there would have

Ibsntay3                    Del Rosario - Direct

1   to be some kind of software applied to it.

2   Q.  Downloaded to a computer?

3   A.  Yes.

4   Q.  Are you familiar with the term "heading"?

5   A.  Yes.

6   Q.  What is a heading of a recording?

7   A.  A heading on a recording is when you first turn the

8   recorders on, you state the date and time.  You may state the

9   target.  You may state the location you are going to.  You

10  mention that you're sending in a source or a cooperator.

11              MS. FLETCHER:  Your Honor, may I approach the witness?

12              THE COURT:  Yes.

13  Q.  Detective, I've just handed you a series of compact disks.

14  Can I ask you to take a look at the compact disk marked

15  Government Exhibit 204.  If you need to unbind the disks to see

16  them more clearly, you can feel free to do that.

17  A.  OK.

18  Q.  You can also remove them from the sleeve, if easier.

19  A.  OK.  No, I can see.  OK.

20  Q.  Do you have Government Exhibit 204 in front of you, sir?

21  A.  Yes, I do.

22  Q.  Do you recognize Government Exhibit 204?

23  A.  Yes.

24  Q.  What is Government Exhibit 204?

25  A.  They're disks of the videos made on October 8, 2015.

1   Q.  Who made those videos?

2   A.  Myself and my team.

3   Q.  Is there a particular patient whose recording is reflected

4   in those videos?

5   A.  Yes, Christine Oakes.

6   Q.  Sorry.  Did you say the date, sir?

7   A.  October 8, 2015.

8   Q.  You mentioned that there are two disks.

9   A.  Yes.

10  Q.  What is on each of the two disks?

11  A.  One disk has the recording in its entirety, and the other

12  disk has the snippets of, like, the interaction with the doctor

13  on them.

14  Q.  And what are the respective labels of those two disks?

15  A.  We have 204A and B and 204.

16  Q.  Is 204 the complete recording?

17  A.  I believe so.

18  Q.  How do you know taking a look at these CDs that these

19  reflect the recordings made by Christine Oakes on October 8 of

20  2015?

21  A.  Because I reviewed them myself and then I marked the disks.

22  Q.  How did you mark the disks?

23  A.  I wrote Oakes on them, I wrote the date, and then I put my

24  initials underneath the date.

25          MS. FLETCHER:  The government offers Government

1    Exhibit 204, and the accompanying excerpts, 204A and 204B.

2                THE COURT:  Any objection?

3                MR. CARNESI:  No, sir.

4                THE COURT:  Those are in.

5                (Government Exhibits 204A and 204B received in

6    evidence)

7    BY MS. FLETCHER:

8    Q.  Detective Del Rosario, you mentioned that you reviewed

9    these recordings and marked them.

10   A.  Yes.

11   Q.  When did you first review the recordings on Government

12   Exhibit 204?

13   A.  When I was able to get to a computer.

14   Q.  And how close in time was that to when Ms. Oakes made the

15   recording on October 8, 2015?

16   A.  Usually within hours.

17   Q.  Same day or maybe the next day?

18   A.  Correct.

19   Q.  And when you reviewed the recording, what, if any, steps

20   did you take to assess whether the recording device had been

21   tampered with?

22   A.  I watched the video to see if there was -- if the recording

23   had stopped or went off, and neither of them did.

24   Q.  When you say neither of them, what do you mean?

25   A.  Well, on both disks it went through.

Ibsntay3                    Del Rosario - Direct

1    Q.  Just to clarify, is it fair to say that Government Exhibit

2    204A and B includes excerpts of Government Exhibit 204?

3    A.  Yes.

4    Q.  OK.  And can you describe generally the course of events

5    depicted on the fuller recording of Government Exhibit 204?

6    A.  I mean, it shows the heading.  It shows when the CS is

7    walking.  You hear her walking.  It shows her in the waiting

8    room talking with maybe staff or checking in, and then it leads

9    into the doctor visit.  And then it's the whole walk back to

10   meet with the agents or myself and shut the recorders off.

11   Q.  Prior to your testimony today, did you review a draft

12   transcript of portions of Government Exhibit 204?

13   A.  Yes, I did.

14   Q.  What portions of Government Exhibit 204 were transcribed in

15   that draft transcript that you reviewed?

16   A.  The interaction with the doctor.

17   Q.  What, if any, steps did you take to confirm the accuracy of

18   the transcript of Government Exhibit 204?

19   A.  I reviewed the transcript at the same time while I was

20   watching and listening to the video, and I made any necessary

21   corrections.

22           MS. FLETCHER:  Your Honor, may I approach the witness

23   again?

24           THE COURT:  Yes.

25   BY MS. FLETCHER:

1    Q.  Detective Del Rosario, can you please turn to the tab

2    labeled 204T in the binder that I've just handed you, or 204.

3    A.  It's 204T.

4    Q.  Do you recognize the document that's in your binder as

5    Government Exhibit 204T?

6    A.  Yes.

7    Q.  How do you recognize it?

8    A.  It has the date, it has Christine Oakes' name on there with

9    the doctor's name.

10   Q.  Is this the draft transcript that you reviewed?

11   A.  Yes, it is.

12   Q.  When you reviewed the draft transcript, what, if any, steps

13   did you take to verify the accuracy of the transcript?

14   A.  I listened to it, and then I read the transcript and made

15   sure it was accurate.

16   Q.  When you say you listened to it, what did you listen to?

17   A.  The recording.

18   Q.  Did you make corrections to the draft transcript?

19   A.  Yes.

20   Q.  Are the corrections that you made reflected in 204T that's

21   in front of you?

22   A.  Yes.

23   Q.  Your Honor, at this time the government would offer

24   Government Exhibit 204T as an aid to the jury and ask that we

25   be permitted to pass out the transcript binders I referred to

 1   earlier.

 2               THE COURT:  Any objection?

 3               MR. CARNESI:  No, sir, not as an aid.

 4               THE COURT:  OK.

 5               MS. FLETCHER:  We may pass out the binders?

 6               THE COURT:  Yes.

 7               MS. FLETCHER:  Thank you.

 8               THE COURT:  Hold on just a second before you start

 9   playing that.  Just hold on.

10               MS. FLETCHER:  I will, your Honor.

11               Would your Honor mind asking the jurors to please turn

12   only to 204T at this time.

13               THE COURT:  Yes.  I am going to give them an

14   instruction as well.

15               Please just turn to 204T in the binder.

16               This transcript has been provided to you to assist you

17   in listening to the recording.  The transcript is not the

18   evidence of what took place.  The recording is the actual

19   evidence of what allegedly took place.  If there's any

20   discrepancy between what's in the transcript and what is in the

21   recording, it is the recording that controls.  Again, these

22   transcripts are simply an aid to you in listening to the

23   recording.

24               Go ahead, counsel.

25               MS. FLETCHER:  Thank you, your Honor.  Before we play

1    this recording, Detective Del Rosario, can you take a look at

2    the first page of 204T.

3    A.   Yes.

4    Q.   What is the time of this recording?

5    A.   4:59 p.m.

6    Q.   Ms. Corrado, can you please play what is in the first --

7    the recording corresponding to the first clip of 204.  That is

8    page 2 of 204T.

9              (Video played)

10             THE COURT:  Hold on.  Do the jurors all have it on

11   their screens?

12             JUROR:  I didn't hear what you just said.

13             THE COURT:  I was just making sure that you had it on

14   your screens.

15             There is a little bit of a delay.  I think the jurors'

16   screens should be ready now.  Do you want to go ahead and play

17   that now.

18             MS. FLETCHER:  Please, Ms. Corrado.

19             THE COURT:  The jurors have it?  OK.

20             (Video played)

21             MS. FLETCHER:  Ms. Corrado is just jumping ahead in

22   the recording.

23             (Video played)

24   BY MS. FLETCHER:

25   Q.   Detective Del Rosario, where was Dr. Taylor's office

1    located at this time?

2    A.   4350 Hylan Boulevard.

3    Q.   Did you see a woman in the beginning portion of that video?

4    A.   Yes.

5    Q.   Who is that woman?

6    A.   Christine Oakes.

7         MS. FLETCHER:  Ms. Corrado, can we please move to clip

8    2.

9         (Video played)

10   BY MS. FLETCHER:

11   Q.   Detective Del Rosario, just a couple of questions about

12   what we just heard.  You mentioned earlier that on certain

13   occasions you asked Ms. Oakes to bring a bottle of whisky to

14   Dr. Taylor.

15   A.   Yes.

16   Q.   Was this one of those occasions?

17   A.   Yes.

18   Q.   Is that what's being discussed at the beginning of this

19   recording?

20   A.   Yes.

21   Q.   Prior to sending in Ms. Oakes to make this particular

22   recording -- actually, withdrawn.

23         Where in the sequence of nine or ten recordings that

24   Ms. Oakes made does this particular recording fall?

25   A.   This is the first one.

1   Q.  Prior to Ms. Oakes making this recording, what, if any,

2   concerns did you have about Ms. Oakes on that day?

3   A.  So, when we started speaking to her, she sounded very

4   slurred in her speech, very loopy, like long drawn out, like

5   that.  I was concerned if she was OK to do this.

6           So, you know, we spoke with her, and, you know, we

7   went over a few things that we had discussed in the past, and

8   she was answering us like she was coherent, but she just didn't

9   sound right.

10          So I was a little bit worried, and I kept asking her:

11  Are you sure you're OK?  Are you sure you can do this?

12          She's like, No, I'm fine.  I'm fine.

13          I said, OK.

14          She attributed her condition to the headache medicine

15  the doctor was giving her called Fioricet.

16  Q.  How long after you began speaking with her did you notice

17  this slurring?

18  A.  It was immediate when she got in the car.  I'm like, Are

19  you kidding?  Are you all right?

20          And she was like, No, I'm fine.  What's the matter?

21          I'm like, well --

22          MS. FLETCHER:  OK.  Ms. Corrado, please continue to

23  play the recording.

24          (Video played)

25  BY MS. FLETCHER:

1  Q.  Detective Del Rosario, did you hear the mention of someone

2  named David at the beginning of that recording?

3  A.  Yes.

4  Q.  Who is David?

5  A.  David Oakes, her husband.

6  Q.  David Oakes is whose husband?

7  A.  Christine Oakes' husband.

8  Q.  Detective, I know it is hard with the space, but could I

9  ask you to lean into the microphone just a bit more.  If I

10  can't hear you, I suspect no one can.

11  A.  OK.  Christine Oakes' husband.

12  Q.  She refers in this recording to paying cash.  Did she pay

13  cash for that visit?

14  A.  Yes.

15  Q.  And where did she get the cash to pay for the visit?

16  A.  We gave her the money, me and my partners.

17  Q.  I am going to show you what's been marked for

18  identification as Government Exhibit 164.

19        Do you recognize Government Exhibit 164?

20  A.  Yes.

21  Q.  I'm sorry.  You're tilting your head.  It's the wrong one.

22        MS. FLETCHER:  163, please, Ms. Corrado.

23  Q.  Do you recognize 163, Detective?

24  A.  Yes, I do.

25  Q.  What is Government Exhibit 163?

Ibsntay3                    Del Rosario - Direct

1   A.   That's the prescription obtained by Christine Oakes on

2   October 8, 2015.

3   Q.   And is this actually a photograph of the prescription?

4   A.   Yes.

5   Q.   Did you have occasion to see the underlying prescription on

6   that date?

7   A.   Yes.

8            MS. FLETCHER:   The government offers Government

9   Exhibit 163?

10           THE COURT:   Any objection?

11           MR. CARNESI:   No, your Honor.

12           THE COURT:   OK.  It's in.

13           (Government Exhibit 163 received in evidence)

14           MS. FLETCHER:   Can we please publish.

15           THE COURT:   Yes.

16   BY MS. FLETCHER:

17   Q.   Detective, do you see that up on your screen?

18   A.   Yes, I do.

19           MS. FLETCHER:   Ms. Corrado, can we please blow up the

20   prescription portion of that photograph just a little bit.

21   Thank you.

22   BY MS. FLETCHER:

23   Q.   What is this prescription for?

24   A.   Roxicodone, 30 milligram, which is the brand name for

25   oxycodone.

1  Q.  How many pills are in this prescription?

2  A.  240 pills, which is eight a day in the bottom right box

3  there.

4  Q.  What is the date?

5  A.  October 8, 2015.

6          MS. FLETCHER:  Can you please pull up page 2,

7  Ms. Corrado.

8  Q.  What is this prescription, Detective Del Rosario?

9  A.  So this is for Percocet, which is 10 milligrams oxycodone,

10  325 milligrams acetaminophen.

11  Q.  How many pills are in this prescription?

12  A.  150 pills, which comes out to five a day in a 30-day

13  script, and it's from October 8, 2015.

14          MS. FLETCHER:  Ms. Corrado, please pull up page 3.

15  Q.  What is this prescription, Detective?

16  A.  This is a noncontrolled substance prescription, which is

17  called Fioricet.  There are 30 pills in this prescription, and

18  it's from October 8, 2015.

19  Q.  Fioricet, is this the medication that Ms. Oakes described

20  as causing her slurred speech?

21  A.  Yes.

22  Q.  Can you please take a look at the CD that's before you

23  that's been marked Government Exhibit 205.

24          MS. FLETCHER:  Your Honor, I'm about to start another

25  recording.

