IBS6TAY1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                              17 Cr. 390 (ALC)

DAVID TAYLOR,
               Defendant.                 Trial

------------------------------x

                                          New York, N.Y.
                                          November 28  , 2018
                                          9:15 a.m.

Before:

               HON. ANDREW L. CARTER, JR.,

                                          District Judge

                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  KIERSTEN A. FLETCHER
     JUSTIN V. RODRIGUEZ
     NICOLAS T. ROOS
     Assistant United States Attorneys

CHARLES F. CARNESI
     Attorney for Defendant

Also Present:

Matthew Del Rosario, Special Agent DEA
Rosanna Corrado, Paralegal Specialist

IBS6TAY1

1                    (In open court; jury not present)

2              THE COURT:  I received the government's email last

3       night that they were not filing anything;

4              Is there anything we need to discuss on this issue

5       this morning?

6              MS. FLETCHER:  Your Honor, I think it may make sense

7       for the Court to get an update from the government about

8       scheduling and our decision-making with respect to the boiler

9       witness issue and with respect to the stipulation related to

10      James Impellizine.

11             THE COURT:  Okay.

12             MS. FLETCHER:  So with respect to the boiler issue,

13      the government last night had done exactly what we previewed we

14      would do.  We discussed as a team what witnesses we still

15      intended to call in the government's case.  In an effort to

16      take into account some of your Honor's rulings and I think

17      cautions about streamlining the government's case, we cut some

18      witnesses.

19             THE COURT:  Okay.

20             MS. FLETCHER:  Included in the list of witnesses that

21      we no longer intend to call is the boiler witness, Michael

22      Montanino.

23             THE COURT:  Okay.

24             MS. FLETCHER:  So we don't anticipate calling that

25      witness today.  The way that we intend to begin the day is to

IBS6TAY1

1      play the recordings that we were able to fix last night, and

2      then to call Nicholas Avicolli and then to call John Marino,

3      and if there is time remaining to begin Adrian Castro.

4            Adrian Castro is a DEA investigator -- investigator

5      analyst.  He was intended to be a summary witness so we

6      intended to call him later; but in an effort to kill the time

7      between now and Dr. Gharibo's testimony, we may start him

8      today.  We may request the Court's permission to interrupt his

9      testimony for Dr. Gharibo depending on timing.  We have not

10     asked for Mr. Carnesi's position on this.

11            Do you take a position on that?

12            MR. CARNESI:  No.

13            MS. FLETCHER:  So with that schedule, our current

14     expectation is that we will rest around midday Friday.  That is

15     the scheduling update.

16            There was some discussion that Mr. Carnesi and I had

17     this morning and late yesterday about his desire to either

18     recall Detective Del Rosario or to reopen cross-examination

19     with respect to Detective Del Rosario.  We conferred and I

20     think rather than doing either of those things what we will

21     likely do is come to some sort of the factual stipulation as to

22     what his testimony would be and offer that.  I think we

23     resolved that issue.

24            The only other outstanding issue relates to the prior

25     stipulation that the parties had signed related to

1    Mrs. Impellizine.  In light of your Honor's concerns that

2    testimony of a stipulation might create a risk of prejudice, we

3    have revised the stipulation to essentially get the documents

4    in -- a factual stipulation of what the particular documents

5    are and an agreement that they are admissible.  Mr. Carnesi has

6    signed that stipulation.  Unless the Court has any issue with

7    the government's introducing that stipulation, that is what we

8    would intend to do at some point very likely today.

9              THE COURT:  Defense counsel?

10             MR. CARNESI:  That's fine, Judge.

11             THE COURT:  Again, the defense and government have

12   entered into these discussions and the defense and government

13   both agree that this stipulation should be admitted into

14   evidence; is that correct?

15             MS. FLETCHER:  The stipulation as well as there are

16   four documents referenced in the stipulation.  They are the

17   letter that we have spoken about related to James Impellizine

18   and his prescriptions.

19             THE COURT:  Is that correct, defense counsel?

20             MR. CARNESI:  Yes.

21             THE COURT:  Do we need to do a quick sound check?

22             MS. FLETCHER:  We have checked and we believe it

23   works.

24             THE COURT:  The government believes that perhaps you

25   will be resting by midday Friday?

1          MS. FLETCHER:  Yes.

2          THE COURT:  Defense counsel, at this point do you know

3     whether or not you intend to call any witnesses?

4          MR. CARNESI:  I don't at this point, Judge.

5          THE COURT:  I will see you when the jury gets here.

6          Anything else we need to discuss?

7          MS. FLETCHER:  I know Mr. Rodriguez is knowing the

8     answer to this, if we DO rest by midday Friday, would your

9     Honor give us the three-day weekend before we sum up, or would

10    we be expected to close Friday afternoon if there is an hour

11    and a half?

12         THE COURT:  I would not require the parties to sum up

13    Friday.  I think it will be a four-day weekends because we're

14    not siting that Monday.

15         MS. FLETCHER:  We are sitting Tuesday.

16         THE COURT:  Correct.  I guess it is a three-day

17    weekend.  Sorry.

18         MS. FLETCHER:  I thought I lost track.

19         THE COURT:  I would not require the parties to sum up

20    on Friday.

21         MS. FLETCHER:  Okay.

22         THE COURT:  If the government rests and if the defense

23    rests and it seems to me it may be appropriate to have the

24    charge conference Friday afternoon.  We'll talk about that

25    later today.  We'll have the charge conference Friday afternoon

1  but I will not require counsel to sum up on that Friday.  I

2  don't know if counsel have an estimate how lengthy their

3  summations would be; but in terms of the flow of the evidence

4  and the flow of the arguments, it would make sense to have

5  counsel sum up Friday and perhaps finish the charge Friday and

6  have the jury come back Tuesday.  I rather do that all on

7  Tuesday if we can.

8         MS. FLETCHER:  I am sorry.  I didn't understand.  I

9  thought you said we would sum up on Friday.

10        THE COURT:  I am saying I would not.  I don't think it

11 would make sense to sum up on Friday.

12        MS. FLETCHER:  We would agree.

13        THE COURT:  Defense counsel, anything on this?

14        MR. CARNESI:  No, your Honor.

15        THE COURT:  See you soon.

16        MS. FLETCHER:  Your Honor, may we pass out the

17 transcript binders, just set them on the chairs for the jury so

18 we don't have to do that once they are here?

19        THE COURT:  Defense counsel?

20        MR. CARNESI:  I don't have an objection.

21        THE COURT:  That's fine.

22        (Recess).

23        THE COURT:  The jury is here.  Let's bring them in.

24        (Continued on next page)

25

IBS6TAY1

| | |
|---|---|
| 1 | (In open court; jury present) |
| 2 | THE COURT:  Please be seated. |
| 3 | Welcome back.  I hope you had a pleasant evening.  The |
| 4 | weather forecast calls for strong winds today so again the |
| 5 | windows are going to raddle and shake a little bit but they |
| 6 | will not break.  If it becomes so loud that you miss something, |
| 7 | raise your hand and we'll have the testimony repeated or the |
| 8 | recording played again for you. |
| 9 | Go ahead, counsel. |
| 10 | MS. FLETCHER:  Thank you, your Honor. |
| 11 | At this point, your Honor, we're going to try to |
| 12 | replay the recordings that we had technical issues with |
| 13 | yesterday. |
| 14 | Ms. Corrado, if we can please pull up Government |
| 15 | Exhibit 206, the first clip. |
| 16 | If the jury could please turn to 206 T in their |
| 17 | binders.  This is the third Julio Clark recording that did not |
| 18 | play yesterday. |
| 19 | Ms. Corrado, can you please play Clip 1. |
| 20 | (Audio recording played) |
| 21 | MS. FLETCHER:  Thank you. |
| 22 | Ms. Corrado, if we can now pull up what is now in |
| 23 | evidence as Government Exhibit 203. |
| 24 | If the jury can turn to the tab in your binders |
| 25 | labeled 203 T.  This was the May 22nd, 2017, Brian Dolinko |

1    recording that we had issues hearing yesterday.

2              (Audio recording played)

3              MS. FLETCHER:  Ms. Corrado, can can we play Clip 2,

4    please.  That is page 3 of 302 T.

5              (Audio recording played)

6              MS. FLETCHER:  Your Honor, in an effort to enhance the

7    audio, we had to separate the audio from the video.  We would

8    like to play the video that corresponded to that audio clip one

9    more time.  You will not be able to hear it, but we'll be able

10   to see it.

11             Ms. Corrado, can we please play the video clip, that

12   is Clip 2 of Government Exhibit 203.

13             (Video played)

14             MS. FLETCHER:  Thank you, Ms. Corrado.

15             Your Honor, at this time can we collect the transcript

16   binders from the jurors?

17             THE COURT:  Yes.

18             MS. FLETCHER:  At this time, your Honor, the

19   government calls Nicholas Avicolli.

20             THE DEPUTY CLERK:  Please remain standing and raise

21   your right hand.

22    NICHOLAS AVICOLLI,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

1    BY MS. FLETCHER:

2    Q.  Good morning, Mr. Avicolli.

3    A.  Good morning.

4    Q.  What do you do for a living, sir?

5    A.  Currently I do catering.

6    Q.  Do you work for a catering company, or do you own your own

7    catering company?

8    A.  I own my own catering company.

9    Q.  Where is that catering company located?

10   A.  It's located in Raritan, New Jersey.

11   Q.  How long have you run your own catering company?

12   A.  Since 2004.

13   Q.  Prior to June of this year, did you have another

14   profession?

15   A.  Yes.  I am a pharmacist.

16   Q.  How long have you been a pharmacist?

17   A.  I've been a pharmacist for approximately 30 years.

18   Q.  Turning to the middle of 2017, were you working as a

19   pharmacist at that time?

20   A.  Yes.

21   Q.  Where were you working?

22   A.  I was working at my business, Victory Drugs Pharmacy.

23   Q.  Did you own that pharmacy?

24   A.  Yes.

25           MS. FLETCHER:  Can we pull up what is in evidence as

1    Exhibit 127, Ms. Corrado.

2    Q.  Mr. Avicolli, what do you see here --

3              THE COURT:  Do the jurors have it yet?

4              Wait a second.

5              MS. FLETCHER:  I will try to remember the delay today.

6              THE COURT:  Go ahead.

7    Q.  Mr. Avicolli, what is depicted in Government Exhibit 127?

8    A.  That is the front of my business.

9    Q.  Where is that business located?

10   A.  It is located at 2236 Victory Boulevard, Staten Island, New

11   York.

12   Q.  Do you still own that business?

13   A.  No.

14   Q.  When did you stop running that business?

15   A.  This year.  June 20th was my last day.

16   Q.  How long had you owned Victory Drugs prior to that --

17   Victory Pharmacy?

18   A.  Well, I've owned the pharmacy since 1991.  It was Medicine

19   Man Pharmacy, and in the year 2000 we switched over to Victory

20   Pharmacy.

21   Q.  How long did you operate at this location?

22   A.  I believe approximately five years.

23   Q.  I want to turn your attention now to June of 2017.

24              Were you arrested in June of 2017?

25   A.  Yes.

1  Q.  What were you arrested for?

2  A.  I was arrested for diversion of a controlled substance.

3  Q.  What controlled substance?

4  A.  Oxycodone.

5  Q.  Have you since pled guilty in federal court to that crime?

6  A.  Yes.

7  Q.  When you say "diversion," what do you mean by diversion?

8  A.  Well, I sold -- I sold Oxycodone without a prescription and

9  I filled -- and I also filled prescriptions that were for --

10  for people that weren't medically necessary.

11  Q.  In connection with pleading guilty, did you enter into an

12  agreement to cooperate with the government?

13  A.  Yes.

14  Q.  Are you testifying here today as part of that agreement?

15  A.  Yes.

16        MS. FLETCHER:  Ms. Corrado, can we please pull up now

17  what is in evidence as Government Exhibit 102 A.

18  Q.  I want it talk now, Mr. Avicolli, about the diversion that

19  you committed.

20        Do you see 102 A on your screen?

21  A.  Yes.

22  Q.  Do you know the person depicted in 102 A?

23  A.  Yes.

24  Q.  Who is that person?

25  A.  That is the photograph of Vito Gallicchio.

1    Q.  How did you first meet Vito Gallicchio?

2    A.  He came into my pharmacy prior to 2010 to fill

3    prescriptions.

4    Q.  What did he come in to fill a prescription for?

5    A.  For Oxycodone.

6    Q.  Did you fill it?

7    A.  In the beginning, no.

8    Q.  Why not?

9    A.  I felt that it was -- it wasn't medically necessary.

10   Q.  Did there come a time when you filled Vito Gallicchio's

11   prescription?

12   A.  Yes.

13   Q.  When did that begin?

14   A.  That began around 2010.

15   Q.  Who wrote the prescription for Oxycodone for Vito

16   Gallicchio?

17   A.  Dr. David Taylor.

18   Q.  After Vito first came into your pharmacy, what, if any,

19   relationship did you have with him?

20   A.  We became friends.

21   Q.  Did you socialize?

22   A.  On occasion.  We went out to either have a drink or cigar.

23   Q.  Did you go to his house?

24   A.  Yes.

25   Q.  Did he go to your house?

1   A.  He came to my place of -- he came to my catering business

2   once.

3   Q.  Did you he meet each other's spouses?

4   A.  I met his spouse.

5   Q.  I am going to show you what is in evidence as Government

6   Exhibit 115 A.

7            Do you recognize the person in Government Exhibit 115

8   A?

9   A.  Yes.

10  Q.  Who is that person?

11  A.  That is a photograph of his wife, Lori Gallicchio.

12  Q.  When you say his wife, whose wife?

13  A.  I am sorry.  Vito's wife.

14  Q.  In what context did you interact with Lori?

15  A.  I saw her when he was with -- when she was with him and I

16  went to the house and I saw her at the house.

17  Q.  Did you ever fill prescriptions for her?

18  A.  Yes.

19  Q.  Did she come into the pharmacy to fill her prescriptions,

20  or did someone else come in for her?

21  A.  No, she never came in.

22  Q.  What was she prescribed?

23  A.  She was prescribed Oxycodone 30 milligrams.

24  Q.  Who wrote her prescriptions?

25  A.  Dr. David Taylor.

1   Q.  Did you ever discuss with Vito why his wife was receiving a

2   prescription for Oxycodone?

3   A.  He had told me that she had wrist pain, carpal tunnel

4   syndrome.

5   Q.  How did he come to tell you that?

6   A.  I had asked.

7   Q.  Why did you ask?

8   A.  I find -- I found it it odd that husband and wife needed

9   medication -- that kind of medication, Oxycodone.  I knew what

10  his -- his -- supposedly his ailment.  He had back problems.

11  He was on a disability from the city.  So supposedly he was in

12  pain.

13  Q.  What did he tell you about his wife's pain?

14  A.  He said she had pain.  She had pain.  Severe pain.

15  Q.  You mentioned that it struck you as unusual that both

16  spouses would get the same medication.  Do you recall how many

17  pills each of them were getting per month when you started

18  filling her prescription?

19  A.  They were getting 180 per month.

20  Q.  Did there ever come a time when that changed?

21  A.  Yes.

22  Q.  How did it change?

23  A.  It went to about 240 per month.

24          MS. FLETCHER:  We can take that down, Ms. Corrado.

25  Q.  I want to turn back to your relationship with Vito

1   Gallicchio.

2           Did there ever come a time when Vito asked you to

3   provide him for Oxycodone for which he did not have a

4   prescription?

5   A.  Yes.

6   Q.  When did that occur?

7   A.  That occurred in -- I believe, it was November of 2013.

8   Q.  What did you say?

9   A.  I told him no.

10  Q.  Why did you say no?

11  A.  Because I -- I -- it wasn't -- it wasn't the right thing to

12  do at the time.

13  Q.  As a pharmacist were you permitted to provide Oxycodone to

14  people who did not have a prescription?

15  A.  No.

16  Q.  I am sorry?

17  A.  No.  You are not allowed to.

18  Q.  Can I ask you to lean a little bit closer to the mic.

19  A.  You are not allowed to give something like that without a

20  prescription.

21  Q.  After you told Vito no, did he ask again?

22  A.  He asked again in 2014.

23  Q.  How many times did you say no?

24  A.  A couple times.

25  Q.  Did there come a time when you told him you would give him

1   narcotics without a prescription?

2   A.   Yes.

3   Q.   What did you tell him you would give him?

4   A.   First I told him I would give him the hydrocodone, Norco,

5   and he didn't want that.

6   Q.   Are you familiar with the relative strengths of hydrocodone

7   as compared to Oxycodone?

8   A.   Yes.

9   Q.   Which of them is stronger?

10  A.   Oxycodone.

11  Q.   You said that he told you he didn't want hydrocodone; is

12  that correct?

13  A.   Yes.

14  Q.   What did he say he did want?

15  A.   He wanted the Oxycodone.

16  Q.   Did he give you a dosage of the Oxycodone pills that he

17  wanted?

18  A.   He wanted Oxycodone 30 and they had to be blue.

19  Q.   They had to be blue?

20  A.   Yes.

21  Q.   Is there some significance of the blue Oxycodone 30s?

22  A.   Well, I guess on the street they are familiar with the

23  blues.  They call them the "blues" and that is what they want

24  to purchase and use.

25  Q.   How much did Vito ask for?

1    A.   As many as I can give him.

2    Q.   Did there come a point when you said yes?

3    A.   Yes.

4    Q.   When did you say yes?

5    A.   In the middle of 2014.

6    Q.   What caused you to change your mind?

7    A.   Well, what happened was I -- I had -- I had a very good

8    marriage and out of the blue my wife wanted a divorce on -- in

9    January of 2014.  And what happened was there was no

10   communication between me or her.  I lost communication with my

11   daughter because of the divorce.  I was heavily into debt with

12   a loan shark.  I was borrowing money to keep the pharmacy going

13   and to pay the bills at home, and then she threw me out of the

14   house.  He wasn't allowed back into the house.  I was in all

15   this debt.  I had to pay divorce lawyers.  I wound up living

16   with my mom.

17   Q.   How much debt were you in, Mr. Avicolli?

18   A.   I was in debt over 500,000 to a loan shark.

19   Q.   How often were you making payments to the loan shark at

20   that time?

21   A.   I had to make payments once a week to the tune of $10,000.

22   Q.   When you agreed to sell Oxycodone to Vito Gallicchio, how

23   much did you agree to give him?

24   A.   I agreed to give him anywhere between five and 10 bottles a

25   week.

1    Q.  How many pills were in a bottle?

2    A.  100.

3    Q.  How much did Vito pay you per bottle?

4    A.  $1,000.

5    Q.  Did you have an understanding of what Vito was doing with

6    the pills that you sold him?

7    A.  Yes.

8    Q.  What was he doing?

9    A.  He was -- he was selling them on the street.

10   Q.  How did you obtain the pills that you were selling to Vito

11   Gallicchio?

12   A.  I received -- I ordered them through my wholesaler.

13   Q.  What is a wholesaler?

14   A.  It's a distributor.

15        MS. FLETCHER:  Ms. Corrado, can we please pull up what

16   is in evidence as Government Exhibit 101 A.

17   Q.  Do you know the person depicted in Government Exhibit 101

18   A, Mr. Avicolli?

19   A.  Yes.

20   Q.  Who is depicted?

21   A.  It's a photograph of Dr. David Taylor.

22   Q.  How do you know Dr. David tailor?

23   A.  I know him.  He was a physician in the neighbor -- down the

24   block in the neighborhood.  He was practicing on the corner,

25   Victory Associates.

IBS6TAY1                    Avicolli - direct

1   Q.   When you say "on the corner," on the corner of what?

2   A.   The corner of Sheridan and Victory Boulevard.

3   Q.   Are you familiar with who he was practicing with at that

4   location?

5   A.   He was practicing with Dr. Gessman and Dr. Sunil Patel.

6   Q.   When did you first meet Dr. Taylor?

7   A.   Well, the first time I spoke to him was approximately the

8   year 20 -- 2007.  We spoke on the phone.  He used to call in

9   prescriptions.

10  Q.   In 2007 what kind of prescriptions did Dr. Taylor typically

11  call in?

12  A.   He would call in antibiotic, medications for diabetes,

13  medications that an internist would prescribe generally.

14  Q.   What is an internist?

15  A.   General practitioner.

16  Q.   Based on your experience as a pharmacist, what is the role

17  of a general practitioner?

18  A.   General practitioners pretty much diagnose many conditions

19  anywhere from high blood pressure, diabetes to things like

20  thyroid, skin diseases.  And whatever they cannot do, they will

21  refer to a specialist.  But he is pretty much the person that

22  people go to first and if he can't handle it, they will send

23  him to a specialist.

24  Q.   Did Dr. Taylor write prescriptions for controlled

25  substances during that time?

1  A.  He would write a few.  He would write some.

2  Q.  What is a controlled substance?

3  A.  A controlled substance is a drug or chemical substance that

4  causes mental or physical dependency and -- sorry.  I was going

5  to -- it's manufacturing and its use and possession is

6  regulated by laws that were created by the DEA.

7  Q.  Are you familiar with schedules of controlled substances?

8  A.  Yes.  It's part of the Controlled Substance Act.  In order

9  for the DEA to regulate these drugs, they put them in certain

10  schedules depending upon their mental and physical dependency.

11  The schedules go from one to five.

12  Q.  What are some drugs that excluded Schedule I?

13  A.  Well, schedule I is a group of drugs that have no medicinal

14  use or anything that is approved in the United States.

15  Q.  Can you give a couple examples?

16  A.  Sure.  Heroin, Ecstasy, peyote.  Marijuana is part of that,

17  but they will probably change that.

