Ibtntay1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                           17 Cr. 390 (ALC)

DAVID TAYLOR,
               Defendant.        Trial

------------------------------x

                                New York, N.Y.
                                November 29 , 2018
                                9:45 a.m.

Before:

                  HON. ANDREW L. CARTER, JR.,

                                District Judge
                                -and a Jury-

                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  KIERSTEN A. FLETCHER
     JUSTIN V. RODRIGUEZ
     NICOLAS T. ROOS
     Assistant United States Attorneys

CHARLES F. CARNESI
     Attorney for Defendant

Also Present:

Matthew Del Rosario, Special Agent DEA
Rosanna Corrado, Paralegal Specialist

Ibtntay1

1          (Trial resumed)

2          THE COURT:  Anything else we need to discuss this

3     morning, counsel?

4          MR. RODRIGUEZ:  No, your Honor.

5          (Jury present)

6          THE COURT:  OK.  Please be seated.

7          Welcome back.  We're going to continue with the case

8     on trial.

9          Hold on a second.

10         Let me see counsel here at the sidebar quickly.

11         (At sidebar)

12         THE COURT:  One of the jurors was pointing to like the

13    notepad that he or she should have.  I don't know if they left

14    the notepad back there or something.  I just wanted to check in

15    with you before I do anything.  I am going to ask my law clerk

16    to make the inquiry, and, if the notepad is just back there, I

17    will send him back there to get it if that's fine with

18    everyone.

19         MR. CARNESI:  That is fine.

20         MS. FLETCHER:  That's fine.

21         MR. RODRIGUEZ:  That's fine.  Thank you.

22         (Continued on next page)

23

24

25

1          (In open court)

2          THE COURT:  Go ahead, counsel.

3          MS. FLETCHER:  Thank you, your Honor.  The United

4    States calls Brian Dolinko to the stand.

5     BRIAN DOLINKO,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8          THE COURT:  Go ahead, counsel.

9    DIRECT EXAMINATION

10   BY MR. RODRIGUEZ:

11   Q.  Good morning, sir.  How old are you?

12   A.  35.

13   Q.  Where do you live?

14   A.  Staten Island.

15   Q.  How long have you lived in Staten Island?

16   A.  I was born and raised.

17   Q.  Sir, are you currently employed?

18   A.  Yes.

19   Q.  What kind of work do you do?

20   A.  Retail.

21          MR. RODRIGUEZ:  Ms. Corrado, could you please pull up

22   Government Exhibit 101A, which is already in evidence.

23   Q.  Sir, do you see an image on your screen that's Government

24   Exhibit 101A?

25   A.  Yes.

1   Q.  Do you recognize what is depicted there?

2   A.  Yes.

3   Q.  What is it?

4   A.  A picture of Dr. Taylor.

5   Q.  How do you know Dr. Taylor?

6   A.  I was a patient.

7   Q.  When you say you were a patient, what do you mean?

8   A.  I was a patient of Dr. Taylor's.

9   Q.  Did you attend visits at his office?

10  A.  I did.

11  Q.  What were some of the medications, if any, that Dr. Taylor

12  prescribed you?

13  A.  Oxycodone, 30 milligrams, oxymorphone, and Soma.

14  Q.  Were you in pain when you received these prescriptions from

15  Dr. Taylor?

16  A.  No, I wasn't.

17  Q.  Did you take the oxycodone Dr. Taylor prescribed to you?

18  A.  Some of it, yes.

19  Q.  What did you do with the rest?

20  A.  I sold them.

21  Q.  If you weren't in pain when you were prescribed these

22  medications, why did you take the oxycodone?

23  A.  To get high.

24  Q.  Who did you sell some of your oxycodone to?

25  A.  Danny Garcia and Vito Gallicchio.

Ibtntay1                    Dolinko - direct

1    Q.  Did that change at all over time?

2    A.  No.

3    Q.  Mr. Dolinko, other than selling these medications, have you

4    sold other drugs in the past?

5    A.  No.

6    Q.  Are you familiar with the drug Fentanyl?

7    A.  I know what it is.

8    Q.  Have you ever sold Fentanyl?

9    A.  On one occasion.

10   Q.  When was that?

11   A.  I don't know the exact date.

12   Q.  Do you remember the year?

13   A.  2017.

14   Q.  Mr. Dolinko, in 2017, did law enforcement approach you

15   about the prescriptions you were receiving from Dr. Taylor?

16   A.  Yes, they did.

17   Q.  What were the circumstances of that approach by law

18   enforcement?

19   A.  They had me on video surveillance making multiple drug

20   transactions.

21   Q.  What kind of drug transactions were you making?

22   A.  I was purchasing pills for somebody else.

23   Q.  Were you arrested?

24   A.  I was not.

25   Q.  Were you charged with a crime?

Ibtntay1                    Dolinko - direct

1    A.  I was not.

2    Q.  Did you provide law enforcement with information at this

3    time?

4    A.  I did.

5    Q.  About what?

6    A.  About my visit to Dr. Taylor's office, who I was selling

7    the pills to, that I was getting high with the pills.

8    Q.  Did you agree to work with law enforcement at this time?

9    A.  I did.

10   Q.  After that, did there come a time when you began meeting

11   with prosecutors in this case?

12   A.  Yes.

13   Q.  Have you attended meetings at the U.S. Attorney's Office?

14   A.  Yes.

15   Q.  After those meetings, did there come a time when you

16   entered into an agreement with the government?

17   A.  Yes.

18   Q.  What kind of agreement was that, sir?

19   A.  Nonprosecution agreement.

20   Q.  And are you testifying here today pursuant to that

21   agreement?

22   A.  Yes.

23   Q.  Sir, what is your understanding of what you are obligated

24   to do under the terms of that agreement?

25   A.  To tell the truth.

Ibtntay1                    Dolinko - direct

1   Q.  What is your understanding of what you get in return if you

2   uphold your end of the agreement?

3   A.  There will be no charges.

4   Q.  What is your understanding of what could happen to you

5   today if you do not tell the truth?

6   A.  My deal will be voided, and there could be perjury charges

7   as well.

8   Q.  Mr. Dolinko, were you ever in a car accident?

9   A.  Yes, I was.

10  Q.  When was that?

11  A.  About ten years ago.

12  Q.  What injuries, if any, did you sustain as a result of that

13  accident?

14  A.  I had a tear in my labrum in my left shoulder.

15  Q.  What is your labrum?

16  A.  I don't know exactly what it is, but it has something to do

17  with your rotator cuff and holding it in place or something

18  like that.

19  Q.  What, if any, medical treatment did you seek after you

20  sustained that injury?

21  A.  Pain management, physical therapy, and I had a surgery done

22  to repair it.

23  Q.  Did you see a doctor?

24  A.  Yes.

25  Q.  About how long after that accident did you see a doctor?

Ibtntay1                    Dolinko - direct

1    A.  Maybe about a week, two weeks.

2    Q.  Which doctor did you see?

3    A.  I saw Dr. Lifshutz.

4    Q.  Were you in pain from that accident when you went to go see

5    that doctor?

6    A.  No.  Mildly.  Mildly.

7    Q.  I'm sorry.  Can you repeat that?  I couldn't hear you.

8    A.  Mildly.

9    Q.  Mildly.  What medication, if any, did Dr. Lifshutz provide

10   you?

11   A.  He prescribed me oxycodone, 30 milligrams.

12   Q.  And approximately how long did you see this doctor?

13   A.  Maybe two or three years.  I don't know the exact dates.

14   Q.  Why did you stop seeing this doctor?

15   A.  The no-fault insurance which covered my treatment was -- it

16   ran out.

17   Q.  Now, when you first started seeing this doctor, did you

18   take the oxycodone pills that you were prescribed?

19   A.  Not at first.

20   Q.  Why not?

21   A.  I didn't think I needed them.

22   Q.  Were you able to cope with the pain from your accident

23   without those pills?

24   A.  I was.

25   Q.  What, if any, other treatment were you receiving for your

Ibtntay1                    Dolinko - direct

1    pain around that time?

2    A.  Physical therapy.

3    Q.  Did you find that the physical therapy worked?

4    A.  Yeah.

5    Q.  What did you do with these pills that you were being

6    prescribed, these oxycodone pills, if you weren't taking them?

7    A.  I sold them.

8    Q.  To whom?

9    A.  Danny Garcia.

10   Q.  For how much?

11   A.  $15 per pill.

12   Q.  Do you know what Mr. Garcia did with these pills?

13   A.  He sold them.

14   Q.  Do you know how much he sold them for?

15   A.  I believe $20 a pill.

16   Q.  Did there come a time when you did, in fact, take some of

17   the oxycodone that was prescribed to you by Dr. Lifshutz?

18   A.  There did.

19   Q.  Why did you do that, sir?

20   A.  I received a phone call from a friend that was also going

21   to the same office giving me a heads-up that they were drug

22   testing to make sure you were taking your medication properly,

23   so I took one.

24   Q.  What kind of reaction, if any, did you have after you took

25   that oxycodone pill?

Ibtntay1                    Dolinko - direct

1    A.  It made me very nauseous, and I ended up throwing up.

2    Q.  You testified earlier about a surgery on your shoulder.

3         When did you get that?

4    A.  Maybe like a couple of months later.

5    Q.  Immediately after that surgery on your shoulder, were you

6    in pain?

7    A.  I was.

8    Q.  What medication, if any, were you prescribed after that

9    surgery?

10   A.  The surgeon prescribed me Percocet, 10 milligrams, and I

11   was still getting the oxy, 30 milligrams, from the pain

12   management doctor.

13   Q.  Did you take the Percocet that the surgeon gave you?

14   A.  I did.

15   Q.  And the other doctor that you're referring to is who?

16   A.  Can you repeat the question?

17   Q.  You testified that you were also seeing another doctor at

18   the same time.

19   A.  That was the pain management doctor, Dr. Lifshutz.

20   Q.  What medication, if any, were you taking from that doctor?

21   A.  Oxycodone, 30 milligrams.

22   Q.  So, focusing on the time right after your shoulder injury,

23   what were you doing with the oxycodone pills that Dr. Lifshutz

24   was providing you?

25   A.  I was getting high with them, and I was also selling them.

Ibtntay1                    Dolinko - direct

1   Q.  Did there come a time where you started seeing another

2   doctor around the time of seeing Dr. Lifshutz?

3   A.  Yes, I did.

4   Q.  Who was that?

5   A.  Dr. Lanting.

6   Q.  Can you repeat that, sir.

7   A.  Dr. Lanting.

8   Q.  How many times did you see that doctor?

9   A.  Two times.

10  Q.  What medication, if any, did Dr. Lanting prescribe you?

11  A.  Oxycodone, 30 milligrams.

12  Q.  And why did you stop seeing that particular doctor?

13  A.  I was no longer able to get into the -- get an appointment

14  or to get into the building over there.  It was -- they had

15  like bodyguards at the doors.  It was no longer -- I was no

16  longer able to get an appointment in there.

17  Q.  After you were no longer able to get an appointment with

18  that doctor, did you see any other doctor?

19  A.  I did.

20  Q.  Which doctor was that?

21  A.  Dr. Disenza.

22  Q.  Why did you start seeing that doctor?

23  A.  To receive oxycodone 30 milligrams.

24  Q.  Were you in pain at this point?

25  A.  Mildly, not where I needed the oxycodone.

Ibtntay1                    Dolinko - direct

1    Q.  So why were you still trying to get oxycodone if you were

2    in mild pain?

3    A.  I wanted to sell them, and I wanted to get high.

4    Q.  How much oxycodone were you getting a month, approximately

5    at this point?

6    A.  About 180 pills a month.

7    Q.  Did there come a time when you stopped seeing that

8    particular doctor?

9    A.  There did.

10   Q.  And did you see another doctor after that?

11   A.  Yes, but I don't remember his name.

12   Q.  Do you remember where that doctor operated?

13   A.  He was in New Jersey.

14   Q.  What medications, if any, did you receive from that doctor?

15   A.  Oxycodone, 30 milligrams.

16   Q.  And what did you do with those pills?

17   A.  I sold some and I got high with the rest.

18   Q.  Did there come a time when you stopped seeing that doctor?

19   A.  Yes.

20   Q.  Why was that?

21   A.  The office manager had informed me that they were no longer

22   accepting patients from Staten Island.

23   Q.  After you received that information, did there come a time

24   where you saw any other doctors?

25   A.  Yes.

Ibtntay1                    Dolinko - direct

1   Q.   Which doctor?

2   A.   Dr. Taylor.

3   Q.   Approximately how long after you saw that doctor in New

4   Jersey did you start seeing Dr. Taylor?

5   A.   I can't be sure of the exact date, but maybe about a month

6   or two.

7   Q.   During that period of time, the month or two between the

8   doctor in New Jersey and when you first started seeing

9   Dr. Taylor, what, if any, medication or drugs were you taking?

10  A.   I was taking oxycodone, 30 milligrams.

11  Q.   Where were you getting them from?

12  A.   I was buying them on the street.

13  Q.   How much were you typically paying for oxycodone pills on

14  the street at this time?

15  A.   Between $20 to $25 per pill.

16  Q.   At this point in time were you in pain?

17  A.   Not really.

18  Q.   Why were you taking those pills?

19  A.   To get high.

20           MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

21  Government Exhibit 102A, which is already in evidence.

22  Q.   Sir, do you recognize the person depicted in Government

23  Exhibit 102A?

24  A.   I do.

25  Q.   Who is that?

Ibtntay1                    Dolinko - direct

1   A.  Vito Gallicchio.

2   Q.  How, if at all, if you know Vito Gallicchio before you

3   started going to Dr. Taylor?

4   A.  Can you repeat the question.

5   Q.  Sure.  How, if at all, did you know Vito Gallicchio before

6   you started going to Dr. Taylor?

7   A.  He was a customer where I worked.

8   Q.  Did there come a time when you spoke to Vito about

9   Dr. Taylor?

10  A.  Yes.  There did.

11  Q.  What led you to speak to Vito about Dr. Taylor?

12  A.  A coworker of mine explained to me that Vito, if I spoke to

13  Vito, he could arrange for me to get an appointment at

14  Dr. Taylor's office.

15  Q.  Do you know if your coworker had previously had an

16  arrangement with Vito with respect to Dr. Taylor?

17  A.  Not that I know of.

18  Q.  What are some of the things that Vito said in this

19  conversation you had with him about Dr. Taylor?

20          MR. CARNESI:  Objection.

21          THE COURT:  Please rephrase the question.

22  BY MR. RODRIGUEZ:

23  Q.  Sir, you testified earlier that you had a conversation with

24  Vito about Dr. Taylor?

25  A.  Yes.

Ibtntay1                    Dolinko - direct

1   Q.  What are some of the things that Vito told you about

2   Dr. Taylor in this conversation?

3            MR. CARNESI:  Objection.

4            THE COURT:  Overruled.  You may answer.

5   A.  That he would be able to arrange for me to get an

6   appointment there.

7   Q.  What, if anything, did Vito say -- did he say anything else

8   about Dr. Taylor in that conversation?

9   A.  He told me he paid the rent in the office, that he

10  purchased furniture for the office, and that was really about

11  it.

12  Q.  What, if anything, did Vito say about what might happen if

13  you tried to get an appointment with Dr. Taylor?

14  A.  Can you repeat the question.

15  Q.  I am going to withdraw that question.

16           What, if anything, did Vito say about how he knew

17  Dr. Taylor?

18  A.  He didn't really say much about how he knew him.  That

19  never came up in the conversation.

20  Q.  You testified earlier that he helped him do certain things?

21  A.  What's that?

22  Q.  Your previous testimony was that he did what?  He bought

23  him things?

24           MR. CARNESI:  Objection.

25           THE COURT:  Please rephrase the question.

Ibtntay1                    Dolinko - direct

1    BY MR. RODRIGUEZ:

2    Q.  Sir, what were some of the things that Vito said to you

3    about how your office visits to Dr. Taylor would be paid for?

4    A.  He would lay the money out for the visit.

5    Q.  Who's the "he" in that that you are talking about?

6    A.  Vito Gallicchio.

7    Q.  What do you mean he would lay the money out?

8    A.  He would give me the money to pay for my appointment.

9    Q.  Did he say why he would do that?

10   A.  He was to get half of my prescription every month.

11   Q.  When you say half of your prescription, what are you

12   referring to?

13   A.  If I was getting 180, then 90 would go to him and 90 would

14   go to me.

15   Q.  Specifically what kind of prescription would that be?

16   A.  Oxycodone, 30 milligrams.

17   Q.  Sir, did there come a time when you had an appointment with

18   Dr. Taylor?

19   A.  Yes.

20   Q.  How was that appointment made?

21   A.  Vito made the phone call to make the appointment for me.

22   Q.  Did you see him make that phone call?

23   A.  I did.

24   Q.  Did there come a time when you actually went to that

25   appointment?

Ibtntay1                    Dolinko - direct

1    A.  There did.

2    Q.  What were some of the things, if anything, that you brought

3    to that appointment?

4    A.  I brought an MRI with me, the money for the appointment,

5    and I believe that was it.

6    Q.  Why did you bring an MRI?

7    A.  It was one of the requirements going into -- to go to the

8    appointment.

9    Q.  How did you know it was one of requirements to go to the

10   appointment?

11   A.  The girl at the office had told me when I called to confirm

12   my appointment.

13   Q.  Do you know who that person was?

14   A.  I believe her name was Denise.

15   Q.  Which MRI did you bring with you?

16   A.  The one from my first -- from the accident with my

17   shoulder.

18   Q.  So approximately how long was the time between when you had

19   that MRI and your first visit with Dr. Taylor?

20   A.  Approximately ten years.

21   Q.  How old were you when you first saw Dr. Taylor?

22   A.  I don't remember exactly how old I was.  Maybe 31 or 30.

23   Q.  Were you in pain at this point?

24   A.  No.

25   Q.  Were you taking oxycodone at this point?

Ibtntay1                    Dolinko - direct

1   A.  Yes.

2   Q.  Can you describe for the jury what your first visit with

3   Dr. Taylor was like.

4   A.  It was pretty brief.

5   Q.  What, if anything, were some of the things that he asked

6   you during that visit?

7   A.  How much pain I was in.  There wasn't really much

8   conversation.

9   Q.  What kind of physical examination, if any, did he do?

10  A.  There really wasn't no physical examination.

11  Q.  Did you see him look at the MRI you provided?

12  A.  I didn't see him look at it.

13  Q.  What kind of questions, if any, did Dr. Taylor ask you

14  about previous doctors you were seeing?

15  A.  Nothing.

16  Q.  What kind of questions, if any, did Dr. Taylor ask you

17  about medications were you taking?

18  A.  Nothing.

19  Q.  Did you ask Dr. Taylor to prescribe you oxycodone?

20  A.  No.

21  Q.  Did Dr. Taylor prescribe you oxycodone?

22  A.  Yes.

23  Q.  Did you ask Dr. Taylor for a specific dosage of medicine?

24  A.  No.

25  Q.  Did you ask him for a certain amount of pills?

Ibtntay1                    Dolinko - direct

1    A.  No.

2    Q.  Sir, how much did you pay for your first visit?

3    A.  I believe it was $300 for the first visit.

4    Q.  And how did you pay?

5    A.  It was paid with cash.

6    Q.  Where did you get that cash from?

7    A.  Vito Gallicchio.

8    Q.  Did you make another appointment with Dr. Taylor?

9    A.  I did.

10   Q.  Approximately how long was that?

11   A.  It was four weeks later.

12   Q.  Sir, before you had your first visit with Dr. Taylor, did

13   you sit in the waiting room at all?

14   A.  I did.

15   Q.  Were there other people in the waiting room?

16   A.  Yes, there were.

17   Q.  What, if anything, did you notice about the other kinds of

18   people in the waiting room?

19   A.  Everybody was, you know, on edge.  There were all types of

20   different people -- normal people, people that looked like they

21   were on drugs, loud, obnoxious.

22   Q.  Sir, after that first visit that you had with Dr. Taylor,

23   approximately how many more visits did you have with him?

24   A.  I don't know the exact number, but there were -- it went on

25   once a month for a couple of years.

1    Q.  I just want to return to something you just testified to.

2    You said that people in the waiting room were on edge.

3         What do you mean by that?

4    A.  Like strung out, maybe.

5    Q.  I still don't know what you mean by that.  What do you mean

6    by strung out?

7    A.  Like possibly withdrawing.

8    Q.  You mentioned taking oxycodone pills to get high in the

9    past.  Do you have any experience with observing other people

10   who were on drugs?

11   A.  I was on oxycodone myself, so I guess you could say yeah.

12   Q.  Sir, after your first visit with Dr. Taylor, did the way he

13   conducted the visits change in any way over time?

14   A.  No.

15   Q.  Did he do any kind of physical examination?

16   A.  No.

17   Q.  Did you have any conversations about your pain?

18   A.  Maybe here or there.  Not really.

19   Q.  What, if anything, did he ask you during the course of

20   those visits?

21   A.  How you doing?  There wasn't really much conversation

22   during the visit.

23   Q.  Did the number of oxycodone pills he prescribed to you

24   change over time?

25   A.  It went up.

1  Q.  Do you recall how they went up?

2  A.  I explained to Dr. Taylor that I was falling short of my

3  pills a little early, and I asked him if he could give me more.

4  Q.  What did he say in response?

5  A.  He gave me more.

6  Q.  Did there ever come a time where Dr. Taylor refused to give

7  you oxycodone pills?

8  A.  No.

9  Q.  Did there ever come a time when the dosage changed?

10  A.  No.

11  Q.  Did there ever come a time where Dr. Taylor discussed with

12  you alternatives to taking oxycodone?

13  A.  No.

14  Q.  Did he ever discuss going to physical therapy with you?

15  A.  No.

16  Q.  Did Dr. Taylor prescribe I any other medications besides

17  oxycodone?

18  A.  Yes.

19  Q.  What did he prescribe you?

20  A.  A muscle relaxer called Soma and oxymorphone.

21  Q.  Do you know what oxymorphone is?

22  A.  No.

23  Q.  Did you ask Dr. Taylor to prescribe you those medicines,

24  oxymorphone and Soma?

25  A.  No.

Ibtntay1                    Dolinko - direct

1    Q.   Did Dr. Taylor tell you why he was prescribing you

2    oxymorphone or Soma?

3    A.   No.

4    Q.   You testified earlier that you gave Dr. Taylor your MRI

5    from about ten years before you had your first visit.  Did he

6    ever ask you for an updated MRI?

7    A.   No.

8    Q.   Did he ever ask you for any other kind of medical

9    screenings.

10   A.   There was a urine analysis once or twice.

11   Q.   Did you take those tests?

12   A.   I did.

13   Q.   Did Dr. Taylor ever discuss with you the results of those

14   tests?

15   A.   No.

16   Q.   Sir, what did you do with the oxycodone that you received

17   from Dr. Taylor?

18   A.   I sold some and got high with the rest.

19   Q.   Did you fill the prescription?

20   A.   I did.

21   Q.   Where did you fill them?

22   A.   Victory Pharmacy.  There was a pharmacy on Hylan Boulevard.

23   There was a few different pharmacies I filled them at.

24   Q.   Why did you fill your prescriptions at Victory Pharmacy?

25   A.   For starters it was the cheapest pharmacy to fill them at,

1    and I knew Vito -- that's where Vito directed me to go

2    basically.

3    Q.  Did Vito say why he was directing you to go there?

4    A.  To my knowledge, he was friends with the pharmacist.

5    Q.  Did he say that?

6    A.  No.  But I've seen them together, you know, in the

7    pharmacy, talking.

8    Q.  How much of your pills, if any, did you sell to Vito?

9    A.  I gave him half my prescription.  That went on for a couple

10   of months.

11   Q.  After those couple months, did that change?

12   A.  Yes.

13   Q.  What happened?

14   A.  I stopped giving him half my prescription.

15   Q.  Why did you do that, sir?

16   A.  Because I felt he was ripping me off and trying to

17   exploit -- extort me.

18   Q.  What do you mean by that?

19   A.  Like, there really was no reason to give him half my

20   prescription anymore in my opinion.

