IBU6TAY1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                       17 Cr. 390 (ALC)

DAVID TAYLOR,
            Defendant.         Trial

------------------------------x

                           New York, N.Y.
                           November 30 , 2018
                           9:30 a.m.

Before:

               HON. ANDREW L. CARTER, JR.,

                           District Judge
                           and Jury

                      APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  KIERSTEN A. FLETCHER
     JUSTIN V. RODRIGUEZ
     NICOLAS T. ROOS
     Assistant United States Attorneys

CHARLES F. CARNESI
     Attorney for Defendant

Also Present:

Matthew Del Rosario, Special Agent DEA
Rosanna Corrado, Paralegal Specialist

1    (In open court; jury not present)

2    THE COURT:  Is there anything we need to discuss

3  before the jury comes in?

4    MR. ROOS:  Nothing from the government, your Honor.

5    MR. CARNESI:  Nor for the defense.

6    MR. ROOS:  Your Honor, the witness is in the hallway.

7  He can take the stand now before the jury comes out.

8    THE COURT:  Okay.

9    (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Please be seated.  Welcome back.  Let's

3    continue.

4              Go ahead, counsel.

5    CROSS-EXAMINATION

6    BY MR. CARNESI:

7    Q.  Thank you.

8              Good morning, Doctor.  My name is Charles Carnesi, and

9    I represent Dr. David Taylor.

10   A.  Good morning.

11   Q.  I just have a few questions for you if I may.  You said

12   that you were licensed to practice in New York; right?

13   A.  Correct.

14   Q.  What is the licensing authority in New York?

15   A.  New York State Department of Health.

16   Q.  Do they have within the Department of Health a committee

17   assigned to review professional medical conduct?

18   A.  Yes.

19   Q.  Are you a member of that committee?

20   A.  I get sent cases by that committee.

21   Q.  You consult with the committee?

22   A.  I consult with the person handling the case.  I haven't

23   been before that committee.

24   Q.  The guidelines that you spoke about on direct, are they

25   written guidelines or requirements of this committee?

1    A.   Can you rephrase?

2    Q.   Sure.

3              In other words, what I am trying to ask you, sir, is

4    you spoke on direct examination about certain guidelines; is

5    that right?

6    A.   Correct.

7    Q.   Is the basis of that information requirements issued by the

8    medical board on professional conduct?

9    A.   I have other guidelines in mind such as through American

10   Academy of Pain Medicine, American Pain Society.

11   Q.   Okay.

12   A.   I didn't have the specific guideline in mind.

13   Q.   All right.  So when we speak of requirements here, I would

14   like to focus in on specific requirements of that committee

15   which has the responsibility for overseeing medical conduct.

16             Do you understand what I am saying?

17   A.   Okay.  What's the --

18   Q.   All right.  Within that committee are there specific

19   requirements as to a doctor having to issue urinalysis tests in

20   order to dispense opioids?

21   A.   I would need to take a look at those requirements and have

22   it it in front of me to be able to answer the question.

23   Q.   So as you sit here now, you really don't know?

24   A.   I don't know it off the top of my head.

25   Q.   How about requirements as to the strength of opioids that a

1    doctor can prescribe?  Are there specific requirements within

2    that section, the code of professional medical conduct?

3    A.   The requirements are generally to keep things low on the

4    dosing end, to have some type of a monitoring strategy in

5    place.  They are general requirements to keep responsible,

6    monitored and on the low end of things.

7    Q.   When you say they are general requirements, in other words

8    what I am trying to ask you, sir, is it a violation of a

9    requirement that a doctor start with more than 40 milligrams a

10   day?

11   A.   Yes, it is.

12   Q.   How about with regard to the amount of pills, is there a

13   specific requirement that you are aware of controlling the

14   number of pills a doctor can issue or prescribe to a patient

15   within a month?

16   A.   There is no numerical requirement as to how many pills we

17   need to give and so on.  There are general principles through

18   the state and through medical societies that we got to keep

19   things on the low end of things, we have to combine it with

20   other forms of therapy, and keep the doses low and not start at

21   very high dosages that can be dangerous to the individual and

22   to everybody around the individual.

23   Q.   But is there requirement as to the specific number of pills

24   that a doctor can prescribe to a patient?  In other words, not

25   more than 180 pills?  Not more than 100 pills a month?

1   A.  The requirement does not mention a number, but the

2   requirement says to keep things responsible and low and start

3   at the lowest effective dose and titrate the effect.  That is

4   the requirement.  That is also safe medical practice.  In fact,

5   it may caution to not start at very high dosages where you may

6   run into breathing issues and overdoses and divertibility of

7   the medicine.

8   Q.  Those are generally speaking the guidelines; right?

9   A.  Those are requirements because you have to start low and go

10  slow.  Those are foundational to safe prescribing.

11  Q.  In the requirement they don't specify what they mean by low

12  than anything more than 90 pills a month?

13  A.  They don't specify a number.

14  Q.  Now, your specialty is pain management.  When a patient

15  comes to you initially, can you tell me what the procedures are

16  that you would follow?

17  A.  Repeat the question, please.

18  Q.  Sure.

19      In your pain management practice, a parent comes to

20  you, and generally speaking what are the initial procedures

21  that you follow?

22  A.  What are the initial procedures that I follow?

23  Q.  Yes.

24  A.  The patients come to me.  They register in the front.  They

25  check with my secretary.  They get put into the room.  They get

1    their vital signs taken by the medical assistant.  I come in

2    and ask them -- if it is a new patient, What is bothering you?

3    Tell me why you are here.  They tell me about their pain

4    problem.  Then we try to sort out the pain problem with respect

5    to location, severity, the character of the pain -- what makes

6    it better, what makes it worse -- the history, followed by the

7    physical examination, followed by review of the diagnostic

8    studies that they may in the computer or with them, and then

9    there is a plan that is dealt up based on the diagnosis.

10   Q.  How significant is what they tell you to the ultimate

11   diagnosis that you make?

12   A.  It is all significant, but what they tell me -- it depends.

13   For example, the location of the pain is very important.  The

14   directionality of the pain is very important.  So I got to sort

15   out that referral.  Is it a referral pattern down the leg?  Is

16   it a radiating pattern?  Is it some other peripheral nerve.

17          So what type of information that they tell me is very

18   important.  So I have to get into the details of the

19   presentation.  Is it something that is worse with sitting that

20   can indicate, for example, disc disease?  Is it something that

21   is worse in the morning as you are twisting out of bed that can

22   indicate arthritis of the spine?  Is it something that is

23   better when you are flexing forward that can indicate narrowing

24   of the spinal canal.  So that type of information is very

25   important.

1    Q.   You rely on that information in forming your diagnosis?

2    A.   Correct.

3    Q.   Now, when you are trying to ascertain the strength of the

4    pain, frequency of the pain, is there any objective measure

5    that you can use?  Is there any device that you have to measure

6    pain?

7    A.   No.   There is a clinical intake.   There is no device.   But

8    the intensity of the pain and the impact of the pain is gauged

9    by how it affects your quality of life, your physical function,

10   your social function, and what you do throughout the day.   So

11   that is how we gauge the true severity of the pain.   So it is

12   not just a simple number of 10, let's say.   That's meaningless

13   in this context.   Is it affecting your day?   Is it affecting

14   your nights?   Your sleep?   And so on.

15   Q.   For example, if you want to test somebody's blood pressure,

16   there is a mechanical device that you can use to come up with a

17   number as to their blood pressure; right?

18   A.   Yes.

19   Q.   So we can know if they have high or low blood.  If you want

20   to check someone's body temperature, there is a device to do

21   that.

22        But in trying to determine the extent of their pain,

23   what you have to rely on to a great extent is what they are

24   telling you; is that right?

25   A.   A good clinical history and what they tell you within that

1    clinical history.

2    Q.  Now, there are different devices such as MRIs that are

3    sometimes used to diagnose the pain or to review whatever the

4    problem may be, the underlying problem causing the pain; right?

5    A.  Correct.

6    Q.  But not every type of pain shows up on an MRI; right?

7    A.  Not every type shows up.

8    Q.  So even though an MRI may not indicate a particular source,

9    it doesn't necessarily mean that a patient is not in severe

10   pain?

11   A.  It may or may not.  You got to look at the whole picture.

12   MRI shows the neurological structures and the musculoskeletal

13   structures.  If it doesn't show it, you can order other

14   diagnostic tests.  But an important component here is that is

15   the clinical history and the physical examination painting a

16   diagnostic picture.  So you got to get that out of the patient.

17   Which diagnosis is the presentation most consistent with, and

18   sometimes it is more consistent with several different

19   diagnosis and you entertain all of them.

20   Q.  For example, nerve pain, does nerve pain show up on an MRI?

21   A.  It can.

22   Q.  I assume from that answer that means it can also not?

23   A.  It may not.

24   Q.  How about fibromyalgia --

25   A.  Fibromyalgia?

1    Q.  Yes.

2    A.  It may show up on functional MRI.  It is an area of

3    oversensitivity in the brain that may get picked up on the

4    functional MRI.

5    Q.  Now, if somebody in the doctor's professional opinion is

6    dependent on an opioid, is it a violation of these rules of

7    possessional medical conduct to continue to prescribe an

8    opioid?

9    A.  If somebody is dependent, pain doctors don't treat

10   dependency.  So if you are prescribing to maintain the

11   dependency and to treat the dependency, it is a violation.

12   Because if -- there are specific methadone maintenance centers

13   where the clinicians are there to treat dependency.  So in that

14   case, yes, it is.

15   Q.  And if this opioid dependent individual is also suffering

16   from chronic pain, is it a violation of the medical code of

17   responsibility to provide him with continued opioid medication?

18   A.  You have a responsibility to provide balanced analgesia in

19   those patients.  It is not a violation, but you have a

20   responsibility to not create temptation and an opportunity to

21   cause a reoccurrence of the addiction.  Because those patients

22   are at high risk of addiction reoccurrence.

23          So you should treat them.  You can treat them with

24   opioids, but it needs to be done in a very measured fashion,

25   paying attention to the molecule that you are prescribing, the

1  dosages that you are giving, and the number of pills that are

2  prescribed.

3  Q.  Would there be an adverse effect on suddenly cutting off

4  the opioid medication?

5  A.  For pain or dependence?

6

7  Q.  For the dependent.  For the individual who was having pain

8  but happens to be opioid dependent at this point?

9  A.  Now, the methadone center would treat the dependents.  Now,

10 for pain if you cut it off, they go into withdrawal.  Now,

11 withdrawal is not like, let's say, alcohol withdrawal or

12 benzodiazepine withdrawal.  It is a very uncomfortable

13 withdraw.  So that would be the adverse event.

14 Q.  In the practice of pain management, is long-term opioid

15 treatment an acceptable medical practice under right

16 circumstances?

17 A.  As part of combination care, it is.

18 Q.  We talked about how important it is to be able to rely on

19 the information being provided by the patient.  How important

20 is it to rely on the medical staff within the office?

21 A.  It's people you rely on.  Is it important?  How important

22 is it?  It's important.

23 Q.  Would it be significant in making that determination if you

24 were informed that one of the people who was responsible for

25 ordering the urinalysis test was accepting bribes from patients

1    not to submit the urine test?

2    A.   Informing the patients -- repeat the -- rephrase, please.

3    Q.   Okay.  You have somebody in your office and their

4    assignment is basically you speak to them and you say, I want

5    patient X to have a urinalysis test; right?  They walk out of

6    your office and then they accept cash or a gift from patient X

7    not to submit their urine for analysis.

8          Is that a significant problem in your mind?

9    A.   That would be a significant problem.

10   Q.   Generally speaking I believe you said that in your practice

11   there are less than 5 percent of your patients who are

12   receiving opioid treatment; is that right?

13   A.   That's correct.

14   Q.   Would you consider that to be the norm, or do you think

15   that is on the conservative side?

16   A.   I think it depends.  There is a whole range out there and I

17   think patients could be on opioids to a greater percentage in

18   some other practices and I think is that okay here too.  But

19   the issue here is not so much the percentage.  You can have a

20   practice that gives out a much greater percentage of patients

21   and put them on opioids, but the manner of prescribing the

22   strength, the pill counts, and the combination with other

23   controlled substances is really the heart of the matter here as

24   to what the problem is.  So the 5 percent is probably, yes, if

25   you were to average out all the different doctors that treat

1    pain, that's probably the norm.

2    Q.  You believe that is the norm?

3    A.  Yeah.  I think if you average it out.  There are some pain

4    doctors that don't give any opioids.  There are pain doctors

5    that are much higher than 5 percent.  I don't think it is where

6    half the patients are on opioids.  It depends on the practice.

7    I think the key issue here is inappropriate prescribing.  And

8    there are I am sure practices where there is appropriate

9    prescribing and the percentage is much higher than 5 percent.

10   Q.  Right.  Do you know, for example, with regard to the number

11   of individuals on Medicare what percentage of those individuals

12   are on opioids -- or have been treated by opioids is more

13   accurate?

14   A.  The percentage of Medicare patients?

15   Q.  Yes.  Let's take that as the pool.  Let's say there are 43

16   million people on Medicare.  What percentage -- if you know

17   have any kind of idea -- do you believe have received opioid

18   treatment?

19   A.  I think that may have nothing do with what we're talking

20   about.  We're talking about chronic opioid therapy for chronic

21   pain.  Patients get opioids for a whole variety of different

22   reasons.  So we have to look at the time frame.  And if a

23   significant higher percentage may be on opioids, it doesn't

24   mean they are getting it for chronic pain.

25   Q.  Do you have any idea as to the percentage that may be on

1   opioids or may have received opioid treatment?

2   A.  I don't want to give a number.  I don't know.

3   Q.  In the course of your practice, do you sometimes recommend

4   patients that they have their prescriptions filled at a single

5   pharmacy?

6   A.  Yes.

7   Q.  Why is that?

8   A.  It's to pretty much build a relationship with the pharmacy

9   that I may choose to contact or that may choose to contact me

10  such that there is a consistent source of the controlled

11  substance.  To keep things a lot more trackable, that's what I

12  need to do.  I think with the New York State Prescription

13  Monitoring Program, it is not as necessary because now we can

14  pick up all the different pharmacies across the tristate area

15  such that we see where every -- where all the medicines are

16  coming from regardless of where they go.  It is not as

17  important as it used to be, but we still try to educate them on

18  that and have them go to a single pharmacy.

19  Q.  With regard to the doctors that you mentioned a moment ago

20  who have pain management practices but don't prescribe any

21  opioids, why is that?  Do you have any reason why they take

22  that position?

23  A.  There are different pain doctors.  It's over a range and

24  some doctors, for example, may be interventional.  Some doctors

25  actually don't do medications or procedures.  They focus on the

1   physical medicine and rehab approach and physical therapy.

2   There are some pain doctors that sort of they are part of a

3   surgical service that are just -- they want to take the patient

4   through a rehab program, an opioid taper program, and something

5   that they believe is not effective.  So there is a range there.

6   Some doctors believe opioids don't work for chronic pain and

7   they don't give it at all.

8   Q.  They don't believe that opioids are in any way effective?

9   A.  Yeah.  They don't think it is effective long term.

10  Q.  Do you think part of the consideration in determining

11  whether or not they be involved --

12  A.  I am missing.  Can you rephrase?

13  Q.  Sure.

14          Is part of the consideration as well a fear that one

15  day they can end up in court charged with a crime?

16  A.  No.  I think that most doctors feel that chronic opioid

17  therapy has some role.  There is a subset that believes that it

18  should not be used in chronic pain at all for misuse, abuse and

19  diverse purposes.  But what everybody agrees on is that -- even

20  those that don't believe it is effective -- if you use it

21  responsibly in the aging body in the aging population where

22  there is nothing left to do, there is a role.  Even if you

23  press those people that don't use it in their practice, where

24  let's say 0 percent of their patients are on opioids, if you

25  press them, they will tell you, well, a 77-year-old with

1    multiple other medical problems that there is no other surgical

2    indication for, there is nothing medically left to do, it is

3    human to give them controlled substances in a measured fashion

4    as part of the overall plan.  It is also important to not

5    overdose them and not charge the doses too high and charge the

6    pill counts too high and so on.  There is a consensus on

7    responsible prescribing.

