Ic4ntay1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        17 Cr. 390 (ALC)

 5   DAVID TAYLOR,
                    Defendant.            Trial
 6   ------------------------------x

 7
                                         New York, N.Y.
 8                                       December 4, 2018
                                         9:30 a.m.
 9

10   Before:

11
                     HON. ANDREW L. CARTER, JR.,
12
                                         District Judge
13                                       -and a Jury-

14                        APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  KIERSTEN A. FLETCHER
17        JUSTIN V. RODRIGUEZ
          NICOLAS T. ROOS
18        Assistant United States Attorneys

19   CHARLES F. CARNESI
          Attorney for Defendant
20
     Also Present:
21
     Matthew Del Rosario, Special Agent DEA
22   Rosanna Corrado, Paralegal Specialist

23

24

25
```

Ic4ntay1

1          (Trial resumed; jury not present)

2          THE COURT:  Are we all on the same page regarding the

3    demonstrative exhibits?  Has the government shown defense

4    counsel your demonstrative exhibits?

5          MR. RODRIGUEZ:  We have, your Honor.

6          THE COURT:  Any objection to it by the defense?

7          MR. CARNESI:  No, your Honor.

8          THE COURT:  OK.

9          Regarding the jury instructions, there will be some

10   sort of occasional misspellings, grammatical errors.  I will

11   just edit those on the fly, and then we will make those changes

12   later.  There are a couple of things that I've seen already

13   that I think should be changed, and I will run that by counsel.

14          On page 16 of the jury instructions -- again, these

15   aren't substantive changes -- the first sentence of that first

16   full paragraph, "which I will explain to you shortly and

17   knowing the specific objective of a conspiracy, on the other" I

18   think we should delete that "on the other" because we don't

19   talk about the first hand.  So I think we should delete that

20   "on the other."

21          Any objection by the government or the defense?

22          MR. RODRIGUEZ:  No, Judge.

23          MR. CARNESI:  No.

24          THE COURT:  OK.

25          The penultimate paragraph on that page, the paragraph

Ic4ntay1

1   that starts "in sum" on that same page.  It says, "In sum, if

2   you find that the defendant believed that this was a high

3   probability," I believe that should be "there was a high

4   probability."

5          Any objection to that by the government or the

6   defense?

7          MR. RODRIGUEZ:  No, your Honor.

8          MR. CARNESI:  No, your Honor.

9          THE COURT:  OK.  I will make that change.

10         MS. FLETCHER:  Your Honor?

11         THE COURT:  Yes.

12         MS. FLETCHER:  There is one more in that paragraph.

13         THE COURT:  OK.

14         MS. FLETCHER:  The second-to-last line, "knowingly

15  with respect to at a fact."  I think that's supposed to be "to

16  that fact."

17         THE COURT:  Maybe that didn't get -- you are on that

18  same sentence?

19         MS. FLETCHER:  Same page, page 16, second sentence

20  from the end of that section.

21         THE COURT:  Yes.  "At" should be "that."  I will make

22  that change as well.

23         Has everyone seen that?

24         Any objection to that by the defense.

25         MR. CARNESI:  No, your Honor.

Ic4ntay1

1          THE COURT:  OK.  I will make that change.

2          This is slightly substantive.  It is not huge.  But on

3     page 26, "Use of Recordings and Transcripts," the last

4     paragraph in that section.

5          It reads currently, "If you wish to view any of the

6     recordings or transcripts, they will be made available to you

7     during your deliberations."

8          It seems to me that the transcripts that we are

9     talking about in this section were the transcripts that were

10    given to them in aid of their listening to the recordings.  I

11    don't think it would be appropriate to give them the

12    transcripts without them listening to the recordings and seeing

13    the recordings at the same time.  So it makes sense to me to

14    perhaps change -- also, one of the recordings didn't have a

15    visual component to it.  It may make sense to say, if you wish

16    to view or hear any of the recordings with transcripts, they

17    will be made available to you and repeat during your

18    deliberations or cut that.

19         Any objection that or any comment on that by the

20    government or the defense?

21         MR. CARNESI:  Judge, I would object to the

22    transcripts, since they are not evidence, going into the jury

23    room at any point.  If the jury wants to listen --

24         THE COURT:  They are not going into the jury room,

25    which is why I was thinking about cutting the "during your

Ic4ntay1

deliberation."  If they want to view or to hear the recordings,

they are going to be brought out here.

MR. CARNESI:  OK, Judge.  I didn't understand that.

THE COURT:  That's fine.

They will be brought out here, they will be played for

them and then they will be provided the transcripts.

MR. CARNESI:  That's fine.

THE COURT:  But neither the recordings nor the

transcripts are going into the deliberations room.  That is at

least my position unless counsel has a different view of

things.

MR. RODRIGUEZ:  That's fine, Judge.

THE COURT:  Any objection to that change then in terms

of the wording of that last sentence?

MR. RODRIGUEZ:  No objection.

MR. CARNESI:  No, your Honor.

THE COURT:  Because that is what is going to happen.

They will be brought out here.  I don't know if it is necessary

to tell them that in the instructions.  Maybe we just cut out

that last prepositional phrase "during your deliberations" and

say they will be made available to you.

Any objection to that by the government or the

defense?

MR. RODRIGUEZ:  No objection.

MR. CARNESI:  No, your Honor.

Ic4ntay1

1          THE COURT:  All right.  Again, there will probably be

2     some other things, and I will just make those edits on the fly.

3          Is there anything else we need to address before the

4     jury comes in?

5          Counsel for the government?

6          MS. FLETCHER:  Not for the government, your Honor.

7          THE COURT:  For the defense?

8          MR. CARNESI:  No, your Honor.

9          THE COURT:  We will just wait for the jury to get

10    here.  Is there any update in terms of length of summations?

11    Let's get an update and see if they've gotten a little shorter.

12    Hopefully they haven't gotten longer.

13          What is the government's estimate.

14          MR. RODRIGUEZ:  Your Honor, I think we mentioned last

15    time we expect it to be under an hour we still expect it to be

16    under an hour, 45 minutes.

17          THE COURT:  OK.  Defense counsel?

18          MR. CARNESI:  Between half an hour to 45 minutes,

19    Judge.

20          THE COURT:  All right.  We'll see how it goes.

21          Is the jury here?

22          THE DEPUTY CLERK:  Yes, Judge.

23          THE COURT:  Are we ready to bring the jury in?

24          MR. RODRIGUEZ:  Yes your Honor.

25          THE COURT:  Where the demonstrative exhibits.

Ic4ntay1

1          MR. RODRIGUEZ:  The government will only be using a

2     PowerPoint presentation.  We contemplated using a face board as

3     well.  We are not using that.  It will just be a PowerPoint

4     presentation that will appear on the screens throughout the

5     courtroom.

6          THE COURT:  Defense counsel has seen it and has no

7     objection?

8          MR. CARNESI:  I have no objection.

9          THE COURT:  All right.  Let's bring in the jury.

10     Actually, Tara, hold on just a second.

11          Another thing to make clear if I haven't made it clear

12     to counsel before, we are going to give each of the jurors a

13     written copy of the jury instructions.  I will tell them that

14     when I get to charge them.

15          OK.  Let's bring in the jury.

16          (Jury present)

17          THE COURT:  Please be seated.

18          Welcome back.  We are now going to have closing

19     arguments by counsel.  The closing arguments are not evidence,

20     but you should listen to the closing arguments.

21          If counsel states a fact in their closing argument

22     that is different than your recollection of the facts, it is

23     your recollection that controls.

24          We will start off with the government's summation.

25     Then, if the defense wishes to have a summation, they will

Ic4ntay1                    Summation - Mr. Rodriguez

1    provide a summation.  Then the government will have a rebuttal

2    summation if they choose.

3            We will start with summation, closing argument by the

4    government.

5            MR. RODRIGUEZ:  David Taylor is a drug dealer.  He

6    betrayed his oath as a doctor and he broke the law.

7            For years Taylor supplied Vito Gallicchio and the

8    members of his crew with enormous amounts of oxycodone that

9    Taylor knew they did not need.  He did this in exchange for a

10   steady stream of easy money and gifts.

11           David Taylor did not run a medical practice.  He ran a

12   pill mill.  And he knew exactly what he was doing.

13           He did not provide medical treatment to patients.  He

14   maintained a facade.  He went through the motions with his fake

15   examinations, almost nonexistent at times, and he covered his

16   tracks by writing bogus notes in the patient charts.

17           He supplied a network of drug traffickers with the

18   pills that were needed to fuel opioid addictions that destroy

19   lives and devastate communities.

20           That's why we are here today.  We are here to finally

21   hold that man, the defendant, accountable for his crime.

22   Because of what he did, David Taylor is charged in a one-count

23   criminal indictment.

24           Now, at the end of this trial, Judge Carter will

25   instruct you on the law.  What Judge Carter says controls, and

Ic4ntay1                    Summation - Mr. Rodriguez

1   you should follow all of his instructions, but for now I will

2   just note that the indictment alleges that David Taylor

3   conspired or agreed with other people to distribute oxycodone

4   in violation of the law.  That is, David Taylor agreed to

5   prescribe oxycodone to people that he knew did not need it.

6   That's what this case is about.

7          Now, as you've heard, it's perfectly lawful for a

8   legitimate doctor to issue a legitimate medically necessary

9   prescription for oxycodone.  But, as I expect Judge Carter will

10  explain, when a doctor acts outside the regular course of

11  professional practice and issues medically unnecessary

12  prescriptions for controlled substances, he is no longer acting

13  lawfully.  That doctor is acting as a drug dealer.

14         Now, there's not much that's really in dispute in this

15  case, so let's briefly talk about what's seemingly not in

16  dispute here.

17         There is no dispute that David Taylor was a medical

18  doctor who at times operated out of three offices on Staten

19  Island, an office on Victory Boulevard, then at New You Medical

20  and Dental Pavilion on Castleton Avenue.  Lisa Mercado, who

21  used to work at that office as the office manager, told you

22  about how there was a time when David Taylor got kicked out of

23  this office.  After that, he went on to another office on Hylan

24  Boulevard.

25         There is also no dispute that from July 2012 to June

Ic4ntay1                    Summation - Mr. Rodriguez

1   2017 David Taylor wrote over 21,000 prescriptions for oxycodone

2   pills.  As you now know quite well, oxycodone is a powerful and

3   highly addictive painkiller that is similar in chemical makeup

4   to heroin.

5           You heard from Dr. Gharibo, who helped design the pain

6   management center at Langone Medical here in New York.  He

7   explained that there is a wide range of doses that oxycodone

8   comes in.  It ranges from 2.5 milligrams on the low end to 30

9   milligrams on the high end for short-acting oxycodone.

10  Dr. Gharibo explained that 30 milligrams of oxycodone is so

11  strong that it's almost never appropriate except for a patient

12  dying from cancer in the last few months of their life.

13  Because of the strength of these pills, you now know that

14  short-acting oxycodone and 30-milligram oxycodone pills in

15  particular are the preferred pills of drug addicts and drug

16  traffickers.

17          Dr. Gharibo explained that 30-milligram oxycodone

18  pills provide a rapid and euphoric high that addicts and

19  abusers crave.  When one 30-milligram pill doesn't suffice,

20  addicts turn to more pills.  They look for different ways to

21  absorb the drug.  They take it with alcohol.  They crush it up

22  and snort it.

23          And you heard from Detective Del Rosario and DEA

24  Analyst Castro that 30-milligram oxycodone pills are the

25  highest dose oxycodone pill on the market that can be crushed

1   up and snorted.

2         There's no dispute that from July 2012 to June 2017,

3   David Taylor wrote over 14,000 prescriptions for 30-milligram

4   oxycodone pills.  So about two-thirds of the oxycodone

5   prescriptions during these five years were for the highest

6   dosage of short-acting oxycodone available.  That is over 2.6

7   million pills of 30-milligram oxycodone.  There's no dispute

8   about any of this.

9         There is also no dispute that for years Taylor

10  prescribed a massive amount of 30-milligram oxycodone directly

11  to this man, Vito Gallicchio, a brash and shameless drug

12  dealer.  From July 2012 to June 2017, Taylor wrote 63

13  prescriptions for 30-milligram oxycodone to Gallicchio, most

14  often, 240 or 270 pills at a time.  That's over 10,000

15  30-milligram pills, the kind of pills for people dying from

16  cancer, over the course of five years just to Vito himself.

17        There is also no dispute that Vito had what you heard

18  described as an inner circle of people that he referred to

19  David Taylor -- people like his wife, Lori Gallicchio; his

20  brother, Robert Adams; his nephew, Don Michael Carim; his

21  nephew's roommate, John Marino; his driver, Michael Farley, who

22  you heard referred to as Mikey Limo; his driver's wife, Tara

23  Farley; and other people like Larry Montalbano and Brian

24  Dolinko, both of whom testified at this trial along with John

25  Marino.

1          There is no dispute that David Taylor prescribed every

2     one of the people in this crew huge amounts of 30-milligram

3     oxycodone.  Now, there is also no dispute that David Taylor

4     knew that Vito Gallicchio was referring people from this crew

5     to him.  Vito is explicitly referenced in his wife's patient

6     chart, his brother's chart, and in Tara Farley's chart.  Vito's

7     address and phone number are listed in Leonard Danzi's file.

8     Vito went with Larry Montalbano for his first visit to David

9     Taylor.  John Marino told you how he told David Taylor during

10    his first appointment that Vito had recommended him.

11         There is also no dispute that the people in Vito's

12    crew had absolutely no need for this oxycodone that David

13    Taylor was prescribing them and that for the most part the crew

14    was just funneling the oxycodone to Vito, which he then sold on

15    the street.

16         You heard from Larry Montalbano and John Marino that

17    they never took the oxycodone pills Taylor prescribed them.

18    Instead, they gave the prescriptions for the pills to Vito in

19    return for cash.  Brian Dolinko told you that as part of the

20    arrangement he had to give some of his oxycodone pills to Vito.

21    Dolinko then took the rest of the pills, not because he was in

22    pain, not because he needed them, he told you that he took the

23    pills to get high.

24         There is also no dispute about how Vito and the

25    members of this crew filled the oxycodone prescriptions that

Ic4ntay1                    Summation - Mr. Rodriguez

1    they received from David Taylor.  You heard from Larry

2    Montalbano and John Marino about how certain pharmacies that

3    they went to, like Walgreens, CVS, refused to fill the

4    oxycodone prescriptions that David Taylor wrote.

5            You know from the data that pharmacies have to report

6    as part of the prescription monitoring program that Vito and

7    his crew often traveled far into New Jersey to fill their

8    prescriptions.

9            They also went to places where Vito had arrangements

10   to fill these prescriptions with pharmacists like Nicholas

11   Avicolli at Victory Pharmacy, and the pharmacist who you heard

12   referred to as Joe as Bergen Point Apothecary in Bayonne, New

13   Jersey.

14           There is also no dispute that David Taylor received

15   money and gifts from Vito and those in the crew.  The three

16   phony patients from Vito's crew you heard testify in this

17   trial -- Larry Montalbano, Brian Dolinko, John Marino -- they

18   all told you how they paid cash for their visits to David

19   Taylor.  The three of them, three people who don't know each

20   other, told you how Vito helped Taylor pay the rent on Taylor's

21   office.  You heard from Montalbano how Vito once had to pay

22   Taylor $5,000 in cash.

23           You saw the bottles of Scotch Taylor received, like

24   the ones you heard about him talking on the recordings, the

25   Glenlivet and Macallan.  You even saw a bottle of Scotch right

Ic4ntay1                    Summation - Mr. Rodriguez

1    there in David Taylor's exam room on the day he was arrested.

2           Now, you know also that Vito spend almost $400 buying

3    a dryer for David Taylor, because you heard it from Brian

4    Dolinko and you saw it in the records from P.C. Richard.  Right

5    there, the record from P.C. Richard:  Sold to Vito Gallicchio,

6    ship to David Taylor, paid $391.95.

7           Vito also bought Taylor a refrigerator.  You heard

8    about that.  You saw the record from P.C. Richard.

9           Finally, there is no real dispute that venue is proper

10   in this district.  That simply means that some act in

11   furtherance of the conspiracy that Taylor was charged with

12   occurred in this district.  This district includes, among other

13   places, Manhattan, the Bronx, certain counties to the north, as

14   well as the bridges and waterways that connect Staten Island to

15   the rest of New York and to New Jersey.

16          Now, at several times during this trial, you heard

17   reference to Vito and the members of his crew getting

18   prescriptions from Taylor in Staten Island and then crossing

19   bridges into New Jersey and filling them at various pharmacies

20   in New Jersey.  So, for example, Larry Montalbano testified

21   that he traveled over bridges and waterways within this

22   district to fill his oxycodone prescriptions that he illegally

23   obtained.

24          So there's no real dispute it seems that this

25   conspiracy took place in places in this district.  All of that

Ic4ntay1                    Summation - Mr. Rodriguez

1    seems not to be in dispute in this case.

2              Which brings us to the only issue which really does

3    appear to be disputed:  When David Taylor wrote prescription

4    after prescription of oxycodone for Vito and the members of his

5    crew, month after month, year after year, did David Taylor know

6    that these people did not need it?

7              When you look at the overwhelming evidence in this

8    case, it is crystal clear that Taylor absolutely did know that

9    he was prescribing medically unnecessary oxycodone to people

10   who did not need it.