1           THE COURT:  Let's go ahead and take our break then.

2           Let's go ahead and take our break for the day.  Don't

3   discuss this case amongst yourselves, don't let anyone discuss

4   this with you.  I will see you in 30 minutes.

5           Don't do any independent research regarding the

6   issues, parties, or locations in this case.

7           See you soon.

8           (Jury not present)

9           Counsel, could you please take the binders back.

10          OK.  See you in 30 minutes.

11          (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    A F T E R N O O N    S E S S I O N

3                         12:30 p.m.

4          (Jury not present)

5          THE COURT:  One quick thing with counsel.  Let me find

6   out, how many more recordings does counsel plan on playing with

7   this witness.

8          MS. FLETCHER:  Five.

9          THE COURT:  And how many more recordings -- are all

10  five of them involving the same Christine Oakes.

11         MS. FLETCHER:  No.  The next one involves Ms. Oakes,

12  then there are three related to Julio Clark, and then one

13  related to Brian Dolinko.  The one that we just looked at is,

14  by far, the longest of all of them.

15         THE COURT:  All right.  That's fine.  Just in terms of

16  maybe moving things along a little bit, is there any objection

17  to 205, that is the next one involving Oakes, is it?  Is there

18  any objection to that?

19         MR. CARNESI:  No, your Honor.

20         THE COURT:  So you can just move that in without

21  objection so we don't have to go through the whole laying of

22  the foundation, unless there is something in particular you

23  want with that -- and just start playing that.

24         MS. FLETCHER:  No.  I mean -- okay.  That's fine.

25         THE COURT:  What were you going to say?

Ibr2tay4                    Del Rosario - Direct

1          MS. FLETCHER:  We are laying a foundation because we

2     understand from our conversations with Mr. Carnesi that he

3     wants the foundation, but if -- that's fine.

4          THE COURT:  I'm saying for this one, because we have

5     already heard it, we can just go to 205.

6          MS. FLETCHER:  My intention for the remainder of the

7     recordings is to ask, the process that you described with

8     Ms. Oakes, did you employ the same process with this CS.

9          THE COURT:  Okay.  That sounds good.  Let's bring in

10    the jury.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2            THE COURT:  You may be seated.  Continue.  Go ahead,

3    counsel.

4            MS. FLETCHER:  May I proceed?

5            THE COURT:  Yes.

6    BY MS. FLETCHER:

7    Q.  Detective Del Rosario, before the break we talked about

8    Fioricet.  Do you recall that?

9    A.  Yes.

10   Q.  And you said it is not a controlled substance.

11   A.  That's correct.

12   Q.  What is a controlled substance?

13   A.  A controlled substance is any substance scheduled by the

14   Drug Enforcement Administration you have Schedule 1 through 5.

15   Q.  What schedule is oxycodone on?

16   A.  2.

17           MS. FLETCHER:  Your Honor, at this time the government

18   moves to admit Government Exhibit 205 and offers 205T as an aid

19   to the jury.

20           THE COURT:  Okay.

21           MR. CARNESI:  No objection.

22           THE COURT:  That's in.  Counsel, do you want to have

23   your assistants hand the binders out to the jury?

24           MS. FLETCHER:  Yes.  Thank you.

25   BY MS. FLETCHER:

1    Q.  While those are being passed out, Detective, what's the

2    date of the recording made at Government Exhibit 205.

3    A.  November 12, 2017.

4    Q.  And who made that recording?

5    A.  Myself and my partners.

6    Q.  Who is the individual who wore the recording device?

7    A.  Christine Oakes.

8    Q.  And you described earlier the process for setting up a

9    recording device on Ms. Oakes with respect to Government

10   Exhibit 104.  How, if at all did the process differ for

11   purposes of this next recording, Government Exhibit 205?

12   A.  It was the same.

13   Q.  And you also described the efforts that you took to review

14   the audio recording for accuracy and tampering.  What, if any,

15   steps did you take with respect to this audio recording,

16   Government Exhibit 205?

17   A.  I reviewed the recording to make sure it wasn't shut off or

18   that it had no breaks.

19          MS. FLETCHER:  Your Honor, at this time we would ask

20   that Ms. Corrado be permitted to publish Government Exhibit 205

21   and that the jury be instructed to take a look at the

22   transcript behind tab 205T.

23          THE COURT:  Okay.

24          Members of the jury, the instruction I gave you before

25   about transcripts still applies.

Ibr2tay4                    Del Rosario - Direct

1          MS. FLETCHER:  Ms. Corrado, can we play clip one,

2     please.

3               (Video played)

4     BY MS. FLETCHER:

5     Q.   Whose voice is that, sir?

6     A.   That's mine.

7          MS. FLETCHER:  If we could please publish clip two of

8     205, which is page 3.

9               (Videotape played)

10    BY MS. FLETCHER:

11    Q.   Detective Del Rosario, did you hear that female voice at

12    the end of that recording?

13    A.   Yes.

14    Q.   Who was that the voice of?

15    A.   That's Denise Suarez.

16    Q.   What is Denise Suarez's role here?

17    A.   She was the officer manager/receptionist at the office.

18    Q.   And at which offices did she work?

19    A.   She worked in the Castleton Avenue office and the Hylan

20    Boulevard office.

21    Q.   Okay.  You testified earlier that Ms. Oakes made nine to

22    ten recordings of Dr. Taylor.  Do you remember that?

23    A.   Yes.

24    Q.   Do any of the recorded interactions with Dr. Taylor differ

25    in any substantive way from the two that we have looked at

Ibr2tay4                    Del Rosario - Direct

1    today?

2    A.   In regards to her interaction with Dr. Taylor?

3    Q.   Yes.

4    A.   No.

5    Q.   Did Ms. Oakes receive prescriptions at the end of each of

6    those visits?

7    A.   Yes.

8    Q.   Let's take a look at what's been marked for identification

9    as Government Exhibit 164.

10          Do you recognize Government Exhibit 164?

11   A.   Yes, I do.

12   Q.   What is 164?

13   A.   It is the prescription obtained on November 12, 2015, from

14   this recording.  It is for Roxicodone, the brand name of oxy,

15   30 milligram, 240 pills at eight pills a day.

16          MS. FLETCHER:  Your Honor, government offers

17   Government Exhibit 164.

18          MR. CARNESI:  No objection.

19          THE COURT:  It's in.

20          MS. FLETCHER:  If we could please publish that page.

21          (Government's Exhibit 164 received in evidence)

22   BY MS. FLETCHER:

23   Q.   Do you see that page there, sir?  Is this the page you were

24   just reading from?

25   A.   Yes.

1    Q.  And what is the amount of pills on this prescription?

2    A.  240.

3    Q.  If we can go to page 2, please.  What is this prescription?

4    A.  That is for the noncontrolled Fioricet.

5    Q.  And how about page 3?

6    A.  Okay.

7    Q.  What's the prescription on page 3, sir?

8    A.  That's the Percocet 10 milligram, oxycodone, 150 pills at

9    five a day from the video on November 12, 2015.

10   Q.  These three prescriptions, did Ms. Oakes receive these

11   three prescriptions during each visit?

12   A.  No.  Sometimes she only got two prescriptions.

13   Q.  Which two did she get on the occasions that she only got

14   two prescriptions?

15   A.  Percocet and the oxycodone.

16   Q.  Was there ever a time when Ms. Oakes went into the doctor's

17   office at your direction and was able to pick up a prescription

18   for someone else?

19   A.  Yes.

20   Q.  How many occasions did that occur?

21   A.  I remember it on one occasion.

22   Q.  Whose prescriptions did she pick up?

23   A.  She picked up prescriptions for her mother and father.

24   They were waiting at the front desk for her in an envelope.

25   Q.  Who were those prescriptions written by?

1    A.  Dr. Taylor.

2    Q.  What were those prescriptions for?

3    A.  Oxycodone and Percocet.

4    Q.  How did you become aware that Ms. Oakes had picked up

5    prescriptions for each of her parents?

6    A.  Because she came out of the office and she had an envelope

7    in her hand and I asked her what it was and she showed me that

8    it was prescriptions left at the desk for her mother and

9    father, that she didn't know that they were going to give it to

10   her.

11   Q.  Did you take those prescriptions from her?

12   A.  No, I didn't.

13   Q.  Why not?

14   A.  Because her parents' prescriptions aren't under my control.

15   She is our informant, so I take her pills.  I couldn't take her

16   parents' prescriptions.

17   Q.  You mentioned that she was your informant.

18        MS. FLETCHER:  Ms. Corrado, we can take that down.

19   Q.  Did there come a time when Ms. Oakes ceased to be your

20   informant?

21   A.  Yes.

22   Q.  Approximately when was that?

23   A.  That was near the end of 2016.

24   Q.  What precipitated the end of her cooperation?

25   A.  She became very hard to deal with.  She became very

 1  difficult, hard to get ahold of, and then she -- her father had

 2  passed and she was a little bit distraught, and she had gone

 3  into the doctor without our permission and obtained

 4  prescriptions.

 5  Q.  And you said without your permission.  Did she, under the

 6  terms of her cooperation, need your permission to go in to the

 7  doctor?

 8  A.  Yes, she did.

 9  Q.  How did you come to learn that she had gone in to see

10  Dr. Taylor without your permission?

11  A.  She contacted one of the agents and said that she had

12  received a prescription for Opana on top of the oxycodone from

13  the doctor, and that she was afraid to have them, so she asked

14  us to come and get them.

15  Q.  What is Opana?

16  A.  Opana is another opioid.  It is as strong, if not stronger

17  than, oxy.

18  Q.  And how, if at all, does the chemical makeup differ from

19  oxycodone?

20  A.  You can't crush the Opanas.

21  Q.  Does it contain the same narcotic or is it a different

22  narcotic?

23  A.  It's of the opium family.

24  Q.  Okay.  She said she asked -- you said she asked you to come

25  and pick up the prescription.  Did you go and pick up the

1    prescription?

2    A.   Yes.

3    Q.   Where did you go?

4    A.   We went to her residence.

5    Q.   What happened when you got to her residence?

6    A.   She was very belligerent.  You know, we asked her to come

7    outside and bring the prescriptions with her, and she didn't

8    want -- I guess she didn't want her husband to know.  She said,

9    I don't want my husband to know.  And so I'm like, listen, we

10   have to pick up these pills.  You can't have them.  So either

11   you bring them out or we are coming in to get them.

12   Q.   Detective, were you able to pick up the pills that she had

13   received?

14   A.   Yes.

15   Q.   Were you able to pick up all of the pills that she had

16   received?

17   A.   No.

18   Q.   Approximately what proportion of the pills did you pick up?

19   A.   So I don't remember specifically obtaining the Opanas, but

20   out of the oxy, there was only 30 pills left.

21   Q.   30 pills left from what total number of pills?

22   A.   From the prescription of -- I can't remember the amount.

23   I'm not sure if it was -- I think it was 40, but I'm not 100

24   percent sure.

25   Q.   What else could it have been?

1   A.  Possibly 180.

2   Q.  After that interaction with Ms. Oakes, did there come a

3   time when you saw her again?

4   A.  Yes.

5   Q.  When did you next see her?

6   A.  The day I arrested Dr. Taylor, on June 22, 2017.

7   Q.  Where did you see her?

8   A.  She was actually in the exam room when I arrested the

9   doctor.

10  Q.  Okay.  I want to move now to talk about another individual.

11  Can we pull up what's been marked for identification as

12  Government Exhibit 118.  Do you recognize Government Exhibit

13  118A on your screen?

14  A.  Yes, I do.

15  Q.  What is it?

16  A.  It's a photograph of Julio Clark.

17  Q.  And how did you -- briefly, how do you know who Julio Clark

18  is?

19  A.  He became a cooperator for us.

20          MS. FLETCHER:  Government offers Government Exhibit

21  118A and the corresponding name, 118B.

22          MR. CARNESI:  No objection.

23          THE COURT:  Okay.  It is in.

24          (Government's Exhibits 118A and B received in

25  evidence)

1              MS. FLETCHER:  Can we please publish?

2    BY MS. FLETCHER:

3    Q.  Detective Del Rosario, how did you become familiar with

4    Julio Clark?

5    A.  From looking at the data, the prescription data from New

6    Jersey and New York.

7    Q.  What, if anything, did you see in that data?

8    A.  So in that data I saw that Julio Clark filled in both

9    states, but at the same time he was filling Dr. Taylor's

10   prescriptions, he was also filling from another doctor that we

11   were investigating.

12   Q.  When you say that he filled in both states, what do you

13   mean by that?

14   A.  He filled his oxycodone prescription in both New York and

15   sometimes New Jersey.

16   Q.  Who was prescribing oxycodone to Julio Clark at that time?

17   A.  Dr. Taylor and Dr. Anderson.

18             MR. CARNESI:  I'm sorry, Judge.  I didn't hear.

19             THE WITNESS:  Dr. Taylor and Dr. Anderson.

20   BY MS. FLETCHER:

21   Q.  What did you do upon seeing that data for Julio Clark?

22   A.  We went to the pharmacy in Staten Island that he filled

23   Dr. Taylor's prescriptions at and we wanted to verify his last

24   date there.  We then set up on the pharmacy afterwards and we

25   observed Julio Clark come to pick up his prescription.  We

1    followed him off with the prescription, and we eventually

2    stopped him and confiscated his oxycodone bottle.

3    Q.  During that stop, did you ask Julio Clark to do anything?

4    A.  Yes.

5    Q.  What did you ask him to do?

6    A.  We asked him if he would be willing to cooperate against

7    the doctor and go in and make recorded visits.