18  Q.  How about Schedule II?

19  A.  Schedule II has severe pain medications, the opioids.  Also

20  medications for ADH, attention deficit disorder, such as a

21  Methylphenidate, Ritalin, Concerta.  You have the pain

22  medications such as Oxycodone.  You have hydrocodone, which is

23  Vicodin and Norco.  You have the Percocets.  Also you have a

24  cough medicine that has hydrocodone called Tussionex that was

25  moved from Schedule IV.  Because of the hydrocodone, it was

1    moved to Schedule I -- I mean, Schedule II.

2    Q.  I want to focus you now back to the time period when you

3    first started interacting with Dr. Taylor.

4         When you received prescriptions for controlled

5    substances that he wrote, what, if any, steps did you take?

6    A.  Well, at the time I would -- generally, I would call the

7    doctor and I would want to speak to the doctor himself or

8    herself.  And I would ask them, Did you write this

9    prescription?  And if it was for pain medicine I would say,

10   What did the patient have?  That's basically it.  I would just

11   confirm that it was written by the physician for that patient.

12   Q.  Would you ask any other questions about the medications

13   specifically?

14   A.  I would just ask if it was medically necessary.

15   Q.  What was the purpose of asking those questions?

16   A.  Well, to make sure that the medications weren't being

17   diverted, that they weren't being given under false pretenses.

18   Q.  Were you trying to confirm that the prescription was valid,

19   that the doctor --

20   A.  Yes.

21   Q.  -- the doctor had actually written it?

22   A.  Yes.  Exactly.

23   Q.  What was the purpose of asking questions about the

24   patient's medical condition?

25   A.  Well, I just wanted to make sure that the patient was -- it

1    was the proper thing to prescribe for the patient, it was

2    medically necessary.

3    Q.  You said that you made these phone calls to doctors

4    generally.  What if any phone calls did you make to Dr. Taylor

5    during the 2007 to 2012 time frame?

6    A.  I made a few calls because I didn't know him and then after

7    awhile I got comfortable with him.

8    Q.  What do you mean when you say "got comfortable with him"?

9    A.  Well, I wouldn't call again because I knew his handwriting

10   and I knew that -- the pattern that he had in the beginning.

11   He had a certain pattern in the beginning.

12                    (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Did there ever come a time when that pattern of

2  prescriptions changed?

3  A.  Yes.

4  Q.  Approximately when did it change?

5  A.  It changed approximately I would say after 2010.

6  Q.  What change did you notice?

7  A.  He was writing more pain medication.

8  Q.  When you say pain medication, what medications specifically

9  was he writing for?

10  A.  He was writings for the Schedule IIs, the oxycodone,

11  Percocet.  He would write a lot of Xanax prescriptions.

12  Q.  What is Xanax?

13  A.  Xanax is classified under Schedule IV, which has less a

14  dependency as we go down the schedules, lesser dependency

15  and -- lesser of a physical dependency, but still you can

16  become addicted to it.  It is in a class called

17  benzodiazepines, and they are antianxiety, similar to like a

18  Valium.

19  Q.  Did there come a time when you discussed with Dr. Taylor

20  around this time frame the reason for the change in his

21  prescribing habits?

22  A.  I had called him, and he said that he was doing hospice, he

23  started doing hospice.

24  Q.  What is hospice?

25  A.  Hospice is -- it's treatment of terminally ill patients.

1    You want to keep them comfortable, so you give them pain

2    medications.

3    Q.   Did there ever come a time when you discussed with

4    Dr. Taylor another change in his medical practice?

5    A.   Well, as the frequency of the prescriptions started

6    getting -- you know, there was more and more being written, he

7    had told me he was doing pain management.

8    Q.   What is pain management?

9    A.   Pain management is an area of medicine where patients go to

10   to manage their pain, you know, to get relief, you know, for

11   medications.

12   Q.   That conversation you had with Dr. Taylor about pain

13   management, where did that conversation take place?

14   A.   I believe it took place over the phone.  I am not sure --

15   either over the phone or he came in one day.

16   Q.   Did you interact with Dr. Taylor in person?

17   A.   The only time when I interacted with him in person was when

18   he would come in to fill prescriptions for his wife.

19   Q.   What prescriptions did he fill for his wife?

20   A.   He -- I believe he -- he filled Dilaudid, and Lomotil.

21   Q.   What is Dilaudid?

22   A.   Dilaudid is a Schedule II pain medication.

23   Q.   How does Dilaudid compare to oxycodone or oxymorphone?

24   A.   They are similar.  They're similar I would say.

25   Q.   How about Lomotil?

Ibsntay2                    Avicolli - Direct

1   A.  Lomotil is an antidiarrheal.

2   Q.  Who wrote the Dilaudid and Lomotil prescriptions that

3   Dr. Taylor was filling for his wife?

4   A.  He did.

5   Q.  Did you ask Dr. Taylor to pay for those prescriptions?

6   A.  No, I never accepted any money.  My general practice was

7   usually physicians in the neighborhood I never accepted any

8   money for their prescriptions.

9           MS. FLETCHER:  Ms. Corrado, we can take that photo

10  down.

11  Q.  I want to turn back to your arrangement with Vito

12  Gallicchio.  You mentioned that you sold him oxycodone you

13  obtained from wholesalers?

14  A.  Yes.

15  Q.  Did Vito Gallicchio ever tell you about a relationship that

16  he had with Dr. Taylor?

17  A.  Yes.

18  Q.  What did he say?

19  A.  He had you could say a working relationship.  He would send

20  patients to Dr. Taylor and Dr. Taylor would write the oxycodone

21  for them.

22  Q.  How did Vito Gallicchio refer to Dr. Taylor?

23  A.  He referred to him as T.

24  Q.  What, if anything, did Vito say to you about what he would

25  do for Dr. Taylor in exchange for Dr. Taylor writing these

Ibsntay2                    Avicolli - Direct

1   oxycodone prescriptions?

2   A.  He would compensate him in terms of giving him cash,

3   Scotch, cigars.  He would give him steaks.  And I believe one

4   time he purchased an appliance for him, a refrigerator he told

5   me.

6   Q.  The steaks that he gave to the doctor, did you have an

7   understanding of where those steaks came from?

8   A.  They came from his brother.

9   Q.  From whose brother?

10  A.  I'm sorry.  They came from Vito's brother.

11  Q.  Do you know Vito's brother's name?

12  A.  Yes.

13  Q.  What is his brother's name?

14  A.  Robert Adams.

15  Q.  You said Vito mentioned cash.  Did he ever say how much

16  cash?

17  A.  No, he didn't.

18  Q.  Did he tell you what the cash was for?

19  A.  The cash was primarily in exchange for Dr. Taylor writing

20  the oxycodone prescriptions for Vito's people.

21  Q.  Did he tell you ever about bills or expenses that he was

22  paying for the doctor?

23  A.  I believe once -- once in a while he would pay for his

24  rent.  He would give him money for his rent he told me.

25  Q.  What, if any, information did Vito give you about how the

Ibsntay2                    Avicolli - Direct

1   doctor was able to get into his office?

2   A.  I'm sorry.  Can you repeat that.

3   Q.  Did Vito ever discuss with you how Dr. Taylor was able to

4   get into his office?

5   A.  Vito helped him financially at one point.

6   Q.  How do you know that?

7   A.  Vito told me.

8   Q.  Are you familiar with the different offices that Dr. Taylor

9   operated out of?

10  A.  Yes.

11  Q.  What are those offices?

12  A.  He operated out of Victory Associates, and then he moved

13  to -- he had a Castleton office, and lastly I believe it was

14  Hylan Boulevard, his last office.

15  Q.  Do you know which of those offices Vito Gallicchio helped

16  the doctor get into?

17  A.  No, I don't.

18  Q.  In the context of discussing his relationship with

19  Dr. Taylor, did there ever come a time where Vito asked you to

20  do something else for him?

21  A.  Can you repeat that?  Can you rephrase that?  I'm sorry.

22  Q.  What, if anything, did Vito ask you to do with respect to

23  the patients that Vito was sending to Dr. Taylor?

24  A.  He wanted me to fill their prescriptions for oxycodone.

25  Q.  What did you say in response?

1    A.  I told him yes.

2    Q.  Did Vito tell you during that initial conversation how many

3    people he would be sending to you?

4    A.  He didn't tell me, but it was approximately about 10 people

5    at the start, at the beginning.

6            MS. FLETCHER:  Ms. Corrado, can we please pull up what

7    is I believe in evidence as Government Exhibit 104A.

8    Q.  Mr. Avicolli, do you recognize the person depicted in

9    Exhibit 104A?

10   A.  Yes.

11   Q.  Who is depicted?

12   A.  His name -- it is a photograph of Mike Carim.

13   Q.  How did you first meet Mike Carim?

14   A.  I met Mike through Vito.

15   Q.  Where were you when you met Mike?

16   A.  In the pharmacy.

17   Q.  What, if anything, did Vito tell you about who Mike Carim

18   was?

19   A.  He told me that Mike was his nephew.

20   Q.  What, if anything, did Vito say about why he was

21   introducing you to Mike Carim?

22   A.  He was sending Mike to Dr. Taylor to get a prescription for

23   oxycodone, 30 milligrams, and he wanted me to fill it.

24   Q.  Did Vito say anything to you about any injury that

25   Mr. Carim had?

1    A.   No.

2    Q.   Did you observe Mr. Carim to have any injury?

3    A.   No.

4    Q.   Approximately how old was Mr. Carim when he first came into

5    your pharmacy?

6    A.   Mid 20s.

7    Q.   After that initial meeting, did you see Mike Carim again?

8    A.   Yes.

9    Q.   In what context did you see him?

10   A.   He brought his prescription for oxycodone.

11   Q.   Who wrote Mike Carim's prescription?

12   A.   Dr. Taylor.

13   Q.   Approximately how many times did Mr. Carim bring in his

14   oxycodone prescription for you to fill?

15   A.   I don't know.  It was many times, but I can't give you a

16   number.

17   Q.   Did Vito ever fill Mr. Carim's prescription for him?

18   A.   Yes.

19   Q.   Approximately how many times?

20   A.   A few times.

21   Q.   When Mike Carim came into the pharmacy to fill his

22   prescription, can you describe the process when a customer

23   comes in to fill a prescription.  What do they do?

24   A.   OK.  When a customer comes in, usually if it's for a

25   controlled substance I will ask them for a copy of their

license.  I'll make a copy.  I will return their license.  I

will attach the license in back of the prescription, I will

write their information down, and then I call the doctor to

confirm if that physician wrote that prescription, if that's

his handwriting, especially if I didn't know the doctor.  I

mean, if I knew the handwriting, I would -- I was comfortable,

I still call, but I would just, I would make sure that that

prescription was for that patient.

Q.  Can you pinpoint roughly when in time Vito began

introducing you to these patients that he was sending to

Dr. Taylor?

A.  It was about 2014, the middle of 2014.

Q.  The process that you just described of calling the doctor,

did you implement that process with respect to these patients

that Vito was bringing in to you?

A.  No, I didn't.

Q.  When Mike Carim came in, did he wait to pick up his pill

bottle or did he just drop off the prescription?

A.  No.  He would drop off the prescription and Vito would pick

it up and pay me.

Q.  How much did Vito pay you for a prescription for oxycodone?

A.  I charged -- I only charged $3 per pill.  So if it was 180,

$540.

          MS. FLETCHER:  Ms. Corrado, could we please pull up

what is in evidence as Government Exhibit 105A.

Ibsntay2                    Avicolli - Direct

1   Q.  Do you recognize the person depicted in Government Exhibit

2   105A?

3   A.  Yes.

4   Q.  Who is that?

5   A.  It is a photograph of Larry Montalbano.

6   Q.  How did you first meet Larry Montalbano?

7   A.  I met him through Vito Gallicchio.

8   Q.  Where did you meet him?

9   A.  In the pharmacy.

10  Q.  What, if anything, did Vito say about why he was

11  introducing to you Mr. Montalbano?

12  A.  He wanted me to fill his oxycodone prescription.

13  Q.  During that conversation, did Vito say anything to you

14  about an injury that Mr. Montalbano had?

15  A.  No.

16  Q.  Did you observe him to be injured in any way?

17  A.  No.

18  Q.  Did you agree to fill Mr. Montalbano's prescription?

19  A.  Yes.

20  Q.  How many pills were in that first oxycodone prescription

21  for Mr. Montalbano, if you recall?

22  A.  I would like to say 180, but usually when the patient --

23  usually with a new patient with Dr. Taylor, he would write

24  between 30, 30 pills and 90.  So I really don't know.  I can't

25  tell you.  But subsequent prescriptions were 180.

Ibsntay2                    Avicolli - Direct

1    Q.  OK.  Was there a range?  Were some prescriptions another

2    number of pills?

3    A.  Well, like I said, if it was a new patient that was brought

4    to Dr. Taylor, he would usually give them anywhere between 30

5    and 90.  And then on the next visit, 180.  And then there was a

6    time that they went to 240.  And then after that, there was

7    another time that they went back to 180.

8    Q.  When you described this pattern of 180 to 240 to 180, are

9    you speaking about one patient in particular, or was there a

10   pattern?

11   A.  No, there was a pattern.  It was all the people that Vito

12   brought to me pretty much got that kind of quantities.

13              MS. FLETCHER:  Ms. Corrado, can we please pull up

14   what's been marked for identification as Government Exhibit

15   106A.

16   Q.  Mr. Avicolli, do you recognize the person depicted in

17   Government Exhibit 106A?

18   A.  Yes.

19   Q.  Who is depicted?

20   A.  Elizabeth Grieco.

21   Q.  How did you first meet Elizabeth Grieco?

22   A.  She came into the pharmacy.

23   Q.  The government offers Government Exhibit 106A.

24              MR. CARNESI:  No objection.

25              THE COURT:  Any objection?

1        MR. CARNESI:  No, sir.

2        THE COURT:  OK.  It's in.

3        (Government Exhibit 106A received in evidence)

4   BY MS. FLETCHER:

5   Q.  Mr. Avicolli, when Ms. Grieco came into the pharmacy, did

6   she come in on her own or with someone else?

7   A.  No, she came in on her own the first few times.

8   Q.  And what, if any, prescription did she try to fill with

9   you?

10  A.  The oxycodone 30.

11  Q.  Who wrote her prescription?

12  A.  Dr. Taylor.

13  Q.  Do you recall the number of pills in her prescription?

14  A.  No.

15  Q.  Did there ever come a time when you discussed her with Vito

16  Gallicchio?

17  A.  Yeah.  Vito told me that she was one of -- she was one of

18  his associates or people that he would, that would go to

19  Dr. Taylor.

20  Q.  Did you ever see her with Vito Gallicchio?

21  A.  I saw her a couple of times with him.

22  Q.  Did you continue to fill prescriptions for her?

23  A.  Yes.

24  Q.  What, if any, conversation did you have with Ms. Grieco

25  about her medical conditions?

1   A.  She had bariatric surgery.  She had the procedure called

2   the gastric sleeve, where 80 percent of your stomach is taken

3   out.  She had a lot of trouble, and she expressed to me that

4   she had a lot of pain.

5   Q.  Why do you think she discussed that particular surgery with

6   you?

7   A.  Well, that's what -- well, I had mentioned to her that I

8   had the same procedure, and I guess that's what we had in

9   common, so that's what we spoke about.  Every time she would

10  come in, she would give me like a little progress report, how

11  she was doing.

12  Q.  Did you ever discuss with Vito whether she would be selling

13  Vito her pills?

14  A.  Yes.

15  Q.  What did Vito say?

16  A.  There was a time when he was picking them up for her.

17          MS. FLETCHER:  Can we please pull up what is in

18  evidence as Government Exhibit 107A.

19          Your Honor, I neglected to offer Government Exhibit

20  106B, which is the corresponding nameplate for 106A.

21          The government offers 106B.

22          THE COURT:  Any objection?

23          MR. CARNESI:  No objection.

24          THE COURT:  OK.  It's in.

25          (Government Exhibit 106B received in evidence)

Ibsntay2                    Avicolli - Direct

1    BY MS. FLETCHER:

2    Q.  Do you recognize the individual depicted in Government

3    Exhibit 107A?

4    A.  Yes.

5    Q.  Who is depicted?

6    A.  Lenny Danzi.

7    Q.  How did you first meet Lenny Danzi?

8    A.  I met him through Vito.

9    Q.  Where were you when you met him?

10   A.  In the pharmacy.

11   Q.  What, if anything, did Vito say about why he was

12   introducing you to Lenny Danzi?

13   A.  He wanted me to fill his oxycodone 30 milligrams

14   prescription.

15   Q.  Did you agree?

16   A.  Yes.

17   Q.  Who wrote that prescription?

18   A.  Dr. Taylor.

19   Q.  What, if any, conversation did you have with Mr. Danzi

20   about the Dr. Taylor prescriptions?

21   A.  We really didn't -- he didn't discuss much.  The only time

22   he -- he was a little nervous when I asked him for his address

23   to put on the prescription.  He didn't want to give it to me.

24   I told him I needed it, and I needed a copy of his license

25   also.  And he had told me not to mention it to his wife if his

1  wife ever called.

2  Q.  Did he provide you an address?

3  A.  Yes, he did.

4  Q.  Did Lenny Danzi drop off additional oxycodone prescriptions

5  after that initial meeting?

6  A.  Yes, he would drop them off.

7  Q.  Did he pick them up?

8  A.  Occasionally, but Vito would pick them up.

9  Q.  How, if at all, did that arrangement differ from the

10  arrangement with Mike Carim?

11  A.  No difference.  I didn't see a difference.

12  Q.  Vito paid to you for the prescriptions?

13  A.  Yes, he paid me.

14       MS. FLETCHER:  Let's pull up what's in evidence as

15  Government Exhibit 108A.

16  Q.  Sorry.  I neglected to ask this with respect to Mr. Danzi.

17  Did he ever discuss with you any injury or medical condition

18  that he had?

19  A.  No.

20  Q.  Did you observe him to have any injury or medical

21  condition?

22  A.  No.  He was a very happy-go-lucky guy.  He was really very

23  benign, very nice.

24  Q.  Do you recognize the individual in the photograph 108A?

25  A.  Yes.

Ibsntay2                    Avicolli - Direct

1   Q.   Who is that?

2   A.   It is a photograph of Mikey Limo.

3   Q.   Mikey Limo?

4   A.   Yes.

5   Q.   Why was he called Mikey Limo?

6   A.   He was called Mikey Limo because -- he was a good friend --

7   well, supposedly a good friend of Vito's.  But he would drive

8   Vito around.  He had a limo business, and he was Vito's driver.

9   Q.   Do you know his last name?

10  A.   Farley.

11  Q.   How did you first meet Mikey Limo?

12  A.   I met him in the pharmacy.

13  Q.   Who introduced you to him?

14  A.   Vito.

15  Q.   What, if anything, did Vito say to you about why he was

16  introducing you to Mikey Limo?

17  A.   He wanted me to fill his oxycodone prescriptions.

18  Q.   Oxycodone prescriptions written by whom?

19  A.   By Dr. Taylor.

20  Q.   Did you agree?

21  A.   Yes.

22  Q.   Did you ever discuss with Mr. Farley any injuries or

23  medical conditions he had?

24  A.   He had no injuries, but he did have a medical condition.

25  Q.   What was his medical condition?

1   A.  He had high blood pressure.  I filled a prescription for

2   his high blood pressure pills.

3   Q.  Approximately how many prescriptions did you fill for

4   Michael Farley?

5   A.  Well, since I met him, I would fill them -- I filled a few

6   of them.  I can't tell you the amount.  But then it stopped.

7   He stopped bringing them to me.

8   Q.  When did it stop?

9   A.  I can't tell you that.  I don't know.

10  Q.  Do you know why it stopped?

11  A.  It stopped because they didn't want -- he had insurance,

12  and he didn't want to pay the cash price for it.

13  Q.  OK.  During the time period when he was filling his

14  prescriptions with you, who picked up the prescriptions?

15  A.  Vito.

16  Q.  I want to show you what's in evidence as Government Exhibit

17  112A.  Do you recognize the person depicted in 112A?

18  A.  Yes.

19  Q.  Who is that?

20  A.  Brian Dolinko.

21  Q.  How did you first meet Brian Dolinko?

22  A.  He came into the pharmacy on his own.

23  Q.  Did he have a prescription to fill?

24  A.  He did.

25  Q.  What was the prescription for?

Ibsntay2                    Avicolli - Direct

1    A.   The only thing I can remember is he filled a Soma with me.

2    Q.   Soma?

3    A.   Soma.  Soma, 350 milligrams.

4    Q.   What is Soma?

5    A.   Soma is a muscle relaxant that was rescheduled by the DEA.

6    They put it into, I believe, schedule -- I think it's either

7    III or IV.  They moved it from noncontrolled to controlled.

8    Q.   Did you ever discuss Brian Dolinko with Vito Gallicchio?

9    A.   No, I didn't.  I didn't know he was with him.  No.

10   Q.   Who wrote Brian Dolinko's Soma prescription?

11   A.   Dr. Taylor.

12   Q.   Did Brian Dolinko ever bring in an oxycodone prescription

13   to be filled?

14   A.   He might have, but I don't remember.

15        MS. FLETCHER:  Let's pull up what's been marked for

16   identification as Government Exhibit 116A.

17   Q.   Do you recognize the person depicted in Government Exhibit

18   116A?

19   A.   Yes.

20   Q.   Who is depicted?

21   A.   That's Robert Adams.

22   Q.   How, if at all, is Robert Adams related to Vito Gallicchio?

23   A.   His brother.

24        MS. FLETCHER:  The government offers Government

25   Exhibit 116A and the corresponding name, 116B.

Ibsntay2                    Avicolli - Direct

1          MR. CARNESI:  No objection.

2          THE COURT:  OK.  It's in.

3          (Government Exhibits 116A and 116B received in

4    evidence)

5          MS. FLETCHER:  Please publish.

6    Q.  How did you first meet Robert Adams?

7          THE COURT:  Just wait.

8          There is a delay.

9          MS. FLETCHER:  OK.

10   Q.  How did you first meet Robert Adams?

11   A.  I met Robert Adams through Vito.

12   Q.  Where were you when you met him?

13   A.  The pharmacy.

14   Q.  What, if anything, did Vito tell you about why he was

15   introducing you to Robert Adams?