21   Q.  What did you do with the pills that you otherwise would

22   have given to Vito?

23   A.  I sold them and got high with them.

24   Q.  Before you went to Dr. Taylor, did Vito say you had to give

25   him half of your pills?

Ibtntay1                    Dolinko - direct

1    A.  That was part of the deal for him to get me the

2    appointment.

3    Q.  Did he say that you would receive any benefit for giving

4    him half the pills?

5    A.  He wasn't specific as far as receiving any benefits, but he

6    did mention that, like, when you're in his circle, you would be

7    protected.

8    Q.  What did you understand that to mean?

9    A.  I never had any proof of it or saw anything that led me to

10   believe it was true, but I got the impression that he had some

11   type of law enforcement on his side, like --

12   Q.  Sir, in connection with your work with law enforcement, did

13   there ever come a time where law enforcement asked you to make

14   a recording?

15   A.  Yes.

16   Q.  And did you do that?

17   A.  I did.

18   Q.  What did you record?

19   A.  I recorded the visit at Dr. Taylor's office, I recorded a

20   trip of me going to the Victory Pharmacy, and I believe that

21   was it.

22   Q.  What did you use to record the visit to Dr. Taylor's

23   office?

24   A.  I had a credit card that was a recording device in my

25   pocket and a watch that recorded.

Ibtntay1                    Dolinko - direct

1    Q.  Where did you get those devices from?

2    A.  The agents provided me with them.

3    Q.  After the agents provided you with those devices, what did

4    you do with the devices?

5    A.  When I was done making the recording, I gave it back.

6    Q.  Did the agents give you any instruction about what to do

7    when you went into Dr. Taylor's office?

8    A.  Not really.  Just to act like normal, like a normal

9    appointment.

10           MR. RODRIGUEZ:  Your Honor, at this time we would like

11   to play Government Exhibit 203, which is already in evidence,

12   but if we can please first just hand out the transcript binders

13   to the jury.

14           THE COURT:  OK.

15           MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

16   Government Exhibit 203, which is already in evidence.

17           Your Honor, if we can ask the jury to please turn to

18   tab 203T in their binders.

19           THE COURT:  OK.

20           Ms. Corrado, if you can please play Government Exhibit

21   203.

22           (Video played)

23   BY MR. RODRIGUEZ:

24   Q.  Mr. Dolinko, what did we just see in Government Exhibit

25   203?

Ibtntay1                    Dolinko - direct

1    A.  Dr. Taylor writing the three prescriptions for me.

2    Q.  Beyond what we saw in the video, did Dr. Taylor conduct any

3    other examination of you that day?

4    A.  No.

5    Q.  Beyond what we saw in the video, did Dr. Taylor ask you any

6    other questions that day?

7    A.  No.

8    Q.  When you received the prescriptions shown in the video,

9    were you in pain?

10   A.  No.

11   Q.  What did you do with those prescriptions, sir?

12   A.  I filled them.

13   Q.  I'm sorry.  I didn't hear that.

14   A.  I filled them.

15   Q.  And once you filled them, what did you do with the pills?

16   A.  I sold some and got high on some.

17   Q.  Mr. Dolinko, how, if at all, did the visit we just saw in

18   Government Exhibit 203 compare to all of your other visits with

19   Dr. Taylor?

20   A.  They were all exactly the same.

21   Q.  Mr. Dolinko, are you still taking oxycodone?

22   A.  No.

23   Q.  There came a time when you stopped?

24   A.  Yes.

25   Q.  When you stopped, did you experience any withdrawal?

Ibtntay1                    Dolinko - direct

1    A.  I did.

2    Q.  What happens when you withdraw from oxycodone?

3    A.  I was nauseous, throwing up, I had body aches and, you

4    know, there was a big mental part of it, too, like the craving

5    took a while to go away.

6    Q.  Did you see people in Dr. Taylor's waiting room experience

7    some of those things?

8    A.  Yes.

9         MR. RODRIGUEZ:  One moment, your Honor.

10   Q.  Mr. Dolinko, I want to clarify a piece of testimony you

11   just gave.  The day that you made this recording, at whose

12   direction did you make it?

13   A.  Meaning who asked me to make the recording?

14   Q.  Yes, sir.

15   A.  The agents.

16   Q.  And after you made the recording, what did you do with the

17   recording device?

18   A.  I gave it back to the agents.

19   Q.  Did you give the agents anything else?

20   A.  My prescriptions.

21   Q.  You testified earlier that you filled them.  Was that

22   misspeaking?

23   A.  At the appointment that I recorded I didn't fill those

24   prescriptions.  I gave those to the agents.

25        MR. RODRIGUEZ:  Thank you, Mr. Dolinko.

Ibtntay1                    Dolinko - Cross

1              No further questions at this time.

2              THE COURT:  OK.  Any cross-examination?

3              MR. CARNESI:  Yes.

4              THE COURT:  OK.

5    CROSS-EXAMINATION

6    BY MR. CARNESI:

7    Q.  Good morning.

8              THE COURT:  Hold on a second.  Counsel for government,

9    are you going to take this off the screen?

10             MR. RODRIGUEZ:  Oh, yes.  Thank you.

11   BY MR. CARNESI:

12   Q.  You told us that shortly after your car accident you went

13   to see a particular pain management doctor, right?

14   A.  Can you repeat the question?

15   Q.  Sure.  Sometime after your car accident, you went to see a

16   pain management doctor, right?

17   A.  I did.

18   Q.  What was that doctor's name again?

19   A.  Excuse me.

20   Q.  His name.

21   A.  Dr. Lifshutz.

22   Q.  And how did you find him?

23   A.  How did I find him?  A coworker recommended him.

24   Q.  Was the coworker also a patient of his?

25   A.  Not at the time.

Ibtntay1                    Dolinko - Cross

1  Q.  Now, when you went to see Dr. Lifshutz, you brought him I

2  am assuming this MRI as well?

3  A.  He's the one who had me go for the MRI.

4  Q.  There came a time when were you a patient of his when he

5  began prescribing this medication for you, right?

6  A.  Yes.

7  Q.  OK.  And the medication again was oxycodone, 30 milligrams?

8  A.  Yes.

9  Q.  Had you requested specifically that medication?

10  A.  I had asked Dr. Lifshutz to prescribe me oxycodone, 30

11  milligrams.

12  Q.  And how much on a daily basis of oxycodone at that time

13  were you taking?

14  A.  At that time, none.

15  Q.  When he began prescribing it for you, how much did he

16  prescribe for you on a daily basis?

17  A.  I believe it was 120 a month.

18  Q.  120 pills a month?

19  A.  Yes.

20  Q.  And that would be four pills a day?

21  A.  Correct.

22  Q.  Did the dosage ever increase?

23  A.  It was a long time ago, but I believe, if my memory serves

24  me right, yes.

25  Q.  At one point it went up to as many as six or eight pills a

Ibtntay1                    Dolinko – Cross

1    day, right?

2    A.   Yes.

3    Q.   When you went to see Dr. Lifshutz and you told him, I would

4    like a prescription for oxycodone, you had to describe for him

5    what your symptoms were, what the pain was, right?

6    A.   Yes.

7    Q.   And were you truthful at that time in prescribing your pain

8    to him?

9    A.   Was I truthful?  No.

10   Q.   Nevertheless, you were able to convince him that you were

11   actually in pain?

12   A.   Yes.

13           MR. RODRIGUEZ:  Objection.

14           THE COURT:  He's answered.  That's fine.

15           Go ahead.  Overruled.

16           MR. CARNESI:  All right.

17   BY MR. CARNESI:

18   Q.   How long did you remain a patient of his?

19   A.   Maybe two years.  I don't know -- I don't remember the

20   exact dates.

21   Q.   All right.  Roughly?

22   A.   About two years I would say.

23   Q.   During that period of time, you took anywhere from four up

24   to eight pills a day, is that right?

25   A.   When I first started getting the prescription prescribed to

1  me, I wasn't taking any.

2  Q.  All right.  Let me rephrase it.  During that period of time

3  he was prescribing for you four to eight pills a day?

4  A.  That's correct.

5  Q.  Now, during that period of time, did he give you any

6  additional MRI tests?

7  A.  I think there was one more MRI and there was like an EKG.

8  There was a couple of tests he had me go for.

9  Q.  How about urine tests?

10  A.  Excuse me?

11  Q.  Urine test?  Urine analysis?

12  A.  I don't remember getting a urine test there.

13  Q.  None at all?

14  A.  I don't think so, no.

15  Q.  OK.  After that two-year period of time, who was the next

16  doctor you saw?

17  A.  After Dr. Lifshutz, I saw Dr. Lanting, two appointments.

18  Q.  And was he also a pain management doctor?

19  A.  He was.

20  Q.  And what was the purpose in seeing him?

21  A.  To get oxycodone 30 milligrams.

22  Q.  Were you in pain, in need of the medication?

23  A.  Mild.  It was like mild pain.

24  Q.  Did you actually need the oxycodone?

25  A.  I don't think I needed the oxycodone at any point.

Ibtntay1                    Dolinko - Cross

1   Q.  Did you go there with the intention of taking the

2   medication?

3   A.  I went there with the intention of him prescribing it to

4   me, and I planned on getting high with some and to sell some.

5   Q.  And once again, with regard to Dr. Lanting, did he send you

6   for an MRI or any additional tests?

7   A.  No.

8   Q.  Did he ever send you for any urine analysis test?

9   A.  No.

10  Q.  Now, you said you saw him for what?  Two months?

11  A.  Yes.  It was two appointments.

12  Q.  Did you get any prescriptions from him?

13  A.  Two prescriptions for oxycodone.

14  Q.  And it was oxycodone, 30 milligrams?

15  A.  Yes.

16  Q.  You remember the amounts?

17  A.  If I'm not mistaken it was maybe 180 or 150.  It was so

18  long ago, I don't remember.

19  Q.  Just the best recollection you have.

20  A.  I would say 180 a month.  Twice he gave it to me.

21  Q.  All right.

22          And after Dr. Lanting, did you see another pain

23  management Doctor?

24  A.  I did.

25  Q.  Who was that?

Ibtntay1                    Dolinko - Cross

1   A.  That was Dr. Disenza.

2   Q.  How did you get to Dr. Disenza?

3   A.  How did I get there?

4   Q.  Yes.  Who recommended Dr. Disenza?  How did you find him?

5   A.  A friend of mine.

6   Q.  Was he also a patient?

7   A.  No.

8   Q.  Now, when I went to see Dr. Disenza, did he ask you for any

9   additional -- did you bring your MRI, first of all?

10  A.  Yes.

11  Q.  Any additional tests that he asked you to take?

12  A.  No.

13  Q.  And the purpose in going to see him was once again to

14  procure OxyContin?

15  A.  Oxycodone.

16  Q.  Oxycodone.  That was the reason, right?

17  A.  Yes.

18  Q.  In order to motivate him to write the prescription, you had

19  to tell him that you were in pain and you needed this

20  medication?

21  A.  Honestly, he was a little like out there that doctor.  I

22  didn't even have to tell him anything really.

23  Q.  I don't understand.

24  A.  I paid the money to the secretary, you went in to sit down

25  with the doctor, and he wrote you a prescription for oxycodone.

Ibtntay1            Dolinko - Cross

1    Q.  Did you tell them that that's why you were there?

2    A.  No, he knew.  That's what everybody was there for.

3    Q.  OK.  Do you remember the dosage that he wrote the

4    prescription for?

5    A.  I think it was 150 at this time.

6    Q.  150 pills, 30 milligrams also?

7            THE COURT:  Hold on.  You are shaking your head.  You

8    ever you have to answer for the transcript.

9            Is that a yes.

10           THE WITNESS:  To which question?

11           THE COURT:  He asked you the question about 150, 30

12   milligrams also?

13   A.  Yes.

14           THE COURT:  OK.

15   Q.  For how long a period of time did you continue being a

16   patient of Dr. Disenza?

17   A.  That went on for a while.  Maybe two years, two and a half

18   years.  It could have been more.  I don't remember the exact

19   date.

20   Q.  All right.  But safe to say two to three years?

21   A.  Yeah.

22   Q.  During that period of time, did you return to him on a

23   monthly basis to get a renewal of the prescription?

24   A.  It was a monthly basis.

25   Q.  Did there ever come a time where the amount of pills went

Ibtntay1                    Dolinko - Cross

1    up?

2    A.  It could -- I think it one time it went to 180, from 150 to

3    180.

4    Q.  How did that happen?  Did you go to him and tell him you

5    were using the pills too quickly?

6    A.  Yes.

7    Q.  That you needed more?

8    A.  I explained to him I was running out early.

9    Q.  OK.  When you say running out early, part of the

10   explanation was the pain was such that I had to keep taking the

11   pills, right?

12   A.  I wouldn't say the pain.  I would say that I was wanting to

13   obtain more oxy to make more money and to have more to get

14   high.

15   Q.  I understand your motive.  But did you tell the doctor

16   that?

17   A.  Tell him what?

18   Q.  That you wanted to get high more often or you wanted to

19   make more money.

20   A.  No.

21   Q.  What did you tell him in order to get him to increase the

22   medication?

23   A.  I told him that I was running out early and if he could

24   increase the dosage.

25   Q.  All right.  Now, after Dr. Disenza, who else did you see,

Ibtntay1                    Dolinko - Cross

1  if anybody?

2  A.  There was one more doctor, but I don't remember his name.

3  Q.  For how long a period of time did you see him?

4  A.  It was maybe about two months.

5  Q.  And that was also a pain management doctor?

6  A.  Yes.

7  Q.  And the purpose in seeing him was, again, to obtain

8  oxycodone?

9  A.  Yes.

10  Q.  Can you tell me about how you found that doctor?

11  A.  A friend of mine recommended him.

12  Q.  When you went to see that doctor, did you bring him an

13  updated MRI?

14  A.  I did not.

15  Q.  Let me go back to Dr. Disenza just for one more question.

16          Did he ever give you a urine analysis test?

17  A.  No.

18  Q.  Again, with this last doctor, this doctor whose name you

19  don't recall, did he give you a urinalysis test during that

20  time period?

21  A.  No.

22  Q.  He wrote you a prescription on the first visit?

23  A.  Yes.

24  Q.  And how much was that prescription for?

25  A.  I don't remember.

Ibtntay1                    Dolinko - Cross

1    Q.  Did you go back a second time, and did he write you another

2    prescription?

3    A.  I did.

4    Q.  Do you remember then how much the prescription was for?

5    How many pills?

6    A.  It might have been 120 or 150.  It was so long ago I don't

7    remember.

8    Q.  All right.  Now, you told us that you had a conversation

9    with Mr. Gallicchio about getting an appointment with

10   Dr. Taylor's office and that he made a phone call?

11   A.  Yes.

12   Q.  And you were present for the phone call?

13   A.  Yes.

14   Q.  Did he speak to Dr. Taylor?

15   A.  I don't know who he spoke to.

16   Q.  Do you recall him speaking to Denise and telling you that

17   she would set everything up.

18            MR. RODRIGUEZ:  Objection.  Asked and answered.

19            THE COURT:  Overruled.

20   A.  The phone call wasn't on speakerphone, so there was really

21   no way for me to know who exactly was on the phone.

22   Q.  When you went into the office were you expecting to meet an

23   individual by the name of Denise?

24   A.  I just knew she was the office manager.  That's all I knew.

25   Q.  The only information you knew about Dr. Taylor's operation

1  was through Vito, right?

2  A.  I mean, it was a pretty well-known thing that if you wanted

3  oxy, Taylor was your guy.

4  Q.  Denise, how did her name come up in that well-known thing?

5  A.  Can you repeat the question?

6  Q.  Sure.  What I'm asking you is, the information that you had

7  regarding Denise being the doctor's receptionist came from

8  Vito, didn't it?

9  A.  No.  The only reason I knew that Denise was the

10  receptionist was because when I called her to confirm my

11  appointment she answered the phone and introduced herself as

12  Denise, the office manager.

13  Q.  When you went to the office, you brought the MRI, right?

14  A.  I did.

15  Q.  And you dealt with Denise.  You paid her.  You paid her the

16  cash, right?

17  A.  Yes.

18  Q.  Now, during the course of time when you were seeing

19  Dr. Taylor, you remember getting urine tested?

20  A.  I remember getting urine tested multiple times in

21  Dr. Taylor's office.

22  Q.  Multiple times.  As many as five or six?

23  A.  I wouldn't say five or six, maybe between two and four.

24  Q.  OK.  Do you recall being interviewed by members of the U.S.

25  Attorney's Office back in June of 2017, after you began

Ibtntay1                    Dolinko - Cross

1   cooperating?

2   A.   Yes.

3   Q.   Is it possible that you told them that it was five or six

4   times over a period of time?

5   A.   I don't remember, to be honest with you.

6   Q.   But back in 2017, when you were being interviewed, you were

7   attempting to be truthful, but not?

8   A.   Yes.

9   Q.   Your memory may have been better back then over a year ago?

10  A.   It's possible.

11  Q.   All right.  When you saw Dr. Taylor, you told him about the

12  surgery you had had, right?

13  A.   Yes.

14  Q.   You discussed the car accident and the fact that you had

15  shoulder pain as a result of it?

16  A.   I just remember briefly discussing the surgery that I had.

17  Q.   Did you tell him what brought about the surgery?

18  A.   I don't remember that conversation.

19  Q.   Do you remember Dr. Taylor telling you that you should be

20  careful and that you shouldn't take too much of that

21  medication?

22  A.   No.

23  Q.   How many times were you debriefed by the U.S. Attorney's

24  Office?  Do you know how many meetings you had with them?

25  A.   There had to be about five or six, possibly a couple more.

Ibtntay1                    Dolinko - Cross

1    Q.   When was the last one?

2    A.   Excuse me?

3    Q.   When was the last meeting you had?

4    A.   The last meeting?  Last night.

5    Q.   And the one prior to that?

6    A.   A couple of days before.

7    Q.   When for the first time did you ever mention that Vito told

8    you that he bought furniture, computers, and things like that

9    for Dr. Taylor?  When did you first tell them that?  Did you

10   tell them that back in 2017?

11   A.   I might have.  I don't remember the exact conversation, but

12   I'm -- that's something that more than likely came up in the

13   early conversations.

14   Q.   Could it have been as recently as last week?

15   A.   It might have been discussed again last week.

16   Q.   As you sit here now, do you have any specific recollection

17   of ever discussing that with them prior?

18   A.   I mean, you are going back a while.  I believe we spoke

19   about that prior.

20   Q.   Do you have any recollection as to with whom you spoke, you

21   had that conversation --

22   A.   It might have been --

23   Q.   -- in the meeting that you had?

24   A.   It might have been one of the agents, Matty or -- I don't

25   know how to say her name.

Ibtntay1          Dolinko - Cross

1   Q.  I'm sorry.  You're gesturing towards somebody at the table.

2   A.  Yeah, I don't know how to say her name.

3   Q.  Ms. Fletcher?

4   A.  Yes.

5   Q.  You remember having that conversation with her?

6   A.  If I'm not mistaken, yeah.

7   Q.  Well, do you remember it --

8   A.  Yes, that was an early conversation when we first started?

9   Q.  When this all first started, right?

10  A.  Yes.

11          MR. CARNESI:  All right.  Thank you.

12          No further questions, Judge.

13          THE COURT:  Any redirect?

14          MR. RODRIGUEZ:  One moment, your Honor.

15          Your Honor, we may have a brief sidebar, please.

16          THE COURT:  Yes.

17       (Continued on next page)

18

19

20

21

22

23

24

25

1          (In the robing room)

2          MR. ROOS:  Your Honor, Mr. Carnesi asked a series of

3    questions as you know about why the witness stopped or what the

4    practices were for with each of those doctors.

5          THE COURT:  Yes.

6          MR. ROOS:  It seems fairly plain that he's intending

7    to use this to sort of compare his client to those physicians.

8    The witness was not asked why he left those practices.  The

9    answer is two of those individuals were arrested.  We think

10   it's totally appropriate to elicit that as the reason, but

11   wanted to flag for your Honor before we did it.

12         THE COURT:  OK.

13         MR. CARNESI:  I don't think it's probative that

14   anybody was arrested.

15         Was anybody convicted?

16         THE COURT:  What is that?

17         MR. CARNESI:  Were they convicted?

18         MS. FLETCHER:  I think both Lanting and Disenza were

19   arrested by the DEA.  It was very well publicized, and they

20   were both convicted.  The agent can confirm that, but I think

21   Lanting was the --

22         THE COURT:  You don't need to get into the fact that

23   they were convicted.  If you want to get into the fact that

24   they were arrested, it seems to me that is appropriate based on

25   that line.  How is that?

Ibtntay1                    Dolinko - Cross

1              MR. CARNESI:  That is fine.

2              THE COURT:  How much longer do you have with him?

3              MR. RODRIGUEZ:  It is going to be a few questions to

4    address that point, and a few other questions with respect to

5    one other item Mr. Carnesi asked about.

6              THE COURT:  OK.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2    REDIRECT EXAMINATION

3    BY MR. RODRIGUEZ:

4    Q.  Mr. Dolinko, on cross-examination, Mr. Carnesi asked you

5    some questions about Dr. Disenza.  Do you recall that?

6    A.  Yes.

7    Q.  Why did you stop going to Dr. Disenza?

8    A.  Dr. Disenza was arrested by law enforcement.

9    Q.  Mr. Carnesi also asked you some questions -- well, let me

10   ask you this.  Do you know why he was arrested?

11   A.  For illegally prescribing oxycodone to, I believe, hundreds

12   of patients.

13   Q.  Mr. Carnesi also asked you some questions about your visits

14   to Dr. Lanting.  Why did you stop going to Dr. Lanting?

15   A.  I was no longer able to get an appointment there.  He had

16   like bodyguards at the front door, and I stopped trying.  He

17   was also arrested.

18   Q.  Do you know why he was arrested?

19   A.  For illegally writing oxycodone prescriptions.

20   Q.  Mr. Carnesi also asked you some questions during

21   cross-examination about things that Vito told you that Vito

22   gave to Dr. Taylor.

23           What are some of the things that Vito told you he gave

24   to Dr. Taylor?

25   A.  A washer and dryer, office furniture for the office.

Ibtntay1                    Dolinko - redirect

1   Q.  Which office are you referring to, sir?

2   A.  It was my understanding that it was both.

3   Q.  What do you mean when you say both?

4   A.  The first office was in -- I don't know what neighborhood

5   it was in.

6   Q.  Whose office are we talking about?

7   A.  Dr. Taylor's.

8   Q.  Thank you.  You can continue.

9   A.  And he mentioned that he paid the rent for the office.

10  Q.  Who paid the rent for whose office?

11  A.  Vito Gallicchio for Dr. Taylor's office.

12  Q.  Did Vito tell you approximately how much he was paying?

13  A.  No.

14  Q.  Did he tell you for how long he was paying the rent?

15  A.  No.

16  Q.  Sitting here today, do you recall Vito telling you anything

17  else about things that he gave to the doctor?

18  A.  I don't recall anything else besides what I've told you.

19          MR. RODRIGUEZ:  Nothing further, your Honor.

20          THE COURT:  OK.  Anything else?

21          MR. CARNESI:  No, your Honor.

22          THE COURT:  OK.  The witness is excused.

23          (Witness excused)

24          THE COURT:  You may call your next witness.

25          MR. RODRIGUEZ:  The United States calls Investigative

1  Analyst Adrian Castro to the stand.

2   ADRIAN CASTRO,

3       called as a witness by the Government,

4       having been duly sworn, testified as follows:

5  DIRECT EXAMINATION

6  BY MR. RODRIGUEZ:

7  Q.  Sir, are you employed?

8  A.  Yes, I am.

9  Q.  Where do you work?

10  A.  The Drug Enforcement Administration.

11  Q.  What is your title at the Drug Enforcement Administration?

12  A.  I am an intel research specialist.

13  Q.  What are your duties and responsibilities as an intel

14  research specialist with the DEA?

15  A.  I support criminal and regulatory investigations by doing

16  phone analysis, financial analysis, open-source searches for

17  any information that will be of use during an investigation.