8    Q.  In preparation for your testimony here, you said you

9    received certain files from the U.S. Attorney's Office?

10   A.  Yes.

11   Q.  How many files did you get?

12   A.  12, 14.

13   Q.  Do you know how many patients Dr. Taylor saw in a year?

14   A.  No.

15   Q.  You have no idea what percentage of his practice those 14

16   files may have represented?

17   A.  I don't know the percentage.

18   Q.  You told us in reaching your diagnosis plan with regard to

19   your patients and your practice, initially it starts with

20   speaking to them and inquiring as to their complaints, their

21   pain, the source of their complaint, and things like that;

22   right?

23   A.  Correct.

24   Q.  In regards to any of those 14 people, did you speak to any

25   of those patients?

1    A.  I did not.

2    Q.  So is it fair to say that whatever testimony you gave

3    yesterday was based primarily on your review of the files and

4    on your review of the other documents that were used in court?

5    A.  That's correct.

6              MR. CARNESI:  Thank you, sir.

7              THE COURT:  Any redirect?

8              MR. ROOS:  Briefly, your Honor.

9    REDIRECT EXAMINATION

10   BY MR. ROOS:

11   Q.  Dr. Gharibo, you heard a question about the significance of

12   what a patient tells you.

13             Do you remember those questions?

14   A.  Yes.

15   Q.  Now, in the ordinary course of generally accepted medical

16   practice for pain management, to what extent can a physician

17   just rely on what a patient says?

18   A.  It's -- generally speaking we -- it depends on the type of

19   information that is being provided.  You got to contextualize

20   it.  If someone tells me they are worse with walking, they are

21   worse, let's say, working and sitting at a desk and while they

22   are doing that they have pain that shoots down the arm to their

23   thumb, well, that is very medically relevant.  That is

24   important and I rely on that.  If they tell me that their pain

25   is 15 out of 10, I can't do anything, I am lying in bed all day

and they look fine, they are moving everything about, they got

to my office, and they have pain of 15 out of 10, well, that

isn't -- that doesn't validate.  It fails the validation check

if you are in such severe pain, you got here and you look

perfectly fine and you are doing fine during my provocation,

during my physical exam, which includes some provocative tests.

So then some information is reliable and some information I

begin to question.

Q.  Do you remember some questions about the New York State

Department of the Health licensing rules?

A.  Yes.

Q.  Mr. Carnesi asked you some questions about the low end,

what the low end means of prescribing opioids?

A.  Yes.

Q.  It was your testimony that there is no specific number that

is at the low end; is that right?

A.  Yes.

Q.  Would 240 Oxycodone 30 pills per month constitute the low

end?

A.  Absolutely not.  That's -- that's a ridiculous high end.

That is nowhere near the low end.

Q.  What about 180?

A.  Same.  Low end would be -- for example, it could be

codeine, Tylenol #3, Tylenol #5, Tramadol, Hydrocodone 5,

Oxycodone 5.

1     130 is six Percocet 5's.  So that is clearly not the

2     low end but it is more one pill the extreme end.  So if you are

3     getting that eight times a day, that is just outside the

4     practice of medicine.  It nowhere within the practice of

5     medicine.  It is outside of that.

6     Q.  Mr. Carnesi asked you about the prescribing of opioids over

7     the long term.  Do you remember that?

8     A.  Yes.

9     Q.  You said under some circumstances that would be acceptable?

10    A.  Yes.

11    Q.  Now, is it within the standard support of the practice of

12    pain management to do long-term prescribing of 240 pills of

13    Oxycodone 30 per month?

14    A.  Absolutely not.

15    Q.  Why not?

16    A.  Because that is something that is going to probably

17    definitely cause dependence.  And over time dependence and

18    addiction may go hand and hand because in an attempt not to

19    withdraw, they are going to take more of the medicine.  Each

20    time they are taking the medicine, the medicine strength is so

21    high they are going to peak really high.  They are going to get

22    that euphoria and they are going to withdraw.  So all of a

23    sudden they are going to come across and -- they are going to

24    develop into somebody who is addicted because of that

25    rollercoaster effect of getting 240 pills of 30 milligrams of

1    Oxycodone.  That is reckless prescribing for nothing medical.

2    Q.  You were asked a question about if a person -- a

3    hypothetical -- a person in a doctor's office did not submit

4    urine tests in exchange for bribes.  Do you remember that?

5    A.  Yes.

6    Q.  Now, what would you do under the circumstances if you

7    prescribed a urine test and nothing came back?

8    A.  Well, that would be in my notes that I ordered a urine drug

9    test.  I would follow up on it.  What happened to the urine?

10   Did he submit the urine?  It would somebody I would

11   troubleshoot and probably be successful at within a week or so.

12   Within a couple weeks at most.

13   Q.  Your practice, is that a standard practice across the

14   medical profession?

15   A.  Yes.

16   Q.  If a urine test was missing from the file, would it be

17   appropriate to inquire about where it went?

18   A.  Yes, very much.  In fact, in our plan section we have a

19   list of what the plan is -- urine drug testing, MRI, X ray, and

20   so on.  So when the patient comes back to us, that will be one

21   of the first sections that open up to.  Did he get the MRI?

22   Did he get the X ray?  Let's take a look at your urine drug

23   test.

24   Q.  Whose responsibility is it to follow up and look for the

25   urine test?

A.  It would be mine.  It would be the physician's or the nurse

practitioner's.

          MR. ROOS:  One moment, your Honor.

          No further questions.

          MR. CARNESI:  No recross.

          THE COURT:  The witness is excused.

          (Witness excused)

          THE COURT:  Call your next witness.

          MR. ROOS:  Your Honor, if it is all right with the

Court, we'll read one last stipulation.

          THE COURT:  All right.

          MR. ROOS:  Ms. Corrado, is this 704?

          MS. CORRADO:  Yes.

          MR. RODRIGUEZ:  The parties hereby agree that

Government Exhibit 301 is a true and accurate copy of a receipt

for the filing of an Oxycodone prescription in or around April

2010.

          Government Exhibit 304 is the true and accurate copy

of a letter that David Taylor wrote on or about August 10th,

2012, to the City of New York Department of Citywide

Administrative Services regarding James Impellizine.

          Government Exhibit 302 contains true and accurate

photographs of prescriptions written by David Taylor on or

about April 21, 2014, and September 25, 2014.

          Government Exhibit 303 is a true and accurate

1    photograph of a bottle of Oxycodone that was transcribed for

2    James Impellizine by David Taylor.

3         The parties further stipulate and agree that this

4    stipulation, which is Government Exhibit 705, as well as

5    Government Exhibit 301, 302, 303, 304 described in the

6    stipulation may be received into evidence as exhibits at trial.

7         The government offers now 301, 302, 303, 304 and 704.

8         THE COURT:  Those are in.

9         (Government's Exhibits 301, 302, 303, 304, 704

10   received in evidence)

11        MR. ROOS:  If we can show the jury first Government

12   Exhibit 301, which is a copy of an Oxycodone prescription from

13   in or around April of 2010.

14        Ms. Corrado, is there any way to zoom in where it says

15   "James Impellizine" and the type of medication, "Oxycodone

16   30 milligrams."

17        It says on here Dr. David Taylor.

18        Can we now please show the jury Government

19   Exhibit 302.  The stipulation says it is a photograph -- I am

20   sorry, Government Exhibit 304.  My apologies.  The stipulation

21   says it is a letter that David Taylor wrote on or about

22   August 10th, 2012 to the City of New York regarding James

23   Impellizine.  It says, Mr. Impellizine was treated by Dr.

24   Taylor from June 13th, 2012, through August 13, 2012, for

25   opioid dependency and self-reported abuse of prescription

 1   opioids.  He was not treated for cervical disc disease.  It was

 2   not related to an accident or an injury due to employment.

 3   This is not a workman's comp case.  If you have any questions,

 4   please notify our office.  Thank you, David Taylor, M.D.

 5          Can we see Government Exhibit 302.  If you can zoom in

 6   on what it says the prescription is for.  At the top, Cervical

 7   disc for James Impellizine.  It says April 21, 2014,

 8   prescription for Oxycodone, Roxicodone, Xanax, Soma.

 9          Look at the next page.  That's a bill bottle.  It

10   says, James Impellizine, Oxycodone.

11          If you can zoom in on the prescriber name on the

12   bottom of the bottle.

13          It says, Prescriber:  Taylor, David R.

14          If we can see Government Exhibit 303.

15          That was that.

16          That concludes the government's reading of the

17   stipulation.

18          THE COURT:  Okay.

19          MS. FLETCHER:  The government calls Lisa Mercado.

20          THE DEPUTY CLERK:  Please remain standing and raise

21   your right hand.

22    LISA MERCADO,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

1    BY MS. FLETCHER:

2    Q.  Good morning, Ms. Mercado.

3    A.  Good morning.

4    Q.  What do you do for a living?

5    A.  I am a medical biller.

6    Q.  Where do you work as a medical biller?

7    A.  I work for the spine and pain institute of New York.

8    Q.  Where is that located?

9    A.  Staten Island, New York.

10   Q.  How long have you worked with that medical practice?

11   A.  Two years.

12   Q.  How long have you been in medical billing overall?

13   A.  About 18 years.

14   Q.  What generally is the job of a medical biller?

15   A.  Depends on the practice.  Some practices you are actually

16   in charge of coding claims based on diagnosis.  CPT coding,

17   which is procedure codes, whatever the patients have at the

18   office, what their ailments are.  You mark it, submit to the

19   insurance companies.  And then you follow up on the actual

20   payments, reimbursements and things like that just to manage

21   revenue flow.

22   Q.  Is it fair to say that a medical biller handles obtaining

23   payment from insurance company for medical services?

24   A.  Yes.

25   Q.  I want to turn your attention, Ms. Mercado, to June of

1     2014.

2              Where were you working during that time?

3     A.   I was working for the New You Physical Therapy Medical

4     Pavilion.

5     Q.   Where was New You located?

6     A.   796 Castleton Avenue in Staten Island, New York.

7              MS. FLETCHER:   Ms. Corrado, can we please bring up

8     what is in evidence as Government Exhibit 125.

9     Q.   Do you see Government Exhibit 125 on your screen,

10    Ms. Mercado?

11    A.   Yes.

12    Q.   What is depicted in Government Exhibit 125?

13    A.   That is the New You Medical Pavilion in Staten Island, New

14    York.

15    Q.   When did you begin working at New You?

16    A.   I would say June of 2014.

17    Q.   Who hired you?

18    A.   I was hired by Boris Polanski and Oleg Dron, the owners.

19    Q.   Was one of those two individuals your direct supervisor?

20    A.   Yes.   I was working in that facility directly under Oleg

21    Dron.

22    Q.   What was your title?

23    A.   I was the office manager there and medical bill.

24    Q.   What were your responsibilities as office manager?

25    A.   As the office manager for that practice, we were growing --

1    beginning to grow practice.  It started physical and

2    occupational therapy.  But the goal was we did have office

3    suites that we would rent out to potential physicians looking

4    for satellite locations.  And we were actually working on

5    getting dental pavilion.  So a lot of my work was to promote,

6    get new patients, spread the word of the practice, run social

7    media, post opportunities for rentals in the practice.  Then as

8    well I tack care of all the billing for physical therapy,

9    occupational therapy, and any providers requests my billing

10   services.

11   Q.  What, if any, responsibilities did you have with respect to

12   the front desk of the office?

13   A.  I also filled in.  So as a manager I did oversee the other

14   employees, making sure that their tasks were completed.  If

15   they were to call out sick or we had an overflow of patients

16   and my help was needed, I would come and provide assistance or

17   even cover the front end on the times they were not there but

18   the office was open.  So a few times a week I would actually

19   sit at the front desk just kind of monitoring, making sure that

20   there was no patients coming in during that time.

21   Q.  Ms. Mercado, can you please describe the layout of the New

22   You Medical Pavilion when you first walked in the door?

23   A.  Well, when you walked in to the office, you had the main

24   area, which is the main reception area.  The main reception

25   area had about, I would say, 10 seats and then there was a

1    front desk.  Usually two seats were there.  One to two people

2    may be sitting there depending how busy the day was.

3           Then you had the entrance that would go back to the

4    physical therapy and occupational therapy gym kind of room

5    where we had our equipment.  To the left of the equipment were

6    separate tables -- treatment tables separated by a curtain.  To

7    the right of the equipment were four rooms lined up, which were

8    medical suites that had basically everything for a doctor to

9    run a practice.

10          And then you would continue down the hall through

11   another door down about four steps and that is where you would

12   enter my office.  And then to the left was another office,

13   which was my supervisor's office.  And then downstairs we were

14   completing a dental pavilion.

15   Q.  You mentioned your office.  Did you share your office with

16   anyone?

17   A.  My office did have to two seats and two computers.  On some

18   occasions we would have one of the staff members come to the

19   back during busy hours to help with billing, but most of the

20   time I was alone in my office.

21   Q.  You mentioned the medical suites that were available for

22   rental.  Was anyone renting out those spaces when you first

23   started working at New You?

24   A.  When I first started working, we did have one provider that

25   was a pain management specialist coming in, I would say, twice

1    a week.  And that doctor would see patients -- very few

2    patients.  They would also administer injections downstairs.

3    We had a fluoroscopy table, which was for spinal injections and

4    epidurals and things like that.  At that time that is who I was

5    aware of that was renting out, but we were expecting additional

6    doctors to join.

7    Q.  That pain management doctor that you mentioned, do you know

8    the name of that person?

9    A.  Yes.  That was Dr. Timothy Canty.

10   Q.  Were there any other medical doctors renting out space in

11   New You when you started working there?

12   A.  We were expecting the arrival of David Taylor -- Dr. Taylor

13   at the time.

14   Q.  Did David Taylor come to rent out space at New You?

15   A.  Yes.

16   Q.  Do you see Dr. David Taylor in the courtroom today?

17   A.  Yes.

18   Q.  Can you please identify him by an article of clothing he is

19   wearing and describe where he is sitting.

20   A.  Sitting over there with a black tie, polka dots.

21          MS. FLETCHER:  Let the record reflect that the witness

22   has identified the defendant.

23          THE COURT:  Okay.

24   Q.  How did you first meet Dr. Taylor in person?

25   A.  The first interaction I think was when he brought me

1    billing for at-home visits for patients to start billing and

2    also some credentialing information for me to start the process

3    of getting him credentials with some insurance plans.

4    Q.  At that time was he seeing patients at New You?

5    A.  At that time he was not.  However, we were actually working

6    with patients to start scheduling them onto the schedule.

7    Q.  Onto Dr. Taylor's schedule?

8    A.  Yes, onto Dr. Taylor's schedule.

9    Q.  What was your understanding of what type of medical

10   practice Dr. Taylor was going to operate out of New You?

11   A.  We were actually excited because we knew that it was an

12   internal medicine provider, which was a kind of a good thing to

13   have in the practice and in the neighborhood.  Because the goal

14   of the practice was eventually to have multi-specialties, and

15   having an internist was just something that was a good start

16   for us.

17   Q.  What is your understanding of what an internist does?

18   A.  Well, an internist is basically patients will have a

19   primary care physician.  Insurances may -- some insurances will

20   require you to have one.  The primary care physician in my

21   knowledge is the one that is basically guiding you, your health

22   as far as routine checkups and preventive care and things like

23   that.  If you have an ailment, you will be sent to a specialist

24   for that particular ailment.  If you had a common cold or

25   anything like that, you would go to your internist.  That is

1  your primary doctor.