11             So let's look at the evidence.  Let's start with the

12   sheer number of 30-milligram oxycodone pills that Taylor

13   prescribed to Vito and the members of the Vito's crew.

14             David Taylor knew the power of these kinds of pills,

15   and he knew the types of patients that legitimate doctors used

16   them for.  You remember Nicholas Avicolli telling you about

17   when he first noticed David Taylor prescribing more and more

18   drugs like oxycodone.

19             Avicolli confronted Taylor, and in a conversation

20   between two professionals, Taylor said he was doing hospice

21   care, the treatment of terminally ill patients focused on just

22   keeping them comfortable.

23             That's not what David Taylor was doing for any of the

24   people in Vito's crew.  Oxycodone for five years is not hospice

25   care.  For Vito Gallicchio, Taylor prescribed either 240 or 270

Ic4ntay1                    Summation - Mr. Rodriguez

1    30-milligram oxycodone pills at a time for almost five years.

2    That's eight or nine pills of the strongest short-acting

3    oxycodone available every day.

4           You know from Dr. Gharibo that these are massive -- to

5    use his word, ridiculous quantities of oxycodone.  This is not

6    something that two doctors can have a reasonable professional

7    disagreement about.  These doses of oxycodone, to use

8    Dr. Gharibo's phrase, are not human doses.  This is not the way

9    that human beings are treated for pain, especially not for

10   shoulder pain or back pain or carpal tunnel syndrome.

11          David Taylor prescribed Vito this much oxycodone

12   because he knew that Vito was not taking these pills.  He was

13   selling them.  And when you sell pills, the more the better.

14          The numbers tell the story here.  You can convict

15   David Taylor based on what you know about oxycodone

16   30-milligram pills and the simply not human doses of oxycodone

17   he prescribed to Vito, and that's it.  These numbers tell you

18   beyond a reasonable doubt that David Taylor knew he was

19   prescribing medically unnecessary oxycodone.

20          But, of course, it wasn't just Vito.  Taylor was

21   doling out massive doses of 30-milligram oxycodone to everyone

22   in Vito's crew.

23          Let's take a look at just a couple more examples.

24          Michael Farley, Vito's driver, 240 30-milligram pills

25   for almost three years between 2013 and 2016.

1           Robert Adams, Vito's brother, 240 pills at a time

2    between 2012 and 2014.  He jumps to 270 pills at a time in

3    March 2014 and he stays there until about 2016.

4           These numbers don't lie.  David Taylor knew he was

5    prescribing huge amounts of oxycodone that could not possibly

6    be for the legitimate treatment of anything.

7           So what else proves that David Taylor knew what he was

8    doing?

9           Well, the fact that Taylor performed almost no

10   examination on his so-called patients whatsoever proves that he

11   knew they didn't need the oxycodone.

12          Dr. Gharibo told you about what a legitimate pain

13   management examination looks and sounds like.  Legitimate pain

14   management doctors ask their patients lots of questions:

15   Where's the pain coming from?  What direction does it go in?

16   What makes it better?  What makes it worse?  How does the pain

17   affect what you can or can't do in your life?

18          They ask their patients, legitimate doctors that is,

19   to move, bend, flex the parts of your body where you're telling

20   me you have pain.  Legitimate doctors touch and examine the

21   parts of the body where their patients tell them they have

22   pain.

23          Now, Larry Montalbano, John Marino, Brian Dolinko,

24   they told you that David Taylor hardly did any of that during

25   any of their visits.  John Marino even told you he told Taylor

Ic4ntay1                     Summation - Mr. Rodriguez

1    his shoulder was fine.

2            You remember that recording that Brian Dolinko made.

3    The visit that lasted all of two minutes and 15 seconds, most

4    of it in complete silence.

5            What was said?

6            "David Taylor:  OK, how's -- how's your shoulder,

7    range of motion?

8            "Brian Dolinko:  OK.

9            "David Taylor:  OK.  So we got the -- the oxycodone

10   and the oxymorphone, right?  OK.  Go ahead and take a seat in

11   the waiting room."

12           This is supposed to be someone suffering from

13   excruciating pain, someone who requires a massive amount of

14   opioids, and that's the examination he gets.

15           Brian Dolinko left Taylor's office that day with what?

16   180 pills of the muscle relaxer Soma, that's six pills a day;

17   60 extended-release 12-hour 40-milligram oxymorphone pills,

18   another two pills a day; 180 30-milligram oxycodone pills, six

19   more pills a day.

20           To be given this cocktail of powerful drugs after

21   asking, "How's your shoulder range of motion?" and getting "OK"

22   with no further physical examination, no follow-up questions,

23   it's ridiculous.  This is not a medical examination.  This is

24   not the legitimate practice of medicine.  This is a charade.

25           David Taylor did not perform a legitimate medical

Ic4ntay1                    Summation - Mr. Rodriguez

1    examination on Brian Dolinko because he knew that any exam

2    would reveal that Brian Dolinko did not need it.  That's how

3    Taylor operated, a brief song and dance before doling out

4    massive quantities of oxycodone.

5            You also saw it on the other recordings as well.

6            With Julio Clark, Taylor went on and on in the

7    recording about Scotch and the history of the Glenlivet after

8    Clark had brought him a bottle.  No questions about whether

9    Clark was in pain, no physical examination, nothing.

10           But what did Julio Clark walk away from that visit

11   with?  A prescription for 180 pills of 30-milligram oxycodone.

12           The next time Clark goes to see Taylor, he tells

13   Taylor that he's addicted to these pills.  Then Taylor makes

14   some sort of flippant comment about how Clark should just go to

15   rehab.

16           Then what does he do?  He gives Clark more pills:  A

17   prescription for oxycodone, a prescription for oxymorphone, and

18   an appointment card for the next visit.

19           How about Christine Oakes.  You remember what one of

20   her visits sounded like.

21           (Video played)

22           MR. RODRIGUEZ:  You don't need a medical degree to

23   know what is wrong there.  She was slurring her speech beyond

24   recognition.

25           No questions from Taylor about this.  No physical

1     examination.  Why not?  Because Taylor doesn't care.  He knew

2     what she was there for and he knew what he was going to give

3     her.

4              And what did she get?  240 30-milligram oxycodone

5     pills and 150 Percocets.

6              Why didn't Taylor perform meaningful examinations?

7     Because he knew that these patients didn't need them.  He knew

8     that if he performed real examinations he wouldn't find

9     anything that required the medications he was prescribing.  He

10    knew that these patients did not need oxycodone.

11             Now, if you had any doubt about that, just remember

12    Vito's nephew, Don Michael Carim.  At 30 years old, Carim began

13    seeing David Taylor and receiving oxycodone 30-milligram

14    prescriptions.  By May 2016, he's getting 240 pills at a time.

15             Then what happens in March of 2017?

16             Right in the middle of a string of prescriptions for

17    180 oxycodone 30-milligram pills, David Taylor clears Don

18    Michael Carim to participate in the FDNY fitness awareness

19    program.

20             What does that program involve?

21             Let's look at the paperwork that was in Taylor's file

22    and that Taylor signed.  Here it is.  "This program involves

23    strenuous physical activity, which will be progressive in

24    nature."

25             You can see at the bottom of the page there that that

1   includes performing the maximum number of uninterrupted pushups

2   and pullups the candidate can perform.

3            But what else does this document show?

4            Let's look at this paragraph right here.

5            It describes the type of people who are not fit to

6   participate in this program because of the serious health risks

7   involved.  It includes, right here, people who take opiates,

8   people who take pain medications.

9            The next page continues to describe what this physical

10  fitness program will entail.  The maximum number of situps the

11  candidate can perform, a timed one and a half mile run, a

12  40-minute physical training session similar to that which is

13  administered during probationary firefighter school.

14           David Taylor certifies that he examined Don Carim and

15  that he is medically fit to participate in this program.

16           Taylor is prescribing Carim almost 200 pills a month

17  of the kind of oxycodone reserved for dying cancer patients and

18  he certifies that he's fit to participate in this strenuous

19  physical fitness program?

20           This document is devastating proof that David Taylor

21  knew that Don Carim was not in pain, that he did not need

22  oxycodone, and that he was not taking oxycodone.  You can

23  convict David Taylor based on this document and the oxycodone

24  he was prescribing to Don Michael Carim.

25           How else do you know that Taylor knew these were not

1     medically necessary prescriptions?

2             Literally everyone in the crew got the same

3     prescription for oxycodone.

4             You saw in the recordings and you also know from the

5     patients who testified at this trial that Taylor never explored

6     or even discussed less potent alternatives to 30-milligrams

7     oxycodone.  He always prescribed that pill.

8             He prescribed it to people like Larry Montalbano, John

9     Marino, Brian Dolinko, right away.  No questions asked.  In

10    fact, Brian Dolinko told you how he got a prescription of 30

11    milligrams of oxycodone from David Taylor with no discussion at

12    all about it.  He didn't ask for it.  They didn't talk about it

13    because they didn't need to.  Everyone knew that if you wanted

14    oxy, Taylor was your guy.

15            You heard from Dr. Gharibo that the norm for a

16    legitimate pain management practice is to have a low percentage

17    of patients on opioids.  But astoundingly, against all odds,

18    everyone in Vito's crew not only got opioids, but 30 milligrams

19    of oxycodone, the most diverted form of oxycodone, a pill that

20    addicts like Brian Dolinko buy on the street for $20 to $25 for

21    each pill, the strongest oxycodone that can be crushed and

22    snorted by addicts.

23            Vito and his wife, Lori, were both prescribed this

24    pill.  Vito's driver, Michael Farley, and his wife, Tara, were

25    both prescribed this pill.  Vito's nephew Don Michael Carim and

1    his roommate John Marino were both prescribed this pill.

2              Detective Del Rosario explained how Christine Oakes

3    and both of her parents were prescribed this pill by David

4    Taylor.

5              It was not a coincidence that all these connected

6    people required the same medication.  That's just one small

7    piece of legitimate pain management practice, and David Taylor

8    knew it.

9              You know from the witnesses and other evidence that

10   Taylor never discussed physical therapy, changes to the

11   patient's lifestyles, referrals to other doctors or

12   specialists, surgeries, pain injections, medications that are

13   not controlled substances, medications that are not opioids,

14   medications that are not oxycodone, lower doses of oxycodone

15   than 30 milligrams, anything else in the wide range of

16   legitimate pain management that you heard about from

17   Dr. Gharibo short of 30 milligrams of oxycodone.

18             Let me talk just for another minute about Vito and his

19   wife.  Both received massive quantities of oxycodone from

20   Taylor.  Your common sense tells you how suspicious it is for a

21   wife and a husband to be receiving the same prescription for

22   the same potentially lethal painkiller.

23             Lisa Mercado, someone with no medical training, was

24   shocked when she learned that a patient as well as that

25   patient's mother and father were all being prescribed the same

1    medication from David Taylor.  Vito and Lori, husband and wife,

2    both in their 40s, both receiving enormous quantities of the

3    most abused type of oxycodone from David Taylor, the type of

4    oxycodone reserved for people dying of cancer in their last

5    months of life.

6         That would be suspicious enough on its own, but of

7    course there was more.  Vito's brother, his nephew, all of them

8    in such debilitating pain that they had to take hundreds of

9    oxycodone pills each month for years.  These were young

10   patients.  Mostly all of them were under 50; some of them were

11   in their early 30s.

12        They weren't in pain and Taylor knew it.  That's why

13   he didn't consider any other option that a legitimate pain

14   management doctor would consider.  Because when it came to Vito

15   and his crew, Taylor was not a legitimate pain management

16   doctor.  He was a drug supplier.

17        Taylor knew that these patients were addicts and drug

18   dealers, not people in real pain seeking real treatment.  That

19   much was obvious from the people in the waiting room in his

20   office that you heard about.  Larry Montalbano told that you

21   there were people in there who were nodding off, high on drugs.

22   As Brian Dolinko put it, people were strung out, possibly

23   withdrawing.

24        How did it work?

25        You paid your money, you sat down with the doctor, and

1    he wrote you a prescription for oxycodone.  You didn't have to

2    tell him why you were there.  He knew.

3          Lisa Mercado told you that the waiting room was always

4    chaotic, that there were fights breaking out among the people

5    there.

6          Larry Montalbano told you that the waiting room was so

7    out of control one day that Taylor stormed in and he yelled:

8    If everybody doesn't shut up and sit down, no one is getting

9    anything.

10          David Taylor knew that everyone in that waiting room

11    was there for one thing, oxycodone, and he knew they weren't in

12    real pain.  But if they were, if they were in such excruciating

13    pain, pain associated with end-stage cancer, what legitimate

14    doctor would threaten to withhold treatment?

15          No real doctor would do that.  But Taylor wasn't

16    acting as a real doctor, trying to treat real patients.  He was

17    dealing drugs.

18          Now, it wasn't only obvious from the waiting room.  It

19    was obvious from the inside of his exam room as well.  You

20    remember Christine Oakes slurring her words.  It was obvious

21    from the phone calls that came in and that were recorded to

22    Taylor.

23          Like the call Lisa Mercado got that she told David

24    Taylor about, where the mother of a patient in detox called the

25    office and demanded that Taylor no longer see her daughter.

Ic4ntay1                      Summation - Mr. Rodriguez

1             It's clear that Taylor knew he was treating addicts

2     based on the records you saw relating to James Impellizine.  In

3     August 2012, Taylor wrote a letter stating that he was treating

4     Impellizine for opioid dependency and self-reported abuse of

5     prescription opioids.  Less than two years later Taylor is

6     prescribing Impellizine OxyContin, Roxicodone, Xanax and Soma.

7     Taylor wasn't treating James Impellizine for anything.  He was

8     fueling his addiction.

9             How else is Taylor's knowledge of what he was doing

10    apparent?  The advanced diagnostics that you heard about, like

11    MRIs, CT scans that were in Taylor's charts make clear that his

12    patients did not have the kind of injuries that require

13    oxycodone.

14            Look at Vito Gallicchio.  The only test results in his

15    file were a 2012 CT scan of his head, which revealed normal CT

16    of the brain without contrast.  Vito continued getting

17    oxycodone from Taylor for another five years after that normal

18    scan.

19            Lori Gallicchio, no record of any advanced diagnostic

20    tests in her file at all.

21            Robert Adams, Vito's brother, three MRIs from 2003,

22    almost a decade before he began seeing David Taylor.

23            You know from John Marino that his medical scans

24    detected no major injuries.

25            And Brian Dolinko told you that he only had MRIs from

Ic4ntay1                      Summation - Mr. Rodriguez

1   a car accident that happened years before he ever saw Taylor.

2          And what did these patients complain about?

3          Vito complained of postoperative pain from a 2007

4   surgery on his knee, general back pain, anxiety, headaches.

5          Lori Gallicchio, carpal tunnel syndrome.

6          Larry Montalbano said he had heel spurs.

7          John Marino complained of pain when he was playing

8   sports.

9          These are not the kind of injuries that require an

10  opioid as powerful as 30 milligrams of oxycodone.  In fact, as

11  Dr. Gharibo told you, oxycodone 30 milligrams would make some

12  of these conditions like headaches and anxiety even worse.  And

13  David Taylor knew that.

14         You heard a lot about urinalysis testing, especially

15  from Mr. Carnesi during this trial.  So let's put aside the

16  fact that Vito was tested once in ten years.  Let's put aside

17  that his wife, Lori, was tested twice in eight years.  Let's

18  focus instead on the test results that David Taylor actually

19  kept in his patient files and that he oftentimes signed.  Now

20  for some patients, the drug tests were negative for oxycodone,

21  meaning that the oxycodone they were prescribed was not

22  detected in their urine.  In other words, they were not taking

23  the oxycodone Taylor prescribed.  Taylor knew that.

24         For others, the results showed oxycodone, but not

25  noroxycodone.  Dr. Gharibo explained that noroxycodone is

1    what's called a metabolite of oxycodone.  It's a chemical that

2    a person's body produces when they ingest oxycodone and that

3    should show up in their urine test if someone is actually

4    taking the pills.

5              So how could a person test positive for oxycodone, and

6    then negative for noroxycodone?  You know how.  As John Marino

7    explained, Vito taught the people in his crew to crush up an

8    oxycodone pill and put it in their samples if they were ever

9    tested.

10             Now, as you heard from Dr. Gharibo, doctors are taught

11   in medical school about metabolites and what should be in the

12   results of a drug screening test for someone taking oxycodone.

13   Taylor saw these results.  He knew that these people were not

14   taking oxycodone.

15             Let's look at an example.  Lori Gallicchio did exactly

16   what her husband advised by crushing up an oxycodone pill and

17   dropping it in her sample.  In June 2010, she took a drug test.

18   David Taylor gets this report.  It's in his file.  What

19   happens?

20             She tests positive for oxycodone, but negative for the

21   metabolite noroxycodone.  A report that is in his chart with

22   his signature right there.  He knew that Lori Gallicchio had

23   tampered with her urine, and he didn't care.  He didn't care,

24   and he continued prescribing 30 milligrams of oxycodone for

25   years.

Ic4ntay1                    Summation - Mr. Rodriguez

1           Other people in Vito's crew tested positive for

2      medications that Taylor wasn't prescribing or for illicit drugs

3      like cocaine.  These were all test results that were in David

4      Taylor's files, results that he reviewed and that he knew

5      about, results that showed that these people did not need

6      oxycodone.