8    Q.  Did he agree during that time?

9    A.  He did.

10   Q.  Did Mr. Clark in fact make recordings of Dr. Taylor?

11   A.  He did.

12   Q.  Did he do so immediately after that initial interaction?

13   A.  No, it took several months.

14   Q.  Why did it take several months?

15   A.  Because Mr. Clark disappeared on us.  He wouldn't answer

16   our phone calls and he never called us back.

17          So one day, while performing surveillance on the

18   doctor's office, we observed a female enter the office, later

19   identified as Denise Gonzalez.  She was in and out of the

20   office in about five minutes.

21          We followed her off to a pharmacy in Staten Island.

22   Based off of the data, we knew that she lived in downtown

23   Brooklyn.  So we followed her to the pharmacy.  And then, as

24   she was heading towards the Staten Island Expressway, she

25   stopped and she didn't get on the highway to go back to

1    Brooklyn.  Moments later, Julio Clark shows up in a black

2    Mercedes, and he purchases Denise Gonzalez's bottle of

3    oxycodone, and we then arrest Julio Clark.

4    Q.  Following Mr. Clark's arrest what, if anything, did you ask

5    him to do?

6    A.  We asked him again to go into the doctor's office and make

7    recorded visits for us, to which he agreed.

8    Q.  Approximately how many recordings did Mr. Clark make?

9    A.  Three.

10   Q.  Detective, I'm going to ask you to take a look at three

11   different sets of CDs that are before you, the CDs marked

12   Government Exhibit 201, Government Exhibit 202, and Government

13   Exhibit 206.

14   A.  Okay.

15   Q.  Do you recognize 201, 202 and 206?

16   A.  I do.

17   Q.  What are those three recordings?

18   A.  These are videos.

19   Q.  I'm sorry the three CDs.

20   A.  These are disks containing the recordings with Julio Clark

21   on three separate dates.

22   Q.  What is the date for Government Exhibit 201?

23   A.  201 is 9/27 of 2016.

24   Q.  How about 202?

25   A.  202 is 10/25 of '16; and 206 is November 21 of '16.

Ibr2tay4                    Del Rosario - Direct

1    Q.  Do you still have that binder in front of you, sir?

2    A.  Yes, I do.

3    Q.  Binder with the transcripts?

4    A.  Yes.

5    Q.  We talked with respect to the Christine Oakes recordings

6    about the transcripts.  Can you take a look at Government

7    Exhibits 201T, 202T, and 206T.

8    A.  Yes, okay.

9    Q.  Did you employ the same practice for reviewing the

10   transcripts that you did with respect to these three

11   transcripts that you did with respect to the transcripts of the

12   Christine Oakes recordings?

13   A.  Yes.

14   Q.  And are these transcripts fair and accurate transcripts of

15   the three recordings?

16   A.  They should be, yes.

17   Q.  Please take a moment to confirm.

18   A.  Yes.

19           MS. FLETCHER:  Your Honor, at this time the government

20   offers Government Exhibits 201, 202, and 206 and offers 201T,

21   202T, and 206T as aids to the jury.

22           THE COURT:  Any objection?

23           MR. CARNESI:  No, your Honor.

24           THE COURT:  Okay.  Those are in.

25           (Government's Exhibits 201, 202, and 206 received in

1    evidence)

2    BY MS. FLETCHER:

3    Q.  Detective, just a couple of questions before we look at

4    these recordings.

5           You described, with respect to Ms. Oakes, a series of

6    questions that you asked her related to her visits with

7    Dr. Taylor.  How -- what questions, if any, did you ask

8    Mr. Clark?

9    A.  We asked Mr. Clark the same type of questions.

10   Q.  And what, if any, instructions did you give him with

11   respect to his visits with the doctor?

12   A.  Again, we told him to act natural.  He was a little bit

13   nervous because he was wearing a recorder, and we said to be

14   natural and just do what he normally would do during these

15   visits.  We gave him instructions, again, about if the doctor

16   inquired about pain to be vague, and that was it.

17   Q.  What, if any, instructions did you give Mr. Clark related

18   to whisky?

19   A.  So on the first visit he hadn't been there in a while, so

20   we told him to, you know, if he felt necessary, to mention to

21   the doctor that he had bought him a bottle of whisky while he

22   was away visiting family down south, and then on a second visit

23   he did bring the bottle of whisky.

24   Q.  At your instruction?

25   A.  Yes.

1   Q.  You mentioned that Mr. Clark hadn't been to see the

2   defendant in a while.  Why had he not been to see the

3   defendant?

4   A.  After we approached Mr. Clark, he stopped going to the

5   doctor, so he didn't go for a couple of months.

6   Q.  Okay.

7           MS. FLETCHER:  Ms. Corrado, can we please start with

8   Government Exhibit 201.  If we could publish the first clip of

9   that for the jury.

10          THE COURT:  Which section?  I assume you want the

11  jurors to look at 201T at this point.

12          MS. FLETCHER:  Please, your Honor.

13          THE COURT:  Okay.  Please turn to 201T.

14          (Videotape played)

15  BY MS. FLETCHER:

16  Q.  Whose voice is that, sir?

17  A.  That's my voice.

18  Q.  We talked a bit with respect to Ms. Oakes about the

19  different steps that you took prior to placing the recording

20  device on Ms. Oakes?

21  A.  Yes.

22  Q.  Did you take those same steps with Mr. Clark?

23  A.  Yes, I did.

24          MS. FLETCHER:  Ms. Corrado, please pull up and let's

25  play clip 2.

1        (Video played)

2        MS. FLETCHER:  Can we play the next clip, please,

3  Ms. Corrado, clip three.

4        (Audio played)

5  BY MS. FLETCHER:

6  Q.  Detective, I'm sorry.  Who is the female at the end of that

7  recording?

8  A.  That's Denise Suarez.

9  Q.  What, if any, instructions did you give to Mr. Clark

10  regarding Ms. Suarez?

11  A.  We told him that, if necessary, to tip her because he

12  hadn't been there in several months, didn't have an

13  appointment, just walked in the door.

14  Q.  And how would tipping her benefit him?

15  A.  Because she would look out for him in the future.

16  Q.  Okay.  In what way would she look out for him?

17  A.  As far as scheduling is concerned.

18  Q.  Let him get in, not have to wait in line?

19  A.  Yes.

20        MS. FLETCHER:  Ms. Corrado, can we please pull up for

21  identification what's been marked as Government Exhibit 160.

22  Q.  Do you recognize Government Exhibit 160?

23  A.  Yes, I do.

24  Q.  What is it?

25  A.  It's the prescription Julio Clark got on September 27 of

Ibr2tay4                    Del Rosario - Direct

1    2016.

2              MS. FLETCHER:  Government offers Government Exhibit

3    160.

4              MR. CARNESI:  No objection.

5              THE COURT:  Okay.  It is in.

6              (Government's Exhibit 160 received in evidence)

7              MS. FLETCHER:  Please publish.

8    BY MS. FLETCHER:

9    Q.  What's this a prescription for, Detective?

10   A.  It's for Roxicodone, the brand name of oxycodone, 30

11   milligram, 180 pills, which comes out to six a day over a

12   30-day prescription.

13             THE COURT:  Hold on a second.  Do the jurors have it

14   yet?

15             JUROR:  Yes.

16             THE COURT:  Okay.  Go ahead.

17             MS. FLETCHER:  Thank you.

18             Ms. Corrado, let's pull up what's now in evidence as

19   Government Exhibit 202, the second recording.

20             And, your Honor, if the jury could be instructed to

21   turn to 202T.

22             THE COURT:  Okay.  Yes.

23             (Video played)

24             MS. FLETCHER:  Ms. Corrado, if we could play clip

25   three.

Ibr2tay4                    Del Rosario - Direct

1                (Video played)

2                THE COURT:  Hold on just a second.  Is everyone able

3       to hear everything okay?

4                JUROR NO. 11:  I have a question.

5                THE COURT:  Okay.  You have a question?

6                JUROR NO. 11:  The date stamp.

7                THE COURT:  Hold on just a second.  You have a

8       question regarding the date stamp?

9                JUROR NO. 11:  Yes.

10               THE COURT:  All right.  Let me see counsel at the

11      sidebar briefly.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

Ibr2tay4                    Del Rosario - Direct

1              (In the robing room)

2              THE COURT:  Juror Number 11 was trying to get my

3    deputy's attention.  My deputy got my attention and, as you

4    just heard, she indicated she has a question regarding the date

5    stamp.  So what we can do, but I want to check with counsel, is

6    we can just ask her what her question is or, if counsel has a

7    sense of what it is, we could do something else or how do

8    counsel wish to proceed?  I don't want to get the jurors in the

9    habit of asking a bunch of questions.  So how do you want to

10   proceed?

11             MS. FLETCHER:  We would agree that the jurors should

12   not be asking questions and, from the government's perspective,

13   we should not be responding to their questions.  So what I

14   would suggest at this point is that we don't ask the juror what

15   her question is and that the jury is given an instruction that

16   they are supposed to listen to the evidence as it comes in and

17   discuss any questions they may have about the evidence in their

18   deliberations.

19             The date stamp on these particular recordings is

20   wrong, and so my concluding question from these recordings was

21   going to be:  These recordings say a particular date, is that

22   the date that the recording was made?  No.  I suspect that may

23   address her question, but I am very reluctant to engage in any

24   sort of question-and-answer with the jury for reasons that I

25   suspect are obvious to the court.

1            THE COURT:  Defense counsel.

2            MR. CARNESI:  I'm fine with that, Judge.  I think that

3     will resolve it without getting into the specific question.

4            THE COURT:  Okay.  But I think I need to say something

5     at this point, so perhaps what I should say to the jurors is to

6     say thank you, there may be questions that arise in your mind,

7     but as I told you at the beginning of the case you can't

8     discuss this case with anyone else, including your fellow

9     jurors at this point, or with the parties or with me.  As time

10    goes on, some of these questions that you have may be answered

11    in the course of time.  To the extent that they are not, once

12    you begin your deliberations, as deliberating jurors, you may

13    give us written questions and you will get further instructions

14    about that at the end of the case.

15            How is that?

16            MS. FLETCHER:  Fine for the government.

17            MR. CARNESI:  I think that's fine.

18            THE COURT:  Okay.  Sounds good.  All right.

19            (Continued on next page)

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Okay.  So one of the jurors had a question

3    about the time stamp.  Let me give you an instruction on that.

4          As I told you at the beginning of the case, you cannot

5    discuss this case with anyone else at this point, not even your

6    fellow jurors, until it is time to deliberate, not with me, not

7    with the parties.  So some questions that you may have may end

8    up being answered as time goes on throughout the course of this

9    trial.  To the extent that those questions are not answered,

10   once you begin your deliberations -- and I will give you

11   further instructions about that later -- you will be able to

12   send out written questions regarding any questions that remain

13   outstanding.

14         So at this point we are not going to answer any

15   questions because we can't engage in any sort of discussion

16   about the substance of the case or the testimony or the

17   evidence.

18         Now, having said that, obviously make sure you get our

19   attention if you cannot hear anything, if you cannot hear

20   what's happening here, or if there is an issue with your

21   screen, or you cannot see something.  Okay?

22         All right.  Go ahead, counsel.

23         MS. FLETCHER:  Ms. Corrado, can we please pull up

24   what's been marked for identification as Government Exhibit

25   160.  Oh I'm sorry, 161.

1   BY MS. FLETCHER:

2   Q.  Detective, do you recognize Government Exhibit 161?

3   A.  Yes, I do.

4   Q.  What is it?

5   A.  It's the prescription Julio Clark obtained on October 27th

6   of 2016.

7         MS. FLETCHER:  Government offers Government Exhibit

8   161.

9         MR. CARNESI:  No objection.

10         THE COURT:  Okay.  It's in.

11         (Government's Exhibit 161 received in evidence)

12   BY MS. FLETCHER:

13   Q.  The date on this --

14         THE COURT:  Hold on a second until the jurors get it.

15         MS. FLETCHER:  Apologize.  Trying to move.

16         THE COURT:  Okay.  Go ahead.

17   BY MS. FLETCHER:

18   Q.  The date on this prescription, Detective Del Rosario, do

19   you see that?

20   A.  Yes.

21   Q.  What's the date?

22   A.  October 27 of 2016.

23   Q.  And is that the date of the record -- excuse me, is that

24   the date that the recordings we just looked at were made?

25   A.  Yes.

1    Q.  The recording devices that you used in your

2    investigation -- the watch, the key fob, the audio recording

3    card -- did those recording devices maintain a date and time

4    stamp?

5    A.  Some did, but a lot of them were off.  There were like

6    glitches and problem with the date and time stamps, which is

7    why we had the recordings.

8    Q.  You included the heading that we talked about earlier on

9    the recordings.

10   A.  Yes.

11   Q.  Okay.

12        And we didn't hear a heading -- we didn't review a

13   heading in court just now, did we, for that particular

14   recording?

15   A.  Did we hear what?

16   Q.  A heading in court?

17   A.  No.

18   Q.  Is there a heading included elsewhere within Government

19   Exhibit 202 for that recording?

20   A.  Yes.

21   Q.  Okay.  Let's take a look at now Government Exhibit 206 in

22   evidence.  And what's the date of this recording?