16   A.  He wanted me to fill his oxycodone prescriptions.

17   Q.  Who wrote those prescriptions?

18   A.  Dr. Taylor.

19   Q.  Did you agree?

20   A.  Yes.

21   Q.  What was the process for filling Robert Adams

22   prescriptions?  Who dropped off the prescription, and who

23   picked it up?

24   A.  Vito would pick them up all the time, and once in a while

25   Robert would drop them off.  There was one time that I met him

Ibsntay2                    Avicolli - Direct

1   at a QuickChek in New Jersey.

2   Q.  For what purpose did you meet him at the QuickChek in New

3   Jersey?

4   A.  To pick up the prescription.

5   Q.  When you say to pick up the prescription, are you referring

6   to the piece of paper?

7   A.  Yes, I'm sorry.  The piece of paper.

8   Q.  And had you already filled the prescription or were you

9   picking up the prescription paper before you filled it?

10  A.  No, I had filled it already.

11  Q.  Who did you give the pills to?

12  A.  To Vito.

13  Q.  Why did you meet with Robert Adams to pick up his paper

14  prescription if you had already filled the pills?

15  A.  I needed to cover myself for the pills that I gave out.

16  Q.  How would picking up the prescription paper help you cover

17  yourself?

18  A.  Well, it would account for the pills that I gave to Vito,

19  those pills.

20  Q.  You mentioned that you met him at a QuickChek in New

21  Jersey.

22          How did you get there?

23  A.  It was -- it was on my way in.  It was on my way into work.

24  It was right before the Outerbridge.

25  Q.  Where were you living at the time?

1    A.  I was living in Bridgewater, New Jersey.

2    Q.  Where were you working?

3    A.  I was working at -- I was working at the catering at night,

4    and I was working at the pharmacy during the day.

5    Q.  When you say that it was on your way in, can you describe

6    the route that you drove from home to work during that time?

7    A.  Yes.  I would get on Route 22, 22 east to 287 south to 440

8    and I would get off at -- I believe it's Route 184, 35.  I

9    would get off, go to the second traffic light, make a left,

10   then make a U-turn into the QuickChek.  And it was right before

11   the Outerbridge.

12   Q.  The Outerbridge?

13   A.  The Outerbridge.

14   Q.  Did you have to drive over that bridge to get from New

15   Jersey to Staten Island?

16   A.  Yes.  I did it for 30 years.

17   Q.  Turning back now to Robert Adams, approximately how many

18   prescriptions did you fill for Robert Adams?

19   A.  I can't tell you that.  I don't recall how many.  But there

20   were -- there were lots.

21   Q.  Did there ever come a time when you discussed with Vito or

22   with Robert Adams any injury or medical condition that

23   Mr. Adams had?

24   A.  No, we didn't.

25   Q.  Are you familiar with what Robert Adams did for a living?

Ibsntay2                    Avicolli - Direct

1   A.  Yes.  He was a butcher.

2           MS. FLETCHER:  Can we please pull up what is in

3   evidence as government exhibit -- no, I'm sorry.

4   Q.  We discussed Michael Farley earlier.  Are you familiar with

5   whether Michael Farley was married?

6   A.  Yes, he was.

7   Q.  Do you know his wife's name?

8   A.  Tara.

9   Q.  Did you ever fill prescriptions for Tara Farley?

10  A.  I believe I filled them a couple of times.

11  Q.  What prescriptions did you fill for Tara Farley?

12  A.  Oxycodone, 30.

13  Q.  Who wrote those prescriptions?

14  A.  Dr. Taylor.

15  Q.  What, if any, conversation did you have with Vito before

16  filling those prescriptions?

17  A.  He just told me that they were -- it was Mikey's wife, and

18  he asked me to fill it.

19  Q.  I want to turn now to your interactions with Dr. Taylor.

20          Did you ever have an explicit conversation with

21  Dr. Taylor about the arrangement that you and Vito came to?

22  A.  We didn't have a conversation per se.  It was more like an

23  understanding.

24  Q.  What was that understanding?

25  A.  That Dr. Taylor would write these prescriptions, these

Ibsntay2                    Avicolli - Direct

1    oxycodone prescriptions for Vito's people and Vito wanted me to

2    fill them.

3    Q.  What else --

4              MR. CARNESI:  Judge, I am going to object.

5              THE COURT:  Overruled.

6              MR. CARNESI:  There was no conversation, but it was an

7    understanding.

8              THE COURT:  Hold on, wait.  No, no, no, no, no.  Let's

9    have a sidebar.

10             MR. CARNESI:  Sure.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In the robing room)

2           THE COURT:  Can I have the last three questions and

3    answers read back.

4           (Record read)

5           THE COURT:  OK.

6           So what is the objection?

7           MR. CARNESI:  My objection is there's no foundation

8    for his response.  What he said is we didn't have a

9    conversation or explicit conversation, however you want to

10   categorize it.  From not having a conversation, we then went to

11   somehow or another he arrived at some understanding.  What I am

12   saying is there should have been questions or a foundation in

13   between as to how they got to that understanding.

14          THE COURT:  You can cross-examine him about that.

15   That is fine.  You are saying there is no foundation for what.

16          MR. CARNESI:  There is no foundation for the response,

17   we had an understanding.

18          THE COURT:  He said there was no explicit

19   conversation.

20          MR. CARNESI:  Yes.

21          THE COURT:  Right.

22          MR. CARNESI:  Now there was no explicit conversation

23   and suddenly there was an understanding.

24          THE COURT:  Right.

25          MR. CARNESI:  How did we get to an understanding?

Ibsntay2                    Avicolli - Direct

1          THE COURT:  You didn't object at the time that the

2     question was asked.  When she said "What was that

3     understanding?" you didn't object then.

4          MR. CARNESI:  No, Judge.  I didn't know that it was

5     going to end there.  I expected there was going to be something

6     leading up to yes.

7          THE COURT:  That is fine.  That objection is

8     overruled.  You can certainly cross-examine about that.

9          MR. CARNESI:  Sure.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  OK.  That objection is overruled.

3          Go ahead, counsel.

4    BY MS. FLETCHER:

5    Q.  What was your understanding of what you were supposed to do

6    vis-a-vis the prescriptions that Dr. Taylor wrote?

7    A.  My understanding was Vito had a relationship with

8    Dr. Taylor because he -- first of all, he told me he did.  He

9    would send these people to Dr. Taylor, Dr. Taylor would

10   prescribe the oxycodone 30.  I was not to question it.  And

11   these people would come back to me and I would fill them and

12   either give them to the people themselves or I gave them to

13   Vito most of the time.

14   Q.  When you say you were not to question it, what do you mean

15   by that?

16   A.  I was to look the other way, even though I knew it was

17   wrong.  I knew there what is no medical necessity for them.  I

18   was -- I was -- I looked the other way, even though, you know,

19   they had high dosages, no medical necessity, and they were all

20   for oxy 30.

21   Q.  When you say there was no medical necessity, how do you

22   know that there was no medical necessity?

23   A.  Because, number one, Vito told me that they were coming to

24   me.  Number two, usually patients, patients that would come in,

25   I had a mom-and-pop store, and I had a relationship with --

1    even the new customers, I tried to make them feel at ease when

2    they came into the drugstore.  We would talk.

3          Usually when someone came from their surgery, or,

4    like, say, Elizabeth, you know, she told me she had bariatric

5    surgery.  You know, there was like a common thread, like, with

6    me and Elizabeth, because we both had the same surgery.  So we

7    both told stories, you know, how we were doing, you know, what

8    we could eat, what we can't eat, you know, if we were

9    exercising.

10          So, patients that were on these kind of medications

11   they would come in and say, Oh, I just had this surgery; or I

12   had kidney stones the, worst pain I ever had; or I just had

13   back surgery.  They would talk to me.

14          With these people, they would come in, we would talk

15   about the Yankees, we would talk about sports, the -- you

16   know,, oh, it's cold outside, it's warm outside; or, you know,

17   they're going to a party.

18          There was no -- to me there was -- there was a

19   different change of conversation.  One, you know when people

20   actually were taking them, they were in pain.  And I would rush

21   to fill their prescriptions because they must have just got out

22   of the hospital and I would attend to them.

23          Like I said, while I was filling the prescriptions,

24   they would tell me, Oh, you know I just had this kind of

25   surgery or I went in for kidney stones or I had something

Ibsntay2                    Avicolli - Direct

1    removed from my foot.  So it was different.  It was different

2    in terms of that respect.

3    Q.  Apart from the lack of conversation about injuries or

4    medical conditions, was there anything else about the patients

5    that Vito was bringing in to you that signaled to you that they

6    didn't have a medical need for the oxycodone?

7    A.  Well, Vito told me there was nothing wrong with them.  And,

8    second of all, like I said, I didn't see anything wrong with

9    them.  They didn't say anything.  They didn't express that they

10   had any pain.  Usually people taking these medications first

11   thing they will do is, Oh, please, can you do this for me right

12   away?  I'm in pain.  So that's what I saw.

13   Q.  Was there anything about the quantity of pills prescribed

14   that stood out to you?

15   A.  They were very large quantities.  They were very large

16   quantities, and they were given every month.

17   Q.  Was there anything else about the length of time that these

18   individuals were prescribed these large quantities that stood

19   out to you?

20   A.  Sure.  Like I said, they were prescribed every month.  Some

21   of them were on -- I mean, minimum a year, because they didn't

22   come back, so I didn't know what happened.  But I was filling

23   them every month for a few years.

24   Q.  How about the age of the patients?

25   A.  The patients were young.  They were young, they were, you

1    know, 20s, 30s, except for you know, Lenny, maybe Larry, they

2    were older, but most of them --

3    Q.  What about the relationship of the patients to each other?

4    A.  Well, they were husband and wife.  Like, with Vito and his

5    wife, Lori, and you had Mike supposedly was Vito's nephew, but

6    he was going out with Vito's niece, so he called him his

7    nephew.  So they were husbands and wives, he had a brother and

8    brother, Vito and his brother Robert.  That was basically it.

9    Q.  Why did that stand out to you?

10   A.  It's odd to have two people in the same family on the same

11   medication.  I mean, you don't even have that -- I mean,

12   they're both on potent painkillers.  The odds of that

13   happening, they're very slim.

14        You wouldn't have that with people that are on -- say

15   two diabetics in the same family having the same medication.

16   You have better chances with that or, in high blood pressure,

17   you know, people having the same medication.  But when it comes

18   to pain, you know, it's not common at all.  At least in my

19   opinion it's not.

20   Q.  Now, turning to the discussion that we had earlier about

21   the pattern, can you describe the pattern that you observed

22   with respect to these patients in terms of the quantity of

23   pills they were prescribed?

24   A.  Like I said, if they were new patients, if they were new,

25   Dr. Taylor would write anywhere between 30 and 90, and the next

1  time they would get 180.

2          If they were already getting it from somewhere else

3  and then Vito decided to send them to me, it usually started at

4  180.  I would say most of them were 180.  And then there was a

5  time -- I can't tell you that time -- but they did jump up to

6  240.

7          And then there was a time they went back to 180, and

8  Vito had mentioned it to me, they're going back to 180.  I

9  remember the conversation.  He said, Yeah, T is scaling back

10 because this way not to, not to draw any attention that he was

11 writing such large quantities.  But they were large to begin

12 with, so it didn't matter whether it was 240 or 180.

13 Supposedly the DEA had frowned upon it, those large quantities.

14 Q.  You say supposedly the DEA had --

15 A.  Well, I'm saying from what I understand they didn't like to

16 see those kinds of quantities, and that's why he scaled back.

17 Q.  You say from what you understand.  How did you come to that

18 understanding?

19 A.  Two ways.  When I saw the drop in the quantities and Vito

20 had told me that he had spoken to Dr. Taylor about it, he had

21 asked -- you know, Vito was upset that the quantities had

22 dropped.  So --

23 Q.  Why was Vito upset?

24 A.  Because he was getting less pills.

25 Q.  I want to talk again about your conversations with

1   Dr. Taylor.  Did there ever come a time when you called

2   Dr. Taylor or saw him in person and asked him questions about

3   his prescribing practices after 2014?

4   A.  Yes, I did.

5   Q.  Where did that conversation take place?

6   A.  That conversation took place on the occasion when he came

7   in to fill prescriptions for his wife.

8   Q.  What, if anything, did you ask him?

9   A.  Well, I had asked him if he was doing his due diligence,

10  meaning was he doing a proper exam, did he have MRIs on these

11  patients, did he order them, did he do a urinalysis.  And he

12  told me, yes, he was.

13  Q.  Why did you want to know if Dr. Taylor was doing his due

14  diligence as you put it?

15  A.  Well, because, you know, I was scared, and I wanted to make

16  sure that we were covered, all three of us.  You know, our

17  rears, our rear ends were covered, meaning if anybody came to

18  look at these prescriptions, the DEA, that at least, you know,

19  Dr. Taylor, he was doing, he was doing what he was supposed to

20  do, and I filled them knowing that he was doing it.  But in

21  reality I knew there was no medical necessity for any of them.

22  Q.  When you say you wanted to be sure Dr. Taylor was doing

23  what he was supposed to do, what do you mean by that?

24  A.  Well, like I said, I wanted to make sure he was covering

25  our rears -- you know, our butts.  I wanted to make sure that

1  he was doing what he was supposed to do in regards in

2  dispensing -- in prescribing these medications.  Because when

3  you prescribe them, you should have a thorough exam, you should

4  have some kind of history.  And you know, Vito just sending

5  these people there.  I didn't believe there was anything being

6  done.

7  Q.  Did there come a time when you stopped working with Vito

8  Gallicchio?

9  A.  Yes -- uh, yes and no.

10 Q.  What do you mean?

11 A.  Well, I was still -- well, back in November of '16, I got a

12 call from the wholesaler that they were, they were going to

13 stop shipping controlled substances to me.  My account was

14 under review.  At that time I realized, I realized that it was

15 only a matter of time when the DEA was going to come.

16      And so I wasn't able to give him anything for about a

17 month in terms of any pills.  And then I found another

18 wholesaler, which I can't recall the name, I found another

19 wholesaler, and they only allowed me 15 bottles a month.  Those

20 15 bottles went to the prescriptions.  I would use them

21 primarily to fill the prescriptions.

22 Q.  Did you continue to fill prescriptions for patients that

23 Vito brought you?

24 A.  Yes, I did.

25 Q.  Did you continue to sell him bottles of oxycodone without a

1    prescription?

2    A.  No.

3    Q.  Why not?

4    A.  I didn't have any more.  I didn't have any -- I only had

5    enough for those prescriptions, and I decided not to do that

6    anymore.  I mean, I was very happy that they did that to me.

7    Q.  When you say "they," who do you mean?

8    A.  The wholesaler.

9    Q.  Why were you happy?

10   A.  Because I was doing -- I was doing the wrong thing.

11           THE COURT:  Do you need to take a break.

12           THE WITNESS:  No, I'm all right.

13           That's not what I -- that's not what my job was.

14   That's not what a pharmacist was supposed to do.  So, in that

15   respect, I mean, I still filled those prescriptions, but I was

16   happy that I wasn't able to give them any more.  I know that

17   sounds strange, but I was happy that they cut me off in that

18   respect.

19   Q.  Now, Mr. Avicolli, I want to ask you some questions about

20   your testimony that you have been cooperating with the

21   government.

22           When you were first arrested in this case, were you

23   questioned by law enforcement?

24   A.  Yes, I was.

25   Q.  Who questioned you?

1    A.   The DEA agent.  The head DEA -- the head of the

2    investigation.

3    Q.   Where were you questioned?

4    A.   I was questioned in the pharmacy.

5    Q.   Were you completely truthful with the agents when they

6    first questioned you in the pharmacy?

7    A.   No, I wasn't.

8    Q.   What were you not truthful about?

9    A.   The amount of pills that were missing from my inventory.

10   Q.   Approximately how many pills were missing from your

11   inventory at that time?

12   A.   Approximately 100,000.

13   Q.   Where did these hundred thousand pills go?

14   A.   They went to Vito.

15   Q.   What did you tell the agents about why those 100,000 pills

16   were missing?

17   A.   I had told them that I was previously robbed in 2008 and

18   2009.  I was robbed four times, one at gunpoint.  In 2008 five

19   men came into the pharmacy and robbed me at gunpoint and took

20   all the controls.  And then subsequent robberies were -- or

21   they were burglaries.  They came through the roof, and that

22   person was one of my customers that did that.

23   Q.   Was your pharmacy, in fact, robbed and burglarized?

24   A.   Yes, it was back in 2008 and '09.

25   Q.   Were the robberies and burglaries of your pharmacy

Ibsntay2                    Avicolli - Direct

1    responsible for the hundred-thousand-pill shortfall in your

2    inventory?

3    A.  No.

4    Q.  Did there come a time after that initial encounter with law

5    enforcement when you corrected that statement?

6    A.  Yes, I did.

7    Q.  Approximately how much time elapsed between your initial

8    statement and the correction?

9    A.  It was within the week.

10   Q.  Did there come a time that you began having meetings with

11   the prosecutors in this case?

12   A.  Yes.

13   Q.  Approximately how long after you were arrested was that?

14   A.  Within the week.

15   Q.  Do you recall approximately how many meetings you have had

16   with the government since you decided to start cooperating?

17   A.  Approximately ten or twelve.

18   Q.  Who was present at the meetings you had with the

19   government?

20   A.  You -- yourself, the DEA agents, and a few times my lawyer.

21   Q.  In general terms, can you describe what happened at those

22   meetings.

23   A.  At those meetings we spoke -- in the beginning you took

24   down basic information about my life, about what I've done, the

25   crimes that I've committed.  We spoke about the other people,

1  like people such as today.  We spoke about them and what their

2  role was in this whole situation.

3  Q.  You said what you've done.  What crimes did you tell the

4  government about?

5  A.  Well, this one.  And there was -- after the first robbery,

6  I had become licensed for a gun, so I had a carries permit.  On

7  occasion I would take it into New Jersey for the simple fact --

8  I wasn't licensed in New Jersey, but I did it because, prior to

9  me doing this crime, I used to get threatened, two three times

10  a week because I used to -- I used to step up to people that

11  wanted to come in for these medications and I wouldn't fill

12  them.  After, you know, after I made an observation, I wouldn't

13  fill the prescriptions.

14          Many times I was threatened.  Many times they said

15  they were going to wait for me after work.  I kind of feared

16  for my life, so I took my weapon home with me.  A lot of times

17  I would take a different route home.  You know, I didn't want

18  to bring these people home to my -- to my town.  I didn't want

19  them knowing where I lived.  So --

20  Q.  Was it your understanding, Mr. Avicolli, that it was a

21  crime for you to transport your firearm?

22  A.  Absolutely, but I feared for my life.

23  Q.  You said you told the government about this crime.

24          What crime is this is that?

25  A.  This crime, diversion of a controlled substance.

1    Q.  What controlled substance did you divert?

2    A.  Oxycodone, 30 milligrams.

3    Q.  Did you also distribute other controlled substances without

4    a prescription?

5    A.  Yes, I did.

6    Q.  What controlled substances?

7    A.  I gave Vito a bottle of 500 tablets of generic Xanax, 2

8    milligram tablets.

9    Q.  Did he have a prescription for that bottle?

10   A.  No.

11   Q.  Have you been sentenced yet?

12   A.  No.

13   Q.  What is your understanding of the maximum sentence that you

14   face?

15   A.  I face 20 years.

16   Q.  What is the lowest sentence that you could get?

17   A.  There is no minimum.  Hopefully, no jail time.

18   Q.  When you pled guilty, did you sign an agreement to

19   cooperate with the government?

20   A.  Yes, I did.

21   Q.  What is your understanding of your responsibilities are

22   under your cooperation agreement?

23   A.  My only responsibility is to be here and to tell the truth.

24   Q.  What, if any, responsibilities do you have with respect to

25   meeting with the government when the government asks?

Ibsntay2                    Avicolli - Direct

1    A.   Whenever they ask me to show up, I was supposed to be

2    there.

3    Q.   What is your understanding of your responsibilities with

4    respect to committing any future crimes?

5    A.   I am not going to commit anything anymore, but I am not

6    supposed to commit anything, any crime.

7    Q.   What is your understanding of when your cooperation is

8    complete?

9    A.   When the government tells me.

10   Q.   Is your testimony here today as part of your cooperation?

11   A.   Yes, it is.

12   Q.   Could you be asked to testify in other cases?

13   A.   Yes.

14   Q.   If you meet your responsibilities under the cooperation

15   agreement, what is your understanding of what the government

16   will do for you?

17   A.   The government would write a 5K1 letter.

18   Q.   What is your understanding of what will be in the 5K1

19   letter?

20   A.   My understanding is that in that letter there's going to be

21   all the good and bad that I've done and all the crimes that

22   I've committed, and that's basically it from what I understand.

23   Q.   Who is that letter sent to?

24   A.   It's sent to the Honorable Judge Carter.

25   Q.   What does that letter allow the judge to do?

1   A.  To review it and hopefully give me a lesser sentence.

2   Q.  Now, we talked about other crimes, your transportation of

3   the firearm to New Jersey, and your diversion of Xanax.

4           What is your understanding of whether Judge Carter

5   will know about those other crimes in connection with your

6   sentencing?

7   A.  They will be in the letter.  They will be there.

8   Q.  Has the government promised you a reduced sentence in this

9   case?

10  A.  No.

11  Q.  Has anyone promised you a reduced sentence?

12  A.  No.

13  Q.  What is your understanding of who decides what your

14  sentence will be?