18  Q.  What are some of the kinds of information that you analyze

19  as part of your duties and responsibilities?

20  A.  Prescription monitoring data which is provided by the

21  states.

22  Q.  Any other kind of information or documents?

23  A.  Yes.  Urinalysis reports, medical files, phone analysis,

24  financial analysis, like I said.

25  Q.  How long have you been in your current position with the

1  Drug Enforcement Administration?

2  A.  Over nine years.

3  Q.  How, if at all, were you employed before you joined the

4  DEA?

5  A.  So, I was a military intelligence officer with the United

6  States Army for the last -- for eight and a half years prior.

7  Q.  As part of your experience with the DEA, were you assigned

8  to a particular unit?

9  A.  Yes, to the tactical diversion squad.

10  Q.  What is the tactical diversion squad?

11  A.  So, the primary focus of the tactical diversion squad is

12  regulatory or criminal investigations that are involved with a

13  DEA registration.  So, it could be a doctor, pharmacist, or

14  individuals who are diverting pharmaceutical-grade controlled

15  substances.

16  Q.  As part of your duties and responsibilities in your current

17  position, have you been involved in an investigation of

18  Dr. David Taylor?

19  A.  Yes.

20  Q.  Have you reviewed and analyzed certain documents and data

21  as part of that investigation?

22  A.  Yes, I have.

23  Q.  What kinds with respect to that investigation?

24  A.  Prescription monitoring data, financial documents, phone

25  analysis, patient files that were seized during the search

1   warrant, and urine reports.

2   Q.  You mentioned prescription monitoring data.  Where did you

3   get that from?

4   A.  I received it from both New York and New Jersey.  So, from

5   New York it was the Bureau of Narcotics Enforcement and from

6   New Jersey, New Jersey State Consumer Affairs.

7   Q.  Just generally, what is the Bureau of Narcotics

8   Enforcement?

9   A.  It's a regulatory agency that collects the data from

10  different pharmacies within the state of New York.

11  Q.  And what kinds of data do they provide?

12  A.  So, part of their data that they provide is any controlled

13  substance that was filled in the state of New York.

14  Q.  What types of information do they provide about those

15  controlled substances?

16  A.  So, as part of the actual data, you will have the

17  prescriber's name, the patient, the patient's date of birth,

18  their address, the strength of the drug, the drug type, the

19  quantity, where the prescription was filled, as in which

20  pharmacy filled it, and the address of the pharmacy.

21  Q.  You also mentioned receiving some data from New Jersey.

22          Can you describe for the jury the kind of data from

23  New Jersey you're referring to?

24  A.  So, the New Jersey P&P data is similar in nature.  It

25  provides the patient's name, the date of birth, the doctor who

Ibtntay1                    Castro - Direct

1    wrote the prescription, the type of drug, the quantity, the

2    strength, the pharmacy that filled it, and once again the

3    address of the pharmacy.

4    Q.  What agency provides that data?

5    A.  The New Jersey Consumer Affairs.

6    Q.  Have you had an opportunity before testifying to review and

7    analyze that data?

8    A.  Yes, I have.

9            MR. RODRIGUEZ:  Your Honor, may I approach the

10   witness --

11           THE COURT:  Yes.

12           MR. RODRIGUEZ:  -- and hand the witness what has been

13   marked for identification as Government Exhibit 502, a

14   three-page document.

15   Q.  Sir, I've handed you what's been marked for identification

16   as Government Exhibit 502.

17           Do you recognize this document?

18   A.  Yes, I do.

19   Q.  Generally speaking, what is it?

20   A.  It is a summary chart of the controlled substances written

21   by Dr. David Taylor as reported by the states of New York and

22   New Jersey.

23   Q.  Did you participate in the production of this document?

24   A.  Yes.

25   Q.  And what sources of information did you use to create this

Ibtntay1                    Castro - Direct

1   document specifically?

2   A.   Both the New York BNE data and the New Jersey P&P data.

3   Q.   Does this document, Government Exhibit 502, fairly and

4   accurately summarize the data you've just referred to regarding

5   Dr. David Taylor?

6   A.   Yes.

7        MR. RODRIGUEZ:  Your Honor, the government offers

8   Government Exhibit 502.

9        THE COURT:  Any objection?

10       MR. CARNESI:  No objection.

11       THE COURT:  OK.  It's in.

12       (Government Exhibit 502 received in evidence)

13       MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

14   and publish for the jury the first page of Government Exhibit

15   502.

16   Q.   Sir, focusing in on the top portion of the document, can

17   you explain to the jury the information that's reflected here.

18   A.   So these are the controlled substances written by Dr. David

19   Taylor from July 2, 2012, to June 22, 2017.

20   Q.   The controlled substances from where?

21   A.   Written in New York as reported by pharmacies in New York.

22   Q.   What is the total number of controlled substance

23   prescriptions written by David Taylor during this period of

24   time as reported by the BNE?

25   A.   24,513.

Ibtntay1                        Castro - Direct

1    Q.  Focusing your attention now on the pie chart there, can you

2    explain to the jury the information that is generally reflected

3    in that pie.

4    A.  This is a breakdown of the controlled substances written by

5    Dr. David Taylor into different schedules as they have been

6    placed by the DEA.

7    Q.  So, there is a blue piece to that pie.  Can you explain to

8    the jury what is captured in the blue piece of that pie.

9    A.  So that's all the prescription -- the oxycodone

10   prescriptions that were written by Dr. David Taylor within this

11   time frame as reported by pharmacies in New York.

12   Q.  How many oxycodone prescriptions did Dr. David Taylor write

13   during this period of time according to the BNE data?

14   A.  13,650.

15   Q.  What percentage of the total controlled substance

16   prescriptions that he wrote was that?

17   A.  56 percent.

18   Q.  Sir, there's another piece of the pie there that is red,

19   and it says, "Other Schedule II."

20          Can you please explain to the jury what that piece of

21   the pie reflects.

22   A.  So other Schedule II drugs as written by Dr. David Taylor

23   include Fentanyl, oxymorphone, hydrocodone after 2014, and

24   morphine.

25   Q.  You mentioned a few other drugs there that I want to ask

1  you some questions about.  What is Fentanyl?

2  A.  Fentanyl is the strongest opioid-based painkiller.  It can

3  be -- take the form of a patch, a spray.  There's a few

4  different applications.

5  Q.  I believe you also mentioned something called oxymorphone?

6  A.  Yes.

7  Q.  What is that?

8  A.  It's commonly known as Opana.  It has a similar composition

9  as morphine and oxycodone, but it's twice as strong as

10 oxycodone.

11 Q.  Is oxymorphone still commercially available as Opana?

12 A.  No, it is not.

13 Q.  Why not, sir?

14 A.  It was pulled from the market due to the high risk -- the

15 risk no longer outweighed the benefit.

16 Q.  When you say the risks, are you referring to the risks of

17 abuse of the drug?

18 A.  Yes.

19 Q.  Sir, there's another piece of the pie here that appears to

20 be green.  Can you explain to the jury what is reflected in

21 that piece of the pie?

22 A.  Those are schedule III and IVs, which would be the

23 testosterone, hydrocodone before 2014, alprazolam, zolpidem.

24 Q.  You mentioned a few different types of drugs.  I believe

25 you said alprazolam?

1   A.  Yes.

2   Q.  Are you familiar with any brand names that drug is

3   available as?

4   A.  Yes, Xanax.

5   Q.  You mentioned another drug after alprazolam.  What was

6   that?

7   A.  Zolpidem.

8   Q.  Are you familiar with any brand names that drug is

9   available as?

10  A.  Yes, Ambien.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. RODRIGUEZ:

Q.   Thank you, sir.

     Now, focusing your attention on the right side of the
page.  There are two boxes.  The top box says Oxycodone
prescriptions.  Total:  13,650.

     Can you explain to the jury the information reflected
in that top box?

A.   So the top box reflects the three most common strengths as
written by Dr. David Taylor.

Q.   Can you explain what those strengths are?

A.   So the first one is the Oxycodone 10, slash, 325.  So the
10, which is the smaller number is the amount of Oxycodone in
the actual pill.  325 is the acetaminophen in that same pill.

Q.   What is acetaminophen?

A.   It is commonly known as Tylenol.

Q.   Is that type of Oxycodone pill commonly available under any
particular brand names?

A.   Yes.  Endocet or Percocet.

Q.   What about the other pieces of information reflected in
that top box?

A.   So the other two most commonly written by Dr. David Taylor
were the Oxycodone 15 milligrams and 30 milligrams of pills.

Q.   Are you familiar with any brand names under which those
drugs are said?

A.   Roxicodone.

Ibt6tay2                    Castro - direct

1   Q.  Sir, there is another box underneath there that says

2   Oxycodone 30-milligram prescriptions.  1,625,646 Oxycodone

3   30-milligram pills.  Why did you create a separate box for

4   Oxycodone 30-milligram prescriptions?

5   A.  So in my experience Oxycodone 30 milligrams is the most

6   commonly sought after in the diversion market on the streets.

7   It is the strongest type of Oxycodone you can get that doesn't

8   have a tamper-resistant gel in it.

9   Q.  What significance, if any, is there to tamper-resistant gel

10  in Oxycodone?

11  A.  So with an Oxycodone 30-milligram pill, it can be crushed

12  and snorted.

13  Q.  There is some more information in that box regarding the

14  number of pills.  Can you explain to the jury the information

15  reflected there?

16  A.  So these are the amount of actual Oxycodone milligram pills

17  that were written or prescribed by Dr. David Taylor within the

18  State of New York.

19  Q.  There is a line there that says, Other amount.  What is

20  that referring to?

21  A.  That refers to any prescription written by Dr. David Taylor

22  in New York that was either higher than 180 or lower -- higher

23  than 240 or lower than 180.

24  Q.  Thank you.

25          MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

1    the second page of Government Exhibit 502.

2    Q.  Sir, what information did you use to create what is

3    reflected on this page?

4    A.  So this is based off New Jersey PMP data.

5    Q.  What period of time does it cover?

6    A.  July 2nd, 2012 to April 12th, 2017.

7    Q.  According to the data that you are reviewed and used to

8    create this, how many total controlled substance prescriptions

9    did Dr. David Taylor write as reported by the agency in the

10   state of New Jersey that provided this data?

11   A.  12,032.

12   Q.  How does that compare to the total number of controlled

13   substance prescriptions reported by New York in the first page

14   we looked at?

15   A.  So the overall -- it's about half the amount as written in

16   New York.

17   Q.  Let's take a look at the pie that is reflected on this

18   page.  There is a blue piece here.  Can you explain to the jury

19   what that is?

20   A.  So that represents the 8,277 Oxycodone prescriptions

21   written by Dr. David Taylor as reported by pharmacies in the

22   state of New Jersey.

23   Q.  How does the percentage of controlled substance

24   prescriptions reported in New Jersey at this time of Oxycodone

25   compare to the percentage of controlled substances reported in

Ibt6tay2                        Castro - direct

1   New York that are Oxycodone?

2   A.  It is approximately 13 percent higher.

3           MR. RODRIGUEZ:  Ms. Corrado, can we pull up both page

4   1 and 2 of Government Exhibit 502 for the jury.

5           Thank you.

6   Q.  Sir, on your screen you have pages 1 and 2 of Government

7   Exhibit 502.  Can you explain to the jury how the blue pieces

8   of the pie compare?

9   A.  So it is about 5,000 pills less as reported in the state of

10  New Jersey for Oxycodone but the percentage is higher in New

11  Jersey.

12  Q.  Thank you.

13          MR. RODRIGUEZ:  Ms. Corrado, let's pull up the third

14  and final page of this exhibit, Government Exhibit 502.

15  Q.  Sir, can you just explain to the jury what is reflected in

16  this page?

17  A.  So these are the -- a combination of both the New York and

18  New Jersey PMP data for Dr. David Taylor which covers July 2nd,

19  2012 to June 22nd, 2017.

20  Q.  During this period of time according to the data that you

21  received with respect to New York and New Jersey, what was the

22  total number of controlled substance prescriptions that

23  Dr. David Taylor wrote?

24  A.  36,545.

25  Q.  What was the total number of Oxycodone prescriptions he

Ibt6tay2                    Castro - direct

1   wrote?

2   A.  21,927.

3   Q.  What was the total number of Oxycodone 30-milligram pills

4   that he wrote for during this period of time?

5   A.  The total amount of pills 2,648,177.

6   Q.  Thank you, sir.

7          MR. RODRIGUEZ:  Ms. Corrado, we can pull that down.

8          Ms. Corrado, can we please pull up for just the

9   witness Government Exhibit 501.

10  Q.  Sir, do you recognize Government Exhibit 501?

11  A.  Yes.

12  Q.  What is it?

13  A.  It's the locations where Dr. David Taylor had medical

14  offices.

15  Q.  Does this document have several pages?

16  A.  Yes.

17         MR. RODRIGUEZ:  Ms. Corrado, can you flip through

18  those pages for the witness.

19  Q.  Sir, did you review this document before testifying today?

20  A.  Yes.

21  Q.  Does this document include some maps?

22  A.  Yes, it does.

23  Q.  Do those maps fairly and accurately depict the locations

24  that they purport to depict?

25  A.  Yes.

Ibt6tay2                    Castro - direct

1   Q.  Does this document fairly and accurately summarize the data

2   that you testified earlier about with respect to David Taylor?

3   A.  Yes.

4           MR. RODRIGUEZ:  Your Honor, the government offers

5   Government Exhibit 501.

6           MR. CARNESI:  No objection.

7           THE COURT:  That is in.

8           (Government's Exhibit 501 received in evidence)

9           THE COURT:  Let's take a six-minute break and give the

10  jurors a chance to stretch their legs.  Don't discuss this case

11  with anyone else.  Don't discuss it amongst yourselves.  Don't

12  conduct any independent research any of the parties, issues or

13  locations.

14          See you soon.

15          (Jury excused)

16          (Recess)

17          (Continued on next page)

18

19

20

21

22

23

24

25

Ibt6tay2                    Castro - direct

1          THE COURT:  Are we ready?

2          Let's bring the jury in.

3          (In open court; jury present)

4          THE COURT:  Please be seated.  Welcome back.

5          Let's continuing.

6    BY MR. RODRIGUEZ:

7    Q.  Sir, before the break we were looking at Government

8    Exhibit 501.

9

10         MR. RODRIGUEZ:  Ms. Corrado, can we please bring that

11   up on the screen.

12         THE COURT:  I don't think it is on for the jury yet.

13   You have to hit the button.

14         Okay.

15   Q.  Can you explain to the jury what is depicted on the first

16   page of Government Exhibit 501?

17   A.  So those are Dr. Taylor's medical office locations.

18   Q.  Focusing your attention on the right side of the screen,

19   can you explain briefly where each one of those locations was

20   or where it corresponds to on the map?

21   A.  So the first office was the one on 796 Castleton Avenue,

22   Staten Island.  That is depicted by the orange icon in the top.

23   He was there from 2014 to 2015.

24         The second office 2260 Victory Boulevard, Staten

25   Island, which is depicted by the blue icon, Dr. David Taylor

1    was from 2012 to 2014.

2            And then the last one from 2015 to 2017 he was at 4350

3    Hylan Boulevard, Staten Island, which is depicted by the green

4    icon towards the bottom

5            MR. RODRIGUEZ:  Ms. Corrado, can we please go to page

6    2.

7    Q.  Sir, can you tell me what is depicted here and what

8    information was used to create it?

9    A.  So this is a summary chart of Vito Gallicchio, an

10   individual that was receiving prescriptions from Dr. Taylor and

11   the pharmacies that he utilized to fill those prescriptions in

12   the state of New Jersey.

13   Q.  Thank you.

14           Starting on the right side of the page with the

15   information at the top, can you explain what is reflected there

16   to the jury?

17   A.  So Vito Gallicchio filled 22 Oxycodone 30-milligram

18   prescriptions in New Jersey.

19   Q.  Where did he fill those prescriptions?

20   A.  So he filled 14 prescriptions at Bergan Point Apothecary

21   from July 1st, 2013 to July 16, 2014.

22           Then he filled seven prescriptions at A & P Pharmacy

23   from August 14th, 2014 to February 5th, 2015.

24           He also filled one prescription at the Pathmark on

25   August 28th, 2015.

Ibt6tay2                    Castro - direct

1   Q.   Which state are those pharmacies located in?

2   A.   All three of those pharmacies are in the state of New

3   Jersey.

4   Q.   To be clear what data did you use to create this?

5   A.   The New Jersey PMP data.

6        MR. RODRIGUEZ:   Ms. Corrado, can we go to page 3,

7   please.

8   Q.   Sir, can you explain what is reflected on page 3 of

9   Government Exhibit 501?

10  A.   These are the prescriptions filled by Lawrence Montabano

11  written by Dr. David Taylor and filled in the state of New

12  Jersey.

13  Q.   How many were filled and for what?

14  A.   There were 24 Oxycodone 30-milligram prescriptions filled

15  in New Jersey.

16  Q.   At which pharmacies in New Jersey according to the data

17  that you used?

18  A.   So two of them were filled at Bergan Point Apothecary on

19  July 2nd, 2014 and August 1st, 2014.

20       Another two were filled at Safe RX Pharmacy from

21  September 30th, 2014 to October 29, 2014.

22       And then 20 were filled at Hudacko's Pharmacy

23  October 30, 2015 to March 16th, 2017.

24  Q.   There are two boxes on the left side of the page.  Can you

25  explain to the jury what those two boxes are?

1    A.  So the top box is an overall view of the pharmacies in the

2    state of New Jersey with the one in South Plainfield being all

3    the way in the top -- all the way to left on that top map.  The

4    second one is just a closer view of where South Plainfield --

5    the pharmacy of South Plainfield.

6            MR. RODRIGUEZ:  Ms. Corrado, can we go to the next

7    page, page 4 of Government Exhibit 501, please.

8    Q.  Mr. Castro, what is reflected on this page?

9    A.  So these are the prescriptions filled by Leonard Danzi

10   written by Dr. David Taylor as filled in New Jersey.

11   Q.  Where were they filled according to the data you used?

12   A.  So 15 Oxycodone 30-milligram prescriptions were filled at

13   Bergan Point Apothecary from July 31st, 2013 to July 14th,

14   2014.

15   Q.  Thank you.

16            For clarity where is Bergan Point Apothecary located?

17   A.  It is located 110th West 4th Street, Bayonne, New Jersey.

18   Q.  Where does that location information come from?

19   A.  It comes from the New Jersey PMP data.

20            MR. RODRIGUEZ:  Ms. Corrado, can we please go to the

21   next page, page 5 of Government Exhibit 501.

22   Q.  Sir, can you please explain to the jury briefly what is

23   reflected on this page?

24   A.  These are the prescriptions filled by Robert Adams as

25   reported by pharmacies in the state of New Jersey for

Ibt6tay2                    Castro - direct

1    prescriptions written by Dr. David Taylor.

2    Q.  How many such prescriptions were filled?

3    A.  So 30 -- there were 39 Oxycodone 30-milligram prescriptions

4    filled in New Jersey.

5    Q.  Where?

6    A.  So 12 were filled at Bergan Point Apothecary from July 11,

7    2013 to July 14, 2014.

8              Another 14 were filled at A & P Pharmacy, August 14,

9    2014 to August 4th, 2015.

10              Two prescriptions were filled at Rite Aid from October

11    20th, 2015 to November 25th, 2015.

12              And 11 prescriptions were filled at Wallgreens on

13    December 23rd, 2015 to February 2nd, 2017.

14              MR. RODRIGUEZ:  Ms. Corrado, can we go to the next

15    page, page 6.

16    Q.  Briefly can you please explain what is depicted here?

17    A.  These are the prescriptions filled by Michael Barberi

18    written by Dr. David Taylor and filled in the state of New

19    Jersey.

20    Q.  Which prescriptions were filled?

21    A.  So 17 Oxycodone 30-milligram prescriptions were filled in

22    New Jersey as written by Dr. David Taylor.

23    Q.  At which pharmacies?

24    A.  So two prescriptions were filled at Easy Pharmacy

25    January 11th, 2016 to February 18, 2016.

1          13 prescriptions at CVS Hillsborough from

2    January 21st, 2016 to February 15, 2017.

3          One prescription at Wallgreens on November 22nd, 2016.

4          Another one prescription at CVS Bridgewater, March 11,

5    2017.

6    Q.  Mr. Castro, for complete clarity on pages 236 of Government

7    Exhibit 501, does what is shown there include any prescriptions

8    filled by these individuals in the state of New York?

9    A.  No.

10   Q.  Mr. Castro, during the course of your work with the DEA,

11   have you become familiar with the basic geography of Staten

12   Island and its surrounding areas?

13   A.  Yes.

14   Q.  Have you become familiar with the ways getting on to and

15   off of the island?

16   A.  Yes.

17          MR. RODRIGUEZ:  Ms. Corrado, with you please pull up

18   page 7 of Government Exhibit 501.

19   Q.  Mr. Castro, what is depicted here?

20   A.  That is the Bayonne Bridge which connects Staten Island to

21   New Jersey.

22   Q.  What body of water does this bridge go across?

23   A.  The kill van Kull.

24          MR. RODRIGUEZ:  Ms. Corrado, can you go to the next

25   page, page 8.

1   Q.  What is depicted here, sir.

2   A.  The Goethels Bridge, which connects Staten Island to New

3   Jersey.

4   Q.  What body of water does that bridge go over?

5   A.  Arthur Kill Waterway.

6           MR. RODRIGUEZ:  Ms. Corrado, can you please go to page

7   9.

8   Q.  What is depicted here, sir?

9   A.  The Outerbridge Crossing, which also connects Staten Island

10  to the state of New Jersey.

11  Q.  What waterway does this bridge go over?

12  A.  It also goes over the Arthur Kill Waterway.

13  Q.  The last page of this exhibit, page 10 of Government

14  Exhibit 501, what is depicted here, sir?

15  A.  Verrazano-Narrows Bridge, which connects Staten Island to

16  Brooklyn.

17  Q.  What body of water does that go over, sir?

18  A.  The Narrows.

19  Q.  Thank you.

20          MR. RODRIGUEZ:  Ms. Corrado, you can take that down.

21          Your Honor, if I may approach and hand the witness

22  what has been marked as Government Exhibit 503.

23          THE COURT:  Okay.

24  Q.  Mr. Castro, I have handed you what has been marked as

25  Government Exhibit 503.  It is several pages.  Can you please

Ibt6tay2                    Castro - direct

1    take a second to review them.  Once you have had an opportunity

2    to do that, please tell me if you recognize this document.

3    A.  Yes, I do.

4    Q.  What is it?

5    A.  It's summary charts of individuals that were receiving

6    prescriptions by Dr. David Taylor.

7    Q.  Who created this chart?

8    A.  I did.

9    Q.  How did you do that, sir?

10   A.  Through the use of the New York and New Jersey PMP data,

11   urinalysis reports and the patient files.

12   Q.  Does Government Exhibit 503 fairly and accurately summarize

13   the information from the patient files, the urinalysis data,

14   and the Prescription monitoring Program data that you testified

15   about?

16   A.  Yes.

17          MR. RODRIGUEZ:  Your Honor, the government offers

18   Government Exhibit 503.

19          MR. CARNESI:  No objection.

20          THE COURT:  503 is in.

21          (Government's Exhibit 503 received in evidence)

22          THE COURT:  Counselor, how many more exhibits do you

23   have with this witness just in the short-term?

24          MR. RODRIGUEZ:  Just this one exhibit, which is about

25   eight or nine pages.

1          THE COURT:  This is 503.  And after 503 are there

2    others?

3          MR. RODRIGUEZ:  No, your Honor.

4          THE COURT:  That's it.

5          MR. RODRIGUEZ:  Thank you.

6          Ms. Corrado, can we please pull up the first page of

7    Government Exhibit 503.

8    Q.  Mr. Castro, let me focus your attention on the top portion

9    of this page.  Please explain to the jury what is depicted

10   here.

11   A.  So this is a summary chart for Don Carim and the

12   prescriptions written by Dr. David Taylor from June 11th, 2014

13   to May 25th, 2017.