2  Q.  Did you become familiar with Dr. Taylor's office hours when

3  he was working at New You?

4  A.  Yes.

5  Q.  What were his office hours?

6  A.  So I recalled the office ours being Mondays from 9:00 to

7  12:00.  Thursdays were 1:00 p.m. to about 8:00 p.m.  There were

8  one Saturday a month.  I can't remember which Saturday.  And

9  then home visits.

10  Q.  Did he come into the office Tuesday, Wednesday or Friday?

11  A.  I don't recall.

12  Q.  You mentioned your understanding that an individual with a

13  cold might see their internal medicine doctor.

14          Did Dr. Taylor see patients for ailments like colds?

15  A.  When I was performing the billing, I would see a lot of

16  those ailments mostly with the home care patients.  Very few

17  bills that I would receive were depicting those ailments.  I

18  wouldn't see a lot of bills.  So it is really hard for me to

19  tell what the diagnose of most of those parents were.

20  Q.  Why didn't you see a lot of bills?

21  A.  A lot of the billing was not -- was not able to be

22  submitted at the time since the provider had not been accepting

23  insurances.  He was not able to accept insurances.  He was not

24  on their panels, and we were trying to get him on the panel.

25  So we wouldn't bill claims for those patients with those

1    insurances.  They were self-pay.

2    Q.  When you say "self-pay," what do you mean by that?

3    A.  They basically paid to see the doctor out-of-pocket.

4    Q.  What, if any, role did you have with respect to accepting

5    payment from patients?

6    A.  The only time I actually saw payment come in is if I was at

7    the front desk running or covering and a patient happened to

8    make a payment.  And we would just take the money and write it

9    on the envelope -- the patient's name and put the money in the

10   envelope.  But there was really no other way of tracking.  We

11   would just put it in the envelope.

12   Q.  How much did Dr. Taylor charge for an office visit if the

13   patient paid in cash?

14   A.  I can't honestly remember.  I believe between 150 and 250.

15   Q.  Were there any exceptions made for patients with particular

16   insurances?

17   A.  The only exception I remember is BlueCross BlueShield

18   patients because a lot of those patients came from a previous

19   practice.  So a lot of them had -- since we were not on the

20   BlueCross BlueShield panel yet, it was inconveniencing them to

21   see the doctor they are used to seeing so they would charge $80

22   for BlueCross BlueShield.

23   Q.  $80?

24   A.  $80, yes.

25   Q.  Were there any staff members who were dedicated to

1  supporting Dr. Taylor's practice?

2  A.  Yes.  So we had our front receptionist girl who was handled

3  to handle both physical therapy, but she was actually more

4  hands on with Dr. Taylor's practice.

5  Q.  What is the name of that person?

6  A.  Her name was Denise Suarez.

7  Q.  When did she join New You?

8  A.  She joined the same time I did around 2014 in June.

9  Q.  Just to clarify the timing, how long after you started at

10  New You in June of 2014 did Dr. Taylor begin seeing patients in

11  the office?

12  A.  July.

13  Q.  Of 2014?

14  A.  Yes.

15  Q.  What were some of Ms. Suarez's responsibilities?

16  A.  Denise was very hands on with scheduling and making sure

17  that the scheduling was within the guidelines as far as how

18  many patients we were allowed to see within a certain time

19  period or on a certain day.  She handled the patient flow on a

20  day -- every time the patients would come into the practice.

21  She handled the majority of collecting the money.  She set up

22  the charts for the patients for the day of the visits.  She

23  answered a lot of incoming calls and handled all the

24  authorizations for insurances, for prescription.  She also -- I

25  am trying to think.

1    Q.  That's fine, Ms. Mercado.

2            Did you have any role in supporting Dr. Taylor's

3    practice?  You mentioned there were times that you covered the

4    desk.  Can you describe that?

5    A.  Yeah.  So there were some mornings, Thursday mornings in

6    particular, Dr. Taylor's practice would start about 1:00 and I

7    would open up the office that morning at about 11:00.  And so

8    during that time, I handled the majority of the front desk

9    duties until she got there at 1:00.  So any time she was

10   overwhelmed and needed assistance if I was in the back room, I

11   would kind of come out or answer the phones whenever.

12   Q.  During that time how much interaction, if any, did you have

13   with Dr. Taylor's patients?

14   A.  I did have some interaction.  Patients would sometimes come

15   in early to sign-in and wait.  A lot of the times -- I mean, we

16   would have five or six patients early and I would take the

17   payment and put it in the envelope.  I would take messages for

18   Denise and leave them on stickies for her.  A lot of scheduling

19   on the phone.  So if I got the phone calls that came in and if

20   it wasn't something I couldn't do, I left the message for her.

21   If it was a scheduling issue, I would schedule them or cancel

22   or whatever the case may.

23   Q.  Turning to the phone calls that you received from patients,

24   apart from calling to schedule appointments, did patients call

25   for any other reasons?

1   A.  Patients would call either because they needed a new

2   prescription, something happened with their medication, it was

3   lost.  Patients would call because maybe they missed an

4   appointment and needed to be scheduled urgently because they

5   were running out of their prescription medicine.  They would

6   call a lot when pharmacies couldn't fill their prescriptions

7   because they needed authorizations, which we were never aware

8   of obtaining because they would pay us cash and we were not

9   aware of insurances.

10  Q.  You mentioned that patients would say that their

11  prescriptions were lost.  How common was that?

12  A.  Very common.  Different stories.  We would joke about the

13  stories sometimes.  You know, they would say they ripped it by

14  accident, they lost it, the pills went in the pool.  Things

15  like that.

16  Q.  These phone calls, did they relate to any particular type

17  of prescription?

18  A.  Yes.

19  Q.  What prescription did these type of calls relate to?

20  A.  Mostly pain medication -- Oxycodone, Percocet.  Things like

21  that.  Mostly Oxycodone.

22  Q.  Based on your conversations with patients, were you

23  familiar generally with the type of prescriptions that Dr.

24  Taylor wrote?

25  A.  Yes.  I became more aware during the time that we would get

1    calls from the pharmacies.

2    Q.   Were there any medications that Dr. Taylor prescribed more

3    often than others?

4    A.   Mostly Roxicodone.

5    Q.   Roxicodone?

6    A.   Oxycodone.  Same thing.

7    Q.   You mentioned that patients called and said they needed to

8    see the doctor urgently.  How common was that?

9    A.   Very common.

10   Q.   Did patients say why they needed see the doctor urgently?

11   A.   Some patients would state that if they didn't see the

12   doctor this certain day, they would start -- they would have

13   convulsions from not having the medication.

14   Q.   Did you have an understanding as to what the patients meant

15   by convulsions?

16   A.   Yes.  Kind of putting two and two together that the

17   medication is in their system and withdrawals could often

18   result in convulsions I would think.

19   Q.   What, if any, steps did you take to communicate those types

20   of calls from patients to Dr. Taylor?

21   A.   We did have one case that I recall in particular that the

22   patient was very upset because the authorization wasn't going

23   through and he needed that medication that day and wanted to

24   file -- file a complaint to the doctor himself because he said

25   our staff wasn't competent and we were not getting it done on

1    time.

2    Q.  Do you recall what medication that related to?

3    A.  Oxycodone.

4    Q.  What steps did you take when you received that complaint?

5    A.  So I got the call that -- early on a Thursday morning I

6    recall I got the call and the patient was very belligerent on

7    the phone, and I told him I would talk to the doctor.  But I

8    left message on a sticky for Denise when she came in that day.

9    And when she did come in that day, I did voice it to her that

10   the patient actually called and stated this, that, he is upset

11   and he wants to talk to Dr. Taylor to complain about it.  So at

12   that day when Dr. Taylor came in, he -- we did voice out that

13   call that we received earlier.

14   Q.  When you say you voiced it out, you voiced it out to whom?

15   A.  To Dr. Taylor.

16   Q.  What did Dr. Taylor say in response?

17   A.  So Dr. Taylor responded that we could just tell the patient

18   he should take one of his mom's or his father's pills.

19   Q.  How did you react to that?

20   A.  I was a little shocked because then I thought to myself,

21   well, the whole family is on the medication, the same

22   medication.  That is really -- that's a -- I don't know.  That

23   is kind of weird.

24   Q.  Other than calls from patients, did you ever receive calls

25   from relatives of patients?

1   A.   Yeah, we did.

2   Q.   Approximately how many times do you recall receiving a

3   phone call from a relative of a patient?

4   A.   Three times.  Actually, two times.  The gout in particular.

5   Q.   Did you convey the substance of those phone calls to Dr.

6   Taylor?

7   A.   Yes.

8   Q.   Can you describe the substance of the phone call that you

9   conveyed to Dr. Taylor?

10  A.   One of the phone calls I did convey, which the -- a mother

11  of a patient -- older patient.  Maybe in her 30s called the

12  practice and told us her daughter's name and said that her

13  daughter is not allowed to come to the practice anymore.  She

14  is currently in detox.  She is very, very sick and she is not

15  allowed to come there.  You take her chart, get rid of it.  She

16  is no longer a patient, and you let the doctor know she is no

17  longer coming to your practice.

18  Q.   After that phone call, what, if any, conversation did you

19  have with Dr. Taylor?

20  A.   So after that phone call I did leave the message as I

21  normally do with Denise stating that a patient did call and to

22  let Dr. Taylor know that this patient is no longer allowed to

23  come to the practice for this reason.

24  Q.   Ms. Mercado, were you telling the doctor that in your view

25  the patient was not allowed to come, or that in the patient's

1   mother's view?

2   A.   The patient's mother stated that the patient is no longer

3   to come to the practice.

4   Q.   What, if any, medication had Dr. Taylor prescribed to that

5   patient?

6   A.   I believe it was Oxycodone.

7   Q.   What did Dr. Taylor say to you in response to this message?

8   A.   So Dr. Taylor did relate to Denise, who told me.  And also

9   when he came out to get charts that day, I did question again

10  and we did discuss that earlier phone call.  And he stated that

11  any family member of the person is over a certain age, no

12  family member is allowed to intervene in the treatment of his

13  patients and we are not to turn the patient away based on the

14  family member's call.

15  Q.   Now, just to go back.  You mentioned that the mother said

16  the patient was in detox.  What did you understand her to mean

17  by detox?

18  A.   I assumed that the patient was not taking the medication

19  the correct way, abusing the medication, perhaps taking other

20  medications outside.  For whatever reason, the patient had a

21  drug addiction problem and needed to get treatment.

22  Q.   You mentioned phone calls from patients.  Did you ever

23  receive phone calls from pharmacies when you were covering the

24  front desk?

25  A.   All the time.

1    Q.   For what purpose were the pharmacies calling you?

2    A.   So I got a lot of those calls later on during his time in

3    the practice.  So they would call to verify the prescriptions.

4    So they would call, give us the patient's information and we

5    would pull the chart and open the chart and see what the last

6    prescription that was written and match whatever the pharmacist

7    had.  So we would have to go over the quantity, the

8    prescription.  If there was more than one prescription, we

9    would go through all of them.  The instructions -- the doctor's

10   instructions and make sure the doctor did himself sign the

11   prescription.

12   Q.   You said these calls were common.  How common were they?

13   A.   As the practice kept going, it was about three to four

14   phone calls, maybe more in just the morning between 11:00 and

15   1:00 that I was there.

16   Q.   That was just the two-hour window on Thursday morning?

17   A.   Yes.

18   Q.   When pharmacies called, were they calling about any

19   particular prescription?

20   A.   Oxycodone.

21   Q.   What, if any, information did the pharmacist ask for apart

22   from the dosage and the type of medication?

23   A.   The patient's name, the dosage, the type of medication, how

24   often the patient had to take it, the date of birth.

25   Q.   Did they ask any questions about the medical condition of

1    the patient?

2    A.   The diagnosis code, yeah.  That would also be listed on

3    there.

4    Q.   Generally what types of pharmacies made these calls?

5    A.   A lot of calls came from major pharmacies.  We have CVS,

6    Rite Aid, Duane Reade, Staten Island had Nate's Pharmacy, which

7    was a big local mom and pop pharmacy.  Major -- major pharmacy

8    type, supermarket type pharmacies.

9    Q.   When, if at all, did the pharmacist ask to speak with the

10   doctor?

11   A.   So eventually after the pharmacies would confirm that the

12   prescriptions were ligit and correct with us, with the staff,

13   they started to make their own comments and say things and say,

14   Do you not know how much medication this is?  Do you see that

15   there is a lot of medication?  And we would just respond that

16   we are -- the doctor is treating according to how he treats.  I

17   don't know anything about what he is prescribing.  That is how

18   we would respond.  Eventually they started to want to speak

19   with the doctor himself.

20            (Continued on next page)

21

22

23

24

25

1   Q.  Did Dr. Taylor speak to the pharmacists in your presence?

2   A.  I never saw him speak with the pharmacists.

3   Q.  What, if any, instructions did Dr. Taylor give you about

4   what to say if the pharmacists called asking these types of

5   questions, basically that he is prescribing them, whatever he

6   feels is necessary for their course of treatment and for their

7   managing their pain, whatever they were experiencing, he is

8   prescribing correctly.

9   Q.  Did there ever come a time when pharmacists advised your

10  office that they would not fill prescriptions written by David

11  Taylor?

12  A.  Yes.

13  Q.  Were those over-the-phone communications or were there

14  communications in writing?

15  A.  We did get some verbal, but we started getting more letters

16  as time progressed.

17  Q.  Did you see those letters?

18  A.  Yes.  I opened the mail, and I did see the letters.

19  Q.  What, if any, steps did you take to make Dr. Taylor aware

20  of those letters?

21  A.  So, I would either hand them to Denise, or me and Denise

22  would walk them over when the office door was open, we would

23  place them on the desk and say, This is another letter from the

24  pharmacy.  We are not allowed to -- I mean, the patients are

25  not going to be able to get prescriptions filled there anymore.

1   Q.  Did the letters from the pharmacies indicate why they would

2   no longer be filling prescriptions written by Dr. Taylor?

3   A.  I know a lot of the letters did say excessive.  It was that

4   was one of the main words I remember, excessive medications,

5   excessive patients coming to, you know, to the pharmacies.

6   They did not, the numbers -- there were just too many.

7   Q.  And when you say excessive medications, did those letters

8   relate to any specific medications?

9   A.  Yes.

10  Q.  What medications?

11  A.  Oxycodone primarily and other painkillers I would say.

12  Q.  What, if anything, did you hear Dr. Taylor say in response

13  to the letters that you and Denise presented him with?

14  A.  He looked at them, shaked his head, like, you know,

15  disappointed, I guess, that they were doing that.

16  Q.  Did there come a time when you became concerned about

17  Dr. Taylor's medical practice?

18  A.  Yeah.

19  Q.  What were you concerned about?

20  A.  So, patients would come in with an urgent need to see the

21  doctor, an urgent need to stay on schedule.  Patients were not

22  sick.  You know, they were mostly coming for pain medicine.  A

23  lot of the patients were -- they didn't behave as a normal

24  patient.  They were a little agitated.

25  Q.  What do you mean when you say agitated?

1  A.  They would write their name and pace around, go outside,

2  smoke.  It didn't seem to me like a normal doctor office when

3  you go see a doctor, everyone sitting down quietly waiting.  It

4  was kind of always chaotic.

5  Q.  What, if anything else, were you concerned about?

6  A.  I started getting concerned that the patients were either

7  patients suffering with an addiction with the medication or

8  doing something else with the medication.  But for whatever

9  reason they needed the medication that same time of month.

10  Q.  When you say doing "something else with the medication,"

11  what do you mean by that?

12  A.  Filling it for somebody else.

13  Q.  What, if any, steps did you take to try to investigate

14  these concerns?