7           It was all part of the charade.  David Taylor didn't

8      care about the results of the urine tests, but he did them for

9      the same reason he insisted on having MRIs and x-rays in his

10     file even if they were inconclusive.  He did it to create and

11     paper a file.  He did it for a day like today.

12          So, if someone came asking, he could point to his

13     file.  It's what Taylor and Nicholas Avicolli discussed.

14     Nicholas Avicolli told you that he wanted to make sure Taylor

15     was doing these kinds of things so that he was covering their

16     butts.

17          Taylor, of course, couldn't just hand out oxycodone

18     prescriptions, so he insisted on MRIs sometimes.  He took some

19     notes to make it look like he was taking notes and doing a real

20     exam.

21          Larry Montalbano noticed that Taylor would often just

22     copy his notes month after month.  As Dr. Gharibo put it, his

23     notes looked like they were a kind of rubber stamp.  Just look

24     at these two pages from the chart of Don Michael Carim.  It's

25     the same four lines repeated over and over for six visits in a

1    row: "Pain well controlled.  Rotation, 60 degrees, flexion 80

2    percent, cervical disk disease, continued RX, signed David

3    Taylor.

4           You saw how Taylor papered his chart the same day

5    during the recording of that nonexistent examination of Brian

6    Dolinko making references to the pain being well controlled,

7    cervical, and lumbar disk disease.  You saw the video and you

8    know that these notes bear no resemblance to what actually

9    happened.

10          Taylor wrote in John Marino's chart that he was

11   walking with a slight limp.  Marino told you that he wasn't

12   walking with a limp, and he wasn't faking one either.  This is

13   just David Taylor covering his tracks to make it look like he

14   was practicing real medicine, and the fact that he felt he

15   needed to do that tells you all you need to know about his

16   knowledge.  He knew that there was no medical need for these

17   prescriptions because he tried to make it look like there was.

18          Now, David Taylor knew that the huge amounts of

19   medically unnecessary oxycodone he was prescribing, it was a

20   problem.  He was concerned that these sky high numbers would

21   stick out to pharmacies, insurance companies, and the DEA, so

22   he tried to hide it.

23          You know from Lisa Mercado that pharmacies called and

24   wrote letters all the time questioning Taylor prescriptions or

25   sometimes just refusing to fill them altogether.  And you heard

1    on one of the recordings with Christine Oakes that Taylor

2    didn't want to take on too many new patients, in his words,

3    "'cause then the pharmacies get nervous."  Of course, what he

4    means is new patients mean more and more oxycodone, leading to

5    more and more questions by pharmacies.

6              So Taylor tried to bury these oxycodone prescriptions

7    by prescribing other medically unnecessary drugs.  For example,

8    Taylor wrote John Marino Fentanyl, which Marino didn't ask for

9    and which Taylor didn't tell Marino how to use.

10             Why?  What did he say to John Marino?  Because

11   pharmacies or insurance companies like to see an alternative to

12   the oxycodone scripts.

13             In addition to oxycodone, Taylor also wrote Brian

14   Dolinko prescriptions for Soma and oxymorphone that Dolinko had

15   no idea he was getting.  That's what Taylor did.  He prescribed

16   drugs that patients didn't ask for, drugs that Taylor didn't

17   explain why he was prescribing.

18             He wrote Larry Montalbano prescriptions for MS Contin,

19   a 24-hour slow release opioid.  Taylor told Montalbano that he

20   didn't care if Montalbano didn't take them.  Montalbano just

21   had to fill them.  Taylor prescribed these additional drugs to

22   make it look like he was doing something other than prescribing

23   oxycodone to people who didn't need it.

24             He was trying to make his practice look more like a

25   legitimate one, one where a doctor prescribes different drugs

Ic4ntay1                    Summation - Mr. Rodriguez

1   to different people.  He was trying to hide what he was doing.

2           Nicholas Avicolli told you that there came a time when

3   Taylor reduced the number of oxycodone pills he was prescribing

4   to try and avoid detection by the DEA.  You saw that play out

5   in the numbers.

6           In the fall of 2016, Taylor dropped people in Vito's

7   crew down to 180 pills.

8           Let's look.

9           Don Carim, fall of 2016 dropped to 180 pills.

10          Michael Farley, dropped to 180 pills.

11          Vito Gallicchio himself, dropped to 180 pills.

12          Robert Adams, Vito's brother, dropped to 180 pills.

13          Leonard Danzi, dropped to 180 pills.

14          Brian Dolinko, dropped to 180 pills.

15          Taylor dropped all these patients not because he had

16  examined them and that they were all now in less pain, he did

17  it because he was worried about drawing too much attention from

18  the DEA.  This was all part of a concerted effort by Taylor to

19  try and disguise the massive amounts of medically unnecessary

20  oxycodone he was prescribing to avoid detection.

21          Taylor did what he had to do to protect what mattered

22  most to him, the easy money, visits that lasted only a few

23  minutes, and required no more than the stroke of a pen and that

24  could rake in thousands of dollars each day, the rent money

25  from Vito, the $5,000 in cash from Vito, the gifts big and

Ic4ntay1                    Summation - Mr. Rodriguez

1    small.  You saw David Taylor receive bottles of Scotch and then

2    talk about them on the recordings.

3            Did he look surprised?  Did he say thank you?  No.

4            It was expected.  It was part of the deal.

5            It was a criminal agreement, cash and gifts for

6    oxycodone, massive amounts of oxycodone, not human amounts of

7    oxycodone, an agreement, one that Nicholas Avicolli told you

8    did not require anything more between two professionals than a

9    wink and a nod, an agreement that when David Taylor was kicked

10   out of one of the offices that Lisa Mercado told you about,

11   required him to stand shoulder to shoulder with his longtime

12   partner in the drug trafficking business, Vito Gallicchio to

13   demand his money.

14           It's time to hold David Taylor accountable for the

15   crime he committed.

16           Return the only verdict consistent with the evidence,

17   the law, and common sense.

18           David Taylor is guilty.

19           THE COURT:  OK.  Defense counsel?

20           (Continued on next page)

21

22

23

24

25

1              MR. CARNESI:  Yes.  Thank you, your Honor.

2         May I?

3         THE COURT:  Yes.

4              MR. CARNESI:  Good morning, ladies and gentlemen.  A

5    week ago I stood before you upset with the idea that in this

6    court of law we had finger-pointing and a lot of name-calling

7    and a week later we're still at the same spot.  There can point

8    fingers and they can call names, but eventually it is up to you

9    to evaluate the evidence.  When I speak to you about the

10   evidence, what I submit to you is evidence is the testimony,

11   the exhibits, the things that were introduced that will help

12   you answer what we both agree is the fundamental question.

13   This indictment has one count and it has one question, one

14   allegation:  Did David Taylor enter into a criminal conspiracy,

15   an agreement with other individuals, to dispense what he

16   knew -- he knew -- was in fact unnecessary prescriptions?

17             Well, the first thing that I would suggest to you is

18   obviously the agreement.  I don't think anybody has to tell you

19   what an agreement requires.  It is an understanding on both

20   sides, not just one.  You can't say, Well, I had a sense of

21   things, a wink and a nod.  That doesn't get you by.  Not in

22   this court and not with these consequences.  It is an agreement

23   between at least two parties to advance to do a particular

24   criminal act.

25             In an attempt to prove that agreement, what the

1    government did is they produced Larry Montabano, Brian Dolinko,

2    and John Marino.  Let's start with those three.  Those are

3    three people who each came before you and testified.  They

4    each, whether they knew each other or not, had one very what I

5    submit to you is an extremely important piece of information on

6    this issue of whether there was an agreement between Dr. Taylor

7    and anyone else one consistent story.  They each came to this

8    court with one form or another of an agreement that they had

9    reached with the prosecution to try and take measures to get

10   out from under their own criminal conduct -- their own criminal

11   conduct -- and the consequences of that conduct by helping the

12   government in an investigation or a prosecution of some other

13   individual.

14         So they came here to testify concerning Dr. Taylor to

15   help the government.  And ultimately what is it that they

16   actually could say?  We all knew Vito Gallicchio.  We were all

17   approached by Vito Gallicchio.  We were all told by Vito

18   Gallicchio that if we had some form of an injury or some

19   medical documentation of an injury, we can make money by going

20   to see Dr. Taylor and convincing him to write a prescription

21   and selling it back to Vito Gallicchio.  So we know they had an

22   agreement with Vito Gallicchio.

23         But what happens when they go to see Dr. Taylor?

24   Again, one consistent thing.  Vito Gallicchio prepares them to

25   lie.  You got to go to Dr. Taylor and you got to tell him you

1   are hurt and you are in pain.  They came into the courtroom

2   today or last week and said, Nah, I wasn't really in pain.  No,

3   my injury was really old.  But it is not what they told him.

4   What they told him is what they needed to say in order to

5   advance their agreement with Gallicchio.  Keep the old man in

6   the dark.  See if you can get over on the fool.  But you want

7   to make money with Vito?  That is what it is going to depend

8   on.  And they all did it.  Every one of them told you, Oh, no,

9   when I went in to see the doctor, I told him, I am in pain.

10          Now, we can go back and forth about the medical

11   procedure, the therapy, this and that; but one thing I may

12   agree with with Dr. Gharibo is very simple:  A patient comes in

13   and says, I have a fever; you get a thermometer and take their

14   temperature and you can confirm that.  They come in and say, I

15   broke my arm; you get an X ray and you can confirm that.  High

16   blood pressure?  There is a machine to confirm that.

17          I am in excruciating pain.  I can't function.  I can't

18   do my job.  You can't confirm that.  For good or bad to a

19   certain extent, you're at the mercy of the patient of the

20   person giving you the information.  You can be suspect.  You

21   can try to probe at it, but ultimately pain is what the patient

22   says he is experiencing.  And the function in pain management

23   is to reduce the pain, but also to allow the individual to be

24   put back in a position where they can function on a daily

25   basis.  If that requires medication, then that is the

obligation -- to treat them with the medication.

As far as whether all of this was understood from the
beginning, well, let's go back to Mr. Marino for a second.
Mr. Rodriguez mentioned to you, you know, Mr. Marino told him,
Tell Dr. Taylor or mention to somebody that he was recommended
by Vito Gallicchio.  But he went in there with a whole disc of
his medical problems supporting his medical problems.  He went
in there and, I am an athlete and I am this; but when he was
talking to the doctor, ultimately he had to say the opposite.
Of course I told the doctor I was in pain.  I was there to get
medication.  My plan, of which the doctor was not a part of the
conversation I was having with Vito, was to sell the medication
to Vito; but that is what I had to do to get the medication.

The first visit, Vito's name or not, he doesn't get
any medication.  First visit he gets a drug test.  What do you
know about drug tests?  Mr. Rodriguez just showed you.  See,
there is a drug test.  If you read it this way, you see it is
positive for Oxycodone and it shows negative for a number
things including this product that breaks down the Oxycodone in
your body.

It just occurs to me that the purpose of the drug
tests, which the drug its obviously understand, is to make that
determination is the patient taking it or not taking it.  Look
at those things.  Is there an asterisks next to that finding
with regard to that metabolic?  Is it underlined in red?  Is it

IC46TAY2                       Summation - Mr. Carnesi

1    flashing red lights saying, Whoa, wait a second.  We're

2    confirming there is Oxycodone in here, but it didn't go through

3    his system according to this test.  No, it just says along with

4    other chemicals it is not present in there.

5            In Marino's situation it wouldn't have been.  Marino

6    goes back to the doctor.  He is then in a position where he

7    receives prescriptions.  He out of the presence of the doctor

8    in a separate deal with Vito Gallicchio sells his pills to Vito

9    Gallicchio.  But he was urine tested.  And what you do know

10   about urine tests?  Dr. Gharibo said you are not even

11   required -- you are not required -- to give urine tests.  So

12   again when you come to this fundamental issue that you have to

13   decide, and only you have the ability to decide this issue, of

14   did you enter into an agreement and did he understand what Vito

15   Gallicchio was doing, when you ask yourselves that and ask why

16   would he then be taking this unnecessary step of requiring

17   urinalysis?

18           Why would Vito Gallicchio not only have to do

19   counseling of these individuals outside the presence and

20   hearing of Dr. Taylor?  Hey, listen you may end up with a urine

21   test, but here is how you beat the test.  I think he told

22   Marino, Take the pill before the test.  Marino, he didn't want

23   to take one pill.  He said, I wasn't going to do that.  So he

24   tells everybody else, Just grind up the pills and put it in

25   your urine.  Why?  Why if everybody is in and that is the

IC46TAY2                        Summation - Mr. Carnesi

conspiracy?  Everybody understands what is going on.  He is a
willing participant.  Why do we have to get over on him?  Why
are we fooling him?

Why is Denise Suarez if every patient in there
understands this is Dr. Taylor and he is just going to write
Oxycodone and he is a part of this criminal agreement, why are
patients paying Denise Suarez not to submit their urine for
analysis?  Why are they telling her, No, we don't want to get
tested because we don't want to get thrown out of the practice.
If everybody is part of this conspiracy, why do you have to pay
her?  He is in on it.  He is not throwing anybody out.  Why?

Eventually John Marino gets tested.  His urine turns
up clean.  He gets thrown out.  He may have introduced himself
as Vito's friend.  He may have had something going on with Vito
outside the presence of Dr. Taylor.  The test comes up clean;
he is out.  Don't let anybody fill you with nonsense about oh,
well, wait a second there was this guy in the waiting room and
I think he went back and he told Vito and then Vito must have
told the doctor to throw me out.  No, there is no evidence of
that.  And the one thing you are here to do is to decide this
case on evidence.  So let's not let anybody fill in
conversations that there were absolutely no proof of.  Let's
not presume that some individual had a conversation with Vito.
There is no proof of that.  Let's not resume that Vito had a
conversation with the doctor.  There is no proof of that.

IC46TAY2                    Summation - Mr. Carnesi

1    Let's just confine ourselves to the evidence.

2            You had Lisa Ricardo.  She told you initially she was

3    doing the billing for Dr. Taylor.  Then she told you that

4    initially at least when she was doing Dr. Taylor's billing, a

5    good portion of that billing was home visits and hospice

6    patients.  That's the background, the treatment of hospice

7    patients, home confined patients that Dr. Taylor brings to his

8    practice.

9            It is probably philosophically a great deal different

10   than Dr. Gharibo brings to his.  Dr. Gharibo has a certain

11   approach.  He spoke in the course of his expert testimony about

12   guidelines and his guidelines in dealing with certain

13   situations.  His experience and his background is different

14   than Dr. Taylor's.  His practice, although it's what he refers

15   to as a pain management practice and he seems to be imminently

16   qualified of what he does, but his practical experience is

17   five -- less than 5 percent of his patients involve use of

18   opioid treatment.  Less than 5 percent.  Think of your own

19   experience and think of, I don't know, almost anything else in

20   life where you can say, Well, I've had 5 percent experience in

21   my life with these things.

22           I am a criminal defense lawyer for 40 years, but 35

23   years ago I did three divorces.  Would you come to me as an

24   expert divorce lawyer?  I doubt it.  Is there any area in life

25   where someone says based on 5 percent practical experience, I

1   am an expert in that area?  I doubt it.

2           With regard to, again, hospice care.  Dr. Gharibo

3   referred to it.  Mr. Rodriguez referred to it.  It is a big

4   difference.  It is not what we're talking about at this point

5   in this case, but it is part of the experience that goes into

6   how an individual, a doctor, practices, what the nature of his

7   practice is.

8           Ms. Mercado also told you a little bit about Dr.

9   Taylor.  Mr. Rodriguez referred to it as a dispute that they

10  had over withholding his checks because there was an open bill

11  regarding services or whatever.  He got upset and you saw how

12  upset she got because apparently she had had a pretty good

13  relationship with him.  She told you it seemed so out of

14  character.  He was a nice elderly man and it seemed like he was

15  being manipulated.  Well, we resolved the dispute and a couple

16  minutes later he got his checks and a few minutes after that

17  consistent with I think the impression that I got from her as

18  to her relationship with the doctor is he called and

19  apologized.

20          One of the other individuals we heard about rather

21  directly from is Julio Clark.  Now, Julio Clark again was

22  another one of these individuals who was misusing his

23  prescriptions, selling his prescriptions.  He told you that at

24  some point that there was someone in Dr. Taylor's office who

25  was actually duplicating prescriptions.  In other words, he

1    would pick up a prescription for Dr. Taylor and when he went

2    out to the front desk, somebody at the front desk had put in an

3    additional prescription so he was walking out with two

4    prescriptions at a time.  I think this is some indication or

5    should be considered as some indication that Dr. Taylor may not

6    have been on top of everything that was going on in his office.

7         There were a lot of people as I mentioned to you in my

8    opening statement who betrayed Dr. Taylor and who took

9    advantage of him, people who he thought were friends of his.

10   People like Gallicchio that offered to run around and do

11   errands and help him paint and pick up his mail.  Gallicchio is

12   a cigar guy.  He would bring him cigars.  His brother had a

13   butcher shop.  I will bring you some special stakes from my

14   brother.