23   A.  206 is from November 21 of 2016.

24   Q.  Can you take a look at the tab in your binder behind

25   Government Exhibit 206T -- oh, I'm sorry.  Okay.  So this is

1   November 21 of 2016.

2           MS. FLETCHER:  Ms. Corrado, can we please pull up the

3   recording that's at Government Exhibit 206?

4           THE COURT:  Counsel, do you want to draw the juror's

5   attention to the appropriate section of the binder?

6           MS. FLETCHER:  Yes.  If the jury could please take a

7   look at the transcript behind Government Exhibit 206T.

8           THE COURT:  Detective Del Rosario -- Ms. Corrado,

9   would you mind handing up another transcript binder to

10  Detective Del Rosario.  I think his might be missing 206T.

11  Thank you.

12          (Pause)

13          MS. FLETCHER:  Take one from Mr. Rodriguez.

14  BY MS. FLETCHER:

15  Q.   Detective, for this third recording that Julio Clark made,

16  how many recording devices did you outfit Mr. Clark with?

17  A.   Two.

18  Q.   Which two?

19  A.   The watch and the card recorder.

20  Q.   Did one of those devices malfunction?

21  A.   Yes.

22  Q.   Which device?

23  A.   The watch failed to give the audio.

24  Q.   Did the watch record the video?

25  A.   Yes, it did.

1    Q.  And how about the card?  Did the card function?

2    A.  The card did function and gave us the audio.

3              MS. FLETCHER:  And so if we could please publish

4    Government Exhibit 206.

5              (Audio played)

6              JURORS:  We can't hear it.

7              MS. FLETCHER:  I don't think anybody can hear it.  Can

8    we have just a moment, your Honor?

9              THE COURT:  Yes.

10             (Counsel confer)

11             THE COURT:  All right, let's do is this.  Let's take a

12   ten-minute break and, in the interim, don't discuss this case

13   amongst yourselves or with anyone else.  Don't conduct any

14   independent research regarding any of the issues, parties, or

15   locations in this case.  See you in ten minutes.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  All right.  We have got a break.  Do you

3   think, counsel for the government, do you think this is

4   something that can be fixed quickly or is this some bigger

5   issue?

6          MS. FLETCHER:  I think so.  If it can't, we will

7   figure something out.

8          THE COURT:  All right.  See you soon.

9          (Recess)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Do we have the technical stuff worked out?

2          MS. FLETCHER:  We don't, your Honor.  I can move on,

3     and, if we're able to resolve it, we'll play it.

4          We are working on it.

5          THE COURT:  Sounds good.

6          Bring the jury in.

7          MS. FLETCHER:  Our current plan is to try to get

8     speakers from our office and bring them over and play it, not

9     through the AV system.

10          THE COURT:  What kind of speakers are we talking

11    about?  I am a little concerned because you've already got CDs

12    here.  What kind of speakers are we talking about?

13          MS. FLETCHER:  You are concerned how rudimentary --

14          THE COURT:  You don't have a boom box you are bringing

15    in, do you?

16          MS. FLETCHER:  I think we're bringing over like

17    computer speakers, like the two that would plug into a

18    computer.

19          THE COURT:  To move things along, what we could do is

20    we can move on to this other area.  If you can't get this

21    resolved, if you have another witness, you can pause this

22    witness's direct and move on to another witness, because this

23    witness is going to be here throughout the trial.

24          MS. FLETCHER:  Sure.

25          Also, now that the recording is already in evidence,

1   we can play it with or without this witness.  I may just ask a

2   couple of questions about the recording and then move on.

3               THE COURT:  OK.  All right.

4               Is this person on the recording, the person who is

5   wired up, is this person coming in to testify?

6               MS. FLETCHER:  No.

7               THE COURT:  All right.  Let's bring in the jury.

8               Before the jury comes in, I am going to give them the

9   same instructions I have been giving them at the end of every

10  day.  If counsel has something else you want tell me now or

11  make a hand signal.

12              MS. FLETCHER:  With respect to scheduling and not

13  talking to anyone?

14              THE COURT:  Yes.  With respect to scheduling, not

15  talking to anyone, not doing any research.

16              Is there anything else counsel can think of now?

17              MR. CARNESI:  No.

18              THE COURT:  If there is something else, let me know

19  before I dismiss them.

20              MS. FLETCHER:  Yes.  Thank you, your Honor.

21          (Continued on next page)

22

23

24

25

1          (Jury present)

2                 THE COURT:  Please be seated.

3                 Welcome back.  Let's continue.

4    BY MS. FLETCHER:

5    Q.  Detective, before we broke, we were talking about

6    Government Exhibit 206, the recording made on November 27,

7    2016.

8    A.  Yes.

9    Q.  We are going to try to resolve the technological issues

10   overnight, but I just want to ask you a couple of questions

11   about that particular visit.

12               What, if any, instructions did you give Mr. Clark for

13   what he should say to the doctor during that third visit?

14   A.  So we wanted to see what the doctor would do in response to

15   Mr. Clark saying that he was addicted to the pills and that he

16   was eating too many of them too fast and see what the doctor

17   did in response to that statement.

18   Q.  So, what, if any, instructions did you give to Mr. Clark

19   regarding that statement?

20   A.  So, we told him to go in and, you know, some time during

21   the visit to mention that he was running out of pills too fast

22   and to see what the doctor did.

23   Q.  What, if any, instructions did you give him about what he

24   should ask the doctor for?

25   A.  We asked -- we told him to either ask for more pills or to

1    ask for an alternative.  And, you know, he had to play it by

2    ear because he had to see how the doctor's reaction was.

3    Q.  OK.  Did Mr. Clark receive a prescription from the doctor

4    from that visit?

5    A.  Yes, he did.

6    Q.  Let's take a look at what's been marked for identification

7    as Government Exhibit 165.  Do you recognize Government Exhibit

8    165?

9    A.  Yes, I do.

10   Q.  Ms. Corrado, could you please flip through, I believe it is

11   a four pages of Government Exhibit 165.  What are the four

12   pages of that document, sir?

13   A.  So, the first two pages are the front and back of a

14   Dr. Taylor office card.  It's got his information on the front,

15   the doctor, and then it has Julio Clark's next appointment date

16   on the back, and then the next two are the prescriptions he

17   received that day.

18        MS. FLETCHER:  The government offers Government

19   Exhibit 165.

20        MR. CARNESI:  No objection.

21        THE COURT:  OK.  It's in.

22        (Government Exhibit 165 received in evidence)

23        MS. FLETCHER:  Ms. Corrado, please publish.  If we

24   could take a look at page 2 to start.

25   BY MS. FLETCHER:

1    Q.  How did you first --

2              THE COURT:  Hold on just a second.  Do the jurors have

3    it yet?  Let's wait.

4              JURORS:  Now.

5              THE COURT:  OK.

6    BY MS. FLETCHER:

7    Q.  Taking a look at page 2, Detective, how did you first come

8    to see this card?

9    A.  Julio Clark brought it back out of the office to us.

10   Q.  That was after the third recording, the November 27

11   recording?

12   A.  Yes.

13   Q.  I'm sorry.  The November 21st recording.

14   A.  Yes, 21st.

15   Q.  And what is this?

16   A.  It is a business/appointment card.

17   Q.  If we could go back to page 1.  How does page 1 relate to

18   page 2?

19   A.  That is the back of the card telling Mr. Clark when his

20   next appointment date was, which was supposed to be 12/19 of

21   '16, Monday.

22   Q.  You said "supposed to be."  Did Julio Clark attend that

23   appointment?

24   A.  No, he did not.

25   Q.  Why not?

1    A.  He was becoming difficult to get ahold of as well, and we

2    felt that he had done enough.  We didn't need to pursue it any

3    further.

4    Q.  What, if any, instructions did you give him with respect to

5    that appointment?

6    A.  I told him he couldn't go.

7         MS. FLETCHER:  If we could go to page 3.

8    Q.  What is this prescription from November 21, 2016.

9    A.  That is for Roxicodone, the brand name of oxy, 30

10   milligram, 180 pills, six pills a day.

11   Q.  How does the number of oxycodone pills in this prescription

12   compare to the prescription from the prior month?

13   A.  I believe it's the same.

14        MS. FLETCHER:  Let's take a look at the final page,

15   page 4.

16   Q.  What is the prescription on page 4?

17   A.  This is oxymorphone, 40 milligram.

18   Q.  What is oxymorphone?

19   A.  That is Opana.

20   Q.  And how, if you know, does oxymorphone compare in strength

21   to oxycodone?

22   A.  I believe it's stronger.

23   Q.  How many pills are prescribed for Mr. Clark per month of

24   oxymorphone?

25   A.  60.

1  Q.  During the recording that's in evidence as Government

2  Exhibit 206, is there any discussion between Dr. Taylor and

3  Julio Clark about this additional prescription?

4  A.  No, there's not.

5        MS. FLETCHER:  You can take that down, Ms. Corrado.

6  Q.  Did Mr. Clark make any more recordings after this, this

7  third recording, Government Exhibit 206?

8  A.  No, he did not.

9  Q.  Did there come a time when you stopped using him as a

10  source?

11  A.  Yes.

12  Q.  Why was that?  Why did you stop using him?

13  A.  Again, he had become difficult.  He didn't want to do it

14  much anymore, and then he disappeared on us.  We couldn't get

15  ahold of him.

16  Q.  You testified with respect to Ms. Oakes that you observed

17  her in Dr. Taylor's office the day that Dr. Taylor was

18  arrested.  Did you participate in a search of the defendant's

19  office on that day?

20  A.  Yes, I did.

21  Q.  And did you take any steps during that search to locate any

22  particular patient charts?

23  A.  Yes.

24  Q.  What, if any, steps did you take with respect to Julio

25  Clark's chart?

1   A.  I was looking for Julio Clark's chart because of the past

2   interaction.  They couldn't find the chart, so I specifically

3   wanted to see his chart.

4   Q.  And were you able to locate his chart?

5   A.  No, I wasn't.

6   Q.  Where did you look?

7   A.  I looked everywhere in his office, and then we later

8   searched the doctor's house.  I looked there as well and I

9   couldn't find it.

10  Q.  Did you see in one of the earlier recordings that

11  Dr. Taylor appears to be writing down notes in a folder?

12  A.  Yes.

13  Q.  What did you understand that folder to be?

14  A.  Julio Clark's chart.

15  Q.  His original chart or a replacement chart?

16  A.  A replacement chart.

17  Q.  Did you find that replacement chart in any of the places

18  that you searched?

19  A.  No, I did not.

20  Q.  OK.  I want to talk about one more confidential source.

21          MS. FLETCHER:  Ms. Corrado, if we could please pull up

22  what's been marked for identification as Government Exhibit

23  112A.

24  Q.  Do you recognize Government Exhibit 112A?

25  A.  Yes, I do.

1   Q.  What is it?

2   A.  It is a photo of Brian Dolinko.

3   Q.  How did you first become familiar with Brian Dolinko?  Just

4   briefly, who is he?

5   A.  He became a cooperator with us as well.

6           MS. FLETCHER:  The government offers Government

7   Exhibit 112A and B?

8           MR. CARNESI:  No objection.

9           THE COURT:  OK.  It's in.

10          (Government Exhibits Exhibit 112A and 112B received in

11  evidence)

12          MS. FLETCHER:  Ms. Corrado, please publish.

13          I will wait.

14  Q.  Detective Del Rosario --

15          THE COURT:  Hold on.

16          JURORS:  Now.

17          MS. FLETCHER:  I thought I had it this time.

18  BY MS. FLETCHER:

19  Q.  Detective Del Rosario, how did you first become familiar

20  with Brian Dolinko?

21  A.  We were told by another cooperating source that Brian

22  Dolinko was selling oxycodone out of his place of employment,

23  and he was also a patient of Dr. Taylor and that he knew Vito.

24  Q.  What, if any, investigative steps did you take upon

25  learning that information?

1    A.  So, we sent that informant back to make a purchase off of

2    Brian Dolinko, which he did, and then subsequently we sent a

3    second informant with the first informant, and he made

4    subsequent buys off of Brian Dolinko.

5    Q.  Turning your attention to the first purchase, what did the

6    first informant purchase from Brian Dolinko?

7    A.  Oxycodone, 30 milligram.

8    Q.  What was the purpose of introducing a second informant to

9    Mr. Dolinko?

10   A.  We were trying to insulate the first informant so that he

11   didn't have to take responsibility, you know, insulate him from

12   Brian because he knew him.

13   Q.  Can you explain what you mean by insulate him.

14   A.  So, when you insulate an informant, you use one informant,

15   he opens the door and makes the first buy, and then you bring

16   another informant in and then that informant takes over and

17   starts making the buys, and you just use the second informant's

18   buys to protect the first informant.

19   Q.  When you say to protect him, do you mean to protect his

20   identity as an informant?

21   A.  Yes.

22   Q.  How many purchases did the second informant make from Brian

23   Dolinko?

24   A.  About five.

25   Q.  And what did that second informant ask Brian Dolinko for?

1    A.  Oxycodone, 30 milligram.

2    Q.  The second informant, during the, you said the five

3    different purchases, approximately five different purchases,

4    did the second informant purchase oxycodone from Brian Dolinko

5    on those five occasions?

6    A.  Yes, he did.

7    Q.  Was there an occasion that the pills that were sold by

8    Brian Dolinko were not in fact oxycodone?

9    A.  Yes.

10   Q.  What were the pills in that instance?

11   A.  They were a mixture of Fentanyl and acetaminophen.

12   Q.  What is acetaminophen?

13   A.  Tylenol.

14   Q.  During those interactions where the informant made

15   purchases from Brian Dolinko, did you conduct surveillance?