15  A.  The Honorable Judge Carter.

16  Q.  Do you hope to get a lower sentence because you cooperated?

17  A.  Yes.

18  Q.  If the government writes a 5K letter for you, what's the

19  last amount of jail time the judge can sentence you to?

20  A.  No jail time.

21  Q.  If the government writes a 5K letter for you what is the

22  most amount of jail time the judge can sentence you to?

23  A.  20 years.

24  Q.  Mr. Avicolli, if you lie at this trial, and the defendant

25  is convicted, what is your understanding of whether you can get

1    a 5K letter?

2    A.  I won't get a 5K letter, and I'll go straight to jail.

3    Q.  If you tell the truth at this trial and the defendant is

4    found not guilty, what is your understanding of whether you'll

5    get a 5K letter?

6    A.  I should be able to get a 5K letter.

7    Q.  As you understand it, does the outcome of this trial at all

8    affect whether you will get a 5K letter?

9    A.  No, it has no outcome.  They said my only purpose here is

10   to tell the truth.

11            MS. FLETCHER:  Your Honor, may I have a moment?

12            THE COURT:  Yes.

13            MS. FLETCHER:  No further questions.

14            THE COURT:  Any cross-examination?

15            MR. CARNESI:  Yes, your Honor.

16            Thank you.

17            THE COURT:  OK.

18   CROSS-EXAMINATION

19   BY MR. CARNESI:

20   Q.  Good morning, Mr. Avicolli.

21   A.  Good morning.

22   Q.  My name is Charles Carnesi.  I represent Dr. David Taylor.

23   A.  Good morning, sir.

24   Q.  Your agreement that you just referred to, it provides that,

25   in order to get that letter, that 5K letter, you must provide

Ibsntay2                    Avicolli - Cross

1    substantial assistance in an investigation or prosecution.

2            Do you understand that?

3    A.   Yes.

4    Q.   In testifying here today, is it your intention to provide

5    that assistance to the prosecution?

6    A.   Yes.

7    Q.   Now, you told us on direct examination that you spoke to

8    Dr. David Taylor and you asked him about the procedures that he

9    was conducting, and the purpose in doing that was because you

10   wanted to make sure he what covering your backs, sir?

11   A.   Yes.

12   Q.   Is that accurate?

13   A.   Yes.

14   Q.   And when you said covering your backs, you are talking

15   about the agreement that you reached with Vito Gallicchio,

16   right?

17   A.   Can you repeat that again?  I'm sorry.

18   Q.   Sure.  When you are talking about covering your backs --

19   A.   Right.

20   Q.   -- you are talking about covering your backs regarding the

21   agreement you reached with Vito Gallicchio?

22   A.   I asked him because I wanted to make sure that we were all

23   covered, not just the agreement I had with him, but he was

24   writing the prescriptions, I wanted to make sure he had

25   sufficient medical records, and because I knew that Vito was

Ibsntay2                    Avicolli - Cross

1    sending them to him.

2    Q.  Do you understand my question?  I can rephrase it for you.

3    A.  OK.  I'm sorry.

4    Q.  No.  The question simply is, what you were concerned about

5    is that you had had this agreement with Vito Gallicchio that he

6    was going to direct patients to you and that you would fill

7    these prescriptions?

8              MS. FLETCHER:  Objection.

9              Asked and answered.

10              THE COURT:  Overruled.

11    Q.  Right?

12    A.  I'm sorry.  Say that again.  Because it's just --

13    Q.  Sure.

14    A.  I'm sorry.

15    Q.  Take your time.

16              The agreement that I'm referring to is the one that

17    you had with Vito Gallicchio --

18    A.  Right.

19    Q.  -- in which it was understood he was going to send patients

20    to you in order to have their prescriptions filled.

21    A.  Correct.  Yes.

22    Q.  And that the understanding between you and Mr. Gallicchio

23    was that you would fill these prescriptions essentially no

24    questions asked.

25    A.  Right.  But he was sending the patients to Dr. Taylor.

Ibsntay2                    Avicolli - Cross

1   Q.  I understand.  We'll get there.

2   A.  OK.

3   Q.  We'll get to who was writing the prescriptions.

4   A.  OK.

5   Q.  So now the prescriptions being written by Dr. Taylor, and

6   Dr. Taylor is the one you are having this agreement with, this

7   conversation about making sure that your backs are covered,

8   right?

9   A.  Yes.

10  Q.  In that conversation did you discuss at any time with him

11  that you understood from Vito Gallicchio that these

12  prescriptions were not legitimate prescriptions?

13  A.  We didn't discuss, but I believe it was understood because

14  Vito had the relationship with Dr. Taylor.

15          THE COURT:  Hold on just a second.

16          Please listen closely to the question and try to

17  answer counsel questions.  If you can answer it yes or no,

18  answer it yes or no.  If you can't, you can't.

19          Please rephrase the question, counsel.

20          MR. CARNESI:  Sure.

21          THE COURT:  OK.

22  BY MR. CARNESI:

23  Q.  At any time during that conversation with Dr. Taylor, did

24  you indicate to him that you believed that you were in some

25  kind of an illegal conspiracy with Vito Gallicchio?

Ibsntay2              Avicolli - Cross

1   A.  No.

2   Q.  Did you indicate to him the reason why you were asking him

3   these questions, because you wanted to make sure that your

4   backs were covered?

5   A.  No.

6   Q.  At any time in any conversation you ever had with

7   Dr. Taylor, did you tell Dr. Taylor that you and Vito

8   Gallicchio were diverting these prescriptions on to the street?

9   A.  I didn't, but I believed there was an understanding.

10  Because here we are, two professionals --

11  Q.  If you would, sir --

12  A.  I have to give you an explanation.

13  Q.  I will give you --

14          THE COURT:  Hold on.

15          THE WITNESS:  I'm sorry.

16          THE COURT:  Again, hold on.  If you can, answer it yes

17  or no.  If you can't -- what he's asking you, I believe -- I

18  don't want to put words in counsel's mouth -- was there an

19  explicit discussion about that with Dr. Taylor?

20          THE WITNESS:  There wasn't, but I believe there was an

21  understanding, your Honor.

22          THE COURT:  That's fine.

23          OK.  Go ahead, counsel.

24          MR. CARNESI:  Thank you.

25  BY MR. CARNESI:

Ibsntay2                    Avicolli - Cross

1  Q.  Did you ever participate in a conversation with Vito

2  Gallicchio and Dr. Taylor in which it was discussed that there

3  was this conspiracy to divert these drugs?

4  A.  No.  It was only with Vito.

5  Q.  Now, I know you have referred to an understanding, and I

6  want to give you the opportunity to be complete with that.

7       When you say an understanding, did Dr. Taylor ever

8  indicate to you that he was aware that you and Vito Gallicchio

9  with doing these things, were diverting these drugs?  Did he

10  indicate that to you?  Did he tell you that?

11  A.  No, he didn't tell me that, but there was an understanding.

12  He had a relationship with Vito.  And to have two professionals

13  talk about something like that, it didn't occur.  It was like a

14  wink and a nod.  It was just -- it was understood.

15  Q.  OK.

16  A.  He was friends with -- Vito was the middleman, and Vito

17  came between both of us.  And Vito, you know, he had the

18  relationship with Dr. Taylor.  I had a professional

19  relationship.  I only spoke to him on the phone or when I saw

20  him in the pharmacy or when I saw his prescriptions.  That was

21  it.

22  Q.  What I am trying to ask you is, was this understanding

23  based on things that you perceived rather than things that the

24  doctor said to you or Vito Gallicchio said to you, but this

25  internal feeling you had about it?

Ibsntay2                    Avicolli - Cross

1   A.  Basically.

2   Q.  If that's what we are talking about, I would like to know

3   that.

4   A.  I'm sorry.

5           MS. FLETCHER:  Objection to the form, your Honor.

6           THE COURT:  Please just rephrase the question,

7   counsel.

8           MR. CARNESI:  Sure.

9   Q.  Is the source of this feeling, as you indicated, your

10  belief how two professionals might act, your perception of what

11  was going on, or is it something that you're objectively told

12  by one or the other or both?

13  A.  I was just told by Vito.

14  Q.  Vito told you that the doctor was aware that he was selling

15  these drugs, is that right?

16          Is that what you just said?

17  A.  No, he didn't tell me that, no.  He didn't say it like

18  that.

19  Q.  Now --

20  A.  But why -- excuse me, sir.

21          THE COURT:  Hold on.

22          There is not a question before you.

23          MR. CARNESI:  Please.

24  Q.  Let me ask the questions now.

25  A.  OK.  I'm sorry.

Ibsntay2                    Avicolli - Cross

1    Q.  All right.

2            You told us that -- I think that back around that

3    period of time you were having some financial problems, right?

4            When I say that period of time, I am going back to, I

5    think it was 2014?

6    A.  Yes.  My marriage was in the toilet.  I had -- I was kicked

7    out of my house.  I had the debt with the loanshark to the tune

8    of over $500,000.

9    Q.  All right.

10   A.  I had no --

11   Q.  Let me just stop you there.

12           THE COURT:  Hold on.  Let him finish his answer.

13           MR. CARNESI:  Sure.

14           THE COURT:  Go ahead.  Finish your answer.

15   A.  I want to explain the circumstances why --

16   Q.  I am going to give you the opportunity to do that.

17   A.  OK.

18   Q.  When you say --

19   A.  I'm sorry.

20   Q.  When you say 500,000 --

21           THE COURT:  Hold on.  Just one at a time.

22           Are you finishes with the answer to the previous

23   question?

24           THE WITNESS:  I guess I am now.  That's OK.

25           THE COURT:  Go ahead.  Please pose your next question.

1    BY MR. CARNESI:

2    Q.   The original debt was not $500,000, was it?

3    A.   Yes, it was, the original debt.

4    Q.   You didn't start with $225,000?

5    A.   No.  I don't know where you get that number from.

6              (Continued on next page)

1    BY MR. CARNESI:

2    Q.  Do you recall meeting with prosecutors Detective Del

3    Rosario on June 28th of 2017?

4    A.  I could have met with them.  That was right after the --

5    the arrest.

6    Q.  Didn't you tell them during the course of that meeting that

7    there was an individual by the name of Attanasao?

8    A.  Attanasao, yes.

9    Q.  He was a loan shark, right?

10   A.  Uh-huh.

11          THE COURT:  You have to say yes or no.

12          THE WITNESS:  I am sorry, your Honor.

13   A.  Yes.

14   Q.  And that you knew he lent money and that you started with

15   $225,000 and that you were paying approximately $8,000 or so a

16   month to pay him back.

17          Do you remember that?

18   A.  Not a month.  I -- I know -- I know --

19          THE COURT:  Hold on.  Hold on.

20          Can the court reporter read back the last answer for

21   the witness.

22          (Record read)

23          THE COURT:  Go ahead.

24          What is your next question, counsel?

25   Q.  So it started with $225,000; right?  That was your original

1    debt to this loan shark?

2    A.  I know my –– my –– my debt was 500,000.

3    Q.  Eventually?

4    A.  At the time it was 500,000.

5    Q.  Did there come a time when the initial $225,000 was paid

6    off by someone else?

7    A.  No.  No, I just –– I just kept paying $10,000 a week.  And

8    when I couldn't pay it anymore, he said, Okay, give me 5,000.

9    That is what I wound up paying and then I eventually stopped.

10   He wanted me to pay it until I was 58 years old.

11   Q.  Did your parents take a reverse mortgage to pay part of

12   that loan?

13   A.  They helped me, yes.  Okay.

14   Q.  How about Nicholas Pope, who is he?

15   A.  He is a friend.

16   Q.  Did he lend you $225,000 to pay the loan?

17   A.  He did.

18   Q.  After Nicolas Pope gave you $225,000 to pay off the

19   original debt to the loan shark, did you go back and borrow

20   more from him?

21   A.  Yes, I did.  But that 225,000 paid off the debt from years

22   ago that I had borrowed.

23   Q.  So you owed Mr. Attanasao $225,000?

24   A.  Right.  I was paying $3,000 a month at the time for that,

25   but that was years ago.

1   Q.  It was paid off by Nicholas Pope?

2   A.  Right.

3   Q.  And then you went back and you borrowed more money from

4   him; right?

5   A.  I needed to borrow.

6   Q.  And at that time you built up a debt of about $500,000 or

7   so; right?

8   A.  Yes.

9   Q.  Now, it was around that time that you met Vito Gallicchio,

10  right, 2014?

11  A.  No.  I met him approximately 2010.

12  Q.  And you told us on direct examination that you understood

13  he was on disability, that he had some kind of back problem;

14  right?

15  A.  That is what he told me, sir.

16  Q.  Now, he initially approached you; is that right?

17  A.  Yes.

18  Q.  He came to you with this scheme whereby he wanted to buy

19  Oxycodone from you; right?

20  A.  Yes.

21  Q.  Had you ever been approached by anyone other than him

22  before to divert prescription drugs?

23  A.  Not -- not that I can recall.

24  Q.  Are you aware of any reason why he would suddenly approach

25  you with the idea?

Ibs6tay3                    Avicolli - cross

1    A.  The only thing I can think of -- the reason why he did it

2    was at the time I was vulnerable.  Because there was a time

3    when he came in and I -- I would throw him out of the pharmacy.

4    I would throw him and his friends out.  That is when things

5    were good in my life and I had no problem.  I had problems, but

6    not like this.

7    Q.  Did you discuss your financial problems with Vito prior to

8    this?

9    A.  Yeah, we discussed it.

10   Q.  Did he know Mr. Attanasao as well?

11   A.  He did.  He met him in the pharmacy.

12   Q.  He met him through you?

13   A.  Yes.

14   Q.  Initially you said you turned him down but ultimately you

15   decided that you were willing to do that, right, to provide

16   this Oxycodone to him?

17   A.  I was vulnerable.  I was weak when I did it.  I was just

18   way over my head.  I didn't know what to do.  At the time I had

19   lost everything in my life -- my life savings.  My life.  I was

20   suicidal.  I was depressed and still am.  I still am depressed.

21   I don't -- I lost everything.

22   Q.  At that time was the debt to Mr. Attanasao satisfied?  Had

23   you already paid it off?

24   A.  I don't remember if it was.

25   Q.  Do you recall approximately how much Oxycodone you would be

1   giving to Vito Gallicchio at any time when this started?

2   A.  I would give him anywhere from five to ten bottles a week.

3   And there was some weeks I didn't give him any because I filled

4   other prescriptions from other doctors.

5   Q.  How much did you charge him per pill?

6   A.  It was a thousand dollars for a bottle of 100.  So that is

7   $10.

8   Q.  $10 a pill?

9   A.  Right.

10  Q.  I think you said on direct examination that over that

11  period of time that you were dealing with him that you diverted

12  about 100,000 pills?

13  A.  Yes, sir.

14  Q.  That is a million dollars; is that right?

15  A.  Okay.

16  Q.  When I say "that period of time," how long are we talking

17  about?

18  A.  The middle of 2014.

19  Q.  To?

20  A.  To November.  November of 2016.  2016 when I couldn't get

21  the extra pills.

22  Q.  Okay.  So approximately two years?  A little over two

23  years?

24  A.  Uh-huh.

25          THE COURT:  You have to say yes.

Ibs6tay3                    Avicolli - cross

1          THE WITNESS:  Sorry, your Honor.

2    A.   Yes.

3    Q.   He paid you a million dollars in cash?

4          Sorry.  You have to answer.

5    A.   Yes.

6    Q.   At any time while you were doing this with Mr. Gallicchio,

7    did you discuss with Dr. Taylor what was going on between the

8    two of you?

9    A.   No, we didn't discuss it.

10   Q.   You said also that you were charging for the prescriptions

11   that you were filling; right?

12   A.   Yes.

13   Q.   And I think you told us that you charged $3 a pill?

14   A.   Yes, I did.

15   Q.   Is that the normal charge for that medication?

16   A.   I don't believe so.  But if you're trying to say I only

17   charged these people $3, it was everyone that came into the

18   pharmacy.  That price was $3 for Vito's people and for other

19   people that got Oxycodone prescriptions.

20   Q.   That is exactly what I am asking you.  You didn't add

21   anything additionally on?

22   A.   No.  One thing I did when I ran the pharmacy, and it is

23   probably one of my downfalls, were that I never -- I never

24   gouged anybody in terms of even regular prescriptions.  Because

25   a lot of times when I filled prescriptions for blood pressure

1    pills, I was always -- I always looked at what it cost me and I

2    always charged people a fair price.  It was always a lot less

3    than the chains.  When I really should have been charging what

4    the chains charged.

5    Q.  So you weren't really making any profit on filling those

6    prescriptions beyond on what the normal profit was?

7    A.  No, I was making profit.  I was making a profit.

8    Q.  If I could just finish the question?

9    A.  I am sorry, sir.

10   Q.  What I meant is what I think you were saying you weren't

11   charging any additional profit over and above what you would

12   normally charge for filling that prescription?

13   A.  No.  No.

14   Q.  So there was no financial incentive for you other than the

15   side business in keeping that going that you were doing with

16   Mr. Gallicchio; right?

17   A.  Yes.

18   Q.  Now, in your dealings with Mr. Gallicchio, did he discuss

19   with you other criminal activities that he was involved in?

20   A.  Yes.

21   Q.  What types of activities did he tell you about?

22            MS. FLETCHER:  Objection, your Honor.

23            THE COURT:  Overruled.

24            You may answer.

25   A.  He told me that he was involved in a -- in a robbery at one

 1   of the delis in Staten Island.  He had told me that he was

 2   purchasing -- him and I believe Larry Montabano, they were

 3   stealing clothing from a store.  That's all I can recall right

 4   now.

 5   Q.  Did you ever discuss Mr. Gallicchio with Mr. Attanasao?

 6   A.  Not really.  Mr. Attanasao went to his house once and he

 7   said to me that Vito was a bragger and a boaster, that he would

 8   boast about everything he had.

 9              MS. FLETCHER:  Objection.

10              THE COURT:  Overruled.

11              MS. FLETCHER:  Your Honor, that is a hearsay

12   objection.

13              THE COURT:  Overruled.

14              You may continue answering.

15   A.  That's about it.  He thought he was a buffoon.  That is

16   what he thought.

17   Q.  Was that consistent with your dealing with him?  Did you

18   find Mr. Gallicchio to be a bragger and exaggerator?

19   A.  No, not really.  He liked to just talk about the things

20   that he did.

21   Q.  Did he talk to you about the Marilyn Monroe painting that

22   was stolen?

23   A.  Yes.

24   Q.  Did you ever see the painting?

25   A.  No, I didn't.

1   Q.   What did he tell you about it?

2   A.   He said he was holding it in his garage or in his house.

3   One or the other.

4   Q.   Did he show you a Rolex watch?

5   A.   Yes, he did.

6   Q.   What did he tell you about the watch?

7   A.   That it was his, that he had the watch.

8   Q.   Do you know whether or not the watch was real?

9   A.   No.  I didn't pay -- I couldn't tell if it was real or not.

10  I believed it was.

11  Q.   Now, you said that Mr. Gallicchio had some conversations

12  with you in which he indicated that he had given money to Dr.

13  Taylor?

14  A.   Correct.

15  Q.   Do you remember his using the term "giving" or "lending"

16  specifically?

17  A.   I thought he gave it.

18  Q.   I am not asking --

19  A.   I know.

20  Q.   Do you remember whether he said to you --

21  A.   Whether he gave or lent it?

22  Q.   Yes.

23  A.   To be honest with you, Vito wasn't the type to lend anybody

24  anything.  So when he said that I believe that he said that he

25  gave it.  Because he didn't -- he wasn't the type that he would

1    lend it.  If he wanted to give you something, he didn't expect

2    it back.

3    Q.  Did he talk to you about giving gifts to Dr. Taylor?

4    A.  For compensation for the prescriptions, yes.

5    Q.  Is that how he said it, I gave gifts to Dr. Taylor as

6    compensation for the prescriptions?

7    A.  Yes.  That's what he told me.

8    Q.  He didn't say I gave cigars?

9    A.  No.  He told me that he gave him cigars, Scotch, steaks,

10   cash money.  And that at one time he said to me he bought him

11   an appliance, and I believe it was a refrigerator.

12   Q.  Did you ever confront him with regard to Dr. Taylor any of

13   the things that Vito was telling you, specifically with regard

14   to cash?

15   A.  No.

16   Q.  Your involvement in this criminal activity --

17           THE COURT:  He answered the question.

18           MR. CARNESI:  I want to follow up.

19           THE COURT:  He said no.  He didn't expect it.

20           Go ahead.

21   Q.  Your involvement in this activity with Gallicchio, you were

22   essentially partners.  He bought pills from you, you were being

23   compensated, and he would resell them; is that clear?

24   A.  Okay.  Yes.

25   Q.  Did you ever discuss with Dr. Taylor any financial

Ibs6tay3                    Avicolli - cross

1    arrangement that Vito was telling you he had with Dr. Taylor?

2    A.   No.  We never discussed it, but it was my understanding

3    from what Vito said -- it was an understanding and --

4    Q.   I understand.

5    A.   And it was like --

6    Q.   I understand.

7              THE COURT:  Hold on.  Let the witness finish the

8    answer.

9              Finish your answer.

10             THE WITNESS:  I am sorry, your Honor.

11   A.   To me it was like an implied agreement.  It was a silent

12   agreement.  It was something that was understood.

13   Q.   I want to make sure that we're both in agreement that

14   whatever your impression was no one ever articulated that to

15   you?  You didn't discuss that with Dr. Taylor, did you?

16             MS. FLETCHER:  Objection.

17             THE COURT:  Please rephrase the question, counsel.

18             MR. CARNESI:  Sure.

19   Q.   You never discussed your impression with Dr. Taylor?

20   A.   No.  I didn't think we had to.  Between two -- I mean, we

21   were both caught in this.  He was on one end, I was on the

22   other end, and Vito was in the middle going to him and going to

23   me.  And that's -- it was understood.  To me it was understood.