14   Q.  What kind of prescriptions?

15   A.  There were 34 Oxycodone 30-milligram prescriptions.

16   Q.  Now I want to focus you to the graphic portion of this

17   page.  Let's start with what is depicted all the way on the

18   left, those numbers going up and down.  What do those numbers

19   signify?

20   A.  Those are the amount of pills per prescription as written

21   by Dr. David Taylor for the Oxycodone 30 milligrams.

22   Q.  Let's look at the information going side to side on the

23   bottom.  What information is reflected there?

24   A.  Those are the dates that were written -- that the

25   prescription was written by Dr. David Taylor.

1    Q.  Now, starting on the left side of the screen.  Can you

2    explain to the jury what the graph depicted?

3    A.  So the first prescription written for Don Carim was on June

4    11, 2014.  That was the first prescription written for Don

5    Carim, which were 60 Oxycodone 30-milligram pills.

6    Q.  There are green dots in this graph.  What do those green

7    dots signify?

8    A.  So the green dots represent any time when two prescriptions

9    were written in the same month for the same individual for

10   Oxycodone 30 milligrams by Dr. David Taylor.

11   Q.  Let's move to the right.  There is a space on the graph

12   that is empty.  Can you explain what that signifies?

13   A.  That is to represent that during those months this

14   individual did not receive any prescription as reported by the

15   state of New York.

16   Q.  Can you explain to the jury what is signified by the

17   remainder of the blue dots and lines starting at November 18,

18   of 2014?

19   A.  So beginning on November 18, 2014, Don Carim continued to

20   receive Oxycodone 30-milligram prescriptions written by Dr.

21   David Taylor until January 26, 2016.

22   Q.  How many pills per prescriptions initially?

23   A.  180.

24   Q.  Does that change at some point?

25   A.  Yes.

Ibt6tay2                    Castro - direct

1    Q.  When and how?

2    A.  On February 10, 2015 it went up to 210 Oxycodone

3    30-milligram pills.

4    Q.  Sir, there is a box towards the bottom that says, 7-7-2015

5    tested positive for cocaine.  What information did you use for

6    that?

7    A.  So this was based off the urinalysis reports that were

8    obtained from Ameritox.

9    Q.  And what did that report reflect that you reviewed?

10   A.  It reflects the urinalysis that was given by Dr. David

11   Taylor to these individuals and the results.

12   Q.  Next to that box there is another box that says, Tested --

13   8-11-2015 tested negative for Oxycodone.  What information did

14   you use to depict that?

15   A.  The urinalysis reports that were conducted on August 11th,

16   2015.

17   Q.  After these two urinalysis -- the dates on these two

18   urinalysis results, did the data that you review showed more

19   prescriptions by David Taylor to Don Carim during this period

20   of time?

21   A.  Yes.  The next prescription was written on August 25th,

22   2015 for Oxycodone 30 milligrams.  210 Oxycodone 30 milligrams.

23   Q.  There is another box there that says, 3-31-16 tested

24   negative for Oxycodone and positive for morphine.  What

25   information did you use to depict that?

Ibt6tay2                    Castro - direct

1    A.  The urinalysis report from March 31st 2016.

2    Q.  After the results of that test did the data that you

3    reviewed show additional prescriptions for 30-milligram

4    Oxycodone pills from Dr. Taylor to Don Carim?

5    A.  The next prescription was written on May 5th, 2016 where he

6    continued to receive Oxycodone 30-milligram pills.

7    Q.  After that point did there come a time when the amount of

8    pills per prescription changed?

9    A.  Yes.  In October 2016 the prescription dropped down to 180

10   Oxycodone 30-milligram pills.

11   Q.  Focusing your attention towards the right portion of that

12   page, can you start explaining to the jury the information

13   reflected around January of 2017?

14   A.  So January 2017 Don Carim was receiving 180 Oxycodone

15   30-milligram pills from Dr. David Taylor and in January he

16   actually received two prescriptions.  One on January 3rd and

17   one on January 31st.

18   Q.  According to the data did he receive any in the month of

19   February?

20   A.  Yes.  He also received on February 28th another 180

21   Oxycodone 30-milligram pills.

22   Q.  Sir, there is a box there that says 3-7-2017 cleared for

23   FDNY exercise program.  What information did you use to depict

24   that?

25   A.  So within Don Carim's patient file there is paperwork

1    required by the Fire Department of New York where the doctor

2    has to sign off saying that he is in physical condition to be

3    able to go through the exercise program as deemed by FDNY.

4    Q.  After the date of that clearance, does the data that you

5    reviewed reflect additional Oxycodone prescriptions?

6    A.  Yes.

7             MR. RODRIGUEZ:  Ms. Corrado, can you please pull up

8    Government Exhibit 408, which is already in evidence, page 47.

9    Q.  Sir, do you recognize this document?

10   A.  Yes.

11   Q.  What is this document?

12   A.  This was found within Don Carim's medical file and seized

13   at Dr. Dave Taylor's residence or office.

14   Q.  Does this document relate to any of the information

15   depicted in the graph we were just looking at?

16   A.  Yes.  This was the paperwork that was signed off on page 2

17   of this document by Dr. David Taylor giving Don Carim the

18   clearance to participate in the FDNY exercise program.

19   Q.  Can you slowly read the title of this document and the

20   bottom two bullets?

21   A.  This is the FDNY fitness awareness program medical

22   clearance form.  Part of the Fitness Assessment Event 1 is the

23   push-ups.  The candidate will perform the maximum number of

24   uninterrupted push-ups, s/he or he can achieve without rest.

25             The second is Fitness Assessment Event No. 2 is the

1  pull-ups.  The candidate will perform the maximum number of

2  uninterrupted pull-ups, s/he can achieve without rest.

3  Pull-ups are to be performed with the palms facing away from

4  the body.

5  Q.  Thank you.

6         MR. RODRIGUEZ:  Ms. Corrado, can we go to the next

7  page of Government Exhibit 408, which is page 48.

8  Q.  Sir, let me just direct your attention -- you don't have to

9  read the whole thing, but the underlined portions of the three

10 bullets at the top.

11 A.  So the third event is sit-ups.  The fourth event is a timed

12 one and a half mile run and the last one is calisthenics

13 sessions.

14 Q.  Thank you.

15        MR. RODRIGUEZ:  Ms. Corrado, can you zoom into the

16 bottom portion where it says, Physician Certification.

17 Q.  Mr. Castro, can you please read the certification?

18 A.  "I certify I have examined the above candidate and further

19 certify this candidate is medically fit to participate in

20 fitness awareness program," and then there is a physician's

21 name, which appears to be Dr. David Taylor, signature and the

22 physicians license number.

23        MR. RODRIGUEZ:  Ms. Corrado, can you zoom out, please.

24        Thank you, you can take that down.

25        If we can please bring back up Government Exhibit 503

1    and go to the second page, please.

2    Q.   Mr. Castro, can you please explain what the information is

3    on this page?

4    A.   So this is summary of Michael Farley's prescriptions for

5    Oxycodone 30-milligram pills as written by Dr. David Taylor.

6    Q.   We won't go through this one in as much detail, but let me

7    draw your attention to the red box there at the bottom that,

8    says, 12-16-2014 tested negative for Noroxycodone.  Do you see

9    that?

10   A.   Yes.

11   Q.   What information did you use to depict that?

12   A.   The urinalysis report from December 6, 2014.

13   Q.   What is Noroxycodone?

14   A.   It is a metabolite that should be depicted within the urine

15   of an individual that is taking the Oxycodone as prescribed.

16   Q.   Can you just, if you can, explain in a little bit more

17   plain terms what you mean by metabolite?

18   A.   It's the way the body processes the Oxycodone.  So if a

19   person is taking it the way it is prescribed, you should be

20   able to -- it should be still within the urine.

21   Q.   At the time of this test, how many Oxycodone pills was

22   Michael Farley being prescribed according to the data you were

23   looking at?

24   A.   240.

25   Q.   Approximately how often?

Ibt6tay2                    Castro - direct

1   A.  Approximately every month.

2   Q.  After the results of this test, were there additional

3   prescriptions of 30-milligram Oxycodone pills?

4   A.  Yes.

5   Q.  Briefly can you summarize the information reflected in the

6   other red boxes on this page?

7   A.  So on March 17, 2015 he tested negative again -- Michael

8   Farley tested negative again for the Noroxycodone.  Then on

9   March 17, 2016 -- so a year later -- he was tested again and he

10  tested negative for the morphine he was prescribed by Dr. David

11  Taylor but tested positive for hydrocodone.

12  Q.  Did you continue to receive Oxycodone prescriptions after

13  that?

14  A.  Yes, he did.  He continued to receive the 240 Oxycodone

15  30-milligram pills until October of 2016 when he was dropped

16  down to 180 pills and continued to do so until the May 23rd,

17  2017.

18          MR. RODRIGUEZ:  Let's look at page 3 of Government

19  Exhibit 503.

20  Q.  Sir, can you explain to the jury the information captured

21  on this page?

22  A.  So these are the Oxycodone prescriptions written by Dr.

23  David Taylor for Vito Gallicchio from the time of July 3rd,

24  2012 to June 15, 2017.

25  Q.  Why did you focus on that period of time?

1    A.   That was the time frame used for the New York PMP data.

2    Q.   All the way to the left of the screen there is a box there.

3    Can you explain what it is?

4    A.   So Vito Gallicchio was -- had been a patient of Dr. David

5    Taylor prior to the PMP data that we're using.  So the first

6    one is June 6, 2012 where that was the only urinalysis that

7    occurred during this five-year time frame for Vito Gallicchio.

8    He tested negative for Noroxycodone for June 6, 2012.

9    Q.   If you know, does the information that you reviewed for

10   that test indicate whether the test results indicated the

11   presence of Oxycodone in the sample?

12   A.   I don't recall that.

13   Q.   So moving from the left to the right, can you explain the

14   information on this page to the jury?

15   A.   So on July 6, 2012 as reported on the medical records for

16   Vito Gallicchio, the patient received an extra 180 pills

17   because Vito Gallicchio was going to be traveling.

18   Q.   How many pills -- prescriptions was Vito Gallicchio

19   receiving according to the data?

20   A.   He was receiving -- he had received 240 on July 3rd and on

21   July 9th was given another 180 pills.

22   Q.   Can you continue making your way from left to right and

23   summarize for the jury the information here.

24   A.   So Vito Gallicchio continued to receive the 240 Oxycodone

25   30-milligram pills per month until June 11th, 2013, where he

Ibt6tay2                    Castro - direct

1    said that -- he claimed that his medicine was damaged in the

2    wash.  So he received another prescription of 120 Oxycodone

3    30-milligram pills.  He continued to receive the 240 until

4    there was a break in June of 2013.

5            He came back and continued to receive his pills until

6    March 27, 2014.  One against he Vito Gallicchio claimed his

7    medicine was damaged in the rain and was again another 120

8    Oxycodone.  At this point Vito Gallicchio was receiving 270

9    Oxycodone pills a month until December of 2015.  He received

10   two prescriptions that month.  One for 270 and then one down to

11   240 where he received -- he continued to receive the 240

12   Oxycodone 30-milligram pills for the majority of 2016 until

13   October 2016 when he was also dropped to 180 Oxycodone.

14   Q.  Mr. Castro, the two boxes, the one that says, Patient

15   claimed medicine was damaged in wash and the Patient claimed

16   medicine was damaged in rain, where in the documents that you

17   received did that come from?

18   A.  From the patient file.

19   Q.  Specifically what kind of document in the patient file?

20   A.  It is the doctor's note of that patient visit.

21           MR. RODRIGUEZ:  Ms. Corrado, can we go to the next

22   page, please.

23   Q.  Sir, how if at all does the information on page 4 of

24   Government Exhibit 503 differ from the information on the prior

25   pages?

Ibt6tay2                     Castro - direct

1    A.  So for this I only used the New York, New Jersey PMP data.

2    I did not use the medical file or urinalysis reports for this

3    chart.

4    Q.  If you can briefly summarize for the jury the information

5    reflected here?

6    A.  So for Robert Adams he received 60 Oxycodone from July 11,

7    2012 to March 28, 2017.  There were several months where he

8    received multiple prescriptions for 240 Oxycodone 30-milligram

9    pills.

10   Q.  Are those indicated with the green dots?

11   A.  Yes.

12   Q.  Please continue.

13   A.  He was consistently received the Oxycodone 240 milligrams

14   for 2012 and most of 2013.  The one dip you see in October is

15   because he received two prescriptions.  One for the 240 and

16   another one for 180 pills.  Then in March of 2014 he bumped up

17   to 270 Oxycodone 30-milligram pills, which he received for the

18   rest of 2014 and the majority of 2015.

19   Q.  Thank you.

20        MR. RODRIGUEZ:  Ms. Corrado, can we go to the next

21   slide, please, page 5.

22   Q.  Very briefly, sir, what did you do to create this chart and

23   who does it relate to?

24   A.  This is for Leonard Danzi.  This is also just using the New

25   Jersey and New York PMP data.

Ibt6tay2                    Castro - direct

1   Q.  Can you note the total number of prescriptions in the

2   period of time?

3   A.  53 Oxycodone 30-milligram prescriptions from December 8,

4   2012 to May 22nd, 2017.

5   Q.  Let me direct your attention to the May 2017 portion of the

6   graph.  Can you explain to the jury what is depicted here?

7   A.  There are three prescriptions that were written with the

8   same day but were filled on different days by the pharmacy as

9   reported on May 8th.

10  Q.  What were those prescriptions for?

11  A.  All three were for Oxycodone -- 240 Oxycodone 30-milligram

12  pills.

13          MR. RODRIGUEZ:  Can we go to page 6, please.

14  Q.  Sir, what is depicted here?

15  A.  So this is Brian Dolinko prescriptions as written by Dr.

16  David Taylor.  There were 29 Oxycodone 30-milligram

17  prescriptions written from February 7, 2017 to April 10, 2017.

18  Q.  I just want to draw your attention to the two-month period

19  between September 13th of 2016 to November 15th of 2016.  How

20  many prescriptions did Brian Dolinko receive during that

21  approximately two-month period and what were they?

22  A.  So it was two prescriptions for 180 Oxycodone 30-milligram

23  pills.  One was on October 6.  The other one was October 27.

24  Q.  What about the start and end day?  So starting September 13

25  and ending November 15th.

1  A.  He dropped down from the 210 Oxycodone 30-milligram pills

2  down to 180.

3        MR. CARNESI:  Go to the next page, please.

4  Q.  Just very briefly, sir, whose information did you review

5  for this?

6  A.  This is Tara Farley's prescriptions from -- there were 46

7  Oxycodone 30-milligram prescriptions filled from May 2nd, 2013

8  to May 22nd, 2017.

9        MR. RODRIGUEZ:  Ms. Corrado, the next page, please,

10  page 8.

11  Q.  Sir, can you explain what is depicted here and particularly

12  if you can focus your explanation as well on the white space.

13  A.  So this is for John Marino.  H3 had 14 Oxycodone

14  30-milligram prescriptions written from October 28, 2014 to

15  August 11, 2016.  He started receiving pills on October 28,

16  2014.  He received 40 Oxycodone and quickly the next month went

17  up 120.  There was large periods of time where John Marino was

18  not receiving any prescriptions from Dr. David Taylor.

19  Q.  After those large periods -- let me focus your attention on

20  a specific period of time.  According to the data that you

21  reviewed, did John Marino receive any Oxycodone prescriptions

22  from David Taylor from May of 2015 until December of 2015?

23  A.  No.

24  Q.  After that period of time when he received no

25  prescriptions, did there come a time where you continued

Ibt6tay2                    Castro - direct

1   receiving prescriptions?

2   A.  Ye.  On December 22nd he received another 150 Oxycodone

3   30-milligram pills.

4   Q.  What other additional prescriptions, if any, did he receive

5   according to the data?

6   A.  He received once again on January 26, February 25th of

7   2016, there was another month gap where he didn't receive a

8   prescription and went back to getting the 150 -- 150 Oxycodone

9   30-milligram pills from August 2nd to August 11, 2016.

10  Q.  The last page in this chart, sir, page 9 of Government

11  Exhibit 503, just very briefly if you can explain to the jury

12  the information depicted here?

13  A.  This is for Lawrence Montabano.  He received 35 Oxycodone

14  30-milligram prescriptions from July 2nd 2014 to March 16,

15  2017.

16  Q.  Thank you, sir.

17          MR. RODRIGUEZ:  No further questions.

18          THE COURT:  Any cross-examination?

19          MR. CARNESI:  No, Judge.

20          THE COURT:  Witness is excused.

21          (Witness excused)

22          THE COURT:  Let's go ahead and take our break for the

23  day.  I will see you in 30 minutes.  Don't discuss this case

24  amongst yourselves or with anyone else.  Don't conduct any

25  independent research regarding this case.  I will see you in 30

1   minutes.

2           (Jury excused)

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court; jury not present)

2            THE COURT:  The expert will be here when we get back?

3            MR. ROOS:  That's right.

4            THE COURT:  Have a good break.  See you soon.

5            (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ibt6tay2                          Castro - direct

1                          AFTERNOON SESSION

2                  (12:30 p.m.)

3                  THE COURT:  Are we ready?

4                  MR. RODRIGUEZ:  Yes, your Honor.

5                  THE COURT:  All right.

6                  Let's bring the jury in.

7                  THE COURT:  Please be seated.  Welcome back.  Let's

8      continue.

9                  Go ahead, counsel.

10                  MR. ROOS:  Thank you, your Honor.  The government

11     calls Dr. Christopher Gharibo.

12       CHRISTOPHER GHARIBO,

13           called as a witness by the Government,

14           having been duly sworn, testified as follows:

15                  MS. FLETCHER:  Your Honor, I just noticed that the

16     jurors still have their transcript binders.

17                  Would your Honor like us to collect those.

18                  MR. ROOS:  We are going use them later in this direct.

19     They don't need them now, if they want to hold on to them

20     now --

21                  THE COURT:  How soon are you going to use them?

22                  MR. ROOS:  It's probably going to be over an hour

23     before we use them.

24                  THE COURT:  All right.

25                  Please pick them up.

1              Go ahead counsel.

2              MR. ROOS:  Thank you.

3    DIRECT EXAMINATION

4    BY MR. ROOS:

5    Q.  Good afternoon, Dr. Gharibo.

6              Where are you employed?

7    A.  NYU Medical Center.

8    Q.  Are you a physician?

9    A.  Yes.

10   Q.  What kind of physician are you?

11   A.  I am a pain medicine specialist.

12   Q.  What is a pain management specialist?

13   A.  People that take care of chronic pain, sort out where the

14   pain is coming from, diagnose it and treat it.

15             THE COURT:  Counsel, let's have a very quick sidebar.

16             MR. ROOS:  Sure.

17        (Continued on next page)

18

19

20

21

22

23

24

25

Ibtntay3                    Gharibo - Direct

1          (In the robing room)

2          THE COURT:  There is nothing wrong.  One of the jurors

3     left their notebook in the jury room again and I just wanted to

4     check with you before I send my deputy back to get it.

5          Is that fine with everyone?

6          MR. ROOS:  Your Honor, if I might raise one other

7     issue.

8          THE COURT:  Yes.

9          MR. ROOS:  I have number of questions to qualify the

10    expert.  Depending on whether Mr. Carnesi is going to have an

11    objection to the qualification, I could potentially truncate

12    that so -- those background questions a little bit to move this

13    along.  I just wanted to raise this sort of pre-qualify -- of

14    course, you have a right to hear it.  I just want to raise it

15    now.

16         MR. CARNESI:  I don't think that I am going to go into

17    it extensively.  I don't need you to go into it extensively,

18    but I certainly need a record that establishes it.

19         MR. ROOS:  OK.

20         THE COURT:  I will send my deputy into to get the book

21    and we'll continue.  All right.

22         (Continued on next page)

23

24

25

Ibtntay3                    Gharibo - Direct

1          (In open court)

2          THE COURT:  Go ahead, counsel.

3          MR. ROOS:  Thank you.

4     BY MR. ROOS:

5     Q.  Dr. Gharibo, would you tell the jury a little bit about

6     your educational background.

7     A.  I went to Rutgers University in New Jersey.  That was

8     followed by Rutgers Medical School in Newark, New Jersey.  That

9     was followed by one year of internship at Robert Wood Johnson

10    University Hospital, in New Brunswick, New Jersey.

11         That was followed by three years of anesthesiology

12    residence at NYU Medical Center.  That was followed by one year

13    of pain medicine fellowship in Philadelphia at Thomas Jefferson

14    University Hospital

15    Q.  What did you do after your fellowship?

16    A.  I came to NYU.

17    Q.  Do you recall approximately when that was?

18    A.  About '97.

19    Q.  Are you still at NYU?

20    A.  Yes.

21    Q.  And what is your current role there?

22    A.  I am the medical director of pain medicine for NYU Langone

23    Health.

24    Q.  What are some of your duties and responsibilities in that

25    role?

1    A.  My responsibilities -- primarily I see patients.  That's

2    the good amount of my practice.  I see acute and chronic

3    patients, mostly chronic patients.  I also oversee a practice

4    of about 11 physicians and about 10 nurse practitioners.  We do

5    both inpatient pain medicine and outpatient pain medicine.

6    Q.  And with respect to your nonmedical practice duties, what

7    sort of duties are included in that?

8    A.  That means pretty much running the service.  It means

9    quality assurance, it means looking at medical records, looking

10   at safety events that occur within the hospital, both in the

11   inpatient setting and outpatient setting, practice reviews,

12   that may, for example, look at opioid consumption data for

13   inpatients, for outpatients, for departments, for an individual

14   practice and so on.

15   Q.  Doctor, do you teach any classes?

16   A.  Yes.

17   Q.  What sort of, what are your teaching and lecturing duties?

18   A.  I teach pain assessment, pain medicine as it pertains to

19   how to find out what the pain problem is, the different

20   components of pain, musculoskeletal pain, nerve pain, emotional

21   pain, and how to go about treating it in a complimentary and a

22   combination fashion.  I teach that to medical students,

23   resident fellows and other faculty.

24        I also teach different arms of pain therapy,

25   nonpharmacological arms.  Procedural arms, such as, for

1   example, knee injections, hip injections.  Medication arms,

2   such as nonopioids and opioids.

3   Q.  Are you board certified?

4   A.  Yes.

5   Q.  What does board certification mean?

6   A.  Board certification means that you have fulfilled a board

7   requirement to be called board certified.  So what that means

8   in my field is that, for anesthesiology I had to take a written

9   exam followed by an oral exam, and for pain medicine it meant

10  taking a written exam and then getting re-examined every ten

11  years.

12  Q.  Have you been published in the field of pain management?

13  A.  Yes.

14  Q.  And what are some of the topics you have been published on?

15  A.  Published on pain physiology, how chronic pain becomes what

16  it becomes, what goes wrong with the body when acute pain

17  becomes chronic pain.

18          I published on interventional pain management

19  procedures; for example, such as epidural steroid injections or

20  other procedures used to treat chronic pain.

21          I published on pharmacotherapy, medication management

22  both with nonopioids and opioids.

23  Q.  Are you on any editorial boards of any publications?

24  A.  Yes.

25  Q.  What publications?

1    A.  I am on the editorial board of Pain Medicine News and Pain

2    Physician, and I'm guest editor for a spectrum of other

3    journals.

4    Q.  You testified that you are at NYU, and you see patients

5    there, is that right?

6    A.  Correct.

7    Q.  Are you affiliated with any other hospitals in connection

8    with your clinical practice?

9    A.  Yes.

10   Q.  What hospitals?

11   A.  Bellevue Hospital Center.

12   Q.  You testified that you see patients.

13           Approximately how long have you been seeing patients?

14   A.  20 years.

15   Q.  Do you present at any conferences?

16   A.  Yes.

17   Q.  What are some of the topics you present on?

18   A.  The topics range from pain assessment, how to sort out the

19   pain.

20           That could be to non-pain specialists, for example; to

21   interventional pain management, how to combine interventional

22   pain management with pharmacological pain management and

23   physical therapy.

24           One of my areas of interest is acute to chronic pain.

25   I speak quite a bit about that.  How to take good care of the

1    patient in the acute setting.  I've presented on that across

2    the country.