15  A.  So, Denise and I would talk about this concern.  We were

16  both kind of on the same page at the time.  We wanted to kind

17  of make sure that, if this was our suspicion, that we were

18  going to intervene somehow.  So we started to open charts on

19  different patients.  If there was a patient that seemed a

20  little bit more off than others, we would kind of spot check,

21  check their MRI, x-ray film -- not films, reports, make sure

22  that they had been having their urine tox screenings done.

23  Q.  You used the phrase "if this was our suspicion."  What was

24  your suspicion?

25  A.  Our suspicion was that either the patients were -- we were

1  fueling their addiction to the medication, so they were taking

2  them perhaps when they didn't really have pain or they were not

3  taking them at all and they were giving them to somebody else.

4  Q.  How did your review of the urinalysis records relate to

5  your efforts to uncover these suspicions?

6  A.  We did come across some urinalysis that patients were,

7  there was no medication detected or there were other illicit

8  drugs detected on the urinalysis.

9  Q.  When you say that there were instances that there was no

10  medication detected, were these patients for whom the doctor

11  had prescribed medication?

12  A.  Yes.

13  Q.  What medication?

14  A.  Oxycodone.

15  Q.  What, if any, steps did you take to raise these concerns

16  with the supervisor in the office?

17  A.  So, when we would find something that was not compliant

18  with the patient's course of treatment, we were told to present

19  them to our supervisor at the time, and he would address it

20  with Dr. Taylor.

21  Q.  And who was your supervisor at the time?

22  A.  Oleg Dron.

23        MS. FLETCHER:  Let's pull up, Ms. Corrado, what's

24  marked and is in evidence as Government Exhibit 102A.

25  Q.  Ms. Mercado, do you recognize the person depicted in

Ibuntay2                    Mercado - Mercado

1  Government Exhibit 102A?

2  A.  Yes.

3  Q.  Who is that person?

4  A.  That's Vito.

5  Q.  Do you know Vito's last name?

6  A.  Gallicchio.  I don't know if I pronounced it right.

7  Gallicchio?

8  Q.  How did you first become familiar with Vito?

9  A.  So, Vito I actually heard by name at first.  I was not

10  personally introduced or had a one-on-one instance with him

11  where I was able to meet him personally.  We actually spoke

12  over the phone, and I was explained by Oleg, my supervisor,

13  that he -- that Dr. Taylor explained that Vito was helping him

14  get patients for his practice.

15  Q.  Did you ever meet Vito in person?

16  A.  I eventually did, later on.  Most of the communication was

17  over the phone, like I said, and I did meet him maybe once or

18  twice -- twice or three times I would say.

19  Q.  Before you met Vito in person, what generally did you speak

20  about over the phone?

21  A.  So, Vito would call to either ask if a patient -- and he

22  will say the name of the patient -- if this person called and

23  scheduled, did we get him in OK.  That kind of conversation.

24          So, Hi, it's Vito.  Did someone call with the name

25  blah, blah, blah?  Did he schedule or did this patient come in

1   today?  Did he see the doctor?

2           So he kind of -- he was often calling in the beginning

3   to make sure a patient was either seen or confirmed that the

4   patient saw the doctor.

5   Q.  How common were these phone calls?

6   A.  Very common in the beginning, and then they were actually a

7   little destructive.  So Oleg stated that he did not want Vito

8   calling during the office hours because it was just too much

9   for us.  So those phone calls eventually slowed down.

10  Q.  When you say Oleg stated, Oleg stated to Dr. Taylor?

11  A.  He stated to Dr. Taylor, but he stated to the staff as well

12  that he did voice that.  He didn't want him calling anymore.

13  Q.  When you first met Vito in person, what, if any,

14  observations did you have about his appearance?

15  A.  Well, at first I explained that he works for the doctor.  I

16  am thinking he is an assistant, a PA, he's professional,

17  dressed professionally, scrubs maybe, something like that.

18          When I first met him, I was kind of taken back,

19  because he was not professional at all.  He actually looked

20  like one of his patients.

21  Q.  What do you mean when you say that?

22  A.  He was dressed in sweatpants, sneakers, hat, jewelry,

23  sweater, you know, dressed down.  There was nothing

24  professional at all.  So it just didn't make sense to me that

25  he was actually working for the doctor.

Ibuntay2                    Mercado - Mercado

1    Q.  You mentioned that Vito looked like one of the doctor's

2    patients.  Did you ever see Vito come into the office for an

3    appointment for himself?

4    A.  I personally didn't, no.

5    Q.  How about Vito's wife?  Did you ever see her in person in

6    the office?

7    A.  No.

8    Q.  Was Vito ever an employee of New You?

9    A.  No.

10   Q.  Did you ever receive any instructions from Dr. Taylor about

11   whether you should either accept or reject new patients?

12   A.  Yes.

13   Q.  What were those instructions?

14   A.  So we were told that we were not allowed to see any new

15   patients about I think six or seven months in.  It was getting

16   a little chaotic, and we were not allowed to see any new

17   patients.

18   Q.  What do you mean when you say it was getting chaotic?

19   A.  During his office hours patients were standing all over the

20   room, outside the office.  It just became too much.  You know,

21   we had too much going on.  I am not sure what sparked the

22   decision to stop seeing new patients, but it was just we

23   reached our capacity.  He could not see any more new patients.

24   Q.  When you say patients were standing in and around the

25   office, why was that?

1   A.  They were just all coming at the same time, trying to get

2   in first.  You know, they were just all there at once.

3   Q.  Were there ever fights or disputes in the waiting room?

4   A.  Yes.  Yes, there were.

5   Q.  What did those fights relate to, as best you can tell from

6   your observations?

7   A.  Who came in first, why that patient went in before me.  I

8   can't wait; I have somewhere to be.  That kind of stuff.

9   Q.  I want to go back to the instruction you mentioned a moment

10  ago that you weren't to accept new patients.  Did Dr. Taylor

11  ever communicate any exceptions to that rule?

12  A.  So, I remember on two occasions that I actually personally

13  handled where Vito -- actually we were -- we would tell the

14  patients, sorry, we are not accepting new patients.  They would

15  call and say, But I have my films, I have my reports, and we'll

16  tell them no.  Sorry.  The doctor said no more patients.

17          We would then get, probably a follow-up phone call

18  would follow that call from Vito, and he would ask, Did anyone

19  try to schedule and you said you could not see the patient?

20          And I said, Yes, we are not seeing new patients.  The

21  doctor said no new patients and we stressed it.

22          But then he would either say, Well, leave a message,

23  tell him I said that this patient is OK, we see him, he is a

24  friend or whatever the reason would be.  Or he would reach out

25  to the doctor, he would say, I will just call him myself.  He

1    will put him on.

2            But he a lot of the times said, Just leave the message

3    and let him know.  So we would -- I would do just that.  I

4    would give it to Denise, and she would take the message, and

5    that's what -- and then she would relay it to the doctor.

6    Q.  Did you ever communicate directly with Dr. Taylor about

7    those messages?

8    A.  Directly, I don't recall.  However, I would follow up with

9    Denise with the message and ask her what happened with that

10   patient.

11   Q.  Did those patients get in?

12   A.  She said he would make an exception.

13   Q.  When she said he would make an exception, who did you

14   understand "he" to be?

15   A.  Dr. Taylor would make the exception to see the patient.

16   Q.  I want to turn your attention to 2015.  Did there come a

17   time when Dr. Taylor left the practice?

18   A.  Yes.

19   Q.  Approximately when was that?

20   A.  I would say it was the ending of summer.  I can't really

21   remember exactly what month, but I know it was about a year.

22   He was not there more than a year.

23   Q.  At the time that Dr. Taylor left the practice, was

24   Ms. Suarez still working there?

25   A.  No.

Ibuntay2                    Mercado - Mercado

1    Q.   Why not?

2    A.   Denise actually left the practice about six weeks prior to

3    that.  She just never showed up one day to work.  We tried

4    reaching out to her, and she just said she couldn't, she didn't

5    want to do it anymore.

6    Q.   Turning back now to Dr. Taylor's departure, what is your

7    understanding of why Dr. Taylor left the practice?

8    A.   Dr. Taylor was asked to leave the practice by my

9    supervisor, Oleg Dron.

10   Q.   After Dr. Taylor left the practice, did you have occasion

11   to see Vito again?

12   A.   Yes.

13   Q.   Where were you when you first saw Vito?

14   A.   I was at the front, covering the front in the morning, as I

15   usually would, and Vito did come in to the practice requesting

16   the doctor's mail.

17   Q.   Did you provide him with the doctor's mail?

18   A.   I did provide him with the doctor's mail with the exception

19   of insurance payments.

20   Q.   Why did you not provide him with the insurance payments?

21   A.   Because we were still -- based on agreements, we were still

22   calculating my services for his billing of whichever claims

23   that got to the insurances at that time.  By that time we were

24   probably participating with about two more insurances.  So we

25   would have to open the mail to make sure that our payments for

Ibuntay2                        Mercado - Mercado

1    the patients seen at our office were paid.  At that time there

2    was an arrangement where he would get -- he would have to pay a

3    percentage of that billing service.

4    Q.  Did you make the decision not to provide him with his

5    checks, or were you instructed not to?

6    A.  I was instructed not to provide any insurance checks until

7    they were reviewed by my supervisor.

8    Q.  Is that Oleg --

9    A.  Yes.

10   Q.  -- who gave you that instruction?

11   A.  Yes.

12   Q.  Oleg is the one who gave you the instruction?

13   A.  Yes.

14   Q.  How did Vito respond when you told him you weren't giving

15   him the checks?

16   A.  He was asking me why not, and I told him because I was

17   instructed I cannot.  Our patients are in there still, and I

18   was instructed that something had to be done and reviewed

19   before they were actually released to the provider.  And the

20   person who had to review those, which was my supervisor, was

21   not there at the time, so he would have to wait until he gets

22   there to review the checks, but I was not giving him the

23   checks.

24   Q.  What did Vito say in response?

25   A.  He walked out at that point.

1   Q.  Did he come back?

2   A.  Yes.  He did come back a few minutes later, and he was on

3   the phone.  He told me that he had Denise on the phone.

4   Q.  Ms. Mercado, I'm going to stop you right there.  We'll come

5   back to that.  Before Vito left the first time, what, if

6   anything, did he say about the fact that you had opened the

7   mail?

8   A.  Vito actually told me that opening the doctor's mail was a

9   federal offense and that I was breaking the law by opening the

10  mail.

11  Q.  What did you say in response?

12  A.  I was really upset that he accused me of that, and I told

13  him if, I were you, I wouldn't talk about breaking laws.  And

14  let's not talk about any -- let's not accuse anyone of doing

15  anything illegal here because you and I both know what you are

16  doing.

17  Q.  What did you know him to be doing?

18  A.  At that time I definitely knew he was involved with some

19  kind of interaction with distributing or getting patients to

20  give him prescription medication.

21  Q.  Did he say anything in response?

22  A.  No.

23  Q.  You mentioned that he returned a few minutes later on the

24  phone?

25  A.  On the phone.

1  Q.  What happened when he returned on the phone?

2  A.  He was with Denise on the phone, who I found out was

3  working at the new practice.

4  Q.  When you say the new practice, what do you mean by that?

5  A.  Dr. Taylor had rented out a new office after he was given a

6  month to vacate our facility.  He opened up a new practice, and

7  we heard, we weren't sure, but that Denise was now working at

8  his new practice.  So she was the one on the phone with Vito

9  that day demanding that I give the checks.

10 Q.  We'll come back to your interaction with Vito, but what was

11 your reaction to understanding that Denise was working for

12 Dr. Taylor again?

13 A.  I was shocked, because she expressed many times to me how

14 frustrated she was working, working at the practice, how

15 overwhelmed and how it was just way too much for her.  She was

16 also concerned -- she shared the same concerns I did as far as

17 what was going on with the medications, trying to figure out --

18 there was something wrong.  We didn't know if it was just there

19 were a bunch of addicts coming in or if there was actually

20 medication being sold.  We weren't sure what was going on, but

21 she was not happy with the whole situation.

22        I did try to get her to stay with us, and we were

23 going to work it out, and she ended up not showing up to work

24 eventually.  But that was not premeditated, we weren't aware,

25 and now she was working with Dr. Taylor at his new practice.

1  Q.  Turning back to the incident where Vito returns to the

2  office and he's on the phone with Denise, what, if anything,

3  did Vito say during that time that he entered the office?

4  A.  So they were going back and forth on the phone, and I

5  overheard the conversation and I was just ignoring it.  And I

6  hear her -- the phone was really loud, and I could hear her

7  saying, What do you mean she's not going to give you the

8  checks?

9       He just responded, She just said she's not giving me

10 the checks.

11      She's like, Well, she has to give you the checks.  You

12 tell her that the doctor said that he wants the checks.

13      So he's like, I have Denise on the phone right now.

14 She said the doctor wants the checks.

15      I said, I am not giving it to you.  There's no way I'm

16 giving the checks.  I already told you come back later.  We'll

17 have it later.

18      And at that point it seemed like he was a little bit

19 more forceful when he had Denise on the phone compared to the

20 first time.  But I think after that he realized Denise was not

21 going to change my mind.  He left.  And then, you know --

22 Q.  What did you do after he left?

23 A.  After he left, one of the PT aids came in for her shift,

24 and that's usually the time that I go to my office to handle my

25 office work.

Ibuntay2                    Mercado - Mercado

1    Q.  Did you see Vito again that day?

2    A.  Yes.

3    Q.  Tell the jury what you observed when you were sitting in

4    your office.

5    A.  So, my office has two computer screens, one that I work

6    from, and one that has cameras facing the entire outside of the

7    building, just missing one part, I guess the main street, but

8    we have the side, the back, the inside.

9            I monitor the cameras, and the first thing I noticed

10   was a car drive into our parking lot.  So, the parking lot, you

11   drive in, and you turn your car, and you park in a space,

12   there's about four spaces, but the car just came in super fast

13   and stopped right at the entrance, and then I realized it was

14   Dr. Taylor's car.

15           And then I saw the doctor come out the car and storm

16   down the sidewalk to the front door area, so I kind of just

17   watched what was happening and preparing myself.

18   Q.  Why were you preparing yourself?

19   A.  I knew he was angry.  The car stopped and kind of did this

20   jolt thing because he just jumped out of the car.  When he

21   walked into the main reception area, I saw a small little guy

22   next to him and I realized it was Vito, so he must have came

23   from the other side where my camera is not facing, came in with

24   the doctor, and they both proceeded to come into the waiting

25   area through the door, just dashing straight towards my office.

Ibuntay2                    Mercado - Mercado

1   Q.  What happened next?

2   A.  So, I sat back in my chair, but I heard the footsteps

3   coming down the stairs and I sat back, and I, you know, waited.

4   First Dr. Taylor walked in and Vito right next to him, and I

5   looked up and Dr. Taylor looked at me and said, Give me my

6   checks.  He was very angry.

7   Q.  How did he look?

8   A.  He was red.  He was, you know, breathing heavily.  And I

9   told him, I said, I cannot give you the checks.  I was

10  instructed by Oleg.  I cannot release the checks to you until

11  he sees them.

12          Then he looked at me, he got redder, he said to me,

13  Give me my fucking checks.

14          And then Vito stood next to him and kind of hyped the

15  situation and said, I told you, I told you you didn't want this

16  to happen.  He was going to come and he was going to get mad.

17          I was thrown back because I knew Dr. Taylor to be this

18  sensitive older man.  We knew something was going on, but we

19  tried to see the benefit of the doubt.  He was usually really

20  kind to me, so there was really no problem, but the only thing

21  was that we were noticing, there was a prescription issue.

22          So, you know, he never came out like that to me, and

23  it was just shocking to say the least.  So I responded, and I

24  said I cannot give you the checks.

25          But at the time I was really not as -- you know, I

1    didn't think of anything of him potentially doing something

2    harmful or Vito.  I just said, I can't give them to you.  If

3    you want, I'll call Oleg, and you can talk to him.