15        The question is whether or not you believe that the

16   doctor was taking stakes from Vito Gallicchio because he

17   understood that he had this agreement, this criminal conspiracy

18   with him, or was Vito Gallicchio just cozying up to the doctor

19   to softening him up to see what he could slip by him?  When you

20   consider that, consider that Mr. Rodriguez is talking about

21   money that was paid for office visits.  Allegations.  There

22   were allegations of $5,000 cash.  How do you know there was

23   $5,000 cash?  Well, Vito Gallicchio.  Vito Gallicchio didn't

24   come in here and testify.  As to all the witnesses who did,

25   where is the opportunity to cross-examine these witnesses.

1          Twenty minutes ago Mr. Rodriguez showed us Vito

2     Gallicchio's picture up here and he talked about what a

3     despicable, miserable excuse for a human life Vito Gallicchio

4     is.  Yet at the same time because Vito Gallicchio for his own

5     purposes may have told the story, Oh, yeah, I do this for the

6     doctor and I do that and I had to give him $5,000 or a paid his

7     rent, for which there is absolutely no proof, never repeated

8     under oath, never tested by cross-examination; but because it

9     fits their narrative, suddenly it is the gospel according to

10    Vito Gallicchio.  Vito said it should be true.  Vito if the

11    evidence has shown anything is a drug-dealing, manipulative,

12    miserable human being who had no problem in taking advantage of

13    anyone that he could.

14         He went into a real conspiracy with Nicholas Avicolli.

15    No doubt about that.  They clearly agree that he was going to

16    buy drugs directly off the truck essentially before they even

17    really got into the pharmacy from Avicolli so he could sell

18    them back on the street, and then he was robbing Avicolli as

19    well.  But because Vito said this to somebody, suddenly, oh,

20    there's something we can rely on.  It makes no sense.

21         Going back to Clark.  Clark is one of those guys they

22    sent him in with a bottle of scotch.  What is the story with

23    the bottle of scotch?  Doc, here is a bottle of scotch which is

24    going to influence how you treat me and what you are going to

25    do for me.  No, he says, Doc, I was down at the Army base and I

IC46TAY2                    Summation - Mr. Carnesi

1      know you like this, this scotch, and they had got a good price.

2      They have things so much cheaper so I got you a bottle of

3      scotch.  Oh, by the way, I am going through these pills too

4      quickly, can I get more pills?  Can you write me a bigger

5      prescription for these pills.  No.  No.  And if you are having

6      a problem with the pills, you should consider entering into a

7      rehab.  Consistent with this conspiratorial agreement?  Hardly.

8      Consistent with the idea that my acceptance of your bottle of

9      scotch requires me to write additional quantities of this

10     Oxycodone to you?  Apparently not.

11             Then you have Mr. Avicolli.  Mr. Avicolli I submit to

12     you is a case study of an individual who just refuses to accept

13     responsibility for his own conduct.  What do I mean by that?

14     Well, he was very, very emotional on the stand.  He seemed to

15     be very upset with his situation.  But how does he get into

16     that situation?  First of all, he wants to say I had other

17     problems.  I thought I had a great marriage, but apparently I

18     had marital problem.  I don't know what the marital problems

19     are and I don't care.

20             And then he had these financial problems.  Think about

21     the individual who we're talking about.  He has financial

22     problems.  He owns a pharmacy and he owns a catering business

23     at that point.  And he says, Well, those divorce lawyers cost

24     me a lot of money.  Maybe the pharmacy business isn't going too

25     well, but he has two businesses.  He didn't close either one of

1    the businesses at the time.  He didn't sell either one of the

2    businesses.  He keeps two businesses.

3         He borrows money.  He doesn't go to Bank of America or

4    wherever to borrow this money.  He goes to a loan shark.

5    Initially he borrows I think the figure was around

6    220-some-odd-thousand dollars from a loan shark.  He has to

7    make weekly payments.  They are high.  They are not even

8    reducing the debt.  That is crushing, a crushing burden on him.

9    But he got out of that.  How?  Because his family bailed him

10   out.  His mother and father took out a reverse mortgage he said

11   and he had a friend.  This Nick Pope.  They got him out from

12   under this crushing burden and paid off his loan shark.  He

13   still has his two businesses.

14        Then what did he do?  What did he do after his family

15   stepped up and bailed him out of that situation?  He went back

16   to the loan shark and he borrowed another half a million

17   dollars from the loan shark.  Now he has a bigger, bigger

18   problem; but he still has the two businesses.  He hadn't sold

19   them.  These businesses you wants to tell you they weren't

20   doing that well.

21        Vito Gallicchio approaches him and makes this overture

22   and says, We can make some money if you divert some of your

23   medications to me.  We can make some real money.  Huh-uh, he is

24   not sure he wants to do that.  It took him about a week or two.

25   He thought it over and he reaches out to Vito, Yeah, we can do

1    business, and he does business with Vito.  Big, big business.

2    Criminal-conspiracy type business, an agreement between him and

3    Vito.  Not a wink and a nod.  Not unstated.  Very clearly

4    stated.  $10 a pill.  Every bottle of 100 pills yields him

5    $1,000.

6              This goes on for about somewhat less than two years.

7    In two years Nick Avicolli pockets just from his transactions

8    directly with Vito from the UPS truck to the pharmacy door to

9    Vito's car a million dollars.  $1 million.  Not stakes.  He

10   didn't do it for stakes.  He didn't do it for scotch.  He

11   didn't do it for a refrigerator or whatever the story was with

12   the appliances.  You only know how far the story went.  You

13   know Vito went and purchased and had them shipped there.  You

14   don't know what happened after that.  You don't know if he got

15   reimbursed.  You don't know whose money he used to buy them in

16   the first place.

17             In any event, Avicolli got a million dollars.  Vito

18   Gallicchio, who lives in this very nice house with this

19   backyard that is worth more than the house itself, who drives a

20   various points in time Bentleys and Corvettes and some high-end

21   cars for five at a time.  If he is paying Avicolli a million,

22   he is telling them at a profit.  Assuming he is doubling his

23   money, he is making at least a million on that.

24             You know one of the ways that they catch drug dealers?

25   You get a guy and he says, I work at pizzeria and I make

1   $50,000 a year.  Yeah, but you check and you find out he spends

2   half a million dollars of a year.  He has this source of income

3   nobody is aware of.  They told you they went to the doctor's

4   house and they turned every upside down.  They examined his

5   financial records.  They didn't find 10 cents that he made.

6   This is an agreement, a criminal conspiracy, an agreement

7   between the parties and somehow or another his part of the

8   agreement was, You guys take the money and I will take the

9   stakes and the scotch.  That's what they want you to believe.

10  Maybe he wasn't on top of his game.  Not that he was trusting

11  and not that he is too tired, but that is his part of the

12  agreement -- you guys get the money.  I will just take the

13  scotch and the stakes.

14         Avicolli is pretty much in the same situation as we

15  talked about with the others.  What is the deal?  He is in a

16  lot of trouble.  He is a prototype of never accepting

17  responsibility for what he did.  He got up there and cried to

18  you.  He didn't cry to you because he made a million dollars

19  and put in his pocket.  He cried to you because he got caught

20  at it and now he is looking at -- what did he say? -- 20 years.

21         Now he wants to make a deal.  She he makes a deal.

22  His deal says, You have to tell the truth.  But that truth --

23  that truth -- has to help us.  It has to help us to prosecute

24  or investigate another individual.  There is only one guy

25  sitting here.  So now you get this kind of testimony.  Well,

IC46TAY2                    Summation - Mr. Carnesi

yeah, I mean Vito never told me that the doctor knew what we

were doing.  And I had conversations with the doctor, but I was

careful not to tell him what we were doing.  But, you know, it

wasn't stated.  It wasn't stated.  It was kind of understood.

This is the evidence.  This is the evidence for which

they are asking you to allow them to point a finger at that man

and say you are a drug dealer.  Not because you agreed with

Vito Gallicchio or you agreed with Nick Avicolli but because

Nick Avicolli has these powers of telepathy from which he

discerned, yeah, you know, he understood.  He understood what

it was about.  I never gave him 10 cents.  I never talked about

all the money I was making with Vito.  I never asked him what

he was doing with his money or if Vito was paying him the right

amount of money from his share.  We never talked about

anything; but nevertheless we had an agreement, an agreement

sufficient to determine that we can strip this man down and

call him a drug dealer.

Dr. Gharibo, we talked about him a couple minute.  I

want to reemphasize what I think is a pretty basic point and

that is that clearly he had his opinions as to what he thinks

would be the appropriate medical care under the circumstances

and how you must start with a particularly low dosage and then

progress upwardly.  How you can't keep someone on medication

for an extended period of time.  I just want you to remember

one thing:  This isn't about who is a better doctor.  This

 1    isn't about whose procedures made more sense.  This is about a

 2    criminal case.

 3          Dr. Gharibo enjoys his privilege to practice medicine

 4    in the State of New York because.  He is granted a license by

 5    the Department of Health of New York State as is Dr. Taylor.

 6    The New York State Department of Health has within in it what

 7    is referred to as the Board of Professional Medical Conduct.

 8    It's not opinions.  They are the board that acts on behalf of

 9    New York State to determine whether or not you are fit to

10    practice medicine in New York State or whether or not there is

11    a need for you to be disciplined within New York State.

12          What Dr. Gharibo told you is, Well, yeah, his opinion

13    is you have to start no more than 40 milligrams a day, but that

14    board has no such regulation.  That board does not require that

15    a doctor write less than 240 pills a month or 180 pills a

16    month.  That board does not say that a doctor cannot prescribe

17    a certain type of medication for more than a year.  If you

18    think about it, there's pretty good reason for that.  Because

19    what they want to do is they want to allow a certain degree of

20    independence, a certain degree of flexibility to the doctor --

21    the doctor's knowledge, the doctor's experience, the doctor's

22    interaction with the patients.  So they don't want hard and

23    fast computer rules.

24          You saw all these records that are all generated.  How

25    simple would it be if that was the standard medical practice?

1    Just think about this for a moment.  Standard medical practice

2    as Dr. Gharibo says can't, cannot, it is not medically

3    responsible to write a prescription for more than 40 milligrams

4    of Oxycodone a day.

5           So what happens?  What happens with all these

6    prescriptions now?  The first prescription is written.  The

7    prescription goes out.  There is a computer system.  The

8    pharmacist has to file it.  There is a record, John Marino

9    received a prescription today and John Marino's prescription

10   covered -- pick a number -- I said 40.  Let's say it covered

11   90 milligrams a day.  It's above our guideline.  It goes into

12   the computer.  The computer now knows John Marino.  We have no

13   other prescriptions for him.  This is the first prescription,

14   90 milligrams a day.  Bing, bing, bing.  The red flag goes off.

15   Call the doctor.  Doc, that is not a medically approved

16   prescription.  You cannot write that.  It is against our

17   regulations.  It is very simple -- very simple -- thing to

18   police.

19          That is not what they do.  The reason they don't do it

20   is because they want the doctors practicing medicine.  They let

21   the doctors decide and the doctors decide what Dr. Gharibo told

22   you.  If they are dealing with their own patients, let me tell

23   you, I talk to my parents.  I ask him, How often do you have

24   the pain?  What is the pain?  Describe the pain.  He told you

25   despite the tests, despite whatever other things or steps we

 1    may take, what we rely on primarily is what the patients told

 2    us.  That is the fundamental part of our diagnosis.

 3           Think about that for a minute.  That is the way he

 4    practices medicine.  He will not act unless he is spoken.  He

 5    will not have an opinion regarding his patient unless he has

 6    spoken to the patient.  Then ask yourself, he came in,

 7    collected his check, and gave you an opinion based on 12 files

 8    of patients he never spoke to.  Wouldn't do it in his practice,

 9    but he will criticize him -- he will criticize him -- because,

10    oh, he didn't need to talk to him.

11           You saw little snippets of video.  He commented on

12    videos.  Would you agree 100 percent.  Were any of them the

13    initial visits?  No.  Were they follow-ups?  Essentially the

14    follow-up.  How you doing?  How is the pain?  Is it manageable?

15    Medication working?  Have any adverse effects?  He may not have

16    asked all those questions directly, but that is what they were

17    about.

18           If I am the doctor and you are coming in to see me and

19    you are having a problem with your medication, you are going to

20    tell me.  Doc, I cannot sleep at night when I am taking this

21    medication.  Doc, it has got me bouncing off the walls.  It is

22    this or that.  If you are there what is, Yeah, it's okay?  What

23    does that mean?  It means the course of treatment we're taking,

24    it's allowing me to function.  It doesn't hurt as much anymore.

25    It is working.  What else do we got to know?

1          It's like walking in the middle of the movies into two

2     minutes of a snippet of a movie and figure out what happened

3     before that.  You can't.  It is relevant for those two minutes

4     for what it was, a follow-up visit, how you doing.

5          Well, there are things Mr. Rodriguez pointed out that

6     he should have known.  He should have been more suspicious or

7     he should have questioned this or questioned that.  Well, he is

8     a product of his experience.  He is at this point in his life a

9     man of advanced age.  It may have been an easy target.  These

10    people may have been particularly good at what they did.

11         You heard Christine Oakes and you heard her tape and

12    you heard Mr. Rodriguez again.  Think about Christine Oakes.

13    Agent Del Rosario testified and he mentioned her.  And that

14    man, he is good at what he does.  He is a smart, professional

15    young man at the top of his game and his game is to be

16    suspicious and suspect of the people he meets professionally.

17    And he meets Christine Oakes and what does he know about

18    Christine Oakes when he meets her?  He knows she is a drug

19    dealer.  They surveilled her before he said two words to her.

20    They caught her in drug deals.  He knows she is a drug dealer.

21         He brings her into the office to try to speak to her

22    and she's amenable and she wants to cooperate.  She wants to

23    make a deal because she doesn't want trouble for what she did.

24    I don't know what her voice sounded like then.  I don't know

25    what her voice sounds like.  In any event, he says to her, We

1    surveilled your other drug deals.  We caught you.  Me?  No, not

2    me.  We did, yeah.  Here, let's go to the videotape.

3            He put it up on the tape for her.  She looks at

4    herself on the tape being video-taped in the middle of these

5    drug deals -- multiple drug deals -- and looks the man in the

6    eye and says, No, that's a lie.  That's not me.  But he decides

7    let's make a deal with her anyway.  So you know she is a drug

8    dealer.  You know she is a stone-cold liar.  He made a

9    decision, let's make a deal with her because, you know, she'll

10   be honest with us at this point.  Right?  We can trust her.

11           What happened?  Well, then you find out that she made

12   an unauthorized visit.  You weren't aware of that.  She got a

13   prescription filled.  And of that bottle of 240 pills or so,

14   210 disappeared.  210 disappeared within days of filling that

15   prescription.  Smart, professional, certainly not gullible, at

16   the top of his game, young, sharp man she got over on him.  She

17   did.  They were good.  They were good at what they did.  If

18   they could fool him, fooling him was not all that hard.

19           Thank you, ladies and gentlemen.  Please keep an open

20   mind.  Hold them to their burden of proof.  Thank you.

21           THE COURT:  Any rebuttal summation?

22           MR. ROOS:  Yes, your Honor.

23           Mr. Carnesi, just spent the last hour or so talking to

24   you and trying to talk you out of your common sense.  Because

25   your common sense, well, it tells you that the defendant, David

 1   Taylor, was not running a medical practice.  He was running a

 2   pill mill.

 3           Now, you know what Mr. Carnesi didn't mention?  The

 4   across-the-board pill numbers, the high maximum doses of

 5   Oxycodone.  Your common sense tells you that a doctor who

 6   believes he is legitimately prescribing medicine, he is not

 7   writing prescription after prescription after prescription of

 8   180 Oxycodone, 240 Oxycodone.  An expert called this number a

 9   nonhuman dose of Oxycodone because it is so ridiculously large.

10           You know what else he didn't mention?  The letter from

11   the fire department where the doctor said, Hey, this guy is

12   good enough to exercise but still just kept giving him that

13   Oxy.  Your common sense tells you that is no legitimate doctor.

14   No legitimate doctor does that after a five-minute visit, no

15   physical exam, no questions.

16           A doctor who is actually engaged in pain medicine

17   practice doesn't give Oxycodone to a guy like Vito Gallicchio.

18   You heard all sorts of things about this doctor being tricked.

19   We're going to talk about that, but tricked by video, a guy who

20   clearly didn't need the Oxycodone.  No, no, your common sense

21   tells you that is not right.

22           Guess what?  It is not just Vito.  It is Vito's wife.

23   She got those 240 pills.  It is his brother and nephew and the

24   nephew's roommate and the driver and the driver's wife and the

25   local pizza delivery guy.  They all got 240 Oxy also, but the

1    doctor was tricked.  That is what Mr. Carnesi is telling you.

2            Your common sense tells you that is not the case.

3    Your common sense tells you doctors don't get boxes of cigars

4    and they don't get bottles of whiskey that can lie in their

5    houses.  They don't get refrigerators and washer and dryers.

6    There are not $150 payments in cash to the doctor in the exam

7    room or 5,000 in an envelope passed.  You know what you don't

8    hear?  Rent payments.  Vito Gallicchio giving out rent

9    payments.  No, your common sense tells you that is not pain

10   management.  It is called drug dealing.

11           This hasn't been a long trial, folks.  It hasn't been

12   a complicated one.  Mr. Rodriguez summarized the evidence.

13   David Taylor prescribed thousands of pills of Oxycodone to

14   people he knew did not need it.  That is why he is guilty.