16   A.  Yes.

17   Q.  Who did you surveil during those buy operations?

18   A.  We surveilled Brian Dolinko, and we came across Daniel

19   Garcia as well.

20   Q.  How did you come across Daniel Garcia?

21   A.  Brian Dolinko was getting some of the pills from Daniel

22   Garcia.

23   Q.  How were you able to conclude that based on your

24   surveillance of the five purchases that you just discussed?

25   A.  So, on one of the purchases, Brian Dolinko goes over to

1   Daniel Garcia in the parking lot of his job, and we see him get

2   the pills from Garcia and come back to the informant.

3            On another buy, the informant trips with Brian Dolinko

4   to Daniel Garcia's residence, and Dolinko goes into the

5   Garcia's residence and purchases the pills and then comes back

6   out.

7   Q.  You used the word "trips."  Do you mean drive with?

8   A.  Yes, I'm sorry.

9   Q.  OK.  The Fentanyl and acetaminophen pills that we

10  discussed, did you have occasion to see those pills yourself?

11  A.  I did.

12  Q.  How, if at all, did those pills -- what was the appearance

13  of those pills relative to the oxycodone pills that you are

14  familiar with?

15  A.  They looked similar, but I was able to tell that they were

16  different.

17  Q.  After these purchases from Brian Dolinko, what, if any,

18  investigative steps did you take with respect to Mr. Dolinko?

19  A.  Eventually we approached Mr. Dolinko and told him that we

20  had been purchasing oxycodone from him.  We asked him to assist

21  the government, and we asked him if he would be willing to make

22  recordings of visits with Dr. Taylor, to which he agreed.

23  Q.  Did Mr. Dolinko, in fact, make a recording?

24  A.  Yes, he did.

25  Q.  How many recordings did he make of Dr. Taylor?

A.  One.

Q.  We talked before about the information that you sought to obtain from a confidential source before sending him in to see Dr. Taylor.

How, if at all, did the information you sought from Brian Dolinko differ from what we discussed earlier with respect to the other CS's?

A.  It was basically the same.

Q.  You say basically the same.  Was anything different?

A.  His injury was different that he had, but for the most part the visit was brief, not a lot of talking, no exam.

Q.  What, if any, instructions did you give him that were different from the instructions you gave to the other CS's?

A.  None.

Q.  We also talked about the procedure for setting up a recording device with respect to the other two confidential sources.  How did the procedure for setting up the recording device on Brian Dolinko, differ, if at all, from the other two that we talked about?

A.  I wasn't there for that recording.

Q.  What were you not there for?

A.  The actual visit into the doctor's office.  I had spoken to Dolinko earlier, and he then met with the agents, Agent Surette and Agent McGrail, and they handled the recording devices and the visit from there.

1   Q.  Did you join your partners later that day?

2   A.  Later on, after I signed in at work, I was able to meet up

3   with them and we recovered the recording devices that they

4   used.

5   Q.  When you say "we," who do you mean?

6   A.  Myself, Agent McGrail, and Agent Surette.

7   Q.  Did you review the audio that Mr. Dolinko made or the

8   recording that Mr. Dolinko made on that day?

9   A.  Yes, I did.

10  Q.  And what, if any, steps did you take to download that

11  recording?

12  A.  I brought it -- I plugged it into the computer and

13  downloaded it.

14  Q.  What was the recording device that was used on that day?

15  A.  The watch.

16  Q.  Detective, can you take a look at the CD before you,

17  labeled Government Exhibit 203.

18  A.  Yes.

19  Q.  Do you recognize Government Exhibit 203?

20  A.  I do.

21  Q.  How do you recognize it?

22  A.  It's the disk with Brian Dolinko's name, the date, May 22,

23  2017, and I initialed it because I reviewed it.

24  Q.  What is the significance of that date?

25  A.  That is a month prior to Dr. Taylor being arrested.

1  Q.  With respect to the recording that Brian Dolinko made,

2  what, if any, significance is there of that date?

3  A.  There was no exam done.

4  Q.  Let me ask a different question.  On what day did Brian

5  Dolinko make the recording that you just discussed?

6  A.  May 22.

7  Q.  How do you know that?

8  A.  Because I was told by Agent -- I mean, I met with Agent

9  Surette and Agent McGrail and recovered the devices.

10  Q.  Is that the recording that's on that CD?

11  A.  Yes.

12       MS. FLETCHER:  The government offers Government

13  Exhibit 203.

14       THE COURT:  Any objection?

15       MR. CARNESI:  No objection.

16       THE COURT:  OK.  It's in.

17       (Government Exhibit 203 received in evidence)

18  BY MS. FLETCHER:

19  Q.  If you could please turn to your binder, Detective Del

20  Rosario, at tab 203T.

21  A.  OK.

22  Q.  Is the transcript behind tab 203T a fair and accurate

23  transcript of the recording that Brian Dolinko made?  Is it a

24  fair and accurate transcript of the excerpt of the recording

25  that Brian Dolinko made that included his interactions with

Ibsntay5                    Del Rosario - Direct

 1   Dr. Taylor?

 2   A.   Yes.

 3             MS. FLETCHER:  The government offers Government

 4   Exhibit 203T as an aid to the jury.

 5             THE COURT:  Any objection?

 6             MR. CARNESI:  No, your Honor.

 7             THE COURT:  OK.

 8             Do you want the jurors to look at 203T now?

 9             MS. FLETCHER:  Please, your Honor.

10             Ms. Corrado, if we could please play clip 1 of 203.

11             THE COURT:  OK.

12             (Video played)

13             THE COURT:  Hold on a second.  I don't think the

14   jurors can hear that.

15             MS. FLETCHER:  May I have a moment, your Honor?

16             THE COURT:  Yes.

17             MS. FLETCHER:  Your Honor, with the Court's indulgence

18   we are going to try the computer-speaker method, which may or

19   may not be worse.

20             THE COURT:  OK.

21             Can the jurors hear that?  The jurors in the back row

22   can't hear.

23             JUROR:  Maybe bring the computer closer.

24             THE COURT:  OK.

25             Are the jurors able to hear that?

Ibsntay5                    Del Rosario - Direct

1          JURORS:  Can you just put a microphone on the speaker.

2          THE COURT:  Can you pause that for a second.

3          Can the jurors here that now?

4          JUROR:  No.

5          THE COURT:  I think the jurors toward the back can't

6     hear.  Can you center that a little bit.

7          Is everyone able to hear that now.  OK.

8          MS. FLETCHER:  Perhaps if we move on to clip 2.  It

9     may be, in part, the recording for that one.

10         THE COURT:  Is the laptop plugged in to something?

11    Maybe we can put it on the jury rail toward the center, if it's

12    not too obstructive.

13         Can everyone hear that?  The back row?

14         I don't think that is loud enough.  Can the jurors in

15    the back row hear that?

16         MS. FLETCHER:  There is nothing being said right now,

17    your Honor.

18         THE COURT:  OK.  Good.

19         (Video played)

20         THE COURT:  OK.  I don't think the jurors can hear

21    that.

22         MS. FLETCHER:  Your Honor, I think we will perhaps try

23    again tomorrow with this recording and the other recording.

24         THE COURT:  OK.

25         MS. FLETCHER:  I will move on.

1          THE COURT:  OK.

2          Do you want to have your assistants retrieve the

3     transcript books now.

4     BY MS. FLETCHER:

5     Q.  Detective Del Rosario, you mentioned when we were

6     discussing your instructions to Brian Dolinko that there were

7     some differences related to his injury.

8          Do you recall that?

9     A.  Yes.

10    Q.  And what were those differences?

11    A.  Like I said, he had a different injury, and, you know, he

12    was -- he basically told us the same thing as everybody else.

13    Q.  What was your understanding of what his injury was?

14    A.  Rotator cuff.

15    Q.  And did he give you a sense of the how recent his injury

16    was relative to when he was making this recording?

17    A.  It was years prior.

18    Q.  OK.  Let's take a look at what's been marked for

19    identification as Government Exhibit 162.

20         Do you recognize Government Exhibit 162?

21    A.  Yes.

22    Q.  What's Government Exhibit 162?

23    A.  It's a printout of the receipt for the electronic

24    prescription.

25    Q.  For whom?

1    A.  For Brian Dolinko.

2    Q.  On what date?

3    A.  May 22, 2018.

4         MS. FLETCHER:  The government offers Government

5    Exhibit 162.

6         MR. CARNESI:  No objection.

7         THE COURT:  OK.  It's in.

8         (Government Exhibit 162 received in evidence)

9         MS. FLETCHER:  Ms. Corrado, can you please blow up and

10   publish the upper left quadrant of that sheet.

11   BY MS. FLETCHER:

12   Q.  Detective Del Rosario, why does that look different than

13   the other prescriptions we looked at?

14   A.  Because this is an electronic prescription with the new

15   system New York State implemented.

16   Q.  And what is the prescription on page 1 of this document.

17   A.  This prescription is for carisoprodol, which is Soma, a

18   sleeping -- like a muscle relaxer, sleeping pill.

19        MS. FLETCHER:  Can we go to page 2, please,

20   Ms. Corrado.

21   Q.  What is this prescription on page 2, Detective?

22   A.  Oxymorphone, or Opana, 40 milligram.

23   Q.  What is oxymorphone again?

24   A.  Opana.

25        MS. FLETCHER:  If we could go to page 3, please.

1   Q.  What is this prescription on page 3?

2   A.  This is for Roxicodone, or oxycodone, 180 pills, 30

3   milligram.

4   Q.  Apart from this recording that Mr. Dolinko made related to

5   Dr. Taylor, did you ask Mr. Dolinko to make any other

6   recordings of any other individuals?

7   A.  Yes.

8   Q.  Who did you ask him to record?

9   A.  We asked him to record Nicholas Avicolli, the pharmacist.

10  Q.  Did he agree?

11  A.  Yes.

12  Q.  Did there come a time when Brian Dolinko ceased to be a

13  confidential source, or does he remain a confidential source?

14  A.  He ceased.

15  Q.  Why did he cease to be a confidential source?

16  A.  Because once we arrested the doctor he had no other

17  information for us.

18          MS. FLETCHER:  May I have one moment, please, your

19  Honor.

20          No further questions.

21          THE COURT:  OK.  Any cross examination?

22  CROSS-EXAMINATION

23  BY MR. CARNESI:

24  Q.  Good afternoon, Detective.

25  A.  Good afternoon, Mr. Carnesi.

Ibsntay5                    Del Rosario - Cross

1   Q.  I would like to go back, if we can, to your interaction

2   with Julio Clark.

3   A.  Yes, sir.

4   Q.  Now, do you recall what date it was when you first began to

5   have your meetings with him or discussions with him about his

6   cooperation?

7   A.  You mean what date was the first approach?

8   Q.  Yes.

9   A.  It was earlier in 2016.  I'm not sure of the exact date.

10  Q.  I have a DEA 6.  It's marked as 3516-070.

11          Can we just have that provided to the witness, Judge.

12          THE COURT:  OK.

13          Hold on a second.  Let's have a quick sidebar.

14       (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (In the robing room)

2          THE COURT:  OK.  I am just trying to figure out, if

3    you want to show him something, that's fine.  But --

4          MR. CARNESI:  I am going to ask him questions, Judge.

5    He has indicated he doesn't remember the date.  I want to be

6    able to refresh his recollection as to the date and the

7    sequence of events.

8          THE COURT:  I don't have any problem with that.  The

9    problem is obviously this is an adversarial proceeding, and the

10   government shouldn't necessarily be put in the position of

11   handing the documents to this witness.

12          Do you have another copy of this document?

13          MR. CARNESI:  I don't, Judge.  I have the single copy.

14   My understanding would have been that, again, they're his

15   reports, that he would have had them available to him.

16          MS. FLETCHER:  Your Honor, I may be able to resolve

17   this.  What I was going to suggest is that rather than have our

18   paralegal go up and hand papers that we just use the screen.

19   She can put the document on the screen.

20          THE COURT:  OK.

21          MS. FLETCHER:  Then the detective can review it.

22          MR. CARNESI:  I assume you mean on the screen which

23   only the witness is seeing.

24          MS. FLETCHER:  Correct.

25          MR. CARNESI:  I don't have a problem with that, Judge.

1    I think there are only two documents like this that I would

2    really be referring to anyway.

3            THE COURT:  Just so we are clear, counsel for the

4    government is willing to put it on the screen for the witness.

5            MS. FLETCHER:  Sure.

6            MR. CARNESI:  Thank you.

7            THE COURT:  All right.

8            MS. FLETCHER:  Assuming it's loaded, which I think it

9    is, but assuming it is it's loaded.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2            MS. FLETCHER:  The best laid plans, your Honor, I

3    think we are going to have to use paper.

4            MR. CARNESI:  Maybe I can do this by showing him mine.

5            THE COURT:  OK.

6            MR. CARNESI:  If I need to see it again, I can

7    approach.

8            THE COURT:  Yes.

9    BY MR. CARNESI:

10   Q.  Here you are, Detective.

11   A.  Thank you, sir.

12           THE COURT:  Do you want to draw his attention to a

13   particular page or section of the document, counsel.