24   It was just as if --

25   Q.   I accept that you understood that.

1   A.  Okay.

2   Q.  What I am asking you is what you discussed with Dr. Taylor

3   so he could understand what was going on and the answer is?

4   A.  No, I didn't discuss anything with Dr. Taylor other than

5   the due diligence to cover our backs.

6   Q.  Okay.

7           Now, did there come a time when you learned that Vito

8   was diverting Oxycodone from you that you weren't even aware

9   of?

10  A.  Yes.  There was a time I learned that.

11  Q.  Can you tell me when that was and how that came about?

12          MS. FLETCHER:  Your Honor, let's have a quick side

13  bar.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (In robing room )

2          MS. FLETCHER:  Your Honor, the reason I stood up is

3     that I think we're getting into the UPS packages.

4          MR. CARNESI:  Right.

5          MS. FLETCHER:  So he first learns that because the

6     agents tell them.  We would have an objection to that.

7          MR. CARNESI:  He ultimately confirmed it.

8          MS. FLETCHER:  Yes.

9          MR. CARNESI:  Right.  He is aware of it.

10          MS. FLETCHER:  Well, he hasn't confirmed it.  There

11     are two conversations.

12          THE COURT:  Can I get in on this?

13          MS. FLETCHER:  Yes.  The first conversation when he is

14     arrested the agents ask him, Were you giving Vito pills

15     directly under your UPS packages or was Vito permitted to take

16     pills out of your UPS packages.  He said, no, he wasn't aware

17     of it at the time.  The agents told him that in fact Vito had

18     intercepted some of his UPS packages.  Apart from that

19     conversation, I think he remains unaware that Vito had ever

20     taken pills out of his UPS packages until earlier this year

21     when the witness's girlfriend told him that Vito told her that

22     he once took a set of pills.

23          So the statements from the agents to the witness are

24     hearsay.  The statements from Mr. Avicolli's girlfriend to him

25     are conveying statements from Vito, which are also hearsay.  If

1    Vito had said it directly to the witness, it wouldn't be

2    hearsay; but there are two different hearsay statements that

3    lead to this understanding.  So I think Mr. Carnesi has gotten

4    what he wanted, which is that he understood Vito diverted pills

5    from him in another way, but the basis for that is all hearsay

6    statements.

7             THE COURT:  Okay.  Where do you want to go with this,

8    Mr. Carnesi?

9             MR. CARNESI:  I want to establish that Vito was the

10   kind of individual who went about doing things with

11   coconspirators, or however you want to phrase it, that they

12   weren't aware of.  I think it is significant here.  He is in

13   this conspiracy selling pills to Vito and understanding that is

14   their arrangement and somehow or another this guy was able to

15   manage himself into a position where he is now receiving

16   packages.  I don't know how that happens, but he is receiving

17   packages from the UPS driver and signing for them.  I don't

18   expect to get into all this with this witness.  But how he

19   knows the drugs are coming that day?

20            THE COURT:  What are you trying to get out?  What is

21   the relevance of this witness's later understanding after he

22   has been arrested after all this has taken place that Vito

23   basically lied to him?  You want to get out that Vito

24   essentially duped him?

25            MR. CARNESI:  Yes.  Cheated him.  He is supposed to be

1   getting $10 a pills.  You got the pills right off the truck.

2           MS. FLETCHER:  I think on the one occasion.  This

3   witness only knows that because the agents told him and because

4   his girlfriend told him.

5           THE COURT:  So in terms of the relationships between

6   coconspirators and their understandings of each other and these

7   sorts of items, I think this certainly is relevant.

8           I will ask both counsel how critical is it that this

9   actually is true, that Vito actually stole the UPS packages?

10  The fact that he has been told that Vito might have stolen the

11  UPS packages is relevant to his state of mind.  And to the

12  extent that Mr. Carnesi can ask him if that would be something

13  that would be consistent with his understanding about Vito

14  Gallicchio without getting into whether or not that actually

15  happened.  Getting into whether or not it actually happened I

16  do think touches upon these hearsay problems that counsel is

17  concerned about.

18          MS. FLETCHER:  That is exactly the concern, your

19  Honor.  As I understood what Mr. Carnesi just said, he said the

20  point of this testimony is to prove that Vito is the type of

21  person who goes around even his coconspirators and does things

22  that the coconspirators don't know about.  Mr. Carnesi can only

23  establish that if he can prove that in fact Vito took these

24  pills.  It is irrelevant that the witness may think he took the

25  pills unless the jury is led to believe that in fact Vito did

1   take the pills.  The only evidence we have that Vito took the

2   pills is two hearsay statements to this witness.

3           THE COURT:  Mr. Carnesi.

4           MR. CARNESI:  Judge, sometimes I think I am just too

5   much of a pragmatist.  As I understand the hearsay rule, it is

6   that the opposition does not have the opportunity to

7   cross-examine.  In this situation the hearsay is coming from

8   the opposing party.

9           THE COURT:  The hearsay is an out-of-court statement.

10          MR. CARNESI:  I understand what hearsay is, but I also

11  understand the purpose of the rule, because out of court we

12  don't get a chance to cross-examine him.  This information is

13  coming directly from the government.

14          So is there a question about whether or not it was

15  true?

16          THE COURT:  I think there is still a hearsay issue

17  there.  Is there actual evidence that is admissible that Vito

18  does this?  I am not just talking about this witness.  Just

19  period.

20          MS. FLETCHER:  So the agents have speculated that this

21  was happening.  This witness would say that there was an

22  occasion where he got a UPS package and that UPS package had

23  been opened and he didn't know where the pills went and he

24  never learned where the pills went until 18 months later when

25  his girlfriend told him about a conversation that she had had

1   with Vito.  So the only evidence that's not hearsay evidence is

2   the UPS package that has been opened by this witness.

3            THE COURT:  Wait.  The witness's girlfriend told this

4   witness that Vito told her that he stole this thing?

5            MS. FLETCHER:  Correct.

6            THE COURT:  That he opened a package that was meant

7   for this witness?

8            MS. FLETCHER:  Correct.  I don't know how specific he

9   was, but I think that is what happened.

10           THE COURT:  It seems to me before getting into this

11  issue with the agents that that creates other issues.  It seems

12  to me in terms of these two levels of hearsay, we are talking

13  double hearsay, that first level of hearsay, Vito making this

14  statement that he basically opened somebody else's package does

15  seem to me a statement against interest.  The statement from

16  the girlfriend to this witness seems to be relevant to this

17  witness's state of mind in terms of this witness's belief about

18  Vito's honesty, loyalty whether or not it is true.  It doesn't

19  seem to be that it hinges upon whether or not this is true.

20           MS. FLETCHER:  This conversation happens in as I

21  understand it the spring of this year.  This witness's belief

22  or understanding about Vito Gallicchio in the spring of this

23  year nearly a year after they have both been arrested is not

24  relevant in this case.  What this witness now thinks about

25  Vito --

1          THE COURT:  This is what I am worried about because be

2      careful with these questions that if this goes to what is

3      relevant is this witness's possession of certain information,

4      whether or not this is true and then having this witness relate

5      that to this witness's overall impressions of Vito at the

6      relevant time period, was Vito this type of person -- there has

7      already been testimony about Vito being a bragger.  He said He

8      wasn't a bragger.  Maybe he was a bragger.  I will allow it.

9      Let's do this quickly.

10          How much longer do you have with this witness?

11          MR. CARNESI:  I think that does it.

12          MS. FLETCHER:  Your Honor, depending on how this comes

13      out, we may ask for a limiting instruction on the purpose of

14      this testimony just to make sure that they are not incorrectly

15      taking statements by the girlfriend to Mr. Avicolli for their

16      truth.

17          THE COURT:  Just as a general overall my sense is that

18      in terms of the jurors' concern about prejudice, my prediction

19      would be that in closing arguments when we get there, I get the

20      feeling that both the government and Mr. Carnesi are going to

21      be dumping very hard on Vito Gallicchio.  I am not sure why all

22      this -- the sense I get is that both of you are going to be

23      saying --

24          MS. FLETCHER:  Including closing arguments and at

25      Mr. Gallicchio's sentencing.

1          THE COURT:  -- that Mr. Gallicchio is a horrible

2    person.  I am not sure why at some level it matters whether

3    Vito duped this guy in taking some of the UPS packages in terms

4    of what this witness already admitted to doing with Mr. Vito.

5          MS. FLETCHER:  I think the reason Mr. Carnesi cares

6    about this, the reason this is different is that this is

7    evidence that Vito is dishonest.  That is why this is I think

8    quantitatively different.

9          THE COURT:  As opposed to sending people to lie about

10   medical issues, allegedly committing a robbery of a friend's

11   car.

12         MS. FLETCHER:  Again, remember this at sentencing.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  You may go ahead and ask your question,

3     counsel.

4              MR. CARNESI:  Thank you.

5     BY MR. CARNESI:

6     Q.  Did there come a time when you became aware that

7     Mr. Gallicchio was diverting drugs intended for your pharmacy

8     without even your knowledge?

9     A.  Yes, I did.

10    Q.  Do you have an understanding as to how he was doing that?

11    A.  Yes, I did.

12    Q.  Even before they were even actually arriving at your

13    pharmacy?

14    A.  Yes.  It happened once.  It happened once.

15    Q.  Do you know how much the order was?

16    A.  It could have been between 10 and 15 bottles in the box.

17    Q.  10 or 15 --

18    A.  Bottles of Oxycodone in the box.

19    Q.  In the hundred-pill bottles?

20    A.  Right.  And five were missing from that box when I received

21    the box from the UPS driver.

22    Q.  When did you realize they were missing?

23    A.  When I opened up the box.  What happened was -- do you want

24    me to explain?

25    Q.  No.  Let me try to get there.

1   A.   Okay.

2   Q.   When you opened up the box, you realized they were missing.

3           At any time, either that day or subsequent to that,

4   did Mr. Gallicchio indicate to you that he had taken those

5   pills?

6   A.   No.

7   Q.   At any time prior or subsequent to that day, did he pay you

8   as per your agreement $10 per pill for those pills?

9   A.   No.

10          MR. CARNESI:  Thank you, sir.

11          THE COURT:  Any redirect?

12          MS. FLETCHER:  Can I have just a moment, your Honor?

13          THE COURT:  Sure.

14          (Pause)

15          MS. FLETCHER:  Your Honor, just one clarifying

16   question.

17  REDIRECT EXAMINATION

18  BY MS. FLETCHER:

19  Q.   Mr. Avicolli, Mr. Carnesi asked you about the financial

20  incentives for filling the prescriptions for members of Vito's

21  crew.

22          Do you remember that?

23  A.   Yes.

24  Q.   How much money did pay your wholesaler per pill for the

25  Oxycodone that Mr. Gallicchio's patients filled with you?

1   A.   They were a dollar each.

2   Q.   You testified that you charged those patients $3 a pill; is

3   that right?

4   A.   Yes.

5   Q.   So your profit on those pills was $2 a pill?

6   A.   Yes.

7          MS. FLETCHER:  No further questions, your Honor.

8          THE COURT:  Anything else?

9   RECROSS-EXAMINATION

10  BY MS. FLETCHER:

11  Q.   That would have been your normal profit on those

12  prescriptions regardless of who was bringing them to you?

13  A.   Yes.

14         MS. FLETCHER:  Thank you.

15         THE COURT:  Thank you.  The witness is excused.

16         THE WITNESS:  Thank you, your Honor.

17         (Witness excused)

18         MR. ROOS:  Your Honor, we have a stipulation that

19  we're planning to read.  It will be short.

20         THE COURT:  Let's do that.

21         The parties have a stipulation.  A stipulation is an

22  agreement between the parties and you must accept this

23  stipulation as true.

24         MR. ROOS:  Your Honor, with your permission I will

25  read the stipulation first.

1          THE COURT:  Okay.

2          MR. ROOS:  It is hereby stipulated and agreed by and

3     among the United States of America, Geoffrey S. Berman, United

4     States Attorney for the Southern District of New York, by and

5     through assistant United States attorneys Kiersten A. Fletcher,

6     Nicholas Roos, and Justin Rodriguez, of counsel, and the

7     defendant, David Taylor, by and through his counsel, Charles

8     Carnesi, Esquire, that:

9          1.  Government Exhibit 316 is a true and accurate copy

10    of business records that were created and maintained by P.C.

11    Richard and Son and were kept in the course of a regularly

12    conducted activity of P.C. Richard and Son.

13         2.  Government Exhibit 317 is a true and accurate

14    image of a Haier gas dryer Model No. RDG350AW.

15         3.  Government Exhibit 318 is a true and accurate

16    image of a Westinghouse refrigerator Model No. WWTR1821QW.

17         The parties further stipulate and agree that this

18    stipulation, which is Government Exhibit 706, as well as

19    Government Exhibits 316, 317, 318 described in the stipulation

20    may be received into evidence as government exhibits at trial.

21         The government would now offer Exhibits 316, 317, 318,

22    and 706.

23         THE COURT:  Those are all in.

24         (Government's Exhibits 316, 317, 318, and 706 received

25    in evidence)

1          THE COURT:  Is there another stipulation?

2          MR. ROOS:  No.  If your Honor would allow me to

3    publish the exhibits to the jury.

4          THE COURT:  Sure.

5          MR. ROOS:  Ms. Corrado, can I ask we start with

6    Government Exhibit 316 on the first page so the jury can see

7    can you zoom in to the top portion.

8          If you could go to the second page and zoom in on the

9    top.

10          Can you go to the eighth page.

11          And then to the next page.

12          If you would now show for the jury Government

13    Exhibit 317.

14          And Government Exhibit 318.

15          That concludes the stipulation, your Honor.

16          THE COURT:  Let's go ahead and take our break.  Don't

17    discuss this case amongst yourselves or with anyone else.

18    Don't conduct any independent research regarding any of the

19    issues, parties, or locations in this case.

20          See you in 30 minutes.

21          (Jury excused)

22          (Continued on next page)

23

24

25

1              (In open court; jury not present)

2              THE COURT:  I will see counsel in 30.

3              How long are the next two witnesses?

4              MR. RODRIGUEZ:  Your Honor, I expect that Mr. Marino

5    who is the next witness, will be shorter than Mr. Avicolli's.

6    Probably between 30 to 40 minutes.  An hour estimate.

7              THE COURT:  See you then.

8              (Luncheon recess)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ibsntay4

| | |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | (12:30 p.m.) |
| 3 | THE COURT:  All right.  Are we ready to go? |
| 4 | MR. RODRIGUEZ:  Yes, your Honor. |
| 5 | THE COURT:  OK.  Let's bring the jury in. |
| 6 | (Jury present) |
| 7 | THE COURT:  OK.  Please be seated. |
| 8 | Welcome back.  Let's continue. |
| 9 | MR. RODRIGUEZ:  Thank you, your Honor. |
| 10 | The United States calls John Marino. |
| 11 | JOHN MARINO, |
| 12 | called as a witness by the Government, |
| 13 | having been duly sworn, testified as follows: |
| 14 | THE COURT:  Let me just see counsel in the robing room |
| 15 | briefly to discuss scheduling. |
| 16 | (In the robing room) |
| 17 | THE COURT:  We can discuss scheduling, but the other |
| 18 | thing is my deputy informed me that Juror No. 1 mentioned to |
| 19 | her that Juror No. 1 left her notepad in the jury room.  So my |
| 20 | deputy can go back in there and retrieve it and bring it to |
| 21 | her.  I wanted to let counsel to know before we did that. |
| 22 | Does counsel object to that? |
| 23 | MR. CARNESI:  No, your Honor. |
| 24 | MR. RODRIGUEZ:  No your Honor. |
| 25 | THE COURT:  I just wanted to let you now before we did |

1    that.

2           If we finish with the witness and the next witness

3    today, is it still the case that the expert cannot get here

4    until noon tomorrow?

5           MS. FLETCHER:  Yes.  Mr. Carnesi and I were speaking

6    about scheduling before the break.  I expect this witness will

7    probably take an hour.

8           THE COURT:  OK.

9           MS. FLETCHER:  Then the government intends to read a

10   pretty lengthy stipulation and publish some exhibits related to

11   that stipulation.  At that point we would start Adrian Castro,

12   the investigator.  That is the witness who is our summary

13   witness who I think, depending how we do today, we may ask to

14   stop at a certain point and then resume his testimony after

15   Dr. Gharibo's testified.  There's a bit of -- he's summarized

16   patient charts that Dr. Gharibo will not have explained yet.

17          THE COURT:  Got you.

18          MS. FLETCHER:  But the government would intend to call

19   another witness tomorrow before Dr. Gharibo.

20          THE COURT:  OK.

21          Who is this witness?

22          MS. FLETCHER:  It is Brian Dolinko.

23          THE COURT:  OK.  How long or short do you think the

24   direct would be of that witness?

25          MR. ROOS:  Probably similar to the length of the

Ibsntay4

1    gentleman who is about to testify, so under an hour.

2           THE COURT:  OK.  It may make sense to just have the

3    jury get here at 9:30 again tomorrow.  We will see where we are

4    at the end of the day today.  But this other witness that you

5    wish to call.  If you start at 9:30, if we are done with this

6    person at 11, I guess the jury will get a long break.

7           MS. FLETCHER:  Perhaps we can check in after

8    Mr. Marino and after the stipulation and see where we are.

9           THE COURT:  Sounds good.

10          MS. FLETCHER:  Thank you, Judge.

11          THE COURT:  OK.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

Ibsntay4                    Marino - Direct

1              (In open court)

2              THE COURT:  Go ahead, counsel.

3    DIRECT EXAMINATION

4    BY MR. RODRIGUEZ:

5    Q.  Good afternoon, sir.  How old are you?

6    A.  38.

7    Q.  Where do you live?

8    A.  Staten Island.

9    Q.  How long have you lived in Staten Island?

10   A.  About 20 years.

11   Q.  Sir, what do you do for a living?

12   A.  Lending officer.

13   Q.  How long have you been in that business for?

14   A.  14 years.

15   Q.  Let me direct your attention to the period from October of

16   2014 to August of 2016.  Were you going to the office of any

17   doctors during that period of time?

18   A.  Yes.  Dr. Taylor.

19   Q.  Where were Dr. Taylor's offices located?

20   A.  Castleton and Hylan Boulevard.

21   Q.  Geographically, where are those offices located?

22   A.  Staten Island.

23   Q.  What medication, if any, did Dr. Taylor prescribe you

24   during that period?

25   A.  Roxicodone, 30 milligrams, and Fentanyl patches.

1    Q.  If you know, what is the chemical that is in Roxicodone?

2    A.  Oxycodone.

3    Q.  You just testified to being prescribed Fentanyl patches.

4         Did you use the Fentanyl patches that Dr. Taylor

5    prescribed you?

6    A.  No.

7    Q.  Did you take the oxycodone that Dr. Taylor prescribed you?

8    A.  No.

9    Q.  Have you ever taken oxycodone in your life?

10   A.  No.

11   Q.  Why were you getting oxycodone from Dr. Taylor if you

12   weren't taking it?

13   A.  To sell the scripts.

14   Q.  When you say "scripts," are you referring to the

15   prescriptions?

16   A.  Yes.

17   Q.  So what did you do with the oxycodone prescriptions that

18   Dr. Taylor gave you?

19   A.  I would give the prescriptions to a person named Vito.

20   Q.  Did that change at all over time?

21   A.  Eventually I gave it to somebody else.

22   Q.  And what, if anything, did you receive in return from Vito

23   when you gave him the scripts?

24   A.  Cash.

25   Q.  You mentioned another person.

1       What, if anything, did you receive from this other

2  person when you gave him the oxycodone prescriptions?

3  A.  Cash.

4       MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

5  what is already in evidence as Government Exhibit 101A.

6  Q.  Sir, do you see a picture on your monitor in front of you?

7  A.  Yes.  Dr. Taylor.

8  Q.  You recognize the person in that photo as Dr. Taylor?

9  A.  Yes.

10      MR. RODRIGUEZ:  Thank you, Ms. Corrado.

11      You can pull that down.

12  Q.  Mr. Marino, other than selling oxycodone that you received

13  from Dr. Taylor, what, if any, other drugs have you sold in the

14  past?

15  A.  Steroids, Adderall, Viagra.

16  Q.  You mentioned steroids.  When did you sell steroids?

17  A.  In my younger 20s.

18  Q.  How often would you do that?

19  A.  It was a very minimal amount; less than 500 bucks.

20  Q.  You mentioned Adderall, what is Adderall?

21  A.  Adderall is for ADHD, attention deficit disorder.  It's,

22  you know, popular to take when people drink.

23  Q.  When did you sell Adderall?

24  A.  I sold it throughout the same time frame, but it was more

25  selling of recreational use amongst friends.

1    Q.  You also mentioned I believe a third drug that you sold.

2    A.  Viagra.

3    Q.  When did you sell that?

4    A.  Same time frames.

5    Q.  How often would you do that?

6    A.  It was same thing, just more recreation.

7    Q.  Mr. Marino, in 2017, did law enforcement contact you about

8    the prescriptions you received from Dr. Taylor?

9    A.  Yes.

10   Q.  Did you provide law enforcement information in response?

11   A.  Yes.

12   Q.  Why did you do that, sir?

13   A.  I felt it was the right thing to do.

14   Q.  After providing that information to law enforcement, did

15   you begin meeting with prosecutors in this case?

16   A.  Yes.

17   Q.  Have you attended meetings at the U.S. Attorney's Office?

18   A.  Yes.

19   Q.  After those meetings, did there come a time when you

20   entered into an agreement with the government?

21   A.  Yes.

22   Q.  Sir, what is your understanding of what your obligations

23   are under this agreement with the government?