3              Opioid pharmacotherapy is something that I get

4    requested to speak on quite often in terms of what the standard

5    is in taking care of a patient with a chronic pain problem,

6    that needs chronic opioids, and how to go about doing that.

7    Q.  Dr. Gharibo, have you been recognized as an expert in a

8    court of law, and, if so, on what topics?

9    A.  Yes.  It has been pretty much the whole range of pain

10   medicine diagnosis and treatments, ranging from orthopedic

11   conditions, nerve conditions, to the treatment end of things,

12   in what the appropriate standard of care is and what that range

13   is.

14   Q.  In those prior instances in which you have been recognized

15   as an expert, have you reviewed patient files?

16   A.  Yes.

17   Q.  Have you reviewed the work of other physicians?

18   A.  Yes.

19   Q.  Approximately how many times have you testified in that

20   role?

21   A.  I've testified dozens of times in that role.

22             MR. ROOS:  Your Honor, at this time, the government

23   moves to qualify Dr. Gharibo as an expert in the field of pain

24   management.

25             MR. CARNESI:  No objection.

1   Q.  Dr. Gharibo --

2            THE COURT:  Hold on one just one second.

3            Members of the jury, you are going to hear testimony

4   from an expert witness.  An expert is someone who by education

5   or experience has acquired learning or experience in a

6   specialized area of knowledge.

7            Such a witness is permitted to give his opinions as to

8   whether relevant matters in which he is qualified as an expert

9   and give his reasons for those opinions.

10           Go ahead.

11           MR. ROOS:  Thank you, your Honor.

12  BY MR. ROOS:

13  Q.  Dr. Gharibo, in the -- I believe you said dozens of times

14  you have testified as an expert, were those both criminal and

15  civil cases?

16  A.  Yes.

17  Q.  Approximately how many of those were civil cases?

18  A.  The vast majority were civil cases.  95 percent of them

19  were civil cases.

20  Q.  In those cases have you testified on behalf of the

21  defendant?

22  A.  Yes.

23  Q.  Were some of those defendants doctors?

24  A.  Yes.

25  Q.  And have you testified on behalf of the party suing the

1   doctor in some of those civil cases?

2   A.  Yes.

3   Q.  On the criminal side of cases, have you previously

4   testified for the government?

5   A.  Yes.

6   Q.  For the United States government?

7   A.  Yes.

8   Q.  Have you ever testified for a defendant doctor in a

9   criminal case?

10  A.  Yes.

11  Q.  Are you being paid for your testimony here today?

12  A.  Yes.

13  Q.  What is your hourly rate for nontestifying work?

14  A.  $400 an hour.

15  Q.  What is your hourly rate for testifying?

16  A.  It's $5,000 for court for the whole day.

17  Q.  And have you met with the government previously to prepare

18  for this case?

19  A.  Yes.

20  Q.  Have you reviewed files in anticipation of your testimony

21  here today?

22  A.  Yes.

23  Q.  Approximately how many times have you met with the

24  government on this case?

25  A.  About half a dozen.

1   Q.  And how many hours have you devoted so far to this case?

2   A.  I think record review about 14, 15 hours or so; plus all

3   the meetings, it would be another eight to ten hours or so.

4   Q.  Have you been paid yet?

5   A.  No.

6   Q.  Does your testimony here today have anything to do with

7   whether or not you are paid?

8   A.  No.

9   Q.  Dr. Gharibo, before we get into the specifics of the files

10  that you reviewed, I want to ask you some questions about your

11  field of specialty.

12        What types of patients do pain management doctors see?

13  A.  We see patients that develop multiple chronic pain

14  conditions that affect their quality of life.

15        The majority of the time is the aging body, so there

16  could be a variety of orthopedic conditions and other

17  neurological conditions that develop.  So, that ranges from,

18  for example, osteoarthritis of the hip and the knee or of the

19  spine, to nerve conditions such as, let's say peripheral

20  neuropathy or reflex sympathetic dystrophy.  That set pretty

21  much forms the majority of the type of pain patients that we

22  see.

23  Q.  Are there standards of care guidelines for how a pain

24  management physician should treat a patient?

25  A.  Yes.

Ibtntay3                    Gharibo - Direct

1  Q.  What are some of the sources of those guidelines or

2  standards?

3  A.  There are a lot of medical societies that come out with

4  guidelines on, for example, how to treat headache, how to treat

5  low back pain, how to go about treating complex regional pain

6  syndrome, how to put a particular plan together for chronic

7  opioid therapy.

8           So, medical societies are a big part of that.  There

9  are some other guidelines.  For example, there are some -- CDC

10  guidelines can be an example as to how to go about treating a

11  particular condition or how to go about prescribing opioids.

12  There are states that can provide guidelines.

13          So that could be -- that could pertain to, for

14  example, in how to go about prescribing chronic opioid use.  So

15  it is both government related, society related that pretty much

16  provides our guidelines.

17  Q.  Based on your familiarity with those guidelines, your own

18  experience, your practice, and your review of the relevant

19  literature, can you walk the jury through what would be

20  expected conduct of a pain management physician during an

21  initial appointment with a patient.

22  A.  The initial appointment is foundational, in that you have

23  got to figure out what the issue is.  And the issue, let's call

24  that the pain generator, a chronic pain generator.  Sometimes

25  there's more than one pain generator.

1          Based on our knowledge of pain, there are three

2     separate types of pain, and it's the job of the pain clinician

3     to sort out what type of pain your patient is suffering from.

4          So that can be divided into musculoskeletal pain,

5     inflammatory pain, and/or nerve pain, also known as neuropathic

6     pain, and psychological pain and emotional pain.

7          So those are the three different arms of pain that our

8     bodies can experience.

9          So we try to sort out what percentage of the patient's

10    pain is musculoskeletal, nerve-related, or emotional by asking

11    questions such as:  What is the location of the pain?  Where is

12    the worst pain?  What is the intensity of the pain?  Mild

13    moderate or severe?  What is the directionality of the pain?

14    Is it referred?  Is it radiating?  Does it go anywhere?  How

15    did it start?  Was it spontaneous, or was it accident-related?

16    What are the characteristics of the pain?

17         That helps you determine whether something is muscular

18    or if something is neurological.

19         Something neurological, for example, would be

20    something electrical.  You would feel the wiring within your

21    body, which normally you shouldn't feel, versus something

22    crampy and throbbing and tight and achy and deep, and that

23    could be something musculoskeletal.

24         What makes it better?  What makes it worse?

25         So, if there is such a manifestation where, I feel

 1  better lying down, but I am worse when I'm walking, that speaks

 2  of something orthopedic, versus it doesn't matter what I do, I

 3  have pain down my arm.  It doesn't matter what I do with the

 4  arm, it still hurts, which can indicate some type of nerve

 5  damage.

 6          So that is part of the history.

 7          Then we also focus on, What have you tried?  What has

 8  worked and what has failed?  What are the medicines that you

 9  are taking for the pain?  Have you had any procedure or was

10  there a diagnostic workup?

11          Then we get into the medical background:  What other

12  medical conditions do you have?  Diabetes?  High blood

13  pressure?  Cholesterol?

14          What are your past surgeries?  Have you ever had

15  surgery for that particular pain condition, such as knee

16  replacement, back surgery, hip replacement, and so on.

17          And then we get into social history and family

18  history.

19          So those are the elements of the history part of the

20  intake.  That can take anywhere from -- I would say it could be

21  very brief, it could be very straightforward.  Somebody very

22  healthy, for example, that could be five to ten minutes.

23          And then we move on to the physical exam.

24  Q.  Let me stop you there before we go to the physical exam,

25  and ask you a few questions about the history.

1          What, if any, notes do you take when you take a

2     person's history like that?

3     A.   You pretty much document what the patient is telling you,

4     not verbatim, but there is a general sense of what the patient

5     is telling you that goes into the medical record.

6     Q.   Now you were about to say something about physical exam.

7          During the initial appointment, what, if any, physical

8     examination is conducted?

9     A.   So you've got -- at the minimum you've got to do a focused

10    exam.  So if somebody is reporting of let's say, back pain

11    being very common, that affects the back and the side of the

12    leg.

13         So I've got to figure out is that back pain coming

14    from muscle?  Is it coming from the spine?  Is it something

15    that is sacroiliac joint related?  Is it a hip bursitis that's

16    causing it?  Is the let pain some time of a peripheral nerve

17    entrapment, such as femoral cutaneous neuralgia.  That is a

18    nerve in the groin.  Or it an L5 that is shooting the pain to

19    the leg?

20         So we do an exam with that possibility in mind, as to

21    the pain could be spinal, muscular, or joint related or

22    neurological.

23         That's the purpose of the physical exam.  We put the

24    hip, the knee, the back through a physical screening and see

25    what comes up positive.

1          Then that's followed by what tests are available that

2   the patient may bring to you or you may have available to you

3   in the system.

4          There's usually some type of electronic medical

5   record.  So that could be a nerve test, x-ray, CAT scan, MRI.

6          And then there is this constant synthesis that occurs

7   in our mind that comes up with a diagnosis.  Sometimes that is

8   a definite diagnosis, for example, it may -- well, it is L5

9   acute herpes zoster that's causing the pain down the leg, or it

10  is an L5-S1 disk.

11         And sometimes we don't know, so we put down back and

12  leg pain and then we order tests to sort things out down the

13  road for the patient to obtain.

14         Then we also come up with some treatment plan.  If you

15  know what the diagnosis is, that could be, for example,

16  physical therapy and medications.  Sometimes it's injections,

17  sometimes it is a referral to surgery, neurology, and so on.

18  Q.  Before I ask you a few more questions about treatment, let

19  me ask you a few questions about physical examinations.

20         So, when you are doing the physical examination, do

21  you lay hands on the person?

22  A.  Yes.

23  Q.  What portion of the physical examination is touch based?

24  A.  A good part of it is touch based.  Basically, for any

25  orthopedic exam, once you move beyond the range of motion -- so

1    if I ask the patient to flex forward, extend, rotate, they are

2    not touched.

3             But beyond that, where does it hurt?  The hand touches

4    the painful area.  An exam is for spasm -- I am examining

5    joints for crepitus, that snap, crackle, and pop.  I'm doing

6    some provocative testing.  That could be, for example, some

7    straight leg raising to see if there is any pain that goes down

8    the leg, and I'm guiding the leg as I'm doing that.

9    Q.  You mentioned some of these advanced diagnostic reports.

10             Are those things like x-rays, MRIs?

11   A.  Yes.

12   Q.  And when you have an x-ray or an MRI, does the treating

13   physician typically get the underlying x-ray or MRI, or is a

14   report generated?

15   A.  There is a report.

16   Q.  What types of things are contained in the report?

17   A.  They have -- like the body of the report is all the details

18   about what the findings are, followed by an impression, which

19   is a summary of the findings.

20   Q.  Now, is any finding in an MRI or an x-ray report a basis

21   for treating a patient?

22   A.  No.

23   Q.  What needs to be in an MRI or an x-ray for that to be a

24   basis for treating a patient in a pain management practice?

25   A.  We look at the MRI to see if there is any finding within

1   the MRI that correlates with the history and the physical that

2   the patient presented with.

3           That is essential because an MRI is an extremely

4   sensitive test.  It will pick up a lot of abnormalities that

5   are not problematic.  So the job of the clinician is to see if

6   there is a significant problem within the MRI that correlates

7   with the presentation.

8   Q.  So, Doctor, if an individual came in complaining of leg

9   pain, but the MRI -- or the MRI shows they have a bulging disk,

10  what, if anything, would that tell you?

11  A.  It may or may not correlate.

12          So let's say somebody has back and leg pain, and I got

13  an MRI of the lumbar spine and that shows a T11-T12 disk that

14  is quite a bit out.  It's herniated.  It's extruded.  But the

15  L5-S1 and the L4-L5 disk look totally fine.  That is not

16  correlating.  That doesn't correlate.  But if the L5-S1 disk is

17  herniated and is pinching a nerve, that's correlation.

18          So, all the other findings on that MRI, that doesn't

19  pertain to the area in question do not correlate.  All of that

20  could look normal, but that abnormality is not causing a

21  problem.

22  Q.  Doctor, a few moments ago you mentioned putting together a

23  treatment plan, and you mentioned a few things.  What are some

24  of the available treatment plan options for dealing with pain

25  management?

1  A.   So, I think foundational within that is that you have to

2  come up with as specific diagnosis as possible, and a treatment

3  plan needs to focus on the cause.

4       So let's say for something musculoskeletal, often that

5  will go back to the basics, pretty much, you know, sitting

6  upright, taking care of your body, good posture, good body

7  mechanics, pretty much everything your mom told you to do as

8  you are sitting upright for example -- giving the patient that

9  type of advice.  You know, don't use your back to lift heavy

10  weights, tuck your belly in, kind of walk tall, create some

11  height to open up the space for the nerves.  That's good

12  advice.  How to move right, how to sit right is very good

13  advice.

14       When you give that, that's going to make the body feel

15  better.  That's going to diminish the pain.  That's going

16  decrease the incidence of recurrence of the pain.

17       As the body wears out, as we age in other words, that

18  becomes more and more important.  So that's foundational.

19       That's good advice if it becomes a chronic condition.

20       But, also, treatment-wise, that can incorporate

21  physical therapy, core strengthening, postures and so on.  It

22  can incorporate medications, interventional pain management,

23  injections.

24       It could be a referral to rheumatology, neurology,

25  psychiatry, psychology, social work, or it could include

1    referral to surgery.

2    Q.  So you mentioned a chronic condition.  What's the meaning

3    of a chronic condition?

4    A.  A chronic condition is pretty much that's going to be a

5    condition that's probably going to be lifelong.

6    Q.  You mentioned physical therapy and other behaviors or

7    changes to someone's lifestyle, types of medications,

8    injections, surgeries.

9           Are there any other types of treatment for pain

10   management?

11   A.  There are acupuncture, chiropractor-type alternative

12   treatments as well, psychological treatments, psychiatric

13   treatments.

14   Q.  What about narcotic treatments?

15   A.  Yes, part of the medication plan.

16   Q.  Are those opioids?

17   A.  Yes.

18   Q.  Of the various options, physical therapy, medications,

19   injections, surgery, opioids, chiropractors, are there various

20   order of preference when you're treating a patient?

21   A.  Yes.

22   Q.  What is the order of preference?

23   A.  The order of preference is first you have to treat the

24   underlying disease.  That's first.

25           If somebody has, let's say, diabetic neuropathy, you

1    have to treat the diabetes.  Because if there's good sugar

2    control, that's going to help the nerve.  That's going to help

3    the nerve become less raw and less irritable.  So treating the

4    underlying disease -- physical therapy.  So treating the

5    underlying orthopedic or medical condition is foundational.

6            Now, beyond that, I think you've got to think of

7    conservative things first before you do anything very

8    aggressive.

9            So, for example, we don't just send them to surgery

10   generally speaking.  Generally speaking, we do physical

11   therapy, and nonopioids.

12           So that would be, for example, Advil, Aleve,

13   meloxicam, and similar combinations of medicines.  It could be

14   a trial of a five-day course of steroids.

15           What we want to do is we don't want to medically

16   burden the patient.  So what we initially do is give spot

17   therapies.

18           What I mean by that is, for example, take a Medrol

19   dose pack.  That's only for five days.  If you take it from the

20   beginning to the end, you are done, because we don't want to

21   burden the patient with any chronic treatment.  We just want to

22   sort of treat it like we treat an infection -- you took

23   antibiotics, you're done.

24           That's the second order of preference.  We want to

25   treat you, make it better and not create a long-term medical

1    burden.

2          But sometimes that is not enough.  We did physical

3    therapy.  I gave you the steroid pack.  You're still having

4    pain.

5          Then what we do is we upgrade it to maybe some

6    interventions.  So that could be, let's say a knee injection, a

7    hip injection, an epidural steroid injection.

8          Sometimes that is not enough either.

9          Then we begin to combine good posture, good body

10   mechanics, maybe an injection with some medication.

11         So that could be chronic medication therapy.  That

12   could incorporate, for example, an antidepressant for

13   musculoskeletal pain.

14         For example, you may have seen the ads for Cymbalta or

15   duloxetine.  There's good data to support that that could be

16   effective in musculoskeletal pain.  Muscle relaxants, Lyrica,

17   gabapentin, other similar medications.

18         We are keeping in mind efficacy, safety, tolerability,

19   patient convenience.  All of that factor in, the practicality

20   of it.  It could be a gel.  It could be a patch.  You don't

21   want to come down heavy on the medications, because they have

22   other end organ issues.

23         If all of that is failing, we are still holding on to

24   what works as part of that foundation, as part of that pyramid.

25   But sometimes we also add on chronic opioid therapy.  So for

1   that to that happen, what we do is we screen the patient for

2   what we call a biopsychosocial indication.

3          If that's appropriate, we may add on some chronic

4   opioid therapy in a fashion where it is effective but the

5   chances of problems with that opioid therapy are minimized.

6   Q.  What is, sort of in lay man's terms, what is a

7   biopsychosocial indication?

8   A.  Biopsychosocial indication means that, at the minimum, you

9   got to have a diagnosis that is appropriate for opioid therapy.

10  So that's the biological part.

11         Now that could be, for example, failed back surgery

12  syndrome, it could be spinal stenosis it, could be severe

13  arthritis of any joint, where it is a condition that is

14  recognized to be treated by opioids.

15         It should not be a condition that is made worse by

16  opioids.  For example, that could be headaches can be made

17  worse, abdominal pain, just -- interstitial cystitis, irritable

18  bowel syndrome.  Those are conditions that could be made worse

19  by an opioid.

20         So the biological indication needs to be there, but

21  there also needs to be psychosocial appropriateness for chronic

22  opioid therapy.

23         So the psychological part is it can't be somebody

24  psychotic.  I mean, the person needs to be reasonably

25  responsible and really compliant and with it generally

1   speaking.

2           It doesn't have to be perfect, but the psychological

3   part needs to be there.  It can't be somebody that is manic,

4   that has severe anxiety, loss of control, borderline

5   personality disorder, somebody who's delusional.  That would

6   not be an appropriate person, because you are going to make

7   their condition worse.

8           The social part -- so biopsychosocial, the social part

9   is that -- I mean, it can't be somebody living on the street,

10  for example.  They have to be able to secure their medicine.

11  It needs to be somebody that has control over the medication.

12  Q.  Now, you've mentioned opioids a few times.  What is an

13  opioid?

14  A.  Opioids are pain medications.

15  Q.  Are there different types of opioids?

16  A.  Yes.

17  Q.  Are there different strengths of opioids?

18  A.  Yes.

19  Q.  Do opioids go by different brand names?

20  A.  Yes.

21  Q.  Is oxycodone an opioid?

22  A.  Yes.

23  Q.  What are some of the different brand name drugs that

24  oxycodone is known by?

25  A.  Oxycodone comes as -- Percocet is an example of that.  That

1   is a quite well known.

2              OxyContin is also oxycodone.

3              Roxicodone is also oxycodone.

4              Those are brand names for oxycodone.

5   Q.  And for oxycodone tablets or pills, do they come in

6   different strengths?

7   A.  Yes.

8   Q.  What are some of the strengths for oxycodone?

9   A.  Roxicodone?

10  Q.  For any oxycodone, what are some of the strengths?

11  A.  Sure.  So oxycodone comes as 2.5 milligrams, 5, 7.5, 10,

12  15, 20 and 30 in the short-acting form.

13  Q.  When those numbers go up, what does that mean?

14             What does 2 versus 30 mean?

15  A.  It means the strength that is being prescribed.  It means

16  the strength within the pill.

17  Q.  You mentioned those are short-acting pills.  Is there

18  something called long acting?

19  A.  Yes.

20  Q.  What is the difference between short acting and long

21  acting?

22  A.  So the short acting -- so that's Percocet, for example,

23  that will begin to get into the blood in about 30 minutes.  It

24  will peak in about 60 to 90 minutes.  It will stick around and

25  work for about three to four hours.  It will be quick onset.

1   It will hang around and give you pain relief.  And then it will

2   be quick offset.  So postsurgically, for example, some of you

3   may have had that.

4        Long acting has a different pharmacological profile.

5   It comes on gradually over six hours.  So the slope is a much

6   more shallow slope.  It will stick around for about six hours

7   and then it will taper off more slowly.  So, slow onset, slow

8   offset for long acting.

9   Q.  Why would a physician prefer slow acting or acting?

10  A.  It's quite consequential as far as how the patient is going

11  to feel and the duration of the treatment.

12       So, in treatment of a chronic pain condition, given

13  it's chronic daily pain, if somebody has low back pain, it's

14  chronic daily pain, so you want to cover that pain like we

15  cover, let's say, blood pressure.

16       You know we don't give a blood pressure pill every

17  four hours.  We give a blood pressure -- somebody takes it once

18  a day and it works the whole day, or somebody takes it twice a

19  day, and it covers the whole day.

20       Another factor there is that we want to minimize the

21  psychoactive effect of opioids, because if something comes

22  on -- if an opioid comes on very rapidly, that is going to have

23  a psychoactive effect.  That could mean that you are dizzy,

24  unsteady, and very sleepy.  Some of you will get completely

25  knocked out, for example, because of that rapid onset.

1          You really don't want that because that rapid onset of

2     Percocet that is short acting can also cause that feel-good

3     effect that addicts prefer, that addicts may enjoy, and that

4     addicts may try to aim for.

5          So, you want to control the doses, the dose delivery.

6     The short actings come on rapidly, so that's good, they stick

7     around, but when they come off the blood, you begin to get

8     uncomfortable.  You begin to withdraw a little bit.

9          This mini withdrawal means I don't feel right, I'm

10    sweaty, my stomach is just growling.  You get diarrhea.  Your

11    hair is just standing on its end.  It is a very uncomfortable

12    feeling.

13         So you don't want to cause that in anybody because

14    then the medicine is taking over their life.  They are taking

15    the medicine just to maintain some normality.  And they are

16    having mini withdrawals between the doses every four hours.

17         So now you're essentially strapped to a medication

18    roller coaster because you're peaking, you're withdrawing,

19    you're peaking, you're withdrawing.  That's not good pain

20    management.

21         If I were to prescribe a long acting, it comes on

22    slowly, and you only take let's say one pill a day or two pills

23    a day, and that works out better for chronic pain patients.

24    Q.  Can you describe for the jury how oxycodone works.

25    A.  Oxycodone works by stimulating the receptors in the brain

1  that can cause -- it is a molecule that is associated with a

2  significant excitatory effect.

3          What I mean by that is, I feel great, I feel like I

4  can fly maybe one comment that would be a significant yellow or

5  red flag, because it can energize you.  There is a subset there

6  that is genetically conditioned to just get energized by

7  oxycodone.  It causes a dopamine release.  You feel great.  So

8  that is one mechanism of it.

9          The other mechanism is that it reduces the pain.

10         The other mechanism is that it can cause some initial

11 side effects, such as nausea, vomiting, pruritus, and it can

12 also cause some sedation, somnolence, respiratory depression,

13 and cessation of breathing.

14 Q.  And you mentioned people being addicted to oxycodone.

15         Is oxycodone addictive?

16 A.  Yes.

17 Q.  What does it mean for a patient to become oxycodone

18 dependent?

19 A.  So dependence means that if you are not on the oxycodone

20 you are withdrawing.  Oxycodone has incorporated itself into

21 your biochemistry, into your nervous system such that if you

22 don't have oxycodone in your system you are going to go into

23 withdrawal.  You need the oxycodone to feel normal.  Therefore,

24 you are dependent.

25 Q.  What, if any, side effects are there to taking oxycodone?

1   A.   The side effects -- I -- nausea, vomiting, somnolence,

2   being very drowsy, getting a euphoric effect, that feel-good

3   effect, constipation, some psychomotor retardation are some of

4   the side effects.

5        It can also cause some pain itself.  It can cause

6   muscle spasm, myalgias.  It can cause some pain sensitivity.

7        So, as your neurological system changes in response to

8   taking oxycodone, not only is it part of your system now from a

9   biochemical perspective, but it also dials up your pain

10  sensitivity.