4              I got Oleg on the phone, and I told him, They're in my

5    room and they want the checks.

6              He said, Let me speak to Dr. Taylor.  Put him on the

7    phone.

8              So I said, OK.

9              So I put him on the phone, and they had a

10   conversation.

11             I overheard Oleg screaming or yelling.  I didn't hear

12   any word from Dr. Taylor at the time.  He was just shaking his

13   head.  After that he gave me the phone, and he left with Vito

14   out the door.  I guess they went to wait outside at the time.

15             Then I stood at my office dumbfounded, because I

16   didn't expect that.

17             And then Oleg came in like 10 minutes, maybe 10, 15

18   minutes after, and at the time he came in, he came in and I

19   guess the guys did see him outside the office and then they

20   just all walked in and proceeded to his office, closed the

21   door, and I don't know exactly what happened.

22             And then after that interaction Dr. Taylor left, and

23   Vito kind of stood behind, lingering.  I heard him talking with

24   Oleg, saying:  I'm sorry, I'm sorry.  I didn't mean for that to

25   happen.  He's got this attitude.  This, that, whatever.  Giving

Ibuntay2          Mercado - Cross

1   excuses that it was the doctor that was upset.  He didn't want

2   that to happen.

3            And Oleg just said, You need to leave my office now.

4   Don't come back ever.

5            Vito popped his head in my office.  He was like, I'm

6   sorry.  I'm sorry.  I'm really sorry.  And then he left.  That

7   was the last time I saw him.

8            MS. FLETCHER:  May I have a moment, your Honor?

9            THE COURT:  Yes.

10           MS. FLETCHER:  No further questions.

11           THE COURT:  Any cross-examination?

12           MR. CARNESI:  Yes, your Honor.

13           THE COURT:  OK.

14   CROSS-EXAMINATION

15   BY MR. CARNESI:

16   Q.  Good morning, Ms. Mercado.  My name is Charles Carnesi, and

17   I represent Dr. Taylor.  Did Dr. Taylor eventually get the

18   checks?

19   A.  Yes.

20   Q.  How long after this?

21   A.  About five, ten minutes.

22   Q.  That same day?

23   A.  That same day.

24   Q.  How long after Dr. Taylor left the office did you hear from

25   him again, if at all?

Ibuntay2                    Mercado - Cross

1   A.  He did end up calling me to apologize about 15 minutes

2   after.

3   Q.  15 minutes after he had originally left?

4   A.  Yes.

5   Q.  OK.  Denise Suarez, what was your relationship with her

6   within the office?  Were you close?  Were you friends?

7   A.  I wanted to be friends with her.  I did try having a nice

8   relationship with her.  But, you know, she was having her own

9   issues.  I was, you know, I like to have, be family with my

10  coworkers.  I see them every day.  I would say that it was a

11  good relationship.  I don't know when it didn't become -- I

12  guess usually as a supervisor, you are inclined to be also a

13  supervisor, and that sometimes could mess up a little bit of

14  the friendship going on.

15  Q.  Sure.  Did you find that she resented that position as a

16  supervisor?

17          MS. FLETCHER:  Objection.

18          THE COURT:  Overruled.

19  A.  Yeah.  I mean, I think that I had to come down at her once

20  or twice, you know.  I had to kind of say, listen.  She was

21  upset at a patient or had an argument on the phone in front of

22  the patient.  I did have to say listen, That was not good, you

23  can't do that.  I was responsible for writeups, things like

24  that.

25          So, you know, if I had to ever discipline, that was

1    probably what may have changed our relationship.

2    Q.  Did you ever speak to her about her accepting gifts from

3    patients?

4    A.  She did mention during the holidays that she did receive

5    things here and there, you know, gift cards maybe.  And me

6    personally, I just saw like, It's a patient, she does so much,

7    she did a great job with what she did, you know, and she

8    handled a lot.  So I didn't think anything terribly of it.  I

9    just -- she just got a gift, and I was like, Oh, that's nice.

10   The patient gave you something.

11   Q.  Did you ever warn her about not taking gifts or money from

12   patients?

13   A.  It wasn't excessive to me.  It happened maybe once or

14   twice.  I don't know any other occasions that were voiced to

15   me.

16   Q.  Is it fair to say that -- well, let me rephrase that for a

17   moment.  Do you remember being interviewed by the Office of

18   Inspector General of Investigations?

19   A.  Re--

20   Q.  Back in I think January of 2016.

21   A.  Where was that located?  I'm not sure if I remember if

22   that's the same.

23   Q.  That was with the DEA Special Agent Kenny McGrail and

24   Detective Del Rosario, seated at the table here?

25   A.  Yes, yes.  That was at the precinct.

1  Q.  Do you remember telling them at that time that you warned

2  Ms. Suarez many times that if you see something say something

3  and do not accept money or gifts?

4  A.  I warned her that if she sees something say something, yes.

5  I don't recall warning her about the gifts.  That part I don't

6  recall.  But I did warn her about keeping her eyes open

7  regarding patients, and if there was something off, she should

8  bring it to our attention.

9  Q.  Do you remember specifically warning her about accepting

10  money from patients?

11  A.  I wasn't aware that she was getting any money from the

12  patients.  I don't recall that.

13  Q.  Do you recall an incident where a patient, a former patient

14  of Dr. Taylor's showed up at the practice and was either drunk

15  or high on medication?

16  A.  I recall one instance.

17  Q.  And he became disruptive in the office?

18  A.  Yes.

19  Q.  Went out to the parking lot and had trouble driving his car

20  off?

21  A.  Yes.

22  Q.  Did you speak to Dr. Taylor about that?

23  A.  I wasn't personally present, but I know that she did,

24  Denise did bring that to Dr. Taylor's attention.

25  Q.  What, if anything, do you recall Dr. Taylor saying?

Ibuntay2                    Mercado - Cross

1   A.  Dr. Taylor was very upset.

2   Q.  What did he say about continuing to treat the patient?

3   A.  The patient wasn't allowed to be seen again, and he

4   dismissed the patient.

5   Q.  Do you remember at that period of time the doctor having a

6   discussion with you and Ms. Suarez and other members of the

7   staff about sending patients to Ameritox for the urine analysis

8   test?

9   A.  The urine -- I believe the urine tox screenings that we did

10  at the office that were picked up were for Ameritox.

11  Q.  OK.  Did he tell you that or do you recall being told that

12  the doctor said that if the patients do not have drugs in their

13  system to tell them right away that he would discharge them?

14  A.  We would tell them right away if we saw it.  But there were

15  patients in that -- that we came across their actual files that

16  were still treating.  So we were not aware that it was our

17  responsibility to review the urine tox reports.  That was

18  something usually the doctor should review and then make the

19  decision to discharge.

20  Q.  But he told you and Denise that if you became aware --

21  A.  Yes.

22  Q.  -- of such tests --

23  A.  If we saw, yes.

24  Q.  -- that you should tell him right away, and he would

25  discharge them, right?

Ibuntay2                    Mercado - Cross

1   A.  Yes.  Absolutely.

2   Q.  Did there come a time subsequent to that where Dr. Taylor

3   indicated to you that he was just becoming aware of some issues

4   involving the urine analysis test?

5            MS. FLETCHER:  OK.

6            THE COURT:  Please rephrase the question.

7            MR. CARNESI:  Sure.

8   BY MR. CARNESI:

9   Q.  Do you recall speaking to, again -- I'm sorry, DEA Agent

10  McGrail and Detective Del Rosario back in September of 2016?

11  A.  Yes.

12  Q.  OK.  And do you recall at that time relating to them that

13  Dr. Taylor said that he was not aware of urinalysis issue and

14  that he was going to discuss them with Denise?

15           MS. FLETCHER:  Objection.

16           THE COURT:  Sustained.

17  Q.  Do you recall discussing with them any issue that

18  Dr. Taylor raised with regard to the urine analysis?

19           MS. FLETCHER:  Objection.

20           THE COURT:  Sustained.  Let's have a quick sidebar.

21           MR. CARNESI:  Sure.

22       (Continued on next page)

23

24

25

1        (In the robing room)

2        THE COURT:  OK.  If you are planning to impeach her

3   with something that may well be appropriate, but you have to

4   ask her the question first.  You haven't asked her the first

5   question.  You can't start reading from the interview.

6        MR. CARNESI:  That was what I thought was the lead-in

7   to the question, did she ever have such a discussion.  I wasn't

8   impeaching her, and I wasn't going into the particulars, but in

9   order to ask the question, if I got a negative answer, I can

10  impeach her with it.

11       THE COURT:  Let me have the last three questions and

12  answers read back, please.

13       (Record read)

14       THE COURT:  Right.  So that's the objection.  If you

15  are going to ask her whatever that is in this report that you

16  want to get to, ask her the question.  Ask her did Dr. Taylor

17  discuss with you the results of the analysis.  If she says

18  something different, then you can impeach her.

19       MR. CARNESI:  Yes.

20       MS. FLETCHER:  Your Honor?

21       THE COURT:  Yes.

22       MS. FLETCHER:  The objection is actually exactly to

23  that.  What Mr. Carnesi is trying to do is get his client's own

24  self-serving out-of-court statements in through this witness.

25  Those statements are hearsay that do not fall within any

Ibuntay2                    Mercado - Cross

1    exception.  I believe the question that preceded this line of

2    questioning was actually did Dr. Taylor ever tell you that he

3    was just becoming aware of the urinalysis issues.  It's

4    essentially putting Dr. Taylor's self-serving statement that he

5    was not aware of urinalysis issues before this jury.  If

6    Dr. Taylor wants to testify that he was just becoming aware of

7    urinalysis issues at this point, he can do that.  What

8    Mr. Carnesi is trying to elicit is clearly hearsay.

9              THE COURT:  You are saying it's hearsay why?

10             If he asks the question, did he tell you when he first

11   became aware of urinalysis issues and she answers that, I am

12   not sure why that's hearsay.

13             MS. FLETCHER:  It's clever, but what he's doing is

14   he's embedding his client's own out-of-court statement into the

15   question.  He's doing that for the purpose of getting her to

16   say that it happened so that he can argue that it is true.

17             It is irrelevant whether he said that.  It doesn't

18   matter what Dr. Taylor told this witness when he was becoming

19   aware of urinalysis issues.

20             What is relevant and what Mr. Carnesi is trying to

21   elicit is the truth of the statement that he was only then

22   becoming aware of urinalysis issues so that Mr. Carnesi can

23   argue that if there were urinalysis issues in his files before

24   this date, he wasn't aware of them, because this statement to

25   Ms. Mercado was trying.

1              THE COURT:  OK.  Mr. Carnesi?

2              MR. CARNESI:  Judge, before I make the argument, I

3    don't know why the government is trying to rebut the argument.

4              That is not the argument I am trying to make.  The

5    rest of the statement is that, as part of this conversation he

6    apparently has become aware that there's some issue regarding

7    the urine analysis test, that he says that he's going to

8    discuss this issue with Ms. Suarez.

9              Then the balance of it is essentially that it is not

10   his intention to take patients from Vito any longer.

11             MS. FLETCHER:  If all of that happened, that is all

12   being offered for its truth.  If Mr. Carnesi's client wants to

13   testify to making those statements, he can do that.  But this

14   is a clear effort to get the defendant's out-of-court

15   statements before this jury so that they can be interpreted for

16   their truth.

17             There is no state of mind exception.  There is no

18   statement against interest exception.  This is hearsay, and it

19   is the defendant's self-serving hearsay.  It is not admissible.

20             THE COURT:  OK.

21             Mr. Carnesi?

22             MR. CARNESI:  Judge, I believe that it is admissible.

23   It's part of her observations of what was going on in the

24   office and the doctor's reaction to it.

25             THE COURT:  Let me hear again from you what it is you

Ibuntay2                    Mercado - Cross

1    would like to elicit from her.

2         MR. CARNESI:  I don't have the full statement in front

3    of me at the moment, but in substance essentially what she says

4    is there was a conversation, at which point some issue had come

5    about regarding the urine analysis test.  He says essentially I

6    didn't know that, but I am going to talk to Denise about it,

7    and I don't want anyone to take patients from Vito any longer.

8    That's it.

9         THE COURT:  OK.  Tell me why this isn't relevant to

10   her state of mind regarding a large portion of her testimony

11   that she gave talking about her observations and her beliefs

12   about what Dr. Taylor knew and about what was going on and what

13   Vito's role was in all of this.  There was certainly a lot of

14   that.

15        MS. FLETCHER:  Your Honor, the government's view is

16   that her personal beliefs are only relevant to the extent that

17   she reported those concerns to her supervisor and her

18   supervisor then asked Dr. Taylor to leave.  The government

19   introduced those concerns and those issues where she reported

20   things to her supervisor because those precipitated the

21   doctor's departure.

22        Her state of mind, what her belief was based on things

23   the that Dr. Taylor said is not at issue here.  These

24   statements, if allowed, if she is permitted to be questioned

25   about several self-serving assertions that Dr. Taylor said to

1    her, it fails under 403, because it has a significant risk of

2    misleading the jury and confusing the jury about the issues

3    here.  And it still, whether it's relevant or not, does not

4    overcome the 801 issues.  Those are statements being offered

5    for their truth.  They are the defendant's assertions.

6            THE COURT:  OK.  What is the timing on this, when

7    you're claiming that Dr. Taylor tells her he doesn't want to

8    have patients from Vito anymore what is the timing of this in

9    terms of --

10           MR. CARNESI:  It is not at the very end of

11   investigation or the end of his practice.  The timing

12   apparently is before he opened up this other practice or around

13   the time he's opening up the practice.  It obviously happened

14   before he left that office.  It is a conversation that he had

15   with her.

16           THE COURT:  But this is toward the end of wrapping up

17   that practice.

18           MR. CARNESI:  Of that one, yes.

19           THE COURT:  The first one?

20           MR. CARNESI:  Yes.

21           MS. FLETCHER:  This is the second one.  But it has to

22   be --

23           THE COURT:  Hold on.  What is the relevance of this?

24           MR. CARNESI:  Judge, the relevance is 90 percent of

25   her testimony was about what the pharmacist thought, what her

1    impression was as a result of the conversation with the

2    pharmacist, what her impression was of the people sitting in

3    the office.

4              THE COURT:  All right.

5              MS. FLETCHER:  Your Honor, the government was careful

6    not to ask her what she thought about certain things unless she

7    alerted her supervisor or the doctor himself to those things.

8    Her impressions are only relevant to the extent she

9    communicated them to the doctor.  So this effort to get in the

10   doctor's statements as a back door relevance to her impressions

11   is improper.

12             THE COURT:  OK.  The objection is sustained.

13             How much longer do you have with this witness?

14             MR. CARNESI:  That will do it, Judge.

15             THE COURT:  That will do it?  You are done with her?

16             MR. CARNESI:  I believe so.  Just give me a moment to

17   check my notes.

18             THE COURT:  Is there another witness for the

19   government?

20             MS. FLETCHER:  No.

21             THE COURT:  OK.  So we will do this and then I guess

22   we will give the jury a break and discuss scheduling.

23             MS. FLETCHER:  Sure.

24             THE COURT:  OK.  All right.

25             (Continued on next page)

1          (In open court)

2          THE COURT:  That objection is sustained.  Go ahead.

3          MR. CARNESI:  Judge, if I can just have a moment.

4          THE COURT:  Sure.

5          MR. CARNESI:  Nothing further, Judge.

6          Thank you.

7          THE COURT:  Any redirect?

8          MS. FLETCHER:  No, your Honor.

9          THE COURT:  OK.  The witness is excused.

10         (Witness excused)

11         THE COURT:  Members of the jury, what we are going to

12    do is we are going to go ahead and I am going to have a quick

13    sidebar with counsel.  We'll discuss some scheduling matters.