15           Now, it is the government's burden of proof in this

16   trial.  We embrace that burden.  The defense doesn't have to

17   say anything.  It doesn't have to do anything.  It doesn't have

18   to make any arguments; but when they do -- and Mr. Carnesi just

19   made a number of them -- you should scrutinize them.  You

20   should think about them carefully.  What he is saying makes

21   sense?  Is it supported by the evidence?

22           I am not going to address everything that he said.  He

23   spoke for about an hour and frankly I don't have the time to

24   address it, but I don't think you need me to address all of it.

25   You paid close attention.  You know the answer to many of the

IC46TAY2                        Rebuttal - Mr. Roos

1    things he posited.  He said, Well, there is a lot of things

2    that happens when someone says the word okay.  Folks, you know

3    what the meaning of okay is.  It is not a hidden meaning there.

4    You don't need me to tell you about it.

5          He talked about the office staff who was actually

6    responsible for the whole conspiracy.  Folks, you know the

7    answer there.  You know there wasn't one office person who is

8    actually behind the whole conspiracy.  You don't need me to

9    tell you that.

10          What I do want to talk about is a few points about the

11    conspiracy and what the doctor knew.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Mr. Carnesi, well, he started out with this argument

2     that there needs to be something more of an agreement,

3     something more explicit than a wink and a nod.  That is not

4     right.  That's actually not correct.  I expect Judge Carter

5     will instruct you that an agreement does not need to be

6     explicit.

7          You should listen to Judge Carter when he gives you

8     these instructions.  It would in fact be quite unusual for an

9     an agreement to be explicit.

10          Nick Avicolli, he said between two professionals you

11     don't need to say it explicitly.  There is an understanding.

12     There is no explicit conversation that is required.  They had

13     an understanding, a wink and a nod:  You write the

14     prescription, I will fill it, we both make money.

15          The same was said by Larry Montalbano.  He

16     understood -- and you remember the sort of the line one hand

17     washes the other, both hands wash the face, you do for me, I do

18     for you.

19          That is an agreement.  That is an understanding.  Even

20     if it were necessary for there to be an explicit agreement, you

21     have that.  You've got it.  Vito told Larry I need to give

22     $5,000 in cash to the doctor or else we are all out of

23     business.  That is explicit.

24          Let me just say something about what you heard from

25     some of these patients up there on the witness stand under oath

796

Ic4ntay3                          Rebuttal - Mr. Roos

1   about what Vito said to them.

2            Mr. Carnesi, you know, he's saying, well, you didn't

3   hear from Vito, and Vito, he is a bad guy.  You can't trust the

4   things he's saying.  Each of those witnesses was asked, Hey,

5   was Vito a liar?  Was he boastful?

6            Yeah, he's a bad guy.  But did he make these things

7   up?  Each of them said no.  Mr. Carnesi pressed them on this,

8   and each time they said no.

9            Why would Vito make up something like I had to give

10  $5,000?  No one wants to part with their money.  Why would you

11  brag and say he forced me to give $5,000 or else we would all

12  be kicked out?

13           It doesn't make sense.  That's why you know they are

14  telling the truth.

15           There are some other reasons why you know the

16  witnesses are telling the truth.  Their incentives, their

17  incentives to tell the truth.  You have heard about that.

18  There's other evidence that shows they are telling the truth.

19  For instance, when they say we gave gifts.  Vito gave a

20  refrigerator.  He told me.  Folks, you saw the receipt from the

21  refrigerator.  You saw the receipt for the washer dryer

22  purchased by Vito shipped to David Taylor.

23           You don't need to rely solely on the witnesses you

24  heard.  There is evidence that backs up what they say.  Now,

25  Mr. Carnesi, he spent the majority of his time talking about

1   how the doctor, well, he was tricked.  He was duped.

2           Really?  Do you believe this story?  This is all

3   happening right in front of Dr. Taylor, and he didn't know.

4   According to Mr. Carnesi, basically a doctor needs the

5   equivalent of a Price is Right, where you've got lights

6   flashing and everyone then is alerted to the red flags that are

7   right in front of them.

8           Your common sense tells you that's not the case.  And

9   Mr. Rodriguez went through all of the evidence of why the

10  doctor knew exactly what was going on, so I am not going to go

11  through it all.  I don't need to waste your time with that.

12          But you know what I do want to point out?  You know

13  who wasn't tricked?  The patients.  They said it was known if

14  you wanted oxy, you go to Dr. Taylor.  They knew why everyone

15  in the exam room was there, to get oxycodone.

16          Who else wasn't tricked?

17          The office manager, Lisa Mercado.  No medical

18  training, didn't work with the doctor for that long, but she

19  sees it like it is.  There is a lot of diversion and a lot of

20  addicts in the waiting room.

21          Who else?  The pharmacist, Nick Avicolli.  He said

22  just the way they walked in was a clue.  The way they spoke.

23  The fact that they said, How's the day going?  Let's talk about

24  the Yankees.  Those were clear signs to him that they didn't

25  need those pills.

1          Then, of course, the other pharmacists and the

2    insurance companies that were sending letters and putting

3    Dr. Taylor on the banned list.  It was clear to them.  But it

4    wasn't clear to this guy.  That's what you are hearing here.

5    Folks, that's ridiculous.  It's clearly ridiculous.

6          You know, Mr. Carnesi said you are at the mercy of

7    these patients when you're the doctor, and that's not right.

8    That's contrary to your common sense.  Dr. Gharibo said you

9    don't just take their word for everything.  You run advanced

10   diagnostic tests, look at the chart, you ask probing questions.

11   You don't just say, How you doing?  OK.  180 oxy.

12         But you don't need an expert to tell you those things.

13   You don't need an expert to say what is already intuitive to

14   you.  You don't need an expert also to tell you that this was

15   not a medical practice, and you don't need an expert to say you

16   have got to do some type of physical exam.  You should ask

17   questions about the pain, you should consider doing an MRI, you

18   should prescribe something other than a painkiller that is the

19   equivalent of heroin, and maybe you shouldn't take gifts and

20   cash and money and all of these things.

21         That's why this is not a medical practice.

22         Now, Mr. Carnesi called out a few of patients.  I'm

23   not going to go through all of them, but I want to make a few

24   observations.

25         John Marino, football player, basketball player, mixed

1    martial arts, goes to the gym five nights a week.  This is not

2    the type of person who needs oxycodone, and Dr. Taylor knew

3    that just from how he presented.

4              But what did he write in the chart?  Limp.  That tells

5    you something.  You don't make up things and put them in a

6    chart unless the whole thing is a giant charade.

7              Who was John Marino's roommate?  That is somebody you

8    didn't hear about.  It's Don Carim.  And Don Carim is the one

9    who got the letter from the New York City Fire Department,

10   because he's able to run a mile and a half and sure can do some

11   pushups, but in the months after he writes that letter, he

12   keeps giving him oxycodone.

13             I want to say a few words about urinalysis testing.

14             Number one, don't get distracted.  The urine testing

15   is just a small part of a much larger issue in this case, which

16   is that these prescriptions were not medically necessary.  But

17   think about the things that Mr. Carnesi did tell you about the

18   urine tests.  Even if he can or can't understand what

19   noroxycodone metabolites are, it doesn't matter, but there are

20   urine tests that showed people testing negative for oxycodone.

21             There were urine tests showing Don Carim testing

22   positive for cocaine; people testing positive for drugs this

23   doctor wasn't prescribing.  That tells you something.  You

24   don't need to go to medical school to know that.  Although,

25   hey, we heard you learned this thing about the metabolites in

Ic4ntay3                       Rebuttal - Mr. Roos

1    the second year of medical school.

2              And you know what else?  Those urinalysis charts --

3    and they are in evidence, you can take a look at them -- they

4    say in block letters review, and right next to it the doctor's

5    signature.

6              So don't get hoodwinked into this idea that the urine

7    tests matter or that somehow somebody manipulated a urine test

8    and that makes a difference.  By the way, the testimony or the

9    stipulation about that woman, Denise Suarez, is that she didn't

10   even do that for Vito's patients.

11             Let me say a word about the law here.  Judge Carter

12   will instruct you about the law that applies in this case.

13   He's going to tell you there are two ways you can find the

14   defendant guilty of the conspiracy.

15             The first, he knew that the prescriptions he was

16   writing weren't medically necessary.  That's been proven.  You

17   know that.

18             The second is that he can deliberately shut his eyes

19   to what otherwise would be obvious.  That's called conscious

20   avoidance, willful blindness.  If Dr. Taylor was aware that it

21   was very likely that his prescriptions weren't medically

22   necessary and he just kept writing them anyways while

23   deliberately avoiding confirming, learning that they weren't

24   necessary, then that is another way he's guilty.

25             You heard a bunch of evidence about that, too.  There

1    are all these red flags right in front of him and he

2    deliberately avoided confirming the fact that Vito's crew

3    didn't need the pills.  He didn't examine them, he didn't urine

4    test them, he ignored their bad urine tests, he didn't ask them

5    if they were taking the pills.  Why not?  He avoided asking

6    those questions because if he did, he would have confirmed what

7    he already knew:  These people didn't need the oxy.

8          Common sense doesn't get checked at the door of the

9    examining room.  That's why you know that the doctor knew.

10   Don't let Mr. Carnesi convince you to check your common sense

11   at the door of the courtroom.

12         Mr. Carnesi, well, he made a point about the experts.

13   The expert, you know, he has a practice that's sort of what we

14   would dream of for a medical practice.  But you know the doctor

15   was doing things different.  The doctor sort of was doing

16   hospice.

17         You know this doesn't make any sense.  First of all,

18   Vito's people, not in hospice.  None of them are dying.  We

19   know that because Vito gets his pills for a decade, 240, 180

20   for a decade.  The same with his wife, the same with his

21   nephew, the same with his nephew's roommate, the same with the

22   pizza guy.

23         It's not about who's a better doctor.  We agree about

24   that.  This is a criminal case.  This wasn't about mistakes in

25   prescribing.  This doctor was selling pills out of his office

Ic4ntay3                              Rebuttal - Mr. Roos

1    with a prescription pad.

2            So let me talk about what he was getting.  Defense

3    counsel, he sort of belittles this and he says, you know what,

4    steaks and cigars, really?  Like he sells his medical practice

5    out for steaks and cigars?

6            You know it is more than that.  Dr. Taylor, he needed

7    the business.  You heard the testimony.  He got kicked out of

8    one medical practice, and he needed Vito's help to start a new

9    one, to pay the rent, to draw in the patients.  That's his

10   motive.  The more patients, the more business, the more money.

11           Vito brought the people to him.  That's why it made

12   sense.

13           The same way for Nick Avicolli.  It made sense to have

14   a volume business, the more people bringing in prescriptions.

15   It made since for the doctor.

16           just think about the math a little bit.  Taylor, he

17   charged something like 50 to 150 per visit, right?  You saw the

18   chart that said he wrote 20,000 oxycodone prescriptions.

19           So do the math.  20,000 visits.  Now, not all of those

20   are Vito's crew, but you saw evidence of hundreds if not

21   thousands of them were Vito's crew.  That's a lot of money.

22   Let's say a hundred dollars times a thousand or 20,000 if

23   they're all bad prescriptions.  That's millions.

24           That's why it made good financial sense for Taylor to

25   turn his practice into a pill mill.  That's not even counting

1    the side payments that Vito made.

2              There are other bribes, some big, some small, like a

3    TV, a washer dryer, refrigerator, whisky, cigars, steaks,

4    chicken parm.

5              It is not just about the steaks and cigars.  It is a

6    cash business.  It makes good financial sense.  And, hey, once

7    you sold your business out, at that point you might as well

8    just ask whatever else you want.  The extra perks, the chicken

9    parm, the steaks, cigars.  Vito's living a good life.  The

10   doctor wants it too.  That's why when he wants something he

11   gets it.

12             I am going to sit down in just a moment.  You have

13   heard enough talking from the lawyers today.  You have paid

14   very close attention.  We appreciate that.  You have seen the

15   evidence.  You have heard the witnesses.

16             So, let me just leave you with this:  Just because a

17   case goes to trial doesn't make it hard.  It doesn't make it

18   complicated.  It doesn't make it close.  This is not a close

19   case.

20             You know what happened.  David Taylor flooded the

21   streets with a highly addictive, powerful drug, a drug similar

22   to heroin that destroys lives.  Why he did it doesn't really

23   matter.  What matters is that there was no medical reason for

24   it.  He wrote prescriptions for oxycodone that people did not

25   need, and he knew it.

1          He knew it, but he kept prescribing them anyways.

2          This was all choice.  He wasn't tricked.  He wasn't

3   duped.  It wasn't a giant conspiracy against Dr. Taylor.  He

4   was part of the conspiracy.  He was part of the conspiracy with

5   Vito and his crew, and he did very well by it and he did it for

6   years.

7          It was destructive.  Its effects are tragic.  That's

8   why it's a crime.  He knew what he was doing, and now it's time

9   to hold him accountable for what he's done.  He's guilty.

10         THE COURT:  OK, members of the jury.  We are going to

11  take our break for 30 minutes.  Don't discuss this case amongst

12  yourselves, don't discuss it with anyone else, and don't let

13  anyone discuss it with you.  Don't conduct any independent

14  research regarding any of the issues, parties, and locations in

15  this case.  See you in 30 minutes.

16         (Jury not present)

17         THE COURT:  OK.  I will see counsel in 30 minutes.

18         One other thing.  You can all sit down.  One of the

19  things I guess we should discuss.  Let me tell counsel what my

20  intentions are with the alternates, and then I will hear from

21  counsel.

22         My intention is to not dismiss the alternates from

23  jury duty, but allow them to leave and go home and give them

24  the instructions we've always been giving them not to discuss

25  this case with anyone and not conduct any research.  That way,

Ic4ntay3                          Rebuttal – Mr. Roos

1    if we need them at some point to substitute for one of the

2    deliberating jurors, they can.  Defense counsel or the

3    government have any position on that?  Any objection to that

4    rather?

5              MS. FLETCHER:  No objection.

6              MR. CARNESI:  No objection, Judge.

7              THE COURT:  OK.  See you in 30.

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ic4ntay3                    Rebuttal - Mr. Roos

1                         AFTERNOON SESSION

2                           (12:25 p.m.)

3

4            THE COURT:  I didn't get any comments from counsel

5    regarding a verdict form.  Here's a copy of the verdict form,

6    if someone can come get it and share it with counsel.

7            MR. RODRIGUEZ:  Your Honor, I have taken the verdict

8    form from you which we previously received from your chambers.

9    We have reviewed it and have no comments on it.

10            I will hand the copy that the Court gave me to defense

11    counsel.

12            MR. CARNESI:  It is fine.

13            THE COURT:  The other thing I will let you know.  I

14    don't plan on reading the captions for the preliminary portions

15    of the instructions.  I will certainly read the captions when

16    we get to the substantive law in this area, but I am not going

17    to read the captions for things such as role of the jury role

18    of the Court, evidence and so forth.

19            Any objection to that by either side.

20            MR. RODRIGUEZ:  No objection.

21            MR. CARNESI:  No objection.

22            THE COURT:  All right.

23            MR. RODRIGUEZ:  Your Honor, can I raise one question?

24            THE COURT:  Sure.

25            MR. RODRIGUEZ:  The government is sort of inquiring

1    what the Court's plan is with respect to how long the jury can

2    be deliberating today, if the Court is going to send the jury

3    home at 3 o'clock as we have been doing, or you are going to

4    give the jury the option of staying later if that is something

5    that they wants to do.

6              THE COURT:  Here's what my thoughts are, and I will

7    hear from counsel.  My thoughts are we would dismiss them at 3

8    o'clock; however, make ourselves available until 5 o'clock if

9    the jury sends us some sort of note indicating that they would

10   like to deliberate longer today.  We can do that.  But other

11   than that, it would be my intention to simply dismiss them at 3

12   o'clock, as we have been doing.  I don't want to just volunteer

13   to them before they ask anything that we can stay a little bit

14   longer today.  I don't want do anything like that.

15             What are counsel's thoughts on that?

16             MR. CARNESI:  That is fine with me.

17             MR. RODRIGUEZ:  So, your Honor, just to be clear, I am

18   not quite sure I understood.  It sound like the Court's

19   intention is, if the jury asks to stay later, we would make

20   ourselves available to do that until 5 o'clock.

21             THE COURT:  Correct.

22             MR. RODRIGUEZ:  But the Court would in the first

23   instance tell them we are being dismissed at 3?

24             THE COURT:  I don't plan on telling them anything.  I

25   plan on, once they start deliberating, they deliberate.  At 3

Ic4ntay3                          Rebuttal – Mr. Roos

1   o'clock, if we haven't heard anything from them, it would be my

2   intention to bring them out and dismiss them.

3          What may happen is, if they want to stay later,

4   perhaps at 2:52 or 2:53 they will send out a note saying they

5   would like to stay later; or, if they come out at 3 o'clock and

6   I say we are going to dismiss you for the day and people start

7   raising their hands and say, Oh, we'd like to stay longer, then

8   we can deal with that.  If they ask to say longer, I would

9   consult with counsel, but it would be my intention to let them

10  know we available to you until 5 p.m. today.