14           MR. CARNESI:  At the moment, Judge, just the date.

15   BY MR. CARNESI:

16   Q.  Does that refresh your recollection, Detective, as to when

17   the initial discussion was had with Julio Clark?

18   A.  This is not the initial discussion.

19   Q.  OK.  At what point in your discussions with him did that

20   occur?  Was that first, second, third?

21           THE COURT:  Hold on.

22           MR. CARNESI:  Do you know?

23           THE COURT:  Please rephrase the question.

24           Did what occur?

25           MR. CARNESI:  OK.

Ibsntay5                    Del Rosario - Cross

Q.  The conversation reflected in that report, what is the date

of that?

          MS. FLETCHER:  Your Honor.

          THE COURT:  Hold on.  Objection sustained.

          Please, let's have a quick sidebar.

          THE COURT:  May I see the document?

          THE WITNESS:  Yes, sir.

       (Continued on next page)

1          (In open court)

2          THE COURT:  OK.

3          Let me hand this back to you.

4          MR. CARNESI:  Thank you.

5          MS. FLETCHER:  May I take a look?

6          MR. CARNESI:  Sure.

7          THE COURT:  What is it you are trying to get, counsel?

8          MR. CARNESI:  Judge, he was asked on direct

9     examination about who authorized certain prescriptions for

10    Mr. Clark.  He spoke about Mr. Clark getting prescriptions from

11    a Dr. Anderson and from Dr. Taylor.

12         THE COURT:  Right.

13         MR. CARNESI:  He did not mention that apparently

14    Mr. Clark told him he was getting prescriptions from Denise

15    Suarez.

16         THE COURT:  OK.  That is a different question than the

17    question that was posed.  I thought you were attempting to

18    refresh his recollection as to when he first met --

19         MR. CARNESI:  I was just trying to do it

20    preliminarily, Judge, so I could do it in order.  It was my

21    understanding, I guess mistakenly, that that was the first

22    substantive conversation he had.

23         THE COURT:  Yes.  He's indicated that that wasn't it.

24         MR. CARNESI:  Right.

25         THE COURT:  So that's fine.  You can ask him

1  questions.

2           What is the government's position on this?

3           MS. FLETCHER:  I only stood up because I was

4  anticipating a reading-a-document-not-in-evidence issue.

5           MR. CARNESI:  All right.

6           THE COURT:  All right.

7           Again, I do think that counsel is correct.  That's why

8  wanted to come back here, because you can't start making

9  reference to what is the date that the conversation listed here

10 took place, and then start going into the conversation.

11          MR. CARNESI:  I was only trying to lay a background

12 for it, Judge.  I will do it differently.

13          THE COURT:  OK.

14          MS. FLETCHER:  I certainly don't want to raise an

15 issue that is not an issue, but I expect what Mr. Carnesi is

16 going to seek to elicit from this particular 6 is that, based

17 on the detective's conversations with Julio Clark, Julio Clark

18 told the detective about something that Denise was doing.

19          THE COURT:  OK.

20          MS. FLETCHER:  So, if that's where this is going,

21 questions about things that Julio told the detective about

22 things Denise was doing, the government is going to have a

23 hearsay objection.  Those are not statements by Julio against

24 his own interest.  They are statements by Julio about something

25 that a third party did.

Ibsntay5                    Del Rosario - Cross

1          THE COURT:  I don't think that's hearsay.  I believe

2    he's attempting to impeach this witness with an inconsistent

3    statement because the witness previously indicated that he was

4    getting prescriptions from Dr. Anderson and from Dr. Taylor.

5          MR. CARNESI:  That's correct.

6          THE COURT:  And he claims he was getting the

7    prescriptions from Denise Suarez, so it is not being offered

8    for the truth.

9          MS. FLETCHER:  Who is he impeaching here in this case?

10         MR. CARNESI:  Your witness testified that he was told

11   by Julio Clark that he had gotten prescriptions from two

12   individuals.

13         MS. FLETCHER:  I don't believe that is his testimony.

14   I believe his testimony is that he reviewed the B and E and P

15   and P data and saw prescriptions from those two doctors to

16   Julio Clark, and that's why he approached Julio Clark.  This

17   doesn't impeach that testimony.

18         MR. CARNESI:  Denise --

19         THE COURT:  Let's go.

20         MR. CARNESI:  Denise Suarez would not appear on the B

21   and E.

22         THE COURT:  Let's go.

23         MR. CARNESI:  We are back to the same thing, where do

24   the prescriptions come from.

25         THE COURT:  Where is it you are going with this?

1    Let's keep this moving.  Where is it you want to go with this?

2            MR. CARNESI:  Sure.  I want to establish that they had

3    information that Denise Suarez was writing prescriptions under

4    Dr. Taylor's name.  It says that's what they were told.

5            MS. FLETCHER:  The only way they had --

6            THE COURT:  If they had information, that was

7    different from impeaching.  I thought you were impeaching.  It

8    is a little different to say they had information.

9            MR. CARNESI:  To me it is impeachment because that's

10   not what he testified to.

11           THE COURT:  That's not what who testified to?

12           MR. CARNESI:  What this witness testified to.

13           THE COURT:  If you're impeaching the former CS through

14   this witness, that seems to me to be appropriate.  If this

15   witness said that the CS told him this, and he didn't mention

16   that the CS also told him this, that's fine.  But it's going a

17   little bit far afield just to get into you had information that

18   this was happening.  If you want to ask this question, you can.

19   You may not like what you get.  If you want to ask him that

20   question, you can ask him that.

21           MS. FLETCHER:  The issue with asking that question is

22   the basis for that information is Julio Clark's hearsay, so

23   there's no statements that Julio Clark has made --

24           THE COURT:  That's fine.  I understand.  But, again,

25   it's being offered not for the truth of the matter asserted,

1    but offered to indicate this is information that this detective

2    had.  It doesn't matter whether the detective believed this or

3    not, but the information was had by this detective.

4              MS. FLETCHER:  Your Honor, respectfully, that is not

5    why it's being offered.  It is being offered for the truth of

6    the statement that Denise was writing these prescriptions.  The

7    detective hasn't testified one way or another about this

8    information.

9              THE COURT:  I understand.

10             MS. FLETCHER:  Because we explicitly instructed him

11   not to introduce hearsay statements.

12             THE COURT:  That's why I am saying this may open up

13   lots of other doors to lots of other things that defense

14   counsel may not want to have come in.

15             MS. FLETCHER:  If the Court's position is this opens

16   the door --

17             THE COURT:  I am not saying it does or doesn't.  I am

18   saying this could be a little dangerous.  If the point is to

19   get out that -- I am not going to tell you how to try your

20   case.

21             Let's move this along.  My concern, again, was

22   originally because he attempted to refresh, that didn't happen,

23   and then you start trying to have him read from a document that

24   is not in evidence.

25             But ask your questions.  Let's see.  I will rule as it

Ibsntay5                    Del Rosario - Cross

1    comes up.

2              Let's see.  All right.

3         (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Go ahead.

3          What is it you wish the witness to do with this

4     document, counsel?

5          MR. CARNESI:  Judge, I just wanted him to have it

6     available in case he needs to refresh his recollection.

7          THE COURT:  Let's just take it back from him.  If he

8     needs to refresh, you can hand it to him.

9          MR. CARNESI:  Sure.

10         THE COURT:  OK.

11         Let me ask the witness to just hand the document back

12    to counsel.

13         THE WITNESS:  Yes, sir.

14         THE COURT:  That document is not in evidence.

15         THE WITNESS:  OK.

16    BY MR. CARNESI:

17    Q.  Detective, you had conversations with Julio Clark about his

18    interaction with Dr. Taylor and Dr. Anderson, right?

19    A.  Yes.

20    Q.  I believe on direct examination you had inquired or you had

21    been asked as to who authorized the prescriptions that Julio

22    Clark had received, right?

23    A.  What do you mean authorized?

24    Q.  Who wrote the prescriptions.

25    A.  That we received?

1    Q.   That Julio Clark received.

2    A.   Oh.  From which time are we talking about counsel?

3    Q.   Sometime prior to September of 2016.

4    A.   Yes.  He told me he received prescriptions from Dr. Taylor.

5    Q.   Did he tell you he received prescriptions from anybody

6    else?

7    A.   Not during our first interaction.

8    Q.   Did he tell you if he received prescriptions from anybody

9    else?

10   A.   Yes.

11   Q.   Who?

12   A.   Dr. Anderson.

13   Q.   Anyone else?

14   A.   Yes.

15   Q.   Who?

16   A.   A staff member at Dr. Taylor's office.

17   Q.   Who?

18   A.   A staff member at Dr. Taylor's office.

19   Q.   Do you know the name of the staff member?

20   A.   No, but I know which office.

21   Q.   I'm sorry.  I didn't hear you.

22   A.   No, but I know which office.

23   Q.   Did he describe this individual to you?

24   A.   Yes.

25   Q.   How did he describe the individual?

1  A.  He said it was the secretary from the Victory Boulevard

2  office.

3  Q.  Did he give you a name?

4  A.  I believe her name was Denise also.

5  Q.  Did he say how this -- was this a doctor?

6  A.  No, sir.

7  Q.  Do you know the position that this individual held at this

8  office?

9  A.  No.  I know that they worked at the front desk of the

10  office.

11  Q.  Do you know how they got access to the prescriptions, the

12  prescription pad?

13  A.  No, sir, I do not.

14  Q.  Do you know what arrangement Mr. Clark had with this

15  particular individual in order to induce her to write

16  prescriptions for him?

17  A.  Yes, sir.

18  Q.  What was that arrangement?

19  A.  Cash arrangement.

20  Q.  Do you know how much he paid?

21  A.  I don't remember the exact amount.  It was a couple hundred

22  dollars, though, per script.

23  Q.  Do you know how many times this occurred?

24  A.  I don't know an exact number.  It happened over the course

25  of a couple of months while at the Victory Boulevard office.

1    Q.  Did you make any effort to have Mr. Clark record a

2    conversation with that individual?

3    A.  I asked him if he would be willing to interact with her.

4    Q.  And?

5    A.  He said he didn't know her anymore like that, and that once

6    their relationship had ceased, he didn't think he could get it

7    done.  So we didn't pursue it.

8    Q.  Did you pursue it through any other means?

9    A.  We did.

10   Q.  As you sit here now testifying, can you tell me what

11   efforts you made to determine whether or not this individual

12   was doing that with other patients of Dr. Taylor's?

13           MS. FLETCHER:  Your Honor, we are going to object to

14   scope at this point.

15           THE COURT:  Yes.

16           Let's have a sidebar on this.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1          (In the robing room)

2          THE COURT:  Let me ask for the last three questions

3    and answers to be read back, please.

4          (Record read)

5          THE COURT:  So where is this going now, counsel?

6          MS. FLETCHER:  Judge, we have heard about numbers of

7    pills that were supposedly prescribed and whatever.  Now I

8    think there is an issue at least that should be developed as to

9    whether or not Dr. Taylor wrote all these prescriptions.

10         If there's somebody --

11         THE COURT:  I got that.  Where is the next question

12   going with this?  I seems that you've already kind of milked

13   this quite a bit.

14         Where are we going with this?

15         MR. CARNESI:  I can't really milk it if I don't know

16   that they spoke to 200 other patients who did the same thing.

17         THE COURT:  All right.

18         Government, what is your position on this?

19         MS. FLETCHER:  I think what Mr. Carnesi just said that

20   he's looking for is a slightly different question than what

21   he's getting at.

22         I think you are asking -- he's asking for his

23   investigative steps, what steps he took.  If he's going to, for

24   example, say that he spoke to ten patients, the next question

25   is going to be, What did those patients tell you.  Then we're

1  going to get into now a totally separate area of hearsay

2  evidence that is offered for its truth for the purpose of being

3  able to argue to the jury that these other patients were

4  telling the truth when they said that Denise -- in this case

5  it's actually a different Denise -- but that Denise gave them

6  prescriptions.

7          THE COURT:  OK.  What is your response to that?

8          Why is this not being offered for the truth of the

9  matter asserted, and, if so, why is this an exception to

10  hearsay?

11         MR. CARNESI:  The question is what steps he took.  So

12  I don't think it is hearsay for him to give me those steps.  If

13  they took none, they took none.

14         THE COURT:  OK.

15         MR. CARNESI:  If they took handwriting exemplars and

16  they made an effort to compare that with prescriptions that

17  were out there, OK, I am entitled to know that.

18         THE COURT:  The next questions or the next statements

19  about what people said to him about Denise?

20         MR. CARNESI:  No.  I want to know did they do

21  something along those lines, for example, just as simple as to

22  take handwriting exemplars.  Did they ever speak to Denise,

23  this Denise?  Did she proffer?

24         THE COURT:  This is a different Denise than Denise

25  Suarez?

1            MR. CARNESI:  Yes.

2            THE COURT:  OK.  All right.

3            Let's keep moving.  Let's go.  Let's do this quickly.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  OK.  Please restate the question.

3          MR. CARNESI:  Can we just read the question back,

4     Judge.

5          THE COURT:  Sure.

6          (Record read)

7     A.  So, we approached Denise Gonzalez, who was one of Julio

8     Clark's fake patients, and we asked her about this person as

9     well.

10    Q.  I'm sorry.  I didn't hear the last part.

11    A.  We asked her about this staff member as well, which she

12    acknowledged.