24   A.  To testify truthfully, with no direction left or right, and

25   to not sell any of the oxycodone again.

Ibsntay4                    Marino - Direct

1    Q.  Sir, were you charged and arrested with a crime in this

2    case?

3    A.  No.

4    Q.  If you comply with your obligations under your agreement

5    with the government, what is your understanding of what you

6    receive in return from the government?

7    A.  As long as I testify truthfully, I would not be prosecuted.

8    Q.  What is your understanding of which crimes you would not be

9    prosecuted for?

10   A.  Any of the crimes mentioned before.

11   Q.  When you say any of the crimes mentioned before, can you be

12   a little bit more specific?

13   A.  The steroids, the Viagra, Adderall, the oxycodone, and the

14   health care insurance fraud.

15   Q.  You mentioned health care insurance fraud?

16   A.  Yes.

17   Q.  What is your understanding of why you wouldn't be

18   prosecuted for that crime?

19   A.  I was using my health care insurance to eventually get the

20   oxycodone scripts.

21   Q.  Do you know whether the outcome of this trial has any

22   bearing on whether you can be prosecuted for those crimes?

23   A.  The outcome of this trial would not have any bearing on

24   whether or not I would be prosecuted.

25   Q.  What is your understanding of what can happen to you if you

1   don't tell the truth here today?

2   A.  I would then be prosecuted if I didn't tell the truth and

3   for any of the aforementioned crimes.

4   Q.  Sir, let me direct your attention to November of 2013.

5           Did you have surgery around that time?

6   A.  I had left knee surgery.

7   Q.  Why did you have that surgery?

8   A.  I have patellar tendonitis in my left knee, which gets

9   inflamminated after sports, and I had extra bone chips that

10  needed to come out because it was making it painful.

11  Q.  Did you have knee pain after you had that surgery?

12  A.  For a couple of weeks.

13  Q.  What medication, if any, did you take while you were in

14  pain after that knee surgery?

15  A.  I believe it was hydrocodone.

16  Q.  Just to be clear, about how long did you take hydrocodone

17  after that surgery?

18  A.  Maybe a week, week and a half.

19  Q.  Did you receive a prescription from a doctor for that

20  medicine?

21  A.  Yes.

22  Q.  Have you taken a hydrocodone since a few weeks after your

23  knee surgery in November of 2013?

24  A.  No.

25  Q.  Mr. Marino, how, if at all, did your financial situation

Ibsntay4                    Marino - Direct

1    change in 2014?

2    A.   I became unemployed and my girlfriend became pregnant.

3    Q.   Who, if anyone, were you living with in the fall of 2014?

4    A.   My roommate, Don Michael Carim, and his girlfriend, Tricia.

5    Q.   Where were the three of you living?

6    A.   263 Sheridan Avenue.

7    Q.   Where is that located?

8    A.   Staten Island.

9    Q.   Sir, how did you know, if at all, Don Michael Carim before

10   you started living with him?

11   A.   We had mutual friends.  We had known each other for almost

12   20 years.

13            MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

14   Government Exhibit 104A which is already in evidence.

15   Q.   Sir, do you recognize this person?

16   A.   Yes.  That's Don Michael Carim.

17            (Pause)

18            JUROR:  I think I'm good, sorry.

19            THE COURT:  Do you want to take a break for a second?

20   Do you want to take a little break?

21            JUROR:  Yes.

22            THE COURT:  OK.  Let's take a five-minute recess.

23   Don't discuss this case amongst yourselves and don't discuss it

24   with anyone else.  Don't do any independent research regarding

25   the issues or the parties in this case or the locations.  I'll

Ibsntay4                    Marino - Direct

1    see you in seven minutes.  OK?

2              JUROR:  Thank you.

3         (Continued on next page)

1          (Jury not present)

2          THE COURT:  OK.  We will resume again soon.

3          Just so the record is clear, Juror No. 3 started

4     coughing quite a bit and started removing her coat and fanning

5     herself with her hands.  I gave her some Kleenex.  I asked if

6     she wanted to take a break.  She nodded yes.  We took a little

7     break so she could get some water, and we'll start again.

8          Anything else counsel want to put on the record?

9          MR. RODRIGUEZ:  No, your Honor.

10          MR. CARNESI:  No, Judge.

11          THE COURT:  OK.  See you soon.

12          (Recess)

13          THE COURT:  Are they ready, Tara?

14          THE DEPUTY CLERK:  Yes, Judge, we are ready.

15          THE COURT:  OK.  Let's bring the jury back in.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  OK.  Please be seated.

3           Welcome back.  Let's continue.

4   BY MR. RODRIGUEZ:

5   Q.  Mr. Marino, before the break, we were discussing Government

6   Exhibit 104A, which should be up on your screen.  Do you

7   recognize this person?

8   A.  That's Don Michael Carim, my former roommate.

9           MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

10  just for the witness Government Exhibit 110A.

11          THE WITNESS:  That's me.

12  Q.  Hold on one second.  Sir, do you recognize what's depicted

13  in Government Exhibit 110A?

14  A.  Yeah, a photo of me.

15          MR. RODRIGUEZ:  Your Honor, the government offers

16  Government Exhibit 110A and the corresponding nameplate, 110B.

17          MR. CARNESI:  No objection.

18          THE COURT:  It's in.

19          MR. RODRIGUEZ:  Thank you.

20          (Government Exhibits 110A and 110B received in

21  evidence)

22  Q.  Ms. Corrado --

23          THE COURT:  Hold on a second.

24          A little delay.  OK.

25          MR. RODRIGUEZ:  Thank you.

1              Ms. Corrado, can you please pull up what is already in

2       evidence as Government Exhibit 105A.

3       Q.  Sir, do you recognize what's depicted in Government Exhibit

4       105A?

5       A.  I am unfamiliar with that person.

6              MR. RODRIGUEZ:  Thank you.

7              Ms. Corrado, can you please pull that down and pull up

8       Government Exhibit 112A, which is already in evidence.

9              Excuse me one moment, your Honor.

10      Q.  Sir, drawing your attention to Government Exhibit 112A, do

11      you recognize what is depicted in that exhibit?

12      A.  I don't know that person either.

13             MR. RODRIGUEZ:  Thank you.

14             Ms. Corrado, you can pull that down.

15             Ms. Corrado, can you please pull up Government Exhibit

16      102A, which is already in evidence.

17      Q.  Sir, do you recognize the person depicted there?

18      A.  That would be Vito.

19      Q.  How do you know Vito?

20      A.  I met Vito through my roommate, Carim.

21      Q.  Where are some of the places that you would see Vito, if

22      any?

23      A.  His niece was my roommate's girlfriend, so he was at the

24      house.  I felt like he was at the house probably like once a

25      week.

1  Q.  When you say the house, are you referring to where you

2  lived with Don Michael Carim?

3  A.  Yes.

4  Q.  Around the fall of 2014, what, if anything, did you discuss

5  with Vito regarding oxycodone?

6  A.  That he had a doctor that would write me a script.

7  Q.  Did he say which doctor that was?

8  A.  Yes, Dr. Taylor.

9  Q.  You said he would write you a script.  Did Vito specify

10  what the script would be for?

11  A.  The Roxicodone, 30 milligrams.

12  Q.  Did Vito tell you why he would write you the script?

13  A.  He didn't say why he would write the script.  He just -- it

14  was really just what we were going to do with the script after.

15  Q.  What were you going to do with the script after, according

16  to Vito?

17  A.  I would give him the script, or I would fill the bottle and

18  give him the bottle, and then he would give me cash.

19  Q.  I just want to be clear.  Who's the "he" you're referring

20  to when you say "he would give me cash"?

21  A.  Vito.

22  Q.  What, if anything, did Vito say to you about why you would

23  go to Dr. Taylor for these prescriptions as opposed to some

24  other doctor?

25  A.  It was a generally tough script to get written from a lot

1  of doctors.  So he said that he had a doctor that would write

2  it.

3  Q.  Did Vito discuss with you the possibility of obtaining

4  oxycodone prescriptions from any other doctor besides

5  Dr. Taylor?

6  A.  No.

7  Q.  What did Vito say, if anything, about how he knew

8  Dr. Taylor?

9  A.  He mentioned something in regards to either paying his rent

10  or helping him open up an office.

11  Q.  The "him" you're referring to is who?

12  A.  Vito mentioned that he either paid rent or helped pay rent

13  or helped open up an office for Dr. Taylor.

14  Q.  Did you speak to Vito around this time, the fall of 2014,

15  about the knee surgery you had the previous year?

16  A.  Yes.  He used to smoke a lot of cigars, and I'm a pretty

17  clean person.  He used to just leave the cigar butts in the

18  driveway, so I brought up that I had knee surgery, you know, I

19  was joking around, saying that I had to keep cleaning up after

20  him.

21  Q.  What, in anything, did Vito say after you told him that you

22  had this knee surgery?

23  A.  He said it should be an automatic win to get a script.

24  Q.  What was your understanding of what he was referring to

25  when he told you it should be an automatic win to get a script?

1   A.  In other words, my knee surgery should have been enough to

2   have Dr. Taylor write me a script for oxycodone.

3   Q.  At this time, the fall of 2014, did you have pain in your

4   knees?

5   A.  No.  I was actively playing sports.

6   Q.  What kinds of sports were you playing around this time?

7   A.  Football for the 9/11 league, basketball weekly, mixed

8   martial arts, and I was in the gym about five days a week.

9   Q.  Were you seeing a doctor for your knees at this time, the

10  fall of 2014?

11  A.  No.

12  Q.  Were you taking any medication for your knees around this

13  time?

14  A.  No.

15  Q.  Were you having any trouble walking?

16  A.  No.

17  Q.  What did Vito say, if anything, about how much you would be

18  paid for getting oxycodone prescriptions from Dr. Taylor?

19  A.  You wouldn't get paid on the first half of the script.  For

20  the remaining pills it would be $10 a pill.

21  Q.  What, if anything, did Vito say about how much it would

22  cost if you, John Marino, couldn't fill the script?

23  A.  Vito said that he had a pharmacist that would fill the

24  script, the pharmacist didn't take insurance, and the

25  pharmacist charges $3 a pill.  So that would be deducted off of

1    whatever you would get on your portion of what you were

2    initially going to get paid.

3    Q.  This pharmacist that Vito was referring to, what, if

4    anything, did Vito say about where this pharmacist operated?

5    A.  Staten Island, I believe Victory Boulevard.

6    Q.  And what, if anything, did Vito say about why he would go

7    to this pharmacist as opposed to any other pharmacist?

8    A.  He went to that pharmacist because he said, quote-unquote,

9    that was his guy.  It was very difficult to get a lot of

10   pharmacies to write an oxycodone script, and I had a tough time

11   getting the script filled in general because it's a tough

12   script to fill.  Dr. Taylor's office was actually banned from

13   the Walgreens pharmacies in general, so it was a very difficult

14   script to fill in general.

15   Q.  You mentioned being paid a certain amount of money based on

16   the number of pills that you would provide.  So let's take an

17   example for the jury.

18           As the terms were with Vito, how much would you be

19   paid if you provided 120 pills to Vito?  And if you can

20   describe for the jury how that number is arrived at.

21   A.  So 120 pills, you don't get paid on the first 60 pills at

22   all.  You get paid on the remainder of the 60 pills, $10 a

23   pill, which would be $600.  If you can't fill the script, then

24   it's $3 a pill for all 120 pills, which is $360 off of the

25   $600, which would be $240 cash for a 120-pill script.

Ibsntay4                    Marino - Direct

1   Q.  After you had these conversations with Vito about

2   Dr. Taylor, did you ultimately try and make an appointment with

3   Dr. Taylor?

4   A.  Yes.

5   Q.  Were you successful in getting an appointment with

6   Dr. Taylor?

7   A.  I called Dr. Taylor's office to schedule an appointment in

8   October of 2014.  The initial response was that they were not

9   taking new patients.

10          I called Vito and explained to him that I couldn't get

11  into the office, they said they weren't taking any new

12  patients.  He told me to call back and say that I was Vito's

13  guy.  I called back.  After I said that I was Vito's guy to the

14  front desk person, they then gave me an appointment.

15  Q.  How long after that conversation did you ultimately have

16  your first appointment, approximately?

17  A.  Probably within a couple of weeks.

18  Q.  What are some of the things, if anything, that Vito told

19  you to bring with you to your first appointment with

20  Dr. Taylor?

21  A.  Medical records and a bottle of alcohol.

22  Q.  Did you, in fact, bring medical records to your first

23  appointment with Dr. Taylor?

24  A.  Yes.

25  Q.  What, if anything, did Vito say about why you should bring

1   medical records to your first appointment with Dr. Taylor?

2   A.   That I would still have to show him, you know, the doctor

3   would still need a reason to write the script.

4   Q.   What are some of the kinds of medical records that you

5   brought to that first appointment?

6   A.   I had some MRIs done in the prior, within the last maybe 18

7   months, and a couple of ultrasounds.

8   Q.   You mentioned having an MRI done and some ultrasounds.  Did

9   you actually bring Dr. Taylor records with respect to those

10  screenings?

11  A.   Yes.

12          MR. RODRIGUEZ:  Your Honor, at this point the parties

13  have a stipulation with respect to certain records.  If I may

14  be permitted to read just a portion of it and move to admit the

15  records referred to in that portion.

16          THE COURT:  OK.

17          MR. RODRIGUEZ:  The parties have a stipulation, which

18  is Government Exhibit 703, and under paragraph 12 of that

19  stipulation the parties have stipulated that Government

20  Exhibits 406 to 420 are true and accurate copies of patient

21  files that were seized from David Taylor's medical office at

22  4350 Hylan Boulevard, Staten Island, New York, on June 22,

23  2017.

24          The parties stipulate and agree that this stipulation,

25  which is Government Exhibit 703, as well as at this point

Ibsntay4                    Marino - Direct

1    Government Exhibits 406 to 420 are admissible as government

2    exhibits at trial.

3             So the government would move to offer Government

4    Exhibit 703 and Government Exhibits 406 to 420.

5             THE COURT:  OK.  They're in.

6             (Government Exhibits 406 through 420 received in

7    evidence)

8             (Government Exhibit 703 received in evidence)

9             MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

10   the first page of Government Exhibit 417, which is now in

11   evidence.

12   BY MR. RODRIGUEZ:

13   Q.   Can you please zoom in on the top portion of that page.

14            Sir, what is the patient name listed on this document?

15   A.   Myself, John Marino.

16   Q.   Do you know what screening, if any, this document refers

17   to?

18   A.   This was before my left knee surgery.

19   Q.   What is the date of service listed on this document?

20   A.   April 4, 2013.

21   Q.   Approximately on how long before your first appointment

22   with David Taylor did this screening take place?

23   A.   About a year and a half.

24   Q.   What kind of screening does this document refer to?

25   A.   This is just a screening for my left knee before I got my

1    knee surgery.

2    Q.  Why at this time, in April of 2013, did you have that test

3    done?

4    A.  There was a swelling in my left knee, particularly after

5    sports.  I just wanted to get it checked out and see what could

6    be done.

7    Q.  Around that time, in April 2013, were you taking any

8    medication for your knee?

9    A.  No.

10            MR. RODRIGUEZ:  Ms. Corrado, you can pull that down.

11            Please pull up page 52 of Government Exhibit 417,

12   which is already in evidence.  Can you please zoom in on the

13   top portion of the document.

14   Q.  Sir, do you know what this document relates to?

15   A.  This is an MRI on a minor herniated disk I have in the

16   middle of my back from October 1, 2013.

17   Q.  Approximately how long before your first visit with

18   Dr. Taylor was this?

19   A.  A year.

20   Q.  Sir, why did you have this MRI of your spine done at this

21   time?

22   A.  I used to have some back pain in the middle of my back, so

23   I was trying to find out what the cause was.  It actually just

24   turned out that I was just -- initially it stemmed from, from a

25   snowboarding injury, and then I found out that it was

Ibsntay4                    Marino - Direct

1   reaggravated whenever I would lift very heavy with

2   weightlifting.

3   Q.  Were you taking any medication around this time, October of

4   2013, for your back?

5   A.  No.

6       MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

7   page 34 of Government Exhibit 417.

8   Q.  Sir, do you know what this document relates to?

9   A.  This document for December of 2013 and November of 2013, it

10  looks like, that was some pain that I had in the inside of my

11  elbows.  I was just checking to see if I had tennis elbow and

12  found out a little bit later on that it was, you know, more

13  conducive in regards to weightlifting again kind of heavy.

14  Q.  Were you taking any medication around this time, November

15  of 2013, for your elbows?

16  A.  No.

17      MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

18  Government Exhibit 417, page 18, which is already in evidence.

19  If you can please zoom in on the top portion of the document.

20  Q.  Sir, do you know what this document relates to?

21  A.  This document was an MRI done in 2013, and I had a slight

22  tear in my right shoulder which was affecting my weightlifting

23  ability, and that's all, just the right shoulder.

24  Q.  Around this time, December 2013, were you taking any

25  medication for your shoulder?

1    A.  No.

2    Q.  Let me fast forward to the time of your first appointment

3    with Dr. Taylor in October of 2014.  Were you taking any

4    medication before that first appointment for your knees?

5    A.  No.

6    Q.  Anything for your back?

7    A.  No.

8    Q.  Anything for your elbows?

9    A.  No.

10   Q.  Anything for your shoulders?

11   A.  No.

12   Q.  Were you taking any pain medication at all right before

13   that first visit with Dr. Taylor?

14   A.  No.

15   Q.  Right before that first visit, were you experiencing any

16   pain in your knees?

17   A.  No.

18   Q.  Your back?

19   A.  No.

20   Q.  Your elbows?

21   A.  No.

22   Q.  Your shoulders?

23   A.  No.

24   Q.  Before that first visit with Dr. Taylor, what, if anything,

25   did Vito tell you to expect with respect to drug testing and

1    Dr. Taylor?

2    A.  He said that you can always just take an oxycodone the day

3    before.  I told him I was not going to do that, though.  I

4    didn't want it in my system.  So then he crushed up an oxy.  He

5    folded it up into a dollar bill and said just pour it into the

6    urine if you had to take a urine test.

7    Q.  Did you, in fact, take a urine test during your first visit

8    with Dr. Taylor?

9    A.  Yes.

10   Q.  Did you put the crushed-up oxycodone in your urine sample

11   during that first visit?

12   A.  No.

13   Q.  Sir, approximately how long did your first visit with

14   Dr. Taylor last?

15   A.  It was pretty quick.  I would say maybe, maybe ten minutes.

16   It wasn't very long.

17   Q.  During that first visit with Dr. Taylor, did you say

18   anything to him about Vito?

19   A.  I made it a point to let him know that I knew Vito, just

20   briefly.

21   Q.  Do you recall what you said about Vito?

22   A.  I said that Vito recommended me.

23   Q.  How, if at all, did Dr. Taylor react when you said that

24   about Vito?

25   A.  He didn't seem to have a reaction.

1    Q.  Sir, why did you say that about Vito to Dr. Taylor during

2    your first visit with him?

3    A.  I was under the impression that if I did, I would be more

4    likely to be written that oxycodone script.

5    Q.  Why were you under that impression that by saying what you

6    said about Vito you would be more likely to get oxycodone from

7    Dr. Taylor?

8    A.  Because Vito said that Dr. Taylor was his guy that would

9    write it.

10   Q.  During that first visit with Dr. Taylor, what were some of

11   the things that Dr. Taylor asked you?

12   A.  He asked me what was bothering me.

13   Q.  What did you say in response?

14   A.  I went over this chart that we all just went over very

15   briefly as to -- I cited those as some of the problems.

16   Q.  You testified earlier that you weren't experiencing pain in

17   certain parts of your body.

18   A.  Correct.

19   Q.  Why did you tell Dr. Taylor that you were having some

20   problems?

21   A.  Vito told me that I still would have to at least bring up

22   the problems because he said that the doctor would have to at

23   least cover himself to be able to write the script and he would

24   have to have a reason to write it.  I couldn't just go in there

25   and say everything was fine, because then he wouldn't write it.

Ibsntay4                    Marino - Direct

1    Q.  What kind of physical examination, if any, did Dr. Taylor

2    perform during your first visit?

3    A.  I don't recall any.

4    Q.  Did Dr. Taylor touch any part of your body that you claim

5    to have issues with during that first visit?

6    A.  No.

7    Q.  During that first visit, did Dr. Taylor ask you to bend

8    your elbow?

9    A.  No.

10   Q.  Did he ask you to rotate your arm?

11   A.  No.

12   Q.  Did he ask you to bend your knees?

13   A.  No.

14   Q.  Did he ask you to bend at the waist?

15   A.  No.

16   Q.  Did he ask you to do any kind of a physical demonstration?

17   A.  I don't recall any demonstrations ever being necessary.

18          MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

19   Government Exhibit, page 16 of Government Exhibit 417, which is

20   already in evidence.  Zoom into the top portion.

21   Q.  Sir, what medications, if any, did you tell Dr. Taylor you

22   were taking prior to your first appointment with him?

23   A.  I told him that I was taking oxycodone off the street.

24   Q.  What did you mean by "off the street"?

25   A.  That I was buying it illegally.

1    Q.  How, if at all, did Dr. Taylor react to you saying that you

2    were buying oxycodone illegally off the street?

3    A.  He didn't.

4            MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

5    Government Exhibit 417, page 17, which is already in evidence.

6    Can you please zoom in on the lower portion of the document,

7    where it says "remarks."

8    Q.  The document says, "Ambulating well, slight limp."

9            Mr. Marino, at the time of your first visit with

10   Dr. Taylor, were you walking with a slight limp?

11   A.  No.

12           MR. RODRIGUEZ:  Thank you.  Ms. Corrado, you can take

13   that down.

14   Q.  Mr. Marino, during that first visit with Dr. Taylor, what,

15   if any, medication did he prescribe you?