11       What used to not hurt now hurts.  Now, it has -- it's

12  called opioid-induced hyperalgesia.  What that means is first

13  it was your low back that hurts you.  Now it's not just your

14  low back, but your whole back is hurting you.

15       First it was a certain motion that hurt your back.

16  Now, no matter what you do with your back, it hurts you.  You

17  have -- that's called allodynia.  What that means is you have

18  pain sensitivity now.  The pain widens and things that are

19  normally not painful are now painful.

20  Q.   You just described a few different types of opioids,

21  including oxycodone.

22       Can oxycodone be prescribed by a physician?

23  A.   Yes.

24  Q.   Legally?

25  A.   Yes.

1   Q.  And are there any illegal drugs that are opioids?

2   A.  Yes.

3   Q.  What are illegal drugs that or a drug that oxycodone is

4   similar to?

5   A.  Heroin.

6   Q.  And can oxycodone be abused?

7   A.  Yes.

8   Q.  How so?

9   A.  It can be abused a whole variety of ways.

10          You can just simply take the whole pill -- especially

11  if I'm giving let's say the highest strength of oxycodone, at

12  30 milligrams, which the short acting.

13          So that's already designed to come on rapidly and come

14  off rapidly.  For somebody let's say who's opioid naive, that's

15  going to create a big peak in the blood.  That's going to cross

16  the blood-brain barrier, and that is going to cause euphoria.

17          So I can just abuse it by taking it whole.  But after

18  a certain point, I may not be happy with that because I'm

19  getting dependent on the oxycodone.  My body is accommodating

20  it.  I'm not getting the same high.  I'm not getting that

21  dopamine rush anymore.  I want to feel that way again.

22          So, next time around I may take two at a time.  Hey,

23  it worked.  But after this two, that fails too.  It's this

24  never ending battle to keep up the high.

25          Well, two doesn't work.  Maybe I can take it with

1    alcohol.

2            So they begin to take let's say two oxycodones with

3    alcohol.  Alcohol is also psychoactive.  It helps the

4    solubility.  It gets absorbed better.

5            Now you have what you want again, but after a while

6    that doesn't work either.

7            So, what I try to do, I try to crush it, I try to

8    dissolve it, I try to solubilize it.

9            I may try to snort it, inject and so on.

10           That's what an addict tries to do, and it's this never

11   ending race to try to maintain the high when they desire it.

12   Q.  You used the phrase opioid naive.  What does that mean?

13   A.  Opioid naive, that means that your body is not on opioids

14   at all.  There's no opioid in the system.

15   Q.  You mentioned earlier that there are guidelines for

16   prescribing practices or opioids.

17           What are some of those guidelines for proper opioid

18   prescribing?

19   A.  They are by the American Academy of Pain Medicine, Center

20   for Disease Control, American Society of Interventional Pain

21   Physicians, American Pain Society.  There are state guidelines.

22   There are workman's comp guidelines for chronic opioid therapy.

23   Q.  Is there a consensus on the guidelines for what is proper

24   opioid prescribing?

25   A.  Generally, yes.  There may be some slight variation, but

1    there's a lot of overlap as well.

2    Q.  For how long has there been a consensus on this topic?

3    A.  Since the late '90s.

4    Q.  Is there also a general consensus on what would constitute

5    inappropriate prescribing?

6    A.  Yes.  At some point, yes.

7    Q.  Is that from the same sources?

8    A.  They may not mention that specifically in their

9    documentation.

10   Q.  In your pain management practice, you see some patients who

11   receive opioids?

12   A.  Yes.

13   Q.  Approximately what percentage of patients receive opioids

14   in your practice?

15   A.  My practice, less than 5 percent.

16   Q.  When prescribing opioids, what types of dosages do you

17   typically prescribe?

18   A.  The dosages are starting dosages for somebody who's opioid

19   naive, or maybe a little bit more than that in somebody who is

20   opioid dependent.

21           So, for oxycodone, that could be oxycodone, 5;

22   Percocet 5.

23           For Vicodin, which is hydrocodone, 5.

24           It could be tramadol, 50 milligrams.

25           It could be morphine, short-acting, 15 milligrams.

1              And the number of pills would be -- let's say it could

2      be 30, 60, sometimes 90.

3      Q.  To give the jury a sense of where these fit in, remind us,

4      for a pill that, let's say Percocet 5, where does that fit in

5      the scale of potential dosages?

6      A.  It is on the lower end of things.  I mean, I think for any

7      of you who's had let's say postop pain, you probably got

8      Percocet 5 or Vicodin 5 one discharge.  The lowest is 2.5,

9      which is not as popular, so it's just one step above that.

10     That will be plenty to cover postop pain.

11     Q.  When you are prescribing opioids to your patients, what

12     number or amount of pills do you typically prescribe?

13     A.  It could be anywhere from 30 to 90.

14     Q.  You mentioned earlier the consensus on opioid prescribing.

15     Is there a general consensus on the quantity of opioid pills

16     that should be prescribed at a given time?

17     A.  Yes.

18     Q.  And what's that general consensus?

19     A.  The general consensus is that you want to cover the pain,

20     and you want to provide a reasonable number to do that without

21     creating an excess.  Because that excess is going to be a

22     significant problem down the road if the patient wants to

23     misuse and abuse the medicine.  Because if there is a

24     tremendous pill count, let's say if somebody getting 240 pills,

25     well, there's a lot that somebody can do with 240 pills.

567

Ibtntay3                    Gharibo - Direct

1    So you want to keep things reasonably tight and well

2    controlled.  If you give 60 pills, that is pretty tight.

3    There's only so much you can do with 60 pills.

4    But if I gave you 240 pills, you may take the 60 pills

5    and save the 180 for some other time, or it may get stolen from

6    you or it may get diverted and it may get recreationally

7    misused and abused.

8    So you want to keep the pill range reasonable,

9    generally speaking for chronic pain, that is 60 to 90 pills.

10   Q.  Now, you mentioned individuals become opioid dependent.

11   Before a physician prescribes a high number of

12   opioids -- you mentioned something that's, you know, in the

13   hundreds -- are there any additional documentations or findings

14   that need to be made?

15   A.  Yes.

16   Q.  What other additional documentation or findings need to be

17   made?

18   A.  I think before you give the higher doses, you have got to

19   document that patient has been on the lower doses.  Because if

20   you are opioid naive -- and I believe probably all of you

21   are -- and I gave you oxycodone 30 milligrams, that could be

22   way too much for you.

23   It can simply make you -- it can knock you out.  You

24   may just fall asleep.  You will probably wake up, or you may

25   not wake up.  If you have obstructive sleep apnea, you may run

1   into significant problems.

2          So, before we give the higher doses, we have to make

3   sure that you are dependent to a certain degree so that we can

4   give you the higher doses, so that you are body can tolerate

5   it.

6          So there's sort of this gradation, if -- once the

7   lower doses are failing, then we can move up to the higher

8   doses.  But at some point we have to change the molecule,

9   because sometimes the body just doesn't respond to a molecule.

10         For example, you may respond to Advil, no matter --

11  and you don't respond to Aleve.  You do great with Advil.  But

12  you may respond to Aleve, but not Advil and so on.

13         So, there are these genetic differences among us, and

14  it's important to not just go up and up and up, because if a

15  certain milligram is not working, I don't think anything higher

16  is going to work either.  You have to switch to another

17  molecule.

18  Q.  Dr. Gharibo, I want to shift topics now to talk about --

19  you already testified about an initial visit.

20         At follow-up visits with a patient, can you walk

21  through with the jury what happens at a standard follow-up

22  visit?

23  A.  So, during follow-up, you follow up on the diagnostic

24  testing as to where the pain may be coming from, and you follow

25  up on the outcome of your multimechanistic, multidisciplinary

1  plan.

2           So it is not just a simple plan, but often, like I

3  said, it is physical therapy, let's say, maybe an injection

4  with medication.  So that's pretty common.

5           Then we focus on, are you able to do what you couldn't

6  do before?  So you couldn't sit ten minutes before.  Are you

7  able to sit better now.

8           You could only walk two blocks before.  Are you able

9  to walk more than two blocks now?  Are you able to stand

10  better?  Are you able to work better?  Are you able to take

11  care of yourself better?  Clean yourself, go out to dinner,

12  shop, and so on?  Are you more capable?  Are you independent?

13  Q.  In these follow-up visits, do you ask patients questions?

14  A.  Yes.

15  Q.  Some of the types you just described?

16  A.  Yes.

17  Q.  Do you ask them questions about their pain?

18  A.  Yes.

19  Q.  How extensive are those questions?

20  A.  It depends.  It's over a range.  Sometimes things are very

21  straightforward.  If they're totally better, they say, I'm back

22  to baseline.

23           I just saw, you know, some patients this morning.

24  There were a couple that said, I'm fine.  I have a little bit

25  of pain.  I can do everything.  I'm really good.  You know,

1  whatever you did helped.  So that's pretty short.  Because the

2  patient is better, they just want to get out of there really.

3  Or we're still running into problems, there's still some pain

4  issues, and then we explore deeper.

5  Q.  What type of physical examination do you do in follow-up

6  visits?

7  A.  Generally speaking.  It's focused.  It could be focused

8  plus, if any new complaints come up.  But we check what the

9  initial exam was, and we follow up on the initial exam.

10         So let's say if there was some weakness, if there was

11  some numbness, if there was some nerve provocation that was

12  positive, we retest the area to see if that resolved.

13         If there was muscle spasm, if there was a limitation

14  of range of motion, we check for that muscle spasm, we check

15  for that range of motion limitation to see if it improved.

16  Q.  What type of notes are appropriate to be taken in these

17  follow-up visits?

18  A.  They are pretty much reflective of the history and the

19  physical.

20  Q.  Now, if a patient's prescribed an opioid or oxycodone in

21  these visits what, if anything, are done in later visits to

22  sort of check in on the opioid prescribing?

23  A.  So, you monitor the success of your opioid therapy to see

24  if it gives the patient their life back.

25         So not so much focusing on a pain score of let's say

1   zero to ten, but are you more physically and socially active as

2   a result of the chronic opioid therapy?

3           Now that could also include some screening.  It could

4   be a pill count.  It could be you are in drug testing.  It

5   could be patient education about appropriately securing the

6   medication.  It could be telling him don't leave it out -- for

7   example, kids that have died from taking the wrong pill or

8   stepping on an opioid patch and so on.  So securing these

9   medicines is extremely important.

10          And there could be follow up on the other medical

11  problems:  How is your diabetes?  Is your sugar under control?

12  And you just get this general sense is this patient with the

13  whole program, and am I really helping them with the opioid

14  treatment plan.

15  Q.  Now, you mentioned a few moments ago an example of a

16  patient you saw.  If the patient comes in and says they're good

17  or their pain is under control and they are on opioids, is it

18  proper practice to just leave them on the opioid indefinitely?

19  A.  If they're doing well in a responsible plan, you can leave

20  them on it for a long time, as long as the biopsychosocial

21  indication maintains itself and there are no aberrancies that

22  are noted on the follow-up.

23  Q.  You mentioned the types of opioids you are prescribing are

24  in the range of 30 to 90.

25          Would that be true if a person is being prescribed a

1    very large opioid dosage?

2    A.   So that's 30 to 90 pills.  If they get to the larger

3    dosages, then what we do is we switch the molecule such that we

4    reestablish efficacy.

5            We don't go up and up and up.  Because as you go up in

6    the dosages, the mortality just skyrockets.  Once you begin to

7    exceed I would say 60- to 90-milligram morphine equivalent, the

8    probability of getting very sick or just dying just increases.

9            So we don't just go up and up on the pill count or the

10   overall strength, the morphine equivalent.  We pretty much try

11   to stay within the CDC guidance of being at less than

12   50-milligram morphine equivalent

13   Q.   Are there ways for physicians to determine whether or not

14   their patients are taking the pills that are being prescribed

15   to them?

16   A.   Yes.

17   Q.   What are some of those ways?

18   A.   Urine drug testing.

19   Q.   What is urine drug testing?

20   A.   Urine drug testing, basically the patient pees into a cup

21   and then the cup is sent for analysis for the metabolites of

22   what you're prescribing.

23   Q.   What about prescribing data?

24           Is that something that physicians consult?

25   A.   Yes.  So that is the prescription monitoring program.  For

1    example, New York State combines its database with other states

2    where you log in and you get to check what New York State

3    clinics are prescribing and what the surrounding states are

4    prescribing.

5            So this way you're picking up is there another

6    prescriber, is the patient doctor shopping and sourcing the

7    opioid from somewhere else.

8    Q.  When you look at that prescription data, do you look at

9    just the current period, or do you also look at the historical

10   period for the patient?

11   A.  You look at the historical period.  Pretty much it drops

12   like the last couple of years really, whatever has been

13   prescribed.

14   Q.  So you can see, for instance, the doctors that the patient

15   has previously received prescriptions from?

16   A.  Correct.

17   Q.  Now, you mentioned medications that a patient can be on.

18           Are there any prescriptions that, when combined with

19   an opioid, are particularly dangerous?

20   A.  Yes.

21   Q.  What are some of those prescriptions?

22   A.  So, one huge category of medications that are dangerous

23   with opioids are what are called benzodiazepines.  What those

24   are, Valium, for example, or Xanax, is a benzodiazepine.

25           And what we know I would say for decades really now is

1   that benzodiazepines can also cause respiratory depression and

2   stoppage of breathing.

3           Opioids can cause the same thing.  But when you

4   combine them together, it becomes potentially deadly, because

5   there is a synergistic respiratory depression.  It is not just

6   additive.  It's not just one plus one causing two degrees of

7   respiratory depression.  One plus one is four extent and degree

8   of respiratory depression.

9   Q.  Besides the benzodiazepines like Xanax or Valium, are there

10  any other types of medication that, when combined with opioids,

11  are dangerous?

12  A.  Yes.

13  Q.  What are some of those?

14  A.  The other medicines, we look for psychoactive medications,

15  for example, Soma and other muscle relaxants are very

16  psychoactive.

17          They are -- they tend not to not improve function

18  much.  They tend to be very sedating.  But they can also be

19  misused and abused along with an opioid.  In fact, that's what

20  the addicts will prefer.  They'll try to seek out the

21  oxycodone, and they'll try to see out the Soma and combine them

22  together.

23          So I may be giving them the oxycodone.  Then my

24  question would be are they getting another muscle relaxant,

25  like Soma, from somewhere else.

1     Other types of medicines could be medicines like

2  methadone.  There's cardiotoxicity, heart toxicity, associated

3  with methadone and other medicines, such as antibiotics and

4  antidepressants and other psychiatric medicines, or even some

5  of the other like antifungal type of medicines.  That can cause

6  a cardiac arrhythmia and sudden death.  So there's a lot of

7  drug-drug interactions that can really hurt somebody basically.

8  We try to screen for that.

9  Q.  Dr. Gharibo, in your experience as a pain management

10  physician, your training and your review of the literature that

11  you mentioned earlier, are you aware of an illegal market for

12  oxycodone?

13  A.  Yes.

14  Q.  Is it important as a pain management physician to be aware

15  of this illegal market?

16  A.  Definitely.

17  Q.  Why is that?

18  A.  Because you don't want to harm a community.  You don't want

19  to feed a network.  There's a reason why these molecules are

20  controlled since the early 1900s, because but they're

21  psychoactive, and it can ruin individuals, it can ruin

22  families, it can ruin towns, and it can devastate, it can kill

23  people basically.

24     Even if it doesn't, it can still ruin somebody

25  psychosocially, it can ruin somebody medically, because you can

1   have a heart attack, you can have a stroke, you can lose

2   your -- you could lose your persona.  You won't be what you are

3   now.  You will be a different person, and you may be completely

4   dependent on opioids as a result of those changes that have

5   occurred in your body.

6           Now you are a dependent person, an opioid dependent

7   person that has to go to a methadone center to pick up that

8   single methadone pill just so you file normal.

9           That's a terrible thing to do to anybody, so we have a

10  responsibility to keep that in check and prevent that.

11  Q.  You mentioned the term earlier "diversion."  What is

12  diversion?

13  A.  Diversion is -- it could be giving the medicine to somebody

14  that the medicine is not prescribed to or simply selling it.

15  Q.  Is oxycodone a drug that's susceptible to diversion?

16  A.  Yes.

17  Q.  Why is that?

18  A.  Oxycodone is -- it's very psychoactive.  It is a feel-good

19  medication.  It is the drug of choice of many addicts.  It

20  tends to just really be out there.  I mean just, the data is

21  that it's misused, abused, and diverted all the time,

22  especially at the higher strengths, and addicts will doctor

23  shop to get their oxycodone.

24  Q.  Now, are this any particular dosages of oxycodone that are

25  susceptible to diversion?

1   A.   Yes.

2   Q.   And what are those?

3   A.   So, the higher the strength of the oxycodone, the more

4   susceptible it is to diversion.  So those are 15, 20 and 30

5   milligrams, because what the addicts prefer, what anybody

6   prefers is that, you know, similar to how -- let's say you get

7   something at a store, you want it to be freshly packaged.  You

8   don't want an open box.  You don't want something that somebody

9   else has been in.  Nobody wants cut-up pills and so on.

10          People want manufactured grade, pharmaceutical grade

11  oxycodone.  The higher the strength the better.  You don't want

12  to take six 5-milligram pills.  If you can find a single

13  30-milligram pill, that becomes more valuable.  So the higher

14  strengths are more valuable and are more diverted because they

15  produce a higher quality high.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

BY MR. ROOS:

Q.   Are you familiar with some of the red flags of diversion or

misuse of Oxycodone?

A.   Yes.

Q.   What are some of those red flags?

A.   The red flags are patients that are coming with you with

nonspecific pain where you are unable to come with a structural

or neurological diagnosis.  You are working the patient up.

There is pain there, but you can't put your finger on anything

but they will still reporting pain to you.  So there is no

biological indication that you can discover through your

workup.

        Patient is aiming for high strengths of the pill at a

high pill count.  So that could be, for example, Oxycodone 30

milligrams at 120 pills or greater.  Because the greater the

strength, the more valuable it is.  The greater number of pills

you have, the more value within that bottle.  And they tend to

be more advanced.  They may, separate from the financial

issues, if they are pure addicts themselves for themselves,

then they also try to seek out other agents such as

benzodiazepines.  Xanax is a common example of that.  They will

not settle for the lower end of things.  Just like they did not

settle for Oxycodone 5.  They will aim to get Xanax 1

milligram, two milligrams, two to three times a day.

        So now you have a very addictive combo.  You have a

IBT6TAY4                    Gharibo - direct

1    combo that will create some dependence and withdrawal.  That is

2    also a combo that is also very valuable and they tend to drive

3    that up.  So what they will do is they will lose prescriptions,

4    they will lose bottles basically.  They will say, I lost my

5    bottle.  I opened the bottle over the toilet.  Or over the

6    sink.  Somehow it got destroyed.  I need a refill.  Those

7    patients will also pay cash.  They want to be off the grid.

8    They will pay the physician cash in return for the

9    prescription.

10            There are many other red flags.  They could be urine

11   drug testing issues, behavioral issues, and so on.

12   Q.  Let me ask you mentioned the request for combinations of

13   medications.  I forgot to ask you in the same way of Xanax and

14   Soma, are sleep pills something that interact negatively with

15   Oxycodone?

16   A.  Yes.  So many sleep peels are benzodiazepines.  For example

17   Valium can be a sleep pill.  Some patients take Xanax for

18   sleep.  They tend to be depressants as well, antianxiety type

19   medications.

20   Q.  You mentioned earlier a phrase "doctor shopping."  What is

21   that a reference to?

22   A.  That means going to different clinicians to get additional

23   controlled substance prescriptions.

24   Q.  Is going to different doctors or doctor shopping a red

25   flag?

IBT6TAY4                    Gharibo - direct

1    A.   Yes.

2    Q.   How would a physician identify potential doctor shopping?

3    A.   You can do it through the Prescription Monitoring Program.

4    It is a website that you log into.

5    Q.   Are age or appearance or behavior or there any ways that

6    those are red flags?

7    A.   Age could be a red flag.

8    Q.   How so?

9    A.   Generally speaking younger population is more predisposed

10   to being an addict.  I guess at some point you just kind of

11   grow out of it.  But the data is that demographically speaking

12   if you are less than 40, especially if you are a male, you have

13   a higher probability of being addicted or becoming an addict.

14   Q.   You mentioned the ways in which a patient speaks to you and

15   how it could be a red flag.  What about claims of a patient

16   running out early of pills or they lost pills?

17   A.   If it happens once -- I think it happens to everybody.  We

18   lose something that we have -- it is perfectly understandable.

19   If it is happening in a serial fashion in a very frequent

20   fashion that is a problem because it indicates lack of

21   responsibility for that prescription.  A prescription is like

22   money.  In this case it may be.  So if they are constantly

23   losing the bottles, that is a major problem.

24         If somebody gets ahold of that bottle, it can simply

25   be misused, abused.  It can cause a death.  It could be

 1  mistaken for another medication.  Then you are potentially

 2  threatening that family with that prescription.  That is the

 3  social part -- the psychosocial part.  If they are not

 4  together -- I mean, one loss is fine.  But if it happening

 5  frequently, that is a red flag.

 6  Q.  Are there steps in a way a pain management physician runs a

 7  clinic or sees patients that could be taken to avoid the

 8  diversion or misuse of pills?

 9  A.  Yes.

10  Q.  What are some of those steps?

11  A.  I mean, the steps is -- I think first of all it shouldn't

12  just be automatic to give opioids to a patient.  You give

13  opioids when opioids are indicated.  Majority of your patients

14  can be treated through more elementary therapies that don't

15  have such consequences.  So physical therapy, injections, no

16  opioids, and so on.

17          If the patient has the appropriate biosocial

18  indication and you have made a decision to prescribe an opioid,

19  you can keep things tight and well measured and controlled.

20  From patient education, you can do urine monitoring, you can do

21  pill counts, you can do Prescription Monitoring Program.  But

22  how you go about prescribing is huge to mitigate misuse, abuse

23  and diversion.  Because you can -- I mean, as a physician if

24  you really drive things hard, you can turn everybody into this

25  room into addicts and dependents.

1          So we have responsibility to keep things in check and

2     keep things tight as far as the dosage and the pill count.  If

3     I keep the doses and pill counts low, there is only so much you

4     can do with that.  That is one way to minimize misuse, abuse

5     and diversion.  Keep the units low and well controlled and

6     prescribe it to the appropriate patient who is more less

7     together.

8          THE COURT:  Let's do this.  Let's take a 10-minute

9     break.  Don't discuss the case with anyone else.  Don't let

10    anyone discuss it with you.  Don't conduct any independent

11    research regarding this case.  See you in 10 minutes.

12          (Jury excused)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  See you soon.

2           (Recess)

3           THE COURT:  Are we ready?

4           MR. ROOS:  Yes, your Honor.

5           THE COURT:  How much longer do you have on direct?

6           MR. ROOS:  I think over halfway.

7           THE COURT:  Let's bring the jury in.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IBT6TAY4                    Gharibo - direct

1          (In open court; jury present)

2          THE COURT:  Please be seated.

3          Let's continue.

4    BY MR. ROOS:

5    Q.  Dr. Gharibo, shortly before we had left off, you had

6    mentioned urine testing and you earlier mentioned it was a way

7    to verify whether or not patients are taking their pills.  Are

8    there any other purposes for urine testing?

9    A.  Yes.

10   Q.  What are those other purposes?

11   A.  That they are not taking something elicit, like cocaine

12   let's say, and that they are also not taking something that is

13   not prescribed by you.

14   Q.  If you found out that a patient was using an elicit

15   substance like cocaine, for example, what would you do?

16   A.  That would be a major problem.  That would require me to

17   stop prescribing chronic opioids.  I can still treat them, but

18   they are already addicted by definition since they are using

19   cocaine and I cannot give them another addictive substance.  So

20   I would taper them off the chronic opioids.

21   Q.  Do you have any experience evaluating physicians' medical

22   practices?