14    OK.  Be back with you soon.

15         (In the robing room)

16         THE COURT:  OK.

17         Anything else the government needs to do?  Any other

18    stipulations or anything else?

19         MS. FLETCHER:  No.

20         THE COURT:  OK.  Defense counsel, did you have a case?

21         MR. CARNESI:  No, Judge.  We just have one stipulation

22    we are going to enter into, and then we will rest.

23         THE COURT:  OK.  I think it makes sense to go ahead,

24    and we will have the government rest on the record, you can

25    read the stipulation, the defense will rest, and then we will

Ibuntay2                    Mercado - Cross

1    send the jury home and tell them to come back Tuesday at 9:30.

2              Does that sound good?

3              MR. RODRIGUEZ:  One moment, your Honor?

4              THE COURT:  Yes.

5              MS. FLETCHER:  Mr. Rodriguez raises an important

6    point.  Do we need to have another short break so that the

7    defendant can be allocuted on his right not to testify?

8              THE COURT:  I don't know if we need to do that in

9    front of the jury -- obviously we are not going to do it in

10   front of jury.

11             MS. FLETCHER:  Understood.

12             THE COURT:  What I am saying is, if defense counsel is

13   going to read the stipulation and rest, I guess we can, in case

14   the defendant changes his mind, I guess we don't want the

15   defendant to rest.

16             I was thinking defense counsel reads the stipulation,

17   rests.  Then send the jury home.  I will allocute the defendant

18   on his right to testify, and then we are done with that.  If he

19   changes his mind over the weekend, I guess we will deal with

20   that.  Maybe we should do that now.

21             MS. FLETCHER:  Your Honor, the government's view is

22   just procedurally it would be preferable for the government to

23   rest, then the defendant to be allocuted on his right not to

24   testify, and then for the defense to rest.

25             THE COURT:  OK.

Ibuntay2                    Mercado - Cross

1          MS. FLETCHER:  So that the defendant is only resting

2     once.

3          THE COURT:  All right.

4          Let's do that then.  We'll go out, the government will

5     rest, we will give the jury a ten-minute break and bring them

6     back.  All right.

7          (In open court)

8          THE COURT:  OK.

9          Counsel for the government?

10         MS. FLETCHER:  The government rests.

11         THE COURT:  OK.  Members of the jury, what we are

12    going to do now is we are going to take a 12-minute break.  In

13    the interim, don't discuss this case amongst yourselves, don't

14    let anyone discuss this case with you, don't do any research

15    regarding the issues, parties, or locations in this case.  See

16    you in 12 minutes.

17         (Jury not present)

18         THE COURT:  OK.  Please be seated.

19         OK.  The government has rested.

20         Dr. Taylor, I am going ask you some questions to make

21    sure you understand your right to testify in this case.

22         I am going require that your answers be under oath, so

23    I'll ask my wonderful and talented deputy to administer an

24    oath.

25         (Defendant sworn)

1           THE COURT:  I want to make sure you that understand

2      that you have an absolute right under the United States

3      Constitution to testify at this trial.

4           Do you understand?

5           THE DEFENDANT:  Yes, I do, your Honor.

6           THE COURT:  That is your decision.  You can consult

7      with your attorney about that, but that is ultimately your

8      decision.  You get to make that decision.

9           Do you understand that?

10          THE DEFENDANT:  Yes, I do, your Honor.

11          THE COURT:  Even if your attorney advises you not to

12     testify, if you wish to testify, you have the final say in

13     that, and you have that constitutional right to testify.

14          Do you understand?

15          THE DEFENDANT:  Yes, I do, your Honor.

16          THE COURT:  Any further allocution from the

17     government?

18          I will ask him the question ultimately.

19          MS. FLETCHER:  No, your Honor.

20          THE COURT:  Any further allocution requested by the

21     defense?

22          MR. CARNESI:  No, your Honor.

23          THE COURT:  All right.  Do you understand your right

24     to testify under the United States Constitution, Dr. Taylor?

25          THE DEFENDANT:  Yes, I do, your Honor.

1      THE COURT:  Do you wish to testify, or do you wish to

2   remain silent.

3      THE DEFENDANT:  I do not wish to testify, your Honor.

4      THE COURT:  Has anyone made any promises to induce you

5   to give up your right to testify?

6      THE DEFENDANT:  No, your Honor.

7      THE COURT:  Has anyone made any threats to forced you

8   to give up your right to testify?

9      THE DEFENDANT:  No, your Honor.

10     THE COURT:  Defense counsel, are you convinced that

11  your client understands his right to testify?

12     MR. CARNESI:  Yes, I am.

13     THE COURT:  Do you have any doubts about his

14  competence?

15     MR. CARNESI:  No, your Honor.

16     THE COURT:  I find that Dr. Taylor has knowingly and

17  voluntarily waived his right to testify at this trial.

18     So, when the jury comes back, the defense will read a

19  stipulation, and then I believe the defense will rest.

20     Is that correct, counsel?

21     MR. CARNESI:  Yes, it is.

22     THE COURT:  OK.

23     Yes?

24     MS. FLETCHER:  Your Honor, if the Court would just

25  inquire if there are any defense applications at this time.

Ibuntay2                    Mercado - Cross

1          THE COURT:  OK.

2          The government has rested.  Is there an application

3     from the defense?

4          MR. CARNESI:  Your Honor, we would make a Rule 29

5     application based on the record.

6          THE COURT:  OK.  That is denied.

7          Anything else from the government or the defense?

8          MS. FLETCHER:  No, your Honor.

9          THE COURT:  OK.  We'll see you soon.

10         (Recess)

11         THE COURT:  Before we head out, let me just check in

12    with counsel.

13         My plan is then to, after the defense rests, have the

14    jury come back Tuesday at 9:30.

15         Does that sound good.

16         MR. CARNESI:  Fine.

17         THE COURT:  We will have the charge conference shortly

18    after this, depending on what counsel want to do.  Let's get

19    the jury out first, and we can decide whether counsel want an

20    hour break and we can do it then, or whether wants to get into

21    it now.  Do counsel have a thought on it?

22         I will give counsel a chance to confer to with each.

23         MR. CARNESI:  My inclination would be we go straight

24    through, Judge.

25         THE COURT:  OK.  Government?

Ibuntay2                    Mercado - Cross

1              MS. FLETCHER:  That's fine, your Honor.

2              THE COURT:  Sounds good.  See you soon.

3              (Recess)

4              THE COURT:  Counsel, it seems to me that it makes

5     sense to tell the jury on Tuesday what we anticipate will

6     happen is they will get closing arguments and instructions on

7     the law.

8              Any objection to that?

9              MR. RODRIGUEZ:  No objection.

10             MR. CARNESI:  No.

11             THE COURT:  Does anybody want any special sort of

12    instructions to them other than what we have been giving them

13    thus far?

14             MR. CARNESI:  No.

15             MR. ROOS:  No, your Honor.

16             MR. CARNESI:  I just have one question.

17             THE COURT:  Yes.

18             MR. CARNESI:  I had planned on not being here on

19    Wednesday.  How are we going to handle that?

20             THE COURT:  They will start deliberating Tuesday.  If

21    there is no verdict Tuesday, then they will come back Thursday.

22             MR. CARNESI:  Very good.

23             Thank you very much.

24             THE COURT:  We've already told them they won't be here

25    on Monday or Wednesday.

Ibuntay2                    Mercado – Cross

1              MR. CARNESI:  Thank you very much.

2              THE COURT:  Are we ready?  All right.  Let's bring

3    them in.

4         (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury present)

2      THE COURT:  OK.  Please be seated.  Let's continue.

3      Defense counsel?

4      MR. CARNESI:  Thank you.

5      Your Honor, if I may, I would like to enter into the

6  record a stipulation that's been agreed upon between myself and

7  the U.S. Attorney's Office.

8      THE COURT:  OK.

9      MR. CARNESI:  It is as follows:

10      "It is hereby stipulated and agreed by and among the

11  United States of America, Geoffrey S. Berman, United States

12  Attorney for the Southern District of New York, by and through

13  assistant United States attorneys Kiersten Fletcher, Nicholas

14  Roos, Justin Rodriguez, of counsel, and the defendant, David

15  Taylor by and through his counsel, Charles Carnesi, Esq.

16      1.  Denise Suarez was employed as the receptionist for

17  Dr. David Taylor from approximately June 2014 through January

18  2017.

19      2.  On or about September 11, 2017, Ms. Suarez was

20  interviewed by agents of the Drug Enforcement Administration

21  and representatives of the United States Attorney's Office for

22  the Southern District of New York.  During the interview,

23  Ms. Suarez stated in substance and in part the following:

24      A.  During the time that Ms. Suarez was employed by

25  Dr. Taylor, approximately 50 patients asked her not to submit

1  their urine analysis for testing.  Many also offered to pay her

2  in exchange for her agreement not to submit the urine samples

3  for testing.

4          Mr. Suarez identified Robert Bloome –– patients

5  referred to Dr. Taylor by Robert Bloome and defendant David

6  Laborio (phonetic) as some of the patients who made this

7  request and who offered to pay her.  Ms. Suarez accepted the

8  payments.  On some occasions Ms. Suarez did not submit the

9  patient's urine analysis for testing.  On other occasions she

10 submitted the samples for testing, even though she had agreed

11 not to.

12         Ms. Suarez did not think that any of "Vito's people"

13 ever offered to pay Ms. Suarez not to submit their urine

14 analysis for testing by Vito's people.  Ms. Suarez was

15 referring to patients referred to Dr. Taylor by Vito

16 Gallicchio, which included Vito Gallicchio, Lori Gallicchio,

17 Michael Farley, Don Carim, John Marino, May Fiori, Leo Danzi,

18 Brian Dolinko, Christine Marchese, Elizabeth Grieco and Michael

19 Montanino.

20         3.  The parties further stipulate and agree that this

21 stipulation, which is Defense Exhibit A, may be received into

22 evidence as Defense Exhibit A at trial.

23         THE COURT:  OK.  That's in as Defense Exhibit A.

24         MR. CARNESI:  Yes, your Honor.

25         (Defendant's Exhibit A received in evidence)

Ibuntay2                    Mercado - Cross

1          MR. CARNESI:  Your Honor, with that the defense would

2    rest.

3          THE COURT:  So, members of the jury, here's what we

4    are going to do.  We are going to send you home for the day and

5    the weekend.  I'm going to ask you to get here bright and early

6    Tuesday morning at 9:30 a.m.

7          What's going to happen Tuesday morning is we

8    anticipate you will get closing argues from counsel and then

9    you will receive the instructions on the law and begin your

10   deliberations.

11         In the interim, as always, do not discuss this case

12   with anyone else, don't allow anyone to discuss this case with

13   you, don't conduct any independent research regarding any of

14   the issues, parties, or locations in this case.

15         Have a wonderful long weekend.  We will see you

16   Tuesday morning.

17         JURORS:  Thank you.

18         (Continued on next page)

19

20

21

22

23

24

25

Ibuntay2                    Mercado - Cross

1           (Jury not present)

2           MS. FLETCHER:  Your Honor, could we have just one

3  moment.

4           THE COURT:  Yes.

5           MS. FLETCHER:  Your Honor.

6           THE COURT:  Yes.

7           MS. FLETCHER:  I just heard a juror say something to

8  another juror which caused me to raise it with the appeals

9  person who is in the courtroom.

10          Juror No. 3, who has, as your Honor knows, been

11 talkative throughout this trial, turned to Juror No. 2 and I

12 thought her say the word "guilty."  I don't know what that was

13 about.  I am not even a hundred percent sure I heard it

14 correctly.  She may have obviously been referring to like

15 knocking something over and saying guilty like I'm guilty.  I

16 wanted to just raise it with the Court because I did hear her

17 say it.

18          THE COURT:  OK.  Well, can you grab Tara quickly and

19 ask her to hold on to the jurors for a second.  I don't know if

20 we can catch them yet.

21          I don't know if there's anything you want me to do

22 about this, counsel for the government or the defense.

23          MR. CARNESI:  I would certainly like you to inquire of

24 the juror, Judge, whether or not she said it or what it meant.

25          THE COURT:  Counsel for the government, what is your

1   position on this?

2          MS. FLETCHER:  I think our position is that if that's

3   what defense wants that is appropriate.

4          THE LAW CLERK:  Some of the jurors have left.

5          THE COURT:  Which ones are still here?

6          THE LAW CLERK:  The juror in question is still here.

7          THE COURT:  What about the juror that was next to her?

8          THE LAW CLERK:  I don't remember who she was.

9          THE COURT:  Ms. Battaglia I think is juror No. 2.

10         Are 2 and 3 still here?

11         THE DEPUTY CLERK:  Yes.

12         THE COURT:  Great.  Let me find out then from defense

13  counsel what exactly is it you would like me to ask Juror No.

14  3.

15         MR. CARNESI:  I would like you to ask whether or not

16  she voiced any opinion.  I would like you to ask if she had a

17  conversation or related to Juror No. 2 in any way her

18  impression as to the verdict in this case.

19         THE COURT:  How do you want me to ask this?  Should I

20  just ask her straight out, did you use the word guilty and if

21  so --

22         MR. CARNESI:  Yes.

23         THE COURT:  -- did you say the word guilty to Juror

24  No. 2?

25         MR. CARNESI:  Yes.

Ibuntay2                    Mercado - Cross

1      THE COURT:  Just ask that question first of all --

2      MR. CARNESI:  Yes.

3      THE COURT:  -- and see what her response is?

4      MR. CARNESI:  And I think, again, assuming her

5  response is negative, I think it's appropriate for you to

6  instruct her that under the law that she should not reach an

7  opinion, that he is presumed innocent unless and until --

8      THE COURT:  What do you mean if her response is

9  negative?  If she says, "No, I didn't say that"?

10     MR. CARNESI:  If she says she never said it, I think

11 it's still appropriate for you to reemphasize to her that the

12 instruction is that he is presumed innocent, that no one is to

13 reach a decision on the case until they go into the jury room

14 and deliberate collectively, and it's only after their

15 deliberations then they can come to a conclusion that the

16 government has met their burden and he's no longer presumed

17 innocent.

18     THE COURT:  You want me to give that instruction even

19 if she says she never said that word?

20     MR. CARNESI:  Yes, I do.  The reason I do is because I

21 don't know honestly that she would acknowledge, OK, yes I did.

22 I did say it, I did reach an opinion.  That's the end of it.

23 It would be wonderful if everybody were that honest.

24     THE COURT:  That is what I'm wondering.  Do you want

25 me to inquire of Juror No. 2, because Juror No. 2 --

Ibuntay2                    Mercado - Cross

1          MR. CARNESI:  Again, I don't know who counsel was

2     referring to when she said the person next to her, whether it

3     was 2 or 4, but whoever that person was I think it is

4     appropriate to inquire of them too.  They may well have been

5     affected.

6          MS. FLETCHER:  I was referring to Juror No. 2.

7          THE COURT:  What is the government's position on what

8     defense counsel -- here's my concern.  If the juror says yes,

9     then I will ask her what she was referring to, because it may

10    have nothing to do with this at all.  Maybe they said some side

11    bet about whether or not when they came back after the break

12    they were going to be leaving.  I don't know.

13         MR. CARNESI:  Right.

14         THE COURT:  But my concern is, if she says, "No, I

15    didn't say that," for me then to single her out and give her

16    this instruction if she has said this, it may be what we have

17    to do Tuesday morning is give the entire jury this instruction.

18         MR. CARNESI:  Right.

19         THE COURT:  That seems fine.  I don't think it would

20    be appropriate to single her out if she says no, she denies

21    saying it.

22         MR. CARNESI:  The reason I'm asking it, I don't think

23    it has to be done in terms of suggesting to her that you don't

24    believe her or the jurors --

25         THE COURT:  That is fine.

1          MR. CARNESI:  -- the reason I brought you back here,

2     without saying it exactly in those words, is because you

3     understand these are the rules.  You are not supposed to reach

4     a conclusion until you go into the jury room and you listen to

5     everybody else and come to a collective conclusion.