11         MR. RODRIGUEZ:  Understood, your Honor.  It

12  respectfully it would be the government's preference for the

13  Court to inform the jurors of that potential option rather

14  than, you know, see if there is a possibility of getting a

15  note, which they may not know that the option is available or

16  them otherwise signaling from the jury box, but making clear

17  that the government would have no objection if the Court made

18  clear that we have been dismissing every day at 3 o'clock and

19  so if not everyone is available to stay until 5, that is

20  certainly fine.  But it would be the government's preference to

21  flag that potential option for the jury in some way.

22         THE COURT:  My concern, and again I will hear from

23  defense counsel on this in a second, is that we have been

24  dismissing them at 3 o'clock every day.  If all of a sudden

25  today we suggest to them that they have the option of staying

1   until 5, I'm concerned that that may be putting just a slight

2   bit of pressure on them to think that, oh, we need to come up

3   with a verdict by 5 o'clock today, especially if there are

4   jurors who have other situations and they have to adjust

5   schedules.

6           I would rather them do that on their own, voluntarily

7   say to us they would like to stay later than to suggest

8   something to them once they start their deliberations.  I think

9   that that could be seen as putting a little bit of pressure on

10  them, and I don't want to do that.

11          What's defense counsel's view on that?

12          MR. CARNESI:  I agree with that the Court on that.

13          THE COURT:  Again, as we've seen from this jury, they

14  don't strike me as particularly shy, but we'll see.

15          MR. RODRIGUEZ:  Understood, your Honor.  The

16  government doesn't necessarily see that risk, but we have no

17  objection to proceeding that way.

18          THE COURT:  OK.  The jurors do know that the plan is

19  that we will not be sitting tomorrow.  They know that.  So that

20  may be another reason why they might on their own suggest to us

21  that we stay late, and, if so, we can do that.

22          MR. RODRIGUEZ:  Understood.  Thank you.

23          THE COURT:  I don't want to suggest that to them in

24  the first instance.

25          Is the jury ready, Tara.

1           THE DEPUTY CLERK:  Yes, Judge.

2           THE COURT:  Bring them in.

3           (Jury present)

4           THE COURT:  Please be seated.

5           I am going to now give you the instructions on the

6    law.  It's important that you listen to my instructions but you

7    don't need to take notes, because when you start your

8    deliberations each of you is going to be given a written copy

9    of these instructions.

10          It is my duty at this point to instruct you on the

11   law.  It is your duty to accept these instructions and apply

12   them to the facts as you determine them.  Regardless of any

13   opinion you may have as to what the law may be or should be, it

14   would violate your duty to base a verdict on any other view of

15   the law than the one I give you.  If an attorney has stated a

16   legal principle differently than I state it to you, it is my

17   instructions that you must follow.

18          You should not single out any instruction, but you

19   should consider my instructions as a whole when you retire to

20   deliberate the verdict.  You may take a copy of these

21   instructions with you into the jury room.

22          Your role is to decide the facts of the case.  You are

23   the sole and exclusive judges of the facts.  You must determine

24   the facts based solely on the evidence received in this trial.

25   In determining the facts, you must rely upon your own

1    recollections of the evidence.  What the lawyers have said, for

2    instance, in opening statements, in closes arguments, in

3    objections, or in questions is not evidence.  You should bear

4    in mind particularly that a question put to a witness is not

5    evidence.  It is only the answer that is evidence.

6          The lawyers' arguments are intended to convince you to

7    draw certain conclusions from the evidence or lack of evidence.

8    Those arguments are important.  You should weigh and evaluate

9    them carefully, but you must not confuse them with the

10   evidence.  As to what the evidence was, it is your recollection

11   that governs, not the statements of the lawyers.  You should

12   draw no inference or conclusion for or against any party by

13   reason of the lawyers' making objections or my rulings on those

14   objections.

15         The attorneys have a duty to make legal objections

16   when they think that such objections are appropriate.  You

17   should not be swayed against the government or the defendant

18   simply because counsel for either side has chosen to make an

19   objection.  Similarly, statements made by counsel when arguing

20   the admissibility of evidence are not to be considered as

21   evidence.

22         I remind you also that nothing I have said during the

23   trial or during these instructions is evidence.  Similarly, the

24   rulings I have made during the trial are not any indication of

25   my views of what your decision should be.  My rulings were

1    based solely on issues of law.  Do not concern yourselves with

2    what was said at sidebar conferences or during my discussions

3    with counsel.  Those discussions related to rulings of law and

4    not to matters of fact.

5           The law recognizes two types of evidence, direct and

6    circumstantial.  You may rely on either type of evidence.

7    Direct evidence is evidence that, if believed, directly shows a

8    fact.  For instance, one kind of direct evidence is a witness's

9    testimony about something she knows by virtue of her own

10   senses, something the witness has seen, felt touched or heard.

11   Direct evidence may also be in the form of an exhibit.

12          Circumstantial evidence is a chain of circumstances

13   that indirectly proves a fact.  Stated differently,

14   circumstantial evidence is a fact or series of facts that, if

15   believed, leads to a conclusion that another fact exists.  For

16   example, if a witness testified that she saw it raining

17   outside, and you believed her, that would be direct evidence it

18   was raining.  If someone walked into the courtroom wearing a

19   raincoat covered with drops of water and carrying a wet

20   umbrella, that would be circumstantial evidence from which you

21   could conclude it was raining.

22          Circumstantial evidence is as valuable as direct

23   evidence.  The law makes no distinction between them.  There

24   are times when different inferences may be drawn from the facts

25   whether they are proven by direct or circumstantial evidence.

Ic4ntay3                    Rebuttal - Mr. Roos

1    The government asks you to draw one set of inferences.  The

2    defendants ask you to draw another.  It is for you, and you

3    alone, to decide what inferences you will draw.

4         Much of the evidence you heard was presented to you in

5    the form of testimony from witnesses.  First, let me remind you

6    that it is for you, and you alone, to decide the credibility of

7    witnesses who appeared here and the weight their evidence

8    deserves.  Your determination of the credibility of a witness

9    largely depends upon the impression the witness made upon you

10   as to whether or not he or she was giving an accurate version

11   of what occurred.

12        The degree of credit given to a witness should be

13   determined by his or her demeanor, relationship to the

14   controversy and the parties, bias or impartiality, the

15   reasonableness of the witness's statement, the strength or

16   weakness of the witness's recollection viewed in light of all

17   other testimony, and the attendant circumstances in the case.

18   In passing upon the credibility of a witness, you may also take

19   into account any inconsistencies or contradictions as to

20   material matters in his or her testimony.

21        You may consider whether a witness had, or did not

22   have, a motive to lie.  If a witness had a motive to lie, you

23   may consider whether and to what extent, if any, that motive

24   affected the truthfulness of that witness's testimony.  If a

25   witness did not have a motive to lie, you may consider that as

Ic4ntay3                      Rebuttal - Mr. Roos

1    well in evaluating the witness's truthfulness.

2          If you find that any witness has willfully testified

3    falsely as to any material fact, you have the right to reject

4    the testimony of that witness in its entirety.  On the other

5    hand, even if you find that a witness has testified falsely

6    about one matter, you may reject as false that portion of his

7    or her testimony and accept as true any other portion of his or

8    her testimony.  A witness may be inaccurate, contradictory, or

9    even untruthful in some aspects, and yet be truthful and

10   entirely credible in other aspects of his or her testimony.

11         The ultimate question for you to decide in passing

12   upon credibility is, did the witness tell the truth before you?

13   It is for you to say whether his or her testimony at trial is

14   truthful in whole or in part in light of the witness's demeanor

15   and explanations and all of the evidence in the case.

16         In evaluating the credibility of witnesses, you should

17   take into account any evidence that the witness who testified

18   may benefit in some way from the outcome of this case.  Such an

19   interest in the outcome creates a motive to testify falsely,

20   and may sway the witness to testify in a way that advances his

21   or her own interest.  Therefore, if you find that any witness

22   whose testimony you are considering may have an interest in the

23   outcome of this trial, then you should bear that factor in mind

24   when evaluating his or her credibility and accept it with great

25   care.

Ic4ntay3                    Rebuttal - Mr. Roos

1            This is not to suggest that every witness who has an

2    interest in the outcome of a case will testify falsely.  It is

3    for you to decide to what extent, if at all, a witness's

4    interest has affected or colored his or her testimony.

5            You've heard evidence that, at some earlier time,

6    witnesses have said or done something that counsel argues is

7    inconsistent with their trial testimony.  Evidence of a prior

8    inconsistent statement was placed before you only for the

9    purpose of helping you to decide whether to believe the

10   testimony of a witness who may have contradicted a prior

11   statement he or she made.  If you find that the witness made an

12   earlier statement that conflicts with the witness's testimony,

13   you may consider that fact in deciding how much of the

14   witness's testimony, if any, to believe.

15           In making this determination, you may consider whether

16   the witness purposely made a false statement or whether it was

17   an innocent mistake; whether the inconsistency concerns an

18   important fact or whether it had to do with a small detail;

19   whether the witness an explanation for the inconsistency and

20   whether that explanation appealed to your common sense.

21           It is exclusively your duty, based upon all the

22   evidence and your own good judgment, to determine whether the

23   prior statement was inconsistent, and if so, how much, if any,

24   weight to give to the inconsistent statement in determining

25   whether to believe all or part of the witness's testimony.

Ic4ntay3                          Rebuttal - Mr. Roos

1          Some of you took notes periodically throughout this

2     trial.  I want to emphasize to you that notes are simply an aid

3     to your memory.  Notes that you may have made should not be

4     given greater weight or influence than the recollections or

5     impressions of other jurors with respect to the evidence

6     presented or what conclusions, if any, should be drawn from

7     such evidence.  All jurors' recollections are equal.

8          Some of the exhibits received in evidence at this

9     trial were in the form of charts.  Some of those charts were

10    introduced as summaries.  Summary charts are not themselves

11    direct evidence.  They are instead summaries or analyses of

12    evidence that was received either in the form of documents or

13    testimony.  The charts were intended to assist you in your

14    deliberations.  However, it is the underlying evidence and the

15    weight that you attribute to it that gives value and

16    significance to these charts.  To the extent that the charts

17    conform to what you determine the underlying evidence to be,

18    you should accept them.  To the extent that the charts differ

19    from what you determine the underlying evidence to be, you may

20    reject them.

21         You are to perform the duty of finding the facts

22    without bias or prejudice as to any party.  You are to perform

23    your final duty in an attitude of complete fairness and

24    impartiality.

25         The case is important to the government, for the

1   enforcement of criminal laws is a matter of prime concern to

2   the community.  Equally, it is important to the defendant, who

3   is charged with a serious crime.

4          The fact that the prosecution is brought in the name

5   of the United States of America entitles the government to no

6   greater consideration than that given to any other party.  By

7   the same token, the government is entitled to no less

8   consideration.

9          The indictment is not evidence.  It is an accusation,

10  a statement of what the government intends to prove by offering

11  evidence at trial.  It gives the defendant notice of the

12  charges against him and states the nature of the accusations.

13         Because the indictment is not evidence and does not

14  prove guilt, you are to give it no weight.  Nor are you to

15  attempt to consider how the indictment was obtained.  A

16  defendant begins trial with a clean slate and without any

17  evidence against him or her.  What matters is the evidence that

18  you heard and saw during the trial.

19         The defendant is formally charged in an indictment.

20  The indictment consists of charges or accusations.  It is not

21  evidence.  I will not read the entire indictment to you at this

22  time.  Rather, I will first summarize the offense charged in

23  the indictment.  Then I will explain in detail the elements of

24  the offense.

25         Before I do so, however, I need to define the term

reasonable doubt.  The government must prove each element of the crime beyond a reasonable doubt.  Since, in order to convict the defendant of a given charge, the government is required to prove that charge beyond a reasonable doubt, the question then is, what is a reasonable doubt?  The words almost define themselves.  It is a doubt based upon reason.  It is a doubt that a reasonable person has after carefully weighing all of the evidence.  It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life.  Proof beyond a reasonable doubt must, therefore, be proof of a convincing character that a reasonable person would not hesitate to rely upon in making an important decision.

A reasonable doubt is not caprice or whim.  It is not speculation or suspicion.  It is not an excuse to avoid the performance of an unpleasant duty.  The law does not require that the government prove guilt beyond all possible doubt.  Proof beyond a reasonable doubt is sufficient to convict.

If, after fair and impartial consideration of the evidence, you have a reasonable doubt as to the defendant's guilt, you must find the defendant not guilty.

On the other hand, if, after fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of the defendant's guilt, you should find the defendant guilty.

1          Having defined reasonable doubt, let me discuss the

2     charge.  The indictment charges that the defendant, David

3     Taylor, conspired with others known and unknown to violate the

4     federal narcotics laws in violation of Section 846 of Title 21

5     of the United States Code.  Specifically, the indictment

6     charges the defendant with conspiring to distribute and possess

7     with the intent to distribute oxycodone, which is a controlled

8     substance.  The conspiracy charged in the indictment is alleged

9     to have taken place from at least in or around January 2012 up

10    to and including in or around June 2017.

11         Narcotics conspiracy -- elements of the offense.

12         In order to find David Taylor guilty of the conspiracy

13    charged in the indictment, you must find that the government

14    has proven beyond a reasonable doubt each of the following two

15    elements of the crime:

16         First, the existence of the conspiracy charged in the

17    indictment; in other words, that there was in fact an agreement

18    or understanding to violate those provisions of the law that

19    make it illegal to distribute narcotics;

20         Second, the defendant, David Taylor, knowingly became

21    a member of the conspiracy; that is, that he knowingly

22    associated himself with the conspiracy and participated in the

23    conspiracy to distribute narcotics.

24         The first element -- existence of a conspiracy.

25         The first element that the government must prove

beyond a reasonable doubt is the existence of the conspiracy;

that is, the government must prove beyond a reasonable doubt

that two or more persons came to an agreement or understanding

that would try to accomplish an unlawful purpose.  In this

case, the conspiracy charged is a conspiracy to distribute

oxycodone.

          In order for the government to satisfy this element,

you need not find that the alleged members of the conspiracy

met together and entered into any express or formal agreement.

          Similarly, you need not find that the alleged

conspirators stated in words or writing what the scheme was,

its object or purpose, or every precise detail of the scheme or

the means by which its object or purpose was to be

accomplished.  Indeed, it would be extraordinary if there were

such a formal document or specific oral agreement.  When people

agree to enter into a criminal conspiracy, much is left to

unexpressed understanding.  What the government must prove is

that there was a mutual understanding, either spoken or

unspoken, between two or more people to cooperate with each

other to accomplish an unlawful act.

          You may, of course, find that the existence of an

agreement to disobey or disregard the law has been established

by direct evidence.  However, since conspiracy is by its very

nature characterized by secrecy, you may also infer its

existence from the circumstances of this case and the conduct

Ic4ntay3                    Rebuttal - Mr. Roos

1   of the parties involved.

2              It is not required that any particular number of

3   people join together in order for the government to prove that

4   a conspiracy existed.  You need only find that two or more

5   people entered into the unlawful agreement alleged in the

6   indictment in order for you to find that a conspiracy existed.

7   In a very real sense then in the context of conspiracy cases,

8   actions often speak louder than words.  In this regard, you

9   may, in determining whether an agreement existed here, consider

10  the actions and statements of all of those you find to be

11  participants as proof that a common design existed on the part

12  of the persons charged to act together to accomplish an

13  unlawful purpose.

14             Often, the only evidence available is that of

15  disconnected acts that, when taken together in connection with

16  each other, show a conspiracy or agreement to secure a

17  particular result as satisfactorily and conclusively as more

18  direct proof.

19             Of course, proof concerning the accomplishment of the

20  objectives of the conspiracy may be the most persuasive

21  evidence of the existence of the conspiracy itself.  But it is

22  not necessary that the conspiracy actually succeed in its

23  purpose in order for you to conclude that the conspiracy

24  existed.

25             In short, as far as the first element of the

1   conspiracy is concerned, the government must prove beyond a

2   reasonable doubt that the defendant and at least one other

3   alleged -- I'm sorry.  The government must prove beyond a

4   reasonable doubt that the defendant and at least one other

5   alleged conspirator came to a mutual understanding, either

6   spoken or unspoken, to violate the law in the manner charged in

7   the indictment.

8            Object of the conspiracy.

9            As I have just described, the prosecution must prove

10  beyond a reasonable doubt that the defendant and at least one

11  other alleged conspirator came to a mutual understanding,

12  either spoken or unspoken, to distribute a controlled substance

13  in the manner charged in the indictment.  The second part of

14  the first element relates to the object or objective of the

15  conspiracy.  The object of a conspiracy is the illegal goal the

16  coconspirators agree or hope to achieve.  The indictment

17  charges that the object of the conspiracy was the distribution

18  of a controlled substance, which in this case was oxycodone.

19           "Distribution" means to deliver to pass over, to hand

20  over something to another person or to cause something to be

21  delivered, passed on, or handed over to another.  Distribution

22  does not require a sale, but the term includes sales.

23           Note, however, that the actual quantity of oxycodone

24  involved in the charged conspiracy is not an element of this

25  crime.  So you need not be concerned with quantity in

1    determining whether the defendant is guilty or not guilty of

2    the charge.  Similarly, because quantity is not an element, you

3    need not find that every -- or even a majority -- of the

4    prescriptions written by the defendant were written as a part

5    of the charged conspiracy.