13    Q.  You approached Denise Gonzalez?

14    A.  Yes.

15    Q.  OK.  And asked her, the person, the staff person?

16    A.  Yes.  Well, what had happened was she was getting

17    prescriptions double from Dr. Taylor, and I couldn't figure out

18    why that was.  So, when we spoke with her, she let us know

19    about that.

20    Q.  I am not sure I understood your answer.

21    A.  OK.

22    Q.  Denise Gonzalez is the person who was identified as writing

23    those prescriptions, wasn't she?

24    A.  No, sir.

25    Q.  That's where I'm confused.

1    A.  Denise Gonzalez is a different Denise.  There is a lot of

2    Denises, but this is a different Denise.

3    Q.  Let's go back to the individual who was identified as the

4    person who wrote this prescription.

5    A.  Yes, sir.

6    Q.  Who was that?

7    A.  I don't know her identity.

8    Q.  Did you ever ask Julio Clark or show him any pictures of

9    people who were employed by Dr. Taylor in an attempt to try to

10   identify this individual?

11   A.  Not from the Victory Boulevard office, no.

12   Q.  Did you ever make any attempt to identify how many

13   prescriptions this individual may have written?

14   A.  I saw it in the data.

15   Q.  You saw?

16   A.  I was able to recognize it from the data.

17   Q.  How was that?

18   A.  Because Julio Clark's people were the only ones that were

19   getting prescriptions back to back from Dr. Taylor.  I didn't

20   see it with any other patients.  So the data is what told me

21   that it was isolated.

22   Q.  That's how you drew the conclusion of whether or not

23   prescriptions were given back to back?

24   A.  No, sir.  So, Julio Clark's people were receiving double

25   prescriptions from Dr. Taylor.

1    Q.  Right.

2    A.  One was filled in New York; one was filled in New Jersey.

3    Julio Clark's people that I identified were the only ones who

4    were getting that.  So I took that to mean that Julio Clark was

5    the only one that had that relationship with the staff member.

6    Q.  OK.  And when you identified these back-to-back

7    prescriptions, you understood that one was actually written by

8    Dr. Taylor, right?

9    A.  I believed it was, yes.

10   Q.  OK.  And the other was written by this person who was not

11   authorized to write prescriptions, right?

12   A.  I only discovered that after speaking with Denise Gonzalez,

13   who was one of Julio's girls.

14   Q.  Did you at any time try to compare the handwriting from the

15   prescriptions that were not Dr. Taylor's with those of any

16   other patients?

17   A.  No, sir.

18   Q.  Now, you told us about some of the interactions that you

19   had with Christine Oakes.

20          Once again, going back to the first interaction with

21   Christine Oakes, I think that involved you actually conducting

22   an undercover buy from her, right?

23   A.  Interaction, yes.

24   Q.  That transaction was surveilled as it happened, right?

25   A.  Yes, sir.

1   Q.   Was there also a videotape of the transaction?

2   A.   OK.  So that transaction had two parts to it.

3   Q.   OK.

4   A.   There was the part we observed and there was the part where

5   we sent an informant back with cash to pay Ms. Oakes.  So which

6   one are you referring to?

7   Q.   Any part of the transaction.

8   A.   The second part was videoed, yes.

9   Q.   OK.  There comes a point in time where you confront

10  Ms. Oakes, right?

11  A.   Yes, sir.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    Q.  And you tell her that you were aware of the fact that she

3    was selling these drugs, right?

4    A.  Yes, sir, I did.

5    Q.  She admitted that?

6    A.  She was reluctant to admit it, but ultimately she began to

7    work for us, so like. . .

8    Q.  Well, is it fair to say that she admitted it eventually?

9    A.  She never directly admitted what she had done.

10   Q.  Even after you showed her the surveillance?

11   A.  This is correct.

12   Q.  Back when she told you that the surveillance is a lie,

13   right?

14   A.  Yes, she did.

15   Q.  So at that point you knew, one, that obviously she was

16   selling drugs and, two, that she was lying about it.

17   A.  That she wouldn't tell us, yes.

18   Q.  Nevertheless, you enlisted her cooperation in order to go

19   and make recordings for interactions with Dr. Taylor.

20   A.  Yes, sir.

21   Q.  Now, besides Dr. Taylor, were you aware of the fact that

22   she had interactions with anybody else in his office?

23   A.  Yes.

24   Q.  And who was that?

25   A.  Denise Suarez.

1    Q.  And what did you learn about her interaction with Denise

2    Suarez?

3    A.  Denise Suarez would take care of her as far as appointments

4    and jumping the line, and so she would give her cash tips every

5    now and then.

6    Q.  Did you know Denise Suarez to be the individual within

7    Dr. Taylor's office who is was responsible for interacting with

8    the lab that did the urine analysis test?

9    A.  I don't know that for certain.

10   Q.  Do you know whether or not Christine Oakes ever paid Denise

11   Suarez in order to induce her not to have tests conducted on

12   anyone?

13   A.  Yes.

14   Q.  Who was that?

15   A.  Who she asked the tests not to be conducted on?

16   Q.  Yes.

17   A.  William Bray.

18   Q.  And do you know what inducement Christine Oakes gave to

19   Denise Suarez in order to accomplish that?

20   A.  We had given Christine Oakes a sum of currency and she paid

21   Denise Suarez to make sure that William Bray was either not

22   urine tested or, if he was, that she would either get rid of

23   the sample or manipulate the sample in some way and --

24   Q.  When you say -- I'm sorry, can you just keep your voice up

25   a bit?

1    A.  Sure.

2    Q.  When you said you had given Christine Oakes money to pass

3    on to Denise Suarez, can we conclude from that that you had

4    already had a discussion with Christine Oakes about what Denise

5    Suarez was doing with these patients?

6              MS. FLETCHER:  Your Honor, objection.

7              THE COURT:  Overruled.  You may answer.

8    A.  I don't remember if it was Christine that told us that

9    exactly.  It may have been.  I can't remember exactly.

10   Q.  Okay.  But you had reason to believe at the time that you

11   gave her this money that there would be such a transaction,

12   right?

13   A.  We did.

14   Q.  And you were correct.

15   A.  Yes.

16   Q.  Denise Suarez took the money, right?

17   A.  Yes, sir.

18   Q.  Was that recorded?

19   A.  It was.

20   Q.  Now, do you know how those tests were -- what the procedure

21   would be?

22   A.  Inside the office, no, I do not.

23   Q.  Do you know whether or not did Christine Oakes or anyone

24   else indicate to you that they were given prescriptions for a

25   urine analysis tag?

1          MS. FLETCHER:  Objection.

2          THE COURT:  Basis?

3          MS. FLETCHER:  Hearsay.

4          THE COURT:  Overruled.

5  A.  Christine Oakes said she was never urine tested.

6  Q.  Now, there comes a time when you decide you are not going

7  to use Christine Oakes as a cooperator any longer, right?

8  A.  Yes, sir.

9  Q.  And that was based on, once again, her activities as it

10 related to criminal conduct, right?

11 A.  That she was very difficult to deal with.

12 Q.  Now, you told us on direct examination that as a cooperator

13 she was given certain instructions about what she could and

14 could not do?

15 A.  Yes, sir.

16 Q.  One of the things that she was not supposed to do was to

17 pick up prescriptions that you were unaware of.

18 A.  That's correct.

19 Q.  And the reason for that would be so that you would have

20 some control over what her interactions were with the doctor

21 and his staff.

22 A.  Yes, sir.

23 Q.  You wanted to know ahead of time.

24 A.  Yes, sir.

25 Q.  Now, you understood that Christine Oakes was involved in

1   distributing these drugs in order to make a profit?

2   A.  Yes, sir.

3   Q.  Are you aware of a situation where Ms. Oakes, again,

4   attempted to get more -- to get her prescription increased from

5   Dr. Taylor?

6   A.  More than which?  More than what number?

7   Q.  From let's say 180 to 240.

8   A.  I don't recall that.

9   Q.  Do you recall any situation where she attempted to get a

10  prescription for her husband?

11  A.  I don't remember that.

12  Q.  You do recall this conversation at the very end of your

13  relationship with her where she indicated that she had been at

14  the office to pick up a prescription for her father and mother?

15  A.  That's what she said, yes.

16  Q.  And she told you that she had gotten those prescriptions

17  from Denise Suarez, right?

18  A.  No.  During one of our visits that we controlled, she got

19  prescriptions from the front desk in an envelope.  I think it

20  was Denise that handed her the envelope.

21  Q.  Right.  She physically gave her the prescriptions?

22  A.  Right.  Are you talking about later on?

23  Q.  Yes.

24          Now, there comes a point at the end of this

25  relationship where she indicates to you, or to other agents on

Ibr2tay6                    Del Rosario - Cross

1    your team, that she has picked up a prescription for I believe

2    the number was 240 oxycodone pills, right?

3    A.   Could have been.

4    Q.   She wasn't authorized to do that?

5    A.   No, sir.

6    Q.   You told her, or someone on the team, again, I'm going to

7    use the "you" collectively --

8    A.   Yes, sir.

9    Q.   -- so we understand, that she shouldn't fill that

10   prescription, right?

11   A.   That's correct.

12   Q.   And she indicated to you that she wouldn't.

13   A.   At first.

14   Q.   Okay.  When you made arrangements to try and recover that

15   prescription from her, she lied to you again, didn't she?

16   A.   Yes.

17   Q.   And she told you that she didn't fill the prescription;

18   that her husband filled the prescription, right?

19   A.   I believe that's what she said.

20   Q.   And you now know that that was a lie.

21   A.   Well, I know the prescription was filled.

22   Q.   Did you make any attempt to check with the pharmacy to see

23   who actually filled the prescription?

24   A.   No, sir.

25   Q.   When you went to recover the pills that resulted from that

Ibr2tay6                    Del Rosario - Cross

1    prescription, there were approximately 210 missing, right?

2    A.   Yes.

3    Q.   How long after that, after she told you that she received

4    the prescription, did you determine that 210 pills were gone?

5    A.   When I had a chance to count the pills she had given in the

6    bottle.

7    Q.   The question I'm trying to ask is, she received the

8    prescription, you went and recovered whatever was left.  How

9    long after that was it?

10   A.   It's very difficult to count oxy on the street because they

11   fall all over the place.  When I got into a controlled

12   environment and out of that house -- it was a little bit

13   chaotic -- I was able to count them.  Or I don't know if I

14   counted them myself or members of my team counted them, but we

15   were able to determine that only 30 pills remained.

16   Q.   What happened to the 210 pills?

17   A.   I don't know.

18   Q.   Did you discuss that with her?

19   A.   Of course I tried to discuss it with her.

20   Q.   Okay.  Did she tell you?

21   A.   Nope.

22   Q.   Based on your experience, did you believe that she had sold

23   them?

24   A.   I believed somebody in her family may have sold them.

25   Q.   So while she was supposed to be working with you and

Ibr2tay6                    Del Rosario - Cross

1    cooperating and assisting your investigation, she was

2    continuing to sell her prescription?

3    A.   She wasn't cooperating with me after that incident.

4    Q.   Not afterward.

5    A.   No, sir.

6    Q.   But at the time when she filled that prescription, got

7    those drugs into her possession and did whatever she did with

8    them, she was, wasn't she?

9    A.   Yes.

10   Q.   Okay.  Now, as part of your investigation, you looked into

11   Dr. Taylor's background, right?

12   A.   Yes, sir.

13   Q.   Do you know when he was licensed to practice medicine?

14   A.   I do not --

15           MS. FLETCHER:  Objection.

16   A.   -- remember.

17           THE COURT:  Sustained.

18   Q.   Did you conduct surveillance of him?

19   A.   Yes.

20   Q.   Do you know what car he drove?

21   A.   Yes.

22   Q.   What was that?

23   A.   First he had a Volvo and then near the end he had a GMC

24   truck.

25   Q.   At different times?

1    A.  When we first started following him he had this Volvo

2    hatchback, and near the end of the case, he had purchased or --

3    or he was driving a GMC.  I believe it was an Envoy, the SUV,

4    GMC.

5    Q.  Do you know what years, the model year?

6    A.  No.

7    Q.  Did they appear to be new cars, new trucks?

8    A.  They weren't new.

9    Q.  Now, in the course of your surveillance, did you generally

10   describe the type of activities you would observe.

11   A.  If they were pertinent to the case, yes.

12   Q.  Well, did you see him make house calls?

13   A.  Yes.

14          MS. FLETCHER:  Objection, your Honor.

15          THE COURT:  Overruled.

16          MS. FLETCHER:  401.

17          THE COURT:  Overruled.  Go ahead.

18   BY MR. CARNESI:

19   Q.  On more than one occasion?

20   A.  To houses, I don't recall.  I don't recall.

21   Q.  Did you see him on more than one occasion with his black

22   medical bag going into different houses?  If you can recall.

23   A.  Into different houses, no.  I only remember one house.

24   Q.  Do you know who resided at that house?

25   A.  I can't remember.

Ibr2tay6                    Del Rosario - Cross

1    Q.  Did you make any effort to contact the individual residing

2    in the house?

3    A.  No, sir.

4            MR. CARNESI:  Judge, pending introduction of those

5    other exhibits, I don't have any other questions at this time.

6            THE COURT:  Okay.  Any redirect?

7            MS. FLETCHER:  Briefly, your Honor.  Briefly.

8            THE COURT:  Actually let's have a quick sidebar.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In the robing room)

2          THE COURT:  Okay, I just wanted to get a sense of

3    where we are going, if there is anything I need to deal with

4    now on this?  But how much do you have on this?