16   A.  He gave me a ten-day supply of oxycodone.

17   Q.  Did he give you anything else?

18   A.  I believe he also gave me Fentanyl patches.

19   Q.  Why did Dr. Taylor prescribe you a ten-day supply of

20   oxycodone during your first visit?

21   A.  I was under the impression they were waiting for the urine

22   test to come back to see if I had actually been taking

23   oxycodone.

24           MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

25   page 44 of Government Exhibit 417, which is already in

1    evidence.  Zoom in on the top portion of the document.

2    Q.  Sir, do you recognize what's depicted in Government Exhibit

3    417, page 44.

4    A.  This is a script from Dr. Taylor to myself on my first

5    visit, October of 2014, for a ten-day supply of oxycodone and

6    Fentanyl patches.

7    Q.  How many pills were in the 10-take supply of Roxicodone?

8    A.  40 pills, 4 pills a day.

9    Q.  Just to be clear, did you see Dr. Taylor writing these

10   prescriptions?

11   A.  Yeah.

12   Q.  Mr. Marino, did ask you Dr. Taylor to prescribe you

13   oxycodone?

14   A.  Yes.

15   Q.  Whose idea was it for you to receive 30-milligram oxycodone

16   pills?

17   A.  Vito.  He said that's where the -- that those were the ones

18   you can get paid for.  The lesser pills, the lesser milligram

19   pills don't have the same value on the street.

20   Q.  Did you ask Dr. Taylor to prescribe you Fentanyl patches?

21   A.  No.

22   Q.  What, if anything, did Dr. Taylor say to you about why he

23   was prescribing you Fentanyl patches?

24   A.  Something to do with either the insurance companies or the

25   pharmacies like to see an alternative to the oxycodone scripts.

1   Q.  What, if anything, did Dr. Taylor say to you about how you

2   should use these Fentanyl patches?

3   A.  I do not recall having a conversation about the usage of

4   Fentanyl patches ever.

5           MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

6   page 45 of Government Exhibit 417.

7   Q.  Sir, drawing your attention to the bottom portion of the

8   document, the signature line, do you recognize that signature?

9   A.  That's my signature.

10          MR. RODRIGUEZ:  And Ms. Corrado, can you please zoom

11  in under the header of the page, which says, "Dr. Taylor's

12  Rules and Policies for Patients on Pain Medication."

13          I'm actually going to ask you to please first zoom out

14  and then zoom in on No. 7.

15          No. 7 says:  "You will receive a prescription for a

16  ten-day supply today.  Once the urine test results are

17  reviewed, you will receive your 30-day supply."

18  Q.  Mr. Marino, did you take a urine test on your first day,

19  first visit to Dr. Taylor?

20  A.  Yes.

21          MR. RODRIGUEZ:  Ms. Corrado, can you please zoom in on

22  rule No. 12.

23          Rule No. 12 says, "All new pain patients are required

24  to be seen by a chiropractor, Dr. Germino, for an initial visit

25  prior to your next visit with our office.  If you wish to

1  continue with Dr. Germino, feel free to do so."

2  Q.  Mr. Marino, what, if anything, did Dr. Taylor say to you

3  about seeing a chiropractor?

4  A.  I never even heard this guy's name, and I was -- I hadn't

5  even -- at no point did a chiropractor ever make its way into

6  the conversation from what I remember.

7  Q.  Into your conversations with --

8  A.  Dr. Taylor.

9  Q.  -- Dr. Taylor?

10         MR. RODRIGUEZ:  Thank you, Ms. Corrado.

11         You can take that down.

12 Q.  Mr. Marino how did you pay for that first appointment with

13 Dr. Taylor?

14 A.  $50 cash.

15 Q.  Approximately how long after that first appointment with

16 Dr. Taylor did you go back to him, if at all, for another

17 appointment?

18 A.  Ten days later.

19         MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

20 page 36 of Government Exhibit 417.  Please zoom in to the top

21 portion of the document.

22         Above the zoom, there's a heading that says, "Ameritox

23 Medication Monitoring Solutions.  Date collected, 10/28/2014."

24 Q.  Mr. Marino, was 10/28/2014 the date of your first

25 appointment with Dr. Taylor?

Ibsntay4                    Marino – Direct

1    A.  I believe so, yes.

2             MR. RODRIGUEZ:  It also says, "Date Reported,

3    11/5/2014."

4             Ms. Corrado, I'm going to ask you to zoom out and

5    please zoom in on paragraph 3, please.

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ibsntay4                    Marino - Direct

BY MR. RODRIGUEZ:

Q.  Which says medication prescribed for Oxycodone.  Test
result:  Negative.

         Mr. Marino, during that second visit with Dr. Taylor,
did you discuss with him the results of your urine tests from
your first visit?

A.  No.

Q.  Did Dr. Taylor ever mention the results of that urine test
from your first visit?

A.  Not that I recall.

Q.  Did Dr. Taylor bring up after that first visit what you
told him about taking street Oxy?

A.  Not that I remember.

Q.  After your first visit with Dr. Taylor, did he continue
prescribing Oxycodone?

A.  Yes.

Q.  Was there ever a time when you went to Dr. Taylor's office
in which he refused to prescribe you Oxycodone?

A.  No.

         MR. RODRIGUEZ:  Ms. Corrado, can you please pull up
page 26 of Government Exhibit 417 and zoom in.

Q.  Sir, do you recognize what is depicted here?

A.  It's a script from Dr. Taylor to myself for a 120-day
supply -- a 120-pill supply for a one-month supply, four pills
a day.

1    Q.  Supply of what?

2    A.  Oxycodone.  This was November -- 10 days after my initial

3    visit 2014.

4    Q.  The date on the prescription is when?

5    A.  November 8, 2014.

6    Q.  Who wrote this prescription?

7    A.  Dr. Taylor.

8    Q.  Did you see him write it?

9    A.  Yes.

10         MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

11   page 25 of Government Exhibit 417.

12   Q.  Zooming in on the top portion, Mr. Marino, do you recognize

13   what is depicted here and if so what is it?

14   A.  Another script from Dr. Taylor to myself in December of

15   2014 for Fentanyl patches and Oxycodone 120 pills, four-day

16   supply for a one-month supply.

17         MR. RODRIGUEZ:  Ms. Corrado, you can take that down.

18   Q.  Sir, can you describe for the jury what a typical visit

19   with Dr. Taylor was like after that first visit?

20   A.  It was very brief.  Just sometimes just -- I felt like once

21   we were in the office, maybe five minutes.  Something.

22   Q.  During those visits did he ever ask you whether you were in

23   pain?

24   A.  Not that I recall.

25   Q.  Do you recall any of the things, if anything, that he would

1    ask you during those visits after your first visit?

2    A.   He would say sometimes how is the shoulder or how is the

3    arm.

4    Q.   What would you say in response?

5    A.   I would say it's good.

6    Q.   During the visits after that first visit, what kind of

7    physical examination, if any, did Dr. Taylor perform?

8    A.   None.

9    Q.   During visits after that first visit, do you recall his

10   ever laying his hands on you to try to examine you?

11   A.   No.

12   Q.   Did there ever come a time during any time you went to see

13   Dr. Taylor when he would ask you whether the pain or what was

14   bothering you was getting any better?

15   A.   No.

16   Q.   Did he ever discuss with you the possibility of reducing

17   the amount of medication he was prescribing you?

18   A.   No.

19   Q.   Did Dr. Taylor ever you ask you to get any updated medical

20   screenings?

21   A.   No.

22   Q.   Like an MRI?

23   A.   No.

24   Q.   At any point did Dr. Taylor ever discuss with you

25   alternatives to Oxycodone?

1   A.   No.

2   Q.   Did he ever discuss with you the possibility of going to

3   physical therapy?

4   A.   No.

5   Q.   How did you pay for appointments after that first

6   appointment with Dr. Taylor?

7   A.   I don't remember if insurance ever picked up any of the

8   bills eventually.  I just remember a bunch of the visits were

9   $50 a visit.

10  Q.   Now, when you first started going to Dr. Taylor, what did

11  you do with the prescriptions you received from him?

12  A.   I would bring them home.  I would put them under my napkin

13  holder.  My front door as always unlocked.  And either Vito

14  or -- either Vito would pick them up Carim would pick up the

15  scripts.  I would give it to Vito and then I would get paid a

16  few days later.

17  Q.   How would you be paid?

18  A.   They would just leave the money underneath my pillow.

19  Q.   You testified earlier about how Vito would pay you if he

20  had to fill the scripts himself.

21  A.   Yes.

22  Q.   Why didn't you fill the Oxycodone prescriptions you

23  received from Dr. Taylor initially?

24  A.   My main pharmacy is Wallgreens and Wallgreens would not

25  write any scripts no matter what the script was from Dr.

1    Taylor's office.  Apparently he was on the ban list.

2    Q.  Were you finished?

3    A.  So then I went to other pharmacies and a lot of pharmacies

4    said they didn't have it so I had to use Vito.

5    Q.  Did you discuss getting Oxycodone prescriptions from Vito

6    with your roommate Don Michael Carim?

7    A.  Yes.

8    Q.  During those conversations, what arrangements, if any, did

9    you become aware of between Don Michael Carim and Vito with

10   regard to Oxycodone?

11   A.  I was under the impression that they were doing the same

12   thing.

13   Q.  You were under the impression or did he tell you that, Don

14   Michael Carim.

15   A.  No, they were doing the same thing.  I didn't know about

16   the pay structure.  But, yeah, they were doing the same thing.

17   They were selling the scripts.

18   Q.  I want to be clear for the jury.  What do you mean when you

19   say they were doing the same thing?

20   A.  They were also getting Oxycodone scripts from Dr. Taylor's

21   office and selling them.

22   Q.  Did there come a time when you asked Dr. Taylor for more

23   than 120 Oxycodone pills at a time?

24   A.  About three, maybe four months after my initial visit, I

25   said that the pain medication was wearing off a little bit

Ibs6tay5                     Marino - direct

 1   quick and if he can increase my dosage, and he did to 150 pills

 2   a month.

 3   Q.  Why did you say that to Dr. Taylor?

 4   A.  So he would write me a bigger script.

 5   Q.  Why did you want a bigger script?

 6   A.  It was more money.

 7   Q.  What, if anything, did Dr. Taylor say in response to your

 8   request for more Oxycodone pills?

 9   A.  Nothing.  He wrote the extra 30 bills of script.

10   Q.  Did he ask you any questions about your pain in response to

11   your request?

12   A.  I don't recall any questions.

13         MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

14   page 24 of Government Exhibit 417, asking you to zoom into just

15   the top portion.

16         That is a document with a header that is in evidence

17   as Confidential Drug Utilization Report, John Marino.  Search

18   date, 2-21-2015.  The drug utilization report below displays

19   all of the controlled substances, if any, that your patient has

20   filled in the last six months.  The information displayed on

21   this report is compiled from pharmacy submissions to the

22   department and accurately reflects the information as submitted

23   by the pharmacies.

24         This report was requested by David Taylor, and then

25   there is a reference number.

1            Ms. Corrado, can you zoom out and zoom into the bottom

2    portion where it says Other's Prescriptions.

3    Q.  Mr. Marino, do you see on this portion of the document

4    there is a reference to two other drugs?

5    A.  Yes.

6    Q.  What are those drugs?

7    A.  One of them is a sleeping pill and the other one is

8    Adderall.

9    Q.  Which one is the sleeping pill?

10   A.  Zolipidem.

11   Q.  Are you familiar with what brand name, if any, that pill is

12   sold under?

13   A.  I forget the name.

14   Q.  Were you in fact taking that drug at the time, which is

15   January of 2015?

16   A.  Yeah.  I wouldn't take them all the time.  I only needed --

17   one script of that would probably be good for about six months

18   or more.

19   Q.  Did you ever have a conversation with Dr. Taylor about

20   taking that pill and Oxycodone at the same time?

21   A.  No.

22   Q.  There is a second drug listed there.

23            What is the drug listed on the payment?

24   A.  Amphetamine.  That is Adderall.

25   Q.  Did you ever have a conversation with Dr. Taylor about

1  taking Adderall and Oxycodone at the same time?

2  A.  No.

3          MR. RODRIGUEZ:  Ms. Corrado, if you can zoom back out.

4  The search date up top is 2-21-2015.

5  Q.  Mr. Marino, after that date, February 21st, 2015, did Dr.

6  Taylor continue prescribing you Oxycodone?

7  A.  Yes.

8          MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

9  page 32 of Government Exhibit 417.

10  Q.  Sir, do you recognize what is depicted here and if so what

11  is it?

12  A.  This is a March of 2015 script -- two scripts from Dr.

13  Taylor to myself for Oxycodone 30 milligrams and the Fentanyl

14  patches.

15  Q.  After your prescription was increased from 120 pills to 150

16  pills, did you continue providing those prescriptions to Vito?

17  A.  Yes.

18  Q.  Did there come a time when that changed?

19  A.  Yes.

20  Q.  When was that?

21  A.  It would have been when I moved out of 263 Sheridan.

22  Probably about a year later.  I found somebody else that was

23  just paying -- going to pay a lot more money for these types of

24  scripts.

25  Q.  You testified that it was when you moved out of a

1   particular address where you were living?

2   A.  Yes.

3   Q.  After you moved out of that address, were you still living

4   with Don Michael Carim?

5   A.  No.

6   Q.  Sir, why did you stop giving your prescriptions to Vito?

7   A.  Personally I was getting ripped off for the street value of

8   what these scripts were.

9   Q.  Who did you sell these pills to that you weren't selling to

10  Vito?

11  A.  Another person named Joseph Chee.

12  Q.  Approximately how much money did you make when you sold

13  these pills to this other person?

14  A.  Between 1800 to 2,000 a script.

15  Q.  Did you ever discuss with Vito the fact that you were no

16  longer giving him your Oxycodone prescriptions?

17  A.  No.  Once I moved, I knew I wasn't going to see him

18  anymore.

19  Q.  Did you ever discuss with Dr. Taylor the fact that you

20  stopped giving your prescriptions to Vito?

21  A.  No.  We never had a conversation like that.

22  Q.  What did you do with the prescriptions for Oxycodone after

23  you stopped giving them?  How were they filled?

24  A.  I found out that I could use my CVS Caremark card and I was

25  able to mail in the script and get the bottle in the mail.

1   Q.  How long were you getting Oxycodone prescriptions from Dr.

2   Taylor that you were not giving to Vito?

3   A.  I would say at least probably eight months.

4   Q.  Did there come a time when you stopped going to visit Dr.

5   Taylor altogether?

6   A.  Yes.

7   Q.  Why was that?

8   A.  I didn't need the money anymore.  So I -- once I started

9   getting back on my feet after baby bills and unemployment and I

10  got a -- my commissions started rolling in on my new job, I

11  didn't need the money anymore.  I eventually went back because

12  I owed a cousin some good amount of money from when I was

13  unemployed.  I had to pay him back because he was going through

14  a divorce so I started selling the scripts again.

15  Q.  You mentioned taking some time and then going back to Dr.

16  Taylor?

17  A.  Yes.

18  Q.  Did there come a time when you stopped going to see Dr.

19  Taylor altogether?

20  A.  At the very end I stopped seeing Dr. Taylor.  I -- I got --

21  I had to take a drug test, which I found was odd because there

22  was a person in the visit before that I recognized from the gym

23  and I knew that he had to be obviously with Vito and them only

24  because the guy is like a power lifter and you are not going to

25  power lift 400-pound bench press with Oxycodone in your system.

1    The guy kept looking at me and so we guess both most of known

2    that we were probably initially there from Vito.  And the next

3    time I went to the doctor's office, I got drug tested and I

4    peed clean and so then I was told not to come back.

5    Q.  Sir, to be clear this person that you saw at Dr. Taylor's

6    office, that took place after you stopped selling your

7    prescriptions to Vito and after this person saw you at Dr.

8    Taylor's office?

9    A.  Yes.

10            MR. RODRIGUEZ:  One moment, your Honor.

11            (Pause)

12            MR. RODRIGUEZ:  Nothing further at this time, your

13    Honor.

14            THE COURT:  Any cross-examination?

15            MR. CARNESI:  Yes, your Honor.  Thank you.

16    CROSS-EXAMINATION

17    BY MR. CARNESI:

18    Q.  Hello, Mr. Marino.  My name is Charles Carnesi.  I am Dr.

19    Taylor's lawyer.

20            Just so I am clear when was it that you got the final

21    urine test?

22    A.  I believe it was maybe August of 2016.

23    Q.  Was that the same day that you saw this individual in the

24    office or was it --

25    A.  It was definitely after.  I saw that other guy before that

1   last visit.

2   Q.  Do you know how old he was?

3   A.  I don't know if it was a month or two before.  It was a guy

4   I never cared for from the gym that we know each other by face.

5   It's a small gym.

6   Q.  Did you ever have a conversation with him about Vito

7   Gallicchio?

8   A.  No.

9   Q.  Now, you were asked also on direct examination whether or

10  not you told Dr. Taylor that there had come a time where you

11  stopped selling your prescriptions to Vito.

12          Do you remember that?

13  A.  I -- I can't hear very well.

14  Q.  My question is:  You were asked on direct examination

15  whether you ever told Dr. Taylor that you were no longer

16  selling prescriptions to Vito?

17  A.  I never had a conversation with Dr. Taylor about selling

18  any scripts to Vito.

19  Q.  You never had a conversation with Dr. Taylor where you told

20  him you were selling prescriptions for Vito?

21  A.  No.  I thought it would be a odd thing to bring up.

22  Q.  Before you went to see Dr. Taylor, you were given certain

23  instructions by Mr. Vito Gallicchio on how you should present

24  yourself to the doctor; right?

25  A.  Yes.

1    Q.  Specifically you were told to bring any medical records you

2    have that would substantiate the fact that you had physical

3    injury; right?

4    A.  Yes.

5    Q.  You were also told to tell the doctor that you were in pain

6    as a result of these injuries?

7    A.  Yeah.  When the doctor asked me why I was there, you know,

8    I did go over the medical chart.

9    Q.  You understood that you were going see a doctor whose

10   specialty was pain management; right?

11   A.  Yes.

12   Q.  And consistent with what you and Vito discussed when you

13   saw the doctor, essentially you lied about your condition;

14   right?

15   A.  Yes.

16   Q.  And the purpose in your lying about the condition was so

17   that you could procure these prescriptions and sell them to

18   Vito and make money?

19   A.  Yeah.

20   Q.  And all of the things you told us on direct examination

21   that you were able to do regarding sports and the condition at

22   the time, the actual truthful condition at the time regarding

23   pain in your back or the absence of pain in your knees, those

24   aren't things you discussed with Dr. Taylor obviously?

25   A.  I -- can you repeat the question?

1    Q.  Sure.  What I am trying to ask you is you didn't tell Dr.

2    Taylor you had this operation a couple years ago, but I am good

3    and my knee doesn't hurt anymore and my back doesn't really

4    hurt?

5    A.  No, that would have been -- that would have been

6    counterproductive.

7    Q.  That would be counterproductive to the purpose you were

8    there for?

9    A.  Yeah.  Vito did -- Vito did instruct that this is what had

10   to be said because he said the doctor would still have to

11   quote, unquote cover his ass according to Vito.

12   Q.  You had to give the doctor some reason as to why he would

13   be writing a prescription for you; right?

14   A.  Yes.

15   Q.  In your situation the reason in fact was a lie?

16   A.  Yes.  Well, I had injuries.  But, yeah, I am not sure if I

17   am understanding the question again.

18   Q.  Sure.  You told him you were in pain when you weren't in

19   pain; right?

20   A.  Correct.

21   Q.  That's a lie; right?

22   A.  Yes.

23   Q.  And the purpose for your telling him a lie was part of the

24   scheme that you had with Vito to get the prescriptions so that

25   he could sell them?

1    A.  Yes.

2              MR. CARNESI:  Thank you, sir.  I have no further

3    questions.

4              THE COURT:  Any redirect?

5              MR. RODRIGUEZ:  Briefly, your Honor.

6    REDIRECT EXAMINATION

7    BY MR. RODRIGUEZ:

8    Q.  Mr. Marino, at any point when you went to see Dr. Taylor,

9    did you ever fake a limp?

10   A.  No.

11   Q.  You testified earlier on direct that on subsequent visits

12   after your first visit with Dr. Taylor he would ask you

13   questions and you would say you are okay; right?

14   A.  Yeah.  I would say I was fine.

15             MR. RODRIGUEZ:  One second, your Honor.

16             (Pause)

17             MR. RODRIGUEZ:  Nothing further.

18             THE COURT:  Anything else?

19   RECROSS-EXAMINATION

20   BY MR. CARNESI:

21   Q.  When the doctor who was giving you your prescriptions for

22   the pain you were telling him you were experiencing at the time

23   asked you, Are you okay, and you told him, Yes, were you

24   conveying to him, yes, apparently the medications work?

25             MR. RODRIGUEZ:  Objection.

1              THE COURT:  I will allow it.

2              Was that what you intended to convey to him?

3              THE WITNESS:  When he would say something like, How is

4    the shoulder, I would say, Yeah, it's good.  I -- I don't know.

5    I guess I never really thought of it that way.  I just --

6    Q.  Well, on the other side of it were you telling him it's

7    okay, I no longer need the prescriptions?

8    A.  No.

9              MR. CARNESI:  Thank you.

10             THE COURT:  The witness is excused.

11             (Witness excused)

12             THE COURT:  What is next for the government?

13             MR. ROOS:  We're going to read the remainder of the

14   stip.

15             It is here by stipulated and agreed by the parties

16   that Government Exhibit 125 is a true and accurate photograph

17   taken on April 6, 2015, of David Taylor's medical office at 796

18   Castleton Avenue, Staten Island, New York.

19             Government Exhibit 126 A and 126 B are true and

20   accurate photographs taken on June 14th, 2017, of David

21   Taylor's medical office at 4350 Hylan Boulevard, Staten Island,

22   New York.

23             Government Exhibit 127 is a true and accurate

24   photograph taken on March 2nd of 2017 of Victory Pharmacy at

25   2236 Victory Boulevard, Staten Island, New York.