23   A.  Yes.

24   Q.  What is that experience?

25   A.  Quite a bit of experience.  I have evaluated practice

1    within NYU Langone Health, within the surrounding states.

2    Insurance companies and hospitals have sent me a range of

3    medical records.  I have evaluated records for civil trial

4    purposes and criminal trial purposes.  And that is pretty much

5    across certainly the eastern border I would say and some of the

6    midwest states as well.

7    Q.  You tested earlier about red flags you might look for as a

8    physician that a particular patient is diverting his or her

9    Oxycodone.  Now, in addition to those what red flags do you

10   look for to determine whether a physician is him or herself

11   averting Oxycodone?

12   A.  So what I look there for is a prescription that is focused

13   on controlled substances.  So a practice that is up to no good

14   in terms of feeding a diversion network will treat patients in

15   such a fashion that is very controlled substance heavy and they

16   will prescribe high strengths and high pill counts of the most

17   addictive molecules.  I would say the big one in the country is

18   Oxycodone and a Xanax combination.  And not just any Oxycodone

19   but the 30 milligrams given in excessive numbers.  I wold say

20   exceeding 120 pills a month, and a Xanax prescription exceeding

21   .25 milligrams reaching 1 and 2 milligrams 60 or 90 pills at a

22   time.

23            Where no matter who comes in essentially generally

24   speaking the vast majority of the prescriptions are such a

25   combination given for an indication that is nowhere to be

1    found.  There is nothing you can put your finger on as far as

2    that is where the pain is coming from.  Nobody really needs

3    these prescriptions even if you can identify a good indication

4    for the pain too because these high strengths are more for the

5    cancer population that are dying.  Let's say, in the last

6    couple of months of life.  The body builds up a lot of

7    dependence.  That is when you need the Oxycodone 30 and that is

8    when you need that benzodiazepines.  So for a non-cancer

9    population these are virtually close to never appropriate.

10   Q.  Now, besides those red flags what extent are the age of

11   patients that brings up a red flag?

12   A.  If they are treating the younger end of the age range, that

13   is clearly a red flag as well.

14   Q.  What about the documentation or lack thereof in medical

15   charts?

16   A.  That is something very common that I have seen in my

17   reviews as well.  Very sparse documentation or absent

18   documentation of the history and physical.

19   Q.  Now, what about to the extent or lack thereof that the

20   charts reflect violations or problems by patients?

21   A.  So it reflects that -- if there are any violations, they

22   are ignored.  If somebody is found to be using cocaine, there

23   may be an instruction in the prescription but they get another

24   prescription sometime later.  Or if the prescriptions are

25   continuously lost, prescriptions are still provided to the

1    patients despite the violations.  There is a pattern.

2    Q.  Are there are any red flags related to the manner in which

3    physicians see the patients?  The setup of the offices?

4    A.  It is such that it becomes like a pill mill.  The setup is

5    that they come in.  It is a nonspecific diagnosis.  It is a

6    very short visit.  There is no history.  There is no physical

7    exam.  And they walk out with a similar prescription and there

8    is no range within the prescription.  It is pretty much the

9    same thing generally speaking.

10   Q.  How about the number of people in the doctor's office?

11   A.  It could vary.  I mean, certainly if it is a younger

12   population of like young 30-year-old guys and the whole place

13   is -- there is a line out of door and everybody is walking out

14   with a Oxycodone and a Xanax prescription, that is a red flag.

15   The number of people can vary.  It could be anywhere from

16   sparse.  Sometimes offices do get crowded.

17   Q.  You mentioned cash earlier as the method of payment as a

18   potential red flag in a physician's practice.

19   A.  Yes.  That's a huge red flag.  Many of them they are often

20   not employed.  So if they are not employed and paying cash for

21   their prescriptions you ask them, Why you are paying in cash

22   thousands of dollars a year basically for your medical care?

23   Why do you not have insurance?  Why don't you get insurance

24   with this money so you can get your other medical problems

25   addressed as well?

1          It also creates a potential conflict of interests.

2     All of a sudden the doctor is taking cash.  There is a lot that

3     the doctor can do with that cash, reported or not reported.  It

4     brings a whole separate area of a question mark into the

5     investigation of the practice when a doctor accepts cash for

6     controlled substances.

7     Q.  What about methods of compensation other than cash, like,

8     gifts?

9     A.  I mean, sometimes we get a box of donuts, box of bagels.

10    That's okay.  A box of chocolate.  You shouldn't be getting,

11    let's say, a flat screen television from Best Buy.  That would

12    be a huge red flag.  If they are fixing -- if they are coming

13    to your house and doing stuff around your house, that would not

14    be an appropriate gift.  That would not be an appropriate

15    interaction.

16    Q.  Now, you mentioned smaller items.  What about repetition,

17    you know, receiving that item every time the patient goes?

18    A.  That is a major problem.  We tell patients if -- I mean, if

19    they are bringing donuts each time they come in, they

20    shouldn't.  They really don't need to because everybody is on a

21    diet anyway now.  It is clearly something that should not be

22    coming in.  I tell them, You don't have to bring it in.  We get

23    enough food as it is.

24         One time we accept it because they don't like it if

25    you say no.  There should not be a repetition to it.  Once

1    around the holidays is all we'll tolerate.

2    Q.   So what extent are warnings from insurance companies or

3    pharmacies a potential reg flag that you look at?

4    A.   That is a yellow red, red flag.  Certainly it is part of

5    the spectrum that I pay attention to when I look at a practice.

6    It needs to fit in with everything else as well, but that can

7    be a yellow or red flag as well.

8    Q.   Based on your experience, training and review of

9    literature, are there things that physicians can do to disguise

10   their illegal get prescribing of controlled substances?

11   A.   Yes.

12   Q.   What are those things?

13   A.   Sometimes they will do erratic things.  For example, they

14   may come down on their prescription strength for abrupt reasons

15   that are not clear in the record, and it applies to everybody

16   within the practice.  Sometimes the pill counts will drop from,

17   let's say, 240 to 180 and you really didn't explain why.  It is

18   not explained in the medical record as to why that prescription

19   count went from 240 to 180.

20          They may order urine drug testing.  It is a prop.

21   They are not reacting to the results of that urine drug

22   testing.  They may for.example. put up an opioid treatment

23   agreement that is signed; but the elements of that opioid

24   treatment agreement, such as comprehensive care and

25   biopsychosocial indication are not adhered to.  Those are

1    simply prompts to create a facade of paying attention to good

2    medical care, but that is not the case at all.

3    Q.  What about to what extent are prescribing other medications

4    besides the Oxycodone a potential way of, I think you used the

5    phare providing a facade?

6    A.  That is also huge.  If somebody wants to practice pain

7    medicine, you are going to practice pain medicine.  Pain

8    medicine practice is not just consisting of opioid therapy and

9    controlled substances.  So if somebody sort of has this

10   simplistic monotherapy with controlled substances where that is

11   the heart of the prescription, once in a while there will be

12   some antiinflammatory there.  Once in a while there will be

13   some muscle relaxant there.  That is not a good range.  That is

14   a huge red flag because majority the prescriptions that are

15   coming out of the practice are controlled substances and the

16   majority of the prescriptions are high strength, high pill

17   count.  There is no range.  Therefore, there is something up

18   with that especially if it is a bunch of young people coming

19   and getting these prescriptions without adequate documentation.

20   Q.  Doctor, did there come a time when the government contacted

21   you in connection with this case?

22   A.  Yes.

23   Q.  What did the government ask you to do?

24   A.  Review medical records.

25   Q.  Were those medical records patient files of Dr. David

1    Taylor?

2    A.   Yes.

3    Q.   Prior to being contacted by the government, had you ever

4    heard or met Dr. Taylor?

5    A.   No.

6    Q.   Did the government give you the records that you reviewed?

7    A.   Yes.

8    Q.   Did you review the records for every single patient in Dr.

9    Taylor's practice, or just the ones that were selected by the

10   government?

11   A.   Just the ones selected.

12   Q.   Besides the patient charts, did you review any other

13   materials?

14   A.   Yes.

15   Q.   What types of other materials did you review?

16   A.   I looked at urine drug testing.  I looked at Excel

17   spreadsheets of Bureau of Narcotic Enforcement.  I looked at

18   some other office files of favorite medications type of

19   document and so on.

20   Q.   Did you look at video recordings?

21   A.   Yes.  That too.

22   Q.   Now, I am going to hand you five exhibits.

23           MR. ROOS:  May I approach, your Honor?

24           THE COURT:  Yes.

25   Q.   So 504, 505, 508, 513, 514.  Do you recognize these,

1   documents, Dr. Gharibo?

2   A.  I do.

3   Q.  Are these charts that were prepared based on your review of

4   various materials?

5   A.  Yes.

6   Q.  Do they reflect your observations from various patient

7   files and the other materials you reviewed?

8   A.  They do.

9   Q.  Does each chart know which government exhibit the chart is

10  based upon?

11  A.  Yes.

12  Q.  Have you reviewed the charts prior to testifying today to

13  confirm their accuracy of the context that is in them?

14  A.  Yes.

15  Q.  Do they fairly and accurately summarize your opinions about

16  Dr. Taylor's diagnosis and treatment of the patients based on

17  the materials that you reviewed as well as your training and

18  experience?

19  A.  Yes.

20          MR. ROOS:  The government offers Exhibits 504, 505,

21  508, 513 and 514.

22          MR. CARNESI:  No objection.

23          THE COURT:  Those are in.

24          (Government's Exhibits 504, 505, 508, 513, 514

25  received in evidence)

IBT6TAY4                    Gharibo - direct

1    BY MR. ROOS:

2    Q.  I would like to start by asking you about some specific

3    patient records that you reviewed.  Let's start with Government

4    Exhibit 504.

5           MR. ROOS:  Please display that for the jury.

6    Q.  Dr. Gharibo, are you familiar with the records --

7           THE COURT:  Hold on.

8    Q.  Are you familiar with the records relating to Vito

9    Gallicchio?

10   A.  Yes.

11   Q.  You've looked at his patient file?

12   A.  Yes.

13   Q.  Before we get into the substance of what is on the chart on

14   the screen here, can you just orient for the jury what is the

15   information is on the top header there?

16   A.  That is the patient demographic information, name and age,

17   and the treatment time range that the charts were reviewed.

18   Q.  Now, please take us through each of the columns on the

19   chart.  What are we looking at?

20   A.  So let's start with the left side.  That is the first

21   column.  Prescribed controlled substances and lists the

22   controlled substances that were prescribed by Dr. Taylor in a

23   chronological fashion.  Opioids first, followed by non-opioids

24   such as benzodiazepines.

25           And the second column is the biopsychosocial

1    indication part that documents whether there was a diagnosis

2    that supported the prescription that supported the chronic

3    opioid therapy.

4            The third column from the left whether if there was

5    documentation of history and physical examination that

6    supported the prescription.

7            The fourth column is advanced diagnostic testing, what

8    was present in the chart and what it revealed.

9            The fifth column is urine drug testing and the results

10   of that.

11           And the last column are the red flags for diversion.

12   Q.  So let's start with the first column.  What did you observe

13   about the controlled substances that were being prescribed?

14   A.  So for Mr. Gallicchio what I observed was there was no

15   titration.  So there is no documentation of any type of opioid

16   dependence that the body is used to opioids to a certain degree

17   and initiation of an opioid at a very high dose at a very high

18   pill count.

19           So if somebody is opioid naive and you give them

20   Percocet 10, 240 pills at the onset, that is just ridiculous.

21   It just should not be done because you are basically blasting

22   the patient with Oxycodone.  You can kill them.  You can kill

23   the people in the household.  A responsible prescription could

24   be something Percocet 5, 60, 30 pills, maybe 90 pills.  It

25   could be Vicodin.  It doesn't have to be degrade of Oxycodone.

1    You can use codeine, Tramadol.

2              There is no established dependency here.  A very

3    disproportionate initiation and then it just jumps up to

4    30 milligrams.  The typical titration is not just doubling up

5    doses.  At a very high pill count and at some point again a

6    very potent opioid is introduced as well such as Dilaudid.

7    Dilaudid is Hydromorphone.  It is about seven to eight times

8    more potent than morphine.

9              And many of you may have taken Vicodin 5, Percocet 5.

10   The Dilaudid at 8 milligrams is about 60 milligrams of morphine

11   given twice a day.  That is just a huge doze.  The Oxycodone

12   prescriptions are about 45 milligrams at a time morphine

13   equivalent given up to eight times a day.  So 45, 50 milligrams

14   equivalent given eight times a day, those are huge doses.

15   Those are not non-cancer setting doses.  Those are not human

16   doses.

17   Q.  Now, looking at the next three columns in your view of the

18   claimed diagnosis, the history, the physical exams, and the

19   advanced diagnostics, what did you observe?

20   A.  There was no indication for opioid pharmacotherapy.  Here

21   we have a postoperative pain from 2007.  The treatment ranges

22   from 2007 to 2017.  Patient has general back pain.  I have

23   nothing to pinpoint to as to this is where the pain is coming

24   from, whether there is a disk extrusion, a spinal instability,

25   arachnoiditis.  There is nothing of that sort.  There is no

1    clear diagnosis.

2            There is anxiety.  You are going to provoke the

3    anxiety with the Oxycodone.  That withdrawal is going to make

4    the anxiety really much worse such that the patient may spin

5    out of control and may decide to just hurt themselves, kill

6    themselves and so on.  The headaches are going to be made worse

7    by the Oxycodone.  If anything, I am seeing a contraindication

8    to opioid therapy, not an indication.

9    Q.  What about the history physical exam, what did you review

10   on the chart?

11   A.  This is not appropriate for any purpose that is non-cancer

12   related even with good documentation, but we don't even have

13   good documentation here.  So there is -- there's grossly

14   inadequate documentation where the documentation in looking at

15   the record are simply four lines.  There is one line for

16   history, one line for physical, one line for assessment, and

17   one line for plan.  So virtually an inadequate history and

18   physical.  There is no sorting out of that musculoskeletal

19   pain, nerve pain, and emotional pain.  So no relevant history

20   and documentation.

21           There are notes are kind of -- they have this rubber

22   stamp feel to it.  There is no sorting out of the pain.  There

23   is no examination.  There is no putting your hand on the pain.

24   There is no documentation of that opioid dependency.  So for

25   us -- for this to be safe to document such doses, there needs

1    to be some dependency to begin this so that you don't overdose

2    the patient.  There is no verification of that.

3            Inadequate monitoring.  Only one urine drug testing

4    over a decade.  At these doses, let's assume they are

5    appropriate, we would have to test a lot more.  No use of

6    non-opioid.  Why only controlled substances?  Why is this

7    patient a young patient that is only getting -- they are only

8    getting a high dose controlled substance at a very high pill

9    count.  How about everything else that can be tried to try to

10   cut down on the strength and the pill counts?  No referral to

11   other specialists.  No workup to speak of.

12   Q.  Now, you mentioned things you observed in the chart.  Let's

13   take a look at one of those charts.

14           MR. ROOS:  Ms. Corrado, can we have Government 414,

15   page 43.

16           Maybe next to it we can actually have 444.

17   Q.  Dr. Gharibo, can you please describe for the jury some of

18   the things that stood out to you about the records we're

19   looking at?

20   A.  Yes.  So looking at the left upper corner that is for April

21   2th, 2013, pain while controlled.  Again at this grade, you

22   have to sort out the pain and you are going to try to come down

23   on the medicine because it is such a high risk medication that

24   is going out the door.  A very high risk of morbidity and

25   morality given the strength and pill count.  There is no such

1   effort here at all.  It simply says, Pain well controlled.  I

2   have little difficulty believing that given the diagnosis

3   because headache and anxiety would get worse.  Back pain can

4   even get worse with such a prescription given the short-acting

5   nature of it.  Given withdrawal phase, the pain would get

6   provoked at the end of the dose eight times a day.  So that

7   didn't add up to me.  There is no attempt at a sort-out.  And

8   then an inadequate diagnosis followed by the same prescription.

9   Q.  What, if any, impressions do you have of looking at the

10  entirety of the chart, each of these entries for each visit?

11  A.  The entirety of the chart is that there is inadequate

12  initial evaluation and inadequate follow up in every instance.

13          MR. ROOS:  Ms. Corrado, can we look at 414, pages 38

14  and 68.

15  Q.  Dr. Gharibo, do you see at the bottom of the page on the

16  left side, page 38, where it says, Meds damage in wash?

17  A.  Yes.

18  Q.  Is this a phenomenon that you observe throughout the chart?

19  A.  Yes.

20  Q.  What types of things do you see?

21  A.  Simply bottles getting lost or destroyed and then

22  prescriptions being written to replace the bottle.

23          MR. ROOS:  Can we go back to 504 now.

24  Q.  So on the chart, 504, Dr. Gharibo, where it says in the

25  third column from the left, Repetition and notes each month,

1   what is that a reference to?

2   A.  That pretty much -- there's not much of a range in the

3   notes.  Pain is well controlled, ambulating well, same

4   diagnosis of osteoarthritis, same prescription.  So it is a

5   virtual repetition of notes.  There is almost verbiage overlap

6   in the notes.

7   Q.  Looking at the fifth column from the left, the one

8   regarding urine screening, what did you see when you reviewed

9   urine records?

10  A.  There is grossly inadequate monitoring here.  Only one

11  test -- only one urine test over a decade period and it is an

12  invalid test.

13  Q.  Why do you say it is an invalid test?

14  A.  So the patient is on Oxycodone, which produces metabolites.

15  That is noroxycodone and oxymorphone and Oxycodone should be in

16  the urine.  That is how just the body functions.  So this was a

17  case where the urine is tampered with.  The patient is trying

18  to fool the clinician.  This is something that we learned, I

19  would say, very early on that the body produces metabolites.

20  The medicine doesn't come out the same.

21       You are drinking that coke.  That coke is going to

22  come out different.  It is not going to come out as coke.  It

23  is going to come out of something different.  So here Oxycodone

24  produces noroxycodone upon metabolism by the body.  Here there

25  is no noroxycodone in the urine.  Therefore, since there is

 1  Oxycodone, the Oxycodone was pulverized and put into the urine

 2  directly but didn't go through the body.

 3          In other words, the patient is not taking the

 4  Oxycodone.  They are tampering with the urine to make it seem

 5  like they are.  Therefore, they are probably not taking the

 6  medicine at all.  They are probably diverting it.

 7  Q.  The last column here is red flags of diversion.  You

 8  already touched on a few of these.  Are there others that you

 9  haven't explained to the jury yet?

10  A.  Old claimed injury.  Given a decade passes by, I think that

11  needed some further workup as to why the pain is continuing.

12  Multiple short-acting prescriptions and the benzodiazepines.

13  We mentioned the rest.

14  Q.  Were you able to draw any conclusions about whether the

15  Oxycodone prescriptions for Vito Gallicchio were issued for a

16  legitimate medical reason?

17  A.  I was.

18  Q.  You were?

19  A.  I was able to draw a conclusion.

20  Q.  What was the conclusion?

21  A.  The conclusion is they were not issued for a valid medical

22  purpose.

23  Q.  Why have you concluded that?

24  A.  It is based on my experience, my training, what I observed

25  in the community, what I observe in my practice practicing with

1    about eleven pain physicians and nurse practitioners where this

2    is not practice of pain medicine because it lacks a range.

3    There is no dynamics in treatment of Mr. Gallicchio.  There is

4    the same thing over and over.  It is a high-risk prescription

5    that goes out the door with -- that is not appropriate for

6    anybody that is not suffering from cancer, that has no workup

7    associated with it, that has a urine drug testing -- urine drug

8    test that has been tampered with.  That is riddled --

9    riddled -- with red flags that are not paid attention to.  This

10   is not the practice of pain medicine.  This is simply feeding a

11   network that probably diverts.

12   Q.  To be clear, Dr. Gharibo, based on the materials you have

13   reviewed, would it be reasonable for a physician acting in the

14   normal course of professional conduct to conclude that

15   Gallicchio's documented complaint and diagnosis actually

16   justified the he prescriptions here?

17   A.  It would not be reasonable to conclude that.

18   Q.  Why is that?

19   A.  Because such prescriptions are going to cause pain

20   especially given the diagnosis that is documented by Dr. Taylor

21   with the anxiety.  This is going to cause anxiety because of

22   that excitatory effect and the withdrawal effect.  So therefore

23   it is not indicated.  The headache part is going to get made

24   worse.

25            Where is the biological part?  Psychosocially

1   certainly we're not altogether given all the aberrations and

2   the lost prescriptions that are happening repeatedly.  The

3   patient already tried to deceive the doctor and tampered with

4   the urine sample.  This is not a patient who is behaving in

5   good faith here.

6           Even if they were, this is not how you treat a chronic

7   pain patient empty.  This is a great disservice to medical

8   training and to appropriate care of the patients that are

9   suffering from chronic pain.

10  Q.  You mentioned the act of trickery, the urine test.  In your

11  view is that an attempt to trick that would work for most

12  physicians?

13  A.  It would not.

14  Q.  Why is that the?

15  A.  Because it's fundamental.  It's foundational that you learn

16  in your third year of medical school, even second year of

17  medical school when you take your pharmacology class.

18  Medicines go through the body and they get broken down.  The

19  liver chews it up.  There are enzymes in the blood that chew it

20  up and the metabolites come out.  For Oxycodone, if you get --

21  you have to know your specialty.  If you are going to order a

22  test, it is going to come out validated and this is an invalid

23  urine drug test and it is one of the similar once to pick up.

24  It is a tampered urine sample.

25  Q.  Let's take a look at another patient.

1          MR. RODRIGUEZ:  Can we have Government Exhibit 505.

2     Q.  Dr. Gharibo, this is a chart for Lori Gallicchio.  From

3     your review of the records relating to this patient were you

4     able to determine what, if any, relationship the records said

5     she has with Vito Gallicchio?

6     A.  Yes.

7     Q.  What relationship?

8     A.  She is the spouse.

9     Q.  Now, based on your training and experience, does the fact

10    that there are two patients who are spouses in the pain

11    management raise any red flags for you?

12    A.  Yes.

13    Q.  What is the concern there?

14    A.  So my concern there is that there is already one patient

15    that identified that is being inappropriately prescribed

16    controlled substances that I think are probably being diverted.

17    So now I have a strong suspicion that the wife may also be sent

18    to the same practice to get the same set of controlled

19    substances for further diversion.

20          Any time you have a household getting the same set of

21    grossly inappropriate controlled substances prescriptions, then

22    it is a huge red flag because it is not just a one-off.  The

23    doctor knows both patients and is misprescribing to both of

24    them and both of them and their medical records and the

25    prescriptions the way they are carried out are just -- the

1    record is just riddled with red flags.

2    Q.  Now, Dr. Gharibo, I won't ask you to go through each of the

3    columns on this chart, but can you describe generally for the

4    jury what you observed about the described diagnosis, the

5    history, the physical exam, the tests, and then the resulting

6    prescribed controlled substances?

7    A.  What I observed is that in Ms. Lori Gallicchio the

8    diagnosis is carpal tunnel syndrome.  Now, some of you may have

9    had carpal tunnel.  You certainly do not go on Oxycodone

10   30 milligrams, 120 to 270 pills over about an eight-year time

11   frame.  That is not how carpal tunnel syndrome is treated.  It

12   is just completely inappropriate treatment of carpal tunnel and

13   the pain of carpal tunnel.

14          In fact, carpal tunnel is a nerve pain condition.  It

15   is the medium nerve irritation and it can be treated through,

16   let's say, a wrist injection or Gabapentin, a non-opioid.  So

17   this is completely outside of the range of practice of

18   medicine.  It is not even near the border of range of medicine

19   appropriate range of prescribing that I see.

20          So inadequate biological indication, a plan that just

21   doesn't add up from a pain medicine perspective, and void of

22   proper documentation.  The same lack of history and physical as

23   Mr. Gallicchio.  No opioid sparing, no referral.  Not even a

24   cortisone shot is done at the wrist.  Not even a referral to a

25   surgeon, not even a wrist injection, not even a wrist splint to

1    stabilize the wrist and not irritate the nerve, but just this

2    prescribing of controlled substances with no medical basis.  In

3    fact, no record of any advanced diagnostic testing, no EMG, no

4    MRI of any kind.  No diagnostic injection to see if that is

5    where the pain is coming from at the wrist.