6          THE COURT:  OK.  Here's what I propose to do.  Let me

7     ask counsel what your thoughts are.

8          Do we bring out 2 first or 3?

9          I guess we will just start with 3 and figure out where

10     that goes.  If 3 says, "Yes, I said it, but I was referring to

11     something else," we will see where we are.

12          If 3 says she never said it, then I don't know -- we

13     can bring 2 out, but now we are really getting into some stuff.

14     I will certainly instruct either of them and both of them that

15     they should not discussed what we have discussed out here with

16     any other juror.

17          Counsel for the government, what is your view on this?

18          MS. FLETCHER:  That makes sense, your Honor.

19          Just for the record, I am not a hundred percent sure

20     that that's the word I heard.  I think it's what I heard.  If

21     she says I didn't say that or I meant something else by it, I

22     wouldn't be surprised by that.  But I raised it just in an

23     abundance of caution.

24          I presume that the Court is going to tell her that

25     someone overheard her say the word "guilty."  The government

Ibuntay2                    Mercado - Cross

 1  would just appreciate if that is not attributed to us.  If she

 2  can be instructed that the Court overheard it or someone

 3  overheard it.  I don't want to in any way bias this particular

 4  juror against or for either party.

 5          THE COURT:  OK.  That sounds good to me.

 6          Defense counsel, any view on this?

 7          MR. CARNESI:  No, your Honor.

 8          THE COURT:  So I'll say to Juror No. 3, Someone

 9  overheard you speaking and thinks that you might have said the

10  word "guilty" to another juror.  Did you say that?

11          If you said that, what did you mean by that?

12          MS. FLETCHER:  Fine.

13          THE COURT:  Is that neutral enough?

14          MR. CARNESI:  Yes, your Honor.

15          THE COURT:  Is that good?

16          MR. CARNESI:  Yes, your Honor.

17          THE COURT:  OK.  Let's bring Juror No. 3 out.

18          THE DEPUTY CLERK:  She is not here.

19          THE COURT:  She was there a while ago.

20          THE DEPUTY CLERK:  I thought Powell was 3.

21          THE COURT:  Powell is 3.  Hold on.

22          Let's make sure we are on the same page.  I believe

23  Juror No. 3 is Ms. Powell.

24          MS. FLETCHER:  The one with the coughing fit.  The one

25  who spilled her tea.

Ibuntay2                    Mercado - Cross

1          THE COURT:  Yes.

2          THE DEPUTY CLERK:  Ms. Powell.

3          THE COURT:  Yes.  Let's bring her out.

4          (Juror No. 3 present)

5          Please have a seat.  Tara will hand you a microphone.

6   OK.

7          So, juror No. 3, someone overheard you speaking to

8   another juror and thought you might have used the word

9   "guilty."  We are just trying to find out if you said that,

10  and, if you did, what you meant by that?

11         JUROR:  I never mentioned it.

12         THE COURT:  OK.  All right.  I also just want to

13  remind you that you cannot come to any conclusion about this

14  matter until you start deliberating, OK?

15         JUROR:  Yes.

16         THE COURT:  Thank you.

17         Please hand the microphone back to my deputy.  Also,

18  do not discuss with any other juror what we have discussed out

19  here.

20         JUROR:  All right.

21         THE COURT:  Thank you.

22         (Juror not present)

23         THE COURT:  Please ask her to stay.

24         THE DEPUTY CLERK:  I did, Judge.

25         THE COURT:  Any further inquiry of Juror No. 3 from

Ibuntay2                    Mercado - Cross

1    the government or the defense?

2           MS. FLETCHER:  No, your Honor.

3           MR. CARNESI:  No, your Honor.

4           THE COURT:  I will note that as soon as I said the

5    word "guilty," she was pretty adamantly shaking her head and

6    saying that she never said that.  It was a pretty firm denial.

7           I don't know if it's necessary to bring out Juror No.

8    2.  I can.  Perhaps that makes sense, but I worry about setting

9    up a very strange dynamic to bring out Juror No. 2 and

10   basically then ask her did someone say the word "guilty" to

11   you, because it is going to be obvious who we are talking

12   about, even if that never happened.  It seems to me that we may

13   be creating more of a problem by doing that, especially given

14   the fervor with which this juror denied saying that.

15          MS. FLETCHER:  We agree, your Honor.  It did appear

16   that Juror No. 3 was adamant that she did not say that word.

17          Mr. Carnesi, may have a different --

18          THE COURT:  What is defense counsel's view on that.

19          MR. CARNESI:  Judge, I accept everything that you said

20   just now, but honestly, in an abundance of caution, I don't

21   know how you can avoid asking Juror No. 2 whether or not there

22   was such a conversation.

23          THE COURT:  What do you want me to ask Juror No. 2?

24          MR. CARNESI:  Whether any other juror has indicated to

25   you in any way that they have form an opinion.  I don't care

Ibuntay2                    Mercado - Cross

1   how general you do it.

2           THE COURT:  Now we are fishing for something.

3           MR. CARNESI:  I am trying to do it in a way to avoid

4   the other problem you suggested.

5           THE COURT:  Hold on a second.  Your voice just carried

6   a bit.  I don't think they can hear us back there but --

7           I think it's too general to ask has any other juror

8   communicated with you.  We don't need to get at that.  Juror

9   No. 2, right before the break did any other juror mention

10  anything -- did any other juror say the word "guilty" to you?

11          How about that?

12          MR. CARNESI:  That's OK.

13          MS. FLETCHER:  Fine, your Honor.

14          THE COURT:  I can say in the last 30 minutes.  Is that

15  good?

16          MR. CARNESI:  That is fine.

17          THE COURT:  I will say shortly before the break did

18  any other juror say the word guilty to you?

19          Is that good?

20          MS. FLETCHER:  That is fine.

21          MR. CARNESI:  Yes.

22          THE COURT:  Defense counsel?

23          MR. CARNESI:  Yes.

24          THE COURT:  If she says yes, then I guess we will have

25  some interesting things to deal with.

1              MR. CARNESI:  Yes.

2              THE COURT:  Let's bring Juror No. 2 out then.

3              (Juror No. 2 present)

4              JUROR:  Hello.

5              THE COURT:  Please have a seat.  I just had a

6    question.

7              Right before the break, did any other juror say the

8    word "guilty" to you?

9              JUROR:  No, they did not.

10             THE COURT:  All right.  Thank you.

11             JUROR:  Not that I recall, no.

12             THE COURT:  OK.

13             So don't discuss what we have discussed out here with

14   any other juror, OK?

15             JUROR:  OK.

16             THE COURT:  Just hold on here for just a second.  Let

17   me see counsel at sidebar quickly.

18             (In the robing room)

19             THE COURT:  I am just wondering, since this was nice

20   and abrupt and awkward, does it make sense for me to advise her

21   again, as I did Juror No. 3, that obviously you cannot form any

22   opinion about this case or not necessary?

23             I guess it's not really necessary.

24             Do you have any views on this.

25             MR. CARNESI:  I don't, Judge.

Ibuntay2                    Mercado - Cross

1            THE COURT:  The government?

2            MS. FLETCHER:  We're good.

3            THE COURT:  I will send her back now, send her on

4    home.

5        (Continued on next page)

1              THE COURT:  Thank you very much.

2              Again, as I said don't discuss this with any other

3    juror.

4              JUROR:  Absolutely.

5              THE COURT:  Can we let them go now?

6              MR. CARNESI:  Yes, your Honor.

7              MS. FLETCHER:  Yes, your Honor.

8              THE COURT:  Let the jury go.

9              Let's move onto the charge conference then.  Let's

10   start off with the government's objection regarding government

11   as a party.  We will add that into the instructions, something

12   about the government as a party.

13             The government also had some objection to similar

14   acts.  I want to get a sense from the government if you still

15   want that similar acts.  It was something that you had

16   originally, but do you still want a similar acts instruction?

17             MR. ROOS:  Just to be clear the reason we think it may

18   be appropriate is that there was a stipulation entered this

19   morning regarding James Impellizine.  There is now proof before

20   the jury that he was a member of the Vito conspiracy.  There

21   were some recordings by confidential sources for whom there is

22   no proof before the jury that they are members of the

23   conspiracy.  So we think it might be appropriate for that

24   reason.

25             THE COURT:  Defense counsel, any view on that?

1            MR. ROOS:  No objection.

2            THE COURT:  We'll include that.

3            Now, conscious avoidance.  I saw the government's

4    submission.  I read the government's case they cited.  I want

5    to get further elucidation from the government regarding the

6    factual basis for the inclusion of this charge.  There is no

7    doubt that the defense has put knowledge at issue, but what I

8    am trying to figure out is the factual predicate for including

9    this instruction under the facts in this case.

10           The case you cited was a case in which -- it is a

11   summary order, but the circuit held that the district court

12   didn't commit error by including this charge in a situation in

13   which the doctor had medical records in which the names had

14   been taped over it.  It had been altered.  So if the doctor was

15   not perhaps paying attention to that, deliberately closing her

16   eyes to the fact that it had been altered.  But perhaps what is

17   in the medical records themselves, putting aside the name,

18   could justify the prescription of Oxycodone, that makes sense

19   for a conscious avoidance charge in that circumstance for

20   someone to be deliberately closing their eyes to something

21   which there is a high probability.  Blah, blah, blah.  I am

22   trying to figure out what it is in this case.  There is

23   certainly a lot of evidence regarding evidence, but the

24   evidence seems to be regarding actual knowledge as opposed

25   conscious avoidance.

1          Let me hear from the government on that.

2          MR. ROOS:  Well, certainly, your Honor, is right that

3    the defendant has put knowledge at issue and there's a

4    substantial amount of proof before the jury about red flags

5    that would have -- that the doctor saw that he -- in order for

6    the defense theory to succeed, he needs to have -- his theory

7    is that he was ignorant of them.  So to give your Honor some

8    examples--

9          THE COURT:  Ignorant of what?

10          MR. ROOS:  The defense theory here is that there's --

11    you know, we've heard from a variety of witnesses and the

12    expert about various red flags of the fact that people -- the

13    prescriptions were not medically necessary and the defendant's

14    defense is that he was basically -- he missed these things.  He

15    was tricked.  He was ignorant.

16          The government's argument to the jury, and I think it

17    is a very appropriate one under -- because the defense put

18    knowledge at issue based on the factual record is that there

19    are a number of red flags that the defendant saw and had to

20    close his eyes to in order to keep prescribing.  So those

21    includes the urinalysis records that have been testified about

22    and are in evidence.  Those records show things like people

23    testing negative for Oxycodone even after they are being

24    prescribed or people testing negative for the metabolite for

25    Oxycodone or people having positive tests for cocaine.  Those

1    are all red flags that the doctor -- those are in the charts

2    for the doctor to look at and then consciously avoid inquiring

3    further why there is a problem.

4           THE COURT:  What further inquiry would be necessary?

5    I am saying you are labeling the expert may have called these

6    things red flags.  What other color flag do you want to put on

7    them?  It seems when you have a situation in which we're

8    dealing with whether or not there is a legitimate medical

9    purpose for prescribing the Oxycodone and we're talking about a

10   reasonable standard of medical care, you can't close your eyes

11   to certain things.  There is an obligation to do certain

12   things.  That is why it seems to me the conscious avoidance

13   charge may not be warranted here.

14          For example, if the results of the urine that show

15   that there is not the metabolite in there, it is just the pure

16   Oxycodone in there and you are saying that is a red flag that

17   should have made him aware of what?  You are saying that he

18   deliberately closed his eyes to that how?  I guess that is what

19   I am trying to figure out.

20          He sees this.  There is no further inquiry if you see

21   that according your expert.  You know that is not a red flag.

22   You know it is not a conscious avoidance.  You have knowledge.

23   You have actual knowledge then that this didn't go through this

24   person's system.  This isn't a conscious avoidance thing in my

25   mind.  If it hasn't been metabolized, then that is actual

knowledge.  The jury will ultimately decide that, but that is

proof of actual knowledge.

Conscious avoidance is a situation in which someone

has a suitcase and they don't want to open the suitcase because

they don't want to see what is in this.  If they open the

suitcase and they see it and then they say, Well, I saw it but

am going to ignore it.  Well, that is not conscious avoidance.

That is actual knowledge.

Tell me a little bit more why this is not proof of

actual knowledge especially when we have to deal with a

standard of medical care here.  Because those things that you

are calling red flags are not it seems to me things that the

doctor sees them and the doctor is required to make or the

doctor chooses not to make an inquiry.  It seems to me that if

the doctor chooses not to make an inquiry, then the doctor very

well may not be using reasonable medical care.

So if the doctor, for example, does not performance

examination if that is something that is required, that is not

a conscious avoidance situation because the doctor doesn't

perform the examination because he is afraid he is going to

find out something when we're in a situation in which the

argument is that the doctor is required to perform the

examination.

I will hear from you more on this.

MR. ROOS:  On the urinalysis question as an example, I

1    think that is a contested issue here.  There has been testimony

2    that has been adduced in cross-examination that the defendant

3    maybe didn't necessarily look at them.  For instance, the very

4    last witness defense counsel was eliciting facts like, you

5    know, maybe the defendant was saying to someone else that they

6    should look at it or he wasn't necessarily looking at it.

7         So if the urinalysis test established the fact of the

8    medical illegitimacy of the prescription and the defendant is

9    saying things like or suggesting through argument that he is

10   not necessarily looking at them, that right there is the

11   conscious avoidance.  It is the deliberate ignorance to what

12   the fact that would reveal that these are prescriptions that

13   are not being used for a legitimate medical purpose.

14        THE COURT:  I thought that the government's argument

15   is going to be that he is required to look at it.  It is not

16   that he can choose not to look at it.  He is required to look

17   at the urinalysis.  In fact, your expert said that, that is he

18   required to look at it.  How could it be conscious avoidance?

19   Conscious avoidance applies in a situation in which someone is

20   legally permitted to shut their eyes to something; but by doing

21   so, they are consciously avoiding a situation.  What you are

22   saying is that the doctor is not permitted to ignore the

23   urinalysis.  The doctor is not permitted to not look at that.

24   I don't know how conscious avoidance plays in there because

25   your theory is that the doctor is not permitted to not

1    performance examination.  The doctor is not permitted to not

2    have MRIs and not have X rays and not have a complete medical

3    history.

4            So the fact that if the defense is going to be he just

5    chose not to do this -- I don't know what the defense will be,

6    but I can anticipate some things.  I assume there will be some

7    different doctors can disagree about things and their expert is

8    really not that much of an expert and he can do this.  I am not

9    sure how that sets up a pure conscious avoidance situation.  I

10   want to make sure fully I understand your point.

11           So with the urinalysis, you are saying that especially

12   in this factual scenario in which I believe the undisputed

13   evidence is that the doctor is ordering urinalysis and then

14   choosing not to look at it?

15           MR. RODRIGUEZ:  That's correct.  Or he is -- unless --

16   the jury instructions right now for the substantive charge

17   don't list in it a failed urinalysis test is -- means that it

18   is a medically unnecessary prescription.  There is an

19   inferential step there that that I think is a contested issue

20   in this case, which is upon seeing the negative tests, does --

21   what does the -- does the doctor miss it?  Does he look at it

22   and say there is an excuse?  Like, Oh.  For instance, in the

23   chart it will say something like they may be -- they ran out of

24   pills, which is the reason why they failed their urine tests.

25   So I don't think defense counsel has conceded the fact that

1  definitively a failed urine test means ipso facto that the

2  prescription --

3         THE COURT:  Well, by failed urine test, you mean the

4  urine test doesn't have the metabolite present?