6             As you have heard, oxycodone may be lawfully dispensed

7    for certain prescribed purposes, but because of its highly

8    addictive qualities, it is otherwise prohibited from being

9    dispensed.  A doctor who acts outside the usual course of

10   professional practice and knowingly prescribes oxycodone for no

11   legitimate medical purpose may be found guilty of unlawful

12   distribution.  On the other hand, a doctor who in good faith

13   writes prescriptions for controlled substances such as

14   oxycodone in the regular course of legitimate professional

15   practice does not violate the laws.  Good faith in this context

16   means the honest exercise of best professional judgment.

17            In determining whether a doctor acted without a

18   legitimate medical purpose, you should examine all of the

19   doctor's actions and the circumstances surrounding them.  For

20   example, if a doctor prescribes a drug for the purpose of

21   improving a patient's health or addressing a legitimate medical

22   need, you may consider this as proof that the doctor was

23   prescribing the drug lawfully in the usual course of

24   professional medical practice and for a legitimate medical

25   purpose.  On the other hand, if a doctor prescribes a

1   controlled substance with knowledge that the drug was not being

2   prescribed for a purpose of improving the patient's health or

3   addressing a legitimate medical need or with the knowledge that

4   the recipient of the drug was going to resell it, this may

5   suggest to you that the doctor was acting outside the usual

6   course of professional medical practice and not for a

7   legitimate medical purpose.

8           These examples are neither conclusive or exhaustive.

9   They are simply meant to give you an idea of the kind of

10  behavior from which you might conclude that a doctor was not

11  prescribing drugs for a legitimate medical purpose and was not

12  acting in the usual course of professional medical practice.

13          Thus, the government must prove beyond a reasonable

14  doubt that the object of the conspiracy in which the defendant

15  is charged was to distribute some amount of oxycodone or to

16  cause an amount of oxycodone to be distributed other than for a

17  legitimate medical purpose, other than in good faith, and not

18  in the usual course of medical practice.

19          Conscious avoidance.

20          In determining whether the government has proved

21  beyond a reasonable doubt that the defendant knew that  the

22  object of the conspiracy was the distribution of oxycodone

23  using prescriptions that were written outside the usual course

24  of a medical practice and that were not written for a

25  legitimate medical purpose, you may consider whether the

1    defendant deliberately closed his eyes to what would otherwise

2    have been obvious.  One may not willfully and intentionally

3    remain ignorant of a fact important to one's conduct in order

4    to escape the consequences of criminal law.  The law calls this

5    "conscience avoidance" or "willful blindness."   In other

6    words, the government can prove either that the defendant

7    actually knew the objective of the conspiracy or he consciously

8    avoided knowledge of the object of the conspiracy.

9           Acts done knowingly must be a product of a person's

10   conscious intentions.  They cannot be the result of

11   carelessness, negligence, or foolishness.  But a person may not

12   willfully and intentionally remain ignorant of a fact that is

13   material and important to his or her conduct in order to escape

14   the consequences of criminal law.  We refer to this notion of

15   intentionally blinding yourself to what is staring you in the

16   face as conscious avoidance.

17          An argument by the government of conscious avoidance

18   is not a substitute for proof of knowledge.  It is simply

19   another factor that you, the jury, may consider in deciding

20   what a defendant knew.  Thus, if you find beyond a reasonable

21   doubt that the defendant was aware that there was a high

22   probability that a fact was so, but that the defendant

23   deliberately and consciously avoided confirming this fact, such

24   as by purposely closing his or her eyes to it or intentionally

25   failing to investigate it, then you may treat this deliberate

Ic4ntay3                    Rebuttal - Mr. Roos

avoidance of positive knowledge as the equivalent of knowledge.

That being said, you must also keep in mind that there
is an important difference between knowingly and intentionally
participating in the conspiracy -- which I will explain to you
shortly -- and knowing the specific objective of the
conspiracy.  You may consider conscious avoidance in deciding
whether a defendant knew the objective of the conspiracy, that
is, whether he reasonably believed that there was a high
probability that a goal of the conspiracy was to commit the
crime charged as the object of the conspiracy, but deliberately
avoided confirming that fact and participated in the conspiracy
anyway.  Conscious avoidance, however, cannot be used as a
substitute for finding that the defendant knowingly and
intentionally joined the conspiracy in the first place.  It is
logically impossible for a defendant to intend and agree to
join a conspiracy if he does not actually know it exists.  On
the other hand, if you find beyond a reasonable doubt that the
defendant knowingly chose to participate in such a joint
undertaking, you may consider whether the defendant
deliberately avoided confirming otherwise obvious facts about
the purpose of that undertaking.

In sum, if you find that the defendant believed there
was a high probability that a fact was so and that the
defendant deliberately and consciously avoided learning the
truth of that fact, you may find that the defendant acted

1    knowingly with respect to that fact.  Conversely, if you find

2    that the defendant actually believed the fact was not so, then

3    you may not find that he acted knowingly with respect to that

4    fact.  You must judge from all the circumstances and all the

5    proof whether the government did or did not satisfy its burden

6    of proof beyond a reasonable doubt.

7            Good faith.

8            Let me advise you that a defendant's good faith is a

9    complete defense to the charge in this case.  A doctor who in

10   good faith prescribes drugs in the regular course of a

11   legitimate professional practice is protected from conviction.

12   A doctor acts in good faith when he or she is engaged in the

13   honest exercise of professional judgment and acts with a

14   reasonable belief as to proper medical practice.

15           The burden of establishing criminal intent and lack of

16   good faith rests upon the government.  A defendant is under no

17   burden to prove his or her good faith.  Rather, the government

18   must prove bad faith and an intent to unlawfully distribute

19   oxycodone.

20           Second element -- membership.

21           If you find beyond a reasonable doubt that the

22   conspiracy existed, you must determine separately whether the

23   defendant was a member of that conspiracy.  You must determine

24   not only whether the defendant participated in the conspiracy,

25   but also whether he did so knowingly and intentionally; that

Ic4ntay3                        Rebuttal - Mr. Roos

1    is, he participated in the conspiracy with knowledge of its

2    unlawful purpose and with the specific intention of furthering

3    the charged objective that you have agreed was the goal of that

4    conspiracy.

5          "Intentionally" and "knowingly" defined.

6          The terms "intentionally" and "knowingly" mean that

7    you must be satisfied beyond a reasonable doubt that in joining

8    the conspiracy, if you find that the defendant did join the

9    conspiracy, the defendant knew what he was doing, that he took

10   the actions in question deliberately and voluntarily.

11   Knowledge is a matter of inference from the facts proved.

12         The defendant need not know the full extent of the

13   conspiracy or know all of the activities of the conspiracy, or

14   even who all of the coconspirators are.  Indeed, a single fact

15   may be enough to bring the defendant within the membership of

16   the conspiracy, provided that the defendant was aware of the

17   conspiracy and knowingly associated himself with its criminal

18   objective.

19         Of course, mere association with a conspirator or a

20   mere presence at a place where a conspiracy is going on does

21   not make someone a member of the conspiracy.  Nor is knowledge

22   without participation sufficient.  What is necessary is that

23   the defendant participated with knowledge of the unlawful

24   object of the conspiracy and with intent to aid in the

25   accomplishment of that end.

1              If you find that the conspiracy existed and that the

2    defendant participated knowingly and intentionally in it, the

3    extent of the defendant's participation has no bearing on

4    whether or not he is guilty.

5              The fact that the defendant's participation in a

6    conspiracy was more limited than that of a coconspirator should

7    not affect your verdict.  It is not necessary for the

8    government to show that the defendant received or anticipated

9    any financial benefit from his participation in the conspiracy,

10   so long as he participated in it in the way that I have

11   explained.

12             The question is, has the government proven beyond a

13   reasonable doubt that the defendant joined the conspiracy and

14   knowingly and intentionally participated in it with the

15   awareness of its basic purpose and as something he wished to

16   bring about?

17             Time of conspiracy.

18             If you find that the defendant was a knowing and

19   intentional participant in the conspiracy, the point at which

20   the defendant joined the conspiracy is not relevant to your

21   decision.

22             (Continued on next page)

23

24

25

1          THE COURT:  The defendant may join a conspiracy at any

2     point during its progress and be held responsible for all that

3     went on before he joined and all that occurs thereafter.  With

4     respect to the time period for the conspiracy alleged in the

5     time, it is sufficient if you find that the defendant was a

6     member of the conspiracy for some time within the period of in

7     or around January 2012 through on or about June 2017.

8          In making this determination, you should bear in mind

9     that once you find that a person has knowingly and

10    intentionally participated in a conspiracy to violate the law

11    for some time within the period charged, he is presumed to

12    continue as a member of the conspiracy unless he proves that he

13    took affirmative steps to withdraw from the conspiracy or that

14    he conspiracy ended.

15         Liability for acts and declarations of coconspirators.

16    When people enter into a conspiracy to accomplish and unlawful

17    end, they become agents or partners of one another in carrying

18    out the conspiracy.  In determining the facts, you may consider

19    any acts or statements made by any of the people that you find

20    to have been coconspirators even though such acts or statements

21    were not made in the defendant's presence or with the

22    defendant's knowledge.

23         Concluding instructions:  Venue.  In addition to

24    evaluating the elements of each offense, you must also consider

25    the issue of venue as to each offense.  The government must

IC46TAY4                      Charge

1    establish what is called venue, which means that some act in

2    furtherance of that charge occurred in the Southern District of

3    New York.  The Southern District of New York includes

4    Manhattan, the Bronx, Westchester, Dutchess, Putnam, Orange,

5    Sullivan, and Rockland counties, the waterways surrounding

6    those counties including the East River, the Hudson River, the

7    Arthur Kill, and Kill van Kull, and all the bridges that

8    traverse those waterways, including the Verrazano-Narrows

9    Bridge, which traverses the Narrows, the body of water

10   separating Staten Island and Brooklyn; and the Bayonne Bridge

11   which traverses the Kill van Kull, the body of water separating

12   Staten Island and Bayonne, New Jersey; the Goethals Bridge,

13   which transfers the Kill van Kull, the body of water separating

14   Staten Island and Elizabeth, New Jersey; and Outerbridge

15   Crossing, which traverses the Arthur Kill, the body of water of

16   separating Staten Island and Perth Amboy, New Jersey.

17          Venue is proven if any act in furtherance of the crime

18   you are considering occurred in the Southern District of New

19   York regardless of whether it was the act of the defendant or

20   anyone else.  Furthermore, on the issue of venue only, the

21   government can meet its burden by a preponderance of the

22   evidence rather than proof beyond a reasonable doubt.  That

23   means the government can meet its burden by showing that it was

24   more likely than not that an act in furtherance of a given

25   crime occurred in the Southern District of New York.

1          Uncalled witness equally available.  There are several

2    people whose names you have heard during the course of the

3    trial, but who did not appear here to testify.  Both the

4    government and the defendant have the same power to subpoena

5    witnesses to testify on their behalf.  If a potential witness

6    could have been called by the government or by a defendant and

7    no one called the witness, then you may draw the conclusion

8    that the testimony of the absent witness might have been

9    unfavorable to the government or to the defendant or to both.

10   On the other hand, you may choose to draw no inference at all

11   from the failure of either side to call a witness.

12         You should remember that there is no duty on either

13   side to call a witness whose testimony would be merely

14   cumulative of testimony already in evidence or who would merely

15   provide additional testimony to facts already in evidence.

16         You should also remember that the law does not impose

17   on a defendant in a criminal case the burden or duty of calling

18   any witness or producing any evidence.

19         Law enforcement and government employee witnesses.

20   You have heard testimony of law enforcement officers and

21   employees of the government.  The fact that a witness is

22   employed by the government does not mean that his or her

23   testimony is necessarily deserving of more or less

24   consideration or greater or lesser weight than that of any

25   other witness.  It is legitimate for defense counsel to attack

IC46TAY4                         Charge

the credibility of a law enforcement or government witness like
any other witness.  It is your decision after receiving all of
the evidence whether to accept or reject the testimony of the
witness and to give that testimony whatever weight you find it
deserves.

Expert witness.  You have heard expert testimony from
Dr. Christopher Gharibo.  An expert is someone who by education
or experience has acquired learning or experience in a
specialized area of knowledge.  Such a witness is permitted to
give his opinions as to relevant matters in which he is
qualified as an expert and give his reasons or his opinions.
You should consider the expert opinion that was received in
evidence and give it as much or as little weight as you think
it deserves.  If you decide that the opinion of an expert was
not based on sufficient education or experience or on
sufficient data or if you conclude that the trustworthiness or
credibility of the expert is questionable for any reason or if
the opinion of the expert was outweighed in your judgment by
other evidence in the case, then you may discard the opinion of
the expert entirely or in part.

On the other hand, if you find that the opinion of the
expert is based on sufficient data, education, and experience
and the other evidence does not give you any reason to doubt
his conclusions, you may rely on his testimony in whole or in
part.

IC46TAY4                         Charge

1        You should not, however, accept a witness's testimony

2   merely because he is an expert nor should you substitute it for

3   your own reason, judgment and common sense.

4        Persons not on trial or not indicted.  You may not

5   draw any inference favorable or unfavorable towards the

6   government or the defendant from the fact that any person other

7   than the defendant is not on trial here.  You may not speculate

8   as to the reasons why other persons are not on trial.  Those

9   matters are wholly outside your concern and have no bearing on

10  your function as jurors.

11       Cooperating witness testimony.  You also heard from

12  witnesses who testified they were involved in criminal conduct

13  and have subsequently pled guilty pursuant to what is called a

14  cooperation agreement with the government.  Your concern is

15  whether a witness has given truthful testimony in court.

16  Whether or not you approve of the use of cooperating witnesses

17  to detect and investigate unlawful activities is not to enter

18  into your deliberations in any way.  The government sometimes

19  must rely on the testimony of witnesses who have pleaded guilty

20  and are cooperating.  Indeed, the testimony of a single

21  accomplice witness may be enough in itself for conviction if

22  you believe that the testimony establishes guilt beyond a

23  reasonable doubt.

24       You should scrutinize and view with caution the

25  testimony of any witness who has signed a cooperation

1   agreement.

2           In doing so, you should ask yourself whether the

3   witness would benefit more from lying or by telling the truth.

4   Was his testimony made up in any way because he believed or

5   hoped he would receive favorable treatment by testifying

6   falsely?  Or did he believe that his interest would be best

7   served by testifying truthfully?  If you believe that the

8   witness was motivated by hopes and personal gain, was the

9   motivation one that would cause him to lie or was it one that

10  would cause him to tell the truth?  Did the motivation color

11  his testimony?

12          In sum, you should look at all of the evidence in

13  deciding what credence and what weight, if any, you'll want to

14  give to the cooperating witness.

15          Witnesses who pled guilty.  You have heard testimony

16  from a witness who pled guilty arising out of the same facts as

17  this case.  You are to draw no conclusions or inferences of any

18  kind about the guilt of the defendant on trial here from the

19  fact that a witness pled guilty to similar charges or unrelated

20  charges.  A decision of a witness to plead guilty is his own

21  personal decision.  It may not be used by you in any way as

22  evidence against or unfavorable to the defendant on trial here.

23          Nonprosecution agreements.  You have heard the

24  testimony of individuals who entered into nonprosecution

25  agreements with the government.  What this means is that the

1    testimony of the witness may not be used against him in any

2    criminal case unless he commits the crime of perjury or

3    otherwise fails to comply with the nonprosecution agreement

4    with the government.

5            The government is permitted to make these kinds of

6    promises and is entitled to call as witnesses people to whom

7    such promises are given.  The fact that the government as

8    agreed not to prosecute a witness does not disqualify him or

9    her from testifying and does not preclude you from accepting

10   that testimony as true.  You may convict the defendant on the

11   basis of such a witness's testimony alone if you find that the

12   testimony proves the defendant guilty beyond a reasonable

13   doubt.

14           I must also caution you that it is no concern of yours

15   why the government made an agreement with a particular witness.

16   Your sole concern is whether the witness has given truthful

17   truthful testimony here in this courtroom before you.

18           The testimony of a witness who has entered into a

19   nonprosecution agreement with the government like that of a

20   cooperating witness should also be examined by you with greater

21   care.  You should scrutinize it closely to determine whether or

22   not it is colored in such a way as to place guilt upon the

23   defendant in order to further the witness's own interests.

24           Preparation of witnesses.  You have heard evidence

25   during the trial that witnesses have discussed the facts of the

1   case and their testimony with the lawyers before the witnesses

2   appeared in court.

3           Although you may consider that fact when you are

4   evaluate witness's credibility, I should tell you there is

5   nothing either unusual or improper about a witness meeting with

6   lawyers before testifying so that the witness can be aware of

7   the subjects he will be questioned about, focus on those

8   subjects, and have the opportunity to review relevant exhibits

9   before being questioned about them.  Such consultation helps

10  conserve your time and the Court's time.  In fact, it would be

11  unusual for a lawyer to call a witness without such

12  consultations.

13          Again, the weight you give to the fact or the nature

14  of the witness's preparation or his or her testimony and what

15  inferences you draw from such preparation are matters

16  completely within your discretion.

17          A defendant's right not to testify.  David Taylor did

18  not testify in this case.  Under our Constitution, a defendant

19  has no obligation to testify or to present any evidence because

20  it is the government's burden to prove guilt beyond a

21  reasonable doubt.  That burden remains with the government

22  throughout the entire trial.  A defendant is never required to

23  prove that he is innocent.  You may not attach any significance

24  to the fact that a defendant did not testify.  No adverse

25  inference against him may be drawn by you because he did not

1   take witness stand.  You may not consider this in any way in

2   your deliberations.