5          MS. FLETCHER:  I was a bit stunned at the conclusion

6    of the questions, and so I probably have two date-clarifying

7    questions.

8          I'm not sure what you referred to when you said

9    "pending the introduction of the other exhibits."  You mean the

10   recordings?

11         MR. CARNESI:  Yes.

12         MS. FLETCHER:  My intention is to play them without

13   the witness at some later point.

14         MR. CARNESI:  Okay.

15         MS. FLETCHER:  So I can ask my two questions, and I

16   think we will be done.

17         THE COURT:  All right.  Then we will let the jury go.

18         (Continued on next page)

19

20

21

22

23

24

25

1                    (In open court)

2                    THE COURT:  Go ahead, counsel.

3                    MS. FLETCHER:  Thank you

4        REDIRECT EXAMINATION

5        BY MS. FLETCHER:

6        Q.  Just a couple of clarifying questions, Detective.

7                    Going back to the beginning of your cross-examination,

8        do you recall the questions that Mr. Carnesi asked you about

9        the staff member whose name you didn't know?

10       A.  Yes.

11       Q.  And that staff member, you were asked a number of questions

12       about that staff member helping Julio Clark to get a second

13       prescription for each of his people.  Do you remember that?

14       A.  Yes.

15       Q.  During what time period -- and, I'm sorry, that staff

16       member, what office did that staff member work at?

17       A.  The Victory Boulevard office.

18       Q.  When did Dr. Taylor cease working at the Victory Boulevard

19       office?

20       A.  Sometime near the end of 2014.

21       Q.  Sorry.  Did you say the end of 2014?

22       A.  Middle to end of 2014.

23       Q.  Okay.  And where did he move at that time?

24       A.  Then he went to the Castleton Avenue office.

25       Q.  You testified that you said became aware of that issue with

1    that employee because you saw the two prescriptions in the

2    data.

3    A.   Yes.

4    Q.   Approximately how many patients of Dr. Taylor did you see

5    that for?

6    A.   About three or four.

7    Q.   And for how many months did you see that prescription

8    activity?

9    A.   It went on for about six months.

10   Q.   You said that you spoke with Julio Clark and with Denise

11   Gonzalez about the members of Julio Clark's crew.  How many

12   people were in that crew based on your investigation?

13   A.   We believe it was between three and five people.  We were

14   able to tell from the addresses of the people because, Julio

15   Clark was originally from the Fort Greene section of Brooklyn,

16   and there were several people with that neighborhood as their

17   address on the data.

18              MS. FLETCHER:  Okay.  May I have a moment, your Honor?

19              THE COURT:  Yes.

20              (Counsel confer)

21              MS. FLETCHER:  Nothing further.

22              THE COURT:  Okay.  Anything else?

23              MR. CARNESI:  Just one very briefly.

24   RECROSS EXAMINATION

25   BY MR. CARNESI:

ibr2tay6

```
 1   Q.  Once again, Detective, with regard to this individual who
 2   was issuing these unauthorized prescriptions, I had asked you
 3   whether or not Julio Clark had given you a name or any
 4   description of the individual.
 5   A.  Um-hmm.
 6   Q.  And I believe you told me no, is that right?
 7   A.  At first I couldn't remember the name, but then I
 8   remembered that he had mentioned a Denise from Victory
 9   Boulevard, and I had gotten confused, and he clarified that she
10   was at Victory and she didn't move to any of the new offices.
11   Q.  So he did give you the name of Denise.
12   A.  Yes.
13               MR. CARNESI:  All right.  Thank you.
14               MS. FLETCHER:  Your Honor, very, very brief redirect.
15               THE COURT:  Yes.
16   REDIRECT EXAMINATION
17   BY MS. FLETCHER:
18   Q.  Are you familiar with when Denise Suarez started working
19   for Dr. Taylor?
20   A.  When he moved to Castleton Avenue in 2014.
21               MS. FLETCHER:  Okay.  Nothing further.
22               THE COURT:  Okay.  The witness is excused.
23               THE WITNESS:  Thank you.
24               (Witness excused)
25               THE COURT:  Members of the jury, we are going to break
```

ibr2tay6

1    for the day.  Again, I'm going to ask you to remember my

2    instructions:  Do not discuss this case with anyone.  Don't

3    allow anyone to discuss this case with you.  Don't conduct any

4    independent research regarding any of the issues, parties, or

5    locations in this case.

6              I will see you bright and early tomorrow at 9:30 a.m.,

7    keeping the same schedule.  Have a good evening.

8              JURORS:  Thank you.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Okay.  Please be seated.

3          Who is next up for the government for tomorrow?

4          MS. FLETCHER:  It will be either John Marino or

5    Nicholas Avicolli.  Both of them were here and on deck this

6    afternoon, so we will discuss and make a decision.

7          THE COURT:  And how long or short do you believe that

8    their testimony will be?

9          MS. FLETCHER:  I believe that Mr. Avicolli's will

10   probably be an hour and a half.  He is the pharmacist.

11         THE COURT:  Okay, maybe 45 minutes on direct for

12   Marino.

13         THE COURT:  Okay.  That seems maybe a little long, but

14   we will see.

15         MS. FLETCHER:  That's an outside estimate, Judge.

16         THE COURT:  All right.  Anything else we need to

17   discuss today or cue up to discuss tomorrow morning?

18         MS. FLETCHER:  Could we just have two minutes?  We are

19   working out scheduling issues related to the expert, and we may

20   be able to do that and then resolve things.

21         THE COURT:  All right.

22         (Counsel confer)

23         MS. FLETCHER:  Your Honor, I think we are set.

24         THE COURT:  Okay.

25         MS. FLETCHER:  So just a couple of scheduling issues

ibr2tay6

1  to bring to the court's attention.

2          We expect that tomorrow we will call some combination

3  of John Marino, Nicholas Avicolli and, in light of your Honor's

4  ruling this morning, Michael Montanino.  I suspect that we will

5  want -- as I previewed earlier today, that we will want to be

6  heard on the extent of Dr. Gharibo's ability to discuss Michael

7  Montanino's medical condition.  And there is still the

8  outstanding issue relating to the Impellizine stip.  So

9  perhaps, if the court is okay with it, we could come at 9:00

10  tomorrow and address those issues?

11          THE COURT:  That is fine with me.

12          Defense counsel?

13          MR. CARNESI:  Judge, I left New Jersey at 5:30 this

14  morning to get here for 9:00, so if it's got to be, I will do

15  it again, but. . .

16          THE COURT:  Does the government have something else

17  you want to submit in writing regarding the expert testimony

18  regarding --

19          MS. FLETCHER:  Your Honor, that may be better,

20  actually.  So if your Honor will allow us, perhaps we can do

21  that this evening.

22          THE COURT:  Okay.

23          MS. FLETCHER:  We could also deal with the issue, to

24  the extent there is any argument related to it, at the end of

25  the day tomorrow since we don't expect that he will testify

ibr2tay6

1    until Thursday.

2              THE COURT:  That's fine.  We can do it at the end of

3    the day tomorrow.  We could do it, I guess, at the beginning of

4    the day on Thursday, I suppose.  So that's fine.  Let's do

5    that.

6              Let's get the government's submission tonight by 7:00.

7    If defense counsel wants to submit something in opposition,

8    give me something by 9:00, and we can discuss it.  I can give

9    counsel more time.  We can discuss it Thursday.  I'm not sure

10   we need to necessarily.  Let's go ahead and get the submissions

11   in early and we can discuss it.  Let's have counsel get here at

12   9:15.  I don't think it will take long to resolve this.  But if

13   you get here at 9:15 we can resolve this.  Again, I'm not sure

14   what else the government will have and you have my inclination

15   regarding this expert and this testimony.  Again, as I

16   indicated before, this testimony regarding Witness 2 just does

17   seem a little far afield.

18             MS. FLETCHER:  We are working on ways to try to

19   address your Honor's concern related to her testimony.  It is

20   your Honor's statement that her proposed -- that the

21   information to be contained in the stip is far afield that is

22   precisely what the government would like to address and so

23   perhaps it is best to do that in writing.

24             THE COURT:  Okay.

25             MS. FLETCHER:  And we can do that this evening.

ibr2tay6

1          THE COURT:  Okay.  Because again especially since the

2     other person whose name I am about to butcher, but witness 1 is

3     going to be testifying about three separate occasions which he

4     was kicked out of the practice and at least where he and his

5     brother kicked out at the same time each of these three times

6     or he and the brother were kicked out the third time together.

7          MS. FLETCHER:  My understanding is that it is at least

8     the third time.

9          (Counsel confer)

10          MS. FLETCHER:  Okay.  Mr. Rodriguez is telling me it

11     was once it may not be the third time it may be the second

12     time.  (@ AUSA Rodriguez.

13          THE COURT:  Okay my recollection is that he indicated

14     today the second time was the gift that they don't remember the

15     third time was the boiler.

16          MS. FLETCHER:  I think the problem is the sequencing

17     the Boyer L. is both brother.

18          MR. RODRIGUEZ:  Let me clarify the first time he is

19     kicked out of the practice, my -- he doesn't recall

20     specifically what gift it is.  The second time he is kicked out

21     is when he is kicked out around the same time as his brother

22     with his brother and they chip in for the boiler.  The third

23     time is the wood.

24          THE COURT:  All right.  So let me get those

25     submissions and we will deal with it tomorrow morning at 9:15.

ibr2tay6

1    Yes anything else.

2          MS. FLETCHER:  Then the only other issue related to

3    scheduling, your Honor, is that we are in the process of trying

4    to cut witnesses to conclude this case -- to conclude the

5    government's case earlier than anticipated, and so Dr. Gharibo

6    is I 42 available to testify beginning at noon on Thursday.  At

7    the end of the day tomorrow we will let your Honor know exactly

8    where we are, but we may be in a situation where we are not

9    able to fill the time before his availability, in which case we

10   may ask the court to have the jury come a little bit later on

11   Thursday so they are not sitting around, but we will have a

12   better sense of that tomorrow.

13         THE COURT:  Okay.  Right now how many other

14   witnesses -- how many witnesses do you have left.

15         MS. FLETCHER:  So we have either six or seven.  We

16   presently intend to call Michael Montanino, Nicholas Avicolli,

17   John Marino, Christopher Gharibo, an agent with the DEA Adrian

18   Castro, and Lisa Mercado.  Those are for sure going to be

19   called.  There are at least two, potentially three, other

20   witnesses on our witness list that we are discussing cutting.

21   If we don't cut them we will have no problem filling the final

22   but if we do cut them, I suspect it will be close.

23         THE COURT:  Okay.  Defense counsel have anything to

24   add.

25         MR. CARNESI:  No, your Honor.

ibr2tay6

1          THE COURT:  Okay.  See you tomorrow morning, counsel.

2                                oOo

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2      Examination of:                           Page

3      LAWRENCE MONTALBANO

4      Direct By Mr. Roos . . . . . . . . . . . . . .97

5      Cross By Mr. Carnesi . . . . . . . . . . . . 151

6      Redirect By Mr. Roos . . . . . . . . . . . . 164

7      Recross By Mr. Carnesi . . . . . . . . . . . 167

8      MATTHEW DEL ROSARIO

9      Direct By Ms. Fletcher . . . . . . . . . . . 169

10     Cross By Mr. Carnesi . . . . . . . . . . . . 243

11     Redirect By Ms. Fletcher . . . . . . . . . . 277

12     Recross By Mr. Carnesi . . . . . . . . . . . 278

13     Redirect By Ms. Fletcher . . . . . . . . . . 279

14                   GOVERNMENT EXHIBITS

15     Exhibit No.                           Received

16      418A    . . . . . . . . . . . . . . . . . . 100

17      125    . . . . . . . . . . . . . . . . . . 103

18      418B    . . . . . . . . . . . . . . . . . . 107

19      126 A and B   . . . . . . . . . . . . . . . 115

20      418C    . . . . . . . . . . . . . . . . . . 120

21      111A    . . . . . . . . . . . . . . . . . . 123

22      127    . . . . . . . . . . . . . . . . . . 132

23      109A and B . . . . . . . . . . . . . . . . 134

24      418D    . . . . . . . . . . . . . . . . . . 136

25      104A and B . . . . . . . . . . . . . . . . 138

107A and B . . . . . . . . . . . . . . . . 139

108A and B . . . . . . . . . . . . . . . . 140

122A    . . . . . . . . . . . . . . . . . 141

122B    . . . . . . . . . . . . . . . . . 141

120A and B . . . . . . . . . . . . . . . . 142

121A and B . . . . . . . . . . . . . . . . 143

115A and B . . . . . . . . . . . . . . . . 144

111B    . . . . . . . . . . . . . . . . . 149

103A and 103B . . . . . . . . . . . . . . 173

204A and 204B . . . . . . . . . . . . . . 185

163    . . . . . . . . . . . . . . . . . . 193

164    . . . . . . . . . . . . . . . . . . 201

118A and B . . . . . . . . . . . . . . . . 206

201, 202, and 206  . . . . . . . . . . . . 210

160    . . . . . . . . . . . . . . . . . . 214

161    . . . . . . . . . . . . . . . . . . 219

165    . . . . . . . . . . . . . . . . . . 227

Exhibit 112A and 112B  . . . . . . . . . . 232

203    . . . . . . . . . . . . . . . . . . 238

162    . . . . . . . . . . . . . . . . . . 242