1              Can we show the jury Government Exhibit 120.

2              If it is okay, your Honor, I will read the end of this

3      stip, which is that the parties stipulate and agree that the

4      stipulation and the exhibits cited in it may be received into

5      evidence.  I will offer first those three and then we'll show

6      the jury and then I will continue if that is okay.

7              THE COURT:  Well, let me get a sense.  What do you

8      plan to do after that?  Are you going read some more and admit

9      the others?

10             MR. ROOS:  That's right, your Honor.  It is roughly 20

11     exhibits.  So the jury can follow along, I thought I can read a

12     few and we'll show them.

13             THE COURT:  That's fine.

14             MR. RODRIGUEZ:  The government offers Exhibits 125,

15     126 A and B, and 127 into evidence.

16             MR. CARNESI:  No objection.

17             THE COURT:  Those are in.

18             (Government's Exhibits 125, 126 A and B, and 127

19     received in evidence)

20             MR. ROOS:  Can we show 125, which is the stipulation

21     that says this is Dr. Taylor's medical office 797 Caslteton

22     Avenue.

23             Can we publish 126 A and B, which is Dr. Taylor's

24     medical office at 4350 Hylan Boulevard.

25             We already saw Government Exhibit 127.

1           The fourth item on the stipulation, Government 128 A

2    through 128 I are true and accurate photographs taken on

3    May 26th, 2015, in the Vicinity of 796 Castleton Avenue, Staten

4    Island, New York.

5           Government Exhibit 135 is a true and accurate video

6    taken on June 22nd, 2017, of the third floor of David Taylor's

7    home at 7872 Amboy Road, Staten Island, New York.

8           Government Exhibits 136 A, 136 B and 136 C are true

9    and accurate photographs taken on June 22nd, 2017, at David

10   Taylor's home at 7872 Amboy Road, Staten Island, New York.

11          The government offers 128 A through I, 135, 136 A, B,

12   and C.

13          THE COURT:  Those are in.

14          (Government's Exhibits 128 A-I, 135, 136 A, B, C

15   received in evidence)

16          MR. ROOS:  Can we please play for the jury what has

17   been marked as Government Exhibit 135, which is the video taken

18   from the third floor of David Taylor's home.

19          (Video played)

20          MR. ROOS:  You can stop there.

21          Can we display Government Exhibit 136 A, B, and C for

22   the jury.  The stipulations says photographs taken from David

23   Taylor's home.

24          Item seven on the stipulation is Government

25   Exhibit 137 A and B are true and accurate photographs taken on

1   June 22nd, 2017, in the basement of David Taylor's home at 3872

2   Amboy Road, Staten Island, New York.

3            I will read it again.

4            Government Exhibit 137 A and B are true and accurate

5   photographs taken on June 22nd, 2017, in the basement of David

6   Taylor's home at 7872 Amboy Road, Staten Island, New York.

7            Government Exhibits 150, 151, 152, 153, 154, 155, 156,

8   157, and 158 are true and accurate photographs taken on

9   June 22nd, 2017, at David Taylor's medical office at 4350 Hylan

10  Boulevard, Staten Island, New York.

11           The government offers 137 A and B and 150 through 158.

12           THE COURT:  Those are in.

13           (Government's Exhibits 137 A and B and 150-158

14  received in evidence)

15           MR. ROOS:  Ms. Corrado, can you please show the jury

16  Government Exhibits 150 through 158.

17           The stipulations says these are Dr. David Taylor's

18  medical office.  Item nine on the stipulation, Government

19  Exhibits 401 and 403 the true and accurate copies of records of

20  payments by patients for office visits seized from David

21  Taylor's home at 7872 Amboy Road, Staten Island, New York, on

22  June 22nd, 2017.

23           Government Exhibits 442 to 444 are true and accurate

24  copies of records of payments by patients for office visits

25  seized from Dave Taylor's to medical office at 4350 Hylan

1  Boulevard, Staten Island, New York, on June 22nd, 2017.

2          Government Exhibits 401 to 403 and 442 to 444 are

3  records created by David Taylor and staff of his medical office

4  at or near the time of the acts they record as part of Taylor

5  and his office's regular practice and which were kept in the

6  course of Taylor's and his office's regular conducted activity.

7          Number 10:  Government Exhibit 404 is a true and

8  accurate copy of profit and loss statements that were seized at

9  David Taylor's home at 7872 Amboy Road, Staten Island, New

10 York, on June 22nd, 2017.

11         Number 11:  Government Exhibit 405 is a copy of David

12 Taylor's 2015 filed tax returns seized from his home at 7872

13 Amboy Road, Staten Island, on June 22nd, 2017.

14         Number 12:  Government Exhibits 406 to 420 are true

15 and accurate copies of patient files that were seized from

16 David Taylor's medical office at 4350 Hylan Boulevard, Staten

17 Island, New York, on June 22nd, 2017.

18         Government Exhibits 421 to 437 are true and accurate

19 copies of patient sign-in sheets seized from David Taylor's

20 medical office at 4350 Hylan Boulevard, Staten Island, New

21 York, on June 202nd, 2017.

22         Government Exhibits 438, 441 are true and accurate

23 copies of letters from insurance companies that were seized

24 from David Taylor's medical office at 4350 Hylan Boulevard,

25 Staten Island, New York, on June 22nd, 2017.

1      Government Exhibits 445 is a true and accurate copy of

2  a document entitled Favorite Prescriptions, which was seized at

3  David Taylor's home at 7872 Amboy Road, Staten Island, New

4  York, on June 22nd, 2017.

5      Lastly the parties further stipulate and agree that

6  this stipulation, which is Government Exhibit 703, as well as

7  the Exhibits 125, 126 A and B, 127, 128, and 135, 136 A through

8  C, 137 A and B, 150 through 158, 401 through 445 described in

9  the stipulation may be received in evidence.

10      Some of those have already been admitted, your Honor,

11  and the government would move in the remainder of the exhibits.

12      THE COURT:  They are in.

13      (Government's Exhibits  136 A - C, 401 - 445 received

14  in evidence)

15      MR. ROOS:  If we can show to the jury the exhibit that

16  is now admitted as Government Exhibit 445, which is the

17  document from David Taylor's home entitled Favorite

18  Prescriptions.

19      Ms. Corrado, if you can highlight the top of the

20  document entitled Favorite Prescriptions and if you can zoom

21  out.  If you can highlight toward the bottom of this is page

22  where it begins, Oxycodone 15 milligrams towards the bottom.

23      That's it, your Honor, on the stipulation.

24      THE COURT:  Who is the next witness?

25      MR. RODRIGUEZ:  Your Honor, before we call the next

1    witness, we do need to read two more stipulations.

2            THE COURT:  Okay.

3            MR. RODRIGUEZ:  Thank you, your Honor.

4            The parties have stipulated to the following:  If

5    called as a witness a representative of the New York Bureau of

6    Narcotic Enforcement, hereinafter BNE, would testify that

7    beginning on or about 2006 all pharmacies in New York were

8    required to electronically report dispensing information to the

9    New York Prescription Monitoring Program (NY PMP).  For each

10   prescription involving a controlled substance, pharmacies are

11   required to report, among other information, the patient name,

12   address, date of birth, prescription number, date the

13   prescription was filled, date the prescription was written, the

14   prescribed medication, the prescribing physician, and the

15   quantity and days supply of the prescription.

16           Prior to in or about August 2013, information was

17   required to be reported to the New York PMP no less frequently

18   than every 15 days.  After in or about August 2013, information

19   was required to be reported to the New York PMP no less

20   frequently than every 24 hours.

21           Government Exhibit 311 is a compact disc, which

22   contains Government Exhibit 311 A and Government Exhibit 311 B.

23   Government Exhibit 311 A is a true and accurate copy of records

24   maintained by the BNE relating to prescriptions for controlled

25   substances written by David Taylor from January 3rd, 2010,

1  through May 17, 2016.

2          Exhibit 311 B is a true and accurate copy of records

3  maintained by the BNE relating to prescriptions for controlled

4  substances written by David Taylor from October 8, 2015,

5  through June 23rd, 2017.

6          The records in Exhibits 311 A and 311 B are records of

7  regularly conducted activity that were made at or near the time

8  of the occurrence of the matters set forth by or from

9  information transmitted by the person with knowledge of those

10  matters, kept in the course of regularly conducted activity of

11  the BNE, and made by the regularly conducted activity of the

12  BNE as a regular practice.  The records contain information

13  electronically submitted to the New York PMP by the respective

14  pharmacy.

15          If called as a witness a representative of the New

16  Jersey Division of Consumer Affairs, hereinafter NJDCA, would

17  testify that beginning on or about September 1st, 2011, all

18  pharmacies in New Jersey were required to report dispensing

19  information to the New Jersey Prescription Monitoring Program,

20  (New Jersey PMP).  For each prescription involving a controlled

21  substance, pharmacies are required to report, among other

22  information, the patient name, address, and date of birth,

23  prescription number, date the prescription was filled, date the

24  prescription was written, the prescribed medication, the

25  prescribing physician, and the quantity and days supply of the

1    prescription among other information is required to be reported

2    to the New Jersey PMP no less frequently than every 30 days.

3            Government Exhibit 312 is a compact disc, which

4    contains Government Exhibit 312 A, B, and C.

5            312 A is a true and accurate copy of records

6    maintained by the NJDCA relating to prescriptions for

7    controlled substances written by David Taylor, the defendant,

8    from September 1st, 2011, through March 24th, 2015.

9            312 B is a true and accurate copy of records

10   maintained by the NJ BCA relating to prescriptions for

11   controlled substances written by David Taylor from March 1st,

12   2015 through June 28, 2016.

13           312 C is a true and accurate copy of records

14   maintained by the NJDCA relating to prescriptions for

15   controlled substances written by David Taylor from June 1st,

16   2016 through April 12th, 2017.

17           The records in Government Exhibit 312 A, 312 B, and

18   312 C are records of regularly conducted activity that were:

19           1.  Made at or near the time of the occurrence of the

20   matters set forth by or from information transmitted by a

21   person with knowledge of those matters, kept in the regular

22   course of activity conducted by the NJDCA, and made by the

23   regularly conducted activity of the NJDCA as their regular

24   practice.  The records contained information electronically

25   submitted to the New Jersey PMP by their respective pharmacies.

1          The parties further stipulated and agree that this

2     stipulation, which is Government Exhibit 701, as well as

3     Government Exhibit 311, 311 A, 311 B, 312 and its constituent

4     parts may be received into evidence as government exhibits at

5     trial.

6          The government offers this stipulation and those

7     exhibits.

8               THE COURT:  That's in.

9               (Government's Exhibits 701, 311, 311 A and B, 312

10    received in evidence)

11              THE COURT:  You said have another stipulation?

12              MR. RODRIGUEZ:  Yes, your Honor.

13              THE COURT:  Is that stipulation around the same length

14    as the last one you read?

15              MR. RODRIGUEZ:  It's a little shorter.

16              THE COURT:  Why don't we take a break.  Let's take a

17    five-minute break.  Don't discuss the case amongst yourselves

18    or anyone else.  Don't do any research regarding any of the

19    issues, parties or locations in this case.

20              See you in five minutes.

21              (Jury excused)

22              (Continued on next page)

23

24

25

1              (In open court; jury not present).

2              THE COURT:  I wanted to take the break because the

3     jurors were struggling hard to focus.  I wanted to give them a

4     break.

5              How are we doing in terms of scheduling for tomorrow

6     and the rest of the day?

7              MS. FLETCHER:  Can we have a moment to confer?

8              THE COURT:  Sure.

9              (Pause)

10             MS. FLETCHER:  Your Honor, I think where we are

11    scheduling-wise, it is unlikely that we'll be able to fill the

12    time between right now and noon tomorrow when Dr. Gharibo is

13    available to testify based on witnesses who are scheduled

14    between then and now.

15             We're happy to start Mr. Castro until 3:00 today, but

16    then I expect we would have some gap of time tomorrow morning.

17    Alternatively, we could conclude today and be much more likely

18    to fill the time tomorrow morning.  However the Court would

19    prefer to do this.

20             THE COURT:  So you have the beginning of Castro and

21    then who else?

22             MS. FLETCHER:  And then Brian Dolinko before

23    Dr. Gharibo.

24             THE COURT:  Give me an offer of proof of Dolinko.

25    What is the testimony of Dolinko going to be?

1            MS. FLETCHER:  His testimony I expect will be very

2      similar to John Marino's but I think a bit shorter.  He is a

3      patient.  He is the patient who made the last recording that

4      the jury was shown this morning.

5            THE COURT:  What is defense counsel's view?  Perhaps

6      it makes sense to have the jury listen to this stipulation and

7      then maybe send them home today and get them here at 9:30

8      tomorrow.  I don't want to tell you how to try the case.  You

9      indicated we may have to take a break with Castro's testimony.

10     Would it make more sense to start with Dolinko tomorrow and

11     finish that up and then depending on where we are we can get to

12     Castro's testimony before noon and take the break then.

13     Perhaps that makes sense.

14           MS. FLETCHER:  I think that would make sense, your

15     Honor.

16           THE COURT:  Defense counsel, what is your view?

17           MR. CARNESI:  I am fine with that, your Honor.  Read

18     the stipulation and send the jury home today.

19           THE COURT:  We'll do that.  We'll have the stipulation

20     read and we'll send the jury home.

21           Any other instructions you want me to give the jury

22     other than the instructions we have been giving them all along?

23           MS. FLETCHER:  No, your Honor.  Perhaps once the jury

24     is gone, we can discuss the government's view of the remainder

25     of its case and other scheduling issues.

1            THE COURT:  Sounds good.

2        (Recess)

3        (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Please be seated.

3              Go ahead counsel.

4              MR. RODRIGUEZ:  Thank you, your Honor.

5              The parties have stipulated to following:

6              If called as a witness, a representative of Ameritox,

7      LLC, would testify that:

8              From at least January 1st, 2012, through at least

9      May 11th, 2017, Ameritox, LLC, performed urinalysis and drug

10     screening tests at the request of David Taylor.

11             In response to a subpoena dated May 3rd, 2017,

12     Ameritox performed a diligent search for any and all records

13     maintained in the Ameritox's possession, custody or control

14     relating to urinalysis for drug screening tests requested by

15     David Taylor from January 1st, 2012 through May 11, 2017.

16             Government Exhibits 315 A through 315 M, are true and

17     accurate copies of all the records Ameritox located as a result

18     of the search described above relating to urinalysis or drug

19     testing -- drug screening tests requested by David Taylor from

20     January 1st, 2012 through May 11th, 2017 for the following

21     individuals:

22             Robert Adams, as to Government Exhibit 315 A; Don

23     Michael Carim, as to 315 B; Julio Clark, as to 315 C; Leonard

24     Danzi, as to 315 D; Brian Dolinko, as to 315 E; Michael Farley,

25     as to 315 F; Tara Farley as to 315 G; Vito Gallicchio, as to

1    315 H; Elizabeth Grieco, as to 315 I; James Impellizine, as to

2    315 J; John Marino, as to 315 K; and Christine Oakes, as to 315

3    M, skipping 315 L.

4         The records in Government Exhibit 315 A through M are

5    records of regularly conducted activity that were made at or

6    near the time of the occurrence of the matters set forth by or

7    from information transmitted by a person with knowledge of

8    those matters, kept in the course of the regularly conducted

9    activity of Ameritox and made by the regularly conducted

10   activity of Ameritox as a regular practice.

11        After performing the search described above, Ameritox

12   did not locate any records relating to the urinalysis or drug

13   screening tests requested by David Taylor from January 1st,

14   2012 through May 11th, 2017 for Lori Gallicchio or Lawrence

15   Montabano.

16        The parties further stipulate and agree that this

17   stipulation, which is Government Exhibit 702, as well as

18   Government Exhibits 315 A through 315 K as well as 315 M may be

19   received into evidence as government exhibits at trial.

20        The government offers this stipulation and the

21   aforementioned exhibits as exhibits.

22        THE COURT:  That's in.

23        MR. RODRIGUEZ:  Thank you, your Honor.

24        (Government's Exhibits 702, 315, 315 A - 315 K

25   received in evidence)

1          THE COURT:  Members of the jury, we're going to

2     dismiss you for the day.  I will ask you to be here again

3     bright and early tomorrow morning at 9:30.  As always don't

4     discuss this case with anyone else.  Don't allow anyone to

5     discuss this case with you.  Don't post anything about this

6     case on social media.  Don't conduct any independent research

7     regarding any of the issues, parties, or locations in this

8     case.

9          We'll see tomorrow morning at 9:30.  Have a pleasant

10    evening.

11               (Jury excused)

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

ibsntay6

```
 1            (Jury not present)

 2            THE COURT:  OK.  Please be seated.

 3            Counsel wanted to discuss scheduling?

 4            MS. FLETCHER:  Yes.  We wanted to give your Honor an

 5   update in light of the pace that things went today.  We expect

 6   that, in addition to Brian Dolinko and Adrian Castro, we'll

 7   call Dr. Gharibo and then we will have a very short witness

 8   after Dr. Gharibo.  I expect under an hour for sure for that

 9   witness.  So it currently looks as though the government will

10   rest by the morning on Friday, barring any lengthy

11   cross-examination by Mr. Carnesi.

12            I assume the Court's intention would be to just

13   continue right into the defense case on Friday morning.

14            THE COURT:  Correct.

15            MS. FLETCHER:  And then have a charge conference,

16   depending on whether there is a case?

17            THE COURT:  Yes.  Depending on if there is a defense

18   case and how long that is.  If there is a short defense case or

19   no defense case, we would move to a charge conference.

20            MS. FLETCHER:  OK.

21            THE COURT:  What I plan to do is to get you each our

22   draft jury charges by tomorrow evening.  We'll get that to you.

23   We'll e-mail that to you.  Then, any objections you have, you

24   can give us redlined versions of that by e-mail that evening

25   before, and we can deal with that Friday if we have the charge
```

1   conference Friday.

2           Does defense counsel have an idea now as to, other

3   than potentially the defendant, whether or not you have any

4   other witnesses?

5           MR. CARNESI:  I have one other, Judge, possibility.  A

6   lot will depend on obviously on the testimony from the expert.

7           THE COURT:  All right.  So that's where we are.

8           I am still not going to make counsel sum up on Friday,

9   if that is what the question is.  It seems to me we still

10  definitely need to have the charge conference.  Even if the

11  government's case is done Friday morning or there is a very

12  short defense case or no defense case, it would still be my

13  preference to have the charge conference and then have

14  summations and charge on Tuesday.

15          MS. FLETCHER:  OK.  That's fine, your Honor.

16          I don't know if Mr. Carnesi is in a position to say

17  who his witness is.  We obviously don't have any information

18  about any defense case, and we would request that, as soon as

19  it becomes clear that there may be a witness, the government be

20  provided with 26.2 material.

21          MR. CARNESI:  That is fine, Judge.  I am going to know

22  by the end of the day after the expert testifies.

23          THE COURT:  OK.

24          MS. FLETCHER:  I'm sorry.  You mean the day that

25  Dr. Gharibo testifies?

1          MR. CARNESI:  Yes.

2          MS. FLETCHER:  I thought I heard him say he had an

3     expert.  It caused some alarm.

4          THE COURT:  He is talking about the government's

5     expert.

6          MR. CARNESI:  Your expert.

7          MS. FLETCHER:  I understand.

8          THE COURT:  I suppose for Dr. Gharibo we normally

9     today our break between around noon and 12:30, so he should be

10    able to be here by 12:30.

11         Anything else we need to discuss today?

12         MS. FLETCHER:  Nothing from the government, your

13    Honor.

14         THE COURT:  From the defense?

15         MR. CARNESI:  No, your Honor.

16         THE COURT:  Let's get counsel here tomorrow -- try to

17    get here by like 9:25 or so, just to avoid any unnecessary

18    bumping into jurors, and we will start at 9:30 in the morning.

19    OK.

20         Bye.

21         MR. CARNESI:  Thank you, Judge.

22         (Adjourned to November 29, 2018, at 9:30 a.m.)

23

24

25

INDEX OF EXAMINATION

Examination of:                               Page

NICHOLAS AVICOLLI

Direct By Ms. Fletcher . . . . . . . . . . . 297

Cross By Mr. Carnesi . . . . . . . . . . . . 349

Redirect By Ms. Fletcher . . . . . . . . . . 378

Recross By Ms. Fletcher . . . . . . . . . . 379

JOHN MARINO

Direct By Mr. Rodriguez . . . . . . . . . . 386

Cross By Mr. Carnesi . . . . . . . . . . . . 425

Redirect By Mr. Rodriguez . . . . . . . . . 429

Recross By Mr. Carnesi . . . . . . . . . . . 429

GOVERNMENT EXHIBITS

Exhibit No.                               Received

 106A    . . . . . . . . . . . . . . . . . 321

 106B    . . . . . . . . . . . . . . . . . 322

 116A and 116B  . . . . . . . . . . . . . . 328

 316, 317, 318, and 706   . . . . . . . . . 380

 110A and 110B  . . . . . . . . . . . . . . 395

 406 through 420  . . . . . . . . . . . . . 403

 703  . . . . . . . . . . . . . . . . . . . 403

 125, 126 A and B, and 127    . . . . . . . 431

 128 A-I, 135, 136 A, B, C  . . . . . . . . 432

 137 A and B and 150-158  . . . . . . . . . 433

  136 A - C, 401 - 445  . . . . . . . . . . 435

1  701, 311, 311 A and B, 312   . . . . . . . . 439

2  702, 315, 315 A – 315 K  . . . . . . . . . . 444