6         And a urine drug testing that is negative for

7    Oxycodone in both instances.  Where there is no evidence that

8    the patient was taking the Oxycodone, they are getting a huge

9    red flag for diversion.  Here we have two patients within the

10   same household that are being prescribed inappropriately --

11   grossly inappropriately -- with all the signs of diversion.

12   Q.  Let's talk about the third patient.  We have the chart for

13   Robert Adams, Government Exhibit 508.

14        Dr. Gharibo, can you again generally summarize for the

15   jury what you observed in your review of the chart for Robert

16   Adams?

17   A.  So for Mr. Adams basically we have a diagnosis that is just

18   not clear.  It may have something to do with the hip or not.

19   There is nothing to point to within the hip that would explain

20   significant pain.  And what is prescribed is inappropriate

21   almost regardless of a non-cancer diagnosis.

22        Again, it is the same set.  We are lacking a range

23   here.  So for all these three patients, we have Oxycodone 15,

24   30 milligrams.  We have at some point that being switched to a

25   ridiculous dose of Dilaudid at about 55, 66 milligrams of

1    Coumadin.  So that is the Dilaudid 8 that you see here.  That

2    goes for all the patients.  We have a sleep agent here.  And we

3    don't have a diagnosis.  It is never appropriate for any

4    diagnose, but we don't have a diagnosis.

5              Same lack of history and physical.  But I think what

6    also stands out here is that this grade of chronic oidioid

7    therapy -- let's assume it is at a much lower level and is

8    appropriate requires a history in a physical.  Not somebody

9    else coming to pick up the prescriptions.  There shouldn't be

10   anything prearranged.  If I am sending my friend John to pick

11   up a prescription of Oxycodone 30 and Xanax 2 or Dilaudid 8

12   that is a major problem.  I am going to -- if my friend is

13   getting that, that is a major problem for that clinician and

14   for the patient.  So there is no -- there should not be any

15   prearrangement of a pickup of these prescriptions.

16   Q.  Let's look at what you are referring to in the chart.

17             MR. ROOS:  Can we see Government Exhibit 407 at page

18   6.  If we can zoom in on the last entry on the page of this

19   chart.

20   Q.  Is this what you are referring to?

21   A.  Yes.

22   Q.  Let's look at the next page also.

23             MR. ROOS:  If we can look at 47, page 7.

24   Q.  Do you see that middle entry?

25             MR. ROOS:  We can zoom in on the 9-27 entry.

1   Q.   What does that say?

2   A.   Prescription Vito picked up.

3           MR. ROOS:  Let's go back to Government Exhibit 508.

4   Q.   Now, you mentioned a number of the red flags that are

5   identified here.  I note that at the bottom you have, Pays for

6   visits in cash.  Why does that stand out to you?

7   A.   It stand out because it creates a conflict of interest for

8   the physician.  There is an expectation for a prescription when

9   a patient pays cash.  If you are getting 120 milligrams, the

10  physician should not be doing that for controlled substances.

11  That is a potential for something that the physician can horde

12  on the side.  They can horde the cash on the side, for example.

13  That is not how we practice pain medicine.

14  Q.   The last entry says on this chart at the bottom on the

15  right side says, Lives and fills prescriptions in New Jersey.

16  For a physician who is practicing in Staten Island, why is it

17  where the patient lives and bills relevant?

18  A.   It is a yellow flag, red flag in that why is the patient

19  traveling.  Have they found an easy target to accumulate pills

20  and then divert?  The diverters will go to where the loose

21  prescribers are.  They will travel anywhere.  They will cross

22  state lines.  They will travel over a thousand miles or on let

23  alone Jersey.  There are plenty of other pain doctors in New

24  Jersey that they can go to.  The fact that they are going to

25  Staten Island is a red flag.

1   Q.  So what is your overall opinion of the treatment of or the

2   prescribing to Robert Adams based on the records you reviewed?

3   A.  My overall opinion is that it fits the pattern of the other

4   two patients that is in inappropriate prescribing, period,

5   regardless of the medical reason and we don't even have a

6   medical reason.  There is no documentation of such medical

7   reason.  There is no workup of the pain.  There is no behavior

8   that signifies that the pain is getting worked up, the

9   underlying issue is getting addressed, and risk is being

10  minimized.

11          Here, the risk is getting maximized.  This is not a

12  pain medicine practice.  This is just something giving out

13  controlled prescriptions.  There is no attempt at trying to

14  address the problem.  So for somebody, for example, with the

15  carpal tunnel, you give an injection.  So this is not a pain

16  medicine physician behavior pattern.  This is somebody who is

17  inappropriately prescribing controlled substances for

18  diversionary reasons.

19  Q.  Now, you mentioned a pattern.  Did you review about 12

20  patient files for this case?

21  A.  Yes.

22  Q.  And did you notice any patterns across those patient files?

23  A.  Yes.

24          MR. ROOS:  Can we see Government Exhibit 513.

25  Q.  Dr. Gharibo, what are we looking at here?

1  A.  What we're looking at here is the first column labeled red

2  flag.  It is an identification of different red flags in review

3  of the medical record.

4          And the second column lists of patient that fits that

5  red flag.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.   The first row, which lists 12 patients, all 12 patients,

2    what's the red flag here?

3    A.   The red flag is inadequate documentation.  All the patients

4    have grossly inadequate documentation, lack of biopsychosocial

5    indication, lack of adequate history and physical, significant

6    repetition of the notes and nothing to justify the regimen

7    prescribed.

8    Q.   Let's look at the next one.  The next row is 150 or More

9    oxycodone pills.  Is this a red flag for many of the reasons

10   you already testified?

11   A.   Yes.

12   Q.   Let's look at the third row.  This identifies an increase

13   in the number of pills over time, is that right?

14   A.   Correct.

15   Q.   Why is that a red flag?

16   A.   Because it's pretty disproportionate to begin with at 180

17   pills, and to bring that up to 210 and 240 is even more

18   outrageous.

19   Q.   The fourth row here says, "Reduction in the number of

20   oxycodone 30-milligram tablets to 180 per month without chart

21   note in October of 2016," and lists a number of patients.

22        Why did you identify this as a red flag?

23   A.   Because all of a sudden, abruptly, over a very narrow time

24   range between October and November of 2016, all of a sudden the

25   prescription numbers, the number of pills that are prescribed

1    are dropped by a significant amount, and there is no

2    explanation for that in the medical record.

3            It could be because -- could there have been let's say

4    what happened in the community to another clinician.  It could

5    be because of a warning letter that they got.  It could be

6    because of sense of apprehension and fear as to what may come

7    next over something they have heard.

8            So physicians may behave in such a fashion where

9    they'll try in their mind to minimize the risk.  But there is

10   no evidence of any medical explanation for that lowering of the

11   pill count.

12   Q.  Let's look at the next page.  Dr. Gharibo, the first row is

13   "Dangerous Prescription Combinations."  Are those some of the

14   combinations you have testified about previously?

15   A.  Yes.

16   Q.  Are these on the right side, are those what you observed in

17   some of the patient charts?

18   A.  Yes.

19   Q.  Let's look at the next row.  This says, "Patients Under 50

20   Years Old."

21           Dr. Gharibo, this is identified as a red flag.  You

22   earlier testified about the patients' age.  Do you remember

23   that?

24   A.  Yes.

25   Q.  And how it could be a red flag?

1   A.  Yes.

2   Q.  And is that why you have noted this here?

3   A.  Yes.

4   Q.  And could we see what the next row is.

5           Dr. Gharibo, of the 12 charts you reviewed, were these

6   the patients that the chart notated were paying in cash?

7   A.  Yes.

8   Q.  So about 50 percent?

9   A.  Yes.

10  Q.  And we don't need to go through the warning letters from

11  insurance.  Look at the last one of the 12 charts you reviewed.

12  Besides Vito Gallicchio's charts did you identify other charts

13  that referenced Vito Gallicchio?

14  A.  Yes.

15  Q.  Why is that a red flag?

16  A.  Why is it always Vito?

17          MR. ROOS:  Now, can we look at Government Exhibit 514.

18          What's this chart, Dr. Gharibo?

19  A.  This is a pretty much a tabulation of red flags within

20  urine drug testing.

21  Q.  Can you describe for the jury each of the red flags that

22  are identified?

23          MS. FLETCHER:  Can we have a sidebar, Judge.

24          THE COURT:  Yes.

25          (Continued on next page)

1           (In the robing room)

2           MS. FLETCHER:  I can only assume somebody is looking

3    for their notebook, but a couple of the jurors were gesturing

4    to each other and trying to get the attention of your deputy.

5    I wanted to flag it before they started talking to each other.

6           THE COURT:  All right.  Thank you.

7           MS. FLETCHER:  Sure.

8           THE COURT:  All right.

9           THE DEPUTY CLERK:  Excuse me, Judge.  One of the

10   jurors really has to go to the restroom.  Should I take them

11   all out.

12          THE COURT:  Yes.

13          (In open court)

14          THE COURT:  Let's take a ten-minute break.

15          (Jury not present)

16          THE COURT:  OK.  We'll take this break.  How much

17   longer is the direct?

18          MR. ROOS:  Your Honor, I have this chart that is up

19   there which will probably be a minute.  Then we were going to

20   show him one recording, and that's it.

21          I don't know.  Probably like ten minutes.

22          THE COURT:  All right.  I think that will take us

23   right around 3.  I will ask defense counsel, do you want to

24   start any cross now, or do you want to just wait until

25   tomorrow?

1          MR. CARNESI:  Judge, I would rather wait than

2     interrupt it.  But I don't think the cross is going to be all

3     that long, if you wanted to go until 3:15 or so.

4          THE COURT:  I don't know.  We told the jury 3.  We'll

5     let them go at 3.

6          MR. CARNESI:  No problem.

7          THE COURT:  All right.  Let me ask you this then,

8     since it seems like what we may be doing, we will come back,

9     the direct will finish up, and we will let the jury go.

10          Any extra instructions you want me to give this jury

11     as opposed to the usual instructions?

12          MR. CARNESI:  No.

13          THE COURT:  OK.  Sounds good.

14          See you soon.

15          (Recess)

16          THE COURT:  OK.  Let's bring the jury in.

17          (Jury present)

18          THE COURT:  All right.  Please be seated.

19          Let's continue.

20     BY MR. ROOS:

21     Q.  When we left off, Dr. Gharibo, we would looking at

22     Government Exhibit 514.

23          What does this chart show?

24     A.  What this chart shows is all the red flags that are

25     associated with urine drug testing, ranging from infrequent

1  testing to oxycodone is not detected in the urine to no

2  detection of metabolite of oxycodone in the urine to picking up

3  of an illicit drug, such as cocaine, to picking up medicines

4  that are not being prescribed and what patients had that

5  characteristic in their record.

6  Q.  Dr. Gharibo, earlier today you testified that you had

7  reviewed recordings of patient visits, is that right?

8  A.  Yes.

9  Q.  Were those patients visits done by a confidential source?

10 A.  Yes.

11        MR. ROOS:  Ms. Corrado, we can take down 514.

12 Q.  You reviewed the videos made by three different

13 confidential sources, is that right?

14 A.  That's correct.

15 Q.  Did you also review transcripts?

16 A.  Yes.

17 Q.  And were those confidential sources Christine Oakes, Julio

18 Clark, and Brian Dolinko?

19 A.  Yes.

20        THE COURT:  Counsel, are you about to play a

21 recording?

22        MR. ROOS:  Yes your Honor.

23        THE COURT:  Do you want the jurors to look at the

24 transcripts?

25        MR. ROOS:  Certainly, I think that will be helpful.  I

1    mean, they've seen it, but why not.

2            THE COURT:  OK.  Maybe your colleagues can help hand

3    those out, and you can keep asking your questions.

4    Q.  Those were Brian Dolinko, Julio Clark and Christine Oakes,

5    is that right?

6    A.  Correct.

7    Q.  Where they existed, you have reviewed the corresponding

8    patient files for those individuals?

9    A.  Repeat that, please.

10   Q.  To the extent they exist, you've reviewed the corresponding

11   patient files for those individuals?

12   A.  I did.

13   Q.  And had you also, to the extent they exist, reviewed the

14   urinalysis or urine testing --

15   A.  I did.

16   Q.  -- records for those folks?

17   A.  Yes.

18   Q.  Now, I would like to show you one recording and have you

19   look at the corresponding transcript.  There is a small binder

20   up there with you.  Do you see it?

21   A.  Yes.

22   Q.  And if you would turn to -- with your Honor's permission

23   the jury as well -- to Government Exhibit 203T.

24            You'll see it's multiple pages.

25            Is this the transcript for Brian Dolinko, Dr. Gharibo?

Ibtntay5                    Gharibo - Direct

1    A.   Yes.

2    Q.   The first page is sort of an introduction.  If you would

3    look to the page after that.

4          MR. ROOS:  Ms. Corrado, if we could play Government

5    Exhibit 203B.

6          (Video played)

7    BY MR. ROOS:

8    Q.   Dr. Gharibo, what did you observe about the recording?

9    A.   A number of things.  There's no history, there's no sorting

10   out of the pain, there's no assessment of the response to pain

11   medications, there's no attempt at any type of a diagnosis or

12   any type of opioid-sparing initiative of any kind.  There is

13   close to no physical exam.  There's more a question:  So we got

14   the oxycodone and oxymorphone, right?  And that ends the whole

15   visit.  That is not a clinical intake.

16          MR. ROOS:  Can we please see Government Exhibit 410,

17   page 21.

18   Q.   Dr. Gharibo, are these the prescriptions that correspond to

19   this visit?

20   A.   Yes.

21   Q.   What was Brian Dolinko prescribed for this visit?

22   A.   Prescribed oxymorphone, which is a much more potent form of

23   opioid than oxycodone, given as a long-acting formulation.

24   That is normally every 12 hours, but in the case of Mr. Dolinko

25   Dr. Taylor prescribes it four times a day.  It should not be

1    prescribed four times a day.  It is a 12-hour medicine.

2    Q.  I'm sorry.  What else was prescribed?

3    A.  Soma, 350 milligrams, also very frequently at every four

4    hours, 180 pills; as well as oxycodone 30 milligrams, 180

5    pills.  This is a very addictive mixture.  This is a very

6    diversionable set.

7    Q.  Let's look at the portion of the patient chart that

8    corresponds to the office visit that we saw the recording of.

9              MR. ROOS:  Can we please see Government Exhibit 410 at

10   page 67.  It's the middle entry is the one I want to focus on.

11   Q.  Now, Dr. Gharibo, what do the notes say about the visit

12   that we just watched?

13   A.  The notes state that the pain is well controlled.  So I

14   don't know how that got deciphered, but that is what is written

15   here.

16              Then there is a range of motion.  I am not sure what

17   it pertains to.  Flexion of 80 degrees, rotation of 60,

18   abduction of 80.  It appears to be the shoulder.  The diagnosis

19   is not founded in the recording.

20              There is a cervical and lumbar disk disease -- none of

21   that was discussed during the visit -- followed by a left

22   shoulder tendinopathy.  So really none of those conditions

23   should be treated with that set of pain medications that were

24   prescribed.

25   Q.  Based on your review of the recording, does what's

1   documented in the patient file correspond with what we actually

2   saw on the video?

3   A.  It does not.

4   Q.  How does it differ?

5   A.  It differs drastically in that there was no evidence that

6   the pain was well controlled.  The patient wasn't asked such a

7   question to gauge if the pain was well controlled.

8           There was no sorting out, is the oxycodone helping

9   you, is the oxymorphone helping you and so on.  How long does

10  it last?  Does it enable you to do what you want to do?

11          That is what would determine the answer such as pain

12  is well controlled.  So there's no such answer given by the

13  patient because the questions are never asked.

14          MR. ROOS:  One moment, please.

15          No further questions.

16          THE COURT:  OK.

17          So, members of the jury, we're going let you go home

18  today.  Again, we will ask that you get here tomorrow morning

19  at 9:30.  As always, do not discuss this case with anyone,

20  don't let anyone discuss it with you, don't conduct any

21  independent research regarding any of the issues, the parties,

22  or the locations.  Have a wonderful evening.  We will see you

23  tomorrow morning at 9:30 a.m.

24          Counsel, can you get the transcript binders, please.

25

Ibtntay5                    Gharibo - Direct

1              (Jury not present)

2              THE COURT:  OK.

3              Can the witness be excused now?

4              MR. ROOS:  Yes, your Honor.

5              THE COURT:  The witness can be excused.

6              (Witness not present)

7              THE COURT:  For the record briefly, Juror No. 3 just

8    motioned to me and had a brief conversation with me and told me

9    that she dropped some tea and wanted me to be aware of that.  I

10   said that's OK.  That's that.

11             Anyone want me to do anything about that other than

12   have that cleaned?  The government and the defense?  No?  OK.

13             So what are we looking like for tomorrow?

14             We will have cross-examination of the expert.

15   Counsel, do you have an estimate as to how long that might be?

16             MR. CARNESI:  I think maybe half an hour.

17             THE COURT:  Then I think the government wants to

18   re-call the summary chart witness, is that correct?  Or no?

19             MR. ROOS:  That won't be necessary, your Honor.

20   Everything came in through him today.  So, after defense

21   counsel's cross and if there is any redirect with the witness

22   who was on the stand, we have one more witness.  We expect her

23   direct is under an hour, probably closer to a half an hour than

24   an hour.  Then the government intends I think -- I believe we

25   have one stipulation, but besides that the government intends

1   to rest.  So we likely will conclude the government's case in

2   chief before lunchtime certainly.

3           THE COURT:  OK.  Remind me again, who is this other

4   witness.

5           MR. ROOS:  It's Lisa Mercado.  She worked in one of

6   the offices that defendant worked in.  She is not a cooperator

7   or anything.

8           THE COURT:  OK.  Anything else we need to discuss

9   today?

10          MR. ROOS:  Certainly, your Honor.  Obviously tomorrow,

11  you know, the government will rest early, so to the extent

12  there is a defense case or any witnesses to be called, we

13  expect that will probably get started before lunchtime.

14          THE COURT:  Right.

15          MR. ROOS:  If there is no defense case to begin

16  tomorrow, does your Honor intend to start the charge conference

17  early or wait until in the afternoon?

18          THE COURT:  It depends on if there is no defense case.

19  It depends on when we finish.  I can give counsel a little bit

20  of time to go grab some lunch if you want to do that.  The

21  other thing is we should be able to get our draft jury

22  instructions to you tonight by 6 o'clock.  But I plan to have

23  the charge conference I think -- we will see.

24          Defense counsel, do you have a sense now as to whether

25  or not there is going to be a defense case?

1          MR. CARNESI:  Honestly, Judge, I don't have a final

2    decision.  I have a sense of where we are going.

3          THE COURT:  OK.  We will see where we are tomorrow,

4    but I would prefer to -- I guess as I'm thinking about this, it

5    depends on when we finish.  If we are finishing at 12 o'clock,

6    then we can certainly have the charge conference at 1 or

7    something like that.  It depends.

8          I don't think that the charge -- well, who knows?  I

9    don't know how contentious the charging conference is going to

10   be, but we will see.

11         One thing, just so counsel can think about this, the

12   government in their submissions for jury instructions wanted a

13   conscious avoidance charge.  I am not sure if that's applicable

14   in this case.  Under the facts of this case, I am not sure if

15   that makes sense, but you can think about that some more.

16         MR. ROOS:  Your Honor, we are certainly happy to

17   discuss it further.  I think our view of -- one of the reasons

18   why it is appropriate is the defense opening, which made the

19   argument that Dr. Taylor didn't necessarily know that the pills

20   were diverted down the line.

21         Obviously, you know our position, which was that is

22   not an element of the charge, but a conscious avoidance

23   instruction could still be appropriate because the instruction

24   on a conspiracy case would just be that he consciously avoided

25   the object of the conspiracy.

1          So, to the extent there is an argument that the

2      defendant did not know the object of the conspiracy, a

3      conscious avoidance instruction would be appropriate.

4          THE COURT:  OK.  Defense counsel have any thoughts on

5      that?

6          MR. CARNESI:  Judge, obviously in the context of this

7      case and the way that they ended up arguing it and talking

8      about strictly medical necessity, I don't think it is

9      appropriate.

10         THE COURT:  All right.  That is my inclination.  We

11     will see.  But, yes, at this point I don't intend to give it

12     because it does seem, if this is about prescribing medically

13     unnecessary oxycodone, I don't know how you consciously avoid

14     doing that.

15         MR. ROOS:  I think that's right, your Honor.  Although

16     I think the -- again, it's the question of the objects.  To the

17     extent there is a larger object of the conspiracy that the

18     defendant consciously avoids, certainly he has to have the

19     knowledge to join the conspiracy, but for the second element of

20     the charge, the object, he could consciously avoid it.

21         We think that the defense counsel has put forth

22     additional arguments.  We are happy to take it up further

23     either by written submission or at the charge conference, but I

24     think our view is that, given some of the arguments by defense

25     counsel, the avoidance instruction is appropriate as to the

1    object.

2           THE COURT:  My sense is that defense counsel's, I

3    don't want to put words in defense counsel's mouth, based on

4    what he just indicated I think he's -- what is defense

5    counsel's position on that?

6           MR. CARNESI:  Judge, my position is that, as I am

7    looking at this, it appears to me that there are multiple

8    conspiracies with regard to their argument as to other

9    individuals who didn't have anything to do with Mr. Gallicchio

10   and their theory that it was just medically unnecessary.  I

11   don't see how, again, there is an argument regarding conscious

12   avoidance.

13          THE COURT:  Right.

14          Maybe we will just deal with this tomorrow.  Again, if

15   the theory that is presented to this jury in the instructions

16   is that a conspiracy, a narcotics conspiracy in this case

17   consisted of prescribing medically unnecessary oxycodone, then,

18   as defense counsel indicated as well, I don't see how a

19   conscious avoidance charge would make sense there.  I think the

20   government also agrees.  I think the government is just

21   concerned that there is a different theory of the conspiracy

22   that the jury would be charged with.

23          MR. ROOS:  No.  Your Honor, we are not concerned about

24   you charging a different theory.  I think it is, our concern

25   has to do with what defense counsel does in his summation.

1          THE COURT:  OK.

2          MR. ROOS:  Our view is, if it's similar to what he

3    said in his opening or the arguments he made even when we were

4    arguing the statement of facts, that it could then necessitate

5    a conscious avoidance charge, and it makes sense to sort of

6    litigate these before that happens.

7          THE COURT:  All right.  We'll deal with that tomorrow,

8    but we will get you the draft instruction this evening.

9          MR. ROOS:  Thank you.

10          The only other matter, your Honor, and I have already

11    spoken to defense counsel about this, but to just reiterate

12    Ms. Fletcher's request on the record, we've requested Rule 26.2

13    material to the extent there is a defense case.

14          THE COURT:  OK.  Anything else today?

15          Let's get counsel here at 9:25 tomorrow and that's it.

16          See you.

17          MR. CARNESI:  Thank you.

18          (Adjourned to November 30, 2018, at 9:30 a.m.)

19

20

21

22

23

24

25

1            INDEX OF EXAMINATION

2    Examination of:                        Page

3    BRIAN DOLINKO

4    Direct By Mr. Rodriguez . . . . . . . . . . 453

5    Cross By Mr. Carnesi . . . . . . . . . . . . 478

6    Redirect By Mr. Rodriguez . . . . . . . . . 494

7    ADRIAN CASTRO

8    Direct By Mr. Rodriguez . . . . . . . . . . 496

9     CHRISTOPHER GHARIBO

10   Direct By Mr. Roos . . . . . . . . . . . . . 535

11            GOVERNMENT EXHIBITS

12   Exhibit No.                         Received

13    502 . . . . . . . . . . . . . . . . . . . 500

14    501 . . . . . . . . . . . . . . . . . . . 509

15    503 . . . . . . . . . . . . . . . . . . . 517

16    504, 505, 508, 513, 514 . . . . . . . . . 592

17

18

19

20

21

22

23

24

25