5         MR. ROOS:  Doesn't have metabolites, negative for

6  Oxycodone, or has an elicit substance other than Oxycodone.

7  For instance, the positive cocaine test or the positive test

8  for Xanax that wasn't prescribed by the doctor.

9         THE COURT:  What I am still struggling a little bit

10 with under this fact scenario of this particular case is it

11 would be different if there were evidence, maybe there is, that

12 Dr. Taylor is receiving urinalysis results from another

13 practice.  Another doctor is submitting these things to him.

14 Even then it seems a little odd, but it seems odd if he is the

15 one ordering the urinalysis.  How is it under a reasonable

16 standard of medical care how can he order the urinalysis and

17 then not look at it?

18        MR. ROOS:  Because he would be choosing not to look at

19 it.  I think that is exactly why it is appropriate to have

20 conscious avoidance instruction.  Another example would be

21 the --

22        THE COURT:  Then why conduct a urinalysis?  I know

23 what the government's argument is going to be.  The

24 government's argument on urinalysis is going to be that he just

25 did this to cover his tracks to make sure he was doing

1   something when he was just running a pill mill.  The defense

2   will say, perhaps, that he is doing the urinalysis because he

3   is really behaving like a doctor and he is concerned about his

4   patients and that is why he is conducting the urinalysis.

5   Perhaps the defense is going to argue that maybe there are

6   people in the office who were mishandling the charts and doing

7   this sort of thing and keeping him from getting this

8   information.

9           MR. ROOS:  I think the defense also is going to argue

10   that the defendant didn't look at the urinalysis charts upon --

11   the testimony comes back to that he didn't know that his

12   patients were failing their urine test.  Under those

13   circumstances it is -- that's the prime example of why it is

14   conscious avoidance and the instruction is appropriate.

15           THE COURT:  An argument that the doctor ordered the

16   urinalysis results, had the urinalysis results and chose not

17   look at them?

18           MR. ROOS:  That's correct.  Or he didn't see them or

19   somebody diverted the tests.

20           THE COURT:  Someone diverting them or someone doing

21   something else is different from this.  I just want to make

22   sure I am fully understanding this.  Because if he is ordering

23   the tests and he has the tests -- let's go this scenario.  He

24   has the tests and he has them in the file and doesn't look at

25   them.  Is that -- okay.  You are saying if they are in the

1  file, he has them and doesn't look at them, then that would be

2  conscious avoidance?

3        MR. ROOS:  That's correct.  That is just one example.

4  I use urinalysis because I think it is one that fits well.

5  There are a few others.  Another is the vague pain

6  descriptions.  He sees what happens with patients.  He sees

7  them come in and then turns a blind eye to the fact that they

8  are behaving relatively normal, that they don't have the type

9  of indicators of pain like most people do and writes vague

10  descriptions in his chart.

11        Another example would be Brian Dolinko's testimony,

12  which was that he went to multiple pain doctors who were then

13  arrested.  Those people coupled with the PMP, which are in the

14  patient's charts -- that is the Prescription Monitoring

15  Program -- that is a way where the doctor would see that this

16  guy is a doctor shopper, a pill shopper, and then he once again

17  turns a blind eye.  So there are numerous different pieces of

18  evidence there that should have alerted the defendant to the

19  fact there is no issue.  Even including MRIs that say these

20  inconclusive findings or no significant finding, and the

21  defendant puts in the file and writes the prescription.

22        So each of those are things that should confirm for

23  the defendant that the prescription is not medically necessary,

24  but then once again he writes -- he continues to write the

25  prescriptions by disregarding the fact that it would lead him

1 to know that the prescription is not medically necessary.

2          THE COURT:  Okay.  Let me hear from defense counsel.

3          MR. CARNESI:  Judge, the charge is very specific and

4 the specific charges are that they must prove that the doctor

5 knew that the prescriptions he was writing were medically

6 unnecessary.  Everything that counsel just stated may very well

7 be appropriate for this argument to the jury as to why the

8 doctor knew, but there is nothing in there to indicate that he

9 took conscious steps to avoid looking at an MRI, to avoid

10 looking at a urinalysis test, to avoid a particular

11 examination.  Those were his arguments you, but it doesn't

12 imply that the defendant did anything affirmative from seeing

13 it.

14          They can argue that from having seen that it is

15 medically unnecessary.  That is their argument, but it is not

16 part of that argument that he took affirmative steps to avoid

17 doing it.  If he chose to ignore it, those are issues for the

18 jury.  It is not a question of him doing anything affirmatively

19 to avoid awareness of these factors.

20          THE COURT:  Let me hear a little bit more from the

21 government.  When you are talking about the MRIs, for

22 example -- you can all sit down.

23          MR. ROOS:  Well, your Honor, on the MRIs for instance,

24 there are MRIs that are evidence.  Some of them were referenced

25 in the expert's summary charts that describe -- one of the

1  columns was the findings or lack thereof in the advanced

2  diagnostics.  And things like that are on the summary charts

3  and on the advanced diagnostics like no conclusive finding,

4  that should be something that tells the physician there is

5  potentially no need for the prescription by his disregarding

6  that fact.  That's part of the conscious avoidance.

7          THE COURT:  In this situation you are saying that he

8  is looking at the MRI that says no conclusive finding?

9          MR. ROOS:  Well, they are in the chart and there has

10  been testimony that Larry Montabano says he handed the X ray

11  and the guy just sort of put it in the chart.

12          THE COURT:  No, no.  That's fine.  What I am trying to

13  figure out is if he is actually looking at it.  It is one thing

14  if he is deliberately choosing not to look at something or

15  deliberately choosing not to do certain things.  But in terms

16  if he actually looks at the chart, how is he consciously

17  avoiding it?  I understand your position that if he is looking

18  at the MRI and you're saying he should know at that point from

19  looking at the MRI that this is medically unnecessary, that

20  goes to actual knowledge.  That doesn't go to his deliberately

21  choosing not to know something.  He knows it according to you.

22  It is actual knowledge; right?

23          MR. ROOS:  Well, no, your Honor.  I think, for

24  instance, if the MRI says no conclusive finding, that

25  doesn't -- I don't think defense is ready to concede that that

1    means the person does not need the prescription.  It is a

2    reason why there needs to be additional inquiry, a reason why

3    his notes should say something.  He doesn't -- he chooses then

4    not to take the next step of confronting his patients and

5    saying, What is up with your MRI?  It seems to suggest there is

6    nothing wrong with your back, or it is 10 years old.  The

7    decision not to inquire upon being confronted with the evidence

8    is the way in which he consciously avoids knowing the fact that

9    the prescription is not medically necessary.

10          THE COURT:  That is what I am trying to find out.

11   This nuance, this difference between once he gets certain

12   information whether or not that gives him knowledge or whether

13   or not that shows that he had knowledge.  Your theory is that

14   he knew along, but this shows that he had actual knowledge and

15   chose not do anything about it because he already knew versus

16   claiming that he -- I guess that is what I am trying to figure

17   out.  What is there that is unclear about any of this?  What is

18   there that he is seeing that is unclear, that he is not

19   required to do?

20          For example, if this were a different kind of case, if

21   he were not a doctor and were not under your theory required to

22   performance an physical examination or let's take the physical

23   exams for an example.  We've seen recordings in which there is

24   no physical examination performed.  The government is going to

25   show he is not doing a physical exam because this is not

1    medically necessary.  The defense will claim that he is not

2    conducting a physical exam because it is not necessary to do a

3    physical exam.  He has got the chart.  His patient says he is

4    in pain and that is all he needs to know and he is writing the

5    script for that.  How does not performing the exam equal

6    conscious avoidance in this situation?

7         We can go through the things that may could be done

8    through the exam to confirm this.  Your expert talked about

9    that, but your expert talked about that in the context as a

10   doctor is required to do that before prescribing Oxycodone.  So

11   if he required to do it, I am still confused as to how he can

12   consciously avoid it if you're required to do it.

13        MR. ROOS:  Well, your Honor, the cases in our letter

14   make clear that at least under the Second Circuit's controlling

15   precedents, it does not need to be a binary.  The evidence can

16   both go to actual knowledge and conscious avoidance.  So on

17   that question the lack of physical exam is both probative of

18   the fact that the defendant may know that the guy doesn't need

19   the prescription.  It is medically unnecessary.  And the

20   decision not to physically exam, not to confirm the fact that

21   the person -- the patient doesn't need it.  So, for instance,

22   not to do some of the things that Dr. Gharibo said like probing

23   their muscles, seeing how much they can bend, their level of

24   activity.  All of those things that he chooses not to do in the

25   context of the physical exam is an act of conscious avoidance.

1           THE COURT:  Defense counsel, anything else on this?

2           MR. CARNESI:  My response is still the same.  It is

3    not an act of conscious avoidance.  It may be bad medical

4    practice.  It may indicate he was not interested in really

5    finding out whether they were medically necessary.  There are a

6    lot of arguments that can flow from it; but I don't think that

7    this is a specific connection in saying that my not doing this

8    he consciously avoided finding it out.

9           THE COURT:  This database involving prescriptions that

10   may be filled for patients at different pharmacies and things

11   of that nature, how is that accessed by doctors?

12          MR. ROOS:  It's a computer system.  Here it is -- we

13   don't -- there is no evidence I don't think about the defendant

14   logging into the computer system.  Instead, that evidence comes

15   in the form of printouts from the PMPs that are in the patient

16   charts.

17          I want to make clear, your Honor, even defense

18   counsel's argument just now he is making claims about how the

19   defendant didn't need to do certain things, like certain types

20   of examinations in his medical practice.  If those arguments

21   are going to be made to the jury, it is absolutely proper that

22   the government be permitted to argue to the jury that there

23   were all sorts of signs that the defendant -- that the reason

24   why he wasn't doing those things wasn't an act of negligence.

25   It was his deliberate decision to avoid knowing the fact.

1          THE COURT:  I will be back.

2          (Recess)

3          THE COURT:  As I indicated before I was leaning

4     against giving the conscious avoidance conscious instruction.

5     The government's arguments have been fairly persuasive, but I

6     will give defense counsel another opportunity if there is

7     anything else you want to say about this.  It does seems that

8     perhaps there are circumstances in this case that justify a

9     conscious avoidance charge.

10          Let me hear from defense counsel if there is anything

11     else you would like to say in.

12          MR. CARNESI:  Judge, the only thing I would say, again

13     at the risk of repeating myself, is the allegations as I

14     understand in this conspiracy is that the doctor was involved

15     in the conspiracy to distribute what was unnecessary medication

16     to these various individuals.  He is at the heart of this very

17     conspiracy.  How he does that by consciously avoiding knowing

18     that it is unnecessary is not within the theory of this

19     conspiracy or the facts as they were elicited.  That is the

20     very purpose of his participation in the conspiracy, to write

21     what he knows to be unnecessary prescriptions.  I just don't

22     see how the two correlate.

23          MR. ROOS:  Your Honor, I imagine your Honor was going

24     to say this also so feel free to tell me to sit down.  I think

25     defense counsel is conflating two knowledge questions here.  It

1    is a question of knowledge in terms of joining the conspiracy

2    or participating in the conspiracy and the question of

3    knowledge of the object.

4         The government needs to prove that he knowingly joined

5    the conspiracy.  As to the object, though, he can consciously

6    avoid knowing the fact that the prescriptions are medically

7    unnecessary, which is why we think the instructions is

8    appropriate here.  It sounded like when your Honor came out

9    initially that you also see the defense arguments relating to

10   knowledge was a question more of whether the government has put

11   forward a factual record to predicate a conscious avoidance

12   instruction, which I think is different than what Mr. Carnesi

13   is suggesting.

14        THE COURT:  What makes this a little bit complicated

15   is that because Dr. Taylor is a doctor, we have some of the

16   same facts that would make him a bad doctor and have him

17   prescribing these things for unnecessary reasons.  It might

18   also be things that he would be consciously avoiding, which

19   makes this is little bit tricky trying to sort through this.  I

20   do take the government's argument.

21        I think there certainly are circumstances in which,

22   for example, if he orders urinalysis and doesn't get the

23   results because someone stole them, they diverted it, or they

24   did something else to it, by not following up on the urinalysis

25   results, it could be both that he is consciously avoiding

1  finding out information that would let him know whether or not

2  it was medically legitimate for him to prescribe this and it

3  would go toward potentially his not following a reasonable

4  standard of medical care.

5          It is just a little difficult in this case because the

6  government put forward their expert.  But I recognize that the

7  jury may disregard the expert.  The jury may not believe the

8  expert.  The jury may believe that Dr. Taylor wasn't medically

9  required to do some of the things that he failed to do but that

10  in a certain circumstance even if he wasn't required by his

11  profession to do certain things if he chose not do certain

12  things or chose not to investigate other things, he could still

13  be consciously avoiding the knowledge.  That is what my

14  thinking is.

15          Again, I will hear from government and defense a

16  little bit more if there is anything more, especially defense

17  counsel.

18          MR. CARNESI:  No, your Honor.  At least I am not

19  trying to conflate it.  I do think they are completely two

20  different --

21          THE COURT:  I didn't take your argument as conflating

22  those two things.

23          MR. CARNESI:  Thank you.

24          THE COURT:  Government?

25          MR. ROOS:  Nothing else, your Honor.

1          THE COURT:  I will give the conscious avoidance

2    charge.

3          Does the defense want a separate good-faith charge as

4    well?

5          MR. CARNESI:  Yes, your Honor.

6          THE COURT:  We'll do that.

7          Is there anything else in terms of the jury

8    instructions?

9          MR. ROOS:  No, your Honor.  We had a few minor nits

10   that you saw, but otherwise there are no other questions or

11   objections.

12         THE COURT:  Defense counsel?

13         MR. CARNESI:  No, your Honor.

14         THE COURT:  So let's get counsel here like 9:25 on

15   Tuesday.  Does counsel have an estimate as to how long their

16   summations are going to be?

17         Government, your first summation?

18         MR. RODRIGUEZ:  Your Honor, I think it is going to be

19   an hour, maybe under.

20         THE COURT:  Defense counsel?

21         MR. CARNESI:  About an hour, your Honor.

22         THE COURT:  Your rebuttal summation?

23         MR. ROOS:  20 minutes.

24         THE COURT:  Do counsel plan on using any demonstrative

25   aides.  If you do, just make sure that you bring them in in

1    advance and show them to your opposing counsel if you plan on

2    doing that so we don't have any issues.

3              MR. RODRIGUEZ:  Yes, the government does anticipate

4    doing that for its summation and will do as the Court

5    instructed.

6              THE COURT:  Maybe counsel should meet and confer about

7    that maybe on Monday or so to make sure that we don't have any

8    issues with that.

9              Is this going to be electronic demonstrative aides or

10   analogue stuff?

11             MR. RODRIGUEZ:  It will be two things for the

12   government, your Honor, a PowerPoint presentation as well as a

13   face board using the pictures that are in evidence.

14             THE COURT:  Defense counsel, are you planning to using

15   any demonstrative aides?

16             MR. CARNESI:  No, your Honor.

17             THE COURT:  That's it.

18             We'll get the revised jury instructions to you Monday.

19             THE LAW CLERK:  I will get it to them sooner.

20   Probably tonight.

21             THE COURT:  Have a good weekend.

22                            o0o

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                        Page

3   Cross By Mr. Carnesi . . . . . . . . . . . . . 629

4   Redirect By Mr. Roos . . . . . . . . . . . . 643

5   LISA MERCADO

6   Direct By Ms. Fletcher . . . . . . . . . . . 650

7   Cross By Mr. Carnesi . . . . . . . . . . . . 684

8                  GOVERNMENT EXHIBITS

9   Exhibit No.                          Received

10   301, 302, 303, 304, 704  . . . . . . . . . 648

11                  DEFENDANT EXHIBITS

12  Exhibit No.                          Received

13   A  . . . . . . . . . . . . . . . . . . . . 705

14

15

16

17

18

19

20

21

22

23

24

25