3          Similar acts.  You have heard evidence that the

4   defendant engaged in conduct similar in nature to the contact

5   charged in the indictment.  Let me remind you that the

6   defendant only is on trial for committing the conspiracy

7   alleged in the indictment.  Accordingly, you may not consider

8   this evidence as similar acts as substitute for prove that the

9   defendant committed the crime charged.  Nor may you consider

10  this evidence that the prove that the defendant has criminal

11  personality or bad character.  This evidence was admitted for a

12  more limited purpose and you may consider it for that purpose

13  only.

14         If you determine that the defendant committed the acts

15  charged in the indictment and the similar acts as well, then

16  you may but you need not draw an inference that in doing the

17  acted charge the in the indictment the defendant acted

18  knowingly and intentionally and not because of some mistake,

19  accident or other reasons.

20         Nevertheless, the evidence of similar conduct is to be

21  considered by you only for the purpose for which it was

22  admitted and not for any other purposes.  Specifically, you may

23  not consider it as evidence a that the defendant is bad

24  character or has a propensity to commit crime.  Particular

25  investigative techniques not required.  Techniques used by the

1    government in deciding whether the government has met its

2    burden of proof because you should look to all of the evidence

3    or lack of evidence in deciding whether the defendant is

4    guilty.  However, you are also instructed that there is no

5    legal requirement that the government use any specific

6    investigative techniques to prove its case whether you approve

7    or disapprove of various law enforcement techniques is not the

8    question.  You should determine whether or not based on the

9    evidence or lack of evidence the defendant's guilt has been

10   proven beyond a reasonable doubt.

11          Use of evidence obtained pursuant to search.  You have

12   heard testimony about evidence seized and searched conducted by

13   law enforcement officials.  Evidence obtained from these

14   searches was properly admitted and may be properly considered

15   by you.  Whether you prove or disapprove of how it was obtained

16   should not enter into your deliberations.  You must therefore,

17   regardless of your personal opinions, give this evidence full

18   consideration along with all the other evidence in determining

19   whether the government has proved the defendant's guilt beyond

20   a reasonable doubt.

21          Use of recordings and transcripts.  The government has

22   offered evidence in the form ever recorded conversations and

23   transcripts of those conversations.  Whether you approve or

24   disapprove of the recording of these conversations may not

25   enter into your deliberations.  I instruct you that the

1    recordings were made in a lawful manner and that no one's

2    rights were violated and that this evidence was properly

3    admitted at this trial.  You must therefore regardless of any

4    personal opinions consider this evidence as you would any other

5    evidence in this case and make your determination as to its

6    meaning and significance, if any, in evaluating whether the

7    government has proven beyond a reasonable doubt the guilt of

8    the defendant.  The transcripts recording were provided to you

9    as aides.  The recordings themselves are the evidence.  If you

10   wish to view or hear any of the recordings with transcripts,

11   they will be made available to you.

12           Stipulations.  Stipulations have been entered into

13   relating to various facts in this case.  A stipulation of fact

14   is an agreement between the parties that a certain fact is

15   true.  You must regard such agreed facts as true.  You have

16   also heard evidence in the form of stipulations of testimony.

17   A stipulation of testimony is an agreement even among the party

18   if called witness would have given certain testimony.  You must

19   accept as true a fact that the witness would have given the

20   testimony.  However, it is for you to determine the

21   significance of that testimony.

22           Deliberations of jury.  Presumption of innocence and

23   the burden of proof.  The defendant has pled not guilty to the

24   charges as a result the burden is on the government to prove

25   guilt beyond a reasonable doubt.  This burden never shifts to a

1    defendant and never imposes upon the defendant the burden or

2    duty of testifying calling any witnesses or locating or

3    producing any evidence.  The law presumes the defendant is

4    innocent.  This presumption of innocence alone is sufficient to

5    acquit the defendant.  This presumption was with the defendant

6    when the trial began and remains with the defendant unless and

7    until you're convinced that the government as proven the

8    defendant's guilt beyond a reasonable doubt.

9              Punishment is not to considered by the jury.  You

10   should not consider the question of possible punishment of the

11   defendant in determining if he is guilty of the crimes charged.

12   Sentencing is exclusively the function of the Court.  It is not

13   your concern and you should not give any consideration to that

14   issue in deciding what your verdict will be.  Therefore, I

15   instruct you not to consider punishment or possible punishment

16   at all in job deliberations in this case.

17             Simply or prejudice.  You are not to be swayed by

18   sympathy or principle advertise you are to be guided solely by

19   the evidence in this case.  It is for you to alone to decide

20   whether the government has proven the defendant is guilty of

21   the crime charged solely on the basis of the evidence and

22   subject to the law as I given it to you.  If you have a

23   reasonable doubt as to the defendant's guilt, you should not

24   hesitate to acquit the defendant.  On the other hand, if you

25   should find that the government has met its burden of proving

IC46TAY4                     Charge

1    the defendant's guilt beyond a reasonable doubt, you should not

2    hesitate because of sympathy or any other reason to render a

3    verdict of guilty.

4           Request to see testimony and Exhibits.  You are about

5    to go into the jury room and begin your deliberations.  If

6    during those deliberations you want any of the exhibits or any

7    specific portions of testimony, the exhibit will punished to

8    you to to you be the testimony will be provided to you.  Please

9    remember it is not always easy to locate testimony is to to

10   being as specific as you possibly can be in any request for

11   testimony.  A vague or overbroad request for testimony can lead

12   to delays.

13          Selection of a foreperson and communications with the

14   Court.  The foreperson will preside over your deliberation and

15   will be the spokesperson in court.  This is done simply for the

16   convenience.  It gives him or her no greater authority, and his

17   or her vote has no greater weight than any other jurors.  You

18   are free to select any foreperson you like.  Any communication

19   with the Court is to be made to me in writing, signed by your

20   foreperson and given to one of the marshals.  I will respond to

21   any questions or requests you have as promptly as possible

22   either in writing or by having you return to the courtroom so I

23   can speak with you in person.

24          The verdict must be unanimous.  Your function now is

25   to weigh the evidence in this case and to determine if the

1    government as proven the crimes charged.  You must base your

2    verdict solely on the evidence or lack of evidence and these

3    instructions as to the law.  You're obligated to follow the law

4    as I instruct you whether you agree or disagree with a

5    particular law in question.

6         The verdict must represent the considered judgment of

7    each juror.  In order to return a verdict, it is necessary that

8    each juror agrees to it.  Your verdict must be unanimous.  You

9    should consult with one another and deliberate with a goal of

10   reaching an agreement.  Each of you must decide the case for

11   himself or herself, but do so only after impartial discussion

12   and consideration of all of the evidence with your fellow

13   jurors.  Do not hesitate to re-examine your own views and

14   change your opinion if convinced it is erroneous; but do not

15   surrender your honest conviction as to the weight or effective

16   evidence solely because of the opinion of your fellow jurors.

17        Remember, you are the judges of the facts.  Your sole

18   interest is to determine whether the government has proven the

19   crime charged beyond a reasonable doubt.  If you are divided,

20   do not report on how the vote stands.  When you reach a

21   verdict, do not report what it is until you have been

22   instructed to do so.  In conclusion, ladies and gentlemen, I am

23   sure that if you listen to the views of your fellow jurors and

24   if you apply your own common sense, you will reach a fair

25   verdict here.  Remember, that your verdict must be rendered

IC46TAY4                          Charge

1   without fear, without favor, and without prejudice or sympathy.

2   I have prepared a verdict form for you to use and you should

3   record the verdict you reach unanimously on it.

4            Let me just speak with counsel at side bar.

5            I will be right back.

6            (Continued on next page)

1          (In robing room)

2          THE COURT:  I made a few edits on the fly.

3          Any objection to my reading of the instructions by the

4    government?

5          MR. RODRIGUEZ:  No, your Honor.

6          THE COURT:  By the defendant?

7          MR. CARNESI:  No, your Honor.

8          THE COURT:  We'll go ahead and we'll have the marshal

9    sworn in.

10          Let me go through the corrections that I noted.

11          On several pages it mentioned "crimes" that the

12    defendant was charged with instead of "crime."  I made that

13    singular instead of plural.  We'll make those corrections.

14          On page 10 it had "offenses."  I made that "offense."

15    It also had "crimes" and I made that "crime."

16          On page 21:  You may not draw any inference, favorable

17    or unfavorable, toward the government or the defendants.  I

18    made that singular, "the defendant."

19          Page 27:  It is for you alone to decide whether the

20    government has proven that the defendant is guilty of the

21    crimes charged.  I made that "crime."

22          On page 29, third paragraph:  You're sole interest is

23    to determine whether the government has proven the crimes

24    charged.  I made that "crime."

25          We'll make those corrections.  I will have the marshal

IC46TAY4                              Charge

1    sworn.

2              Let me check with counsel on how you want to do this.

3    This is my intention:  I will have the alternate jurors go into

4    the jury room and grab their belongings and come back out and

5    then I will tell them that they are still on jury duty but

6    we're going to allow them to come home but they may not discuss

7    this case with anyone else.  They may not do any independent

8    research.  It may be necessary at some point that we might need

9    to substitute them for one of the deliberating jurors, but my

10   deputy will be in touch with them and then we let them go.  My

11   plan will be to let the other jurors start deliberating.

12             Any objection to that by the government or defense?

13             MR. RODRIGUEZ:  No, your Honor.

14             MR. CARNESI:  No, your Honor.

15             THE COURT:  Anything else we need to do?

16             MR. ROOS:  No, your Honor.

17             THE COURT:  I will let the jurors know.  I can let

18   them know that we'll give them a copy of the instructions as

19   soon as they are ready, or I can be silent on it.  What are the

20   parties druthers?  I can be silent and they will get it when

21   they get it.

22             Government and defense, fine?

23             MR. RODRIGUEZ:  That's fine.

24             MR. CARNESI:  That's fine.

25             (Continued on next page)

1          (In open court; jury present)

2          THE COURT:  I will ask my wonderful and talented

3    deputy to swear the marshal.

4          THE DEPUTY CLERK:  Please raise your right hand.

5          (Marshal sworn)

6          THE COURT:  Now, I am going ask the four alternate

7    jurors to go into the jury room and retrieve your belongings

8    and come back out.

9          (Pause)

10         THE COURT:  You can stand over there.  Step over

11   closer to the television.

12         So for the four alternate jurors, here is what is

13   happening:  You are not dismissed from jury duty.  You are not

14   finished with jury duty, but I am going to allow you to go home

15   and go on about your usual course of business.  It may be

16   necessary to substitute you for one of regular deliberating

17   jurors.

18         Do not discuss this case with anyone.  Don't allow

19   anyone to discuss this case with you.  Don't conduct any

20   independent research about any of the issues or the parties or

21   the locations in this case.  My deputy will be in touch with

22   you later if we need to have you substitute for one of the

23   deliberating jurors.  And if not, my deputy will be in touch

24   with you if your duty ends at some point.

25         Thank you very much.  Again, don't discuss this case

IC46TAY4                         Charge

1   with anyone else or let anyone discuss this with you.

2            (Pause)

3            For the 12 jurors, you are going to begin your

4   deliberations shortly.  I will give you another instruction.

5   Once you start your deliberations, you are free to discuss this

6   case with each other obviously but do not discuss this case

7   with anyone else outside of the jury room.  If someone needs to

8   step outside to take a smoke break or a walk, you have to stop

9   your deliberations and you may not resume them until unless all

10  of them are together in the jury room.

11           You may begin your deliberations.

12           (Jury excused)

13           (Continued on next page)

IC46TAY4                          Charge

1          THE COURT:  I think defense counsel you may still have

2     the printed out version of the verdict sheet.?

3          MR. CARNESI:  Yes, I do.

4          THE COURT:  Hand that to the government and make sure

5     again we're working on the right copy.

6          Everyone can sit down.

7          We'll make that Court Exhibit 1 and we'll send that

8     into the jury.

9          Any objection to that going in?

10         MR. CARNESI:  No, your Honor.

11         MR. RODRIGUEZ:  No, your Honor.

12         THE COURT:  My law clerk will make those minor

13    corrections in the instructions and we'll make the jury

14    instructions Court Exhibit 2 and then we'll have one for each

15    juror.

16         It will be A through?

17         THE DEPUTY CLERK:  A through L, Judge.

18         THE COURT:  A through L.

19         Any objection to that?

20         MR. CARNESI:  No.

21         THE COURT:  What we'll do is make those corrections.

22    We'll have that brought up to counsel to make sure that

23    conforms with everybody.

24         Anything else from the government or defense at this

25    point?

IC46TAY4                           Charge

1          MR. RODRIGUEZ:  No, your Honor.

2          MR. CARNESI:  No, your Honor.

3          THE COURT:  We'll make those corrections.

4          See you soon.

5          (Recess pending verdict)

6          THE COURT:  Okay.  Let me ask counsel to look.  We

7   made the changes on the jury instructions.  Have counsel look

8   at that and if it is okay and if so we'll send in the

9   instructions to all of the jurors.

10         MR. RODRIGUEZ:  Everything is fine from the

11  government.

12         MR. CARNESI:  It's fine with me, your Honor.

13         THE COURT:  Both sides consent to sending those

14  instructions into the jury?

15         MR. RODRIGUEZ:  Yes, your Honor.

16         MR. CARNESI:  Yes, your Honor.

17         THE COURT:  We have those marked A through L?

18         THE DEPUTY CLERK:  Yes, Judge.

19         THE COURT:  Send them in.

20         Counsel, while we're waiting on the jury, you don't

21  have to sit here in the courtroom.  Just don't go too far away.

22  My deputy has your cell phone numbers if you want to step

23  outside and walk around a little bit.  If you haven't heard

24  anything from us, definitely come back by 3:00 in any event.

25         MR. RODRIGUEZ:  Yes, your Honor.  Thank you.
           (Recess pending verdict)

IC46TAY4                          Charge

1           THE COURT:  It's 3:00.  I will bring the jury out and

2     tell them that we're going to dismiss them for the day, remind

3     them again not to discuss the case with anyone else, not to

4     conduct any independent research, and have them come back here

5     Thursday at 9:30.  I will remind them that they will go

6     straight to the jury room but they cannot start their

7     deliberations until all of the jurors have arrived.

8                Any objection to that by government or the defense?

9                MR. CARNESI:  No, your Honor.

10               MR. RODRIGUEZ:  No, your Honor.

11               THE COURT:  If the jurors come out here and start

12    jumping up and down, then we'll deal with that then.

13               Let's bring the jury in.

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

IC46TAY4                         Charge

1          (In open court; jury present)

2          THE COURT:  It's 3:00.  We're going dismiss you for

3    the day.  I will ask you to get here at 9:30 on Thursday.

4    Remember we're not sitting tomorrow.  On Thursday you go

5    straight to the jury room but you may not start your

6    deliberations until everyone is there.  When everyone has

7    arrived in the jury room, you may resume your deliberations.

8    Again, as always do not discuss this case with anyone else.

9    Don't allow anyone to discuss it with you except when you are

10   all assembled together in the jury room.  Don't conduct any

11   independent research regarding any of the issues, parties or

12   locations in this case.

13          Have a wonderful evening.  Again, Thursday you will

14   come here.  You will not need to come out but you will go

15   straight to jury room and resume your deliberations.

16          See you on Thursday.

17          (Jury excused)

18          (Continued on next page)

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  I didn't see any jurors making any frantic

3     gestures.  Did anyone else?

4              MS. FLETCHER:  I am loathe to say what I heard jurors

5     say in the courtroom.  We heard two jurors discuss amongst

6     themselves whether they should ask the Court something and they

7     said it is never too late and then they walked out.

8              THE COURT:  Defense counsel?

9              MR. CARNESI:  No.

10             THE COURT:  In light of what the government said, we

11    can ask counsel to stay a few minutes.

12             MS. FLETCHER:  I presume the jurors are already on

13    their way out of the building.

14             THE COURT:  Just to be safe let's have counsel hang

15    out another three minutes.  My deputy has your contact

16    information.  It's not necessary for counsel to get here at

17    9:30.  I think that the government's office is relatively close

18    to here unless you moved offices or you are at some satellite

19    office.

20             Mr. Carnesi, how far is your office from here?

21             MR. CARNESI:  Far enough that I will be here if not

22    9:30, 10:00.

23             THE COURT:  Let's have counsel check in either in

24    person or by telephone with my deputy at, say, 10:00.

25             MR. CARNESI:  Thank you.

1           THE COURT:  In light of what counsel for the

2    government just said that they believe that they overheard

3    jurors saying, it doesn't seem it is necessary or appropriate

4    for to us make any inquiry, but let me just check in with

5    counsel.

6                Counsel for government or defense?

7                MR. CARNESI:  I have no request, Judge.

8                MR. RODRIGUEZ:  Or the government.

9                THE COURT:  No request for me to do anything about

10   that at all, counsel for the government and defense?

11               MR. CARNESI:  No, your Honor.

12               MR. RODRIGUEZ:  Correct, Judge.

13               THE COURT:  See you.

14               (Adjourned to December 6th, 2018, 9:30 a.m.)